```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,      ) Criminal
                                      ) No. 17-201
4                     Plaintiff,      )
                                      ) Status Conference
5      vs.                            )
                                      ) Washington, DC
6      PAUL JOHN MANAFORT, JR.        ) December 11, 2017
       RICHARD W. GATES, III,         ) Time:  9:30 a.m.
7                                     )
                      Defendants.     )
8      _____

9                 TRANSCRIPT OF STATUS CONFERENCE
                          HELD BEFORE
10         THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
11     _____

12                    A P P E A R A N C E S

13     For the Plaintiff:     ANDREW WEISSMANN
                              GREG D. ANDRES
14                            KYLE R. FREENY
                              U.S. Department of Justice
15                            Special Counsel's office
                              950 Pennsylvania Avenue NW
16                            Washington, D.C.  20530
                              202-514-1746
17

18     For Defendant Manafort: KEVIN M. DOWNING
                              815 Connecticut Avenue, N.W.
19                            Suite 730
                              Washington, D.C. 20006
20                            (202) 754-1992

21                            THOMAS EDWARD ZEHNLE
                              Miller & Chevalier, Chartered
22                            900 Sixteenth Street, NW
                              Washington, DC 20006
23                            (202) 626-5800
                              Email:  Tzehnle@milchev.com
24

25
```

```
1    For Defendant Gates:        SHANLON WU
                                 Wu, Grohovsky & Whipple
2                                1300 Pennsylvania Avenue, NW
                                 Suite 700
3                                Washington, DC 20004
                                 (202) 204-3053
4                                Email:  Swu@dcwhitecollar.com

5                                Walter Mack
                                 DOAR RIECK DeVITA KALEY & MACK
6                                217 Broadway
                                 Suite 707
7                                New York, NY 10005
                                 (212) 619-3730
8                                Email:  Wmack@doarlaw.com

9
     ALSO PRESENT:               Andre Sidbury, Pretrial Officer
10

11   _____

     Court Reporter:             Janice E. Dickman, RMR, CRR
12                               Official Court Reporter
                                 United States Courthouse, Room 6523
13                               333 Constitution Avenue, NW
                                 Washington, DC  20001
14                               202-354-3267

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Your Honor, this morning we

2     have criminal case number 17-201-1 and -2, the United States

3     of America v. Paul Manafort, Jr., and Richard Gates, III.

4     Both Mr. Manafort and Mr. Gates are present in the

5     courtroom.  The pretrial services agency officer that's

6     present is Mr. Sidbury.

7          Will counsel for the parties please approach the

8     lectern, identify yourself for the record and the party that

9     you represent.

10          MR. ANDRES:  Good morning, Your Honor.  Greg

11     Andres for the special counsel's office.

12          THE COURT:  Good morning.

13          MR. DOWNING:  Good morning, Your Honor.  Kevin

14     Downing and Thomas Zehnle for Mr. Manafort.

15          MR. WU:  Good morning.  Shanlon Wu for Mr. Gates.

16     And with me is Mr. Walter Mack.

17          MR. MACK:  Walter Mack.

18          THE COURT:  Good morning.  We have a number of

19     things on the agenda today.  And I would actually like to

20     try to touch on all of them.

21          First of all are just general scheduling and

22     discovery issues, the typical subject matter of a status

23     conference at this stage in the proceedings.  I also issued

24     an order to show cause concerning the order related to

25     communications with the media with respect to Mr. Manafort.

1   Mr. Manafort has a pending motion for a review of his bond

2   conditions.  I want to just talk about bond conditions and

3   dealing with pretrial services, briefly.  And then we also

4   have -- there is a motion pending related to Mr. Mack's

5   representation of Mr. Gates, that since I have the benefit

6   of Mr. Mack's presence, probably want to deal with today.

7         I don't know if counsel have any other issues they

8   want to put on the table, but that ought to hold us for most

9   of the morning.

10        Let's start with just where we are, the status of

11  the matter.  This is a status hearing.  I received your

12  status report, and I appreciate the fact that the parties

13  are working together to come up with a schedule that

14  provides for things like Jencks material being provided well

15  in advance of trial, which I think is important.  I'm not

16  sure the status report talked about the reciprocal

17  obligations that will attach if and when that happens, but

18  I'm sure the defense knows about it.

19        I want to underscore that I don't think a Jencks

20  schedule trumps your Brady obligations.  If you find

21  something that's favorable to the defense, you don't hold on

22  to it because you don't owe them Jencks until four weeks

23  before trial.  Your 404(b) procedure made sense, but it all

24  seemed to be we're going to give you notice of what we're

25  going to introduce X weeks before trial.  I want to

1    underscore, it's not just a notice issue, they might

2    actually object and I might have to rule on it.  So after

3    you tell them what you intend to introduce and they get two

4    weeks to oppose it and you get to reply, now we're down to

5    three weeks before trial.  And it needs to be decided well

6    in advance of trial because it will affect your exhibit

7    list, their defense.  And so, we might need something that's

8    a little more expansive, once we know what the trial date is.

9         And I guess one question I had:  Is any discovery

10   related to the anticipated 404(b) evidence included in the

11   cache of materials they've been provided at this point, or

12   were you anticipating waiting until just before trial?

13        MR. ANDRES:  So, Judge, on your last question, we

14   would produce the 404(b), the discovery that related to

15   that, well ahead of the trial, together with the rest of the

16   404(b).

17        And if I could just address some of the other

18   issues.  Obviously, in our status report we also noted that

19   in addition to four discovery letters, we had produced a

20   Brady letter, too -- or, Brady or information that was

21   potentially helpful to the defense.  So, we're not

22   conflating that with our Jencks Act obligations, we'll be

23   doing that on a rolling basis and continue to do that.

24        Just in terms of the what's next, we've had the

25   opportunity to talk to defense counsel and have had some

1    very cooperative discussions with them about discovery,

2    about next steps and the like.  In light of all the

3    discovery that's been produced, I think what we would ask

4    for, and my sense from our discussions with defense counsel,

5    is we would ask for another status conference in 30 days.

6    Before that time the government anticipates that it will be

7    substantially done with discovery.  We've produced quite a

8    bit of material already.  We have some outstanding

9    electronic devices and the like that have to go through a

10   variety of different reviews, but we're hoping to finish

11   that in 30 days as well.

12          Hopefully in advance of that 30 days, as well, we

13   could propose some trial dates that might be acceptable to

14   the Court.  And having had Your Honor's order from November

15   that spaced out when the motions should be, I think we would

16   like to work with the defense to provide a schedule for

17   motions and all of the items that were included in that

18   November order.  So that would include motions for the

19   404(b) and any of the other pretrial motions, jury

20   questionnaires, and all of the items that Your Honor listed

21   on that order.  Hopefully we can work with the defense to --

22   prior to that next status conference to propose something to

23   the Court.

24          THE COURT:  Well, some of the dates that were in

25   there were a certain distance from some other date because I

1    had a trial in the interim, or I had something on my

2    calendar in the interim.  So it needs to be similar, but

3    some of that was driven by my schedule.  So, one thing that

4    might be helpful would be is if you have a general idea of

5    when you want to go to trial, whether you're saying July or

6    August or June or May, then I can maybe propose a schedule

7    to you and then you can come back to me with your joint

8    tweaks on it, rather than your coming up with an entire

9    schedule that is just -- plopped a trial in the middle of

10   another trial or something that's already on my calendar.

11   So, if you can include me in that conversation, I think that

12   might be better.

13            MR. ANDRES:  I agree, Judge.

14            THE COURT:  In terms of -- does the defense have

15   any thoughts at this point about motions that it intends to

16   file and when it would be prepared to file them, or do you

17   want to make that part of whatever schedule we put on the

18   table a month from now?

19            MR. DOWNING:  Thank you, Your Honor.  We have been

20   in discussion with the government about some discovery

21   issues.  I think we need to have a few more discussions

22   before we decide whether or not we have to tee something up

23   for the Court.  So I do anticipate we may have some motions

24   that we would file before the next status conference, if in

25   fact we have some disagreements over discovery.

1          THE COURT:  I wasn't necessarily even talking

2     about discovery, because those are going to arise when they

3     arise.  But now that you have the affidavits in support of

4     the search warrants -- I believe that was part of what

5     you've gotten -- are you planning to move to suppress

6     evidence sized in connection with any searches or any of the

7     other evidence that you've received?

8          MR. DOWNING:  Sure.  We received, I believe, 13

9     affidavits on Friday.  So, we're working.

10          THE COURT:  So you don't know yet?

11          MR. DOWNING:  Through that process, that's

12     correct.  We haven't had an opportunity to analyze them, so

13     we're not sure at this point in time.  We do expect, in

14     terms of dispositive motions, that we have one motion -- we

15     started having conversation with the government -- that we

16     think we would like to file a lot earlier than some of the

17     other motions for pretrial.  So that's something we're

18     trying to work out, to give the Court more time to work on

19     something like that.  But again, we only had preliminary

20     discussions, and I think before the next status conference

21     we'll have our arms around all of these issues.

22          THE COURT:  Well, anything in the nature of a

23     dispositive motion that would presumably be a motion to

24     dismiss one of the counts or one of the theories, or a

25     motion to suppress, either statements or evidence, I think

1    those need to be scheduled as soon as they're ready to be

2    heard and not base -- those I don't want to count back from

3    the trial, I want to count forward from here and get them

4    heard because they will affect the shape of everything that

5    moves forward.

6              Once we know the trial date, we move backwards

7    from that to a pretrial conference; based on the pretrial

8    conference, the pretrial statement, and then the exhibit

9    exchange, motions in limine.  But motions to suppress, I

10   think come -- and dispositive motions, if there are any, are

11   going to be on the early side.

12             MR. DOWNING:  Great.  We agree.  Thank you.

13             THE COURT:  So -- yes, Mr. Wu?

14             MR. WU:  As to Mr. Gates, we're still working our

15   way through the discovery.  I think we'll be --

16             THE COURT:  You haven't read it all since Friday?

17             MR. WU:  Not since Friday, no.  We'll be in a

18   better position, I think, by the next status hearing.

19             THE COURT:  Let's do that first.  Let's pick a

20   date for the next status conference in January.  We're

21   talking about a month from now.  Why don't we look at

22   something the week of the 15th.

23             Do I have anything January 16th?

24             THE COURTROOM DEPUTY:  Not presently.  That's the

25   day after the holiday, as well.  Okay.  That's fine.

1          THE COURT:  How about January 16th, at 9:30 a.m.,

2    for the next status conference in this case.  Does that work

3    for everybody?

4          MR. ANDRES:  That works for the government, Judge.

5    Thank you.

6          THE COURT:  All right.  That's what we'll do then.

7    Everybody is nodding over there, no one --

8          MR. WU:  That's fine.

9          THE COURT:  That's fine with the Manafort team

10   also?

11         MR. DOWNING:  Just need one second, Your Honor.

12         THE COURT:  It's the Monday after the three-day

13   weekend, I believe -- Tuesday after the three-day weekend.

14         MR. DOWNING:  That's fine, Your Honor.

15         THE COURT:  All right.  That's what we'll do.

16         The next thing I want to take up, as you know, I

17   issued an order to show cause after I received the

18   government's response to the bond motion that related to Mr.

19   Manafort's communications and whether they violated my order

20   in terms of communications with the media.

21         The first thing I want to do is just communicate

22   something quite clearly, in the event that it wasn't clear,

23   and that is, Mr. Manafort, that order applies to you and not

24   just your lawyer.  I do appreciate the fact that the legal

25   authority for the order, which Counsel set out quite clearly

1    in response to the order to show cause, relates to the jury

2    pool, which is in the District of Columbia and not in

3    Eastern Europe.  But the point of the order was to have the

4    merits of this case, for everybody's benefit, both the

5    government and the defense, debated by the parties in this

6    courtroom and not in the press.

7          And so I don't think it's quite consistent with

8    the global and electronic nature of communication in today's

9    world to say, well, that was just an editorial in Kiev and

10   not in D.C.  And I don't think it's entirely consistent with

11   the subject matter of the editorial to say, well, it was

12   just of interest to the people of Ukraine, when a point made

13   in the proposed draft was why the U.S. media is wrong when

14   they say what they're saying, which implicitly also conveys

15   a message that perhaps the prosecution is also wrong.  And,

16   the problem is if you can tell a reporter what to put in a

17   newspaper in Kiev, then it's on the internet and it's

18   equally available here.

19          Granted, it's probably not the most popular

20   website that people click on in this community.  But, all

21   that has to happen is for that favorable article, which was

22   going to be -- look on its face to be entirely independent,

23   but was actually a message in part crafted and shaped by

24   you, all that has to do is have somebody, you know, post it

25   on Facebook, Twitter or a blog and you've accomplished your

1    goal, given the power of re-Tweeting.

2           So, I'm not going to hold further proceedings on

3    this matter and I am going to vacate the order to show

4    cause.  But I do want all the defendants, all of the parties

5    to understand that I am likely to view similar conduct in

6    the future to be an effort to circumvent and evade the

7    requirements of my order as they have been clarified this

8    morning.  And I do believe it's fair to consider the facts

9    that I was provided with, like all facts, in connection with

10   my consideration of the bond issue.  But, otherwise, I'm

11   going to vacate the order to show cause.

12          Mr. Downing, if there's anything you want to add

13   to your pleading, you're welcome to do so.  But I did read

14   what you said.

15          MR. DOWNING:  One moment, Your Honor.

16          (Pause.)

17          MR. DOWNING:  Your Honor, briefly.

18          THE COURT:  Yes.

19          MR. DOWNING:  We appreciate the guidance from the

20   Court today, it's helpful.  I think maybe more guidance

21   would be even more helpful.  It's a very difficult situation

22   for Mr. Manafort, because as the Court is probably aware,

23   there is a torrent of negative press against Mr. Manafort.

24   A lot of misleading articles, that are clearly biased, that

25   just keep rolling out again and again.  And I do think we

1    took quite seriously your order and do not want this to be

2    tried on the courtroom steps, and we totally appreciate that.

3         But, there is this ongoing issue that's not going

4    away, and it's very difficult, I think, for someone in Mr.

5    Manafort's position to sit and watch his reputation just

6    continue to be besmirched in the press.  A lot of these

7    articles that come out clearly are getting inside

8    information from somewhere, we don't know where.  But they

9    don't stop coming out.

10        And in terms of our filing, we really did stick

11   with two issues; one had to do with his reputation and two

12   had to do with setting the record straight.  Anytime anyone

13   talks to the press -- and here it wasn't talking to a

14   reporter, it was a former person at the Ukraine that he had

15   dealt with, where he was -- the intent was to set the record

16   straight about some false and misleading information that

17   was out there.  No doubt anytime any one of us tries to set

18   the record straight it has some bias in it; of course it

19   does, it's our version of the facts.

20        But what we were -- really wanted this Court --

21   not today, but in time, is to give some advice about what is

22   it that we do when this press just keeps coming out again

23   and again, and it's here in Washington.

24        The Kiev newspaper has a circulation of 10,000

25   and, quite frankly, but for the filing of the government, it

1   would have never been published.  The *Washington Post* has a

2   circulation, during the week, of 480,000 in print.  It has

3   880,000 on the weekend.  And he's faced, week in and week

4   out, with that press.  So to the extent there is a need,

5   we're more than happy to file something with the Court.  I

6   don't know if the Court wants to get into that, but it's not

7   going away for Mr. Manafort.  So any guidance would be

8   greatly appreciated.

9          THE COURT:  Well, I'm not going to just give you

10  advice.  If you present a motion with a question to me, I

11  will respond.  I proposed this order to both parties and

12  gave you an opportunity to object in writing, and no one

13  objected, you may recall that.  So that's all important.

14         I would also note that Mr. Manafort is not the

15  only party in the courtroom that doesn't have the

16  opportunity to go out on the street and set the record

17  straight.  There is a lot of negative press going on right

18  now about the prosecution and if they went out and said, you

19  know, we're people of good faith and this is what we're

20  doing and we're just following the evidence and we're not

21  biased, you would be in here telling me they violated my

22  order, and you would be right.

23         And I certainly understand what you're saying

24  because if articles get written about the Court, as they

25  often do, we have absolutely no avenue to say you got that

1     wrong.  So, I appreciate the situation.

2           I think there was a very famous case of an

3     individual who was charged in a white collar case who, after

4     it was over, said, Now where do I go to get my reputation

5     back?  I understand that, and that is why I want to make

6     sure that this case is scrupulously fair, and why we need to

7     get it tried.

8           But I don't think that the answer is necessarily

9     by making public commentary at this time, while this case is

10    pending.  If there's something specific that you think you

11    should be able to do, you can ask me a specific question in

12    a motion and we'll deal with it.

13          MR. DOWNING:  Thank you, Your Honor.

14          THE COURT:  All right.  Mr. Manafort has filed a

15    motion for review of his conditions of release.  I already

16    found, under 18 U.S. Code § 3142(c)(1), that release on

17    personal recognizance with an unsecured appearance bond

18    would not reasonably secure his appearance and, therefore, I

19    have to order his release subject to certain conditions.

20    I've stated before that I don't think that the current

21    requirement of house arrest is least restrictive condition

22    that will accomplish the goal of ensuring his appearance and

23    that I'm prepared to modify it.  But I required financial

24    information that would satisfy what I thought were the two

25    applicable conditions under the Bail Reform Act.  One was

1        § 3142(c)(B)(xi), which is that he execute an agreement to

2        forfeit property of a sufficient unencumbered value as is

3        reasonably necessary to assure his appearance.  And that

4        requires that the Court be provided with proof of ownership

5        and proof of the value of the property, along with

6        information about any encumbrances on the property, or the

7        execution of a bail bond with solvent sureties who have to

8        provide information that show they have the financial means

9        to forfeit the amount if the defendant doesn't appear.

10              I don't know that those are -- they have to both

11       be satisfied.  I said that one or the other would have to be

12       satisfied.  And that's what I said at the hearing in

13       November, that to be relieved of home confinement, the

14       defendants had to supply either security under subsection

15       11 or a surety under 12, or both, as a substitute for the

16       $10 million or $5 million appearance bonds that are now

17       unsecured, as well as the financial information I need to

18       find those to be sufficient.

19              So I've read everything you've provided and I have

20       a few questions about it.  First of all, Mr. Manafort has

21       agreed to execute the agreements to forfeit four properties

22       that are listed in the public filing in this case.  And

23       those agreements are also going to be executed by family

24       members who are co-owners to ensure that there is no legal

25       impediment to the forfeiture.  You've also indicated a

1   willingness to agree not to further encumber the properties

2   and to remain current on the loan payments, all of which is

3   good.

4         The government has stepped away from its agreement

5   to the defendants' proposal, but I would have to make my own

6   independent judgment, in any event.  But I do have a

7   question for the government, and that is:  Do you agree that

8   the unencumbered value of the properties is or exceeds the

9   $10 million as represented in the motion?

10        MR. WEISSMANN:  Your Honor, with respect to

11   whether all four properties exceed $10 million, we can't say

12   with any confidence that we agree that it is over that

13   amount.  One of the principal things that I think creates

14   the problem is the Bridgehampton property, because that is

15   subject to forfeiture.

16        Now, we don't take that the position that legally

17   it is impossible to post property that is subject to

18   forfeiture, but the Court could conclude that it has less,

19   sort of, gravitational pull in terms of the -- what effect

20   it will have as a part of the bond, if the defendant thinks

21   that it's going to be forfeited anyway.

22        The Court has before it some --

23        THE COURT:  Well, at one point you were supporting

24   the bond package, and then because you felt that he was not

25   compliant with the Court order, you withdrew your support

1    for the bond package.  But, I think I need to know if you're

2    saying I should or should not consider property for bond

3    purposes that is also subject to forfeiture.  You said I

4    could, but I would like to know if you think I should?

5         MR. WEISSMANN:  So, we think -- we think you can

6    and we think you should, but I think there is a discount

7    to -- because it is the main property.  But I do think that

8    it is something that the Court can and should consider

9    because I do think it has some value.  Even though I don't

10   think it is the value that is -- the -- that is placed on it

11   by the defendant's appraisal, which I think is -- I would

12   characterize as soft.

13        Now, just to be clear, before the issue that

14   arose -- or, with respect to Mr. Manafort's publication, we

15   thought that the value was -- of the total package was less

16   than $10 million.  But we, as the Court knows, we thought it

17   was sufficient, given the -- if you take the value and

18   compare it to the stated value that Mr. Manafort has

19   presented to this Court of his overall assets and the fact

20   that there were two sureties that were being proposed, and

21   that was the reason for our consenting.

22        The biggest issue we have is one of trust because

23   of the issues that the Court addressed this morning, and the

24   fact that even through counsel's presentation today there's

25   a sense that the defendant takes unilateral action before

1    asking the Court or advising the Court as to whether it

2    would be appropriate.  So, one of the things that we're

3    concerned about is the idea that the defendant will decide

4    to publish something and say, Well, I thought I -- my view

5    of the law was correct, or I thought it was okay for me to

6    stay out or to violate certain bail conditions because I

7    have my own personal views of what would happen.

8            That is the reason that one of the things we've

9    asked for is that if the Court is going to grant bail beyond

10   home confinement -- in other words, that he can be released --

11   that the bail package should be contingent on his complying

12   with all of the conditions of the bail package.  In other

13   words, it would be a violation to not adhere to all of the

14   rules that the Court sets out and the pretrial sets out.

15           THE COURT:  Well, I don't know of any order that

16   I've ever issued that said you can violate this part but,

17   you know, that won't count is a violation.  But I understand

18   what you're saying.

19           MR. WEISSMANN:  Yes.

20           THE COURT:  I have some questions about finance

21   that I want to talk to you about, Mr. Downing.

22           I think that you've taken the position that the

23   unencumbered value is either slightly above or slightly

24   below the $10 million threshold.  But I want to try to

25   figure out how we got there.

1              With respect to the Jobs Lane property in

2       Bridgehampton, New York, I received a copy of a professional

3       appraisal that was done a year ago, as well as the mortgage.

4       And based on that, you say the property is worth

5       $13,500,000, minus the nine-five mortgage, that gives you

6       $4 million worth of equity, which seems to be pretty fairly

7       established.  I mean, obviously, values can go up and down,

8       but that's pretty close.

9              With respect to the Baxter Street condo in

10      New York City, the defense says if you subtract the mortgage

11      from the $4,725,000 value, you get $3,725,000 million, but I

12      don't see an appraisal there.  And so I want to know what

13      the proof of the value of that property is.  All I saw -- I

14      didn't even get a tax assessment -- was a clip from Zillow.

15      And I'm just not sure that constitutes proof of the value of

16      the property for my purposes.

17             MR. DOWNING:  So the -- in the discussions with

18      the government, we -- the government also went and did some

19      searches and -- to try to get a handle on -- it's difficult

20      with real estate, especially at that point of the market.

21      And I think at the end of the day, that --

22             THE COURT:  Well, if you had to sell it tomorrow

23      or insure it tomorrow or refinance it tomorrow, you would

24      get an appraisal, you wouldn't print out a page from Zillow.

25             MR. DOWNING:  That's correct.  But we -- Zillow is

1    actually considered to be pretty accurate, Your Honor.  I

2    mean, recent reports in the paper have been like within a

3    5 percent margin.  So, it is widely used.  And, in fact, the

4    appraisers -- and I've recently had a re-fi -- appraisers go

5    out and they look at Zillow to start the comp. process.

6          So, I think we started that -- I think we had --

7    we didn't think we would have to come in with a formal

8    appraisal.  But also, there was some give and take between

9    the government and us as to where these values fell out.

10   What we did is we put together four properties that I

11   believe we had an understanding met the $10 million threshold,

12   and there's a little cushion in there.  So whether or not

13   that extra 1.65 million is real value or perceived value,

14   the package was put together to get everybody satisfied that

15   it, overall, came in around $10 million.

16          THE COURT:  And, obviously, notwithstanding the

17   position they're taking today, I know that they were

18   satisfied with that.  But, I felt like with respect to --

19   even if I didn't have a formal appraisal, I needed

20   something, some piece of paper beyond just what I got with

21   respect to Baxter Street.  I have the same concern with

22   St. James Drive.  Those properties together, assuming

23   they're valued as you expect them, came in slightly under

24   9 million.

25          And so then there's the condo in Alexandria, and I

1    wasn't sure I saw proof of value of that one either.  But,

2    my concern was you say that property is not encumbered,

3    there's no mortgage, but apparently it was pledged as

4    security for the Bridgehampton property.

5              MR. DOWNING:  Which we disclosed.

6              THE COURT:  No, I'm not saying it wasn't

7    disclosed.  I just don't understand exactly what that means.

8    Doesn't that mean that the entire value of it is encumbered?

9    If for some reason you didn't satisfy your loan obligations

10   on the New York property, doesn't this one belong to the

11   bank?

12             MR. DOWNING:  No.  No, it does not.

13             THE COURT:  No?  How does it work?

14             MR. DOWNING:  It works that the first home, the

15   Bridgehampton home would have to be sold.  And if it came

16   out for less than 9.5 million or thereabouts, then they

17   could look to the Fairfax property as the additional

18   collateral, or Mr. Manafort could himself satisfy whatever

19   the shortfall was.  So it's an over-collateralization with

20   respect to that loan.

21             The value on the Fairfax property is -- I guess

22   most telling about it, it only recently has been purchased

23   in that price range.

24             THE COURT:  All right.

25             MR. DOWNING:  So it's a new-purchase property.

1          The value, in terms of the Baxter street,

2     comparables are tough to get on these type of properties.

3     And we did go out, for the Bridgehampton one, and we did get

4     a realtor to go take a look at it.  And the realtor said,

5     sure, we think around 13 1/2 million would be the price.

6          THE COURT:  I think that one is the most well

7     established, and obviously that's the one where the bulk of

8     the money is coming from, but -- well, it's about half.  So,

9     I'm not so worried about the value of that one.  I think you

10    gave me so much more information with respect to that one

11    that that was --

12          MR. DOWNING:  Sure.

13          THE COURT:  I was looking through, like, where's

14    the appraisal?  And it's not there.

15          MR. DOWNING:  We can work on more appraisals.  But

16    I will say that the Baxter Street one, in particular, with

17    the cushion of 1.65 million in there, it would be hard for

18    us to imagine we could be off by that much.

19          THE COURT:  Okay.  All right.  Now, assuming that

20    you could provide information to verify that the properties

21    do add up to 10 million, what's the point of the sureties?

22    The surety, to me, is someone who says I'm legally obligated

23    to pay the $10 million if he doesn't show up.  So, if I have

24    the properties, why do I need that?  Are they saying I will

25    pay any cash shortfall?  Or what exactly are they doing here?

1          MR. DOWNING:  Yes.  Yes, the latter.  Any cash

2     shortfall.  What we wanted to do, we wanted to come into

3     this Court and we wanted to submit a bail package that we

4     knew far exceeded what the Court had asked for.  We just

5     want this thing to get done.  And the home confinement has

6     been for quite a while now.  It's been a -- it's been a real

7     difficult time for Mr. Manafort to make a living.  So we

8     just came in and said, look, his family is willing to do --

9     to do anything to let this Court know how serious they are

10    about making sure that Mr. Manafort returns for trial, and

11    the devastation that would befall his family if he does not.

12    And that was the intent of the additional sureties.

13         THE COURT:  Now.  You provided me sealed documents

14    concerning the sureties, assets, which aren't really a

15    matter of public interest.  But it was hard to tell from

16    what I got, without getting into the subject matter of it,

17    who owned what.  It's all in terms of the family.  And some

18    of them, the assets aren't substantiated, they're just

19    described.  And so, I'm not sure that I have the necessary

20    showing that they personally have the assets to satisfy the

21    bond, if he were to fail to appear.  So I wasn't quite

22    comfortable that that explained it to me.  I don't know if

23    it's his or it's theirs or it's joint.

24         MR. DOWNING:  Well, we could give you that

25    breakdown today.  But, pretty much all of it is joint

1    between Mr. and Mrs. Manafort.  Baxter Street is split with

2    their one daughter and one of the other properties --

3              THE COURT:  I know the properties, the properties

4    are separate.  You're trying to say this is above and

5    beyond, it's separate of the properties; there's this pool

6    over here, and that was the pool that's just kind of summarized.

7              MR. DOWNING:  That's joint.  The rest of the pool

8    is joint.

9              THE COURT:  Now, what's your --

10             MR. DOWNING:  Now, again, when I say joint, it may

11   be in one of their names, but it is their marital assets.

12   So -- but, it's joint, they deem it to be joint.

13             THE COURT:  What's your response to whether I

14   should consider properties subject to forfeiture already in

15   connection with the bond?  I mean, again, that was something

16   that they had agreed to.

17             MR. DOWNING:  And I think part of the overall

18   package that we put together was so the government said yes,

19   we believe this will meet the least restrictive means to

20   reasonably ensure that Mr. Manafort will appear for trial.

21   So we did it in the collectivity, even with the consideration

22   on the government side, which I don't necessarily agree

23   with, about a discount for the forfeiture.

24             But in its totality, we got to the point where we

25   agreed, okay, this would satisfy the government and we

1        should submit it to the Court.

2                THE COURT:  All right.  A couple other questions.

3        The parties agreed, and I think that makes perfect sense,

4        that there would be no international travel or applications

5        for passports or visas.  I'm not sure I understand why I

6        should be comfortable with the proposed relaxation of

7        domestic travel.  The parties agreed, if he's going to go

8        somewhere in the United States, he needs to get my

9        permission, except New York or Florida because he has

10       residences in New York, Florida, and here, and so he should

11       be able to go to all his residences and do business.  That

12       basically means he could be on a train or airplane going

13       back and forth at any time up and down the east coast.  And

14       that struck me as inconsistent with the requirement that we

15       already have as a condition of his release that he stay

16       within the Washington, D.C. metropolitan area.

17               So I'm not sure why those, going to New York or

18       going to Florida, should be treated differently than domestic

19       travel anywhere else.

20               MR. DOWNING:  Well, his residence -- he lives in

21       Florida.  He actually doesn't live in Alexandria, Virginia.

22       That's his residence.

23               THE COURT:  All right.

24               MR. DOWNING:  That's where his wife resides.  But

25       he does business -- well, obviously with his residence

1    there, he does quite a bit of business in Florida.  And then

2    New York is the other place.  If we're going to quantify the

3    most amount of time he spends doing business, his second

4    place would be New York.

5           Now, quite frankly, he does business all over the

6    United States and internationally.  So rolling this back and

7    affecting his ability to earn a living has been quite

8    severe.  Having him on more severe restrictions to not have

9    the ability to say, okay, I can down there tomorrow, to give

10   24-hour notice to pretrial services -- and you can see, from

11   his report, he's met all the conditions with pretrial

12   services, he's checked in every time he's supposed to check

13   in, he's done everything they've asked for -- having that

14   done in a more detailed manner so everybody is comfortable

15   about where Mr. Manafort is going, why he's going, how long

16   he's going to be there, that cuts down on this issue about

17   any concern that he's just going to somehow take off

18   because, again, his family would be financially devastated

19   if he did that.

20          And, quite frankly, some of the charges in this

21   case, which we're going to get into early on, we just don't

22   see it.  And, therefore, when we look at this case, we look

23   at it as failing to file some forms, some FARA forms.  We

24   don't look at it -- the rest of this case, we just don't

25   think, at the end of the day, is going to stand against

1    Mr. Manafort.

2            So that really impacts how Mr. Manafort looks at

3    the case, that he wants to defend his reputation, that he

4    wants to come and defend himself against these charges.  But

5    he last to earn a living.  I mean, the last month and a half

6    have been incredibly difficult on him.  And he is presumed

7    innocent.  And his family is willing to stand up and do

8    everything they need to to make sure that he returns for

9    trial.

10           And also, any additional reporting is more than

11   welcome.  Anything we need for pretrial services to get

12   comfortable with where he's going and have him check in on a

13   detailed scheduled is completely agreed to.

14           THE COURT:  Well, if he was going to live in one

15   residence, which would it be?  If you had a preference, if I

16   was going to say you can stay in one but you have to get

17   permission if you want to go somewhere else, as opposed to

18   saying you can live in three places and be wherever you want

19   anytime within the three, do you have a thought about that?

20           MR. DOWNING:  Could I have a moment?

21           THE COURT:  Yes.

22           (Pause.)

23           MR. DOWNING:  Your Honor, that would be Florida.

24           THE COURT:  All right.

25           MR. DOWNING:  And I would ask that as part of

1    that -- you know, the travel back here to the D.C. area is

2    going to be with respect to this case and meeting with his

3    lawyers and prepping for trial.

4            THE COURT:   I understand that he would need to do

5    that.  And I think that is one of the reasons why usually

6    having the geographic restriction be where the court is

7    works.  And I'm not saying that -- I'm going to take all of

8    this under advisement.  But I'm trying to figure out what

9    everybody's position is on all of the various aspects of this.

10           What's the government's position about domestic

11   travel?

12           MR. WEISSMANN:   Your Honor, we set forth, in

13   footnote 4 of our submission, what we think is a reasonable

14   proposal with respect to the domestic travel, and that is

15   that the defendant have to -- if he wants to travel between

16   New York, Florida, and Virginia, that he would have to alert

17   pretrial the week before to exactly where he will be, so

18   that at any moment the Court and pretrial would know where

19   he is.  There would not be -- without coming to the Court,

20   there would not be some last-minute ability to go somewhere

21   without having notified the Court.  Instead, each week by

22   week there would have to be a scheduled provided to pretrial

23   as to which of those three places he would be.

24           And then the one thing that we have not seen --

25   and I'm not saying that counsel did this intentionally, I'm

1   sure it's inadvertent -- but we have not seen the sealed

2   papers.  So we would like an opportunity to see those.

3           THE COURT:  You don't get ECF?

4           MR. WEISSMANN:  We do, but ECF -- we've checked

5   the bounces and there's no bounce of that, but we will check

6   again.  As I said, maybe it's our fault, but we have not

7   seen those.

8           THE COURT:  I think everybody seems to need a

9   little bit of a tutorial on how to file sealed things.  And

10  perhaps you can both consult with Mr. Haley about that after

11  these proceeding.

12          MR. WEISSMANN:  Sure.

13          THE COURT:  I would be the last person to give you

14  the best advice on that.

15          All right.  Yes.

16          MR. DOWNING:  I will check my e-mail, but I'm

17  pretty sure I sent them separately to Mr. Weissmann.  But I

18  will double-check on that.

19          THE COURT:  I think the idea of the seal is that

20  you docket them and you can see them, but no one else can

21  see them.

22          MR. DOWNING:  Yes.  That was my understanding.

23          THE COURT:  And that way I can see them and they

24  don't have to be delivered to my chambers.  I like seeing

25  what's on the docket so that I know I'm seeing what you're

1    seeing and nothing else.

2              MR. DOWNING:  I think we're getting better, I

3    think we are.

4              THE COURT:  Well, we're going to get there.

5              Mr. Downing, do you want to have an opportunity to

6    respond to the motion to forfeit the insurance policy?  We

7    kind of put that aside in case it was going to be wrapped

8    into this bond.  It doesn't seem to be what you're really

9    relying on to ensure his appearance, so do we still have

10   this pending?

11             MR. DOWNING:  At this time we're not going to

12   object to the restraining.

13             THE COURT:  All right.  So that motion will be

14   granted, then, as unopposed.  I don't know what the docket

15   number is off the top of my head.

16             All right.  I'm going to take the bond motion

17   under advisement.  If you have anything, and it doesn't have

18   to be a formal appraisal, but even just comparables or tax

19   assessments, other things, things that you gave the

20   government that helped them become comfortable with the

21   value, you can submit it to me, that would be very helpful.

22             I just wanted to put a few issues on the table

23   concerning general compliance with the home confinement

24   conditions.  Hopefully these conditions won't remain for

25   long.  But pretrial services has brought several matters to

1      my attention.

2              First of all, the way home confinement and curfews

3      and GPS monitoring ordinarily operates is that pretrial will

4      give people subject to this confinement permission to --

5      once they're informed that they're going someplace that

6      they're permitted to go, like their counsel's office or

7      church or a doctor's office, if they say, oh, I need to get

8      a haircut on the way home or I need to stop at CVS and pick

9      up a prescription, they tell pretrial and pretrial says okay.

10             I would expect pretrial services -- and I've told

11     them this because they inquired -- to follow the same policy

12     with respect to these two gentlemen as they would follow

13     with anyone else.  It's not supposed to be more lenient, but

14     it's not supposed to be more harsh just because, apparently,

15     the FBI knows everywhere they're going.  But that still

16     means no unannounced stops.

17             If you need to make a stop on the way home from

18     your lawyer's office, then please just let them know that

19     that's what you're going to be doing, so there's no question

20     about whether you have permission to do it.  And that also

21     means that if you are required to inform them of a place

22     you're going in advance, it has to be more than an hour in

23     advance.  Apparently an issue came up very recently

24     regarding a religious observance that wasn't on a Sunday

25     that they were notified an hour before.  That's just not the

1    way you can ask pretrial to operate.  They're not at

2    people's beck and call.  They need to be informed in advance.

3          Also, Mr. Gates has been submitting one request

4    per athletic event at a time.  And pretrial in Virginia has

5    asked pretrial in D.C. to report to me that now he has

6    signed up to be a coach and not just a spectator.  I'm not

7    sure why you would take on these, essentially, travel

8    responsibilities, given the current conditions of his

9    confinement.  I've been granting isolated requests, but

10   sporting events, in general, is not a general exception,

11   like meetings with counsel or going to the doctor.

12         And so, pretrial has asked that my orders be more

13   specific.  And so that when I order him to go -- that he can

14   go somewhere, they want to know that I've said he can go to

15   X location at X time, because the teams cover a broad

16   territory.  So, again, you know, I'm getting the feeling

17   that Mr. Gates is trying to turn his home confinement into

18   home confinement except when I want to be elsewhere, which

19   is the same as personal recognizance, and I denied that once.

20         But I want to make sure that if you file a motion

21   saying there's something special coming up this weekend,

22   there's a reason why I need to be with my children at this

23   location, the motion -- and this part of it can be filed

24   under seal and what can be on the public record can be

25   redacted -- but it needs to tell me I'm going to X, Y, Z

1  location at Y, Y, Z time so I can tell pretrial he's allowed

2  to go there at that time.  The Virginia office has asked for

3  that specificity.

4        Obviously, in the meantime, if Mr. Gates can

5  present me with what Mr. Manafort has presented, we can get

6  out of the business of monitoring soccer practice, which I

7  think is where I would like to be and where you would like

8  to be and Mr. Gates would like to be.

9        The remaining issue on my radar was the motion

10  filed by the government related to Mr. Mack's representation

11  of Mr. Gates.  The government has still produced no information

12  to suggest that Mr. Gates or Mr. Brown will be witnesses

13  against each other.  So, it's certainly not obvious from any

14  of the pleadings that this is necessary.  And I don't

15  believe there's been a showing of an actual conflict at this

16  point.

17        But, the threshold under the *Curcio* case for an

18  inquiry is very, very low.  Under *Wood versus Georgia*, the

19  Court said if there's even a possibility of a conflict of

20  interest, the District Court has a duty to inquire further.

21  I can rely on the representations of counsel in resolving

22  that inquiry, and I have read and appreciate the filing that

23  was submitted by Mr. Mack on this issue.  But, I do believe,

24  especially just to keep things parallel, that I'm going to

25  follow Judge Wood's lead.

1        I do have one procedural question, which is it

2    seemed like, from the transcript, she held the inquiry in

3    open court and the government was entitled to hear the

4    defendant's answers.  But I'm not sure why that would be so,

5    and not be at the bench, if the issue is what has your

6    lawyer told you?

7        So, Mr. Mack, do you have a position about whether

8    if I ask him some questions, I should ask him in open court,

9    or whether it should just be between me and Mr. Gates?

10        MR. MACK:  Your Honor, if you've read the

11    transcript, Judge Wood basically, when we took the position

12    that we did not want to disclose the names of counsel, she

13    did not compel Mr. Brown to answer those questions.  Our

14    objection, maybe inartfully stated in New York, was that if

15    you cannot identify what the conflict is, you can have a

16    generic description.  But a lot of the questions the

17    government wanted asked imply that someone could articulate

18    what the conflict was.  And our view was any questioning is

19    intrusive.  And I think -- I'll talk to Mr. Gates about it,

20    but I think he would rather do it not in the public forum,

21    if the Court is going to inquire specifically on advice,

22    things of that nature, that he received and who he received

23    it from.

24        THE COURT:  I wasn't planning on asking him who he

25    received it from.  But I think if it's just me talking to

1     him, I have more latitude to ask broad questions.  I thought

2     most of the questions she asked were questions that he was

3     able to answer.

4          We could do this a number of different ways.  We

5     could do it where I can ask general questions, but if it's a

6     question where he wants to specifically tell me something

7     that you told him or another lawyer told him, we can do that

8     separately.  Or we can do the whole inquiry without the

9     government --

10          What is the government's position on whether

11     you're entitled to hear the answer to the questions or

12     whether the point is that I'm supposed to satisfy myself

13     that he's made a knowing and intelligent waiver?

14          MR. ANDRES:  I think the latter, Judge; that you

15     are able to make a ruling that he's made a knowing and

16     intelligent waiver.

17          Having said that, the questions, in large part,

18     are very generic.  So we would request that you follow the

19     procedure that you outlined in which you would ask the

20     general questions in open court, and if there were specific

21     questions Mr. Gates felt he had to answer under seal or

22     solely with -- not in open court, then we're fine with that,

23     too.  But I think the bulk of the questions don't require

24     the type of inquiry.

25          THE COURT:  All right.  Well --

```
1          MR. MACK:  Your Honor.  I'm sorry.

2          THE COURT:  Mr. Mack, what's your thought?  I

3    mean, I am, obviously -- I talked about this last time --

4    troubled about intruding into the attorney-client

5    relationship in any way.  I believe that the fundamental

6    thing I'm supposed to do under Curcio is to advise him.  And

7    those are things where I'm not asking him questions.  But,

8    it's kind of all mixed together.

9          MR. MACK:  I have no -- defense has no problem

10   with a hybrid procedure of that nature that the government

11   seems to prefer.

12         THE COURT:  All right.

13         MR. MACK:  May I make one mention on bail?  Is

14   that possible?  I realize the Court has moved on.

15         THE COURT:  Yes.

16         MR. MACK:  But, basically, Mr. Andres and Mr. Wu

17   and I have -- are discussing, pretty intently, on coming to

18   a package for the Court.  And he is going to let me know

19   soon, forthwith, as to whether we can come to an agreement.

20   But one thing the government did say, and it may not affect

21   at all what the Court said a few moments ago, is that he

22   is -- and forgive me if -- I think I can fairly state that,

23   is the government is no longer going to oppose if we are --

24   or, he'd stand silent on weekend-type requests for Mr.

25   Gates.  So that it will not be, at least, contested.  But
```

1    that being said, I think it's also important to realize we

2    are working very hard to come to a package.  And any concept

3    that we're not doing anything is not true; we are working

4    hard at that.

5              THE COURT:  I did not mean to suggest that I

6    didn't think you -- I know this is your main goal right now.

7              MR. MACK:  That's the only thing I've done so far,

8    is work on bail.  So I'm eager to get to the facts of the

9    case.

10             THE COURT:  I'm sure you are.  We all are.  So I

11   didn't suggest that it was any lack of attention to the

12   issue on your part that was the holdup.

13             MR. MACK:  Sometimes, maybe, I misread the

14   government submissions that seem to sound that way.

15             THE COURT:  All right.

16             MR. MACK:  May I have one other point I think the

17   Court should be aware of --

18             THE COURT:  Wait.  I wasn't finished making my

19   point --

20             MR. MACK:  I'm sorry, Your Honor.

21             THE COURT:  -- which is whether or not they object

22   to the weekend --

23             MR. MACK:  Got to clear it.

24             THE COURT:  -- events, pretrial needs to be

25   notified.  And that's a different issue than whether the

1    government objects to them.  I have permitted him to do them

2    over their objection on a regular basis --

3              MR. MACK:  I know you have, Your Honor.

4              THE COURT:  -- but pretrial does not feel like it

5    has sufficient information to do its job.

6              MR. MACK:  Every client of mine makes very close

7    kinship with pretrial services.  And Mr. Gates, I think he

8    has and will do so in the future.

9              May I make one further comment on the *Curcio*.  And

10   the Court may not be aware of this, but -- and I'm speaking

11   only about the *USA versus Steven Brown* case.  There was a

12   superseder filed last week, I think Thursday.  And at least

13   to our reading, and this is the last infor -- or, indictment

14   that's going to be filed, that the judge is going to permit

15   before the March 5 trial date, which is set, and there's

16   absolutely nothing in that indictment, that new superseder

17   that has any relationship to any of the issues here, before

18   Your Honor.

19             THE COURT:  All right.  Thank you.

20             All right.  Mr. Gates, why don't you join your

21   counsel at the lectern, please.

22             Mr. Mack, you can remain there.

23             MR. MACK:  Thank you.

24             THE COURT:  Yes, Mr. Downing?

25             MR. DOWNING:  I'm wondering if it would be okay

1    for us to be released for the rest of this?

2              THE COURT:  I don't have any issues that relate to

3    Mr. Manafort at this point.

4              What is your request?

5              MR. ANDRES:  Judge, just -- the Court has

6    previously designated the case complex under the Speedy

7    Trial Act, but we would move to exclude time between now and

8    the next status conference.  And, obviously, that relates to

9    Mr. Manafort, as well.

10             THE COURT:  All right.  Mr. Downing, what is your

11   client's perspective with respect to the Speedy Trial Act

12   and excluding the time between now and January 16?

13             MR. DOWNING:  We have no objection.

14             THE COURT:  And, Mr. Wu, is that also Mr. Gates'

15   position?

16             MR. WU:  No objection.

17             THE COURT:  So the time, I believe it's in the

18   interest of justice to do that, especially based on the

19   complex nature of the case, given the volume of discovery,

20   to exclude the time from the speedy trial calculation

21   between now and January 16th.

22             Thank you for reminding me of that.

23             Mr. Downing and Mr. Manafort may be excused.

24             MR. DOWNING:  Thank you, Your Honor.

25             THE COURT:  All right.  At this time, Mr. Haley,

1    can you swear in Mr. Gates?

2                    RICHARD GATES, III,

3    having been first duly sworn, was examined and testified as

4    follows:

5              THE COURT:  Mr. Gates, I want to advise you that

6    if I ask you a question and you feel that you need to

7    respond to that question by telling me something that's the

8    substance of a communication between you and your lawyer

9    that you don't want to share in open court, all you need to

10   do is tell me that.

11             DEFENDANT GATES:  Okay.

12             THE COURT:  Or if I ask you a question and you

13   need to consult with your lawyer before you answer the

14   question, you're entitled to do that.  Do you understand

15   both of those things?

16             DEFENDANT GATES:  I do, Your Honor.

17             THE COURT:  All right.  First of all, because the

18   goal of this inquiry is to make sure that what you do you do

19   knowingly and voluntarily, I have to ask you some questions

20   that are personal or may even seem silly under the

21   circumstances, but they're all part of the required inquiry.

22             So let me start by asking you:  How old you are?

23             DEFENDANT GATES:  Forty-five years old.

24             THE COURT:  How far did you go in your education?

25             THE WITNESS:  Master of education.

1          THE COURT:  All right.  Have you consumed any

2    alcohol or taken any medication in the last 24 hours that

3    would affect your ability to understand what you're doing

4    here this morning?

5          DEFENDANT GATES:  I have not.

6          THE COURT:  Are you currently under treatment for

7    any kind of psychiatric condition or emotional disorder?

8          DEFENDANT GATES:  I am not.

9          THE COURT:  Now, as you know, but I want to be the

10   one who tells you now for the record, you have the right to

11   be represented by a lawyer who owes a duty of loyalty to you

12   and you only.  And part of that representation also means

13   that anything you say to him is covered by the attorney-

14   client privilege, and that means he can't tell anybody what

15   you've said unless you give him permission to do so.  And

16   those are both really fundamental aspects of your right to a

17   fair trial in our country.

18          Have you been informed about Mr. Mack's

19   representation of Mr. Brown?

20          DEFENDANT GATES:  I have, Your Honor.

21          THE COURT:  And do you understand that he owes Mr.

22   Brown the same duty of loyalty that he owes you?

23          DEFENDANT GATES:  I do, Your Honor.

24          THE COURT:  And one problem that we have in this

25   case is that you and Mr. Brown are both charged in criminal

1    cases and you share the same lawyer.  So even if right now

2    we can't put our finger on what the conflict might be, I

3    can't promise you and I can't predict, based on what I know

4    at this point, that there's not going to be one that arises

5    in the future.

6              So, do you understand that there could be a

7    conflict in the future that we can't give you any specifics

8    about right now?

9              DEFENDANT GATES:  I understand, Your Honor.

10             THE COURT:  And can you tell me in your own words

11   what you understand even the possible conflict of interest

12   to be?

13             DEFENDANT GATES:  Your Honor, I don't believe

14   there's a conflict, based on my conversation was Mr. Mack

15   and others in relation to the case in New York.  I know very

16   little detail about the case in New York.  So as I

17   understand it, until this *Curcio* issue was raised, I did not

18   think that there was a conflict at all.

19             THE COURT:  Do you have any reason to believe that

20   Mr. Brown has anything to do with your defense of your case

21   here?

22             DEFENDANT GATES:  I do not, Your Honor.

23             THE COURT:  But do you understand that, for

24   instance, if Mr. Brown were to be called as a witness in

25   this case, Mr. Mack would not be able to cross-examine him?

1    Do you understand that?

2              DEFENDANT GATES:  I do, Your Honor.

3              THE COURT:  And do you also understand that Mr.

4    Mack might not even be able to tell Mr. Wu or any other

5    member of your team things that Mr. Brown told him that might

6    be helpful to you in their cross-examination of Mr. Brown?

7              DEFENDANT GATES:  I understand, Your Honor.

8              THE COURT:  And do you also understand that Mr.

9    Mack wouldn't be able to reveal to you or your team,

10   necessarily, things that Mr. Brown told him that could be

11   helpful to you in your cross-examination of other witnesses

12   or in your defense in general?

13             DEFENDANT GATES:  I do, Your Honor.

14             THE COURT:  And, for instance, he couldn't and

15   nobody else on the team could use information that they

16   learned from Mr. Brown to cross-examine other government

17   witnesses?

18             DEFENDANT GATES:  Um-hum.  I understand, Your Honor.

19             THE COURT:  Now, Mr. Brown is going to trial

20   first, apparently.  I don't think anybody is going to

21   propose a February trial date in this case.  If Mr. Mack has

22   to use all the information at his fingertips to provide Mr.

23   Brown with the best possible defense, he might have to make

24   a decision -- I don't know what it could be, but it's

25   possible -- that isn't in your best interests because it's

1      in Mr. Brown's best interests.  Do you understand that?

2                    DEFENDANT GATES:  I do, Your Honor.

3                    THE COURT:  And to this point, are you satisfied

4      with Mr. Mack's representation of you?

5                    DEFENDANT GATES:  I am, Your Honor.

6                    THE COURT:  Have you had the opportunity to

7      discuss the possibility of this conflict and what it might

8      mean with him?

9                    DEFENDANT GATES:  Yes, Your Honor.

10                   THE COURT:  Have you had the opportunity to

11     discuss it with lawyers who are not Mr. Mack?

12                   DEFENDANT GATES:  Yes, Your Honor, two.

13                   THE COURT:  And have you -- two lawyers, did you

14     say?

15                   DEFENDANT GATES:  Two independent lawyers.

16                   THE COURT:  Okay.  And they're not his partners or

17     members of his law firm?

18                   DEFENDANT GATES:  That is correct, Your Honor.

19                   THE COURT:  Have you had enough time or enough

20     opportunity to do that?

21                   DEFENDANT GATES:  Yes, Your Honor.

22                   THE COURT:  Okay.  Do you feel that you need more

23     time to discuss this or think about it in light of the

24     questions that I've asked you today?

25                   DEFENDANT GATES:  I do not, Your Honor.

1          THE COURT:  Do you understand that if I accept

2     your waiver, you're waiving the right to have a lawyer who

3     has absolutely not even the possibility of any conflict of

4     interest in your case?

5          DEFENDANT GATES:  I do, Your Honor.

6          THE COURT:  And do you understand that if accept

7     your waiver, you can't -- if you are convicted in this case,

8     you can't appeal and say, well, I didn't have a lawyer who

9     was free of a conflict?  Do you understand that?

10          DEFENDANT GATES:  I do understand, Your Honor.

11          THE COURT:  And you can't come back afterwards and

12     file a motion and say my conviction should be overturned

13     because my lawyer was not free of this conflict.  Do you

14     understand that?

15          DEFENDANT GATES:  I do understand.

16          THE COURT:  Now, a lot of the case law seems to

17     suggest that I should, after I've advised you of all these

18     circumstances, give you sufficient time to mull it over and

19     let me know what your answer is.  Do you feel like you've

20     had sufficient time to consider all these circumstances and

21     have me -- and ask you now?  Or do you want me to ask you in

22     January what your answer is about this question?

23          DEFENDANT GATES:  No, I believe I've had

24     sufficient time, Your Honor.

25          THE COURT:  And what is your point of view about

1    whether you would like to waive any potential conflict of

2    interest that your lawyer might have between his

3    representation of you and his representation of Mr. Brown in

4    New York?

5         DEFENDANT GATES:  I am happy to do so, Your Honor.

6         THE COURT:  Okay.  Mr. Mack or Mr. Wu, are there

7    any questions that you think I should have asked that I

8    haven't asked?

9         MR. MACK:  Not by me, Your Honor.

10        MR. WU:  No, Your Honor.

11        THE COURT:  Is there anything the government

12   thinks I should ask?

13        MR. ANDRES:  No, Judge.

14        THE COURT:  Well, I find that Mr. Gates

15   understands what he's doing, that he's had the opportunity

16   to obtain independent advice, and this is a knowing and

17   voluntary waiver, and I will accept it.  So, as far as I'm

18   concerned, that takes care of that issue in this case.

19        Is there anything else, now that Mr. Manafort and

20   Mr. Downing have already departed, that I need to take up in

21   connection with Mr. Gates's case?

22        MR. WU:  No, Your Honor.

23        MR. MACK:  No.

24        THE COURT:  Anything further from the government?

25        MR. ANDRES:  Judge, just for the record, I'm not

1    sure I agree with everything Mr. Mack said about whether we

2    would oppose or not any future issues, and we'll continue to

3    speak with him about that.  I did say that we're aware that

4    the Court has granted those and that we would consider them.

5    But I don't think I categorically said we won't oppose any

6    of those.  I don't think it matters, but I wanted to make

7    that clear.  And we'll respond to each and every one of the

8    requests Mr. Gates wants.

9             THE COURT:  All right.  Hopefully we'll be in a

10   position where he doesn't have to ask me every weekend what

11   he wants to do that weekend.  But at this point we'll

12   continue to proceed the way we've been proceeding.

13            THE COURTROOM DEPUTY:  Was the motion, then,

14   granted or denied?

15            THE COURT:  Well, the motion, I believe, was for a

16   hearing.  I held the hearing, so I think that renders the

17   motion moot.

18            MR. ANDRES:  Agreed.

19            THE COURT:  Thank you, everyone.

20            MR. ANDRES:  Thank you, Judge.

21                         *   *   *

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, JANICE DICKMAN, do hereby certify that the above

4    and foregoing constitutes a true and accurate transcript of

5    my stenograph notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7                          Dated this 20th day of December, 2017.

8

9

10                       /s/_____

11                       Janice E. Dickman, CRR, RMR
                         Official Court Reporter
12                       Room 6523
                         333 Constitution Avenue NW
13                       Washington, D.C. 20001

14

15

16

17

18

19

20

21

22

23

24

25