```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal
                                     ) No. 17-201
 4                    Plaintiff,     )
                                     ) Status Conference
 5    vs.                            ) PUBLIC
                                     ) Washington, DC
 6    PAUL JOHN MANAFORT, JR.        ) January 16, 2018
      RICHARD W. GATES, III,         ) Time:  9:30 a.m.
 7                                   )
                      Defendants.    )
 8    _____

 9             TRANSCRIPT OF STATUS CONFERENCE
                        HELD BEFORE
10         THE HONORABLE JUDGE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE
11    _____

12                  A P P E A R A N C E S

13    FOR THE PLAINTIFF:     GREG D. ANDRES,
                             Senior Assistant Special Counsel
14                           ANDREW WEISSMANN
                             KYLE R. FREENY
15                           U.S. Department of Justice
                             Special Counsel's office
16                           950 Pennsylvania Avenue NW
                             Washington, D.C.  20530
17                           202-514-1746

18

19    FOR DEFENDANT MANAFORT: KEVIN M. DOWNING
                             815 Connecticut Avenue, N.W.
20                           Suite 730
                             Washington, D.C. 20006
21                           (202) 754-1992

22                           THOMAS EDWARD ZEHNLE
                             Miller & Chevalier, Chartered
23                           900 Sixteenth Street, NW
                             Washington, DC 20006
24                           (202) 626-5800
                             Email: Tzehnle@milchev.com

25
```

```
1    FOR DEFENDANT GATES:        SHANLON WU
                                 Wu, Grohovsky & Whipple
2                                1300 Pennsylvania Avenue, NW
                                 Suite 700
3                                Washington, DC 20004
                                 (202) 204-3053
4                                Email: Swu@dcwhitecollar.com

5    ALSO PRESENT:              Andre Sidbury, Pretrial Officer

6                               Omer Meisel, Special Agent

7    _____

8    Court Reporter:            Janice E. Dickman, RMR, CRR
                                Official Court Reporter
                                United States Courthouse, Room 6523
9                               333 Constitution Avenue, NW
                                Washington, DC  20001
10                              202-354-3267

11                                  *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Your Honor, this morning we

2     have criminal case number 17-201, the United States of

3     America v. Paul Manafort, Jr., and Richard Gates, III.  Both

4     Mr. Manafort and Mr. Gates are present in the courtroom.

5          Will counsel for the parties please approach the

6     lectern, identify yourself for the record and the party that

7     you represent.

8          MR. ANDRES:  Good morning, Your Honor.  Greg

9     Andres, Andrew Weissmann, and Kyle Freeney, and Supervisory

10    Special Agent Omer Meisel for the Special Counsel's Office.

11    Good morning.

12          THE COURT:  Good morning.

13          MR. WU:  Good morning, Your Honor.  Happy New

14    Year.  Shanlon Wu and Mr. Walter Mack on behalf of Mr. Gates.

15          THE COURT:  All right.  Good morning.  Good

16    morning, Mr. Mack.

17          MR. DOWNING:  Good morning, Your Honor.  Kevin

18    Downing and Tom Zehnle for Mr. Manafort.

19          THE COURT:  All right.  Good morning.

20          I read the status report filed by Mr. Andres on

21    Friday afternoon.  With respect to discovery, is there

22    anything further that you want to add to the record about that?

23          MS. FREENEY:  Not at this time, Your Honor.

24          THE COURT:  Okay.  Do the defendants agree with

25    what was set out in the report about what's been going on

1   with discovery?  Is there anything I need to know from your

2   perspective about discovery?

3            MR. DOWNING:  Good morning, Your Honor.  I think

4   the status notice has spelled out pretty much what's going

5   on here.  I do think we're a little surprised that we're

6   this late in the game and there's still more discovery

7   coming.  We don't know what's coming, we don't know the

8   amount of it.  We also have been in discussions with the

9   Office of Special Counsel about some of our discovery

10  requests, and we believe starting next week we'll be filing

11  some motions on that.

12           THE COURT:  All right.  Mr. Wu?

13           MR. WU:  Same posture, Your Honor.  We are indeed

14  receiving voluminous discovery and we're in the process of

15  reviewing it.

16           THE COURT:  All right.  Mr. Andres, where are we

17  in terms of the percentage of what you have that's been

18  produced?  Is there more coming?

19           MS. FREENEY:  Your Honor, I can address that.  So,

20  there is more coming, but I think we believe we have

21  substantially produced what's discoverable.  So, as we set

22  forth in the status report, its roughly 590,000 items we are

23  producing.  Again, today another production that contains

24  approximately 46,000 items and six additional devices.  And

25  we think that that covers most of the material that has been

1    obtained in the investigation through the beginning of this

2    year.

3              There are some things that remain outstanding; of

4    course, new material that comes in, to the extent that new

5    material is coming in.  So, for example, after the beginning

6    of January, that material obviously remains to be produced.

7              As we indicated in the status report, there are

8    certain quality checks that the government is undertaking to

9    make sure that we've identified the right -- for lack of a

10   better word, pockets of discoverable material that, you

11   know, may not be in obvious places.  That process remains

12   ongoing.  As we noted in our status report, there are

13   certain privileged materials that still need to be produced.

14             And then finally, as Mr. Downing alluded to, we

15   received, on Friday evening, some discovery requests from

16   Mr. Manafort's counsel.  Just given the time, the timing of

17   when we received them, you know, we just plan to respond to

18   them promptly.

19             THE COURT:  Are those the only ones that are

20   outstanding that we're talking about?

21             MS. FREENEY:  In terms of discovery requests, yes.

22   Again, we received those on Friday evening.  So we're going

23   to take a look at them, see if there's responsive material

24   and respond appropriately.  And then, again, it's more just,

25   sort of, pockets of material in less obvious places, so that

1    we're making sure that we have everything, that is an

2    ongoing process.  But I think in terms of the -- the sort of

3    volume, we believe that the bulk has been produced.

4         THE COURT:  All right.  I mean, I think at this

5    point, other than things that are still coming in, there's

6    no excuse for not producing what you have.  The case was

7    brought some time ago and you're asking for a trial date

8    that isn't that far away and they can't possibly be ready

9    for trial if they don't have what you have.  So it all needs

10   to be produced.  Anything that you already have needs to be

11   produced.

12        MS. FREENEY:  Understood, Your Honor.  Understood.

13        THE COURT:  I don't know whether this is a

14   question for you or this is a question for Mr. Andres.  The

15   last time you were here you told me you anticipated that

16   well before today you would be providing a joint proposed

17   trial schedule so that I could craft a schedule for pretrial

18   proceedings.  I got something at 3 o'clock on Friday.  And

19   it has a trial date in it, but is that a joint suggestion or

20   is that your suggestion?

21        MR. ANDRES:  Judge, we've had discussions with the

22   defense about the trial date.  That's our request.  I

23   understand they also have some scheduling issues as to that

24   date.  And so that is not a joint recommendation, but we

25   thought we would get the trial date set and work backwards

1    with the motions schedule.

2            Judge, there is one issue that we have discussed

3    with the defense that we would like to address with the

4    Court at sidebar relating to the scheduling of trial.  So

5    when Your Honor is ready to address that, we're happy to

6    approach, if that's acceptable.

7            THE COURT:  All right.  Well, let me start by just

8    asking you, if I'm going to be setting a trial date, how

9    long do you anticipate it's going to take to put the

10   government's case on?

11           MR. ANDRES:  Three weeks, Your Honor.

12           THE COURT:  The schedule that I had developed a

13   couple status hearings ago, with an eye towards a May trial

14   date, would have had motions briefed and heard by now.  So

15   I'm not sure May 14th is going to turn out to be practical.

16   And if we use it, or even if we use May or June, the

17   briefing schedule is going to be tight and there's not going

18   to be a lot of room for extensions.

19           But I need to explore some other issues before we

20   talk about the trial date.  And why don't we just hear what

21   you have to say at the bench first.

22           And in connection with that, Mr. Haley, is there

23   an overflow courtroom?

24           THE COURTROOM DEPUTY:  No, there isn't.

25           THE COURT:  All right.  You can approach the

1    bench.

2         (Sealed bench discussion:)























1 ████████████

2          (Open court:)

3          THE COURT:  All right.  I do think it's important,

4    in light of all of those circumstances we've been talking

5    about, to set a motions schedule.  I'm going to defer

6    setting a trial schedule for the moment.

7          Mr. Downing, you told me last time that you

8    expected to file a dispositive motion well before trial and

9    before we got into things like evidentiary motions and

10   motions in limine.  And we have agreed we should set those

11   dates counting forward from now, as opposed to backwards

12   from the trial date.  So is there any reason we shouldn't

13   set a motions schedule right now for motions under Rule 12

14   to deal with defects in the prosecution or defects in the

15   indictment?

16          MR. DOWNING:  I don't have any reason not to set

17   them now.

18          THE COURT:  All right.  So, when do you think you

19   can file your motions?

20          (Off-the-record discussion between defense counsel.)

21          MR. DOWNING:  Your Honor, I believe mid-March

22   would be an acceptable deadline for the defense.

23          THE COURT:  You need to wait until March to file

24   motions under Rule 12(b)(3)?

25          MR. DOWNING:  I just conferred with co-counsel and

1    we think mid-March would be a deadline that would be easy

2    for us to meet.

3            THE COURT:  All right.  Well, I mean, the last

4    time you came in here you told me you were expecting to file

5    them even before this hearing.  So, what's changed?

6            MR. DOWNING:  We did.  But I think what's changed

7    is us sitting around waiting for discovery.  We got 190,000

8    items between December 20th and last week.  So we're doing a

9    lot of things here, Your Honor.  We have limited resources.

10   We have a couple of lawyers working here.  We're not with

11   big firms and it takes time to get through this.

12           So realistically, I don't see, with the discovery

13   load that has been put on us, that we can realistically have

14   the adequate time to file the motions we want to file before

15   mid-March.

16           THE COURT:  All right.  Well, I'm not talking

17   about motions to suppress here.  I'm not talking about

18   motions to suppress statements, motions to suppress

19   evidence, I'm not talking about motions in limine.  All I

20   was talking about was defects in the prosecution or defects

21   in the indictment.

22           MR. DOWNING:  Sure.  Well, I'll give you an example.

23           THE COURT:  All right.

24           MR. DOWNING:  One of the items we have right now

25   and we've been looking at is whether or not we have to serve

1    a request for a bill of particulars, because there are quite

2    a few allegations in the indictment that don't have factual

3    allegations that go along with it.  So we haven't done that

4    yet.  We anticipate that -- for resource allocation for the

5    Court and the defense, that we would file that motion first

6    and get an answer to that.  And that would be something that

7    would be incorporated into a dispositive motion.  So it's

8    just one example I have of how that timing could get

9    affected by a discovery issue.

10             THE COURT:  All right.  Are you planning to file

11   any -- a motion under 12(b)(3)(A) alleging a defect in the --

12   instituting the prosecution?

13             MR. DOWNING:  We are.

14             THE COURT:  All right.  When do you think you can

15   file that?  Don't you think that's something we should take

16   up before we take up anything else?

17             MR. DOWNING:  Could I have a moment, Your Honor?

18             THE COURT:  Yes.

19             (Off-the-record discussion between defense counsel.)

20             MR. DOWNING:  Your Honor, we believe that we could

21   do that by the end of February.

22             THE COURT:  All right.  Mr. Mack, what do you want

23   to say?

24             MR. MACK:  I was just going to say we are the

25   least informed of any counsel before, since we have just

1    entered -- not just --

2         THE COURT:  Not just.

3         MR. MACK:  -- but shortly after October 27.  And

4    we've been focused primarily on the bail issues.  And I

5    think it's going to take us longer than, perhaps, the Court

6    would wish for us to get up to speed.  But we do intend to

7    file, I would say, dispositive motions.

8         I think we need six weeks in order to be able to

9    do that, to master the discovery, which we're getting a

10   great quantity, and we are the least familiar with it.  And

11   we have -- we've been working -- well, we would like to --

12   we think there are important motions to be made and we would

13   like adequate time to do it, plus the fact -- and I realize

14   this is not the Court's problem -- but I am scheduled for

15   trial on April 9, in a four-week trial with more documents

16   than this case, which we are getting from the government --

17   I think we got 100,000 last week.  So my time has to be --

18   not this government, but the U.S. attorney in Southern New York.

19        THE COURT:  It's all the same government.

20        MR. MACK:  It is all the same government.

21   Sometimes I agree with that, but not always.

22        But in any event, the point being that we need the

23   time and we are the least prepared of anyone here and we

24   want to do a good job and we need that time to be able to do it.

25        THE COURT:  All right.  Well, I think that we can

1    certainly have a staggered schedule and deal with motions

2    under 12(b)(3)(A) and 12(b)(3)(B) first.  And then we can

3    move on to motions to suppress and 404(b) motions, with

4    things like motions in limine being set much closer to trial.

5        Discovery motions you can file when you have

6    discovery disputes or you can ask for a status conference so

7    we can talk them through.  I think that may be a more

8    expeditious way to deal with discovery disputes.  A request

9    that was filed on Friday is not a ripe dispute for motion at

10    this point.

11        So, but I think the fact that discovery has been

12    rolling, I don't think that's any wrongdoing on the part of

13    the prosecution, but it certainly affects the defenses'

14    ability to be ready for a trial date on the kind of schedule

15    that you're talking about.  You can't tell me on Friday,

16    Well, last night we produced more documents and expect them

17    to be ready for the same trial that you're ready for;

18    they're clearly not.

19        So, I'm not exactly sure at this point when the

20    trial date should be.  I still think it might be useful for

21    you to speak with each other about it.  I came in here with

22    a prepared motion schedule, but it was a lot sooner than the

23    one you're talking about.

24        All right.  I'm go to say -- why don't we say

25    February 23rd for any motions filed under Federal Rule of

1    Criminal Procedure 12(b)(3)(A) or (B) alleging defects in

2    instituting the prosecution or in defects in the indictment

3    or information.  Given the importance of those motions, the

4    government can respond to them on March 16, replies March

5    30.  And then I would like to set a hearing in April, but if

6    counsel is going to be in trial, that's going to be tricky.

7    Can I set a motions hearing for April 20th?

8         MR. MACK:  Your Honor, as all trials, this one,

9    especially in New York, may plead out sometime in the

10   relatively near future.  Of course I will let the Court know

11   immediately if that were to occur.  But I think the Court

12   can set the schedule that it would expect here, and Mr. Wu,

13   far more competent than me, can basically represent us with

14   my input.

15        THE COURT:  All right.  Then I'm going to set a

16   motions hearing on those dispositive motions only on

17   Tuesday, April 17, at 10 a.m.   And then what I would like

18   to do is issue an order saying what I would like included in

19   a schedule and then ask you to meet and confer and come back

20   to me with a schedule that works for that.

21        In terms of a trial date, I don't have a problem

22   with a trial in September or October.  So I think we should

23   be able to get something on the calendar.  But, no, I don't

24   want something that we're going to continue.  We're going to

25   have a real trial date.  But that means that discovery has

1          to get done, these first motions have to get filed and then

2          we can work together to try to come up with a schedule for

3          the rest of it.

4                    All right.  I received -- with respect to bond

5          issues, I believe that the submission made by Mr. Gates has

6          complied with what I said had to be submitted, so that I

7          could then issue the order with the conditions in it, with

8          the few modifications that I've already talked about.  I

9          asked the government to let me know by today -- and I didn't

10         say this morning -- but do you know now whether you agree

11         that he's done what he needs to do?

12                   MR. ANDRES:  Yes, Judge.  In terms of the

13         paperwork, we have no issue.  There are just two issues, one

14         of which counsel has already represented to the government,

15         but I think it makes sense to put on the record, which is

16         whether Mrs. Gates has surrendered her passport, which is

17         another condition.

18                   And then, secondly, we just had a question in

19         terms of what the appropriate process was for the suretors

20         to swear out, if you will, their -- the bail bond or the

21         bail form.  I understand that some have done it in front of

22         the clerk of court, some have been sworn.  I just wanted to

23         clarify what process the Court required for that in terms of

24         letting the suretors know, putting them under oath and

25         swearing them, in terms of their signatures.

1            THE COURT:  The documents they've filed are not

2      sworn?

3            MR. ANDRES:  I don't want to -- I think it's

4      probably best for Mr. Gates' counsel to address that.  I

5      think some are and some aren't.  But I think he's in a

6      better position to address that.

7            THE COURT:  All right.  All right.

8            MR. WU:  Your Honor, with regard to the passport

9      issue, it's been surrendered, for the record.

10            THE COURT:  All right.

11            MR. WU:  With regard to that question of the

12      attestation, we believe that the individual clerk of the

13      United States District Court's office should be the ones to

14      advise us on that process.  And what they advised was that

15      in one courthouse where the forms were pledged, all of the

16      clerks required them to be signed in their presence.  In one

17      courthouse sureties, pledgers were placed under oath by the

18      clerk of the court.  In the United States District Court for

19      the District of Columbia, the clerk did not have that

20      process of literally swearing in.  But again, the forms

21      which spell out the responsibilities of the pledgers and

22      sureties were signed in the presence of the District of

23      Columbia's District Court's clerk's office.

24            THE COURT:  And do the forms -- I can't recall --

25      say that they're sworn, or that --

1          MR. WU:  They are a -- there's no requirement for

2     a notary or for an affidavit, but they're required to be

3     done in the presence of the clerk for the attestation

4     aspect.  And they clearly state on there what their obligations

5     are going to be.

6          THE COURT:  I think all these forms are sufficient

7     to create the obligations, and I will probably issue an

8     order later today that memorializes the conditions that I

9     said would be issued if and when he complied with the rest

10    of the conditions.

11         MR. WU:  Very well, Your Honor.

12         THE COURT:  All right.  With respect to Mr.

13    Manafort's bond, what are we waiting for?  I mean, I've

14    gotten -- I've received a communication through pretrial

15    services from Mr. Manafort's doctor asking me to modify the

16    conditions of release.  And I don't know why he would be

17    asking me that, since I've already granted his motion and

18    basically the keys to his release lie with him at this point.

19         MR. DOWNING:  Well, first of all, Mr. Manafort's

20    team would disagree that you've given him the keys for his

21    release.

22         THE COURT:  Well, you filed a motion and you said

23    we're seeking relief on the following conditions; these are

24    our sureties, these are the properties we're going to

25    pledge, and I accepted everything he proposed a month ago.

1          MR. DOWNING:  Your Honor, you may not be aware of

2     this, but you actually set another $7 million in security.

3     That's a $17 million bond that you set.  We did not ask for

4     that.  We asked for a $10 million bond.

5          THE COURT:  I don't think I did that.  So if I did

6     that, you had a month to point the error out to me.  I'm

7     happy to read whatever you point out.  I get bond motions on

8     a daily basis, it seems, in this case, so I'm happy to read

9     yours.

10          MR. DOWNING:  Well, we will be filing with you

11     today, Your Honor.

12          THE COURT:  All right.

13          MR. DOWNING:  Thank you.

14          THE COURT:  With respect to the request made

15     through the means of a letter to me from a doctor delivered

16     to the pretrial services agency, if you want me to do

17     anything about it, it needs to be filed as a motion on the

18     docket.

19          MR. DOWNING:  Thank you, Your Honor.

20          THE COURT:  All right.  I will note from the

21     record that while he's subject to home confinement, he's not

22     confined to his couch.  And I believe he has plenty of

23     opportunity to exercise.

24          All right.  There is a further issue to take up.

25     I issued an order to show cause on December 22nd concerning

1    defendant Gates' compliance with my order dated November 8th

2    which barred all the interested parties, including the

3    defendants and their counsel, quote, from making public

4    statements to the media or in public settings that poses

5    substantial likelihood of material prejudice, close quote.

6    The concern, as everyone knows, is the jury venire.  And I

7    want to note again that no one objected to the entry of the

8    order.

9         The order does not prohibit the creation of a

10   legal defense fund and it does not prohibit the solicitation

11   of donations.  But that's not all that happened in this

12   case.  A fund was established, a fundraiser was held, and

13   apparently a number of journalist were specifically invited

14   to the fundraiser.  Mr. Gates was not present, he was

15   abiding by the condition of home confinement.  But he

16   created a videotape to be shown at the event.

17        The defense has provided me with a transcript.  In

18   the videotape he thanked, as he certainly is permitted to

19   do, those who attended and who might help to fund his

20   defense for their generosity and their kindness and their

21   support.  He reminded everyone that he was not permitted to

22   discuss the specifics of his case.

23        But that's also not all that happened.  The host

24   of the event, an individual named Jack Burkman, went much

25   further.  According to press accounts that I found and the

1    accounts provided by the defense, he said that Mr. Gates is

2    a victim of an unfair criminal prosecution, that the special

3    counsel is an increasingly desperate prosecutor, unfairly

4    pursuing the case, and other statements of that nature.  And

5    Mr. Gates said on the video thank to you Jack Burkman for

6    hosting the fundraiser, for believing in my cause, and

7    ensuring supporters from across the United States hear our

8    message and stand with us.  So that's what prompted the

9    order to show cause.

10          Mr. Gates provided an article in response to the

11   order that quotes Mr. Burkman prefacing one of these

12   statements with, "I don't want to get too political, but my

13   personal belief is that our good friend Rick is really the

14   victim of an unfair prosecution."  The response maintains

15   that Mr. Burkman was simply expressing his personal opinion

16   throughout and that he was not acting as a representative

17   for the defendant at the event; he was just acting totally

18   on his own.

19          The problem is that it's hard to discern what

20   message Mr. Gates could be referring to in the video, other

21   than what Mr. Burkman said.  And it doesn't make sense that

22   Mr. Burkman would have a video of Mr. Gates in hand that

23   expressly mentioned Mr. Burkman if the two hadn't been

24   working in tandem on the event, even if it was through an

25   intermediary and they weren't personally communicating.

1          So I want to repeat that my order does not prevent

2     third parties with no relationship to either side of this

3     case from blogging, Tweeting, posting, serving as talking-heads

4     on the news, hosting events, or otherwise publicizing their

5     personal views of the strengths and weaknesses of the

6     prosecution or the defense.  Mr. Burkman is free to exercise

7     his First Amendment rights.

8          But it is hard to swallow the proposition set

9     forth in the defendant's response that Mr. Burkman was not

10    acting as a spokesperson or representative or agent for Mr.

11    Gates on this occasion.  So, I'm not satisfied that the

12    event was entirely consistent with the order.

13         As I did in the case the first time questions were

14    raised concerning Mr. Manafort's compliance, I'm going to

15    discharge the order to show cause.  But I think it's really

16    important for the defendants to use some common sense and to

17    consult with their counsel when a situation comes up that

18    could give rise to these concerns.

19         You can fundraise, you can say what you want at a

20    private gathering to people about why they should help you.

21    And you can certainly send thank you notes to anyone who

22    contributes.  But if the press is going to be invited to an

23    event where you or your surrogate will be speaking, I

24    suggest that that's a pretty big red flag.

25         I also think that other people can talk about the

1    case and other people can fundraise and other people can

2    express their opinions about why money should be donated.

3    But when those events become orchestrated or entangled,

4    that's where the risk is of crossing the line.  If the means

5    used to solicit funds on your behalf is a public attack on

6    the prosecution, you should not be cheering it on, you

7    should not be part of the presentation.  I think that gives

8    you enough guidance moving forward.

9              So is there anything else that anybody needs to

10   raise today in connection with this case?

11             Yes?

12             MR. WU:  Your Honor, just briefly on the issue

13   with fundraising.

14             THE COURT:  Yes.

15             MR. WU:  We completely understand your guidance

16   and appreciate that.  I just want to note for the record

17   that in this day and age the notion, as Your Honor said,

18   you're free to speak in a, quote, unquote, private

19   gathering, in this day and age it's not always so easy to

20   ascertain.  I'm not talking about this fundraiser.  But

21   going forward --

22             THE COURT:  There was nothing complicated about

23   this one when the press was invited.

24             MR. WU:  I'm just saying going forward those

25   issues may vary on a case-to-case basis, because Your Honor

1     is well familiar with the fact that people may think they're

2     speaking privately, but in fact there are journalists there

3     or people making a public record.

4            With regard to this fundraiser that occurred, I

5     just want to reiterate that Mr. Gates in no way implicitly,

6     and certainly not explicitly, gave any instructions with

7     regard to a message by anyone.  He also had no involvement

8     in the invitation list.  But we appreciate your guidance and

9     we'll certainly be very cognizant of that, should there be

10    any further fundraising efforts.

11           THE COURT:  All right.  Is there anything further

12    the government wants me to raise at this time?

13           MR. WEISMANN:  Yes, Your Honor.  As the Court may

14    be aware, on January 3rd there was an action filed, a civil

15    action by Mr. Manafort challenging the order from the acting

16    attorney general and the implementation by Special Counsel

17    Mueller.  I wanted to make sure that the Court was aware,

18    given the Court's scheduling of dispositive motions, that

19    although the time to reply in that case will not run for 60

20    days from Friday, since the action was not served actually

21    until this past Friday, we will be filing, no later than

22    February 2nd, to have that case dismissed.

23           And one of the grounds will be that there was an

24    adequate remedy before this Court and, thus, the

25    government's position is that if Mr. Manafort seeks to have

1    those issues decided on the merits, that under the APA it

2    would behoove him to file that along the motion schedule set

3    by the Court, and that this, in the criminal case, is the

4    appropriate venue for that to be decided, especially since

5    the remedy that is sought is dismissal of the indictment.

6              THE COURT:  Well, obviously the Federal Rules of

7    Criminal Procedure set up remedies for dealing with defects

8    in the prosecution and the indictment, and I have set a

9    schedule for those to be heard.  I'm not going to opine on

10   the record about the legitimacy of the civil action or whether

11   there's subject matter jurisdiction or whether it states a

12   claim under the APA because the matter isn't before me.

13             I suppose I would be interested in the parties'

14   positions as to whether that case should be before me, but

15   it isn't at the moment.  And there's no rule that would

16   require its transfer.  But, there is an indictment pending

17   in this case and under the Federal Rules, if someone wants

18   to challenge it, those motions have to be filed before trial

19   in accordance with the schedule that I just set.

20             MR. ANDRES:  We agree with that, Your Honor, that

21   would be made.  There is an opportunity for the defendant to

22   make those motions before this Court.  And one of the

23   grounds, in addition to the merits that we will be raising

24   before the other court, is precisely that, and this is the

25   proper procedure for seeking that remedy.

1           THE COURT:  All right.  Mr. Downing?

2           MR. DOWNING:  Your Honor, I just want to point out

3    that when we filed the civil complaint, we did put a notice

4    on it that this case was pending here in D.C.  Under the

5    local rules, there's no related-case issue for criminal and

6    civil.

7           THE COURT:  I understand that.

8           MR. DOWNING:  So we filed it with notice to the

9    clerk.  I just wanted you to know, we wanted the clerk to

10   know that this was related to an ongoing criminal matter

11   before it.  That's first of all.  Second of all --

12          THE COURT:  What are you saying?  Do you think

13   that they should be before the same Court, or not?

14   Obviously, we're all quite well aware that the subject

15   matter is the same.  But our related-case rules don't

16   contemplate the notion that people would sue civilly to

17   forestall a criminal prosecution.  This is a rather unique

18   situation.

19          So now that we have the situation, do you have a

20   point of view about whether they should be before the same

21   Court?

22          MR. DOWNING:  They definitely arise out of the

23   same facts and transactions that are before this Court in

24   the criminal case.  So it seems, from a judicial economy

25   issue, it would make sense.  I'm not quite sure why the

1    local rule doesn't allow for that --

2          THE COURT:  I think it allows for it, it doesn't

3    require it.  I think cases in this court can be transferred

4    by consent among the judges.  But in the absence of a rule

5    that specified, I don't think we were inclined to make a

6    transfer, if the parties weren't seeking it.

7          But if the parties all agree that judicial economy

8    requires one judge to decide if there's an adequate remedy

9    at law, that would be a useful piece of information to know,

10   and that's why I'm trying to find out if you all have an

11   opinion on it?  If you think that it would advance the cause

12   of getting this dealt with economically to have it in front

13   of one Court, I think that can be arranged.  We can transfer

14   cases, but I wasn't going to just take it or have Judge

15   Ketanji Brown Jackson give it away, given the fact that our

16   rules didn't demand it.

17         MR. DOWNING:  Sure.  Sure.  Could I have a moment,

18   Your Honor?

19         THE COURT:  Yes.

20         (Off-the-record discussion between defense

21   counsel.)

22         MR. DOWNING:  Your Honor, I believe we need to

23   confer a little more.  We'll have an answer for the Court in

24   a couple of days.

25         THE COURT:  All right.  In the meantime then, the

1    cases will stand where they stand.

2              Does the government have a position?

3              MR. WEISSMANN:  Your Honor, we would have no

4    objection at all to having the matter transferred from --

5              THE COURT:  Judge Jackson to Judge Jackson.

6              MR. ANDRES:  -- Judge Jackson to Judge Jackson.

7    It seems fortuitous.

8              THE COURT:  Confusing, yes.

9              MR. ANDRES:  But we also think that regardless of

10   the local rules of the court, that there was nothing that

11   precluded Mr. Manafort, as he said at the last court

12   appearance, that he had dispositive motions that he was

13   going to make.  We had assumed this was the dispositive

14   motion that he was going to make, which is now in the form

15   of a civil complaint.  It obviously could have been brought

16   here, and that will be -- assuming there is no transfer,

17   that will be our position before both Judge Jacksons.

18             THE COURT:  All right.  Well, I'm not going to

19   respond to that; it's not mine to respond.

20             MR. DOWNING:  Your Honor?

21             THE COURT:  Yes, sir.

22             MR. DOWNING:  One clarification.  The civil

23   complaint does not ask to dismiss the criminal indictment.

24   It does not.  It is a separate civil matter.  So I want to

25   be clear on that.  It does not ask for dismissal of the

1    indictment.

2              THE COURT:  It asks -- I don't have it on me.  I

3    believe that Count 2 and then the relief sought quite

4    specifically call for the invalidation of the indictment in

5    no uncertain terms.  Count 1, I believe, relates to the

6    appointment of the special counsel and Count 2 relates to

7    the indictment of your client specifically as being an

8    ultra vires action on the part of the special counsel.  So,

9    I'm not entirely sure how you can say what you just said.

10             MR. DOWNING:  My apologies, Your Honor.  Since I

11    don't have it in front of me, and at the risk of saying

12    something else that's incorrect, I'll reserve on that.

13             THE COURT:  All right.  So if this lawsuit doesn't

14    seek, among other things, the invalidation of the

15    indictment -- it's possible, I didn't read it very

16    carefully.  But it does seem to seek that, quite clearly.

17             All right.  Well, why don't we say, so that we're

18    not -- it's not a mystery, today is -- what is today?

19    Tuesday.  Why don't we say that by Friday the parties will

20    file a notice about whether they're agreed or not agreed

21    about whether the cases should be both tried in this court.

22    And so that then I'll know and the other Jackson will

23    know -- Judge Jackson will know.  And no one is going to be

24    offended one way or the other based on what you say.

25             All right.  Is there anything else I need to take

1    up on behalf of the government?

2             MR. ANDRES:  Judge, we would just ask for another

3    status conference in 30 days, and also move to exclude time

4    either between now and whenever the next status conference

5    is, or between the next hearing, in light of the complexity

6    of the case and the fact that motions schedule has now been

7    set.

8             THE COURT:  We've already entered the order that

9    finds this to be complex case, outside the realm of the

10   Speedy Trial Act.  I do think we need to set another status

11   date, hopefully for the purpose of setting the rest of the

12   schedule based on the order that I'm going to issue later.

13            We have dates for motions at the end of February,

14   but it seems to me we could get together before then.  If

15   there are discovery issues, I would like to have an

16   opportunity to start ironing them out.  So you can let me

17   know if there are any you want to talk about.

18            How about February 14, or February 13, one of

19   those mornings for the next status conference?

20            MR. ANDRES:  Either is fine for the government.

21            THE COURT:  All right.  What about the defense?

22            MR. WU:  Either day is fine with us.

23            THE COURT:  All right.

24            MR. DOWNING:  Either works.

25            THE COURT:  Okay.  Mr. Mack has something he wants

```
 1     to say.

 2              (Off-the-record discussion between defense counsel.)

 3              MR. WU:  Your Honor, with regard to that date, we

 4     might need to speak for a moment on the sidebar.

 5              THE COURT:  All right.

 6              (Sealed bench discussion:)

 7     ███████████████████████████████████████████████████

 8     ██████████████████████████████████████████████████████

 9     ██████████████████████████████████████████████████████

10     ██████████████████████████████████████████████████████

11     ████████████████████████████████████████████████

12     █████████████████████████████████████████████████████

13     ███████████████████████████████████████████████████████

14     ██████████████████████████████████████

15     ███████████████████████

16     █████████████████████████████

17     ████████████████████████████████████████

18     ████████████

19              (Open court:)

20              THE COURT:  All right.  We'll set the next status

21     conference for February 14th at 9:30 a.m.  Given the

22     complexity of the matter, the need for discovery to be

23     completed and the anticipated motions, I think it's in the

24     interest of justice to exclude the time under the speedy

25     trial calculation between now and the 14th.
```

1          I should be issuing an order today in connection

2     with Mr. Gates' release from the current conditions of

3     confinement and the new conditions imposed.  And I'll be

4     happy to review whatever Mr. Manafort files whenever Mr.

5     Manafort files it.

6          All right.  Thank you, everybody.

7          (Off-the-record discussion between the Courtroom

8     Deputy and the Court.)

9          THE COURT:  Mr. Sidbury, when I issue the new

10     order with the new conditions, do I need Mr. Gates present

11     to swear him to them?  Or can he come to your office and do

12     that?  Or does he need to come into court and sign the way

13     he signs the other conditions?

14          THE PRETRIAL SERVICES OFFICER:  Your Honor,

15     because you're changing his conditions -- if I could have

16     one brief --

17          THE COURT:  All right.

18          THE PRETRIAL SERVICES OFFICER:  Your Honor, Mr.

19     Gates will have to come into court and sign a new release

20     order because of the way that it's phrased in the original

21     release order.

22          THE COURT:  All right.  So, do you want to just

23     set a time tomorrow morning to do that, Mr. Wu?  Or maybe we

24     can do it later today?

25          MR. WU:  Of course, later today would be

1    preferable because of logistics.

2            Is there any possibility that it could be signed

3    at the other courthouse in Richmond?

4            THE COURT:  Well, I don't think it's going to take

5    that much longer, if he can return to your office with you

6    and we can set a time to get together later today to

7    complete this process.

8            MR. WU:  That's fine, Your Honor.

9            THE COURT:  So I think that's the best thing to do.

10            Mr. Manafort and his counsel do not need to return.

11            Why don't we come back at 2 p.m.  Does that work

12    for you, Mr. Wu?

13            MR. WU:  That's fine.

14            THE COURT:  All right.  That's what we'll do.

15            Thank you, Mr. Haley, for bringing that to my

16    attention.

17                                *   *   *

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of

my stenograph notes and is a full, true and complete

transcript of the proceedings to the best of my ability.

                        Dated this 18th day of January, 2017.




                        /s/_____

                        Janice E. Dickman, CRR, RMR
                        Official Court Reporter
                        Room 6523
                        333 Constitution Avenue NW
                        Washington, D.C. 20001