IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 17-201-2 (ABJ)(S-2) |
| | * | |
| v. | * | Violations: 18 U.S.C. §§ 371 and 1001(a) |
| | * | |
| RICHARD W. GATES III, | * | |
| | * | Case: 1:17-cr-201 |
| Defendant. | * | Assigned To : Judge Jackson, Amy Berman |
| | * | Assign. Date : 2/23/2018 |
| | ****> | Description: SUPERSEDING INFORMATION (A) |
| | | Case Related to: 17-cr-201 (ABJ) |

## SUPERSEDING CRIMINAL INFORMATION

The Special Counsel informs the Court:

1.      RICHARD W. GATES III (GATES) served for years as a political consultant and lobbyist. Between at least 2006 and 2015, GATES and Paul J. Manafort, Jr. (Manafort) acted as unregistered agents of the Government of Ukraine, the Party of Regions (a Ukrainian political party whose leader Victor Yanukovych was President from 2010 to 2014), Yanukovych, and the Opposition Bloc (a successor to the Party of Regions that formed in 2014 when Yanukovych fled to Russia). Manafort and GATES generated tens of millions of dollars in income as a result of their Ukraine work.  In order to hide Ukraine payments from United States authorities, from approximately 2006 through at least 2016, Manafort and GATES laundered the money through scores of United States and foreign corporations, partnerships, and bank accounts.

2.      In furtherance of the scheme, Manafort and GATES funneled millions of dollars in payments into foreign nominee companies and bank accounts, opened by them and their accomplices in nominee names and in various foreign countries, including Cyprus, Saint Vincent

& the Grenadines (Grenadines), and the Seychelles. Manafort and GATES hid the existence of the foreign companies and bank accounts, falsely and repeatedly reporting to their tax preparers and to the United States that they had no foreign bank accounts.

3.      In furtherance of the scheme, Manafort and GATES concealed from the United States their work as agents of, and millions of dollars in payments from, Ukraine and its political parties and leaders. Because Manafort and GATES, among other things, directed a campaign to lobby United States officials on behalf of the Government of Ukraine, the President of Ukraine, and Ukrainian political parties, they were required by law to report to the United States their work and fees. Manafort and GATES did not do so. Instead, when the Department of Justice sent inquiries to Manafort and GATES in 2016 about their activities, Manafort and GATES responded with a series of false and misleading statements.

4.      In furtherance of the scheme, Manafort used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income. Manafort, without reporting the income to his tax preparer or the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors. Manafort also used these offshore accounts to purchase multi-million dollar properties in the United States. Manafort then borrowed millions of dollars in loans using these properties as collateral, thereby obtaining cash in the United States without reporting and paying taxes on the income. In order to increase the amount of money he could access in the United States, Manafort defrauded the institutions that loaned money on these properties so that they would lend him more money at more favorable rates than he would otherwise be able to obtain.

5.      GATES aided Manafort in obtaining money from these offshore accounts, which he was instrumental in opening.  Like Manafort, GATES used money from these offshore accounts to pay for his personal expenses, including his mortgage, children's tuition, and interior decorating of his Virginia residence.

6.      In total, more than $75,000,000 flowed through the offshore accounts.  Manafort laundered more than $18,000,000, which was used by him to buy property, goods, and services in the United States, income that he concealed from the United States Treasury, the Department of Justice, and others.  GATES transferred more than $3,000,000 from the offshore accounts to other accounts that he controlled.

### Relevant Individuals And Entities

7.      Manafort was a United States citizen.  He resided in homes in Virginia, Florida, and Long Island, New York.

8.      GATES was a United States citizen.  He resided in Virginia.

9.      In 2005, Manafort and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.  DMP had staff in the United States, Ukraine, and Russia.  In 2011, Manafort created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.  DMI was a partnership solely owned by Manafort and his spouse.  GATES worked for both DMP and DMI and served as Manafort's right-hand man.

10.     The Party of Regions was a pro-Russia political party in Ukraine.  Beginning in approximately 2006, it retained Manafort, through DMP and then DMI, to advance its interests in

Ukraine, including the election of its slate of candidates.  In 2010, its candidate for President, Yanukovych, was elected President of Ukraine.  In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption.  Yanukovych, the Party of Regions, and the Government of Ukraine were Manafort, DMP, and DMI clients.

11.     The European Centre for a Modern Ukraine (the Centre) was created in or about 2012 in Belgium as a mouthpiece for Yanukovych and the Party of Regions.  The Centre was used by Manafort, GATES, and others in order to lobby and conduct a public relations campaign in the United States and Europe on behalf of the existing Ukraine regime.  The Centre effectively ceased to operate upon the downfall of Yanukovych in 2014.

12.     Manafort and GATES owned or controlled the following entities, which were used in the scheme (the Manafort-GATES entities):

Domestic Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Bade LLC (RG) | January 2012 | Delaware |
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
|  | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
|  | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
|  | November 1999 | Virginia |
| DMI (PM) | June 2011 | Delaware |

| Entity Name | Date Created | Incorporation Location |
| --- | --- | --- |
| | March 2012 | Florida |
| Global Sites LLC (PM, RG) | July 2008 | Delaware |
| Jemina LLC (RG) | July 2008 | Delaware |
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |
| Jupiter Holdings Management, LLC (RG) | January 2011 | Delaware |
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM, RG) | July 2008 | Delaware |

<u>Cypriot Entities</u>

| Entity Name | Date Created | Incorporation Location |
| --- | --- | --- |
| Actinet Trading Limited (PM, RG) | May 2009 | Cyprus |
| Black Sea View Limited (PM, RG) | August 2007 | Cyprus |
| Bletilla Ventures Limited (PM, RG) | October 2010 | Cyprus |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Cavenari Investments Limited (RG) | December 2007 | Cyprus |
| Global Highway Limited (PM, RG) | August 2007 | Cyprus |
| Leviathan Advisors Limited (PM, RG) | August 2007 | Cyprus |
| LOAV Advisors Limited (PM, RG) | August 2007 | Cyprus |
| Lucicle Consultants Limited (PM, RG) | December 2008 | Cyprus |
| Marziola Holdings Limited (PM) | March 2012 | Cyprus |
| Olivenia Trading Limited (PM, RG) | March 2012 | Cyprus |
| Peranova Holdings Limited (PM, RG) | June 2007 | Cyprus |
| Serangon Holdings Limited (PM, RG) | January 2008 | Cyprus |

<u>Other Foreign Entities</u>

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) (PM) | Unknown | Grenadines |
| Jeunet Ltd. (PM) | August 2011 | Grenadines |
| Pompolo Limited (RG) | April 2013 | United Kingdom |

13.    The Internal Revenue Service (IRS) was a bureau in the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

## The Scheme

6

14.    Between in or around 2008 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, Manafort and GATES devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises from the United States, banks, and other financial institutions.  As part of the scheme, Manafort and GATES repeatedly provided false information to financial bookkeepers, tax accountants, and legal counsel, among others.

Manafort And GATES' Wiring Of Money From Offshore Accounts Into The United States

15.    In order to use the money in the offshore nominee accounts of the Manafort-GATES entities without paying taxes on it, Manafort and GATES caused millions of dollars in wire transfers from these accounts to be made for goods, services, and real estate.  They did not report these transfers as income to DMP, DMI, or Manafort.

16.    From 2008 to 2014, Manafort caused the following wires, totaling over $12,000,000, to be sent to the vendors listed below for personal items.  Manafort did not pay taxes on this income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **Vendor A** (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova Holdings Limited | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | *Unknown* | *Unknown* | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | Vendor A Total | $5,434,793 |
| Vendor B (Home Automation, Lighting and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 11/5/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | | | **Vendor B Total** | **$1,319,281** |
| Vendor C (Antique Rug Store in Alexandria, Virginia) | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Vendor C Total** | **$934,350** |
| Vendor D (Related to Vendor C) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| Vendor E (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |
| | 10/15/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/24/2014 | Global Endeavour Inc. | *Unknown* | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | **Vendor E Total** | **$849,215** |
| Vendor F (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | Vendor F Total | $655,500 |
| Vendor G (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | Vendor G Total | $623,910 |
| Vendor H (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | Vendor H Total | $520,440 |
| Vendor I (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | Vendor I Total | $500,000 |
| Vendor J (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | Vendor J Total | $432,487 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Vendor K (Landscaper in the Hamptons, New York) | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | | | Vendor K Total | $164,740 |
| Vendor L (Payments Relating to three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | Vendor L Total | $163,705 |
| Vendor M (Contractor in Virginia) | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | Vendor M Total | $125,650 |
| Vendor N (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | Vendor N Total | $112,825 |
| Vendor O (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |

13

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | | | **Vendor O Total** | **$62,750** |
| **Vendor P** (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Vendor P Total** | **$47,000** |
| **Vendor Q** (Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** (Housekeeping in New York) | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

17.     In 2012, Manafort caused the following wires to be sent to the entities listed below to purchase the real estate also listed below.  Manafort did not report the money used to make these purchases on his 2012 tax return.

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|---|---|---|---|---|---|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova Holdings Limited | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |

14

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|---|---|---|---|---|---|
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |

### Manafort And GATES' Hiding Of Ukraine Lobbying And Public Relations Work

18.     It is illegal to act as an agent of a foreign principal engaged in certain United States influence activities without registering the affiliation.  Specifically, a person who engages in lobbying or public relations work in the United States (hereafter collectively referred to as lobbying) for a foreign principal such as the Government of Ukraine or the Party of Regions is required to provide a detailed written registration statement to the United States Department of Justice.  The filing, made under oath, must disclose the name of the foreign principal, the financial payments to the lobbyist, and the measures undertaken for the foreign principal, among other information.  A person required to make such a filing must further make in all lobbying material a "conspicuous statement" that the materials are distributed on behalf of the foreign principal, among other things. The filing thus permits public awareness and evaluation of the activities of a lobbyist who acts as an agent of a foreign power or foreign political party in the United States.

19.     In furtherance of the scheme, from 2006 until 2014, both dates being approximate and inclusive, Manafort and GATES engaged in a multi-million dollar lobbying campaign in the United States at the direction of Yanukovych, the Party of Regions, and the Government of Ukraine.  Manafort and GATES did so without registering and providing the disclosures required by law.

20.     As part of the scheme, in February 2012, Manafort and GATES solicited two Washington,

D.C., firms (Company A and Company B) to lobby in the United States on behalf of Yanukovych, the Party of Regions, and the Government of Ukraine. For instance, GATES wrote to Company A that it would be "representing the Government of Ukraine in [Washington,] DC."

21.     Manafort repeatedly communicated in person and in writing with Yanukovych, and GATES passed on directions to Company A and Company B. For instance, Manafort wrote Yanukovych a memorandum dated April 8, 2012, in which he provided Yanukovych an update on the lobbying firms' activities "since the inception of the project a few weeks ago. It is my intention to provide you with a weekly update moving forward." Toward the end of that first year, in November 2012, GATES wrote to Company A and Company B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013."

22.     At the direction of Manafort and GATES, Company A and Company B engaged in extensive lobbying. Among other things, they lobbied multiple Members of Congress and their staffs about Ukraine sanctions, the validity of Ukraine elections, and the propriety of Yanukovych's imprisoning his presidential rival, Yulia Tymoshenko (who had served as Ukraine President prior to Yanukovych). Manafort and GATES also lobbied in connection with the roll out of a report concerning the Tymoshenko trial commissioned by the Government of Ukraine. Manafort and GATES used one of their offshore accounts to funnel $4 million to pay secretly for the report.

23.     To minimize public disclosure of their lobbying campaign, Manafort and GATES arranged for the Centre to be the nominal client of Company A and Company B, even though in fact the Centre was under the ultimate direction of the Government of Ukraine, Yanukovych, and the Party of Regions. For instance, Manafort and GATES selected Company A and Company B, and only

thereafter did the Centre sign contracts with the lobbying firms without ever meeting either company.  Company A and Company B were paid for their services not by their nominal client, the Centre, but solely through off-shore accounts associated with the Manafort-GATES entities, namely Bletilla Ventures Limited (in Cyprus) and Jeunet Ltd. and Global Endeavour Inc. (in Grenadines).  In total, Company A and Company B were paid more than $2 million from these accounts between 2012 and 2014.

24.   To conceal the scheme, Manafort and GATES developed a false and misleading cover story that would distance themselves and the Government of Ukraine, Yanukovych, and the Party of Regions from the Centre, Company A, and Company B.  For instance, in the wake of extensive press reports on Manafort and his connections with Ukraine, on August 16, 2016, GATES communicated false talking points to Company B in writing, including:

- Q: "Can you describe your initial contact with [Company B] and the lobbying goals he discussed with them?"  A: "We provided an introduction between the [Centre] and [Company B/Company A] in 2012.  The [Centre] was seeking to retain representation in Washington, DC to support the mission of the NGO."

- A: "Our [Manafort and GATES'] task was to assist the [Centre] find representation in Washington, but at no time did our firm or members provide any direct lobbying support."

- A: "The structure of the arrangement between the [Centre] and [Company A and Company B] was worked out by the two parties."

- Q: "Can you say where the funding from for [sic] the [Centre] came from? (this amounted to well over a million dollars between 2012 and 2014)."  A: "This is a

17

question better asked of the [Centre] who contracted with the two firms."

- Q: "Can you describe the lobbying work specifically undertaken by [Company B] on behalf of the Party of Regions/the [Centre]?" A: "This is a question better asked to Company B and/or the [Centre] as the agreement was between the parties. Our firm did not play a role in the structure, nor were we registered lobbyists."

Company B through a principal replied to GATES the same day that "there's a lot of email traffic that has you much more involved than this suggests[.] We will not disclose that but heaven knows what former employees of [Company B] or [Company A] might say."

25.     In September 2016, after numerous recent press reports concerning Manafort, the Department of Justice informed Manafort, GATES, and DMI that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act (FARA), without registering.  In November 2016 and February 2017, Manafort, GATES, and DMI caused false and misleading letters to be submitted to the Department of Justice, which mirrored the false cover story set out above.  The letters, both of which were approved by Manafort and GATES before they were submitted, represented, among other things, that:

- DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

- Manafort and GATES did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications.  Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and

18

conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

- Manafort and GATES had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

- DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

26. In fact, Manafort and GATES had: selected Company A and Company B; engaged in weekly scheduled calls and frequent emails with Company A and Company B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Company A and Company B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over $2 million from offshore accounts they controlled, among other things. In addition, court-authorized searches of Manafort and GATES' DMI email accounts and Manafort's Virginia residence in July 2017 revealed numerous documents, including documents related to lobbying, which were more than thirty-days old at the time of the November 2016 letter to the Department of Justice.

Manafort And GATES' Hiding Of Foreign Bank Accounts And False Filings

27. United States citizens who have authority over certain foreign bank accounts -- whether or

not the accounts are set up in the names of nominees who act for their principals -- have reporting obligations to the United States.

28.     First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year. This is commonly known as a foreign bank account report or "FBAR." The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.   The United States Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law enforcement entities, including the Federal Bureau of Investigation.   The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

29.     Second, United States citizens also are obligated to report information to the IRS regarding foreign bank accounts.  For instance, in 2010 Form 1040, Schedule B had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?"  If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

30.     For each year in or about and between 2008 through at least 2014, Manafort had authority

over foreign accounts that required an FBAR report. Specifically, Manafort was required to report to the United States Treasury each foreign bank account held by the foreign Manafort-GATES entities noted above in paragraph 12 that bear the initials PM. No FBAR reports were made by Manafort for these accounts.

31.     For each year in or about and between 2008 through at least 2013, GATES had authority over foreign accounts that required an FBAR report. Specifically, GATES was required to report to the United States Treasury each foreign bank account held by the foreign Manafort-GATES entities noted above in paragraph 12 that bear the initials RG, as well as three other accounts in the United Kingdom. No FBAR reports were made by GATES for these accounts.

32.     Furthermore, in each of Manafort's tax filings for 2008 through 2014, Manafort represented falsely that he did not have authority over any foreign bank accounts. Manafort and GATES had repeatedly and falsely represented in writing to Manafort's tax preparer that Manafort had no authority over foreign bank accounts, knowing that such false representations would result in false Manafort tax filings. For instance, on October 4, 2011, Manafort's tax preparer asked Manafort in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?" On the same day, Manafort falsely responded "NO." Manafort responded the same way as recently as October 3, 2016, when Manafort's tax preparer again emailed the question in connection with the preparation of Manafort's tax returns: "Foreign bank accounts etc.?" Manafort responded on or about the same day: "NONE."

Manafort And GATES' Fraud To Increase Access To Offshore Money

33.     After Manafort used his offshore accounts to purchase real estate in the United States, he

21

took out mortgages on the properties thereby allowing Manafort to have the benefits of liquid income without paying taxes on it. Further, Manafort defrauded the banks that loaned him the money so that he could withdraw more money at a cheaper rate than he otherwise would have been permitted.

34.    In 2012, Manafort, through a corporate vehicle called "MC Soho Holdings, LLC" owned by him and his family, bought a condominium on Howard Street in the Soho neighborhood in Manhattan, New York. He paid approximately $2,850,000. All the money used to purchase the condominium came from Manafort entities in Cyprus. Manafort used the property from at least January 2015 through 2016 as an income-generating rental property, charging thousands of dollars a week on Airbnb, among other places. In his tax returns, Manafort took advantage of the beneficial tax consequences of owning this rental property.

35.    In late 2015 through early 2016, Manafort applied for a mortgage on the condominium. Because the bank would permit a greater loan amount if the property were owner-occupied, Manafort falsely represented to the bank and its agents that it was a secondary home used as such by his daughter and son-in-law and was not a property held as a rental property. For instance, on January 26, 2016, Manafort wrote to his son-in-law to advise him that when the bank appraiser came to assess the condominium his son-in-law should "[r]emember, he believes that you and [Manafort's daughter] are living there." Based on a request from Manafort, GATES caused a document to be created which listed the Howard Street property as the second home of Manafort's daughter and son-in-law, when GATES knew this fact to be false. As a result of his false representations, in March 2016 the bank provided Manafort a loan for approximately $3,185,000.

36.    Also in 2012, Manafort -- through a corporate vehicle called "MC Brooklyn Holdings, LLC"

similarly owned by him and his family -- bought a brownstone on Union Street in the Carroll Gardens section of Brooklyn, New York. He paid approximately $3,000,000 in cash for the property. All of that money came from a Manafort entity in Cyprus. After purchase of the property, Manafort began renovations to transform it from a multi-family dwelling into a single family home. In late 2015 through early 2016, Manafort sought to borrow cash against the property. The institution Manafort went to for the loan provided greater loan amounts for "construction loans" -- that is, loans that required the loan amounts to be used to pay solely for construction of the property and thus increase the value of the property serving as the loan's collateral. The institution would thus loan money against the expected completed value of the property, which in the case of the Union Street property was estimated to be $8,000,000. In early 2016, Manafort was able to obtain a loan of approximately $5,000,000, after promising the bank that approximately $1,400,000 of the loan would be used solely for construction of the Union Street property. However, Manafort never intended to limit use of the proceeds to construction as required by the loan contracts. In December 2015, before the loan was made, Manafort wrote his tax preparer, among others, that the construction loan "will allow me to pay back the [another Manafort apartment] mortgage in full. . . ." Further, when the construction loan closed, Manafort used hundreds of thousands of dollars from the construction loan to make a down payment on another property in California.

## COUNT ONE

### Conspiracy Against The United States

37.     From in or about and between 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, the defendant RICHARD W. GATES III, together with

others, knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of a government agency, namely the Department of Justice and the Department of the Treasury, and to commit offenses against the United States, to wit, the violations of law charged in Counts Three through Six and Ten through Twelve of the Indictment returned in this matter on October 27, 2017 (Indictment).

38.     In furtherance of the conspiracy and to effect its illegal object, GATES, together with others, committed the overt acts noted in Count Eleven of the Indictment and the overt acts, among others, in the District of Columbia and elsewhere as set forth in paragraphs 9, 16, 17, 20-25, 32, and 34-36, which are incorporated herein.

## COUNT TWO

### False Statement

39.     On or about February 1, 2018, in the District of Columbia, the defendant RICHARD W. GATES III did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, the defendant falsely stated and represented to the Special Counsel's Office, including Special Agents of the Federal Bureau of Investigation:

     (i)     that after a March 19, 2013 meeting in Washington, D.C. attended by Manafort, a senior Company A lobbyist, and a Member of Congress (the Meeting), he was told by Manafort and a senior Company A lobbyist that there were no discussions of Ukraine at the Meeting;

when, in fact, as he then and there well knew:

(ii)     (a) Manafort and the senior Company A lobbyist had not made the above

statements to him; (b) Manafort and the senior Company A lobbyists had told him

that the meeting went well; (c) GATES had participated with Manafort in

preparing a report that memorialized for Ukraine leadership the pertinent Ukraine

discussions that Manafort represented had taken place at the meeting; and (d)

Manafort told GATES in 2016 that Manafort told his FARA lawyer that there had

been no discussion of Ukraine at the Meeting.

(18 U.S.C. §1001(a))


ROBERT S. MUELLER III
Special Counsel


By:     _____

Andrew Weissmann
Greg D. Andres
Kyle R. Freeny
Brian M. Richardson
Senior/Assistant Special Counsel