

**FILED**

**FEB 2 3 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * CRIMINAL NO. 17-201-02 (ABJ) |
| v. | * |
| | * Violation: 18 U.S.C. § 371 |
| | * (Conspiracy against the United States) |
| RICHARD W. GATES III, | * |
| | * |
| Defendant. | * |

*******

## STATEMENT OF THE OFFENSE

Pursuant to the Federal Rules of Criminal Procedure 11, the United States and the defendant RICHARD W. GATES III (GATES) stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense and covered conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that the defendant committed the offense to which he is pleading guilty.

### Count 1 Conspiracy (18 U.S.C. § 371)

1. At all relevant times herein, GATES worked as an employee at companies run by Paul J. Manafort, Jr., and other principals, namely Davis Manafort Partners, Inc. (DMP) and DMP International, LLC. (DMI). Manafort engaged in a variety of criminal schemes, and GATES as part of his work for Manafort, DMP, and DMI knowingly and intentionally conspired with Manafort to assist him in the criminal schemes that make up Count One of the Indictment, as more fully set forth below.



### A. Tax and FBAR Scheme
26 U.S.C. §§ 7206(1) and 7206(2)
31 U.S.C. §§ 5314 and 5322(b)

2. From 2008 through 2014, Manafort, with the assistance of GATES, caused millions of dollars of wire transfers to be made from offshore nominee accounts, without Manafort paying taxes on that income. The payments were made for goods, services, and real estate. Manafort, again with the assistance of GATES, also hid income by denominating various overseas payments as "loans," thereby evading payment of any taxes on that income by Manafort.

3. GATES, acting on the authority of Manafort, routinely dealt with Manafort's tax accountants in the preparation of Manafort's tax returns. GATES was authorized by Manafort to answer questions from Manafort's accountants, to provide documents and other information, and to review Manafort's draft and finalized income tax returns. In doing so, GATES, with Manafort's knowledge and agreement, repeatedly misled Manafort's accountants, including by not disclosing Manafort's overseas accounts and the income. Further, GATES, acting at Manafort's instruction, continued to classify overseas payments made to Manafort as "loans" to avoid incurring additional taxes on the income.

4. Manafort, with GATES' assistance, owned and controlled a range of foreign bank accounts in Cyprus and the Grenadines. GATES helped maintain these accounts and arranged substantial transfers from the accounts to both Manafort and himself. GATES was aware that many of these accounts held well in excess of $10,000 in the aggregate at some point during each year in which they existed. GATES, acting at Manafort's instruction, did not report the accounts' existence to Manafort's tax accountants in an effort to hide them, and to allow Manafort to avoid disclosing their existence on an FBAR filing.

5. GATES was aware at the time that it was illegal to hide income from the Internal Revenue



Service (IRS) by failing to account for reportable income on Manafort's income tax returns. GATES was also aware that it was illegal to fail to report information to the IRS regarding the existence of foreign bank accounts, as required by Schedule B of the IRS Form 1040. GATES also understood at the time that a U.S. person who had a financial interest in, or signature or other authority over, a bank account or other financial account in a foreign country, which exceeded $10,000 in any one year (at any time during that year), was required to report the account to the Department of the Treasury. GATES also understood, after 2010, that the failure to make such a report constituted a crime.

### B. FARA Scheme
### 22 U.S.C. §§ 612 and 618(a)(1)

6.     GATES understood that it was illegal to engage in certain activities in the United States as an agent of a foreign principal without registering with the United States Government. Specifically, a person who engages in lobbying or public relations work in the United States (hereafter collectively referred to as lobbying) for a foreign principal such as the Government of Ukraine or the Party of Regions is required to register. Manafort, together with GATES' assistance, engaged in a scheme to avoid this registration requirement for DMI, Manafort, and others.

7.     It was part of this scheme that in or about 2012 Manafort and others obtained the approval of Ukraine President Yanukovych to implement a global lobbying strategy to promote Ukraine's interests, including entry into the European Union. This was dubbed the anti-crisis project or AC project. Thereafter, DMI, through Manafort, and with the assistance of GATES, worked with various entities and people to lobby in the United States, among other locations. As part of this scheme, the European Centre for a Modern Ukraine (the Centre) was set up by the Government of



Ukraine to coordinate lobbying principally in Europe, as well as to act as the ostensible client for two lobbying firms in the United States. The Centre reported to Ukraine Party of Regions member, and Ukraine First Vice Prime Minister, Andriy Klyuyev. The Centre largely oversaw European lobbying and Manafort and GATES generally oversaw the work of lobbyists in the United States.

8. As one part of the AC Project, in February 2012, GATES solicited two Washington, D.C., firms (Company A and Company B) to lobby in the United States on behalf of the Party of Regions. For instance on February 21, 2012, GATES wrote to Company A that it would be "representing the Government of Ukraine in [Washington,] DC."

9. The general division of labor in managing Companies A and B's lobbying activities was that Manafort would communicate with Yanukovych and his staff, and GATES dealt with coordinating the work of the two firms. For instance, in November 2012, GATES wrote to the firms that they needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013." The two firms engaged in extensive United States lobbying. Among other things, they lobbied multiple Members of Congress and their staffs about Ukraine sanctions, the validity of Ukraine elections, and the propriety of Yanukovych's imprisoning his presidential rival, Yulia Tymoshenko.

10. GATES, at Manafort's instruction, worked with Company A to arrange for Manafort to lobby personally in the United States. Specifically, they arranged a meeting in March 2013 in Washington, D.C. attended by Manafort, a senior Company A lobbyist, and a Member of Congress who was on a subcommittee that had Ukraine within its purview. After the meeting, Manafort, with GATES' assistance, prepared a March 2013 report to Yanukovych's office that the meeting "went well," and reported a series of positive developments from the meeting.



11. To distance their public United States lobbying work from the Government of Ukraine, GATES and others arranged for the Centre to represent falsely that it was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions. GATES knew at the time that the Centre was under the direction of Party of Regions. GATES provided false and misleading representations to a law firm for Company A, which was assessing whether a filing was required under FARA. GATES understood that the false and misleading representations would permit Companies A and B not to register their activities pursuant to FARA.

12. In September 2016, the Department of Justice informed Manafort, GATES, and DMI that it sought to determine whether they had acted as agents of a foreign principal under FARA without registering. In November 2016 and February 2017, GATES and Manafort caused false and misleading letters to be submitted to the Department of Justice. The letters represented, among other things, that:

- DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";
- GATES did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications. Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";
- GATES had merely served as a means of introduction of Companies A and B to the Centre and provided the Centre with a list of "potential U.S.-based



      consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

- DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

13. In fact, GATES knew that the above was false or misleading. He and Manafort had selected Companies A and B without the Centre. Further, GATES engaged in weekly scheduled calls and frequent emails with them to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; wrote communications for Manafort, at his request, to brief Yanukovych on their lobbying efforts; and arranged for payment to the lobbying firms of over $2 million from offshore accounts, among other things. In addition, GATES had provided his then FARA counsel a DMI document retention policy to create the misleading appearance that DMI and its employees did not have responsive documents to provide to the Department of Justice, when he knew that they in fact did.

14. As another part of the lobbying scheme, in or about and between 2012 and 2013 the Party of Regions, through Manafort, GATES and others, secretly retained a group of former senior European politicians to take positions favorable to Ukraine, including lobbying in the United States. Although the former politicians would appear to be providing their independent assessments of actions by the Government of Ukraine, in fact they were paid lobbyists for Ukraine. In or about 2012 through 2013, GATES, at Manafort's instruction, used at least four offshore accounts to wire more than 2 million euros to pay the group of former politicians. GATES



understood that none of the former politicians registered under FARA.

15.   In 2013, foreign politicians who were part of this group lobbied United States Members of Congress, the Executive Branch, and their staffs in coordination with Manafort, GATES, and Companies A and B.

### Criminal Information/ False Statement (18 U.S.C. § 1001)

16.   On February 1, 2018, GATES attended a proffer session with his counsel at the Special Counsel's Office, which included Special Agents from the Federal Bureau of Investigation.  During questioning concerning a March 19, 2013 meeting involving Manafort, a senior Company A lobbyist, and a Member of Congress who was on a subcommittee that had Ukraine within its purview, GATES stated falsely that he was told by Manafort and the senior Company A lobbyist that there were no discussions of Ukraine at the meeting.  At the time of his proffer statement, GATES knew that: (a) Manafort and the senior Company A lobbyist had not made the above statements to him; (b) Manafort and the senior Company A lobbyists had told him that the meeting went well; (c) GATES had participated with Manafort in preparing a report that memorialized for Ukraine leadership the pertinent Ukraine discussions that Manafort represented had taken place at the meeting; and (d) Manafort told GATES in 2016 that Manafort told his FARA lawyer that there had been no discussion of Ukraine at the Meeting.

ROBERT S. MUELLER, III<br>
Special Counsel

By:  *[signature]*

Andrew Weissmann<br>
Greg D. Andres<br>
Kyle R. Freeny<br>
Brian M. Richardson<br>
Senior/Assistant Special Counsels



DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorneys, I agree and stipulate to this Statement of the Office, and declare under penalty that it is true and correct.

Date: 23/2/18

Richard W. Gates III
Defendant

ATTORNEY's ACKNOWLEDGEMENT

I have read this statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 2/23/2018

Thomas C. Green, Esq.
Attorney for the Defendant