1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,      ) Civil Action
                                      ) No. 17-CR-201
4                    Plaintiff,       )
                                      ) ARRAIGNMENT AND PLEA
5      vs.                            ) HEARING
                                      )
6      Richard W. Gates, III,         ) Washington, DC
                                      ) Date:  February 23, 2018
7                    Defendant.       ) Time:  2:00 p.m.
                                      )
8      _____

9            TRANSCRIPT OF ARRAIGNMENT AND PLEA HEARING
                           HELD BEFORE
10        THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
11     _____

12                    A P P E A R A N C E S

13     For the Plaintiff: ANDREW WEISSMANN
                           GREG D. ANDRES
14                         KYLE R. FREENY
                           U.S. Department of Justice
15                         Special Counsel's office
                           950 Pennsylvania Avenue NW
16                         Washington, D.C.  20530
                           202-514-1746
17                         Email: Aaw@usdoj.gov
                           Email: Gda@usdoj.gov
18                         Email: Krf@usdoj.gov

19     For Defendant:      THOMAS C. GREEN
                           SIDLEY AUSTIN LLP
20                         1501 K Street, NW
                           Washington, DC 20005
21                         (202) 736-8069
                           Email: Tcgreen@sidley.com
22
       ALSO PRESENT:
23
          Pretrial Officers:    Andre Sidbury
24                              Shay Holman

25                              Sherine Ebadi, Special Agent

Court Reporter:        Janice E. Dickman, RMR, CRR
                       Official Court Reporter
                       United States Courthouse, Room 6523
                       333 Constitution Avenue, NW
                       Washington, DC  20001
                       202-354-3267

                              *   *   *

1              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

2     This afternoon we have criminal case number 17-201-2, the

3     United States of America v. Richard W. Gates, III.  Mr. Gates

4     is present in the courtroom, Your Honor.

5              Will counsel for the parties please approach the

6     lectern, identify yourself for the record.

7              MR. WEISSMANN:  Good afternoon, Your Honor.  For the

8     government, Andrew Weissmann, Greg Andres, Kyle Freeny, and

9     Special Agent Sherine Ebadi with the FBI.

10             THE COURT:  All right.  Good afternoon.

11             MR. GREEN:  Good afternoon, Your Honor.  Tom Green

12     for Mr. Gates.

13             THE COURT:  All right.  And I note that Mr. Gates is

14     present.

15             I understand, Mr. Green, that we're here because Mr.

16     Gates wishes to enter a plea of guilty, is that correct?

17             MR. GREEN:  Yes, that's correct.

18             THE COURT:  Before we begin we need to arraign him on

19     the superseding information and we need to administer the oath

20     to him.  So, Mr. Gates, why don't you join your counsel at the

21     lectern.

22             THE COURTROOM DEPUTY:  Sir, are you the person named

23     in the superseding information?

24             THE DEFENDANT:  I am.

25             THE COURTROOM DEPUTY:  Are you Richard W. Gates, III?

1          THE DEFENDANT:  I am.

2          THE COURTROOM DEPUTY:  Your Honor, may the record

3    reflect that both Mr. Gates and his attorney have received a

4    copy of the superseding information which has been filed in

5    this case.

6          Mr. Gates, you are charged in criminal case number

7    17-201-2, in a two-count superseding information charging you

8    with the following:  Count 1, 18 United States Code § 371,

9    conspiracy against the United States.  And Count 2, 18 United

10   States Code § 1001(a), false statement.

11         Do you waive formal reading of the superseding

12   information?

13         THE DEFENDANT:  I do.

14         THE COURTROOM DEPUTY:  For purposes of arraignment,

15   how do you wish to plead?

16         THE DEFENDANT:  Not guilty.

17         THE COURTROOM DEPUTY:  Please raise your right hand.

18              RICHARD W. GATES, III,

19   having been first duly sworn, testified as follows:

20         THE COURT:  All right.  Mr. Gates, the purpose of the

21   hearing this afternoon is for you to make a decision, whether

22   you want to go to trial on the government's charges against you

23   or whether you want to enter a plea of guilty.  And obviously

24   it's a very important decision, and so it's important that you

25   understand everything that's going on in this proceeding.  If I

```
1   ask you a question and it's not clear what I'm asking for and
2   you don't understand it, please let me know so I can rephrase
3   it or clarify it for you.  And if I ask you a question and you
4   feel like you would like to confer with your attorney before
5   you answer it, just let me know that and I'll give you that
6   opportunity.  Do you understand that much?
7               THE DEFENDANT:  I do.  Yes, Your Honor.
8               THE COURT:  And do you also understand that you've
9   just been sworn and you're under oath and that means that your
10  answers to me must be truthful and that you would be subject to
11  prosecution for making a false statement, or perjury, if you
12  didn't answer my questions truthfully.  Do you understand that?
13              THE DEFENDANT:  Yes, Your Honor.
14              THE COURT:  All right.  Now, Mr. Green, as I
15  understand it, he's pleading to two offenses today; what was
16  Count 1 in the original indictment, conspiracy against the
17  United States, in violation of 18 U.S. Code § 371, which
18  embraces a conspiracy to violate 28 U.S. Code § 7206(1), which
19  involves false statements in tax returns, 31 U.S. Code § 5312
20  and 5322(b), which involves the reporting of foreign bank and
21  financial accounts, and 22 U.S. Code § 612, 618(a)(1) and
22  618(a)(2), which relate to registration requirements for
23  foreign agents.
24              And I also understand that he's pleading guilty to a
25  second count of making a false statement to the Office of
```

1     Special Counsel, including FBI agents, in violation of 18 U.S.

2     Code § 1001.  Do I have that right?

3         MR. GREEN:  All of that is right.

4         THE COURT:  As part of the plea the government will

5     be prepared, at the time of sentencing, to dismiss the rest of

6     the indictment pending against him.  And they're also not

7     seeking to detain him at this time.  Is that also your

8     understanding?

9         MR. GREEN:  That is correct.

10         THE COURT:  All right.  Now, before I'm allowed to

11     accept your guilty plea this afternoon, Mr. Gates, it's my job

12     to make sure that you understand the terms of the plea and the

13     consequences of the plea.  So the law requires me to ask you a

14     list of questions.  And some of them may seem personal, some of

15     them may seem unnecessary, but they're all designed so that I

16     can determine that you know what you're doing today.

17         The first question I need to ask you is:  How old are

18     you, sir?

19         THE DEFENDANT:  I am 45 years old, Your Honor.

20         THE COURT:  All right.  And I take it you can read

21     and write.

22         THE DEFENDANT:  Yes.

23         THE COURT:  How far did you go in school?

24         THE DEFENDANT:  Uh, master's degree in arts and

25     sciences.

1          THE COURT:  Where were you born?

2          THE DEFENDANT:  Fort Lee, Virginia.

3          THE COURT:  Have you taken any alcohol or drugs in

4    the last 48 hours or any medicine that could affect your

5    ability to understand what you're doing by pleading guilty this

6    afternoon?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  Have you ever received any treatment for

9    any type of mental illness or emotional disturbance?

10          THE DEFENDANT:  No, Your Honor.

11          THE COURT:  Have you received a copy of both the

12    original indictment in this case and the new information, the

13    written charges against you?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  And have you discussed the charges and

16    the case in general with your lawyer?

17          THE DEFENDANT:  I have, Your Honor.

18          THE COURT:  Are you completely satisfied with the

19    services of your lawyer in this case?

20          THE DEFENDANT:  I am, Your Honor.

21          THE COURT:  Now, there were other attorneys in this

22    matter.  Were they also involved in advising you in connection

23    with the plea in this case?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  All right.  Have you had enough time to

1    talk with your current attorney and discuss this case and the

2    plea offer and whether or not you should accept it?

3              THE DEFENDANT:  I have, Your Honor.

4              THE COURT:  Mr. Weissmann, has the government

5    produced any exculpatory in its possession to the defendant or

6    are you aware of any that hasn't been produced?

7              MR. WEISSMANN:  I am not aware of any that has not

8    been produced.  And, yes, we have produced to Mr. Gates and to

9    both prior counsel and current counsel all information that

10   we're aware of that would fall into the category of Brady

11   information.

12             THE COURT:  Okay.  Thank you.

13             Now, Mr. Gates, you have certain rights in a criminal

14   case and I want to go through all of them with you.  First of

15   all, you were originally indicted by a grand jury on the

16   conspiracy charge, but that didn't happen in connection with

17   the false statement charge.  And you're pleading guilty today

18   to something called an information, which is basically a piece

19   of paper where the prosecution types up the charges against

20   you.

21             Do you understand that you have a right to be charged

22   on each felony count through an indictment, where the

23   government has to present the evidence to a grand jury and

24   persuade 12 out of at least 16 of them that there is probable

25   cause that this crime was committed and that you committed it?

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  And so do you understand that by pleading

3    guilty to an information, you're waiving your right to be

4    charged by an indictment, particularly on the false statements

5    count?

6          THE DEFENDANT:  I do, Your Honor.

7          THE COURT:  All right.  Now, I have a document in

8    front of me here that says Waiver of Indictment, has your name

9    at the top.  Are you the one who signed it where it says

10   "defendant's signature"?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Now, you have the right to plead not

13   guilty to these charges, as you did originally, and to have a

14   jury trial in this case.  That means that 12 citizens of the

15   District of Columbia would sit there in that jury box and they

16   would be the ones who determine your guilt or innocence based

17   on evidence that's presented in this courtroom.  Do you

18   understand that you have a right to a jury trial?

19         THE DEFENDANT:  I do, Your Honor.

20         THE COURT:  And do you also understand that if you

21   had a trial, you would have the right to be represented by a

22   lawyer at that trial?

23         THE DEFENDANT:  I do, Your Honor.

24         THE COURT:  And do you understand that at a trial you

25   would have the right, through your lawyer, to confront and

1   cross-examine the witnesses against you?  And that means that

2   you would get to sit there and watch them testify and that Mr.

3   Green would be asking them questions.  Do you understand that

4   you have that right?

5           THE DEFENDANT:  I do, Your Honor.

6           THE COURT:  And do you also understand that you have

7   the right to present your own witnesses, and you could subpoena

8   them and compel them to be here to testify in your defense?

9           THE DEFENDANT:  I do, Your Honor.

10          THE COURT:  And do you understand that if there were

11  a trial, you would have the right to testify and present

12  evidence, if you wanted to, but you wouldn't have to testify or

13  present any evidence in your case at all because you can't be

14  forced to incriminate yourself or present evidence in a case

15  against you.  Do you understand that?

16          THE DEFENDANT:  I do, Your Honor.

17          THE COURT:  And do you understand that unless and

18  until I accept this guilty plea, you are presumed by the law to

19  be innocent because it's the government's burden to prove your

20  guilt beyond a reasonable doubt and until they do, you can't be

21  convicted of a crime.  Do you understand that?

22          THE DEFENDANT:  I do, Your Honor.

23          THE COURT:  And so, now do you understand that if you

24  plead guilty in this case and I accept your guilty plea, you're

25  giving up all the rights I've just explained because there will

1      be no trial?

2                  THE DEFENDANT:  I do, Your Honor.

3                  THE COURT:  All right.  Now, that's obviously a very

4      important waiver and so we ask you to put that in writing.  I

5      have a document in front of me called Waiver of Trial by Jury,

6      there's a space for the defendant to sign.  Are you the one who

7      signed it there?

8                  THE DEFENDANT:  I am, Your Honor.

9                  THE COURT:  All right.  I'm going to sign it, too.

10                 All right.  Now, if the case had gone to trial and

11     you were convicted, do you understand that you would have had a

12     right to appeal, to complain to the Court of Appeals that I

13     made errors in the case, and to appeal your conviction to the

14     Court of Appeals and to have a lawyer help you prepare that

15     appeal?

16                 THE DEFENDANT:  I do, Your Honor.

17                 THE COURT:  And so do you understand that by pleading

18     guilty, you're giving up your right to appeal your conviction,

19     and you're also giving up your right to appeal your sentence,

20     with the very limited exception if I sentence you to more than

21     the maximum the statute would let me sentence you to, or if I

22     sentence you to more than the guideline range would recommend

23     in your case, or if your lawyer was ineffective in representing

24     you at sentencing.  But otherwise, you can't appeal either your

25     conviction or your sentence.  Do you understand that?

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  All right.  Now, does this include, Mr.

3     Green, that he would be unable to appeal findings made in the

4     calculation of what the applicable guidelines range is?

5          MR. GREEN:  He understands that, and I understand

6     that.

7          THE COURT:  Okay.  And what about the government?

8     Would it be able to appeal determinations that I make about the

9     guidelines, if it disagrees with them?  That's not prohibited

10    in the agreement, is that correct?

11         MR. WEISMANN:  That is not prohibited.

12         THE COURT:  All right.  So do you understand if they

13    don't like how I calculate the guidelines, if they think I

14    violated the law when I did it, they could appeal that?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Now, the plea agreement also provides

17    that you're going to give up your rights provided under the

18    Freedom of Information Act and the Privacy Act, to ask the

19    government for documents that relate to you.  So do you

20    understand that you're giving up your rights under those

21    statutes as part of this plea?

22         THE DEFENDANT:  I do, Your Honor.

23         THE COURT:  Now, Mr. Weissmann, I would note that the

24    D.C. Circuit apparently views FOIA waivers and plea agreements

25    with a fair amount of skepticism and it said -- it hasn't said

1    that it can't be waived and it hasn't said that waivers are

2    unenforceable as a matter of law, but it has said they have to

3    be justified by some sort of legitimate law enforcement

4    concern.  So I think that the government should probably

5    supplement the record with some statement justifying the need

6    for the waiver in this case, at least between now and the time

7    of sentencing.

8              MR. WEISMANN:  We will do that.  And we are aware of

9    that law, and also the recent Supreme Court case that would

10   support those decisions.

11             THE COURT:  All right.  Now, you're also giving up

12   your right to come back and attack this conviction later under

13   the 28 U.S. Code § 2255 or Federal Rule of Civil Procedure

14   60(b), which are avenues that people have to come to court

15   after their conviction is over and say there was a problem with

16   it for some reason.  Do you understand that you're giving up

17   your right to do that, unless there's newly discovered evidence

18   or if it turns out that your lawyer was ineffective in

19   representing you?

20             THE DEFENDANT:  I do, Your Honor.

21             THE COURT:  All right.  Now, do you still want to

22   plead guilty in this case and give up your right to a trial and

23   your right to appeal and all the rights that I've just

24   explained you would have if your case went to trial?

25             THE DEFENDANT:  I do, Your Honor.

1          THE COURT:  All right.  At this point in the

2    proceedings I'm going to ask the prosecutor to tell you and me

3    what happened in this case.  I'm going to ask you to listen

4    carefully while he's speaking.  And when he's through, I'm

5    going to ask you if what he has said is correct.  So you can be

6    seated.

7          And, Mr. Weissmann, I do know that we have a written

8    statement of offense in this case, but as the people in the

9    U.S. Attorney's Office here know, I require the prosecutors to

10   go through this exercise because it's different to sign your

11   name to a piece of paper and to hear it said out loud and agree

12   with it.

13         MR. WEISSMANN:  I understand, and I understand that

14   from when we were here earlier this week.  So, Mr. Andres and I

15   are going to address both of the counts, starting with the

16   first count, the conspiracy count.

17         So, at the relevant times in the superseding

18   information, Mr. Gates worked as an employee at companies run

19   by Paul Manafort and other principals; those are Davis Manafort

20   Partners, which has been referred to in the superseding

21   information and the indictment as DMP, with a P, and also David

22   Manafort International, LLC, which has been referred to as DMI.

23         Mr. Gates knew and intended to conspire with Mr.

24   Manafort to assist him in the criminal schemes that make up

25   Count 1.  And that is Count 1 of the superseding information,

1    which tracks the language of Count 1 of the indictment.

2             And now Mr. Andres will turn to the tax component,

3    and then I'll turn to the other aspects of Count 1.

4             THE COURT:  All right.

5             MR. ANDRES:  Your Honor, with the tax and the FBAR

6    conspiracy, from 2008 to 2014 Mr. Gates assisted Mr. Manafort

7    in transferring millions of dollars through wires from offshore

8    nominee accounts.  Mr. Manafort did not pay taxes on that

9    income.  Again, Mr. Gates assisted Mr. Manafort in hiding

10   income in denominating various overseas payments as loans,

11   thereby evading payment of any taxes on that income by Mr.

12   Manafort.

13            And Mr. Gates, also acting on the authority of Mr.

14   Manafort, routinely dealt with Mr. Manafort's tax accountants

15   in preparing Mr. Manafort's tax returns.  And he was authorized

16   to do that, to answer questions and to provide documents and

17   other information.  In doing so, Mr. Gates, with Mr. Manafort's

18   knowledge, misled the tax accountants in various ways,

19   including by not disclosing Mr. Manafort's overseas accounts

20   and the income related to that.

21            Mr. Gates also assisted Mr. Manafort with respect to

22   the ownership of certain foreign bank accounts in Cyprus and

23   the Grenadines.  Mr. Gates helped maintain those accounts and

24   arranged substantial transfers from the accounts to both Mr.

25   Manafort and to himself.  Mr. Gates was aware that many of

1    these accounts held well in excess of $10,000 in aggregate at

2    some point during each year in which they existed.

3            Gates, acting on Mr. Manafort's instruction, did not

4    report the accounts' existence to Mr. Manafort's tax

5    accountants in an effort to hide them and to allow Mr. Manafort

6    to avoid disclosing their existence on an FBAR filing.  Mr.

7    Gates was aware that at the time it was illegal to hide income

8    from the Internal Revenue Service by failing to account for

9    reportable income on Mr. Manafort's income tax returns.  Mr.

10   Gates was also aware that it was illegal to fail to report

11   information to the IRS regarding the existence of foreign bank

12   accounts.

13           Mr. Gates also understood that at the time a U.S.

14   person who had a financial interest or signature or other

15   authority over a bank account or a financial account in a

16   foreign country which exceeded $10,000 in any one year, at any

17   one time during that year, was required to report the account

18   to the Department of the Treasury.  And Mr. Gates also

19   understood, at least as of 2010, that the failure to make such

20   a report constituted a crime.

21           Thank you, Judge.

22           THE COURT:  Thank you.

23           MR. WEISMANN:  Now with respect to the FARA component

24   of Count 1, which is the underlying FARA crime, as well as the

25   false statement components of FARA, Mr. Gates understood that

1  it was illegal to engage in certain activities in the United

2  States as an agent of a foreign principal without registering

3  with the United States government.  He understood that a person

4  who engages in lobbying or public relations -- which in the

5  information and in the indictment for shorthand we will refer

6  to collectively as lobbying -- required foreign principals such

7  as the government of Ukraine or the Party of Regions, would be

8  required to register with the United States government.

9          Mr. Manafort, together with Mr. Gates's assistance,

10  engaged in a scheme to avoid this registration requirement for

11  DMI, for Manafort, and others.  It was part of the scheme that

12  in or about 2012 Mr. Manafort and others obtained the approval

13  of the Ukraine president, Viktor Yanukovych, to implement a

14  global lobbying strategy that was dubbed the anti-crisis

15  project, or the AC project.

16          As part of that scheme, the European Centre for a

17  Modern Ukraine -- which in the information and indictment is

18  referred to as The Centre -- was set up by the government of

19  Ukraine to coordinate lobbying, principally in Europe, as well

20  as to act as the ostensible client for lobbying firms in the

21  United States.  The Centre reported to the Party of Regions.

22          As one part of the AC project, in February 2012 Mr.

23  Gates solicited two Washington, DC-based PR firms to lobby in

24  the United States on behalf of the Party of Regions.  The

25  general division of labor in managing both Companies A and B

1   was that Mr. Manafort would communicate with Mr. Yanukovych and

2   his staff, and Mr. Gates would deal with coordinating the work

3   of the two firms.  The two firms engaged in extensive United

4   States lobbying between 2012 and 2014.

5           One instance that's set forth in the statement of

6   offense is that Mr. Gates, at Mr. Manafort's instruction,

7   worked with Company A to arrange for Mr. Manafort to lobby

8   personally in the United States.  Specifically, they arranged a

9   meeting in March 2013 in Washington, DC, attended by Mr.

10  Manafort as senior Company A lobbyist, and a member of Congress

11  who was on a subcommittee that had Ukraine within its purview.

12          To distance their public United States lobbying work

13  from the government of Ukraine, Mr. Gates and others arranged

14  for The Centre to represent falsely that it was not directly or

15  indirectly supervised, directed or controlled in whole or in

16  major part by the government of Ukraine or the Party of

17  Regions.  Mr. Gates knew at the time that The Centre was under

18  the direction of the Party of Regions.

19          I'm going to turn to another part of the FARA scheme.

20  As another part, between 2012 and 2013, the Party of Regions,

21  through Mr. Manafort, with Mr. Gates's assistance and others,

22  secretly retained a group of foreign, former senior European

23  politicians to take positions favorable to Ukraine, including

24  lobbying in the United States.  Although the former politicians

25  would appear to be providing their independent assessments of

1    actions by the government of Ukraine, in fact they were paid

2    lobbyists for Ukraine.  In or about 2012 through 2013 Mr.

3    Gates, at Mr. Manafort's instructions, used at least four

4    offshore accounts to wire more than 2 million euros to pay the

5    group of former politicians.

6         In 2013 these foreign politicians, who are part of a

7    group that was informally referred as the Hapsburg Group,

8    lobbied United States members of Congress, the executive branch

9    and their staffs in coordination with Mr. Manafort, Mr. Gates,

10   Companies A, and Companies B.

11        As a third part of the FARA component, dealing more

12   with the false statement component, in September 2016 the

13   Department of Justice informed Mr. Manafort, Mr. Gates, and DMI

14   that it sought to determine whether they had acted as agents of

15   a foreign principal under FARA without registering.  In

16   November 2016 and February 2017 Mr. Gates and Mr. Manafort

17   caused false and misleading letters to be submitted to the

18   Department of Justice.

19        I'm not going to go into each of their false

20   representations, but I'll give you two examples.  The letters

21   represented, among other things, DMI's, quote, efforts on

22   behalf of the Party of Regions, unquote.  And start a quote

23   again, did not include meetings or outreach within the United

24   States, unquote.

25        And then second example is DMI, quote, does not

1   retain communications beyond 30 days, unquote.  And as a result

2   of this policy, a, quote, search has returned no responsive

3   documents, unquote.

4          In fact, Mr. Gates knew that the above was false or

5   misleading.  Mr. Gates wrote communications for Manafort, as

6   requested, to brief Mr. Yanukovych, president of Ukraine, on

7   their lobbying efforts.  In addition, Mr. Gates had provided

8   his then FARA counsel a DMI document retention policy to create

9   the misleading impression and appearance that DMI and its

10  employees did not have responsive documents to provide to the

11  Department of Justice, when he then and there well knew in fact

12  they did.

13         And then I'm going to turn to the 1001 component.

14  So, on February 1st, 2018 Mr. Gates attended a proffer session

15  with his counsel at the Special Counsel's Office, which

16  included special agents of the Federal Bureau of Investigation.

17  During questioning concerning a March 19th, 2013 meeting, which

18  I alluded to earlier, involving Mr. Manafort as senior Company

19  A lobbyist and a member of Congress who is on the subcommittee

20  that had Ukraine within its purview, Mr. Gates stated falsely

21  that he was told by Mr. Manafort and the senior Company A

22  lobbyist that there were no discussions of the Ukraine at the

23  meeting.

24         At the time of this proffer statement, Mr. Gates knew

25  that, A, Manafort and senior Company A's lobbyist had not made

1     the above statements to him.  B, Mr. Manafort, as senior

2     Company A lobbyist, had told him that the meeting went well.

3     C, that Mr. Gates had participated with Manafort in preparing a

4     report that memorialized for Ukraine leadership the pertinent

5     Ukraine discussions that Mr. Manafort represented had taken

6     place at the meeting.  And, D, that Mr. Manafort told Mr. Gates

7     in 2016 that Mr. Manafort told his then FARA lawyer that there

8     had been no discussions of Ukraine at the meeting.

9               So that's a summary of the statement of offense.

10              THE COURT:  Okay.  Thank you.

11              All right.  Mr. Gates and Mr. Green.

12              All right.  Mr. Gates, I recognize that they've been

13     speaking for some time, but is what the two prosecutors just

14     told me a true and accurate description of what you did in this

15     case?

16              THE DEFENDANT:  Yes, Your Honor.

17              THE COURT:  And so did you in fact conspire or agree

18     with Mr. Manafort and assist him in hiding or mischaracterizing

19     income and hiding the existence of foreign bank accounts to

20     avoid paying taxes and avoid disclosure requirements?

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  And did you also conspire with him to

23     avoid the requirement that Mr. Manafort and DMI would have to

24     register as foreign agents doing lobbying or public relations

25     work on behalf of the Ukraine, including making false

1    representations to the Department of Justice?

2                THE DEFENDANT:  Yes, Your Honor.

3                THE COURT:  And did you in fact lie to the Office of

4    Special Counsel and the FBI on February 1st of this year,

5    knowing that when you recounted for them what Mr. Manafort and

6    the lobbyists had told you, that what you were saying was false

7    and that you had been told that the meeting did in fact concern

8    Ukraine?

9                THE DEFENDANT:  Yes, Your Honor.

10                THE COURT:  All right.  Now, the prosecutors were

11    speaking to me, summarizing a document called the Statement of

12    the Offense, which has been filed in this case.  I asked you,

13    before I took the bench, to read it over, and not just sign the

14    last page where your signature is required, but to initial and

15    date every page, to tell me that you actually read every single

16    page and you agreed with every page.  Is this your signature on

17    the last page, accepting and acknowledging the statement of

18    offense?

19                THE DEFENDANT:  Yes, Your Honor.

20                THE COURT:  And are you the one who dated and

21    initialed each page of the statement of the offense?

22                THE DEFENDANT:  I am, Your Honor.

23                MR. GREEN:  Your Honor, indulge me one moment?

24                THE COURT:  Yes.

25                (Off-the-record discussion between counsel.)

1          MR. GREEN:  If I may, Your Honor, there's just one

2   small correction to the summation that you provided here.  With

3   respect to the 1001 false statement count, my client did not

4   know for a fact that Ukraine was discussed at the meeting that

5   Mr. Manafort attended.  What he did tell the office is that it

6   had not been discussed and he did not know the status of that.

7          THE COURT:  Well, I think what I said is that the

8   recitation he gave of what happened he knew was false at the

9   time he gave it, and that he had been told by Mr. Manafort what

10  had happened in the meeting; he wasn't there.  Isn't that what

11  the --

12         MR. WEISMANN:  That's right.  I think there's a

13  concern just of a slight misspeak in that.  Because he was not

14  present at the meeting, the issue is not what he can say

15  100 percent what happened, it's just a question of the

16  falsehood, his representation about what he had been told.

17         THE COURT:  He had been told.

18         MR. WEISMANN:  Exactly.

19         MR. GREEN:  Yes.

20         THE COURT:  That is what I thought I said and that is

21  what I meant.  And I don't understand it to be anything

22  different.

23         MR. GREEN:  Okay.

24         THE COURT:  All right.  I have another document in

25  front of me, it's the letter from Mr. Weissmann to your lawyer.

1    It's also another document that, instead of just having you

2    sign the last page, I asked you to go through and indicate to

3    me again that you've read every page by initialing and dating

4    it.  Is this your signature on the last page, accepting this

5    plea offer that's contained in the letter?

6              THE DEFENDANT:  It is, Your Honor.

7              THE COURT:  All right.  Have you had the opportunity

8    to read it and go over it carefully with your lawyer?

9              THE DEFENDANT:  I have, Your Honor.

10             THE COURT:  All right.  I'm just going to go through

11   some of the key elements of the plea agreement.

12             As I understand it, you're pleading guilty to the

13   offense of conspiring against the United States, in violation

14   of 18 U.S. Code § 371, and making a false statement to the law

15   enforcement investigators of the Office of Special Counsel and

16   the Federal Bureau of Investigation, in violation of 18 U.S.

17   Code § 1001.  Do you understand that if I accept your guilty

18   plea in this case, you could, on the conspiracy count alone,

19   receive a maximum sentence of up to five years in prison?

20             THE DEFENDANT:  I do, Your Honor.

21             THE COURT:  And do you also understand that on the

22   charge of making a false statement to the United States, you

23   could be sentenced to a term of up to five years of

24   imprisonment?

25             THE DEFENDANT:  I do, Your Honor.

1        THE COURT:  And do you understand that those two

2   sentences could be consecutive, that means follow one after the

3   other?

4        THE DEFENDANT:  I do, Your Honor.

5        THE COURT:  And do you also understand that as part

6   of my sentence, I could sentence you to serve a term of up to

7   three years on each count of supervised release, which would

8   mean if you served a term of incarceration, when you were

9   released you would be subject to the Court's supervision; if

10  you violated the conditions of supervision, you could be

11  returned to prison.  So do you understand that that's also part

12  of the possible sentence in this case?

13       THE DEFENDANT:  I do, Your Honor.

14       THE COURT:  And do you understand that I could

15  sentence you to pay a fine of up to $250,000 on each count?

16       THE DEFENDANT:  I do, Your Honor.

17       THE COURT:  And finally, do you also understand that

18  because this is a felony case, you have to pay $100 special

19  assessment for each count, which would be a total of $200, into

20  the Clerk's Office in this case?

21       THE DEFENDANT:  I do, Your Honor.

22       THE COURT:  All right.  And as I understand it, the

23  parties have agreed that there is no mandatory restitution

24  that's supposed to be ordered.

25       MR. GREEN:  That's correct.

1          THE COURT:  All right.  Now, as you probably know,

2     I'm not going to sentence you today.  In deciding what is a

3     fair and appropriate sentence, I have to consider a number of

4     factors that are set out in a statute, 18 U.S. Code § 3553(a).

5     It requires me to look at the nature and circumstances of the

6     offense.  It's going to require me to look at your history and

7     characteristics.  It's going to require me to consider a number

8     of goals that criminal sentencing is supposed to fulfil.  And

9     one of the things the statute is going to require me to do is

10    to consider what the U.S. sentencing guidelines would

11    recommend.

12          Congress created a Sentencing Commission and it has

13    established a set of complicated guidelines for judges to

14    consider -- they're recommendations, they're not

15    requirements -- when it imposes sentence in a criminal case.

16    The Commission set up -- recommended ranges for sentences for

17    various offenses, they can go up or down depending on how much

18    money was involved, whether various aggravating or mitigating

19    factors were involved, and they can go up depending on what

20    your criminal history is or is not.

21          So while we have some idea, based on what you've pled

22    guilty to in this case and the nature of your criminal history,

23    what your guideline range is going to be under the guidelines.

24    It's not entirely known at this point, until the probation

25    office prepares a report.  You all get a chance to object to

1    it, the government gets a chance to object to it, and I review

2    it and I make my final determination.

3              But have you and your attorney talked about the

4    advisory sentencing guidelines and how they might apply to your

5    case?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Now, as I understand it -- and now we're

8    going to get into the math portion of this morning -- this

9    afternoon.  The base offense level for conspiracy related to

10   the tax laws is calculated under § 2T1.1(a)(1) and 2T4.1(K).

11   And since they were talking about more than $9,500,000, we

12   start at the base offense level, level 26.  The parties have

13   agreed that since the source of the income is criminal

14   activity, it goes up by two levels under § 2T1.1(b)(1).  And

15   since sophisticated means were used, it goes up two more levels

16   under § 2T1.1(b)(2), to a level 28.  Given his standing here

17   and accepting his responsibility for this offense, it's

18   anticipated that that would be reduced by three levels, to

19   level 25.

20             Mr. Green, is that what you understand the

21   calculation would involve?

22             MR. GREEN:  That is the government's calculation,

23   Your Honor, yes.

24             THE COURT:  Now, Mr. Gates, given the fact that we

25   believe at this point you would be in criminal history category

1     Roman numeral I because you have no prior criminal history, the

2     guidelines would recommend an advisory range between 57 to 71

3     months of imprisonment.  Have you been advised of that?

4               THE DEFENDANT:  I have, Your Honor.

5               THE COURT:  And there's also an advisory fine range

6     for what a fine would be, between $20,000 and $200,000.  Have

7     you been told that?

8               THE DEFENDANT:  I have, Your Honor.

9               THE COURT:  All right.  Now, as I understand it, the

10    defendant has reserved the right to disagree with the

11    calculation, but it's not going to be seeking any downward

12    departures under the guidelines, other than one that might be

13    related to cooperation, which I'm going to address in a minute;

14    is that correct, Mr. Green?

15              MR. GREEN:  And role in the offense.

16              THE COURT:  Okay.  So there's no agreement as to

17    whether a role-in-the-offense adjustment -- I didn't -- there

18    wasn't one in the calculation, but there's a disagreement --

19              MR. GREEN:  Under the calculation, if Your Honor

20    please, actually, there's a minor role decrease for two points.

21              THE COURT:  I see.

22              MR. GREEN:  But beyond that, the Office has agreed

23    with me, that I shall have the right to argue that the

24    guidelines do not take into account the disproportionate

25    conduct between my client and Mr. Manafort.

1          THE COURT:  All right.  And so is that more of a

2     basis of a variance under the statutory factors?

3          MR. GREEN:  It would be in your discretion whether to

4     depart downward on account of that.

5          THE COURT:  All right.  And, Mr. Weissmann, you agree

6     that he's going to be able to make those arguments?

7          MR. WEISSMANN:  Yes.  As explicitly set forth in the

8     agreement, we agree.

9          THE COURT:  But you are agreeing at this point, Mr.

10     Gates, that a sentence within the range of 57 to 71 months

11     would be reasonable.  You understand that?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Okay.  Now, do you understand that I'm

14     not going to be able to determine what the sentencing

15     guidelines would even recommend in your case until after we've

16     completed the presentence report process?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  And do you understand that in the

19     end, the calculation that I come up with might be different

20     than what we've talked about today or what your lawyers told

21     you and what the government is suggesting it should be?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  And do you understand that after I've

24     decided what the guidelines are that apply to your case, I have

25     the authority, in some circumstances, to impose a sentence that

1    either is more severe or less severe than the sentence called

2    for by the guidelines because I can depart from the guidelines?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  All right.  And do you understand that

5    you're not going to be able to withdraw your guilty plea if my

6    calculation of the guidelines turns out to be different from

7    what we just discussed or what you're hoping for?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  And do you also understand that while the

10   government has agreed to consider filing a motion for a

11   downward departure from the guideline range based on your

12   cooperation in this case, that it's going to be their decision

13   whether they file that motion, and only their decision whether

14   to file the motion, and neither you or your lawyer or I can

15   force them to file the motion.  Do you understand that?

16             THE DEFENDANT:  I do, Your Honor.

17             THE COURT:  And do you also understand that it still

18   is up to me, even if they ask me to do it, whether to do it or

19   not?  I'm the one who's going to make the final decision as to

20   whether to depart.

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  All right.  And do you understand that if

23   you are sentenced to incarceration in this case, parole has

24   been abolished for federal charges, so if you're sentenced to

25   prison, you will serve the sentence I impose, with a possible

1      reduction for good time of up to 54 days a year.  But you're

2      not going to be released early on parole the way people used to

3      be.

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  And do you understand, also, that you're

6      pleading guilty today to two felonies, and if your plea is

7      accepted and you're found guilty, then that finding may deprive

8      you of certain valuable civil rights, such as the right to

9      vote, the right to hold public office, the right to serve on a

10     jury, the right to possess a firearm?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  And do you also understand that there's

13     no recommendation right now being agreed to as to what the

14     sentence is going to be?  So if the sentence turns out to be

15     more severe than what you're expecting or what you're hoping

16     for, you're still bound by your plea agreement and you can't

17     withdraw it for that reason.

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  All right.  Now, Mr. Gates, has anybody,

20     including your attorney, the FBI, the prosecutors, or any other

21     person you've come in contact with during this investigation

22     promised you or suggested to you that merely because you're

23     pleading guilty I will give you a lighter sentence?

24             THE DEFENDANT:  No, Your Honor.

25             THE COURT:  Has anybody forced you or threatened you

1   or coerced you in any way into entering this plea of guilty?

2                THE DEFENDANT:  No, Your Honor.

3                THE COURT:  Now, do you understand that the agreement

4   we were talking about, this letter, was the result of

5   negotiations between your attorney, Mr. Green, and the Special

6   Counsel's Office?

7                THE DEFENDANT:  Yes, Your Honor.

8                THE COURT:  Has anybody made any promises to you

9   about what's going to happen as a result of your plea that

10  aren't written down in this letter?

11               THE DEFENDANT:  No, Your Honor.

12               THE COURT:  Has anybody promised you what sentence

13  I'm going to impose if I accept your guilty plea?

14               THE DEFENDANT:  No, Your Honor.

15               THE COURT:  And do you understand at this point I

16  don't even know what sentence I'm going to impose because we

17  haven't been through the whole process that we need to before I

18  can sentence someone?

19               THE DEFENDANT:  Yes, Your Honor.

20               THE COURT:  All right.  And do you understand that

21  while the government is not asking that you be detained between

22  now and the date of your sentencing, that their decision is not

23  binding on me, and that one is also up to me, to decide whether

24  you're going to be released between now and your sentence?

25               THE DEFENDANT:  Yes, Your Honor.

1                    THE COURT:  All right.  Mr. Gates, are you entering

2       this plea of guilty voluntarily and of your own free will,

3       because you are guilty and for no other reason?

4                    THE DEFENDANT:  I am, Your Honor.

5                    THE COURT:  Is there anything you don't understand

6       about this proceeding or about your plea in this case?

7                    THE DEFENDANT:  No, Your Honor.

8                    THE COURT:  Is there anything you want to ask me or

9       you want to ask your lawyer before I ask you for your final

10      decision?

11                   THE DEFENDANT:  Not at this time, Your Honor.

12                   THE COURT:  Are you ready now to make a decision

13      about whether you want to enter a plea of guilty or whether you

14      want to go to trial?

15                   THE DEFENDANT:  Yes, Your Honor.

16                   THE COURT:  And what is your decision?

17                   THE DEFENDANT:  Guilty, Your Honor.

18                   THE COURT:  All right.  I'm satisfied that this

19      defendant is fully competent and capable of making a decision

20      today, that he understands the nature and consequences of what

21      he's doing, that he's acting voluntarily and of his own free

22      will, and that there is an adequate factual basis for the plea

23      and, therefore, I will accept the plea.

24                   I also find by clear and convincing evidence he's not

25      likely to flee or pose a danger to any person or the community,

1    so long as he remains subject to his current conditions of

2    release.  So I will keep you on your current conditions of

3    release between now and the time of sentencing.

4              As I understand it, we're not prepared to set a

5    sentencing date at this point, but we want to set a date,

6    possibly, for a status report?

7              MR. WEISMANN:  That would be what we prefer, Your

8    Honor.

9              THE COURT:  Okay.  What would be an appropriate time

10   to call for that status report?

11             MR. WEISMANN:  Three, four months seems like it would

12   be fine, if that's acceptable to the Court.

13             THE COURT:  That's fine.  If we need to get together

14   earlier, we always can.  This would be February -- all right,

15   why don't I call for the first report May 14?

16             MR. GREEN:  Is that okay?

17             THE COURT:  It may be, it may not be.  Usually they

18   tend to come in and say we need more time, and when do you want

19   to file another report.  But I think we should keep tabs with

20   each other.

21             MR. GREEN:  That's fine.  May 14th?

22             THE COURT:  Yes.

23             MR. GREEN:  At some point I would like to approach

24   the bench and discuss one thing with you.

25             THE COURT:  All right.

```
1              MR. GREEN:  And with counsel.
2              THE COURT:  Am I being broadcast to another room?
3              THE COURTROOM DEPUTY:  Yes.
4              THE COURT:  Okay.  I think we are near the end.  So
5     to the people in the overflow room, we're signing off.
6              (Bench conference:)
7              THE COURT:  Are you asking that this part of the
8     transcript be sealed?
9              MR. GREEN:  No.
10             THE COURT:  Okay.  It's just up here.
11             MR. GREEN:  So, I've been receiving a jillion
12    telephones calling from the press.  And I've not been here, you
13    know, in this case, so I'm not sure of all of your restrictions
14    and so forth.  I suspect I'm going to get a lot of questions
15    asking me to help them understand the plea agreement.  Am I at
16    liberty to help them understand it, explain what the provisions
17    mean?
18             THE COURT:  What's your position?
19             MR. WEISSMANN:  This is one where I think it's very
20    fact-dependent.  I think if it was limited to how -- what
21    exactly it means, as opposed to spin on guilt and innocence,
22    particularly as it relates to Mr. Manafort, we would have no
23    objection.
24             MR. GREEN:  No, I'm not going to talk about Mr.
25    Manafort.  They may just ask me, you know, how does the
```

1      guideline calculation work, whatever.

2              THE COURT:  If it's a mechanical question like that,

3      I don't have a problem with it.  I don't want you talking about

4      the substance of the case.  I clearly don't want you talking

5      about the substance of Mr. Manafort's case.

6              MR. GREEN:  No, no, no.

7              THE COURT:  And, frankly, I think this isn't the

8      first plea agreement that the press has read and I don't think

9      it's that complicated.  So, I would ask you to be extremely

10     circumspect and cautious, and obviously not initiate any

11     communication.

12             MR. GREEN:  No.  Okay.  Very well.

13             THE COURT:  While you're up here, Mr. Gates filed

14     a -- posted a motion for spring break.  And I don't know if you

15     want to start participating in his bond pleadings, but I don't

16     think he should be filing anything pro se anymore.

17             MR. GREEN:  No, he won't.  He won't anymore.

18             THE COURT:  So are you going to substitute something

19     for that?  Do you want to leave that?  Do you want to withdraw

20     that?  What should I do with that?

21             MR. GREEN:  Let me look at it and quickly -- probably

22     I'll just put my *informateur* on it and -- on top of it, so --

23             THE COURT:  I'm not going to do anything permanent

24     about it until I hear from you then.

25             MR. GREEN:  Okay.  Very well.

```
 1                    THE COURT:  All right.  Thank you.

 2                    (Open Court:)

 3                    THE COURT:  All right.  Mr. Green, is there anything

 4        further I need to take up right now on behalf of Mr. Gates?

 5                    MR. GREEN:  I don't think so, Your Honor.

 6                    THE COURT:  Okay.  Anything further on behalf of the

 7        government?

 8                    MR. WEISMANN:  No, Your Honor.

 9                    THE COURT:  Okay.  All right.  Thank you very much,

10        everybody.  You can all be excused.

11                                   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                  CERTIFICATE OF OFFICIAL COURT REPORTER
 3
 4
 5           I, JANICE DICKMAN, do hereby certify that the above
 6     and foregoing constitutes a true and accurate transcript of my
 7     stenograph notes and is a full, true and complete transcript of
 8     the proceedings to the best of my ability.
 9                       Dated this 24th day of February, 2017.
10
11
12                       /s/_____
13                       Janice E. Dickman, CRR, RMR
                         Official Court Reporter
14                       Room 6523
                         333 Constitution Avenue NW
15                       Washington, D.C. 20001
16
17
18
19
20
21
22
23
24
25
```