1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3     United States of America,      ) Criminal
                                     ) No. 17-201
4                    Plaintiff,      )
                                     ) Status Conference
5     vs.                            ) **UNSEALED**
                                     ) **Per 4-17-18 Order**
6     PAUL JOHN MANAFORT, JR.        ) Washington, DC
      RICHARD W. GATES, III,         ) January 16, 2018
7                                    ) Time:  9:30 a.m.
                     Defendants.     )
8     _____

9              TRANSCRIPT OF STATUS CONFERENCE
                        HELD BEFORE
10        THE HONORABLE JUDGE AMY BERMAN JACKSON
                UNITED STATES DISTRICT JUDGE
11    _____

12               A P P E A R A N C E S

13    FOR THE PLAINTIFF:      GREG D. ANDRES,
                              Senior Assistant Special Counsel
14                            ANDREW WEISSMANN
                              KYLE R. FREENY
15                            U.S. Department of Justice
                              Special Counsel's office
16                            950 Pennsylvania Avenue NW
                              Washington, D.C.  20530
17                            202-514-1746

18
      FOR DEFENDANT MANAFORT: KEVIN M. DOWNING
19                            815 Connecticut Avenue, N.W.
                              Suite 730
20                            Washington, D.C. 20006
                              (202) 754-1992
21
                              THOMAS EDWARD ZEHNLE
22                            Miller & Chevalier, Chartered
                              900 Sixteenth Street, NW
23                            Washington, DC 20006
                              (202) 626-5800
24                            Email: Tzehnle@milchev.com

25

```
 1    FOR DEFENDANT GATES:      SHANLON WU
                                Wu, Grohovsky & Whipple
 2                              1300 Pennsylvania Avenue, NW
                                Suite 700
 3                              Washington, DC 20004
                                (202) 204-3053
 4                              Email: Swu@dcwhitecollar.com

 5    ALSO PRESENT:             Andre Sidbury, Pretrial Officer

 6                              Omer Meisel, Special Agent

 7    _____

 8    Court Reporter:           Janice E. Dickman, RMR, CRR
                                Official Court Reporter
                                United States Courthouse, Room 6523
 9                              333 Constitution Avenue, NW
                                Washington, DC  20001
10                              202-354-3267

11                                  *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      THE COURTROOM DEPUTY:  Your Honor, this morning we

2  have criminal case number 17-201, the United States of

3  America v. Paul Manafort, Jr., and Richard Gates, III.  Both

4  Mr. Manafort and Mr. Gates are present in the courtroom.

5      Will counsel for the parties please approach the

6  lectern, identify yourself for the record and the party that

7  you represent.

8      MR. ANDRES:  Good morning, Your Honor.  Greg

9  Andres, Andrew Weissmann, and Kyle Freeney, and Supervisory

10  Special Agent Omer Meisel for the Special Counsel's Office.

11  Good morning.

12      THE COURT:  Good morning.

13      MR. WU:  Good morning, Your Honor.  Happy New

14  Year.  Shanlon Wu and Mr. Walter Mack on behalf of Mr. Gates.

15      THE COURT:  All right.  Good morning.  Good

16  morning, Mr. Mack.

17      MR. DOWNING:  Good morning, Your Honor.  Kevin

18  Downing and Tom Zehnle for Mr. Manafort.

19      THE COURT:  All right.  Good morning.

20      I read the status report filed by Mr. Andres on

21  Friday afternoon.  With respect to discovery, is there

22  anything further that you want to add to the record about that?

23      MS. FREENEY:  Not at this time, Your Honor.

24      THE COURT:  Okay.  Do the defendants agree with

25  what was set out in the report about what's been going on

1    with discovery?  Is there anything I need to know from your

2    perspective about discovery?

3              MR. DOWNING:  Good morning, Your Honor.  I think

4    the status notice has spelled out pretty much what's going

5    on here.  I do think we're a little surprised that we're

6    this late in the game and there's still more discovery

7    coming.  We don't know what's coming, we don't know the

8    amount of it.  We also have been in discussions with the

9    Office of Special Counsel about some of our discovery

10   requests, and we believe starting next week we'll be filing

11   some motions on that.

12             THE COURT:  All right.  Mr. Wu?

13             MR. WU:  Same posture, Your Honor.  We are indeed

14   receiving voluminous discovery and we're in the process of

15   reviewing it.

16             THE COURT:  All right.  Mr. Andres, where are we

17   in terms of the percentage of what you have that's been

18   produced?  Is there more coming?

19             MS. FREENEY:  Your Honor, I can address that.  So,

20   there is more coming, but I think we believe we have

21   substantially produced what's discoverable.  So, as we set

22   forth in the status report, its roughly 590,000 items we are

23   producing.  Again, today another production that contains

24   approximately 46,000 items and six additional devices.  And

25   we think that that covers most of the material that has been

1      obtained in the investigation through the beginning of this

2      year.

3                There are some things that remain outstanding; of

4      course, new material that comes in, to the extent that new

5      material is coming in.  So, for example, after the beginning

6      of January, that material obviously remains to be produced.

7                As we indicated in the status report, there are

8      certain quality checks that the government is undertaking to

9      make sure that we've identified the right -- for lack of a

10     better word, pockets of discoverable material that, you

11     know, may not be in obvious places.  That process remains

12     ongoing.  As we noted in our status report, there are

13     certain privileged materials that still need to be produced.

14               And then finally, as Mr. Downing alluded to, we

15     received, on Friday evening, some discovery requests from

16     Mr. Manafort's counsel.  Just given the time, the timing of

17     when we received them, you know, we just plan to respond to

18     them promptly.

19               THE COURT:  Are those the only ones that are

20     outstanding that we're talking about?

21               MS. FREENEY:  In terms of discovery requests, yes.

22     Again, we received those on Friday evening.  So we're going

23     to take a look at them, see if there's responsive material

24     and respond appropriately.  And then, again, it's more just,

25     sort of, pockets of material in less obvious places, so that

1    we're making sure that we have everything, that is an

2    ongoing process.  But I think in terms of the -- the sort of

3    volume, we believe that the bulk has been produced.

4         THE COURT:  All right.  I mean, I think at this

5    point, other than things that are still coming in, there's

6    no excuse for not producing what you have.  The case was

7    brought some time ago and you're asking for a trial date

8    that isn't that far away and they can't possibly be ready

9    for trial if they don't have what you have.  So it all needs

10   to be produced.  Anything that you already have needs to be

11   produced.

12        MS. FREENEY:  Understood, Your Honor.  Understood.

13        THE COURT:  I don't know whether this is a

14   question for you or this is a question for Mr. Andres.  The

15   last time you were here you told me you anticipated that

16   well before today you would be providing a joint proposed

17   trial schedule so that I could craft a schedule for pretrial

18   proceedings.  I got something at 3 o'clock on Friday.  And

19   it has a trial date in it, but is that a joint suggestion or

20   is that your suggestion?

21        MR. ANDRES:  Judge, we've had discussions with the

22   defense about the trial date.  That's our request.  I

23   understand they also have some scheduling issues as to that

24   date.  And so that is not a joint recommendation, but we

25   thought we would get the trial date set and work backwards

1   with the motions schedule.

2          Judge, there is one issue that we have discussed

3   with the defense that we would like to address with the

4   Court at sidebar relating to the scheduling of trial.  So

5   when Your Honor is ready to address that, we're happy to

6   approach, if that's acceptable.

7          THE COURT:  All right.  Well, let me start by just

8   asking you, if I'm going to be setting a trial date, how

9   long do you anticipate it's going to take to put the

10  government's case on?

11         MR. ANDRES:  Three weeks, Your Honor.

12         THE COURT:  The schedule that I had developed a

13  couple status hearings ago, with an eye towards a May trial

14  date, would have had motions briefed and heard by now.  So

15  I'm not sure May 14th is going to turn out to be practical.

16  And if we use it, or even if we use May or June, the

17  briefing schedule is going to be tight and there's not going

18  to be a lot of room for extensions.

19         But I need to explore some other issues before we

20  talk about the trial date.  And why don't we just hear what

21  you have to say at the bench first.

22         And in connection with that, Mr. Haley, is there

23  an overflow courtroom?

24         THE COURTROOM DEPUTY:  No, there isn't.

25         THE COURT:  All right.  You can approach the

1     bench.

2                    (Sealed bench discussion:)

3                    MR. ANDRES:  Thank you, Judge.  I'm going to ask

4     this portion be sealed, which will be obvious after we tell

5     you exactly what we're -- what we wanted to address to the

6     Court.

7                    We've notified both defendants of our intention to

8     bring additional charges.  Those charges -- the venue for

9     those charges don't lie in this district.  So we asked each

10    of the defendants whether they would be willing to waive

11    venue so that those charges could be brought before Your

12    Honor and all of those issues be tried together.  One

13    defendant agreed to waive venue, the other defendant did not.

14                   So our intention is to move forward in a separate

15    district with those separate charges.  We just wanted the

16    Court to be aware of that.  The government's view is that

17    shouldn't prevent the Court from setting a trial date

18    because those issues will all be before a different court in

19    a different district and not before Your Honor.  And again,

20    we're asking for a trial date so that we can get this case

21    moving and scheduled.  But we certainly wanted the Court to

22    be aware of that additional fact.

23                   THE COURT:  All right.  Do you have a sense of the

24    timing of that?

25                   MR. ANDRES:  You know, there are different

1    variables, but we're hoping within the next 30 days to have

2    that indictment returned.

3              THE COURT:  All right.  Now, is there a

4    possibility that upon seeing it, there will be a change in

5    the defendants' position about whether it would be here or

6    whether it would be elsewhere?

7              MR. WU:  I don't know, it's hard to say.

8              THE COURT:  Do you know what the charges are and

9    what the district is that they're talking about?

10             MR. DOWNING:  Yes.  But what we don't know is how

11   the indictment here changes.  It's been mentioned it may

12   change, the indictment in this District.  So I don't know

13   the answer to that.

14             THE COURT:  Are there additional --

15             MR. ANDRES:  Not in terms of the substantive

16   charges.  We, by telephone, notified both counsel specifically

17   what the charges were and laid them out in some detail, and

18   the district, so that they were aware and could make a

19   knowing decision with respect to waiver, if they decided to

20   waive.

21             But our view is it won't change the trial in this

22   case or the indictment in this case, absent a few factual

23   issues.  But nothing in terms of the substantive counts

24   going forward.

25             MR. MACK:  May I speak to that, Your Honor, if I

1    may, on behalf of Mr. Gates?  We were the defendant who was

2    willing to waive venue because, for a lot of reasons, we

3    feel we can only proceed in one -- for one courthouse.  And,

4    basically, it does impact -- the charges are very similar.

5    We will move, wherever it's brought --

6              THE COURT:  You might want to keep your voice down

7    a little bit.

8              MR. MACK:  I'm sorry.  We will move under Rule 21

9    to transfer the case back to Your Honor.  And we can make

10   no -- obviously, we can't say what the Eastern District of

11   Virginia will do, but the point is, on behalf of our client,

12   there is absolute impact on our ability to schedule a trial

13   date because the issues are very similar, the proof is very

14   similar.  And as I say, Mr. Gates is willing to waive venue.

15             THE COURT:  Well, obviously, I can't force Mr.

16   Manafort's hand.  He has to make the decision --

17             MR. MACK:  Absolutely, Your Honor.  We understand

18   that.

19             THE COURT:  -- whether he wants to be in the

20   Eastern District of Virginia or whether he wants to be here.

21   I can't --

22             MR. DOWNING:  I would like to raise one other

23   issue to the Court.  After receiving the status report on

24   Friday, we have conferred with co-counsel and what we think

25   is more reasonable in the event that it comes for trial,

1    would be a mid-September trial.  If we're going to set

2    something today, we would not know what the rest of

3    discovery looks like.  I think it's more realistic to not

4    come back here and ask for a continuance of the trial --

5             THE COURT REPORTER:  Excuse me.

6             MR. DOWNING:  No one ever tells me to speak up.

7             MR. MACK:  Nor me.

8             MR. DOWNING:  So, I was just making the point that

9    given the unknowns right now, after confirming with

10   co-counsel, we believe jointly that a mid-September trial

11   date will be a firm date that we could live with, with the

12   amount of discovery that the Office of Special Counsel is

13   talking about still producing and with our own anticipated

14   motion practice.

15            MR. MACK:  And may I also add to that, Your Honor,

16   my trial that was scheduled for March 5 is now scheduled for

17   April 9.  That will be a month trial before Judge Wood.  In

18   addition to that, there are going to be substantive motions

19   filed before Your Honor here.  And we, of course, Mr. Wu and

20   I, are the Johnnies-come-lately, just having been brought

21   into the case in late October.  And as a result of that,

22   although everybody else is extremely familiar with all the

23   discovery, I can't say that we have spent an awful lot of

24   time, over 600,000 plus that they said they've offered, and

25   there's going to be a lot more.

1          THE COURT:  All right.  Well, we can probably go

2    back in a minute.

3          I'm inclined to set a motions schedule today.

4    That has to get done because people keep telling me they're

5    going to file motions, but we need to get rolling on that.

6    It does seem that May is a little aggressive, given the

7    number of documents that are still being produced and have

8    recently been produced, and given the fact that the ground

9    may be shifting in terms of what the charges are.  I can

10   tell you that if you set a mid-September date, we might end

11   up with a trial in the Eastern District of Virginia before

12   this one.  So you may want to keep that in mind.

13         MR. DOWNING:  But the problem for us right now is

14   190,000 items were produced in the last month.  We don't

15   know what else is coming down.  So for us to start filing

16   discovery motions without having discovery completed does

17   waste some resources for the Court.  We're willing to do it.

18         THE COURT:  I'm not worried about discovery

19   motions, you'll file them when and if you need.  I'm talking

20   about some of the other motions that you all have been

21   mentioning that you want to file, basically getting the Rule

22   12 stuff out of the way.

23         MR. DOWNING:  But I do think, again, that could be

24   impacted by -- I don't know what they haven't produced to

25   us, that's our biggest problem.

1          THE COURT:  Well, you know whether there's -- you

2     told me last time that you expected to file a dispositive

3     motion well before trial and you articulated what the

4     reasons were for filing the motion.  So it seems to me that

5     we should be able to set motions that talk about defects in

6     the indictment and defects in the prosecution and get that

7     heard.  It's going to affect the trial date potentially; it

8     does need to get going.

9          All right.  Well, what's your response to that?

10          MR. ANDRES:  Judge, I understand that.  There's a

11     gulf between May and September.  So maybe we could find a

12     date in June or July.

13          THE COURT:  I was thinking of proposing a June

14     date, just because I thought the May date didn't leave

15     enough time.  And I think I was going to propose June 11.

16     But, you know, I think maybe what we should do is set a

17     motion schedule and see if you all can talk among yourselves

18     and see if you can come up with a schedule.  I think if

19     everybody's willing to come here and there's going to be one

20     indictment, or another indictment -- I mean, you can't bring

21     it here as part of the superseding indictment unless they

22     agree.

23          MR. ANDRES:  Exactly.  Because of venue.  It would

24     be our intention to proceed with the second case in the

25     Eastern District of Virginia.  We're just hoping to set a

1    trial date today so that we can get on the calendar, get

2    everybody's calendar aligned.

3              THE COURT:  My question is, let's say they had

4    agreed to come here, is it going to be one trial or two trials?

5              MR. ANDRES:  It would be one trial.

6              THE COURT:  All right.  Well, that's something to

7    think about from everybody's perspective.

8              MR. DOWNING:  I'm not sure that's right, it would

9    be one trial; it may not be.

10             THE COURT:  Well, you can move to sever counts,

11   you can move to sever defendants.  Those are the kinds of

12   motions we want to get teed up.

13             MR. DOWNING:  Again, I just wanted to reiterate,

14   we were here a month ago, a May trial date was scheduled --

15   proposed.  We're here a month later and 200,000 more

16   documents and we're talking only about another month.

17             THE COURT:  I don't think May makes any sense,

18   since we've already passed the dates that I would have set

19   for dispositive motions.  I don't think that's going to

20   work.  I tried to come up with something, you know, that got

21   us into June and they -- that may not work.  So --

22             MR. MACK:  And, Your Honor, we will -- assuming

23   what we've been told will occur, we're going to move under

24   Rule 21 to have the case transferred back here.

25             THE COURT:  Right.  But I -- I don't know what the

1      basis for that is, so I can't opine about that.  I don't

2      know what Mr. Manafort's position is going to be and I don't

3      know what the court over there's position is going to be.

4              MR. MACK:  I think our positions are different --

5      or that's been articulated.  So all I can say is that we are

6      going to try to get the case back here to Your Honor.

7              THE COURT:  All right.  Well, I won't be the one

8      ruling on that.

9              MR. MACK:  I understand that.  We're not making

10     any prediction of outcome.  But that makes a lot of sense.

11             MR. WU:  Your Honor, for myself, I have a trial in

12     July, about a two-week trial in D.C.

13             And lastly, with regard to this sidebar, on behalf

14     of Mr Gates, our position is that it should not be sealed;

15     it should be available to the public.

16             THE COURT:  Well, I think at this point it's

17     entitled -- it's not a public event; it hasn't happened yet.

18             MR. WEISSMANN:  Our concern was charges have not

19     been brought.  I think the Court's admonition about not

20     trying the case -- not talking about charges that have not

21     been brought, we thought was something better to address

22     with the Court.  We agree with the defense that once those

23     charges get brought, that this part of the transcript then

24     be unsealed so that there's a public record and everybody

25     has access to it.  At this point the defendants have not yet

1    been charged; we thought it was best to proceed this way.

2            THE COURT:  I mean, I think that makes sense.  I

3    certainly would not have, over your objection, unsealed it.

4    And again, I'm not hearing from both defendants that they

5    think it should be unsealed.  So I think I'll leave it the

6    way it is right now.  All right.  Let's go back.

7            Oh, actually, I'm sorry, one more thing.  Mr.

8    Downing, I received a letter from pretrial services that

9    your lawyer delivered to -- I mean, that your client

10   delivered to pretrial from his doctor.  Are you familiar

11   with that?

12           MR. DOWNING:  I am.

13           THE COURT:  Okay.  Then we're going to talk about

14   it.  I wasn't going to talk about if you were unaware of it.

15           MR. DOWNING:  Are we going to talk about it on the

16   record?

17           THE COURT:  I'm going to talk about the fact that

18   it was delivered to me on the record.  Yes, that's what we

19   do, we do things on the record.  And I said that --

20           MR. DOWNING:  I thought the content --

21           THE COURT:  There are aspects of the content --

22   I'm not going to talk about his medical diagnosis in public.

23   But I'm going to talk about the fact that this was delivered

24   to me in public.  I wasn't going to do it if you weren't

25   aware of it.

1          MR. DOWNING:  No, we're aware of it.  My

2    understanding is pretrial services said they would do this.

3    So I don't understand there to be any problem with what

4    pretrial services thought they were authorized to do.  So,

5    I'm fine going on the record.  But my understanding was

6    pretrial services said, Yes, I'll take the letter and I'll

7    talk to the Judge about it.  That was my understanding of

8    what was going on.

9          THE COURT:  Right.  But I had told you, all of

10   you, when Mr. Wu dropped something off at the Clerk's

11   Office, that that's not how you communicate with the Court.

12   You don't send me messages through other people in the

13   building.  If you want to communicate with the Court, you

14   docket something.  This is basically asking for relief from

15   his conditions of release.  I don't understand why, since I

16   relieved him of the conditions of release on December 15th,

17   which is another issue.  But I don't understand why you're

18   asking pretrial to deliver a letter to me from a doctor

19   asking to change his conditions.

20         MR. DOWNING:  Actually, I don't think that's what

21   happened.  I think what happened was Mr. Manafort asked

22   pretrial services about it, pretrial services said, I'll

23   take the letter, I'll talk to the Judge.  We had no idea

24   that was inappropriate or in any way was outside of the

25   normal practice of pretrial services.  That's what I'm

1    telling you.

2              THE COURT:  So a letter to me, asking for a change

3    in the conditions of his confinement, you deliver it to

4    pretrial.  Have you ever done that in any case, ever?

5              MR. DOWNING:  I've never had bail issues like

6    we've had in this case, Your Honor, so no.

7              THE COURT:  I ruled a month ago.  So at this point

8    it's on your client, if he hasn't posted the bond that he

9    told me he was going to post.  I granted the motion --

10             MR. DOWNING:  It's more than that.  It's more than

11   on my client.  We will have a filing today regarding the

12   last motion.  This was totally through communication of

13   pretrial services.  It was not in any way an end-run around

14   you.  So I'll be happy to --

15             THE COURT:  I didn't say it was an end-run around

16   me.  It was an end-run around the docket.  I got it, but

17   that's not how I get things.  So, if you're asking me to

18   change his conditions of release, you file a motion and ask

19   to change his conditions of release.  They get to see it,

20   the public gets to see it.  We know how this is done.  Okay?

21             MR. DOWNING:  Understood.

22             THE COURT:  All right.

23             MR. WEISMANN:  Your Honor, for the record, we

24   didn't get to see that.

25             THE COURT:  I understand that.  That's my problem.

1          Thank you.

2          (Open court:)

3          THE COURT:  All right.  I do think it's important,

4    in light of all of those circumstances we've been talking

5    about, to set a motions schedule.  I'm going to defer

6    setting a trial schedule for the moment.

7          Mr. Downing, you told me last time that you

8    expected to file a dispositive motion well before trial and

9    before we got into things like evidentiary motions and

10   motions in limine.  And we have agreed we should set those

11   dates counting forward from now, as opposed to backwards

12   from the trial date.  So is there any reason we shouldn't

13   set a motions schedule right now for motions under Rule 12

14   to deal with defects in the prosecution or defects in the

15   indictment?

16         MR. DOWNING:  I don't have any reason not to set

17   them now.

18         THE COURT:  All right.  So, when do you think you

19   can file your motions?

20         (Off-the-record discussion between defense counsel.)

21         MR. DOWNING:  Your Honor, I believe mid-March

22   would be an acceptable deadline for the defense.

23         THE COURT:  You need to wait until March to file

24   motions under Rule 12(b)(3)?

25         MR. DOWNING:  I just conferred with co-counsel and

1    we think mid-March would be a deadline that would be easy

2    for us to meet.

3            THE COURT:  All right.  Well, I mean, the last

4    time you came in here you told me you were expecting to file

5    them even before this hearing.  So, what's changed?

6            MR. DOWNING:  We did.  But I think what's changed

7    is us sitting around waiting for discovery.  We got 190,000

8    items between December 20th and last week.  So we're doing a

9    lot of things here, Your Honor.  We have limited resources.

10   We have a couple of lawyers working here.  We're not with

11   big firms and it takes time to get through this.

12           So realistically, I don't see, with the discovery

13   load that has been put on us, that we can realistically have

14   the adequate time to file the motions we want to file before

15   mid-March.

16           THE COURT:  All right.  Well, I'm not talking

17   about motions to suppress here.  I'm not talking about

18   motions to suppress statements, motions to suppress

19   evidence, I'm not talking about motions in limine.  All I

20   was talking about was defects in the prosecution or defects

21   in the indictment.

22           MR. DOWNING:  Sure.  Well, I'll give you an example.

23           THE COURT:  All right.

24           MR. DOWNING:  One of the items we have right now

25   and we've been looking at is whether or not we have to serve

1   a request for a bill of particulars, because there are quite

2   a few allegations in the indictment that don't have factual

3   allegations that go along with it.  So we haven't done that

4   yet.  We anticipate that -- for resource allocation for the

5   Court and the defense, that we would file that motion first

6   and get an answer to that.  And that would be something that

7   would be incorporated into a dispositive motion.  So it's

8   just one example I have of how that timing could get

9   affected by a discovery issue.

10          THE COURT:  All right.  Are you planning to file

11   any -- a motion under 12(b)(3)(A) alleging a defect in the --

12   instituting the prosecution?

13          MR. DOWNING:  We are.

14          THE COURT:  All right.  When do you think you can

15   file that?  Don't you think that's something we should take

16   up before we take up anything else?

17          MR. DOWNING:  Could I have a moment, Your Honor?

18          THE COURT:  Yes.

19          (Off-the-record discussion between defense counsel.)

20          MR. DOWNING:  Your Honor, we believe that we could

21   do that by the end of February.

22          THE COURT:  All right.  Mr. Mack, what do you want

23   to say?

24          MR. MACK:  I was just going to say we are the

25   least informed of any counsel before, since we have just

1  entered -- not just --

2          THE COURT:  Not just.

3          MR. MACK:  -- but shortly after October 27.  And

4  we've been focused primarily on the bail issues.  And I

5  think it's going to take us longer than, perhaps, the Court

6  would wish for us to get up to speed.  But we do intend to

7  file, I would say, dispositive motions.

8          I think we need six weeks in order to be able to

9  do that, to master the discovery, which we're getting a

10  great quantity, and we are the least familiar with it.  And

11  we have -- we've been working -- well, we would like to --

12  we think there are important motions to be made and we would

13  like adequate time to do it, plus the fact -- and I realize

14  this is not the Court's problem -- but I am scheduled for

15  trial on April 9, in a four-week trial with more documents

16  than this case, which we are getting from the government --

17  I think we got 100,000 last week.  So my time has to be --

18  not this government, but the U.S. attorney in Southern New York.

19          THE COURT:  It's all the same government.

20          MR. MACK:  It is all the same government.

21  Sometimes I agree with that, but not always.

22          But in any event, the point being that we need the

23  time and we are the least prepared of anyone here and we

24  want to do a good job and we need that time to be able to do it.

25          THE COURT:  All right.  Well, I think that we can

1    certainly have a staggered schedule and deal with motions

2    under 12(b)(3)(A) and 12(b)(3)(B) first.  And then we can

3    move on to motions to suppress and 404(b) motions, with

4    things like motions in limine being set much closer to trial.

5         Discovery motions you can file when you have

6    discovery disputes or you can ask for a status conference so

7    we can talk them through.  I think that may be a more

8    expeditious way to deal with discovery disputes.  A request

9    that was filed on Friday is not a ripe dispute for motion at

10   this point.

11        So, but I think the fact that discovery has been

12   rolling, I don't think that's any wrongdoing on the part of

13   the prosecution, but it certainly affects the defenses'

14   ability to be ready for a trial date on the kind of schedule

15   that you're talking about.  You can't tell me on Friday,

16   Well, last night we produced more documents and expect them

17   to be ready for the same trial that you're ready for;

18   they're clearly not.

19        So, I'm not exactly sure at this point when the

20   trial date should be.  I still think it might be useful for

21   you to speak with each other about it.  I came in here with

22   a prepared motion schedule, but it was a lot sooner than the

23   one you're talking about.

24        All right.  I'm go to say -- why don't we say

25   February 23rd for any motions filed under Federal Rule of

1   Criminal Procedure 12(b)(3)(A) or (B) alleging defects in

2   instituting the prosecution or in defects in the indictment

3   or information.  Given the importance of those motions, the

4   government can respond to them on March 16, replies March

5   30.  And then I would like to set a hearing in April, but if

6   counsel is going to be in trial, that's going to be tricky.

7   Can I set a motions hearing for April 20th?

8        MR. MACK:  Your Honor, as all trials, this one,

9   especially in New York, may plead out sometime in the

10   relatively near future.  Of course I will let the Court know

11   immediately if that were to occur.  But I think the Court

12   can set the schedule that it would expect here, and Mr. Wu,

13   far more competent than me, can basically represent us with

14   my input.

15        THE COURT:  All right.  Then I'm going to set a

16   motions hearing on those dispositive motions only on

17   Tuesday, April 17, at 10 a.m.   And then what I would like

18   to do is issue an order saying what I would like included in

19   a schedule and then ask you to meet and confer and come back

20   to me with a schedule that works for that.

21        In terms of a trial date, I don't have a problem

22   with a trial in September or October.  So I think we should

23   be able to get something on the calendar.  But, no, I don't

24   want something that we're going to continue.  We're going to

25   have a real trial date.  But that means that discovery has

1     to get done, these first motions have to get filed and then

2     we can work together to try to come up with a schedule for

3     the rest of it.

4          All right.  I received -- with respect to bond

5     issues, I believe that the submission made by Mr. Gates has

6     complied with what I said had to be submitted, so that I

7     could then issue the order with the conditions in it, with

8     the few modifications that I've already talked about.  I

9     asked the government to let me know by today -- and I didn't

10    say this morning -- but do you know now whether you agree

11    that he's done what he needs to do?

12         MR. ANDRES:  Yes, Judge.  In terms of the

13    paperwork, we have no issue.  There are just two issues, one

14    of which counsel has already represented to the government,

15    but I think it makes sense to put on the record, which is

16    whether Mrs. Gates has surrendered her passport, which is

17    another condition.

18         And then, secondly, we just had a question in

19    terms of what the appropriate process was for the suretors

20    to swear out, if you will, their -- the bail bond or the

21    bail form.  I understand that some have done it in front of

22    the clerk of court, some have been sworn.  I just wanted to

23    clarify what process the Court required for that in terms of

24    letting the suretors know, putting them under oath and

25    swearing them, in terms of their signatures.

1          THE COURT:  The documents they've filed are not

2     sworn?

3          MR. ANDRES:  I don't want to -- I think it's

4     probably best for Mr. Gates' counsel to address that.  I

5     think some are and some aren't.  But I think he's in a

6     better position to address that.

7          THE COURT:  All right.  All right.

8          MR. WU:  Your Honor, with regard to the passport

9     issue, it's been surrendered, for the record.

10          THE COURT:  All right.

11          MR. WU:  With regard to that question of the

12     attestation, we believe that the individual clerk of the

13     United States District Court's office should be the ones to

14     advise us on that process.  And what they advised was that

15     in one courthouse where the forms were pledged, all of the

16     clerks required them to be signed in their presence.  In one

17     courthouse sureties, pledgers were placed under oath by the

18     clerk of the court.  In the United States District Court for

19     the District of Columbia, the clerk did not have that

20     process of literally swearing in.  But again, the forms

21     which spell out the responsibilities of the pledgers and

22     sureties were signed in the presence of the District of

23     Columbia's District Court's clerk's office.

24          THE COURT:  And do the forms -- I can't recall --

25     say that they're sworn, or that --

1          MR. WU:  They are a -- there's no requirement for

2     a notary or for an affidavit, but they're required to be

3     done in the presence of the clerk for the attestation

4     aspect.  And they clearly state on there what their obligations

5     are going to be.

6          THE COURT:  I think all these forms are sufficient

7     to create the obligations, and I will probably issue an

8     order later today that memorializes the conditions that I

9     said would be issued if and when he complied with the rest

10     of the conditions.

11          MR. WU:  Very well, Your Honor.

12          THE COURT:  All right.  With respect to Mr.

13     Manafort's bond, what are we waiting for?  I mean, I've

14     gotten -- I've received a communication through pretrial

15     services from Mr. Manafort's doctor asking me to modify the

16     conditions of release.  And I don't know why he would be

17     asking me that, since I've already granted his motion and

18     basically the keys to his release lie with him at this point.

19          MR. DOWNING:  Well, first of all, Mr. Manafort's

20     team would disagree that you've given him the keys for his

21     release.

22          THE COURT:  Well, you filed a motion and you said

23     we're seeking relief on the following conditions; these are

24     our sureties, these are the properties we're going to

25     pledge, and I accepted everything he proposed a month ago.

1              MR. DOWNING:  Your Honor, you may not be aware of

2     this, but you actually set another $7 million in security.

3     That's a $17 million bond that you set.  We did not ask for

4     that.  We asked for a $10 million bond.

5              THE COURT:  I don't think I did that.  So if I did

6     that, you had a month to point the error out to me.  I'm

7     happy to read whatever you point out.  I get bond motions on

8     a daily basis, it seems, in this case, so I'm happy to read

9     yours.

10             MR. DOWNING:  Well, we will be filing with you

11    today, Your Honor.

12             THE COURT:  All right.

13             MR. DOWNING:  Thank you.

14             THE COURT:  With respect to the request made

15    through the means of a letter to me from a doctor delivered

16    to the pretrial services agency, if you want me to do

17    anything about it, it needs to be filed as a motion on the

18    docket.

19             MR. DOWNING:  Thank you, Your Honor.

20             THE COURT:  All right.  I will note from the

21    record that while he's subject to home confinement, he's not

22    confined to his couch.  And I believe he has plenty of

23    opportunity to exercise.

24             All right.  There is a further issue to take up.

25    I issued an order to show cause on December 22nd concerning

1    defendant Gates' compliance with my order dated November 8th

2    which barred all the interested parties, including the

3    defendants and their counsel, quote, from making public

4    statements to the media or in public settings that poses

5    substantial likelihood of material prejudice, close quote.

6    The concern, as everyone knows, is the jury venire.  And I

7    want to note again that no one objected to the entry of the

8    order.

9         The order does not prohibit the creation of a

10   legal defense fund and it does not prohibit the solicitation

11   of donations.  But that's not all that happened in this

12   case.  A fund was established, a fundraiser was held, and

13   apparently a number of journalist were specifically invited

14   to the fundraiser.  Mr. Gates was not present, he was

15   abiding by the condition of home confinement.  But he

16   created a videotape to be shown at the event.

17        The defense has provided me with a transcript.  In

18   the videotape he thanked, as he certainly is permitted to

19   do, those who attended and who might help to fund his

20   defense for their generosity and their kindness and their

21   support.  He reminded everyone that he was not permitted to

22   discuss the specifics of his case.

23        But that's also not all that happened.  The host

24   of the event, an individual named Jack Burkman, went much

25   further.  According to press accounts that I found and the

accounts provided by the defense, he said that Mr. Gates is

a victim of an unfair criminal prosecution, that the special

counsel is an increasingly desperate prosecutor, unfairly

pursuing the case, and other statements of that nature.  And

Mr. Gates said on the video thank to you Jack Burkman for

hosting the fundraiser, for believing in my cause, and

ensuring supporters from across the United States hear our

message and stand with us.  So that's what prompted the

order to show cause.

        Mr. Gates provided an article in response to the

order that quotes Mr. Burkman prefacing one of these

statements with, "I don't want to get too political, but my

personal belief is that our good friend Rick is really the

victim of an unfair prosecution."  The response maintains

that Mr. Burkman was simply expressing his personal opinion

throughout and that he was not acting as a representative

for the defendant at the event; he was just acting totally

on his own.

        The problem is that it's hard to discern what

message Mr. Gates could be referring to in the video, other

than what Mr. Burkman said.  And it doesn't make sense that

Mr. Burkman would have a video of Mr. Gates in hand that

expressly mentioned Mr. Burkman if the two hadn't been

working in tandem on the event, even if it was through an

intermediary and they weren't personally communicating.

1          So I want to repeat that my order does not prevent

2     third parties with no relationship to either side of this

3     case from blogging, Tweeting, posting, serving as talking-heads

4     on the news, hosting events, or otherwise publicizing their

5     personal views of the strengths and weaknesses of the

6     prosecution or the defense.  Mr. Burkman is free to exercise

7     his First Amendment rights.

8          But it is hard to swallow the proposition set

9     forth in the defendant's response that Mr. Burkman was not

10    acting as a spokesperson or representative or agent for Mr.

11    Gates on this occasion.  So, I'm not satisfied that the

12    event was entirely consistent with the order.

13         As I did in the case the first time questions were

14    raised concerning Mr. Manafort's compliance, I'm going to

15    discharge the order to show cause.  But I think it's really

16    important for the defendants to use some common sense and to

17    consult with their counsel when a situation comes up that

18    could give rise to these concerns.

19         You can fundraise, you can say what you want at a

20    private gathering to people about why they should help you.

21    And you can certainly send thank you notes to anyone who

22    contributes.  But if the press is going to be invited to an

23    event where you or your surrogate will be speaking, I

24    suggest that that's a pretty big red flag.

25         I also think that other people can talk about the

1    case and other people can fundraise and other people can

2    express their opinions about why money should be donated.

3    But when those events become orchestrated or entangled,

4    that's where the risk is of crossing the line.  If the means

5    used to solicit funds on your behalf is a public attack on

6    the prosecution, you should not be cheering it on, you

7    should not be part of the presentation.  I think that gives

8    you enough guidance moving forward.

9           So is there anything else that anybody needs to

10   raise today in connection with this case?

11          Yes?

12          MR. WU:  Your Honor, just briefly on the issue

13   with fundraising.

14          THE COURT:  Yes.

15          MR. WU:  We completely understand your guidance

16   and appreciate that.  I just want to note for the record

17   that in this day and age the notion, as Your Honor said,

18   you're free to speak in a, quote, unquote, private

19   gathering, in this day and age it's not always so easy to

20   ascertain.  I'm not talking about this fundraiser.  But

21   going forward --

22          THE COURT:  There was nothing complicated about

23   this one when the press was invited.

24          MR. WU:  I'm just saying going forward those

25   issues may vary on a case-to-case basis, because Your Honor

1   is well familiar with the fact that people may think they're

2   speaking privately, but in fact there are journalists there

3   or people making a public record.

4       With regard to this fundraiser that occurred, I

5   just want to reiterate that Mr. Gates in no way implicitly,

6   and certainly not explicitly, gave any instructions with

7   regard to a message by anyone.  He also had no involvement

8   in the invitation list.  But we appreciate your guidance and

9   we'll certainly be very cognizant of that, should there be

10  any further fundraising efforts.

11      THE COURT:  All right.  Is there anything further

12  the government wants me to raise at this time?

13      MR. WEISMANN:  Yes, Your Honor.  As the Court may

14  be aware, on January 3rd there was an action filed, a civil

15  action by Mr. Manafort challenging the order from the acting

16  attorney general and the implementation by Special Counsel

17  Mueller.  I wanted to make sure that the Court was aware,

18  given the Court's scheduling of dispositive motions, that

19  although the time to reply in that case will not run for 60

20  days from Friday, since the action was not served actually

21  until this past Friday, we will be filing, no later than

22  February 2nd, to have that case dismissed.

23      And one of the grounds will be that there was an

24  adequate remedy before this Court and, thus, the

25  government's position is that if Mr. Manafort seeks to have

1      those issues decided on the merits, that under the APA it

2      would behoove him to file that along the motion schedule set

3      by the Court, and that this, in the criminal case, is the

4      appropriate venue for that to be decided, especially since

5      the remedy that is sought is dismissal of the indictment.

6              THE COURT:  Well, obviously the Federal Rules of

7      Criminal Procedure set up remedies for dealing with defects

8      in the prosecution and the indictment, and I have set a

9      schedule for those to be heard.  I'm not going to opine on

10     the record about the legitimacy of the civil action or whether

11     there's subject matter jurisdiction or whether it states a

12     claim under the APA because the matter isn't before me.

13             I suppose I would be interested in the parties'

14     positions as to whether that case should be before me, but

15     it isn't at the moment.  And there's no rule that would

16     require its transfer.  But, there is an indictment pending

17     in this case and under the Federal Rules, if someone wants

18     to challenge it, those motions have to be filed before trial

19     in accordance with the schedule that I just set.

20             MR. ANDRES:  We agree with that, Your Honor, that

21     would be made.  There is an opportunity for the defendant to

22     make those motions before this Court.  And one of the

23     grounds, in addition to the merits that we will be raising

24     before the other court, is precisely that, and this is the

25     proper procedure for seeking that remedy.

1          THE COURT:  All right.  Mr. Downing?

2          MR. DOWNING:  Your Honor, I just want to point out

3    that when we filed the civil complaint, we did put a notice

4    on it that this case was pending here in D.C.  Under the

5    local rules, there's no related-case issue for criminal and

6    civil.

7          THE COURT:  I understand that.

8          MR. DOWNING:  So we filed it with notice to the

9    clerk.  I just wanted you to know, we wanted the clerk to

10   know that this was related to an ongoing criminal matter

11   before it.  That's first of all.  Second of all --

12         THE COURT:  What are you saying?  Do you think

13   that they should be before the same Court, or not?

14   Obviously, we're all quite well aware that the subject

15   matter is the same.  But our related-case rules don't

16   contemplate the notion that people would sue civilly to

17   forestall a criminal prosecution.  This is a rather unique

18   situation.

19         So now that we have the situation, do you have a

20   point of view about whether they should be before the same

21   Court?

22         MR. DOWNING:  They definitely arise out of the

23   same facts and transactions that are before this Court in

24   the criminal case.  So it seems, from a judicial economy

25   issue, it would make sense.  I'm not quite sure why the

1    local rule doesn't allow for that --

2         THE COURT:  I think it allows for it, it doesn't

3    require it.  I think cases in this court can be transferred

4    by consent among the judges.  But in the absence of a rule

5    that specified, I don't think we were inclined to make a

6    transfer, if the parties weren't seeking it.

7         But if the parties all agree that judicial economy

8    requires one judge to decide if there's an adequate remedy

9    at law, that would be a useful piece of information to know,

10   and that's why I'm trying to find out if you all have an

11   opinion on it?  If you think that it would advance the cause

12   of getting this dealt with economically to have it in front

13   of one Court, I think that can be arranged.  We can transfer

14   cases, but I wasn't going to just take it or have Judge

15   Ketanji Brown Jackson give it away, given the fact that our

16   rules didn't demand it.

17        MR. DOWNING:  Sure.  Sure.  Could I have a moment,

18   Your Honor?

19        THE COURT:  Yes.

20        (Off-the-record discussion between defense

21   counsel.)

22        MR. DOWNING:  Your Honor, I believe we need to

23   confer a little more.  We'll have an answer for the Court in

24   a couple of days.

25        THE COURT:  All right.  In the meantime then, the

1    cases will stand where they stand.

2           Does the government have a position?

3           MR. WEISMANN:  Your Honor, we would have no

4    objection at all to having the matter transferred from --

5           THE COURT:  Judge Jackson to Judge Jackson.

6           MR. ANDRES:  -- Judge Jackson to Judge Jackson.

7    It seems fortuitous.

8           THE COURT:  Confusing, yes.

9           MR. ANDRES:  But we also think that regardless of

10   the local rules of the court, that there was nothing that

11   precluded Mr. Manafort, as he said at the last court

12   appearance, that he had dispositive motions that he was

13   going to make.  We had assumed this was the dispositive

14   motion that he was going to make, which is now in the form

15   of a civil complaint.  It obviously could have been brought

16   here, and that will be -- assuming there is no transfer,

17   that will be our position before both Judge Jacksons.

18          THE COURT:  All right.  Well, I'm not going to

19   respond to that; it's not mine to respond.

20          MR. DOWNING:  Your Honor?

21          THE COURT:  Yes, sir.

22          MR. DOWNING:  One clarification.  The civil

23   complaint does not ask to dismiss the criminal indictment.

24   It does not.  It is a separate civil matter.  So I want to

25   be clear on that.  It does not ask for dismissal of the

```
1    indictment.

2              THE COURT:  It asks -- I don't have it on me.  I

3    believe that Count 2 and then the relief sought quite

4    specifically call for the invalidation of the indictment in

5    no uncertain terms.  Count 1, I believe, relates to the

6    appointment of the special counsel and Count 2 relates to

7    the indictment of your client specifically as being an

8    ultra vires action on the part of the special counsel.  So,

9    I'm not entirely sure how you can say what you just said.

10             MR. DOWNING:  My apologies, Your Honor.  Since I

11   don't have it in front of me, and at the risk of saying

12   something else that's incorrect, I'll reserve on that.

13             THE COURT:  All right.  So if this lawsuit doesn't

14   seek, among other things, the invalidation of the

15   indictment -- it's possible, I didn't read it very

16   carefully.  But it does seem to seek that, quite clearly.

17             All right.  Well, why don't we say, so that we're

18   not -- it's not a mystery, today is -- what is today?

19   Tuesday.  Why don't we say that by Friday the parties will

20   file a notice about whether they're agreed or not agreed

21   about whether the cases should be both tried in this court.

22   And so that then I'll know and the other Jackson will

23   know -- Judge Jackson will know.  And no one is going to be

24   offended one way or the other based on what you say.

25             All right.  Is there anything else I need to take
```

1    up on behalf of the government?

2              MR. ANDRES:  Judge, we would just ask for another

3    status conference in 30 days, and also move to exclude time

4    either between now and whenever the next status conference

5    is, or between the next hearing, in light of the complexity

6    of the case and the fact that motions schedule has now been

7    set.

8              THE COURT:  We've already entered the order that

9    finds this to be complex case, outside the realm of the

10   Speedy Trial Act.  I do think we need to set another status

11   date, hopefully for the purpose of setting the rest of the

12   schedule based on the order that I'm going to issue later.

13             We have dates for motions at the end of February,

14   but it seems to me we could get together before then.  If

15   there are discovery issues, I would like to have an

16   opportunity to start ironing them out.  So you can let me

17   know if there are any you want to talk about.

18             How about February 14, or February 13, one of

19   those mornings for the next status conference?

20             MR. ANDRES:  Either is fine for the government.

21             THE COURT:  All right.  What about the defense?

22             MR. WU:  Either day is fine with us.

23             THE COURT:  All right.

24             MR. DOWNING:  Either works.

25             THE COURT:  Okay.  Mr. Mack has something he wants

1  to say.

2          (Off-the-record discussion between defense counsel.)

3          MR. WU:  Your Honor, with regard to that date, we

4  might need to speak for a moment on the sidebar.

5          THE COURT:  All right.

6          (Sealed bench discussion:)

7          MR. MACK:  I'm just hoping that whatever action

8  the government is going to take in the Eastern District of

9  Virginia will have been taken by that date because I think

10  that might be important to discuss at our next conference.

11          THE COURT:  All right.  Do you know when you

12  anticipate -- what he was saying is it would be useful if

13  the next indictment is already in existence by that point.

14  Do you expect that will happen?

15          MR. ANDRES:  Yes.

16          Do we want to seal this as well?

17          THE COURT:  Yes, this little portion will be

18  sealed as well.

19          (Open court:)

20          THE COURT:  All right.  We'll set the next status

21  conference for February 14th at 9:30 a.m.  Given the

22  complexity of the matter, the need for discovery to be

23  completed and the anticipated motions, I think it's in the

24  interest of justice to exclude the time under the speedy

25  trial calculation between now and the 14th.

1          I should be issuing an order today in connection

2     with Mr. Gates' release from the current conditions of

3     confinement and the new conditions imposed.  And I'll be

4     happy to review whatever Mr. Manafort files whenever Mr.

5     Manafort files it.

6          All right.  Thank you, everybody.

7          (Off-the-record discussion between the Courtroom

8     Deputy and the Court.)

9          THE COURT:  Mr. Sidbury, when I issue the new

10    order with the new conditions, do I need Mr. Gates present

11    to swear him to them?  Or can he come to your office and do

12    that?  Or does he need to come into court and sign the way

13    he signs the other conditions?

14          THE PRETRIAL SERVICES OFFICER:  Your Honor,

15    because you're changing his conditions -- if I could have

16    one brief --

17          THE COURT:  All right.

18          THE PRETRIAL SERVICES OFFICER:  Your Honor, Mr.

19    Gates will have to come into court and sign a new release

20    order because of the way that it's phrased in the original

21    release order.

22          THE COURT:  All right.  So, do you want to just

23    set a time tomorrow morning to do that, Mr. Wu?  Or maybe we

24    can do it later today?

25          MR. WU:  Of course, later today would be

1    preferable because of logistics.

2              Is there any possibility that it could be signed

3    at the other courthouse in Richmond?

4              THE COURT:  Well, I don't think it's going to take

5    that much longer, if he can return to your office with you

6    and we can set a time to get together later today to

7    complete this process.

8              MR. WU:  That's fine, Your Honor.

9              THE COURT:  So I think that's the best thing to do.

10             Mr. Manafort and his counsel do not need to return.

11             Why don't we come back at 2 p.m.  Does that work

12   for you, Mr. Wu?

13             MR. WU:  That's fine.

14             THE COURT:  All right.  That's what we'll do.

15             Thank you, Mr. Haley, for bringing that to my

16   attention.

17                              *   *   *

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

          I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of

my stenograph notes and is a full, true and complete

transcript of the proceedings to the best of my ability.

                    Dated this 18th day of January, 2017.




                         /s/_____

                         Janice E. Dickman, CRR, RMR
                         Official Court Reporter
                         Room 6523
                         333 Constitution Avenue NW
                         Washington, D.C. 20001