UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICHARD W. GATES III,<br><br>Defendant. | Crim. No. 17-201-2 (ABJ) |

### GOVERNMENT'S MOTION FOR A DOWNWARD DEPARTURE AND MEMORANDUM IN AID OF SENTENCING

Since entering a guilty plea in February 2018, the defendant, Richard W. Gates III, has provided the government with extraordinary assistance.  He met with investigators more than fifty times, providing truthful information to the Special Counsel's Office and several other prosecuting offices of the Department of Justice.  He voluntarily surrendered his electronic devices with broad authorization for the government to image and search them.  He gave sworn testimony in three federal criminal trials in the Eastern District of Virginia and the District of Columbia.  And he has pledged to continue to cooperate with the government after his sentencing in several ongoing matters.  In short, under exceedingly difficult circumstances and under intense public scrutiny, Gates has worked earnestly to provide the government with everything it has asked of him and has fulfilled all obligations under his plea agreement.  Accordingly, consistent with its promise to Gates in his plea agreement, the United States, through the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing and respectfully moves for a downward departure, pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") § 5K1.1, and does not oppose Gates' request for probation.

## **PROCEDURAL HISTORY**

This section reviews the charges filed against Gates in this Court, in the District Court for the Eastern District of Virginia, and his subsequent guilty plea.

### I.     District of Columbia Indictment

On October 17, 2017, a federal grand jury in the District of Columbia returned an eight-count indictment in the instant case. Indictment, ECF No. 13. The conduct charged in the Indictment related to Manafort's and Gates' failure to register under the Foreign Agents Registration Act (FARA) for their work as agents of the Government of Ukraine, the Party of Regions, and Ukrainian President Victor Yanukovych, as well as their failure to report the income earned from that work and the overseas accounts in which those funds were maintained. Manafort and Gates also later concealed that work by making false statements to the United States Department of Justice, National Security Division's FARA Unit. The various charged schemes involved money laundering and tax fraud, as well as a series of lies, by both Manafort and Gates, to the professionals hired by Manafort to assist with his finances and government filings, including his bookkeepers, tax preparers, and lawyers.

### II.    Eastern District of Virginia Indictment

On February 22, 2018, a federal grand jury in the Eastern District of Virginia returned a 32-count Superseding Indictment charging Manafort and Gates. Gates was charged with: (a) assisting Manafort in the filing of Manafort's false tax returns as to income and the existence of Manafort's overseas accounts from 2010 to 2014 (Counts Six through Ten); (b) subscribing false tax returns as to Gates' income and the existence of his own overseas accounts from 2010 to 2014 (Counts Fifteen through Nineteen); (c) filing a false amended tax return in 2013 (Count Twenty); (d) failing to file Foreign Bank Account Reports (FBARs) in the years 2011, 2012 and 2013 for

his own overseas accounts (Counts Twenty-One, Twenty-Two, Twenty-Three); and (e) various bank fraud and bank fraud conspiracy counts (Counts Twenty-Four to Thirty-Two). *United States v. Manafort and Gates*, 1:18-cr-83 (TSE) (ECF No. 9).

Prior to pursuing charges in the Eastern District of Virginia, the Special Counsel's Office asked Manafort and Gates whether they would waive venue and allow the additional charges to be added to the existing District of Columbia Indictment. Gates agreed to waive venue. Manafort, as was his right, declined. In light of Manafort's decision, the government proceeded in the Eastern District of Virginia against both defendants.

As with the Indictment filed in the District of Columbia, the tax and FBAR charges related to income earned in Ukraine, maintained in overseas accounts, and transferred to the United States to purchase luxury items and real estate, and to improve Manafort's homes in Bridgehampton, New York, and Palm Beach, Florida, among others. The Indictment also alleged that Manafort and Gates disguised, for Manafort's benefit, more than $10 million in income transferred from overseas accounts by falsely characterizing that income as loans.

The Indictment added substantive tax charges relating to Gates' false personal income tax filings from 2010 to 2014. During that time period, Gates wired more than $3 million from various overseas accounts to accounts he controlled—some of which he stole from Manafort, totaling several hundred thousand dollars. Gates failed to report this income and the overseas accounts he controlled.

Additionally, the Indictment charged Manafort and Gates in nine bank fraud/bank fraud conspiracies, involving five loan applications to three separate financial institutions. Four of these loans related to properties that Manafort purchased or improved with funds from his overseas accounts. As such, Manafort was able to access the overseas income he invested in these

properties, and for which he did not pay taxes, by using the property as collateral. Manafort (or his son-in-law) were the sole beneficiaries of the four loans that were approved; Gates did not receive any proceeds.

### III.     Guilty Plea and Cooperation Agreement

On February 23, 2018, less than four months after his initial indictment in the instant case, Gates pled guilty, under a plea agreement, to a two-count Superseding Criminal Information. ECF No. 195. Count One of the Information charged Gates with Conspiracy, in violation of 18 U.S.C. § 371; the objects of the conspiracy were tax fraud in violation of 26 U.S.C. § 7206(1), FBAR crimes in violation of 31 U.S.C. §§ 5312, 5322(b), and a FARA violation, including making false statements to the Justice Department, in violation of 22 U.S.C. §§ 612, 618.

Gates' specific conduct underlying the charges was summarized in the Statement of the Offense attached to his plea agreement. ECF No. 206. During his allocution, Gates admitted that he caused millions of dollars of Manafort's income to be wired from offshore accounts for goods, services, and real estate purchased for Manafort; that Gates helped conceal that income and the related purchases, and the offshore accounts themselves; that Gates helped Manafort hide millions of dollars of other income by characterizing it as "loans"; that Gates lied to Manafort's bookkeeper and tax preparers about the payments from overseas and the existence of the bank accounts from which the money was transferred; that Gates engaged in extensive lobbying activities in the United States on behalf of Ukraine and failed to register for this work as required; that Gates was involved in hiring two U.S. lobbying firms to represent Ukraine; and that in submissions to the Department of Justice in November 2016 and February 2017, Gates caused false and misleading statements to be made relating to the Ukraine work. Gates also admitted that as part of the lobbying scheme, he

was involved in hiring a group of former European leaders to lobby in the United States on behalf of Ukraine.

Count Two charged Gates with making a false statement to the Federal Bureau of Investigation on February 1, 2018, in violation of 18 U.S.C. § 1001(a). This conduct involved Gates' lies during his initial proffer sessions with the government at the start of the cooperation process, the effect of which was to provide false exculpatory information about Manafort. Specifically, the information supported a false defense that Manafort was not guilty of a FARA violation because he did not directly lobby any United States government officials. Gates lied about what Manafort and a senior lobbyist told him about their meeting with a Member of Congress in March 2013, affirmatively telling the government that Manafort told Gates that Ukraine was not discussed. After Gates was confronted with, among other things, a memorandum for President Yanukovych written by Gates and Manafort that summarized the meeting and explicitly noted that the meeting addressed Ukraine, Gates admitted the truth.

Gates' lie during the proffer was not without consequence. Because of the false statement, the government's plea offer changed substantially, and in order to obtain a cooperation agreement, Gates had to plead guilty to the false statement count in addition to the conspiracy count. Gates' criminal exposure under the resulting plea agreement increased from five to ten years. Gates agreed.

Consistent with the Gates' plea agreement, the government moved to dismiss without prejudice the charges filed against Gates in the Eastern District of Virginia. The court granted that motion on March 1, 2018. *United States v. Gates*, 1:18-cr-83 (TSE) (ECF No. 21).

## FACTUAL BACKGROUND

The Court is familiar with Gates' substantial criminal conduct. For more than a decade, Gates engaged in a range of crimes at Manafort's direction. Together, Manafort and Gates engaged in tax fraud, FBAR and FARA violations, money laundering, bank fraud, false statements to the government, and related conspiracies. Throughout their jointly undertaken crimes, Manafort was the principal and Gates was his employee. Although Manafort generally benefited either exclusively or principally from these crimes, Gates sometimes profited as well.

Many of Manafort's and Gates' crimes related to their work for Ukraine, President Yanukovych, the Party of Regions, and the Opposition Bloc in Ukraine. Gates, at Manafort's direction, helped conceal the nature of their work, the income derived from it, and the overseas accounts where those funds were maintained. Gates assisted in laundering funds to promote the scheme. From 2010 to 2014, Gates assisted Manafort in shielding more than $15 million of Manafort's income from United States tax authorities. Manafort used that money to pay vendors for personal goods and services and to purchase and improve real estate. More than $65 million flowed through the overseas accounts that Manafort controlled and which Gates helped maintain and conceal. After Manafort's work in Ukraine ended in 2015, Manafort needed liquidity and secured more than $25 million through bank fraud. Gates was an active participant in these schemes, although he received no money from the fraudulently procured loans.

Gates did not commit crimes only with Manafort; on a far smaller scale, he also committed crimes on his own and for his own benefit. He failed to report more than $3 million in income on his tax returns over several years, failed to disclose his own foreign bank accounts, and stole approximately several hundred thousand dollars from Manafort's overseas accounts. He engaged in mortgage fraud by overstating his income and the submitted false reimbursement vouchers to

employers. And Gates also engaged in an investment fraud scheme with a defendant charged in the Southern District of New York, Steven Brown, by drafting a letter that made false representations to promote that scheme. *United States v. Brown*, No. 16-cr-436 (KBW). Finally, as the Court is aware, Gates lied during proffer sessions early on in his cooperation, a crime to which he pled guilty.

## ARGUMENT

### I. Before Any Departure, A Sentence at the Low End of the Guidelines is Sufficient and not Greater than Necessary

In order to determine an appropriate sentence, the Court first accurately calculates the defendant's advisory Guidelines range, and then considers the various factors set forth under 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The United States submits that in this case, in light of such factors, a sentence at the low end of the advisory Guidelines range—before any departure under Section 5K1.1—is appropriate.

A. <u>Gates' Advisory Guidelines Range</u>

The Presentence Investigation Report (PSR)—with which both Gates and the government agree—has calculated the Gates' total offense level at 23. *See* PSR at 13. This includes a base offense level of 24, pursuant to U.S.S.G. §2T1.1; an additional 2 levels for failure to report income of $10,000 or more from criminal activity, pursuant to U.S.S.G. § 2T1.1(b)(1); and an additional 2 levels for an offense involving sophisticated means, pursuant to U.S.S.G. §2T1.1(b)(2). *Id.* at 11-12. The PSR then subtracts 2 levels for Gates' mitigating role, pursuant to U.S.S.G. §3B1.2(b). *Id.* at 12. The PSR agrees that Gates should receive a 3-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b). *Id.* at 13.

Gates has no criminal history. Accordingly, based on a total offense level of 23 and a criminal history category of I, his advisory Guidelines range is 46 to 57 months' imprisonment.

B. Section 3553(a) Factors

Under 18 U.S.C. § 3553(a), the goal of sentencing is to impose a sentence that is "sufficient, but not greater than necessary." After calculating the defendant's advisory Guidelines range, the Court considers factors under Section 3553(a), including the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3553(a).

The nature and circumstances of the offenses demonstrate that Gates engaged in a pattern of deceit over an extended period of time. To be clear, the principal beneficiary of Gates' criminal acts was Manafort, who directed Gates to lie, conceal, and commit fraud and money laundering to feed Manafort's immense greed. But for a decade, Gates agreed and participated, and enabled Manafort to defraud the government on a massive scale. Furthermore, Gates enjoyed some personal financial benefit from his crimes.

Gates' history and characteristics suggest that he could easily have chosen to avoid criminal conduct. According to the PSR, Gates had a pleasant upbringing, earned Bachelor's and Master's degrees, and held positions with several companies before choosing to work for Manafort in 2006. At the same time, the crimes that Gates committed at Manafort's direction appear inconsistent with his behavior before starting work as Manafort's employee, or his conduct since pleading guilty in this case and assisting the government. Gates has no previous criminal convictions and served in the Army National Guard until his honorable discharge. As noted above, Gates accepted responsibility for his crimes within months of his indictment, and has been truthful and reliable since entering his plea.

Finally, a sentence at the low end of the advisory Guidelines range is appropriate to promote respect for the law and ensure adequate deterrence. The government is confident that

there is no need in Gates' case for specific deterrence.  But a pre-departure sentence within the Guidelines would promote respect for laws requiring disclosures of foreign bank accounts and work for foreign principals, and would send a public message that extended financial crimes like Manafort's and Gates' merit a significant prison sentence.

**II.     Motion for Downward Departure under Section 5K1.1 of the Guidelines**

The United States moves for a significant downward departure from Gates' advisory Guidelines range under Section 5K1.1, based on his substantial assistance in the investigation and prosecution of others.  Gates' extensive cooperation is detailed here and in the accompanying sealed submission.

   A.  <u>Nature of Gates' Cooperation</u>

   **i.  Debriefings**

As noted, Gates initially lied to the government about Manafort's involvement in a meeting with a lobbyist and a Member of Congress.  Thereafter, however, Gates' cooperation improved markedly, and the government believes he has been entirely candid about his and other's criminality.  His assistance has been substantial.

Gates has met on more than fifty occasions with numerous prosecutors and investigators from a range of Department of Justice components, and his information has been used in more than a dozen search warrants.  As described in the supplemental Motion being filed separately under seal, Gates has provided truthful and valuable information in a number of different ongoing matters.

Furthermore, over the course of debriefings with the government, Gates has admitted his own participation in crimes in addition to those to which he pled guilty—several of which the government was unaware.  These admissions included that Gates stole money from Manafort;

committed mortgage and credit card fraud; testified falsely during a civil deposition; and participated in investment fraud with a business associate. Most significantly, and early in his cooperation, Gates admitted that he had been living beyond his means and, to pay his expenses, he had stolen money from Manafort's overseas accounts, amounting to approximately several hundred thousand dollars. At the time of this disclosure, the government was unaware that Gates had taken this money from Manafort.

Gates also admitted that as part of a lawsuit involving the Pericles fund that Manafort operated for Oleg Deripaska, a Russian oligarch, at Manafort's request, Gates provided false testimony about his relationship with a lawyer in Cyprus who worked with Manafort. In particular, Gates lied by testifying that Deripaska recommended the lawyer in question and that the Cypriot lawyer controlled the bank accounts at issue. Gates explained that he lied to make it appear that Deripaska had some control over the money that flowed through the overseas bank accounts, when in fact Manafort controlled those accounts. At the time of this disclosure, the government did not know the nature of Gates' false testimony.

Gates provided information about his involvement in additional frauds, including inflating vouchers to his employers and providing false statements to financial institutions to secure credit cards and mortgages for himself. The vouchers involved expenses such as meals that he would claim to be business-related, when they were not. With respect to his mortgage application, Gates had Manafort draft a letter overstating Gates' income as part of a mortgage application. The government was not aware of these frauds at the time Gates admitted them.

Finally, Gates acknowledged that, at the behest of defendant Steven Brown, he drafted documents that made false claims regarding the purchase of film rights, which Brown then used in the course of an investment fraud scheme to induce investment by others. Gates admitted that

the purpose of the documents was to mislead and were, in his words, "clearly fraudulent." The Special Counsel's Office learned of the fraudulent documentation from prosecutors involved in the Brown investigation. When questioned, Gates admitted he had written the materials and understood their purpose. Gates profited from several investments he made with Brown, with whom he invested in various film productions. Brown has since pled guilty in the Southern District of New York and been sentenced in connection with this scheme. *United States v. Brown*, No. 16-cr-436 (KBW).

### ii. Sworn Testimony

As the Court knows, as part of his cooperation, Gates has testified under oath in three federal criminal trials.

*1. Testimony in the Eastern District of Virginia, United States v. Manafort, 1:18-cr-83 (TSE)*

Gates provided important testimony at Manafort's trial in the Eastern District of Virginia (EDVA) over a three-day period from August 6-8, 2018. He provided a firsthand account as to each of the 18 tax, FBAR, and bank fraud/bank fraud conspiracy charges against Manafort, and his testimony was corroborated by numerous documents and was consistent with that of almost a dozen other witnesses. For the Court's consideration, a transcript of Gates' testimony in that case is enclosed as Exhibit 1.

As the Court is aware, as part of the Eastern District of Virginia prosecution, Manafort was principally charged in two schemes: one involving tax fraud and FBAR violations and a second involving multiple bank fraud and bank fraud conspiracies.

During his testimony, Gates detailed Manafort's political work in Ukraine supporting the Party of Regions and Victor Yanukovych (and noting Manafort's skill as a political strategist); the payment by Ukrainian oligarchs including Rinat Akhmetov, Serhiy Lyovochkin, and Boris

Kolesnikov to Manafort for his services; the manner in which they made the payments (from Cypriot account to Cypriot account); the relevant underlying consultancy agreements and the names of both the entities controlled by the Ukrainian oligarchs and Manafort's own entities; the manner in which the monies were held and concealed in Cyprus, and later moved to St. Vincent and the Grenadines; his understanding of how accounts were held by others to conceal Manafort's name and how those accounts were set up and maintained; the manner in which Manafort moved these funds to the United States, and specifically the payments to his tailors, landscapers, and other contractors, totaling millions of dollars; and Manafort's (and Gates') lies to his bookkeepers and tax preparers to perpetuate the scheme. Manafort also fraudulently reduced his tax exposure by classifying certain overseas income as loans, and Gates detailed for the jury the lies Manafort told to do so. Gates provided important details and context to the documentary evidence presented to the jury.

As noted, Manafort was also charged with a series of bank frauds (Counts 25 to 32) relating to five loan applications from three financial institutions for more than $25 million in funding—all at a time when Manafort was experiencing financial difficulties due to President Yanukovych's flight to Russia. Four of the five loans related to properties that Manafort purchased or improved using money he earned in Ukraine and failed to report as income. The properties included a townhouse in Brooklyn on Union Street, a SoHo condominium in Manhattan on Howard Street, and a home in Bridgehampton in Long Island, New York. Manafort applied for a $3.4 million loan from Citizens Bank on the Howard Street property; a $5.5 million mortgage from Citizens Bank on the Union Street property; a $9.5 million mortgage on the Bridgehampton property from The Federal Savings Bank; and a $6.5 million mortgage on the Union Street property also from The Federal Savings Bank. Of these loans, only the $5.5 million loan from Citizens was not

funded. Manafort also applied for, and was granted, a $1 million business loan from the Banc of California.

Gates testified about each of these frauds and many of the materially false statements Manafort made on the bank applications ranging from where he lived and his use of the property to his assets and income, and the existence of liens on the properties at issue. As noted, Gates participated in each of the frauds, and often collected the relevant underlying documents and submitted them to the bank. Gates, for example, helped Manafort create and submit false profit and loss (P&L) statements overstating Manafort's income. At Manafort's request, Gates cut and pasted the contents of .pdf documents to "word versions" and back, altering them in the process and before they were submitted to banks. The details of their efforts to doctor P&L statements were often documented in emails, which Gates read and explained for the jury. At Manafort's direction, Gates also asked an insurance broker to submit an older version of an insurance binder with respect to the Union Street property to conceal the existence of a prior mortgage on the property. Finally, Gates testified about his role in supporting Manafort's claim that a substantial delinquency on Manafort's American Express card—a red flag on his mortgage applications to The Federal Savings Bank—was the result of Manafort's having lent his credit card to Gates to buy season tickets for the New York Yankees, when in fact Manafort had made this payment himself.

Manafort was convicted on 8 of 18 counts in the Eastern District prosecution, and he has been sentenced in both that district and before this Court.

>    2. *Testimony in the District of Columbia, United States v. Craig, 19-cr-125 (ABJ)*

On August 22, 2019, Gates provided a full day of crucial testimony in the trial of *United States v. Craig*, in which Craig was charged with a false statements scheme. In communications with the Department of Justice's FARA Unit in 2013, Craig allegedly concealed information about his work on a report (the Report) for Manafort and Ukraine, including his efforts to distribute the Report within the United States. Gates' testimony was essential to providing the jury with an understanding of how and why Manafort and Ukraine decided to commission the Report, Manafort's and Ukraine's plan for the rollout of the Report in the United States, and Gates' understanding of Craig's participation in the rollout. For the Court's consideration, a transcript of Gates' testimony in *U.S. v. Craig* is enclosed as Exhibit 2.

In his testimony, Gates explained to the jury why Ukraine had commissioned the Report. He testified that the work that he and Manafort were doing for Ukrainian president Victor Yanukovych included retaining a major United States law firm to review Ukraine's prosecution of its former prime minister (and Yanukovych rival), Yulia Tymoshenko; Manafort's strategy was that such a report would improve Ukraine's image internationally. Gates testified that Manafort chose the law firm of Skadden, Arps, Slate, Meagher & Flom (Skadden) and Craig, a senior Skadden partner, because Skadden was a credible Western firm and Craig was, in Gates' words, "a very experienced and credible attorney that would give the project visibility globally." Exhibit 2 at 1822.

Gates also outlined the strategy for the rollout of the Report once it was complete—that a public relations agent would provide an advance copy of the Report to a trusted reporter whose initial exclusive article would set the tone for later coverage. Gates testified that Craig had participated in discussions regarding the rollout of the Report in the United States, understood the

rollout strategy, and had recommended a particular *New York Times* reporter to receive the advance copy of the Report. Gates further explained that the *New York Times* reporter suggested by Craig ultimately was chosen to receive the exclusive advance copy of the Report, consistent with the rollout strategy—and that in fact, Craig personally provided the Report to the reporter and spoke with him. Finally, Gates stated that he had viewed the Report's rollout—and the first *New York Times* article on the Report—as successes for Ukraine.

As the Court knows, Craig was acquitted on the false statements scheme charge on September 4, 2019. Although Craig was acquitted, Gates' testimony was corroborated and credible, and the government believes that Gates testified truthfully and completely in that case. Gates' assistance should be evaluated independent of the jury's decision—he should be given no more or less credit for his cooperation in that matter than had Craig been found guilty.

> 3. *Testimony in the District of Columbia, United States v. Stone, 19-cr-018 (ABJ)*

On November 12, 2019, Gates provided significant testimony in the prosecution of Roger Stone for making false statements and obstructing justice. Stone was charged with obstruction and false statements in connection with Stone's 2017 appearance before and communications with the House of Representatives Permanent Select Committee on Intelligence (HPSCI), and witness tampering in connection with Stone's threatening communications with another witness whose testimony HPSCI sought. The scope of HPSCI's inquiry included WikiLeaks, whether Stone had been in contact with WikiLeaks, and whether Stone had provided information about WikiLeaks to anyone in the Trump Campaign in 2016. Because Gates had worked for the Trump Campaign in 2016, he was able to provide the jury with factual testimony that established that the information that Stone provided to HPSCI in 2017 was not accurate. For the Court's consideration, a transcript of Gates' testimony in *U.S. v. Stone* is enclosed as Exhibit 3.

In particular, Gates testified that he personally had conversations with Stone during the 2016 campaign in which Stone indicated that he had non-public information that WikiLeaks would soon be releasing more information publicly. Gates also recounted an incident in which, when riding in a car with then-candidate Trump, Gates observed Trump take a phone call from Stone, immediately following which Trump indicated that more information would be coming.

As the Court is aware, Stone was found guilty of all of the charges against him on November 15, 2019.

### iii. Voluntary Surrender of Valuable Evidence

During his cooperation, Gates surrendered a series of electronic devices, including multiple phones and computers, which were imaged and searched by the government. Numerous documents recovered from these devices provided the government with important information relating to Manafort. Gates also turned over other physical evidence, namely several passports, which demonstrated his travel to Ukraine and Cyprus. These documents were of evidentiary value and were admitted at Manafort's Eastern District of Virginia trial, as they corroborated Gates' testimony about his and Manafort's work in Ukraine, and the use of financial accounts in Cypress.

### iv. Manafort Breach Issue

Finally, Gates provided information relevant to the Court's determination that Manafort breached his cooperation agreement and the Court's finding that Manafort lied to the government and the grand jury. Gates provided information that formed a part of the Court's findings.

### v. Commitment to Continue Cooperation

Although he is being sentenced now, Gates has committed to continue his cooperation with the government, and has agreed that the Court can make such continuing cooperation a condition of any probationary sentence that he may receive.

B.  Considerations Under Guidelines Section 5K1.1

Under Section 5K1.1 of the Guidelines, upon a motion by the government regarding a defendant's substantial assistance, courts may depart from the guidelines.  The Guidelines suggest that, in determining the appropriate reduction of a defendant's sentence based on his substantial assistance, a court's considerations may include factors such as the court's evaluation of the significance of the defendant's assistance (taking into account the government's evaluation); the truthfulness, completeness, and reliability of information provided by the defendant; the nature and extent of his assistance; any injury or risk of injury suffered to the defendant or his family; and the timeliness of the defendant's assistance.  *See* U.S.S.G. § 5K1.1(a).

In Gates' case, each of these factors weighs in favor of a significant departure from Gates' advisory Guidelines range.  As the government has described above and in the supplemental submission filed under seal, Gates' assistance has been significant and useful to the government in several criminal cases.  Since entering his guilty plea, Gates has worked assiduously to provide truthful, complete, and reliable information to any government investigators who have asked to speak with him.  And Gates' assistance has been timely; after pleading guilty within four months of his initial indictment, Gates has provided significant information contributing to the convictions of Manafort and Stone, and to other investigation that are ongoing.

Finally, is important to note that the public nature of this case has made Gates and Gates' family the subject of intense media scrutiny.  Gates' cooperation has been steadfast despite the fact that the government has asked for his assistance in high profile matters, against powerful individuals, in the midst of a particularly turbulent environment.  Gates received pressure not to cooperate with the government, including assurances of monetary assistance.  He should be commended for standing up to provide information and public testimony against individuals such

as Manafort, Craig, and Stone, knowing well that they enjoy support from the upper echelons of American politics and society.

Based on his substantial assistance, the government recommends a downward departure and does not oppose Gates' request for a probationary sentence.

## **CONCLUSION**

For the foregoing reasons, the government respectfully moves this Court for a significant downward departure from Gates' advisory Guidelines range based on his substantial assistance, and does not oppose his request for probation. The government respectfully requests that the Court make Gates' continued cooperation a condition of his sentence.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
District of Columbia
D.C. Bar No. 472845

By:     /s/ *Molly Gaston*
Molly Gaston, VA Bar No. 78506
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 272-7803
Molly.Gaston@usdoj.gov

Certificate of Service

    I hereby certify that by virtue of the ECF system, I have caused a copy of the foregoing Motion to be served on counsel for the defendant.

                                             /s/ *Molly Gaston*
                                             Molly Gaston
                                             Assistant United States Attorney