# Exhibit 1

─────U.S. v. Manafort─────

981

1            UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3  ─────────────────────────────x
                                :
4  UNITED STATES OF AMERICA,     : Criminal Action No.
                                : 1:18-CR-83
5           versus              :
                                :
6  PAUL J. MANAFORT, JR.,        :
                                : August 6, 2018
7                 Defendant.    : Volume VI
   ─────────────────────────────x

8
                TRANSCRIPT OF JURY TRIAL
9        BEFORE THE HONORABLE T.S. ELLIS, III
             UNITED STATES DISTRICT JUDGE
10
   APPEARANCES:
11
   FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                            United States Attorney's Office
                              2100 Jamieson Avenue
13                            Alexandria, VA 22314
                                  and
14                            GREG ANDRES, SAUSA
                              BRANDON LANG VAN GRACK, SAUSA
15                            Special Counsel's Office
                              U.S. Department of Justice
16                            950 Pennsylvania Avenue NW
                              Washington, D.C. 20530
17
   FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                            BRIAN KETCHAM, ESQ.
                              Kostelanetz & Fink LLP
19                            601 New Jersey Avenue NW
                              Suite 620
20                            Washington, DC 20001
                                  and
21                            THOMAS E. ZEHNLE, ESQ.
                              Law Office of Thomas E. Zehnle
22                            601 New Jersey Avenue NW
                              Suite 620
23                            Washington, DC 20001
                                  and
24                            KEVIN DOWNING, ESQ.
                              Law Office of Kevin Downing
25                            601 New Jersey Avenue NW
                              Suite 620

U.S. v. Manafort

982

1  Washington, DC 20001
       and
2  RICHARD WILLIAM WESTLING, ESQ.
   Epstein, Becker, & Green, PC
3  1227 25th Street NW
   Washington, DC 20037

4
OFFICIAL COURT REPORTER:      TONIA M. HARRIS, RPR
5                             U.S. District Court, Ninth Floor
                              401 Courthouse Square
6                             Alexandria, VA 22314

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─U.S. v. Manafort─

983

1                        TABLE OF CONTENTS
                              TRIAL
2                           WITNESSES

3    On behalf of the Government:

4    Cindy Laporta (cont'd from 8/3/18)

5           Cross-examination by Mr. Downing................. 990
            Redirect examination by Mr. Asonye.............. 1047
6           Recross-examination by Mr. Downing.............. 1065

7    Paula Liss

8           Direct examination by Mr. Asonye................ 1076
            Cross-examination by Mr. Zehnle................. 1081
9           Redirect examination by Mr. Asonye............. 1089

10   Richard Gates

11          Direct examination by Mr. Andres............... 1090

12                          EXHIBITS

13   On behalf of the Government:
                                                        Admitted
14
     Number 2F.............................................. 1101
15   Number 338A............................................ 1134
     Number 338B............................................ 1137
16   Number 356............................................. 1140
     Number 342............................................. 1152
17   Number 344............................................. 1153

18   On behalf of the Defendant:
                                                        Admitted
19
     Number 3............................................... 1010
20
                          MISCELLANY
21
     Preliminary matters.................................... 984
22   Certificate of Court Reporter......................... 1177

23

24

25

                    ─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
                      EASTERN DISTRICT OF VIRGINIA

─────── U.S. v. Manafort ───────

984

**P R O C E E D I N G S**

(Court proceedings commenced at 1:33 p.m.)

        THE COURT:  Contrary to public opinion, Mr. Flood

was not previously a Marine Corps drill sergeant, but he does

a good job.

        All right.  The record will reflect that the

defendant and counsel for the Government and counsel for the

defendant are present, prepared to proceed in this case, which

is U.S. against Manafort.  What's the number, Margaret?

        (Discussion off the record.)

        THE COURT:  83 -- 18-CR-83.

        All right.  And as I recall -- before we get the

jury in, is there anything that needs to be done, Mr. Andres?

        MR. ANDRES:  Very briefly, Judge.  Your Honor, I

don't know if it's the practice of the Court to give an

instruction to the jurors about whether they run into counsel

and other people outside the courtroom, but I know I was in

the elevator with a juror this morning.  Obviously I said

nothing.  But if Your Honor was inclined to just say to the

jury that we're not being rude, but that we're under --

        THE COURT:  Yes, I'll do that.  I'll do that.

        MR. ANDRES:  Okay.  Thank you, Judge.

        THE COURT:  Anything else?

        MR. ANDRES:  Just secondly, to the extent we've

identified previously the idea that -- the idea of any marital

U.S. v. Manafort

985

1    infidelity on the part of a witness is not necessarily

2    reflective of truthfulness and not necessarily a relevant

3    ground for cross-examination.

4            We've talked to the defense about that, and they've

5    agreed to the extent that that comes up during their

6    cross-examination we would approach the bench to understand

7    the circumstance of that so that Your Honor could rule on that

8    prior to any questions asked if that's okay with Your Honor.

9            THE COURT:  Yes, that's the way we do it.

10           MR. ANDRES:  Great.

11           THE COURT:  Anything else?

12           MR. ANDRES:  Just two other issues, which we briefed

13   and won't come up today necessarily, but one is the 1006

14   exhibits and --

15           THE COURT:  Yes, I've read that brief.  I haven't

16   had the opportunity to read the most recent submission, which

17   you-all made, but I will.

18           MR. ANDRES:  Okay.

19           THE COURT:  The 1006, I've read that, but it won't

20   come up in -- on this witness' testimony, it hasn't --

21           MR. ANDRES:  Correct.  And we've also talked to the

22   defense, and not clear to me, and they'll speak to themselves,

23   that they'll object to those.

24           And, lastly, the one we filed today, which won't

25   come up today either, is just to have a FBI agent read the

─────U.S. v. Manafort─────

986

1  e-mails from Mr. Manafort that are his own statements.  That,

2  again, won't come up today, but just to preview for Your

3  Honor.

4           THE COURT:  All right.

5           MR. ANDRES:  Thank you, Judge.

6           THE COURT:  As far as the exhibits, which I've

7  already told you you may use those summary exhibits as

8  demonstrative.  You want to introduce them as evidence in

9  chief.  And I understand that.

10           If you look at the rule carefully, the rule says

11  that if the data is voluminous, that it's sensible and

12  appropriate to do so as long as the exhibits are admitted and

13  so forth.

14           What you may not do is to use an exhibit, which is

15  really a demonstrative, to put that in.  It's an argument

16  disguised as an exhibit.  And so I won't allow that.  But I

17  think what you had originally shown me is something having to

18  do with voluminous financial figures and the like.  And

19  that's, of course -- but I'll hear the parties on that in

20  greater detail.

21           Again, keep in mind that if it is a summary of an

22  argument disguised to be a 1006, I won't allow it.  That

23  doesn't mean you can't use it, but it will be a demonstrative.

24           MR. ANDRES:  Understood.  Thank you, Judge.

25  Appreciate that.

987

1              THE COURT:  All right.  Anything else before we

2      begin?

3              MR. DOWNING:  No, Your Honor.

4              MR. ASONYE:  We have one other issue, Your Honor.

5              We were handed a number of exhibits that defense

6      counsel plans to use in the cross of Ms. Laporta.  One of them

7      is --

8              THE COURT:  Well, how thoughtful of them.

9              MR. ASONYE:  One of them is --

10             THE COURT:  But they're not obligated to do that.

11             MR. ASONYE:  Your Honor, one of them is a tax return

12     from 2016, which is outside of the charged period and was not

13     prepared by Ms. Laporta or her firm.  The Government sees no

14     relevance whatsoever in this document; and, additionally, she

15     would have no personal knowledge of it either.  So we would

16     object to it being used to cross-examine her.

17             THE COURT:  Well, are you going to ask questions of

18     this witness to demonstrate the relevancy of this document.

19             MR. DOWNING:  Correct, Your Honor.

20             THE COURT:  All right.  Well, why don't I wait until

21     you ask those questions?  And when it's offered, then,

22     Mr. Asonye, you may state your objection.  I'll probably have

23     you come to the bench.  But I need to see it in context and

24     it's -- it's a waste of time to sit here and hear Mr. -- hear

25     one or both of you -- hear Mr. Downing or Mr. Zehnle tell me

U.S. v. Manafort

988

1   about this --

2          MR. DOWNING:  May I have one second to confer with

3   the Government?

4          THE COURT:  Yes, you may.

5          (Discussion off the record.)

6          THE COURT:  Mr. Downing, all set?

7          MR. DOWNING:  Yes.

8          THE COURT:  All right.  You may bring the jury in,

9   Mr. Flood.

10          (Jury in.)

11          THE COURT:  All right.  You may be seated.  Good

12   afternoon, ladies and gentlemen.  We'll begin as always with

13   the calling of the roll by the numbers.  Ms. Pham.

14          THE DEPUTY CLERK:  Ladies and gentlemen, as I call

15   your number, please answer "present" or "here."

16          Juror 0008.

17          THE JUROR:  Here.

18          THE DEPUTY CLERK:  Juror 0037.

19          THE JUROR:  Here.

20          THE DEPUTY CLERK:  Juror 0276.

21          THE JUROR:  Present.

22          THE DEPUTY CLERK:  Juror 0017.

23          THE JUROR:  Present.

24          THE DEPUTY CLERK:  Juror 0145.

25          THE JUROR:  Present.

U.S. v. Manafort

989

1           THE DEPUTY CLERK:  Juror 0115.

2           THE JUROR:  Present.

3           THE DEPUTY CLERK:  Juror 0082.

4           THE JUROR:  Present.

5           THE DEPUTY CLERK:  Juror 0009.

6           THE JUROR:  Present.

7           THE DEPUTY CLERK:  Juror 0299.

8           THE JUROR:  Present.

9           THE DEPUTY CLERK:  Juror 0091.

10          THE JUROR:  Present.

11          THE DEPUTY CLERK:  Juror 0302.

12          THE JUROR:  Present.

13          THE DEPUTY CLERK:  Juror 0060.

14          THE JUROR:  Present.

15          THE DEPUTY CLERK:  Juror 0296.

16          THE JUROR:  Present.

17          THE DEPUTY CLERK:  Juror 0054.

18          THE JUROR:  Present.

19          THE DEPUTY CLERK:  Juror 0127.

20          THE JUROR:  Present.

21          THE DEPUTY CLERK:  And Juror 0133.

22          THE JUROR:  Present.

23          THE DEPUTY CLERK:  Thank you.

24          THE COURT:  All right.  Good afternoon, ladies and

25   gentlemen.  Let me confirm, verify that you were able to do as

───────────────── U.S. v. Manafort ─────────────────

990

1   you were instructed to refrain from discussing the matter with

2   anyone over the weekend.

3                THE JURORS:  Yes.

4                THE COURT:  Good.  Thank you.  And I hope you had a

5   pleasant and I had a pleasant and uneventful -- and to me that

6   always make it pleasant, I realize.  You'll get to the point

7   where uneventful is really good.

8                All right.  Ms. Laporta.  Let's have Ms. Laporta

9   back on the stand, please.

10               Ms. Laporta, you may recall you remain under oath.

11               THE WITNESS:  Yes.

12               THE COURT:  You may resume the stand.

13               (Witness seated.)

14               THE COURT:  Mr. Downing, you may proceed, sir.

15   (Witness previously sworn 8/3/18.)

16                    **CROSS-EXAMINATION (cont'd)**

17   BY MR. DOWNING:

18   Q.   Good afternoon, Ms. Laporta.  My name is Kevin Downing,

19   and I represent Paul Manafort.  Thank you for coming back

20   today.

21               I want to follow up on some of your testimony from

22   last week.  There's a bit of testimony about services that you

23   provided through your accounting firm, KWC, to Mr. Manafort

24   and his entities.

25               Can you explain to the jury how big of an accounting

—————————— U.S. v. Manafort ——————————

991

1   firm KWC is?

2   A.   Yes, certainly.

3         KWC has about --

4         THE COURT:  I'm sorry, Ms. Laporta, I can't hear

5   you.  Ask you just to speak up.  I'm sure your voice is fine;

6   my ears aren't.

7         THE WITNESS:  I'm happy to speak up.

8         KWC has about -- I think we've got around 80 people

9   on staff, including partners, CPAs, administrative staff.

10  BY MR. DOWNING:

11  Q.   And you're affiliated with an international accounting

12  firm; is that correct?

13  A.   That's correct.

14  Q.   And what firm is that?

15  A.   BDO.

16  Q.   How big of a firm is that?

17  A.   They're an international firm.

18  Q.   Hundreds of accountants?

19  A.   I would -- yes.

20  Q.   With respect to both KWC and BDO, do you have -- did you

21  have available to you back in 2013, '14, '15, individual CPAs

22  that had expertise in tax?

23  A.   Yes, we did.

24  Q.   And that's not your particular area of expertise, is it?

25  A.   No.

─────U.S. v. Manafort─────

992

1    Q.    What is your particular area of expertise?

2    A.    Accounting and auditing.

3    Q.    And you didn't do any auditing for Mr. Manafort or for

4    his entities, did you?

5    A.    No, I did not.

6    Q.    And most of the work was tax work; is that correct?

7    A.    Yes.

8    Q.    And you did tax work for him individually?

9    A.    Yes.

10   Q.    For DMP and DMP International, his political consulting

11   firm?

12   A.    That's correct.

13   Q.    As well as a myriad of entities that were involved in

14   everything from real estate, horse farm, correct?

15   A.    That's before my time, but as a client of the firm --

16   Q.    You're familiar with that?  Movie production?

17   A.    That's right.

18         THE COURT:  You'll have to answer a little louder,

19   please.

20         THE WITNESS:  Yes.

21         THE COURT:  And you as well, Mr. Downing.  Just a

22   little louder, please.

23         MR. DOWNING:  I've never heard that, Your Honor.

24   BY MR. DOWNING:

25   Q.    How about international investing?

─────U.S. v. Manafort─────
993

1   A.   Yes.

2   Q.   And with respect to this engagement, how is it that you

3   as an audit and accounting partner got put in charge of a tax

4   engagement?

5   A.   Well, typically the profile of our clients is their

6   business taxes, their individual taxes, and then financial

7   statement work.  And what we do at our firm, is we have a tax

8   department that we work as a team on these engagements.

9        So while I may advise on an engagement that is

10  typically tax but then has an accounting and audit section, I

11  would help there the same way the tax department will step in

12  and help me on an engagement.  And when I took over -- well,

13  that's all.

14  Q.   So at that time, did -- KWC did not have someone of your

15  experience that had the expertise in tax to take over that

16  relationship?

17  A.   Uhm, the -- at the time I took over, it was still being

18  run by Philip Ayliff.

19  Q.   And you felt that Mr. Ayliff had considerable experience

20  in the area of tax?

21  A.   Yes, he did.

22  Q.   And with respect to your dealings with Mr. Manafort's

23  entities and his personal taxes, you had quite a few

24  interactions with Mr. Richard Gates; is that correct?

25  A.   Yes, that is correct.

1   Q.   And if I -- if I got this correct from your testimony

2   last week, this was not a client that had everything organized

3   and for you -- and for -- available to you on a timely basis;

4   is that correct?

5   A.   That's correct.

6   Q.   And you ran up against a lot of deadlines; is that

7   correct?

8   A.   Yes, that is.

9   Q.   And it seemed like it was quite a chore to get this

10  information that you needed to get the returns filed year in

11  and year out; is that correct?

12  A.   That is correct.

13  Q.   And I could sense a level of frustration that you had, in

14  particular with Mr. Gates and others on your team, in terms of

15  that process being inefficient, difficult, a fact-finding

16  mission; is that correct?

17  A.   That's correct.

18  Q.   And I think you even stated last week there came a point

19  in time where you just didn't believe what Mr. Gates was

20  saying to you; is that correct?

21  A.   That is correct.

22  Q.   Now, in terms of the team that was involved, especially

23  let's talk about for tax years 2014 and '15, which would cover

24  years 2015; is that correct?

25  A.   That's correct.

U.S. v. Manafort

995

1  Q.   Because the tax returns come a year after?

2  A.   That's correct.

3  Q.   Now, your team consisted of you, that had the general

4  relationship?

5  A.   No, I had the general communication.

6  Q.   General communication.  Mr. Ayliff, what would you

7  describe his role?

8  A.   He would prepare and review the tax returns.

9  Q.   And Mr. Walters, was it?

10  A.   He was one person on the team at one point.

11  Q.   And did he have the tax expertise?

12  A.   Absolutely, yes.

13  Q.   And Mr. O'Brien, who is Mr. O'Brien?

14  A.   He was a staff member on the engagement.

15  Q.   Pretty young accountant at the time?

16  A.   Yes.

17  Q.   So when it came to the technical tax issues, was it

18  primarily Mr. Walters that would be relied upon?

19  A.   And Mr. Ayliff.

20  Q.   And Mr. Ayliff?

21  A.   Yes.

22  Q.   And others at KWC in the tax department?

23  A.   Yes.

24  Q.   So one of the issues that you testified about last week

25  had to do with real estate.  It was Howard Street, in

996

1  particular, that came up.

2          Now, Mr. Manafort had invested in quite a few

3  residential properties; is that correct?

4  A.    That's correct.

5  Q.    And when I say "residential," I don't mean as a

6  residence, but they weren't commercial and big buildings.

7  They were actually individual properties; is that correct?

8  A.    That's correct.

9  Q.    And the ownership interest of these various properties in

10 New York involved Mr. Manafort, correct?

11 A.    Yes.

12 Q.    His wife?

13 A.    That's correct.

14 Q.    His daughters?

15 A.    Yes.

16 Q.    And there were several entities that were being used in

17 various forms, whether it was for personal occupancy?

18 A.    Correct.

19 Q.    Or rentals?

20 A.    That's correct.

21 Q.    And they were in various states of construction or

22 rehabilitation; is that correct?

23 A.    Yes, that is.

24 Q.    And during the 2015 and 2016 period, there were lots of

25 issues about trying to get financing for these various

─U.S. v. Manafort─

997

1   properties; is that correct?

2   A.   Yes, that is.

3   Q.   A lot of moving parts, would you say?

4   A.   Yes.

5   Q.   And we could see from the e-mail traffic that the

6   Government went through with you last week that it seemed to

7   be a lot of things were changing year by year; is that

8   correct?

9   A.   Yes, that is correct.

10  Q.   And that was one of the issues that it was tough for KWC

11  to deal with, was it not?

12  A.   Yes, it was difficult to follow.

13  Q.   And, in fact, at some time one of the issues that came

14  up, well, is it being used as a personal residence or is it

15  being rented; is that correct?

16  A.   That's correct.

17  Q.   And it was for more than one property?

18  A.   Yes, I believe so.

19  Q.   And involving more than Mr. Manafort, all the individuals

20  we talked about before, his daughters?

21  A.   Yes, that's correct.

22  Q.   And then some individual named Jeff Yohai, is it?

23  A.   I don't recall if Jeff Yohai was part of the -- who

24  was -- regarding those properties.

25  Q.   I think you said the other day that you -- you remember

U.S. v. Manafort

998

1  Jessica had a husband and his name was Jeff?

2  A.   Yes, that's correct.

3  Q.   Is that Jeff Yohai?

4  A.   Yes.

5  Q.   And he was involved with one of Jessica's properties; is

6  that correct?

7  A.   So I just -- I guess I think of Jess, where she was

8  living, she was going to be living in New York.  I didn't put

9  it together about Jeff Yohai until just now.

10  Q.   But you do know that she was married to him at the time;

11  is that correct?

12  A.   Yes.

13  Q.   Now, with respect to the Howard Street property, there

14  was an issue that came up, I think Mr. Manafort had sent you

15  an e-mail that was covered last week, and he said, hey -- he

16  didn't say "hey."  That was me.

17          He said, Can you help me with something?  I'm

18  looking to borrow against one of the properties, Howard

19  Street.  And he said that it was a residence and that he

20  wanted you to communicate with the bank about that property

21  being not his primary but his secondary residence?

22          Do you recall that?

23  A.   Yes, I do.

24  Q.   And I believe you stated that you did convey that to

25  Mr. Fallarino at Citizens Bank; is that correct?

─────U.S. v. Manafort─────

999

1   A.   Yes.

2   Q.   And you also indicated that you made a mistake, that it

3   actually wasn't a second residence, it had been picked up as a

4   rental property; is that correct?

5   A.   I relied on Rick Gates' facts as to how each of those

6   properties was being used -- or had been used for 2015.

7   Q.   Right.  And I think just part of the explanation for

8   dealing with an issue like this for the jury, you're not

9   spending day and night on these questions, are you?

10  A.   No.

11  Q.   So if Mr. Manafort calls you up as a client, with a

12  question, how many clients call you with a question any given

13  day?

14  A.   All day, every day.

15  Q.   All day, every day.  And you try to do your best to get

16  accurate information back out for the client; is that correct?

17  A.   That's correct.

18  Q.   And you have files that you can go check or have others

19  check to make sure that you're providing accurate information?

20  A.   That's correct.

21  Q.   And I think, in this instance, you said that you didn't

22  have an opportunity to go check the tax returns or your work

23  papers when you conveyed the information; is that correct?

24  A.   I believe what I said was that I didn't rely on anything

25  else or didn't do any more work on determining how that house

U.S. v. Manafort

1000

1   had been used, how those properties had been used.

2   Q.   And one way you could have done that is to go to your --

3   the tax return that had been filed for the prior year; is that

4   correct?

5   A.   I don't believe so, because I don't think the timing

6   would have been right for that.

7   Q.   So you wouldn't know from the prior years return what was

8   going on, whether it was a rental or a residence for the

9   current year; is that correct?

10  A.   That's correct.

11  Q.   And that's because you hadn't prepared the tax returns

12  yet?

13  A.   That's correct.

14  Q.   And that's because you didn't have any other information

15  from Mr. Gates regarding how the property was being used?

16  A.   The only information I had was his representation,

17  correct.

18  Q.   And other than taking Mr. Gates' representation, you

19  didn't do any other procedures or inquiries to determine if

20  they were accurate; is that correct?

21  A.   That's correct.

22  Q.   Okay.  So at the end of the day, it ends up that it was

23  not accurate; is that correct?

24  A.   That's correct.

25  Q.   Now, on your part, you wouldn't say that you conveyed

─U.S. v. Manafort─

1001

1  something intentionally false to the bank, did you?

2  A.   No, I did not believe so.

3  Q.   And, if anything, a mistake was made on your part; is

4  that correct?

5  A.   That's correct.

6  Q.   And you would have no reason to believe whether

7  Mr. Manafort was mistaken either, do you?

8  A.   No, I have no reason to believe that.

9  Q.   So one of the -- one of the overriding issues, I think,

10  last week during your direct had to do with foreign bank

11  accounts and whether FBARs had to be filed.  And over the

12  years, it seemed there were a lot of questions about whether

13  or not FBARs had to be filed for Mr. Manafort or for his

14  entities; is that correct?

15  A.   That's correct.

16  Q.   Now, the FBAR area is not an area of expertise for you,

17  is it?

18  A.   No.

19  Q.   And who on your team did you go to in terms of relying

20  upon the analysis as to whether or not Mr. Manafort or his

21  entities had any FBAR filing requirements?

22  A.   Philip Ayliff was very well informed about these

23  international filing requirements, and he had established this

24  in a routine of being certain that we addressed it each and

25  every year, for each and every entity.

U.S. v. Manafort

1002

1   Q.   And did you think that Mr. Ayliff had expertise with

2   respect to determining if an FBAR had to filed?

3   A.   Yes, or he would have gone to another member of the firm

4   that did.

5   Q.   Why do you say yes?  You said, yes, you thought he had

6   experience with respect to determining whether or not an FBAR

7   had to be filed.

8   A.   Because he had a lot of large clients that had FBAR

9   requirements.

10  Q.   Would you be surprised to learn last week he testified

11  that he did not have expertise with respect to determining

12  whether or not an FBAR had to be filed?

13  A.   Well, as I said, he may have spoken to other members of

14  the KWC team that did have expertise.

15  Q.   But I asked if you would be surprised if he said he did

16  not have the expertise with respect to determining if an FBAR

17  had to be filed?

18  A.   No, I guess I could see him relying on other people.

19  Q.   As you did; is that correct?

20  A.   Yes.

21  Q.   And in terms of the determination to file FBARs, there

22  came a point in time, I believe, the -- you had some

23  discussions with Mr. Gates, in particular, about some accounts

24  that were in Ukraine; is that correct?

25  A.   That is correct.

U.S. v. Manafort

1003

1   Q.   And it has been represented to us that you had said that

2   Mr. Gates told you that things were set up, the bank accounts,

3   so that they did not have an FBAR filing requirement with

4   regards to a foreign account; is that correct?

5   A.   That is correct.

6   Q.   And other than Mr. Gates' representation to you on that

7   issue, did you have any other information from Mr. Gates about

8   what that meant about how things were set up?

9   A.   No, I did not.

10  Q.   And do you know if KWC or Mr. Ayliff made any further

11  inquiries about what that meant, how they were set up?

12  A.   I don't believe so, or I'm not aware of any others.

13  Q.   And another issue last week that I think you spent

14  considerable time on was talking about loans, and loans

15  between DMP and foreign entities or loans between affiliates

16  and DMP or Mr. Manafort.

17          Do you recall that?

18  A.   I do recall those.

19  Q.   And in particular, you were brought -- you were asked

20  some questions about the 2015, '16 time frame, and most of it

21  came out of questions -- is that correct?

22  A.   That's correct.

23  Q.   Sorry.  I need to slow down.

24          And was that -- did that come about because of some

25  of the questions about Mr. Manafort trying to get lending on

─────U.S. v. Manafort─────

1004

1  the real estate?

2  A.   Do you mind repeating your question?

3  Q.   Sure.  I'll break it down in a smaller piece.

4       Last week when you were asked questions about

5  Telmar?

6  A.   Okay.

7  Q.   Telmar questions came up because Mr. Manafort was trying

8  to borrow some money and they were trying to get financial

9  statements out to the lenders; is that correct?

10 A.   That is not how I recall the Telmar note.

11 Q.   Do you recall Telmar being part of tax return

12 preparation?

13 A.   Yes.

14 Q.   Do you recall it being on a deadline date --

15 A.   Yes.

16 Q.   -- when you were dealing with that issue?

17      Now, when you talked about Telmar, some issues came

18 up about how you're dealing with income that was coming into

19 DMP International; is that correct?

20 A.   That is correct.

21 Q.   And DMP International, you understood to be earning

22 income overseas by providing political consulting; is that

23 correct?

24 A.   Yes, that is correct.

25 Q.   And you understood the money that was coming in from

─────U.S. v. Manafort─────

1005

1  these overseas companies was for the political consulting

2  fees?

3  A.   That is correct.

4  Q.   But there was another issue that you -- KWC was dealing

5  with every year.  It was a question of how much money would be

6  reported as loans to Mr. Manafort or loans from an affiliate;

7  is that correct?

8  A.   The first experience I had with that was filing the 2014

9  tax return.

10  Q.   And Mr. Ayliff was involved with that issue, correct?

11  A.   Yes.

12  Q.   And Mr. Ayliff had been doing the work -- tax work for

13  Mr. Manafort and his entities, going back to 1997, did you

14  know that?

15  A.   Yes, I did.

16  Q.   And Mr. Ayliff is familiar with this income loan issue;

17  is that correct?

18  A.   That's my understanding, yes.

19  Q.   So before I get into the nitty-gritty detail, which I

20  apologize, I need to do, are you familiar that when you're

21  dealing with a partnership and its partners, that every year

22  you have to reconcile issues in terms of personal expenditures

23  that may have been made on behalf of a partner by the

24  partnership?

25  A.   Yes.

U.S. v. Manafort

1006

1  Q.   Distributions that may have been made that may not have

2  been taxed?

3  A.   That's correct.

4  Q.   And then finally, what is the income of the partner; is

5  that correct?

6  A.   That's correct.

7  Q.   Now, in the course of doing accounting and doing tax work

8  in a given year, a partnership may pay out personal expenses

9  for an individual partner; is that correct?

10  A.   That's correct.

11  Q.   And the question is, at the end of the day, how do you

12  account for it; is that correct?

13  A.   That's correct.

14  Q.   Because you're not going to account for it as a

15  deduction, a business deduction for the partnership, correct?

16  A.   That's correct.

17  Q.   And that's because it's personal?

18  A.   Correct.

19  Q.   But the next thing to figure out is, okay, what do we do

20  with it?  Is it going to be compensation to a partner?

21  A.   No.

22  Q.   It's not, because you're not going to have compensation

23  to a partner; is that correct?

24  A.   That's correct.

25  Q.   So the next question is:  Is it a distribution?  Has the

—U.S. v. Manafort—

1007

1   partnership taken its own money for the personal benefit of a

2   partner and distributed it out?

3   A.    That's --

4   Q.    So it could be a distribution?

5   A.    Yes, it could be a distribution.

6   Q.    And then the other item, the only other item that you're

7   generally going to deal with:  If a particular partner got a

8   personal benefit, whether or not it's a loan to that partner;

9   is that correct?

10  A.    I'm sorry.  Can you repeat that question for me?

11  Q.    The third way you can categorize the partnership's

12  payment of a personal expense for a partner would be as a loan

13  to a partner?

14  A.    That's correct.

15  Q.    Okay.  Now, in terms of this issue, as an accountant, you

16  deal with this issue every day with closely held partnerships;

17  is that correct?

18  A.    That's correct.

19  Q.    Because quite often, the partners in these closely held

20  partnerships are having personal expenses paid by the

21  partnership, correct?

22  A.    That is correct.

23  Q.    But they're also going out of their own pockets to pay

24  business expenses?

25  A.    That is correct.

─────U.S. v. Manafort─────

1008

1   Q.   And you had that -- you had that second issue with

2   Mr. Manafort also with respect to DMP; is that correct?

3   A.   That is correct.

4   Q.   Do you need something, ma'am?

5   A.   I need water badly.  Sorry.

6            (A pause in the proceedings.)

7   BY MR. DOWNING:

8   Q.   Now, in the -- in the course of doing work for

9   Mr. Manafort and for DMP International, did you have occasion

10  for yourself or your staff to put together work papers?

11  A.   Yes, we did.

12  Q.   And can you explain to the jury what's a work paper?

13  What's the purpose of it?

14  A.   Work paper is to support items that are reported on the

15  balance sheet or certain income and expense accounts that need

16  to have a little more detail, so that we can follow the next

17  year in preparation.  There might be anticipated activity that

18  we'd want to include in that work paper.  It's just really a

19  guide to help as a -- if there are any questions on the

20  current year, but also for any assistance in the following

21  year.

22  Q.   And part of your work every year for an accountant, let's

23  just talk about DMP and DMP International, there are certain

24  schedules you need to keep, because every year the issue is

25  going to come up again on a tax return like schedules for

———————U.S. v. Manafort———————

1009

1  depreciation?

2  A.   That's correct.

3  Q.   That would be an example.  But anything you would

4  consider reoccurring on a tax return, you'd want to have a

5  schedule for?

6  A.   Yes.

7  Q.   And as part of your work with DMP International with

8  Mr. Manafort, there also comes occasion when clients ask you

9  for information; is that correct?

10  A.   That's correct.

11  Q.   And you have occasion, in your capacity as an accountant

12  at a CPA firm, to put together schedules for clients; is that

13  correct?

14  A.   Yes, that is.

15  Q.   So I'm going to ask you to take a look at what's been

16  marked Defendant's Exhibit 3.

17          And take a minute and take a look at it.

18  A.   Exhibit 3?

19  Q.   3, yes.

20          And, Ms. Laporta, is this a work paper, would you

21  call it, spreadsheet?  What would you call it?

22  A.   A spreadsheet.

23  Q.   And is this something that you -- the client had asked

24  you to put together?

25  A.   Yes, it is.

1010

1   Q.   And is this something you were involved with putting

2   together and oversaw the completion of it?

3   A.   Yes.

4   Q.   And at the time you were putting this together, was this

5   put together from the tax filings of DMP, DMP International,

6   and Mr. Manafort?

7   A.   Yes, that's correct.

8   Q.   And as you were putting the document together, did you

9   have other people help you out and check that it's fair and

10  accurate?

11  A.   Yes, I did.

12  Q.   Okay.  And as you sit here today, do you know this to be

13  a fair and accurate record that you put together?

14  A.   Yes.

15          MR. DOWNING:  Your Honor, I move Defense Exhibits 3

16  into evidence as business record of KWC.

17          MR. ASONYE:  No objection.

18          THE COURT:  Admitted.

19                      (Defendant's Exhibit No. 3

20                      admitted into evidence.)

21          MR. DOWNING:  May we publish, Your Honor?

22          THE COURT:  You may.

23          MR. DOWNING:  Maybe not.

24          THE COURT:  You can use the ELMO.

25          MR. DOWNING:  With a little help, I think so.

U.S. v. Manafort

1    THE COURT:  That, I can't help you with.

2    There we are.

3    MR. DOWNING:  Thank you.

4    Well, it's small enough that no one can read it, so

5  I'm not sure that's going to be helpful.

6    THE COURT:  Well, you can.  You can magnify.  You

7  can focus it down.

8    Let me ask the court security officer, can you

9  manipulate this thing or do we need to get Lance up here?

10    THE CSO:  Probably Lance.

11    MR. DOWNING:  I have a volunteer.

12    THE COURT:  Oh, all right.

13    MR. DOWNING:  Thank you, sir.

14    MR. NANAVATI:  Sure.

15    MR. DOWNING:  We're having technical difficulty.

16    THE COURT:  Mr. Nanavati.

17    MR. NANAVATI:  I'm going to do my best, Your Honor.

18    Yes, Your Honor.

19    THE COURT:  All right.  Go ahead.  He knows how to

20  do it.

21  MR. DOWNING:

22  Q.   Very good.  So on that -- the top left corner of this

23  document, it says it's loans from wire transfers.

24    And do you recall you going back in time and trying

25  to find out through the records, what kind of monies were

U.S. v. Manafort

1  flowing into DMP International, where it was coming from, and

2  how it was categorized; is that correct?

3  A.   That is correct.

4  Q.   And this particular spreadsheet shows wires that came in

5  from various foreign entities that had been recorded as loans;

6  is that correct?

7  A.   That is correct.

8  Q.   And going back as far as 2006, you -- the first loan you

9  have recorded there is about $10 million; is that correct?

10 A.   Yes, that's correct.

11 Q.   And then as you go down that column, there's 3.5 million

12 in 2007, correct?

13 A.   Yes.

14 Q.   And in 2007, there's another -- that's from LOAV.

15 There's another one, 2.8 million that came in, do you see

16 that?

17 A.   That's correct.

18 Q.   And then for 2008, you have four entries; is that

19 correct?

20 A.   That's correct.

21 Q.   For 225,507, 8 million, 120,000.  That one totaled

22 8,120,000, correct?

23 A.   Correct.

24 Q.   You have another 105,000, and then if we go down a little

25 further on 2008, there's a series of transfers in from

—U.S. v. Manafort—

1   Yiakora, correct?

2   A.   Yes.

3   Q.   To the tune of 1.9 million, do you see that?

4   A.   Yes, I do.

5   Q.   Okay.  And then 2012, there's Peranova, right?

6   A.   Right.

7   Q.   1.5, and next up for 2014, '15 is Telmar, which Peranova

8   and Telmar are what you were familiar with, correct?

9   A.   Yes, that's correct.

10  Q.   Okay.  So over that period of time, from 2006 to 2015,

11  there was over $30 million in loans that had been reported on

12  the tax returns, correct?

13  A.   That's correct.

14  Q.   Of DMP International?

15       And during that same period of time, if we can go

16  down a little further --

17  A.   Excuse me, not all on DMP International.  I don't think.

18  I'm looking at the responsible party.  I'm sorry, I'm not --

19  Q.   Go ahead.  Take your time.

20  A.   Okay.  That's all I was going to point out, that there

21  were other entities.

22  Q.   Go ahead.  One more time, I'm sorry?

23  A.   That there were other entities here besides DMP.

24  Q.   There were other entities involved, too.

25       But this -- all of this information came from tax

─────U.S. v. Manafort─────

1014

1  returns that had been filed by KWC, correct?

2  A.   That's correct.

3  Q.   Okay.  And we go to the bottom, you have a total number

4  for the total loans and it shows $30 million, correct?

5  A.   That's correct.

6  Q.   Okay.  What's the next line, "recognized revenues," what

7  does that mean?

8  A.   Those are loans that had been over time.  I guess -- I

9  have to guess, the only one I'm familiar with is the

10  1.5 million from Peranova, but -- so that's the only time I

11  remember recognizing revenue for what had previously been a

12  loan.

13  Q.   And let's just go back to that testimony you gave.

14        The recognition of income from a loan is when you

15  say the loan has been forgiven?

16  A.   That's correct.

17  Q.   And then the amount of the loan in the case of Peranova,

18  you would report that 1.5 million Peranova loan as income on

19  Mr. Manafort's tax return, correct?

20  A.   That's correct.

21  Q.   And even though he didn't receive anymore money, you

22  reported as income because he's not paying it back, correct?

23  A.   That's correct.

24  Q.   So in addition to Peranova, there must have been another,

25  what is that, almost 6 million, just shy of 6 million in loan

1015

1   forgiveness that you were not involved with?

2   A.   That's correct.

3   Q.   But KWC was?

4   A.   Yes.

5   Q.   How about the next line, "Distributed to Paul Manafort,"

6   is that what we were talking about earlier, the distributions

7   from the partnership?

8   A.   Yes.

9   Q.   And that totals $15.7 million, correct?

10  A.   Correct.

11  Q.   The next line is, "Distributed to others, other

12  partners."  Do you see that?

13  A.   Yes.

14  Q.   2.3?  And then "Worthless Investment," what does that

15  mean?

16  A.   I would think that that would -- that would be an

17  investment that had been reported on the tax return that had

18  no further value.

19  Q.   And then the final balance on there says 1.9 million,

20  correct?

21  A.   That's correct.

22  Q.   And that would be Telmar, correct?

23  A.   Yes.

24  Q.   Okay.  Now, let's go to the bottom right-hand side of the

25  document.

U.S. v. Manafort

1016

1    You have some notes on this side of the document,

2  and the particular note I want to point your attention to is

3  the three-star note.  Can you read that?

4  A.   "To be recognized as income in 2016 by Paul Manafort, no

5  longer expected to receive connected anticipated proceeds in

6  order to repay this debt."

7  Q.   So that was the outstanding amount as of 2015?

8  A.   That's correct.

9  Q.   And you were expecting that in 2016, that would be picked

10 up in income?

11 A.   Yes.

12 Q.   Now, you didn't prepare the 2016 tax return for Mr.

13 Manafort, did you?

14 A.   No, I did not.

15 Q.   But you did talk to a Mr. Gittelman, a CPA, about the

16 preparation of that return?

17 A.   Yes, I tried to --

18 Q.   And you provided some records with respect to the

19 preparation of that return, correct?

20 A.   Yes, that's correct.

21 Q.   And you have to provide records, right?  It's like

22 anything else, a new accountant can't start from scratch, they

23 need to know what happened before, correct?

24 A.   That's correct.

25 Q.   And they need some books and records and prior year's tax

—————U.S. v. Manafort—————

1  returns, and those are the kind of things that you provided,

2  correct?

3  A.   That's correct.

4  Q.   Now, I'm going to ask you to take a look at what's been

5  marked Government's Exhibit 4 -- Defendant's Exhibit 4.  Sorry

6  about that.

7          I would like you to take a look at Line 1.  And what

8  is line -- well, first of all, what is this?

9  A.   This is a tax return for DMP International for 2016, and

10 it was prepared by Gittelman CPA.

11 Q.   And that's the Gittelman CPA that you were dealing with

12 in providing information --

13         THE COURT:  Mr. Downing, I want to know what magic

14 you have.  Mr. Asonye started to get up and he went like this

15 and he sat right back down.

16         MR. ASONYE:  Give him a little more leeway, Your

17 Honor.

18         MR. DOWNING:  A little more rope you've given me, I

19 believe.

20         THE COURT:  I see.  Are you offering the Exhibit 4?

21         MR. DOWNING:  Not yet, Your Honor.

22         THE COURT:  All right.

23         MR. DOWNING:  Not yet.

24         THE COURT:  Proceed.

25 MR. DOWNING:

1018

1   Q.   So you see the Line 1, gross receipts?

2   A.   I do.

3   Q.   And how much is that?

4        MR. ASONYE:  Well, objection, relevance, Your Honor.

5        MR. DOWNING:  I'm about to explain why it's

6   relevant.

7        MR. ASONYE:  Now, getting the information out of the

8   document.  It's not admitted.

9        THE COURT:  Go ahead, Mr. Downing, and elicit why

10  it's relevant from this witness, if you can do so.

11  MR. DOWNING:

12  Q.   In terms of your note on the work sheet we just talked

13  about, you had $1.9 million that was supposed to be picked up

14  in 2016; is that correct?

15  A.   That's correct.

16  Q.   And in your dealings with Mr. Gittelman, did you provide

17  him with information regarding picking up that income?

18  A.   I don't recall.  It would -- I just don't recall that for

19  sure.  I gave him everything I could or that he asked for, but

20  I can't tell you exactly what I gave him besides tax returns.

21  Q.   Okay.  So can you turn to the back of this tax return in

22  the statement section marked Page 2, Statement 6?

23  A.   I'm here.

24  Q.   Do you see that entry?

25  A.   Yes.

U.S. v. Manafort

1  Q.   Now, does that refresh your recollection as to whether

2  KWC provided the Telmar information to Mr. Gittelman?

3  A.   It could have also come from the general ledger, the 2016

4  general ledger.

5  Q.   And do you know if the 2016 general ledger indicated that

6  the Telmar investment was picked up as income for

7  Mr. Manafort?

8  A.   I don't remember.  I don't believe I saw that 2016

9  general ledger.

10  Q.   And that's what's being indicated on this year's return,

11  correct?

12  A.   Yes, that's correct.

13        THE COURT:  What is it that's being reflected on

14  this 2016 return?

15        THE WITNESS:  That the -- the liability to Telmar

16  Investments is zero at the end of 2016.

17        THE COURT:  Meaning what?

18        THE WITNESS:  That it was included in income.

19        MR. DOWNING:  In 2016?

20        THE COURT:  For whom in 2016?

21        THE WITNESS:  DMP International.

22        THE COURT:  Next question.

23  MR. DOWNING:

24  Q.   And with respect to the partnership structure at DMP

25  International, the income of DMP International would directly

U.S. v. Manafort

1020

1  flow down to its partners, correct?

2  A.   That's correct.

3  Q.   And that would be Mr. Manafort and Mrs. Manafort,

4  correct?

5  A.   Yes.

6  Q.   And that would flow through to their 1040 for that year?

7  A.   Yes, that's correct.

8  Q.   Now, in terms of your preparation of other documents and

9  work papers for Mr. Manafort at the request of the client,

10  would you take a look at Government's Exhibit No.  2 --

11  Defendant's Exhibit No. 2?

12          THE COURT:  I've already admitted 2, have I not?

13          MR. DOWNING:  It's Defendant's.  I'm sorry, Your

14  Honor.

15          THE COURT:  Yeah, but I've already admitted

16  Defendant's 2, have I not?

17          MR. DOWNING:  3.

18          THE COURT:  3 I've admitted.

19          MR. DOWNING:  I'm going out of order.

20          THE COURT:  All right.  You may do so.

21  MR. DOWNING:

22  Q.   Ms. Laporta, you've had a chance to look at that

23  document?

24  A.   Yes.

25  Q.   And, again, is this a schedule you prepared at the

─────────U.S. v. Manafort─────────

1021

1   request of a client?

2   A.   Yes, it is.

3   Q.   And your capacity as a CPA?

4   A.   Yes.

5   Q.   And did you have other individuals at KWC work with you

6   on this?

7   A.   Yes, I did.

8   Q.   And has it been checked for accuracy?

9   A.   Yes.

10  Q.   Against the tax records of KWC for DMP and Mr. Manafort?

11  A.   It was prepared from the tax returns.

12          MR. DOWNING:  Your Honor, I move Defendant's Exhibit

13  No. 2 into evidence as a record of KWC.

14          MR. ASONYE:  No objection.

15          THE COURT:  Admitted.

16          MR. DOWNING:  May I publish, Your Honor?

17          THE COURT:  Yes, you may.

18  MR. DOWNING:

19  Q.   Ms. Laporta, can you explain what this work sheet is?

20  A.   It's a summary of all of Mr. Manafort's companies and it

21  shows the gross receipts that came from those companies.

22          The second column shows what was reported on

23  Mr. Manafort's personal income tax returns as adjusted gross

24  income.  And then the next column shows what was reported on

25  these various tax years on Mr. Manafort's taxable income.

1022

1  Q.   So can we -- go ahead.  I'm sorry.

2  A.   The final column is how much in federal taxes did

3  Mr. Manafort pay in each of those years.

4           MR. DOWNING:  So can we scroll down to the total,

5  please, Jay?

6  BY MR. DOWNING:

7  Q.   And, again, we have totals by year here, correct?

8  A.   Yes, that's correct.

9  Q.   So start -- going back to 2005, there was about

10 10.9 million in gross revenues, correct?

11          MR. ASONYE:  Your Honor, at this point we're going

12 to object to the relevance of years beyond the charge years

13 2010 to 2014.

14          MR. DOWNING:  I believe Mr. Asonye said the other

15 day this goes back to 2005.

16          MR. ASONYE:  Not the actual income.  Not the actual

17 income that's charged in the indictment, Your Honor.

18          THE COURT:  I'll overrule the objection.  You may

19 proceed.

20 MR. DOWNING:

21 Q.   So there's a year-by-year account from '05 to '15,

22 correct?

23 A.   Yes, that's correct.

24          MR. DOWNING:  And why don't we just scroll down year

25 by year?  We -- we'll go to the total, Jay.  To the next page,

1  please.

2  BY MR. DOWNING:

3  Q.   So in total for this period of time, you're reporting

4  that 92.5 million was reported as gross revenue on the tax

5  returns of DMP and DMP International, correct?

6  A.   That's correct.

7  Q.   And those are federal United States tax returns, correct?

8  A.   Yes, that's correct.

9  Q.   The next number that you list there, it says, "Entity

10 business expenses."  And those are the entity business

11 expenses that were deducted on those various federal tax

12 returns against the $92 million; is that correct?

13 A.   That is correct.

14 Q.   You also have other partner share.  What is that?

15 A.   I think in one of these years there was another partner

16 involved and so the income would have gone to their -- it

17 would have been reported on that partner's 1040, not

18 Mr. Manafort's.

19 Q.   And then you have other Paul Manafort 1040 items.  And

20 what does that encompass?  You have a note on that, I believe,

21 at the bottom.

22 A.   Would you like me to read that note?

23 Q.   Sure.

24 A.   So this 14 million that we're showing here is other

25 Manafort income, meaning not derived from these various

─────U.S. v. Manafort─────

1  entities.  Includes W-2 wages, consulting income, and

2  investment portfolio income.

3  Q.   And that leaves $30,249,398 of adjusted gross income

4  reported on Mr. Manafort's personal federal income tax returns

5  over that period; is that correct?

6  A.   That's correct.

7  Q.   And the next total on there for 30 -- I'm sorry --

8  $23,924,619, what is that?

9  A.   That's the taxable income.

10  Q.   And how do you get to taxable income from gross to

11  taxable?  Can you explain that?

12  A.   There are a few adjustments, including health insurance,

13  but the biggest, of course, is the Schedule A deductions.

14  Q.   And on that amount of money you have that Mr. Manafort,

15  on his federal income taxes from 2005 to 2015, paid $8,383,179

16  in federal income tax; is that correct?

17  A.   That is correct.

18            (A pause in the proceedings.)

19  MR. DOWNING:

20  Q.   Ms. --

21            (A pause in the proceedings.)

22  MR. DOWNING:

23  Q.   Now, Ms. Laporta, last week you were asked some questions

24  about this Telmar loan, and I think you had said that if the

25  $1.9 million had been picked up as income in 2015 or -- 2015,

────────────────U.S. v. Manafort────────────────

1   I believe it was, that there could have been about $500,000 in

2   tax; is that correct?

3   A.   Yes, that's correct.

4   Q.   But it's a ballpark, you're giving a high-end number

5   saying --

6   A.   Yes.

7   Q.   -- tax bracket --

8   A.   Yes.

9   Q.   Now, in terms of -- in terms of that number, you saw the

10  tax return, it was picked up in 2016, as you indicated on your

11  work sheet; is that correct?  The tax return we just looked

12  at?

13  A.   Yes.  I don't know -- I mean, it seems like that's the

14  case.

15  Q.   Well, you saw the number on the income line, correct?

16  A.   Yes.

17  Q.   I'd like to ask you a question.  Do you know what the --

18  the penalty for late payment is, that's calculated by the IRS,

19  of tax?

20  A.   So there are -- there are different fines and

21  penalties --

22  Q.   Sure.

23  A.   -- including underpayment of taxes, and then if it's --

24  Q.   So let's talk about the underpayment of taxes.  Can you

25  go to -- take a look at Defendant's Exhibit 5?

─────U.S. v. Manafort─────

1    It's an IRS publication and it has a penalty for

2  late filing, and it says, "Penalty for late payment."  Do you

3  see that No. 3?

4  A.   Yes.

5  Q.   And that charges .5 percent per month; is that correct?

6  A.   Yes, that's correct.

7  Q.   And with respect to the Telmar, assuming what you've seen

8  as being correct, that Telmar was not reported in 2015 as

9  income but was reported in 2016; is that correct?

10  A.   That's correct.

11  Q.   And the IRS would say, "Okay, well, if we think it should

12  have been paid in 2015, we want .5 percent per month for the

13  late payment"; is that correct?

14  A.   Up to as much as 25 percent.

15  Q.   Depending upon how long you went out; is that correct?

16  A.   That's correct.

17  Q.   But in this case let's say we went out just one year.

18  That's about $30,000, isn't it?

19  A.   I can't do that in my head.

20  Q.   Well, you could do it by month, right?

21  A.   Yes.

22  Q.   Why don't you try?

23  A.   So, no, that's -- that's ballpark.

24  Q.   That's ballpark, about $30,000.  And that's what would

25  have been additionally owed to the IRS for a late payment if,

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

1027

1    in fact, they prevailed; is that correct?

2    A.    That's correct.

3    Q.    So one other issue I wanted to talk about before we leave

4    Telmar.  It seems to -- part of the conversation about Telmar

5    up against the September filing date in 2016 was a question

6    of, why was KWC so off on the estimated taxes?  Why would a

7    client be in a position this far into filing season to be --

8    not know what the tax would be?

9              So why don't we take a minute and talk about that?

10             Can you explain what estimated taxes are and what

11   you do as an accountant with respect to estimated taxes for a

12   client?

13   A.    So you really asked me two questions, right?  The first

14   is -- right.

15   Q.    Go ahead.

16   A.    Okay.  The first question was, how do we -- what are

17   estimated taxes and how are they calculated?

18   Q.    Yes.

19   A.    So typically estimated taxes are calculated at the same

20   time that an extension would be prepared in April.

21             And the information that we have available, as

22   provided by the client, we estimate what the tax hit on that

23   is and then we ask, will the following year be better or the

24   same?  If it's the same, we divide that -- we divide that

25   number by 4 and have the client pay in those estimated taxes

─────U.S. v. Manafort─────

1028

1   during the year.

2            And then the second question about when you get to

3   the -- when you -- based on what you've done in April for

4   extension purposes and then down to the final -- the filing of

5   the tax return, why is there a difference?  And that -- in

6   this instance you're asking how can we be so far off?

7   Q.   Well, I would ask you differently.  When you do your

8   estimates you're at, you know, April 15th, sometimes the

9   following year and you're setting up for the next year,

10  there's a lot of unknowns, correct?

11  A.   That's correct.

12  Q.   But you generally use last year's numbers, correct?

13  A.   Yes.

14  Q.   And then you see if the client has any insight into

15  whether or not you're going to have a lot more income or a lot

16  less; is that correct?

17  A.   That's correct.

18  Q.   And then as the year goes on, you check in with the

19  client, I would imagine?

20  A.   Yes.

21  Q.   And try to see if you can get some updates?

22  A.   That's correct.

23  Q.   And I don't know why, but for some reason for that tax

24  year, KWC didn't seem to note that there was going to be that

25  amount of income that had to be reported, and, therefore,

1029

1  there was going to be additional tax that was going to have to

2  be paid that was not covered by the estimate; is that correct?

3  A.   That's correct.

4  Q.   Do you know how that happened?  Do you know why it

5  happened?

6  A.   Just lack of response to our questions.

7  Q.   And -- and the person that you were dealing with with

8  respect to these kinds of things was Mr. Gates; is that

9  correct?

10  A.   Typically.  But as I testified on Friday, often

11  Mr. Manafort was copied on those e-mails.  Or if I wasn't

12  getting Rick's attention then I'd copy Mr. Manafort on e-mails

13  for requesting information.

14  Q.   Sure.  You also had another source of information, that

15  is, the bookkeeper?

16  A.   Yes, that is correct.

17  Q.   And she's recording things, activity, as it occurs during

18  the year, correct?

19  A.   I don't know that for sure how frequently her recording

20  is, but we certainly relied on her information.

21  Q.   So if she was not up to date on the books and records and

22  you were using the books and records to determine if you

23  needed to pay an additional tax, the tax payments would be

24  short?

25  A.   Yes, that's correct.

1030

1  Q.   Okay.  So the tax payments were short that year, were

2  they not?

3  A.   That's correct.

4  Q.   And you have experience dealing with clients on filing

5  deadlines, don't you?

6  A.   Yes.

7  Q.   Do clients have a tendency to get very upset when all of

8  a sudden they're told they have to cut a check for a few

9  hundred thousand dollars?

10 A.   Yes, this is an usual --

11 Q.   Unusual filing.

12       Regardless of who may have caused the problem, it's

13 just one of those things that people are upset because they

14 usually want to plan for it, especially when it's a large

15 amount of money?

16 A.   That's correct.

17       (A pause in the proceeding.)

18 Q.   So now I'd like to go back and talk a little bit about

19 the Peranova loan and the write-off of the Peranova loan.

20       Again, the issue with the Peranova loan came up with

21 respect to an attempt by Mr. Manafort to borrow money from a

22 bank; is that correct?

23 A.   That's correct.

24 Q.   And had to do with some of his properties up in New York;

25 is that correct?

1031

1   A.   Yes, that is.

2   Q.   And the bank had a bunch of questions about

3   Mr. Manafort's balance sheet, correct?

4   A.   Yes, that's true.

5   Q.   The bank had made a determination that they weren't going

6   to use Mr. Manafort's income or P&L, profit and lost

7   statement, to determine whether or not they were going to

8   lend; is that correct?

9   A.   That's correct.

10  Q.   And they were looking at his assets and his liabilities,

11  correct?

12  A.   Yes.

13  Q.   You'd call that a balance sheet?

14  A.   Yes.

15  Q.   An issue came up about --

16          THE COURT:  I'm sorry, did you answer that question?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  Next question.

19  MR. DOWNING:

20  Q.   And an issue came up with respect to Peranova being a

21  liability, correct?

22  A.   Yes, that's correct.

23  Q.   Okay.  And what was being conveyed to the bank was that,

24  no, it's not a liability at this point in time; is that

25  correct?

1032

1  A.    That's correct.

2  Q.    Now, much like the issue that you talked about with

3  Telmar, if you're making a call whether or not something is a

4  loan or it's income, you're making a call, correct?

5  A.    Yes.

6  Q.    And in this case, the call was made that they were no

7  longer going to carry this as a loan, correct?

8  A.    As I said to the bank, this is being represented to me as

9  forgiveness of debt.

10  Q.    And that's important because you wouldn't know otherwise?

11  A.    That's correct.

12  Q.    Correct?

13        And you were being told by Mr. Gates this is what

14  happened, correct?

15  A.    Yes, that's correct.

16  Q.    But more importantly at that point in time, if, in fact,

17  Peranova was no longer an outstanding loan, it would not be

18  appropriate to tell a bank it was a liability, correct?

19  A.    That's correct.

20  Q.    And let's go to another issue.  There was an issue about

21  monies that Mr. Manafort was owed, about $2.4 million from one

22  of his consulting contracts.  Do you remember that?

23  A.    Yes, I do.

24  Q.    And there was this question about, well, are we doing a

25  cash basis P&L or are we doing an accrual P&L?

U.S. v. Manafort

1033

1   A.   That's correct.

2   Q.   And the way you addressed it, you told the bank, well,

3   here is a cash basis P&L from the bookkeeper, correct?

4   A.   That's correct.

5   Q.   And I want you to know that my client also has an

6   accounts receivable that he believes he is going to collect by

7   November for $2.4 million, correct?

8   A.   Yes, that's correct.

9   Q.   So two separate issues.  Here is the P&L cash basis, and

10  you should know my client believes he's got another asset?

11  A.   That's correct.

12  Q.   Correct?

13       There's nothing inappropriate about telling the bank

14  that someone owes you money, correct?

15  A.   That is correct.

16  Q.   And it's called an accounts receivable, correct?

17  A.   That's what it's called, yes.

18  Q.   But it's not going to show up on a cash P&L, a cash basis

19  P&L, correct?

20  A.   That's correct.

21  Q.   Why is that?

22  A.   Because cash basis only records income that's been

23  received and not what's been earned but not received.

24  Q.   And you have no reason, as you sit here today, to believe

25  that the 2.4 million wasn't really owed as an accounts

─────U.S. v. Manafort─────

1034

1  receivable?

2  A.   I didn't have any evidence that -- to the contrary, I

3  asked for contracts or invoices, but I never saw that.

4  Q.   Well, it's interesting you should raise that issue.  It

5  seems like KWC asks for a lot of information, especially

6  contracts and loan documents that it never received; is that

7  correct?

8  A.   That's correct.

9  Q.   So this would be another instance of not getting what it

10  is you would like to have in your file?

11  A.   That's correct.

12  Q.   So one last thing I'd like to cover with you -- until, of

13  course, I convey with my colleagues and they tell me

14  everything I missed -- an issue came up, and we talked about

15  earlier, that you had reason to question the representations

16  of Mr. Gates, representations he made to you?

17  A.   Yes, that's correct.

18  Q.   About financial information that you were conveying to

19  other people, correct?

20  A.   Yes, that's correct.

21  Q.   About financial information that you would have to put on

22  tax returns?

23  A.   Yes, that's correct.

24  Q.   And you testified last week that you didn't want to rock

25  the boat, you didn't want to upset a client, I think, in sum

1   and substance is what you said about why you didn't raise an

2   issue; is that correct?

3   A.   I did raise issues.

4   Q.   I mean about Mr. Gates' credibility, about him giving you

5   false or misleading information, did you raise that issue?

6   A.   Yes, I did with him.

7   Q.   With Gates?

8   A.   Yes.

9   Q.   Okay.  And I'm sure he reacted well to that?

10  A.   That he didn't respond.

11  Q.   He didn't respond.  So you pointed out to him you thought

12  that you were getting misleading information or incomplete

13  information from him; is that correct?

14  A.   Yes.  I asked for clarification on that.

15  Q.   And you didn't get it?

16  A.   No, I did not.

17  Q.   And did you share that with Mr. Ayliff or other folks at

18  KWC?

19  A.   I don't recall whether they would be copied or whether we

20  talked about it.  We probably talked about it.

21  Q.   Do you know if Mr. Ayliff, in particular, had a similar

22  feeling about the representations he was getting from

23  Mr. Gates?

24  A.   I feel that Philip also felt -- had that --

25  Q.   And at the time of dealing with various banks, this --

———————U.S. v. Manafort———————

1036

1    this Telmar issue and Peranova, the e-mail was clear that you

2    were dealing with Mr. Gates.

3              Did you ever think about picking up the phone and

4    calling Mr. Manafort, either you personally or with

5    Mr. Ayliff, to let him know what your concerns were?

6    A.   I did not do that.  I think that in most instances it was

7    clear that Mr. Manafort was aware of what was going on.

8    Q.   But in this particular instance, you don't know?

9    A.   That's correct.

10   Q.   And were you surprised when Mr. Gates was telling you

11   that Mr. Manafort couldn't come up with the money to pay a

12   couple hundred thousand dollars in tax?  Did that surprise

13   you?

14   A.   Yes, but I had limited experience with the client, so I

15   didn't know if this -- if these were conversations --

16   Q.   Of course.

17   A.   -- that had happened in the past.

18   Q.   Of course.  Well, what if you picked up the phone and it

19   led to finding out that Mr. Gates was embezzling millions of

20   dollars from Mr. Manafort and his entities --

21             MR. ASONYE:  Objection, calls for -- objection, Your

22   Honor.

23             THE COURT:  Let him finish the question, and then

24   you may object.

25             THE WITNESS:  I didn't hear.

1    MR. ASONYE:  Your Honor --

2         THE COURT:  You don't have -- wait until he finishes

3    his question.  Re-ask your question starting at the beginning.

4    And don't answer -- I want to hear the objection and then I

5    may have you come to the bench if you need to, Mr. Asonye.

6         What's your question.

7    MR. DOWNING:

8    Q.   Ms. Laporta, if at the time you were dealing with

9    Mr. Gates you knew that he had embezzled millions of dollars

10   from Mr. Manafort unbeknownst to Mr. Manafort, would you have

11   picked up the phone and called Mr. Manafort?

12        MR. ASONYE:  Objection.

13        THE COURT:  What's your objection?

14        MR. ASONYE:  Assumes facts not in evidence, Your

15   Honor.

16        THE COURT:  I can't hear you.

17        MR. ASONYE:  There are no facts of that in evidence.

18        MR. DOWNING:  I have a good faith basis for asking

19   the question, and the Government knows facts will be coming

20   into evidence.  Mr. Gates is next up.

21        THE COURT:  I'll overrule the objection.  You may

22   answer.

23        THE WITNESS:  If I had known --

24        MR. DOWNING:  Could the court reporter ask the

25   question back, please?

U.S. v. Manafort

1      (Audience laughter.)

2      (Reporter read back into the record.)

3      THE COURT:  I don't think that was the question.

4   Try it again.

5      MR. DOWNING:  I'm sorry, Your Honor.  Did it quiet

6   down?

7   BY MR. DOWNING:

8   Q.   Ms. Laporta, if at the time you were dealing with the

9   Telmar issue and Peranova, if at the time you learned that

10  Mr. Gates was embezzling millions of dollars from

11  Mr. Manafort, would you have picked up the phone, you or

12  Mr. Ayliff to let Mr. Manafort know that?

13  A.   Yes.

14  Q.   Would that have caused you to not trust anything that

15  Mr. Gates was telling you?

16  A.   Yes.  I don't know how that would happen, that whole

17  scenario you've described, but, of course, if I knew there was

18  wrongdoing, then --

19  Q.   So you raised an interesting point.  You've been an

20  accountant for how many years now?

21  A.   Since '84.

22  Q.   Since '84.

23      You have a retainer agreement at KWC that says you

24  are not retained to conduct procedures to detect fraud,

25  illegalities, or defalcations; is that correct?

─────U.S. v. Manafort─────

1039

1   A.   That is correct.

2   Q.   And is that because generally the two last people to know

3   about it are the accountants and the business owner?

4   A.   Yes, that's correct.

5   Q.   And unless you're specifically called in to do procedures

6   to detect fraud, you really won't know?

7   A.   That's correct.

8   Q.   But there's one thing you probably do know, given your

9   experience, when you have somebody on the inside of an

10  accounting system, in the inside of a business that is in

11  control of financial information, if that person is embezzling

12  funds, is that person usually the one of the most difficult to

13  get information from?

14          MR. ASONYE:   Objection, Your Honor, because this

15  calls for speculation.

16          MR. DOWNING:   No, I'm asking her about a CPA -- as a

17  CPA, her experience.

18          MR. ASONYE:   Your Honor, there's no foundation that

19  she's ever dealt with that type of scenario before.  It calls

20  for speculation.

21          THE COURT:   I'll overrule it.  She can answer.  If

22  you don't know, simply say you don't know.

23          THE WITNESS:   That scenario you've just described is

24  what is taught in fraud related CP -- that's continuing

25  professional education.

U.S. v. Manafort

1040

1  MR. DOWNING:

2  Q.   And then continuing professional education for CPAs, they

3  train you for these red flags, would you call them?

4  A.   Yes, that's correct.

5  Q.   And some of the red flags are difficulty in getting

6  information from that individual?

7  A.   Yes.  That's normally on the audit side; on the tax side,

8  not so much.

9  Q.   Well, explain it on the audit side?

10 A.   Well, on the audit side, it's a whole different world and

11 you're doing a risk assessment before you even see a number.

12 Q.   I'm talking about the behavior that you're looking for,

13 not the procedures.  But somebody who is difficult to get

14 information from that should have the information for you; is

15 that correct?

16 A.   Yes.

17 Q.   And you have reason to call into question what

18 information was given to you; is that correct?

19 A.   That is correct.

20 Q.   So these are some of the telltale sides of someone who

21 can be involved as an insider in an embezzlement; is that

22 correct?

23 A.   That is correct.

24          MR. DOWNING:  No further questions.

25          THE COURT:  Let me have counsel quickly at the

U.S. v. Manafort

1041

1    bench, please.

2          (Bench Conference.)

3          THE COURT:  Mr. Downing, I didn't understand what

4    you meant by "there would be evidence of embezzlement."

5          MR. DOWNING:  The Government has produced statements

6    of Mr. Gates regarding embezzlement.  We have accounting

7    records from various accounts which Mr. Gates was unauthorized

8    to take monies out of and embezzled funds, and that's

9    something that that's been given to us by the Government and

10   have put us on notice of the embezzlement.

11         THE COURT:  So is that what you meant when you said

12   you had a good faith basis to believe that he had embezzled

13   money from Mr. Manafort?

14         MR. DOWNING:  That's correct, Your Honor.

15         THE COURT:  Now, on another subject, you didn't ask

16   this witness -- she testified in her direct examination what

17   she took responsibility for.  You didn't go into that at all,

18   about what she took responsibility for, or what consequences

19   she faced, or anything of that sort.

20         Is that right?

21         MR. DOWNING:  That is correct.

22         THE COURT:  And that's a judgment that you-all made?

23         MR. DOWNING:  Correct, Your Honor.

24         THE COURT:  Is she still an accountant?  Is she

25   still a CPA?

U.S. v. Manafort

1042

1    MR. DOWNING:  I believe she is.  I believe that -- I

2  think the Government knows better.  I think over the weekend

3  she was suspended from her firm.  I don't know in what terms.

4    THE COURT:  But you're not going into that?  And you

5  don't plan to go into it for sure?

6    MR. ASONYE:  No, Your Honor.

7    THE COURT:  And he didn't ask whether you-all had

8  made any deal with her about that.

9    MR. ASONYE:  About her --

10    THE COURT:  Consequences.  Typically when a

11  cooperating witness cooperates, typically, they cooperate, but

12  there are consequences.  They plead guilty and so forth.  And

13  they get a reduction in their sentence.  It seems odd in this

14  case that there are no consequences.  And, indeed, her lawyer

15  wanted to sit with her to assert objections to questions,

16  which, of course, I didn't permit.

17    MR. DOWNING:  And, Your Honor, I guess we believe

18  that we can use that immunity in our closing.

19    THE COURT:  Yes, you can.  But it's a judgment you

20  made.  I'm not going to ask the question.

21    Did you want to say something?

22    MR. ANDRES:  May I, Judge?

23    THE COURT:  You may.

24    MR. ANDRES:  It's not right to assume there were no

25  consequences.  Whether they get brought out on direct or not

─────U.S. v. Manafort─────

1  is a different issue.  Mr. Downing wants the jury to believe

2  that Ms. Laporta is telling the truth.  So, obviously, there's

3  no -- I just -- it doesn't mean that we didn't -- there

4  weren't consequences and with her own employment --

5          THE COURT:  What did I miss?  What are the

6  consequences?

7          MR. ANDRES:  Well, she has licensing issues, I'm

8  sure.  She just testified in public that she's lied about

9  things.  That doesn't mean that the accounting board or these

10  other entities, which have now been alerted to, may take

11  action.  We don't know.  We don't control that within the

12  Department of Justice.

13          THE COURT:  And, of course, there's no Government

14  agreement to help her avoid that?

15          MR. ANDRES:  No, no.  The only agreement that we

16  have --

17          THE COURT:  Is in the --

18          MR. ANDRES:  Immunity order.

19          THE COURT:  It's not in the order, it's in the

20  agreement you have with her.  I just signed --

21          MR. ANDRES:  We don't have an agreement with her.

22          THE COURT:  All right.  I signed an order requiring

23  her to testify.  There is no agreement?

24          MR. ANDRES:  The agreement was to get her immunity

25  from the Court, to apply to the Court for --

U.S. v. Manafort

1044

1    THE COURT:  That's the only agreement?

2    MR. DOWNING:  Yes.

3    THE COURT:  I did not give her immunity.  You did.

4    MR. ASONYE:  That is correct.

5    THE COURT:  I required her to testify.

6    MR. ASONYE:  That is correct, Your Honor.

7    MR. ANDRES:  Yes.  Absolutely.

8    MR. DOWNING:  Thank you, Your Honor.

9    THE COURT:  Let's be very clear about it.  All

10   right.  Thank you.  Mr. Downing --

11   MR. ASONYE:  Your Honor, I was going to ask if it's

12   time for -- an appropriate time for a bathroom break.

13   THE COURT:  Oh, okay.  Yes, I'll do that.

14   MR. ASONYE:  Thank you, Your Honor.

15   (End of bench conference.)

16   THE COURT:  All right.  Is there any redirect, Mr.

17   Asonye?

18   MR. ASONYE:  Yes, there is, Your Honor.

19   THE COURT:  How long?

20   MR. ASONYE:  You know, it could be about 15, 20

21   minutes.  15 minutes.

22   THE COURT:  All right.  I take it you would

23   appreciate a break now.

24   MR. ASONYE:  That would be helpful, Your Honor.

25   THE COURT:  Pass your books to the right.  The court

─────U.S. v. Manafort─────

1   security officer will collect them, maintain their security.

2           Ms. Laporta, you may step down.  Remember, you may

3   not discuss your testimony with anyone at all.  You understand

4   that includes attorneys?

5           THE WITNESS:  Yes, I understand.  Thank you.

6           THE COURT:  All right.  We will reconvene at 5

7   minutes after 3:00.

8           I hope -- you got your lunches today, those of you

9   who wanted them.  Good.

10          And there will be soft drinks, Mr. Flood?

11          THE CSO:  Yes, sir.

12          THE COURT:  Good.  Remember to refrain from

13  discussing the matter with anyone or among yourselves and also

14  undertaking any kind of investigation at all.

15          THE CSO:  Quiet.

16          THE COURT:  You may follow Mr. Flood out.

17          (Recess.)

18          THE COURT:  All right.  Before we begin -- ladies

19  and gentlemen, you may be seated for just a moment.

20          Before we begin, in the last session, for the second

21  time in this case, because of something that was said, at

22  least a half a dozen to a dozen or more people jumped up and

23  ran out of here.

24          (Audience laughter.)

25          THE COURT:  Making noises as they did.  It happened

───────U.S. v. Manafort───────

1   once before.  The first time it happened, it was disruptive

2   and mildly amusing, especially since there was no reason at

3   all for it, and this time it was not as amusing and equally or

4   more disruptive.

5            You may not do that.  If you cause a disruption, I'm

6   going to have you excluded.  It's that simple.  If you want to

7   leave the courtroom, yes, of course, you may do so.  But do so

8   in a quiet, orderly way, not in the way in which we've seen it

9   done twice.  Let's not have that again.

10            All right.  Let's have the jury brought in.  We'll

11   continue with the redirect examination of the witness.

12            Did you have something, Mr. Asonye?

13            MR. ASONYE:  Just if Your Honor could remind -- we,

14   again, ran into some of the jurors in the elevator at the

15   break.

16            THE COURT:  Oh, yes, you're quite right.  I will do

17   that, Mr. Asonye.  Thank you for the reminder.

18            (Jury in.)

19            THE COURT:  All right.  You may be seated.

20            Ladies and gentlemen, you will, on occasion, see

21   lawyers on behalf of the Government or the defendant, either

22   in the hallways, here, or on the street or walking across to

23   the hotel or whatever.  And they will typically not

24   acknowledge you or say hello, and that's entirely appropriate.

25            They are told by the Court not to discuss or not to

─────U.S. v. Manafort─────

1047

1   have any conversations or contact with any of the jurors.

2   And, indeed, everyone should avoid that, but the lawyers, in

3   particular.  So if that happened, don't think of the lawyers

4   as being rude.  Think of them, instead, as having adhered or

5   abiding my instructions.

6          All right.  Let's have Ms. Laporta return and,

7   Mr. Asonye, you may do your redirect examination, which you

8   say should be about 30 minutes?

9          MR. ASONYE:  And hopefully I can do it in less, Your

10  Honor.

11         THE COURT:  Good.

12         (Witness seated.)

13         THE COURT:  Ms. Laporta, you'll recall you're still

14  under oath.

15         THE WITNESS:  Yes, I do, Your Honor.

16         THE COURT:  And you may resume the stand.

17                  **REDIRECT EXAMINATION**

18  BY MR. ASONYE:

19  Q.   Good afternoon.  Ms. Laporta, Mr. Downing, do you

20  remember him asking you some questions about 29 Howard Street

21  and whether there was some confusion about whether it was a

22  rental?

23         Do you remember those questions?

24  A.   Yes, I do.

25  Q.   Okay.  Were you confused as to whether 29 Howard Street

─── U.S. v. Manafort ───

1048

1  was a rental?

2  A.   Was I confused that it was?

3  Q.   Were you confused?

4  A.   No, I think the only confusion was whether or -- who was

5  living there when another name was thrown out there.

6  Q.   In fact, let me show you Government Exhibit 156, which

7  has already been admitted.

8         MR. ASONYE:  Your Honor, may we publish?

9         THE COURT:  Yes, you may.

10 BY MR. ASONYE:

11 Q.   And you received -- if you look at the middle e-mail?

12        You received this e-mail from Rick Gates, and did

13 Rick Gates ever express any confusion about the 29 Howard

14 Street, whether it was a rental in 2015?

15 A.   No.

16 Q.   In fact, in Paragraph 2, what does he say about how it's

17 used in 2015?

18 A.   He said rental clearly.

19 Q.   All right.  And if we can pull up Government Exhibit

20 337L, which is the tax return for MC Soho, 29 Howard Street in

21 2015.  And if we could turn to Page 14, if we could zoom in on

22 the top.

23        Was there any confusion about the number of days

24 this property was rented out for when the tax return was

25 filed?

U.S. v. Manafort

1049

1   A.    No, there was not.

2   Q.    Is the -- how many days was it rented for?

3   A.    It was available 365 days.

4   Q.    Okay.  In fact, if you read Line 1, you said it was

5   available for 365 days.  Could you actually read Line 1 to the

6   jury, what does it say?

7   A.    (As read):  "Show the type and address of each property.

8   For each rental property -- real estate property listed,

9   report the number of days rented at fair rental value and days

10  with personal use."

11  Q.    All right.  So that says days rented at fair rental

12  value; is that correct?

13  A.    Yes.

14  Q.    And how many days was it rented?

15  A.    365.

16  Q.    How many days was it personal?

17  A.    None.

18  Q.    If we can take that down.  Thank you.

19        Now, Mr. Downing also asked you some questions about

20  your expertise in preparing tax returns; is that correct?

21  A.    That's correct.

22  Q.    And what is your expertise?

23  A.    Expertise is accounting and auditing, but experience

24  includes business and personal tax returns.

25  Q.    Now, did it take you an -- did you need to be an expert

—————U.S. v. Manafort—————

1050

1   in order to determine that the Peranova letter -- forgiveness

2   letter for $1.5 million was backdated?  Did you need to be an

3   expert to figure that out?

4   A.   No.

5   Q.   Did you need to be an expert to know that you can't

6   disguise income as a loan?

7   A.   No.

8   Q.   Was that complicated?

9   A.   No.

10  Q.   Did you need to be an expert to know that calling

11  $900,000 from Telmar was wrong and not right?

12  A.   The $900,000?

13  Q.   Calling that a loan instead of income?

14  A.   Correct.

15  Q.   Did you need to be an expert to know that that was wrong?

16  A.   No.

17  Q.   Now, Mr. Downing asked you about some tax returns from

18  KWC going all the way back to 2005; is that correct?

19  A.   That is correct.

20  Q.   Now, you testified that you signed the 2014 and the 2015

21  return for DMP International; is that correct?

22  A.   That is correct.

23  Q.   Did you sign the 2010, '11, '12, or '13 returns?

24  A.   No, I did not sign those returns.

25  Q.   Did you even work on the 2010, '11, or '12 returns?

U.S. v. Manafort

1051

1   A.   No, I did not.

2          THE COURT:  Did you work on the 2013 return?

3          THE WITNESS:  I did not work on them.  There's --

4   it's possible I was copied on e-mails in that transition

5   period, but I don't recall.

6          THE COURT:  So you when you say you didn't work on

7   them, what do you mean?

8          THE WITNESS:  I don't -- I don't recall working on

9   anything but '14 or '15.

10         THE COURT:  Next question.

11  BY MR. ASONYE:

12  Q.   In effect, with respect to 2013, did you review or

13  approve the 2013 tax return for Mr. Manafort?

14  A.   No, I did not.

15  Q.   So with respect to the tax returns that are at issue in

16  this case, that are charged in this case, what is the one year

17  that you worked on?

18  A.   2014 and 2015.

19  Q.   Now, Mr. Downing asked you about DMP International's 2016

20  return.  Did you work on that return?

21  A.   No, I did not.

22  Q.   Did your firm work on that tax return?

23  A.   No, we did not.

24  Q.   Okay.  Have you ever seen that tax return before today?

25  A.   No, I have not.

─U.S. v. Manafort─

1052

1  Q.   And you indicated during your cross-examination that

2  $1.9 million from Telmar was apparently picked up as income in

3  that 2016 tax return, correct?

4  A.   That's correct.

5  Q.   Okay.  And did you recall when that 2016 tax return was

6  actually filed?

7  A.   I don't recall when it was actually filed.

8  Q.   If you could take a look at Defendant's two thousand- --

9  I'm sorry, Defendant's 4?

10 A.   Oh, sorry.  October 16, 2017.

11 Q.   Okay.  Now, when were you interviewed for the first time

12 in this investigation?

13 A.   I don't remember.  Maybe a year ago.

14 Q.   Was it -- was it prior to October 2017?

15 A.   I don't believe so.  I honestly don't remember.

16 Q.   Now, let me show you -- Mr. Downing asked you about

17 Defendant's Exhibit 2, and if we could actually put that up on

18 the ELMO.

19        And did you testify that you prepared this document?

20 A.   Yes.

21 Q.   Okay.  How did you prepare this document?

22 A.   It's just based on tax returns that are in the files for

23 those years for those entities.

24 Q.   And did those tax returns rely on the GL's that were

25 provided by Heather Washkuhn and her firm?

U.S. v. Manafort

1  A.   Presumably.

2         MR. DOWNING:  Objection, Your Honor.  How can a tax

3  return rely on a general ledger?

4         THE COURT:  I'll overrule the objection.  But you

5  may, of course, in a recross-examination, clarify that.  She's

6  answered the question.

7         MR. ASONYE:  Oh, I'm sorry.  I didn't -- I didn't

8  hear her response, Your Honor.

9         THE COURT:  Well, maybe I missed it as well.

10        You may re-ask it.

11 BY MR. ASONYE:

12 Q.   Okay.  Ms. Laporta, the tax returns that you -- that KWC

13 prepared, did they rely on the information on the GL's

14 provided by Heather Washkuhn and her firm?

15 A.   That's the initial representation of the activity for the

16 entities, the general ledger.

17 Q.   And if --

18        THE COURT:  Does that mean that everything is

19 accepted without question?

20        THE WITNESS:  No, it does not.

21        THE COURT:  Next question.

22 BY MR. ASONYE:

23 Q.   Now, if income wasn't included on the GL and the client

24 didn't tell you about it, was it reflected in the client's tax

25 return?

U.S. v. Manafort

1054

1  A.   And which tax year are we talking about?  I'm sorry to be

2  confused.

3  Q.   The -- let's just take 2014, the year that you signed for

4  Mr. Manafort.

5  A.   Okay.  Okay.

6  Q.   If you -- if you didn't see a payment or income on the GL

7  and -- or -- and Mr. Manafort didn't tell you about it, was it

8  reflected on his tax return?

9  A.   No, I don't think so, if I'm following correctly.

10  Q.   And, in fact, were you aware of any foreign accounts that

11  were under the control of Mr. Manafort?

12  A.   No, I was not ever aware of those foreign accounts.

13  Q.   So did your tax returns that you prepared reflect any

14  payments into those foreign accounts?

15  A.   No.

16  Q.   And if payments were made out of those foreign accounts

17  on behalf of Mr. Manafort to U.S. vendors, would that have

18  been reflected in your tax returns?

19  A.   If payments had been made from foreign accounts to

20  vendors?

21  Q.   If a payment was made from a foreign account that you

22  didn't know about to a U.S. vendor on Mr. Manafort's behalf,

23  would that have been reflected as income on the tax return

24  that you prepared?

25  A.   Well, I'm not completely following, but I think

U.S. v. Manafort

1055

1    if overseas accounts were used to pay vendors of the

2    company --

3    Q.   Vendors of Mr. Manafort, personal vendors for

4    Mr. Manafort?

5    A.   Oh, I didn't know of any.  And if they were, I don't know

6    if they'd be expenses on his behalf or --

7    Q.   So --

8    A.   -- it'd be -- it would be income.  What your -- I think

9    what the -- ultimately, if there was payments made from

10   another account, that income would need to be picked up

11   somewhere.

12   Q.   And you're not aware of any such payments, are you?

13   A.   No, I'm not.

14   Q.   So any such payments are not reflected on Defendant's

15   Exhibit 2, are they?

16   A.   That's correct.

17   Q.   And, in fact, let's look a little closer at Defendant's

18   Exhibit 2.

19         Now, if you -- Mr. Downing asked you about the total

20   amount of gross receipts between 2005 and 2015, and you said

21   92 million on the second page; is that right?

22   A.   Yes, that's correct.

23   Q.   Okay.  But I want you to actually focus on five

24   particular years, if we can do a little bit of addition

25   together.  If you could add the gross receipts for 2010

1056

1   through 2014 that was reported that you-all picked up, I'd

2   like you to tell the jury what the total of that is, okay?

3            So we're going to start for 2010.  And how much was

4   reported as gross receipts by Davis Manafort in 2010?

5   A.   Approximately $6.5 million dollars.

6   Q.   Okay.  Let me just keep track of that.

7            THE COURT:  What is this?

8            MR. ASONYE:  Your Honor, I'm just -- I'm just trying

9   to --

10           (Audience laughter.)

11           THE COURT:  You don't -- no, take it off of there.

12  You don't testify.

13  BY MR. ASONYE:

14  Q.   All right.  6.5 --

15           THE COURT:  Yes, all right is correct.

16           Go head, Mr. Asonye.

17  BY MR. ASONYE:

18  Q.   In 2011, how much is reported as gross receipts for Davis

19  Manafort Partners?

20  A.   5.3 million.

21  Q.   Okay.  So are we now at 11.8 million?

22  A.   Yes.

23  Q.   For 2012, how much is reported in gross receipts for DMP

24  International?

25  A.   Seven million-three.

1057

1  Q.   Okay.  So are we now at 19.1 million?  11.8 plus 7.3?

2  A.   That sounds right.

3  Q.   Okay.  And how much is reported for 2014 -- 2013?

4  A.   4.5 million.

5  Q.   Does that take you to 23.6 million approximately?

6  A.   Approximately.

7  Q.   And then the final year, how much is reported for DMP

8  International in 2014?

9  A.   7.4 million.

10  Q.   Does that get you to around 31 million?

11  A.   Right.

12  Q.   Okay.  Is that less than 60 million?

13  A.   Excuse me?

14  Q.   Is that less than $60 million --

15  A.   Yes.

16  Q.   -- for the one million that's reported?

17  A.   Yes.

18  Q.   Now, let me show you Defense Exhibit 3.  You were asked

19  about this as well.

20       And can you explain to the jury again what this

21  exhibit is?

22  A.   Yes.  This exhibit is a summary of loans that were made

23  from wire transfers during 2005 and 2015.  And we show the

24  dates and the amounts and which entities received those

25  monies -- that money.  And -- and then we show of those loans

U.S. v. Manafort

1058

1  how much was recognized in revenue, how much was distributed

2  to the patterns, how much was written off as a worthless

3  investment, and the year of -- the loans were repaid or

4  converted.

5  Q.   Okay.  So --

6            THE COURT:  Did you do this?

7            THE WITNESS:  Yes.

8            THE COURT:  Did you do this as what, in order to

9  help you get the return accurate?

10           THE WITNESS:  No, this was a request of the clients.

11           THE COURT:  From Mr. Gates?

12           THE WITNESS:  No, from Mr. Manafort.

13           THE COURT:  What was -- you may proceed.

14           MR. ASONYE:  Thank you, Your Honor.

15  BY MR. ASONYE:

16  Q.   I want to ask you first about some of the entities that

17  are listed on this exhibit.

18           THE COURT:  But is it accurate based on what you

19  saw?

20           THE WITNESS:  This was developed from tax returns

21  that were already filed.  So there were no judgments made here

22  in the preparation of this schedule.

23           THE COURT:  Next question.

24  BY MR. ASONYE:

25  Q.   Now, Yiakora Ventures Limited, do you see that, Yiakora

--------U.S. v. Manafort--------

1059

1    Ventures Limited, in the middle?

2    A.   Yes.

3    Q.   Okay.  What was your understanding of what that entity's

4    relationship with Davis Manafort Partners was?

5    A.   I believe -- and I wasn't familiar back in those years,

6    but I believe they were all -- they were all -- I didn't know

7    the relationship between them.  I'd be guessing.

8              I know the two I dealt with, Peranova and Telmar,

9    were customers of DMP International.

10   Q.   And you didn't understand Peranova to be controlled by

11   Mr. Manafort?

12             THE COURT:  You're leading.

13   BY MR. ASONYE:

14   Q.   Did you understand -- did you understand --

15             THE COURT:  What, if anything.

16   BY MR. ASONYE:

17   Q.   What, if anything, did you understand about whether

18   Peranova was controlled by Mr. Manafort?

19   A.   No -- no knowledge of that.

20   Q.   And what about for Yiakora?

21   A.   I don't -- I wasn't involved with Yiakora, I don't think.

22   Q.   And --

23   A.   I mean, I know I wasn't.

24   Q.   Now, there's a name at the top, Deripaska.  What, if

25   anything, did Mr. Manafort tell you about $10 million in loans

─────U.S. v. Manafort─────

1060

1    from Mr. Deripaska?

2    A.    Nothing.  We were just using numbers and maybe he came in

3    with some explanations or maybe they came from the general

4    ledger.  I don't remember where the client or customer listing

5    or entity where that was coming from.

6    Q.    What did Mr. Manafort tell you about a Russian NGO?

7    A.    Nothing.

8    Q.    Now, this -- the title of this document is called "Loans

9    From Wire Transfers."

10          Why did -- why did you label this document "Loans

11   From Wire Transfers"?

12   A.    We were going from what was reported on tax returns, the

13   balance sheets, as loans for each of these years.  So it was

14   simply every Schedule L for all the entities that are listed

15   here.

16   Q.    Now, the loans I asked you about from Deripaska, the

17   10 million and the 8 million from Yiakora, do you see that --

18   those loans ever being picked up as income in any subsequent

19   year?

20   A.    All I know are when Telmar was picked up as income.

21   Q.    But do you know of any time that the $10 million in loans

22   from Deripaska was picked up as income?

23   A.    I don't know that.  It would be in the recognized income

24   of 7 million.  And I don't have the details of that.  Oh,

25   wait.  That's not true.  7 million -- recognizes income.

U.S. v. Manafort

1061

1       And which two are you asking about?

2    Q.   Well, let's first start with Deripaska.

3    A.   Yes.

4    Q.   Do you see the $10 million purportedly loaned from

5    Deripaska ever being picked up as income?

6            THE COURT:  What do you mean by "ever"?

7            MR. ASONYE:  Ever.

8            THE COURT:  Well, have you seen any returns after

9    2016?

10           THE WITNESS:  No, I have not.

11           THE COURT:  All right.  So that's all she can say.

12   BY MR. ASONYE:

13   Q.   For any return that you've ever seen these loans

14   were made -- supposedly made in 2006?

15           THE COURT:  Well, if she hasn't seen a return, of

16   course, it isn't there.

17           MR. ASONYE:  For any return that she's worked on or

18   seen.

19           THE COURT:  All right.  That's an appropriate

20   question.  You may ask that.

21   BY MR. ASONYE:

22   Q.   Since 2006, have you seen the $10 million in supposed

23   loans from Deripaska being picked up as income?

24   A.   I'm sorry, I'm reading the disposition of those loans

25   over here in the columns to the right.  And it looks like the

─U.S. v. Manafort─

1062

1    loans were distributed, reported as distributions, and to

2    another partner, and there was a write-off of a worthless

3    security.

4            So I don't see it here where its been paid off, no.

5    Q.   And, in fact, if you look at your other -- the other

6    chart that you prepared, which was Mr. Manafort's income that

7    year -- if we could flash that up quickly -- Defendant's

8    Exhibit 2.

9            Do you see any income that is reported from

10   Deripaska?

11   A.   No, I don't see any.

12   Q.   And then let's take a look at Yiakora.  Is there

13   supposedly $1.969 million in loans from Yiakora on Defendant's

14   Exhibit 3; isn't that right?

15   A.   Yes.

16   Q.   And do you see that on Defendant's Exhibit 2 ever being

17   picked up as income?

18   A.   Well, if we can stick with the loan document, the

19   schedule I prepared on loans --

20   Q.   Sure.

21   A.   -- the 1.9, if you go to recognized income, it appears to

22   have happened and it says, "Year 2016 to be recognized in

23   income in 2016."

24   Q.   And when Mr. Downing showed you that 2016 tax return, did

25   you see that being picked up as income?

—U.S. v. Manafort—

1063

1  A.    I did not.

2  Q.    Now, Ms. Laporta, in order to call something a loan, do

3  you have to have an intent to actually repay it?

4  A.    Yes.

5  Q.    Can you call something a loan when it's actually income?

6  A.    No.

7  Q.    If you do that, if you call something a loan when its

8  income, is that fraud?

9  A.    It could be considered fraud.

10  Q.    Now, let me ask you, Mr. Downing asked you about the

11  Telmar loan, isn't that right, or supposed loan?

12  A.    That's correct.

13  Q.    Was Mr. Manafort's 2014 tax return accurate when he

14  called the $900,000 a loan and not income?

15  A.    No, it was not.

16  Q.    And so is -- was Mr. Manafort's 2014 tax return still

17  false for 2014 even if he picked it up as income two years

18  later?

19  A.    Yes, that's correct.

20           THE COURT:  Anything further?

21           MR. ASONYE:  Just a little bit, Your Honor.

22           THE COURT:  All right.

23  BY MR. ASONYE:

24  Q.    Mr. Downing -- do you recall when Mr. Downing asked you

25  about your representations to the bank about $2.4 million in

─────U.S. v. Manafort─────

1064

1    accrual income for Mr. Manafort?

2    A.   Yes, I do.

3    Q.   Okay.  And I think you said there's nothing inappropriate

4    about using an accrual P&L; is that correct?

5    A.   That's correct.

6    Q.   Now, to show as income on an accrual P&L --

7              THE COURT:  Go ahead and finish your question.

8              MR. ASONYE:  I haven't even finished my thought,

9    but, yes.

10   BY MR. ASONYE:

11   Q.   When is income recognized on an accrual basis P&L?

12             MR. DOWNING:  Objection, Your Honor.  The question

13   to Ms. Laporta earlier had to do with the cash basis P&L and

14   then accounts receivable.  I did not ask her a question about

15   an accrual based P&L.

16             THE COURT:  Well, I'll overrule the objection.  But

17   you might use those words.  It might be better, more accurate.

18   Go ahead, Mr. Asonye.

19   BY MR. ASONYE:

20   Q.   For an accrual based P&L, when is income recognized?

21   A.   In the year.

22             THE COURT:  Haven't we been over this?

23             Let's not --

24             (A pause in the proceedings.)

25             THE COURT:  Let us not cover ground that has already

1  been covered.

2  BY MR. ASONYE:

3  Q.   Did you receive any evidence that the $2.4 million was an

4  accounts receivable for Mr. Manafort?

5  A.   No, I did not.

6  Q.   Did you ask for it?

7  A.   Yes, I did.

8  Q.   And in that case were you dealing with Mr. Manafort

9  directly?

10  A.   Yes, I was.

11  Q.   And did you ever get it from him?

12  A.   No, I did not.

13  Q.   Did he tell you why?

14  A.   No.

15        MR. ASONYE:  Nothing further, Your Honor.

16        THE COURT:  Mr. Downing, any recross based on that?

17        MR. DOWNING:  Brief.

18        THE COURT:  All right, sir.  That's the magic word.

19                   **RECROSS-EXAMINATION**

20  MR. DOWNING:

21  Q.   Ms. Laporta, with respect to the questions that you were

22  just asked, the Schedule L is the balance sheet on a tax

23  return; is that correct?

24  A.   That is correct.

25  Q.   And the schedule you put together that you were just

———U.S. v. Manafort———

1066

1  talking about when it looked at the Schedule L's for the tax

2  returns for DMP and DMP International from '05 to '15,

3  correct?

4  A.    That is correct.

5  Q.    And can you explain from year to year on those

6  Schedule L's, do they have a beginning balance for the items

7  on the balance sheet?

8  A.    Yes, they do.

9  Q.    And do they have an ending balance?

10  A.    Yes, they do.

11  Q.    And as part of your preparation of the tax returns, a

12  balance sheet, in fact, has to balance, correct?

13  A.    That is correct.

14  Q.    And what does that mean?

15  A.    That the assets have to equal the liabilities and equity.

16  Q.    And with respect to a loan account, from a year-to-year

17  basis, for a loan to go off of the balance sheet, either

18  somebody had to repay it, correct?

19  A.    Yes.

20  Q.    Or it had to be reclassified; is that correct?

21  A.    That is correct.

22  Q.    They don't magically disappear, do they?

23  A.    No, they don't.

24           MR. DOWNING:  No further questions.

25           THE COURT:  All right.  Thank you.  You may step

———————U.S. v. Manafort———————

1067

1    down.  You may be excused.

2              Call your next witness.

3              (Witness excused.)

4              MR. ASONYE:  The Government calls Paula Liss.

5              MR. ZEHNLE:  Your Honor, may I be heard?

6              THE COURT:  Yes.  At the bench?

7              MR. ZEHNLE:  Yes.

8              THE COURT:  All right.  Keep Ms. Liss outside for

9    just a few minutes.

10             (Bench Conference.)

11             THE COURT:  Yes, Mr. Zehnle?

12             MR. ZEHNLE:  Good afternoon, Your Honor.

13             It is my understanding that through Special

14   Agent Liss that the Government intends to introduce Government

15   Exhibit 117.  That's what we were advised of.

16             And the defense has an objection to Government

17   Exhibit 117 both for relevancy under 401 and 403 analysis and

18   under -- you know, basically stating that it's irrelevant for

19   many, many purposes.

20             It's a composite exhibit.  It deals with more than a

21   dozen separate individuals and entities and purports to state

22   that no FBAR reports were filed for any of these individuals

23   or entities.

24             The defendant's objection --

25             THE COURT:  Let me get the report.

U.S. v. Manafort

1068

1        (A pause in the proceedings.)

2        THE COURT:  Tell me what you think these purport to

3 be, Mr. Zehnle.

4        MR. ZEHNLE:  These are essentially certifications

5 from the FinCEN, Financial Crimes Enforcement Network, stating

6 that a search was done for records relating to the filing of

7 foreign bank reports.  And it purports to do so for the period

8 of January 1, 2001 through May 25th of this year, 2018.

9        The defense's objection, Your Honor, is that in

10 Counts 11 through 14 of the superseding indictment, the

11 Government has charged Mr. Manafort, and Mr. Manafort alone,

12 for failing to file a foreign bank account report for each of

13 the years 2011, '12, '13, and '14.

14        So the basis for the objection are multiple.

15        Number one, out of these -- and I counted them, I

16 believe there's 14, Your Honor.  There's more than a dozen.

17 Out of more of a dozen of these records, the only ones that

18 relate to Mr. Manafort appears to be the first page of the

19 exhibit, Government 117.

20        In addition, the search purports to state that it

21 was done for a period going all the way back to 2001 and

22 continuing all the way up to May 25th of this year, 2018.

23 None of these things have relevance to the four charges

24 related solely to Mr. Manafort with respect to the failure to

25 file the FBARs.

─────U.S. v. Manafort─────

1        And, in fact, under 401 and 403 analysis, it seems

2   that the Government was trying to suggest that he had a duty

3   or a responsibility or an obligation to file these things

4   going back all these years when, in fact, no evidence has been

5   adduced to that whatsoever.

6        THE COURT:  What's your response?

7        MR. ASONYE:  Well, Your Honor, these are all --

8   these not only Mr. Manafort, but all his related entities.  We

9   just saw a chart where he's talking about, I guess, loans from

10  foreign sources for an account that is an affiliate of his.

11  We, of course, to check, A, to show that there was no absence

12  of mistake to show that:  Well, maybe his wife, another 50

13  percent partner, filed the FBAR.  We, of course, had to go and

14  check.  And in addition to --

15       THE COURT:  Well, maybe you had to check, but I'm

16  not sure it's admissible.  Because that -- these people are

17  not the ones accused of it.  And it has -- it has the effect

18  of -- a bit of a smear.  But you have already evidence in the

19  record that he checked "no" on his tax returns; is that right?

20       MR. ASONYE:  Yeah, but this is an independent and

21  different requirement.  The tax return is one requirement.

22  There's a separate statute of a partner that actually filed

23  the FBAR with a different agent.

24       Secondly, Your Honor --

25       THE COURT:  But it only accuses him of failing to do

——————U.S. v. Manafort——————

1070

1   it.

2          MR. ASONYE:  Well, the --

3          THE COURT:  Do you intend to argue that the

4   Government has not proven that because they didn't do it

5   on evidence -- that -- that John Hannah, LLC, did not file

6   a -- an FBAR?

7          MR. ZEHNLE:  Yes, Your Honor.  That's my point.

8   There's no evidence that's been adduced.

9          THE COURT:  No.  Do you intend to argue to the jury

10  that they failed because they didn't show that John Hannah,

11  LLC, did not file an FBAR?

12         MR. ASONYE:  Your Honor.

13         MR. ANDRES:  No, Your Honor.

14         (Court reporter interruption.)

15         THE COURT:  Yes, she can only get one of us at a

16  time.

17         MR. ASONYE:  Your Honor, the other thing that's

18  incredibly important here, the defense -- the parties just

19  agreed to a stipulation where we're going to get into the fact

20  that Mr. Manafort and one of his entities responded to the 31

21  subpoenas and these are Mr. Manafort's -- DMPs foreign

22  accounts.

23         And there's no FBAR filing for DMP as well.

24         THE COURT:  Well, let me see if I can get my

25  fingers -- or my arms around this.

U.S. v. Manafort

1        Who is John Hannah, LLC?  It's a name I've never

2   even heard in the case so far.

3        MR. ASONYE:  It is, Your Honor.  It's one of

4   Mr. Manafort's entities.  In fact, if I can grab that chart, a

5   number of entities received these foreign loans, supposed

6   foreign loans.

7        THE COURT:  Jesand Investments.

8        MR. ASONYE:  These are Manaforts.  And he is a

9   member of these entities or his children are a member of these

10  entities.  But most of them -- I believe all of them are.  But

11  there may be a way.  This is the first time we're hearing

12  about it.  I can tell you about the ones we care about, Your

13  Honor.

14       THE COURT:  All right.

15       MR. ASONYE:  We care about Paul Manafort, Kathleen

16  Manafort.  That's on their tax return.  They probably care

17  more about Rick Gates than we do, but -- Davis Manafort

18  matters and DMP International.  Davis Manafort Partners.

19  Those are the most important ones that are critical to this

20  case.  The evidence about all of those parties actually having

21  foreign accounts and controlling those accounts and that he

22  never filed a FBAR for any of those.  That's highly relevant.

23  The rest we can --

24       THE COURT:  Just a minute.  I want to get a copy of

25  the indictment.

U.S. v. Manafort

1    MR. ZEHNLE:  Your Honor, if you want to just look at

2  mine.

3        THE COURT:  No.

4        (A pause in the proceedings.)

5        THE COURT:  All right.  Mr. Zehnle --

6        MR. NANAVATI:  Yes, Your Honor.

7        THE COURT:  -- do you intend to argue that the

8  Government fails in its allegations on the FBAR, because they

9  didn't cover all of these various other entities?

10       MR. NANAVATI:  No, Your Honor.  My focus is really

11 if we had -- if they had produced a document that simply said

12 Mr. Manafort did not file -- there's no record of filing FBARs

13 for the years 2011 through 2014, we wouldn't be standing here.

14       THE COURT:  Well, you have that, don't you?

15       MR. ASONYE:  We have it for those -- no, we don't.

16 What we have, Your Honor, is each entity and they do one

17 search.  They cover an entire period.

18       THE COURT:  I don't care how they do it.  Do you

19 have evidence that Mr. Manafort didn't file FBARs on these

20 four years, which is the crime he's accused of committing?

21       MR. ASONYE:  Yes.  I mean, we have --

22       THE COURT:  All right.  Then let's offer that and

23 we'll end with that.

24       MR. ASONYE:  Your Honor, it's also absolutely

25 relevant that the company, DMP International did not --

U.S. v. Manafort

1073

1      THE COURT:  He's not accused of that.

2      MR. ANDRES:  He would be required on his tax return.

3   I believe this witness is going to testify it would have

4   been --

5      THE COURT:  All right.  I said that I'm only going

6   to allow one lawyer, but go ahead, Mr. Andres.  Go ahead.

7      MR. ANDRES:  I think the requirement would be that

8   because of his position at DMP, he would have had to file

9   those either himself or for his company.  So his -- he has an

10  obligation to file not just for himself but for his companies.

11  And so --

12     THE COURT:  Well, that's not alleged in the

13  indictment is the problem.  And do you intend to argue

14  anything about his entities having filed FBARs?

15     MR. ZEHNLE:  No, Your Honor.

16     THE COURT:  All right.  That's the way it's going

17  the stand.

18     MR. ANDRES:  Understood.

19     THE COURT:  I'm going to sustain the objection.  You

20  are limited to these four years and the failure of him and his

21  wife, I think -- doesn't she jointly file with him?

22     MR. ASONYE:  Yes.

23     THE COURT:  It's a joint return.

24     MR. ZEHNLE:  The only point I would make in that

25  regard, Your Honor, is that these are done on -- excuse me --

─────U.S. v. Manafort─────

1   the FinCENs are done on an individual basis.  And they didn't

2   charge anything in there with respect to Mrs. Manafort.  Or --

3   I mean, there's individuals in here and there's also entities

4   that they are doing this for and they are doing it for a long

5   period of time.

6            THE COURT:  Yes.  I think you've made your point

7   clear and I've accepted it.  I'm not going to allow them to

8   put on evidence that they've not done it for 15 years.

9            I'm going to allow them to show that he didn't file

10  the FBAR on 2011, 2012, 2013, and 2014, because that's what's

11  alleged in the indictment.  And if -- if you want to show

12  that, you may do it.  How you do it is entirely up to you.

13           MR. ASONYE:  I think -- well, I obviously can't do

14  it from the exhibit, Your Honor.  It's becomes the longer

15  periods --

16           THE COURT:  Yes, but you could maybe ask the person

17  to look -- I'm not going to tell you how to try your case, but

18  I think you have evidence.  You just need to present it.  And

19  you're not required to go ahead with this witness.

20           MR. ASONYE:  Well, Your Honor, may I -- I can either

21  lead her or just have one minute with her to make her clear of

22  the Court's ruling on where we can go.  That will probably

23  solve the issue.

24           THE COURT:  All right.  Well, I'll let you lead --

25  well, did -- did he file -- does the record show that he filed

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

U.S. v. Manafort

1075

1  an FBAR for the years 2012, '13, '14, '15?  Yes or no?

2  MR. ASONYE:  Yes, I just -- she's --

3  THE COURT:  And she can rely on this record to make

4  that statement.  Don't you agree?

5  MR. ZEHNLE:  I'm fine with that, Your Honor.

6  THE COURT:  Let's do it.

7  MR. ASONYE:  I just -- she's prepped a number of

8  times for the whole thing, so it may not --

9  THE COURT:  That's her problem.  Don't let her

10  answer.  I don't want to take a recess at this time.

11  MR. ANDRES:  I agree.

12  THE COURT:  Because then we have a long witness,

13  right?  We do, don't we?

14  MR. ANDRES:  Yes.

15  THE COURT:  That's your witness?

16  MR. ANDRES:  Yes.

17  THE COURT:  All right.  Let's proceed.

18  MR. ZEHNLE:  Thank you, Your Honor.

19  THE COURT:  For the record -- just a moment.

20  For the record, the objection is sustained, but the

21  Government is permitted to offer evidence based on the search

22  that relates to the matters that were listed in the

23  indictment.

24  MR. ZEHNLE:  Understood.

25  THE COURT:  And the sustained -- and it's not

─U.S. v. Manafort─

1076

1  relevant, all of those other things.  And there is a 403

2  problem with doing it that way.  They can convict him for

3  years that he's not alleged to have violated in the

4  indictment.  So that is why I'm doing it.  Let's proceed.

5          (End of bench conference.)

6          THE COURT:  All right.  Mr. Asonye, you may proceed

7  in accordance with the Court's ruling, which focuses sharply

8  on what is in the indictment.

9          MR. ASONYE:  The Government calls Paula Liss.

10          THE COURT:  All right.

11          Come forward and take the oath, please, ma'am.

12          Thereupon,

13                          **PAULA LISS,**

14  having been called as a witness on behalf of the Government

15  and having been first duly sworn by the Deputy Clerk, was

16  examined and testified as follows:

17          (Witness seated.)

18          THE COURT:  All right.  You may proceed, Mr. Asonye.

19                    **DIRECT EXAMINATION**

20  BY MR. ASONYE:

21  Q.   Good afternoon.  Could you please state and spell your

22  last name for the record?

23  A.   My name is Paula Liss, L-i-s-s.

24  Q.   And how far did you go in school?

25  A.   I have a bachelor's degree in accounting.

U.S. v. Manafort

1077

1  Q.   Do you have any certifications?

2  A.   Yes.  I'm a certified fraud examiner and a certified

3  anti-money laundering specialist.

4  Q.   And, Ms. Liss, if you could scoot up and just speak a

5  little bit closer into the microphone, that will -- that will

6  help some of us who are getting up in age, myself.

7            So do you -- where do you work?

8  A.   I work at the Financial Crimes Enforcement Network,

9  commonly known as FinCEN.

10 Q.   And what Government agency is FinCEN part of?

11 A.   FinCEN is a Bureau of the Treasury Department.

12 Q.   What does FinCEN do?

13 A.   FinCEN's mission is to protect the U.S. financial system

14 from money laundering, terrorist financing, and other illicit

15 use through the collection --

16            THE COURT:  Can we get immediately to the

17 straightforward question?  There's no money laundering in this

18 case alleged.

19 BY MR. ASONYE:

20 Q.   Where do you -- what's your position at FinCEN?

21 A.   I'm a senior special agent.

22 Q.   And what are your duties?

23 A.   Part of my duties are to search records maintained in

24 FinCEN's database, testify as custodian of record.

25 Q.   And are you familiar with a report of foreign bank

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

—————U.S. v. Manafort—————

1078

1   account -- bank and financial accounts?

2   A.   Yes.

3   Q.   Is that also called the FBAR?

4   A.   Yes.

5   Q.   Okay.  What is that?

6   A.   An FBAR is required when a U.S. person has a financial

7   interest in or signature or other authority over one or more

8   foreign financial accounts when aggregated exceed $10,000 at

9   any time during a calendar year.

10  Q.   And is the FBAR reporting requirement separate from the

11  requirement to disclose a foreign bank account on an

12  individual tax return?

13  A.   Yes.

14  Q.   When during the year is the deadline to file an FBAR if

15  you are required to do so?

16  A.   It's April 15th of the year following the activity.

17  Q.   Now, when was the deadline to file an FBAR in tax years

18  2011 through 2014?

19  A.   It was June 30 of the following year.

20  Q.   Now, if a person has an obligation to file a FBAR, how is

21  it actually filed?

22  A.   Electronically.

23  Q.   Was there a time that it could be mailed?

24  A.   Yes.

25  Q.   When was that?

U.S. v. Manafort

1079

1  A.   It could be mailed prior to June 30, 2013.

2  Q.   And if it was mailed, who was the FBAR mailed to?

3  A.   It was mailed to the IRS.

4  Q.   Are you familiar with the way that FinCEN keeps records

5  of FBARs?

6  A.   Yes.

7  Q.   And generally how does FinCEN keep those records?

8  A.   They are maintained electronically.

9  Q.   And do you have access to those electronic records?

10  A.   Yes, I do.

11  Q.   Were you asked to conduct a search for FBAR filings in

12  this case?

13  A.   Yes.

14  Q.   And did you conduct a FBAR filing search for Paul

15  Manafort, the defendant?

16  A.   Yes.

17  Q.   Let me show you what's marked as Government Exhibit 117

18  in your binder.

19         THE COURT:  I thought we discussed that at the

20  bench.

21         MR. ASONYE:  I just want her to see it.

22         THE COURT:  Just ask her the question as we

23  discussed at the bench.  Let's get it done.

24         MR. ASONYE:  Trying, Your Honor.

25         THE COURT:  Well --

──────U.S. v. Manafort──────

1080

1  BY MR. ASONYE:

2  Q.   Did you -- did you conduct a search of whether Paul

3  Manafort filed an FBAR for the tax years 2011, 2012, 2013, and

4  2014?

5  A.   Yes.

6  Q.   And who conduct -- who asked you to conduct that search?

7  A.   The U.S. government.

8  Q.   And what were the results -- what did you find for those

9  tax years?

10  A.   There were no FBARs in FinCEN's system of record.

11        MR. ASONYE:  Thank you.

12        THE COURT:  Any cross-examination?

13        MR. ASONYE:  Actually, Your Honor, may I have one

14  moment, Your Honor.

15        THE COURT:  Yes, you may.

16        (A pause in the proceedings.)

17        MR. ASONYE:  Your Honor, may we approach?  There's a

18  question about the Court's ruling.

19        THE COURT:  All right.  Yes, you may.

20        (Bench Conference.)

21        THE COURT:  What's the question?

22        MR. ASONYE:  The question is whether we're allowed

23  to ask about any FBAR filings for Kathleen Manafort during the

24  same period?  We understood that we were allowed to do so,

25  Your Honor.

U.S. v. Manafort

1081

1      THE COURT:  Any objection to that?

2      MR. ZEHNLE:  Your Honor, I was just asking for

3  clarification.  I thought initially it was just the husband.

4      THE COURT:  I did, but as long -- they filed joint

5  returns --

6      MR. ZEHNLE:  I'm okay with it, Your Honor.

7      THE COURT:  Let's return.

8      (End of bench conference.)

9      THE COURT:  All right.  You may proceed.

10 BY MR. ASONYE:

11 Q.  And, Ms. Liss, for the same period, 2011, 2012, 2013, and

12 2014, did your search yield any results for FBAR filings for

13 Kathleen Manafort, the defendant's wife?

14 A.   There were no FBARs in FinCEN's system of record.

15      THE COURT:  I didn't hear you.

16      THE WITNESS:  There were no FBARs in FinCEN's system

17 of record.

18      THE COURT:  Thank you.  Cross-examination.

19      MR. NANAVATI:  Yes, briefly, Your Honor.

20                    **CROSS-EXAMINATION**

21 BY MR. ZEHNLE:

22 Q.   Good afternoon, Agent Liss.  My name is Thomas Zehnle,

23 and I represent Paul Manafort in this case.

24 A.   Good afternoon.

25 Q.   I just wanted to go over a little bit of your testimony a

─U.S. v. Manafort─

1082

1    moment ago.  You are familiar with the FBAR, correct?

2    A.   Yes.

3    Q.   Okay.  And I think you testified that in the past it used

4    to be filed on June 30th of the following year; is that

5    correct?

6    A.   That's correct.

7    Q.   And that was not the same time obviously as income tax

8    returns were generally due, correct?

9    A.   That's true.

10   Q.   And then it's also now changed to a system whereby it's

11   done electronically; is that correct?

12   A.   Yes.

13   Q.   And in the past it could have been mailed in by paper,

14   right?

15   A.   True.

16   Q.   And that was sent to the Detroit center; wasn't that

17   correct?

18   A.   Yes.

19   Q.   Okay.  Now, just in terms of the FBAR so we can clarify

20   this, there are a number of elements that need to be satisfied

21   before a person, a U.S. person, is required to file an FBAR;

22   is that correct?

23   A.   Yes.

24   Q.   And so one of those elements would be that it has to be a

25   United States person, correct?

U.S. v. Manafort

1083

1   A.   Yes.

2   Q.   And a person can be more than just an individual, right?

3   A.   That's correct.

4   Q.   It can be a corporation, correct?

5   A.   Yes.

6   Q.   A U.S. domestic corporation has to file.

7        And the U.S. person has to have a financial interest

8   in the account; is that correct?

9   A.   That's one of the ways.

10  Q.   And another way is that they have signature authority

11  over the account?

12  A.   Yes.

13  Q.   Okay.  And then there's a definition of what is a foreign

14  financial account, correct?

15  A.   Yes.

16  Q.   And a financial account can mean more than just a bank

17  account, right?

18  A.   That's correct.

19  Q.   It can be a securities account, right?

20  A.   Yes.

21  Q.   It could be an insurance policy with a cash or

22  undervalue, right?

23  A.   Yes.

24  Q.   There are a number of definitions that deal with what a

25  foreign financial institution is, correct?

1084

1  A.    That's correct.

2  Q.    Okay.  And then you also said something about aggregating

3  the amounts.  And how amounts are aggravated in order to meet

4  the $10,000 threshold, there are regulations on that as well,

5  correct?

6  A.    Yes, there's guidance on that as well.

7  Q.    And there are practical issues because if it's a foreign

8  financial account, it might be in currency that's different

9  than U.S. dollars, of course?

10  A.    Yes.

11  Q.    Okay.  So in terms of a corporation's filing

12  requirements, and an individual who owns a corporation, what

13  is the rule in terms of ownership of the corporation in order

14  to require the filing of an FBAR?

15  A.    I'm not sure I understand your question.

16  Q.    Okay.  That was probably my inartful question.

17          How much ownership does a person have to have in a

18  corporation in order to be required to file an FBAR on behalf

19  of that corporation?

20  A.    The corporation may have its own filing requirement, and

21  then an individual may have their own filing requirement if

22  they own, directly or indirectly, more than 50 percent of the

23  company.

24  Q.    That is, it's more than 50 percent, correct?

25  A.    That's correct.

U.S. v. Manafort

1085

1  Q.   So if it's 50 percent ownership or less, they have no

2  filing requirement?

3  A.   Well, you have to take into consideration if they may

4  indirectly own some of that as well.

5  Q.   Okay.  So if you take that into account and they don't

6  have indirect ownership of it, if it's 50 percent or less,

7  there is no FBAR filing requirements?

8  A.   For the individual who owned something in the company,

9  that's correct.  Others may have a filing requirement because

10 multiple people can have a filing requirement on one account.

11 Q.   Okay.

12         MR. ZEHNLE:  Nothing further, Your Honor.

13         MR. ASONYE:  Your Honor, I believe he's opened the

14 door on some of the --

15         THE COURT:  I'm sorry?

16         MR. ASONYE:  May we -- I can -- we can approach on

17 this, but we believe his cross opened the door on at least one

18 or two additional filings.

19         THE COURT:  I don't agree.  I can see that.  It's

20 done.  But come to the bench anyway.

21         (Bench Conference.)

22         THE COURT:  Mr. Zehnle, do you intend to argue that

23 any entities -- well, that Paul Manafort or his wife did not

24 file FBARs because they didn't have 50 percent of a company?

25         MR. ZEHNLE:  No, Your Honor.

U.S. v. Manafort

1    MR. ASONYE:  Your Honor, he just basically made the

2  argument.  Because their evidence in this case is if a person

3  who doesn't necessarily own 50 percent of DMP, therefore

4  implying that he has no filing responsibility.  He also went

5  deeply into personal --

6    THE COURT:  But they're not accused of failing to

7  file.  We're only focused on his obligation to file.  You

8  could have indicted him for more, but you didn't.

9    MR. ASONYE:  Then, Your Honor, then he expanded in

10  the area and went into this --

11    THE COURT:  Yes, but he's entitled -- he's entitled

12  to -- what he did in cross-examination is to make clear that

13  if he doesn't own 50 percent of a company, he doesn't have to

14  file.  If he does own more than 50 percent, then he and the

15  company have to file, but the company hasn't been indicted.

16  Only he has been indicted.

17    So he's entitled to argue that for any company that

18  he only owned 50 percent of, there was no FBAR requirement.

19  Well, that's what he wants to argue.  Am I correct?

20    MR. ZEHNLE:  Correct, Your Honor.

21    MR. ASONYE:  And to be clear, Your Honor, in 2010

22  and in 2011, Mr. Manafort owned 100 percent of Davis Manafort

23  Partners.

24    THE COURT:  Well, do you have evidence to that?

25    MR. ASONYE:  It's already in evidence.

1    THE COURT:  Well, then don't worry about it.

2    MR. ASONYE:  Well, Your Honor, that's what we were

3  going to ask her now.  That opened the door on that issue.  If

4  Mr. Manafort had 100 percent ownership in Davis Manafort

5  Partners, did he have an FBAR requirement and so did Davis

6  Manafort.

7    THE COURT:  Yes, but you don't have to -- his

8  failure to file is all you can prosecute because of your

9  indictment.  You cannot prosecute that Davis Manafort

10  Partnership didn't file.

11    Do you understand what I'm saying?

12    MR. ASONYE:  I understand what you're saying, Your

13  Honor.  I just vigorously disagree that he has now opened that

14  issue now by --

15    THE COURT:  Well, then you lose the argument.  I'm

16  going to permit you to offer as much evidence as you would

17  like that he had an obligation to file and that he didn't

18  file.  That is what's in exhibits -- or in the counts 11

19  through 14.  The fact that some partnership or some company

20  didn't file, no.  But if you have shown that he owns more than

21  50 percent of the company, then he had an obligation to file.

22  Not for the company, but on his own.

23    MR. ASONYE:  And, Your Honor, we're going to do that

24  now.  I'm going to ask her that on redirect then.

25    THE COURT:  All right.  You can do that on redirect,

U.S. v. Manafort

1088

1  but it can only focus on him.  Do you understand that?

2          MR. ASONYE:  On Mr. Manafort, understood.

3          MR. ZEHNLE:  Your Honor, if I might just be heard on

4  this.  I was -- I was very careful in the way I asked the

5  questions, simply talking about the element of what's required

6  for the filing of an FBAR.  Mr. Asonye seems like he wants to

7  bring this into a direct discussion of Mr. Manafort's

8  obligations.  I was only asking:  What are the elements that

9  are necessary because the jury needs to know that this is a

10  complicated process.  This isn't just something where it's

11  like, oh, gee, I've got a foreign account and I have to file.

12          THE COURT:  Well, the other --

13          Mr. Flood, let's have the noise in the courtroom

14  kept down, please.

15          THE CSO:  Stop talking.  Court is in session.

16          THE COURT:  Again, I want to emphasize that

17  Mr. Manafort has been indicted for failing to file FBARs for

18  four years, and that is the sharp focus.  Now, it's come out

19  that he does have an obligation to file an FBAR if he owns

20  more than 50 percent of a company that had that obligation.

21  The company would have to file it and the individual would

22  have to file it.  I think that's right.

23          MR. ASONYE:  That's correct.

24          THE COURT:  And so what is it, Mr. Zehnle, that you

25  would object to if he emphasizes that point he asks on

U.S. v. Manafort

1   redirect.  All he would ask is if Mr. Manafort owns more than

2   50 percent, he has to file an FBAR.

3           MR. ASONYE:  I mean, Your Honor, the question I

4   would ask is:  For 2010 and 2011, Mr. Manafort owned 100

5   percent of Davis Manafort Partners and DMP foreign bank, did

6   he have an obligation to file a FBAR?

7           THE COURT:  Any objection to that?

8           MR. ZEHNLE:  Well, only to the extent, Your Honor --

9   not on that particular point, but only to the extent that it

10  assumes that all the other elements that I just discussed with

11  this witness --

12          THE COURT:  That's a matter of argument.  I'll

13  permit you to ask that question and then we're done.

14          Let's proceed.

15          MR. NANAVATI:  Thank you, Your Honor.

16          (End of bench conference.)

17          THE COURT:  All right.  You may proceed in

18  accordance with the ruling at the bench.

19          MR. ASONYE:  Okay.  One moment, Your Honor.

20                     **REDIRECT EXAMINATION**

21  BY MR. ASONYE:

22  Q.   Ms. Liss, if in 2010 and 2011 Davis Manafort Partners had

23  a foreign bank account with more than $10,000 in it and

24  Mr. Manafort owned 100 percent of that company, would he have

25  an FBAR filing requirement in 2010 and 2011?

U.S. v. Manafort

1  A.   It sounds like it, yes.

2  Q.   I'm sorry?

3  A.   Yes, yes.

4        MR. ASONYE:  No further questions.

5        THE COURT:  Any cross?

6        MR. ZEHNLE:  No, Your Honor.

7        THE COURT:  Thank you.  You may step down.  You may

8  be excused.

9        (Witness excused.)

10       THE COURT:  All right.  Call your next witness,

11 please.

12       MR. ANDRES:  The Government calls Richard Gates.

13       THE COURT:  Come forward and take the oath, please,

14 sir.

15       Thereupon,

16                    **RICHARD GATES,**

17 having been called as a witness on behalf of the Government

18 and having been first duly sworn by the Deputy Clerk, was

19 examined and testified as follows:

20       (Witness seated.)

21       MR. ANDRES:  May I inquire, Judge?

22       THE COURT:  Just a moment, please.

23       MR. ANDRES:  Sure.

24       THE COURT:  Thank you.  Proceed, Mr. Andres.

25                 **DIRECT EXAMINATION**

U.S. v. Manafort

1091

1  BY MR. ANDRES:

2  Q.   Please state your name and spell your last name for the

3  record.

4  A.   Yes, Rick Gates, G-a-t-e-s.

5  Q.   How old are you, Mr. Gates?

6  A.   46 years old.

7  Q.   Where do you live?

8  A.   Richmond, Virginia.

9  Q.   Are you married?

10  A.   I am.

11  Q.   Do you have children?

12  A.   I do.

13  Q.   How many children?

14  A.   I have four children.

15  Q.   Can you describe your educational background, starting

16  with college?

17  A.   Yes.  I received my bachelor of arts from the College of

18  William and Mary in 1994, and then I received a masters in

19  arts and public policy in 2001.

20  Q.   Have you served in the military?

21  A.   I did.

22  Q.   In what capacity?

23  A.   I was in the Virginia Army National Guard.

24  Q.   Were you discharged?

25  A.   I was.

─U.S. v. Manafort─

1092

1  Q.   What was the nature of your discharge?

2  A.   Honorable.

3  Q.   Since graduating from college, what field have you worked

4  in?

5  A.   Primarily political affairs.

6  Q.   And can you tell us -- briefly describe what jobs you've

7  held?

8  A.   Yes.  Since graduating from university, I first served

9  with a lobbying firm called Black, Manafort Stone and Kelly.

10  I then went to work for a company called GTECH Corporation.

11  That was followed by a company called Business Strategies and

12  Insight, then went to work for Scientific Games followed by my

13  employment at Davis Manafort Partners, and then I worked for

14  one of the presidential campaigns most recently.

15  Q.   Do you know Paul Manafort?

16  A.   I do.

17  Q.   How do you know Mr. Manafort?

18  A.   I worked for Mr. Manafort from 2006 to 2016.

19  Q.   When did you first meet Mr. Manafort?

20  A.   I first met Mr. Manafort when I was an intern at his

21  firm, Black, Manafort, Stone and Kelly in 1995.

22  Q.   Can you explain the circumstances under which you met

23  Mr. Manafort?

24  A.   Yes.  I was an intern at the time.  Mr. Manafort was

25  hosting a Christmas party at his house.

U.S. v. Manafort

1093

1  Q.   And you testified that you worked at Black, Manafort,

2  Stone and Kelly.  What is that?

3  A.   That is a bipartisan political lobbying firm that was

4  based in Alexandria, Virginia.

5  Q.   And when you worked there, who did you principally work

6  for?

7  A.   At that time, it was one of the named partners, Charlie

8  Black and Rick Davis.

9  Q.   Was Mr. Manafort a named partner?

10  A.   He was.

11  Q.   Did you work with him during that time period?

12  A.   No, I did not.

13  Q.   And over what period of time did you work at Black,

14  Manafort, Stone and Kelly?

15  A.   From 1995 to 1997.

16  Q.   Let me direct your attention to 2006.

17       Did you start a new job in that year?

18  A.   I did.

19  Q.   What month of that year did you start the job?

20  A.   October of 2006.

21  Q.   And where did you go to work?

22  A.   Davis Manafort Partners.

23  Q.   And what is Davis Manafort Partners?

24  A.   It is a -- it was a political lobbying company that also

25  did work in electoral campaigns.

U.S. v. Manafort

1094

1   Q.   Did you work with Mr. Manafort at Davis Manafort

2   Partners?

3   A.   I did.

4   Q.   Okay.  At some point, did the name of the firm change?

5   A.   It did.

6   Q.   Can you explain why it changed and when?

7   A.   Yes.  The two named partners went their separate ways.  I

8   believe the name changed in 2012.

9   Q.   And what was it changed to?

10  A.   DMP International LLC.

11  Q.   And who owned, as far as you knew, DMP International?

12  A.   Mr. Manafort.

13  Q.   During this time period, from 2006 to 2016, who did you

14  report to?

15  A.   Mr. Manafort.

16  Q.   And what type of work did you do?

17  A.   I did primarily work on political electoral campaigns and

18  then the firm also, at that time, had a private equity fund

19  that it was working on.

20  Q.   Did you work internationally?

21  A.   I did.

22  Q.   Where specifically?

23  A.   Primarily in Ukraine.

24  Q.   Anywhere else?

25  A.   In Cyprus as well.

———U.S. v. Manafort———

1  Q.   While you were working for Mr. Manafort, from 2006 to

2  2016, did your responsibility change over time?

3  A.   It did.  Over the years, my responsibilities increased.

4  As well, we had a number of employees that left the firm over

5  time.  So with less employees, I acquired more of the work.

6  Q.   What was the process or protocol during that time by

7  which you kept Mr. Manafort up to date on your activities?

8  A.   Yes, we typically had calls, e-mail exchanges throughout

9  the week.  But that usually culminated in kind of an agenda

10 process where either Mr. Manafort or I would prepare an

11 agenda, and then the other would add items to the agenda to go

12 through kind of on a weekly or biweekly basis.

13 Q.   During the course of the time that you worked for

14 Mr. Manafort, did you learn about his educational background?

15 A.   I did.

16 Q.   Was that -- did you learn about that as part of your work

17 for Mr. Manafort?

18 A.   Yes.

19 Q.   How?

20 A.   In -- as part of my job, I had to put together

21 presentations to describe the firm, and as part of that, I

22 would take and put the bios into the experience that the

23 principals had at the time.

24 Q.   And what did you learn about where Mr. Manafort went to

25 school?

U.S. v. Manafort

1096

1   A.   He went to Georgetown University.

2   Q.   And did he have any additional education?

3   A.   And then he went to Georgetown University of law school

4   following that.

5   Q.   Do you know if Mr. Manafort practiced as a lawyer?

6   A.   I don't know.  I don't know.

7   Q.   Do you know if he had any -- took any continuing legal

8   education courses?

9   A.   I believe he took continuing legal education courses.

10   Q.   How did you know that?

11   A.   I recall, at one point, Mr. Manafort describing that he

12   had to take some classes in continuing legal education.

13   Q.   During the time that you worked for Mr. Manafort, how

14   often would you communicate with him?

15   A.   Very frequently.  I wouldn't say daily, but I mean,

16   sometimes more than a few times a day and then other times

17   throughout the week.

18   Q.   How did you communicate with him?

19   A.   By e-mail, phone, and text.

20   Q.   Did you meet with him in person?

21   A.   I did.

22   Q.   Where would you meet with him?

23   A.   Initially, we met at our Alexandria office until we no

24   longer had the office.

25         And then I would also meet with him at his house in

1  Alexandria, Virginia.

2           And then later, his condo in Alexandria, Virginia.

3           And then we also had a office temporarily in New

4  York, and also in his New York apartment.

5  Q.   In addition to having a professional relationship with

6  Mr. Manafort, did you socialize with him?

7  A.   No, outside of business, we didn't, you know, socialize.

8  I was an employee of the firm.  And I kind of, you know -- I

9  believe Mr. Manafort viewed me as an employee of the firm, but

10 our work was mainly professional.

11 Q.   During the time that you worked for Mr. Manafort, were

12 you involved in criminal activity?

13 A.   Yes.

14 Q.   Did you commit crimes with Mr. Manafort?

15 A.   Yes.

16 Q.   Were you indicted for some of those crimes?

17 A.   I was.

18 Q.   Were you arrested?

19 A.   I was.

20 Q.   When were you arrested?

21 A.   In October of 2017.

22 Q.   Did you make a decision about how you wanted to resolve

23 those charges?

24 A.   I did.

25 Q.   What decision did you make?

U.S. v. Manafort

1098

1  A.    I made the decision to plead.

2  Q.    And when did you plead guilty?

3  A.    In February of 2018.

4  Q.    As part of your guilty plea, did you enter into a written

5  agreement with the Government?

6  A.    I did.

7  Q.    Does that agreement contain all the terms of your

8  agreement with the Government?

9  A.    Yes.

10  Q.    Do you have a binder in front of you?  Two binders.  The

11  binder that starts with Tabs 2F to 326.

12          Can I ask you to look at Government Exhibit 2F?

13          Can you tell me what that is?

14  A.    This is a copy of my plea agreement.

15          MR. ANDRES:  Your Honor, I'd like to admit that.

16          THE COURT:  2F, did you say?

17          MR. ANDRES:  Yes, Judge.

18          THE COURT:  Come quickly to the bench, please.

19          (Bench Conference.)

20          THE COURT:  I want to be clear.  I'm not sure I am

21  clear.  He didn't plead guilty in this case, did he?

22          MR. ANDRES:  No.

23          THE COURT:  This plea agreement isn't in the form

24  I'm accustomed to.  That doesn't mean anything, but he pled

25  guilty to a criminal information?

U.S. v. Manafort

1099

1    MR. ANDRES:  Yes.

2    THE COURT:  And the criminal information was in the

3    D.C. case?

4    MR. ANDRES:  Correct.

5    THE COURT:  And so am I correct that when the time

6    comes for an assessment of whether he has provided substantial

7    assistance and whether he's been truthful, that's not a

8    judgment I will make.  It's a judgment that the judge in the

9    District of Columbia will make?

10   MR. ANDRES:  Correct.

11   THE COURT:  All right.

12   Yes?

13   MR. DOWNING:  Well, I've been in multi-district

14   prosecutions before, and I think, generally, the judge in D.C.

15   will pay deference to your thoughts on the testimony.

16   THE COURT:  Perhaps.

17   MR. DOWNING:  I mean, I've seen it before, Your

18   Honor.

19   THE COURT:  Well, it isn't something that really is

20   of immediate concern.  It does bother me a bit, but that's the

21   way it's happened and we'll deal with it.

22   Ultimately, it's her judgment as to whether he has

23   provided substantial assistance.  And it's her judgment, as to

24   how much that should count and how that should reduce his

25   sentence.  I assume you're going to ask him whether he's been

U.S. v. Manafort

1100

1    sentenced yet.  And I don't see that she's obligated at all to

2    communicate with me or ask me my views.

3              So I'm not sure it works that way.

4              MR. DOWNING:  Okay.

5              THE COURT:  If she calls me, I'll give her my views.

6              MR. ANDRES:  And, Judge --

7              THE COURT:  The problem with that is that it isn't

8    out in the open.  She has to explain or give some speculation

9    of why she thinks there's been substantial assistance and why

10   she thinks that quantum of substantial assistance warrants the

11   required reduction that she orders that's required.

12             Your brow is furrowed.

13             MR. ASONYE:  I'm sorry, Your Honor, I'm just

14   listening.

15             MR. ANDRES:  You're pleasantly listening.

16             THE COURT:  Yes, your brow wasn't furrowed, his was.

17             But anyway, I just wanted to be clear.  He didn't

18   plead here.

19             MR. ANDRES:  Judge, just here is the full scale of

20   the record.  And to the extent that -- I know you're not

21   implying this.  It's not like we chose to let him plea in one

22   place or the other.

23             THE COURT:  Oh, of course not.  I'm not implying

24   that.

25             MR. ANDRES:  The case is much more developed.  It

U.S. v. Manafort

1101

1  went -- the only reason we came here, the defendant, as he's

2  entitled to, decided not to waive in that other court.

3           Your Honor, Mr. Gates wasn't indicted in the Eastern

4  District of Virginia and Your Honor dismissed the indictment

5  against him at the Government's request, and that's a term of

6  his plea agreement, which I will elicit.

7           THE COURT:  All right.  Any objection to any of

8  that?

9           MR. DOWNING:  No.

10          THE COURT:  Let's go.

11          (End of bench conference.)

12          THE COURT:  All right.  Mr. Andres, you may proceed.

13          MR. ANDRES:  Your Honor, the Government moves to

14  admit Government Exhibit 2F.

15          THE COURT:  All right.  Without objection?

16          MR. DOWNING:  Without objection.

17          THE COURT:  It's admitted.

18                          (Government's Exhibit No. 2F

19                          admitted into evidence.)

20          MR. ANDRES:  May I publish that, Judge?

21          THE COURT:  Yes, you may.

22  BY MR. ANDRES:

23  Q.   Mr. Gates, can I ask you, again, to look at Government

24  Exhibit 2F and tell me what that is?

25  A.   Yes, this is a copy of my plea agreement.

1  Q.   Okay.  And can I ask you, first, to look at the last

2  page?

3            Did you sign that agreement?

4  A.   I did.

5  Q.   And did your lawyer sign it?

6  A.   He did.

7  Q.   And if I could ask you to look at the preceding page, is

8  it also signed by the Government?

9  A.   It is.

10  Q.   Do you see in the bottom corner, there's writing on each

11  page?

12  A.   Yes.

13  Q.   What is that?

14  A.   Those are my initials with the date.

15  Q.   And why did you initial and date each page?

16  A.   I was requested by the judge to do so in order to make

17  sure that I read every page.

18  Q.   Okay.  Let me ask you to turn, again, to the first page

19  of the --

20            THE COURT:  Let me ask one further question.

21            MR. ANDRES:  Sure.

22            THE COURT:  If you'd come up quickly, please.  It's

23  very minor, but I want to be sure.

24            (Bench Conference.)

25            THE COURT:  I haven't had the opportunity to read it

U.S. v. Manafort

1103

1    thoroughly.  In virtually every plea agreement in this

2    district, there is an obligation to submit to a polygraph.

3            Is there any reference to a polygraph?  Because we

4    strike that routinely when it's admitted in this Court.

5            MR. ANDRES:  There is not, Judge.  And just so

6    you're clear, these agreements -- this isn't my home district

7    either.  So this is the Washington, D.C. district's plea

8    channel that we follow.  It was slightly foreign to me, but

9    there is no polygraph.  Well, actually --

10           MR. ASONYE:  Well actually --

11           MR. ANDRES:  -- a forfeiture --

12           THE COURT:  If there is, it needs to be stricken.

13           MR. ASONYE:  Yes.

14           MR. ANDRES:  I'm not going to refer to it.

15           MR. ASONYE:  We'll take a look at it and we'll

16   redact it and let the court know.

17           THE COURT:  All right.  Let's proceed.

18           (End of bench conference.)

19   BY MR. ANDRES:

20   Q.  Can you turn now to the first page of the plea agreement?

21           Can I direct your attention to Paragraph 1 where it

22   says, "Charges and statutory penalties"?  Do you see that?

23   A.  I do.

24   Q.  And were you required to plead guilty to one count or two

25   counts?

U.S. v. Manafort

1104

1   A.   Two counts.

2   Q.   And are those listed in Paragraph 1A and 1B?

3   A.   Yes.

4   Q.   And with respect to Paragraph 1A, what were you charged

5   with?

6   A.   One count of conspiracy.

7   Q.   Conspiracy against the United States?

8   A.   Yes.

9   Q.   And with respect to the second count, what were you

10   charged with?

11   A.   Making a false statement to the Government.

12   Q.   With respect to the Count 1 conspiracy against the United

13   States charge, as part of those -- as part of that crime, who

14   did you conspire with?

15   A.   Mr. Manafort.

16   Q.   And over what period of time did that conspiracy cover?

17   A.   It was 2008 to 2015.

18   Q.   Does that conspiracy cover a series of crimes?

19   A.   It does.

20   Q.   What crimes?

21   A.   There was three components to it.  I assisted

22   Mr. Manafort in filing his tax returns falsely.

23        Mr. Manafort, with my assistance, did not file a

24   report indicating he had control over foreign banks.

25        And the third was Mr. Manafort did not register as a

—————U.S. v. Manafort—————

1105

1  foreign agent, which I was aware.

2  Q.   You testified that you pled guilty to conspiring with

3  Mr. Manafort to file false tax returns.  How are those returns

4  false?

5  A.   There are two aspects.  One is that the income was

6  underreported.

7            And, two, there was a schedule in the IRS -- IRS tax

8  report that was not checked.

9            THE COURT:  That was not what, sir?

10            THE WITNESS:  Checked, regarding the foreign bank

11  accounts.

12            THE COURT:  Next question.

13  BY MR. ANDRES:

14  Q.   With respect to the tax charges that you're talking

15  about, whose tax returns were involved?

16  A.   Mr. Manafort's.

17  Q.   Can you explain to the jury what you did to conspire with

18  Mr. Manafort to file those false tax returns?

19  A.   Yes.  Mr. Manafort over the years had requested that I

20  make wire transfers from the offshore accounts.  That

21  information was not reported to the accountants.  The income

22  was not reported as well.

23            In addition, we did not report the foreign bank

24  accounts.  And, then again, we also failed to check the box on

25  the tax returns indicating we had foreign accounts.

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1106

1    Q.   With respect to those foreign accounts, where were those

2    foreign accounts housed?

3    A.   They were primarily in Cyprus and then the Grenadines,

4    and one in the United Kingdom.

5    Q.   And during the time that you were conspiring with

6    Mr. Manafort to file the false tax returns, did you deal with

7    his accountants?

8    A.   I did.

9    Q.   Did you lie to them?

10   A.   Yes.

11   Q.   Why?

12   A.   We didn't report the income or the fact that the accounts

13   existed.

14   Q.   At the time did you understand that it was illegal to

15   file --

16           MR. DOWNING:  Objection, Your Honor, nonresponsive.

17   The question was:  Why?  Why did he lie?

18           THE COURT:  Was that your question, Mr. Andres?

19           MR. ANDRES:  It was a question or two again, but I

20   don't -- I did ask why.  I asked why Mr. Gates lied to the tax

21   accountants.

22           THE COURT:  Well, the objection is overruled, but

23   you should clarify it.

24           MR. ANDRES:  Sure.

25   BY MR. ANDRES:

─U.S. v. Manafort─

1107

1   Q.   You testified that you lied to Mr. -- lied to

2   Mr. Manafort's accountants.  Why did you do that?

3   A.   Yes.  Mr. Manafort requested at different points in the

4   year that we do not disclose the foreign bank accounts.

5   Q.   Okay.  At the time that you conspired with Mr. Manafort,

6   did you understand that it was illegal to file false U.S. tax

7   returns as to income?

8   A.   Yes.

9   Q.   And did you understand that it was a crime to fail to

10  identify foreign bank accounts on a tax return?

11  A.   Yes.

12  Q.   As part of the tax fraud conspiracy, did you provide

13  information to Mr. Manafort's accountants about alleged loans?

14  A.   Yes.

15  Q.   And can you explain what information you provided?

16  A.   Yes.  When income came into the company, Mr. Manafort

17  directed whether the income would be treated as income or, in

18  some cases, whether it would be treated as loans.

19         However, the entity that loaned the money was not

20  one of the companies that actually paid for the work that was

21  done.  It was actually a company offshore controlled by

22  Mr. Manafort.

23  Q.   And were there times that you characterized income as

24  loans?

25  A.   Yes.

1108

1    Q.    And why did you do that?

2    A.    That was in order to reduce the taxable income on the tax

3    returns.

4    Q.    Whose tax returns?

5    A.    Mr. Manafort's.

6    Q.    And who directed you to characterize the income as a

7    loan?

8    A.    Mr. Manafort.

9    Q.    Did you have an understanding of how that benefitted

10   Mr. Manafort?

11   A.    Yes.

12   Q.    How?

13   A.    By not including the income and treating it as a loan he

14   was able to defer the ability to pay the increased tax on his

15   tax returns.

16   Q.    In the context of the income that was characterized as

17   loans, did you deal with Mr. Manafort's bookkeeper?

18   A.    Yes.

19   Q.    Who is that?

20   A.    Heather Washkuhn.

21   Q.    And were you truthful to her about the nature of the

22   income?

23   A.    No.

24   Q.    And in the course of dealing with these loan issues, did

25   you deal with Mr. Manafort's tax preparers?

─U.S. v. Manafort─

1109

1  A.   Yes.

2  Q.   And who were they?

3  A.   It was primarily Philip Ayliff and Cindy Laporta.

4  Q.   And were you truthful to them as to -- were you truthful

5  with them with respect to the nature of the loans and the

6  income?

7  A.   No.

8  Q.   You testified that you conspired with Mr. Manafort to

9  fail to file foreign bank accounts reports with the Treasury

10 Department.  Do you remember that?

11 A.   Yes.

12 Q.   What did you do that made you guilty of failing to file

13 foreign bank account reports with the Treasury Department?

14 A.   We did not submit the required form designating that we

15 had control over a offshore account that was in Mr. Manafort's

16 control.

17 Q.   With respect those accounts, did you have discussions

18 with -- with Mr. Manafort's accountants about the FBAR

19 requirements?

20 A.   Yes.

21 Q.   Okay.  And what, if anything, did you tell them about

22 whether Mr. Manafort had false -- had foreign bank accounts?

23 A.   We told them that he did not have foreign bank accounts.

24 Q.   And when you say "we," who do you mean by "we"?

25 A.   Meaning the company or Mr. Manafort.

1110

1   Q.   And when you spoke to the accountants and told them there

2   were no foreign bank accounts, why did you tell them that?

3   A.   Mr. Manafort's direction.

4   Q.   With respect to those foreign bank accounts, do you know

5   how much money flowed through those accounts?

6   A.   Over the years, it was several million dollars.

7   Q.   And with respect to those overseas bank accounts that

8   Mr. Manafort controlled, do you know what countries they were

9   in?

10  A.   Yes.  They were primarily in Cyprus, the Grenadines, and

11  the United Kingdom.

12  Q.   And at the time that you conspired with Mr. Manafort to

13  fail to file FBARs, did you know it was illegal to fail to

14  file those FBARs?

15  A.   Yes.

16  Q.   How did you know it was illegal?

17  A.   We were notified by the accounting firm in regards to

18  e-mails that were sent both to myself and Mr. Manafort along

19  with the regulation outlining the definitions of foreign bank

20  accounts.

21  Q.   Mr. Gates, you've testified about a variety of foreign

22  bank accounts under Mr. Manafort's control.  Can you tell me

23  the names of those accounts and their locations?

24  A.   Yes.

25  Q.   Slowly.

─U.S. v. Manafort─

1   A.   Actinet was in Cyprus.  Black Sea View Limited was in

2   Cyprus.  Bletilla was in Cyprus.  Yiakora was in Cyprus.

3   Peranova was in Cyprus.  Olivenia was in Cyprus.  Marziola,

4   Cyprus.  Serangon, Cyprus.  Lucicle, Cyprus.

5            Let me see how many more in Cyprus.

6            And then there were two in the Grenadines, Global

7   Endeavor and Jeaunet.

8            And one in the United Kingdom called Pompolo.

9   Q.   Okay.  How about a company named -- or an entity known as

10  Leviathan Advisors?

11  A.   Yes.  Leviathan Advisors was Cyprus, and Global Highway

12  Limited was also Cyprus.

13  Q.   How about LOAV?

14  A.   LOAV was Cyprus.

15  Q.   Do you know if Mr. Manafort's name was listed on any of

16  these accounts?

17  A.   Yes, some of them.

18  Q.   And was your name listed on any of these accounts?

19  A.   It was.

20  Q.   Was there anyone else who was listed on the accounts?

21  A.   Yes.  One other colleague, Mr. Konstantin Kilimnik.

22  Q.   Who is Konstantin Kilimnik?

23  A.   He's a consultant that worked for Mr. Manafort.

24  Q.   Okay.  Were there other signatories on these accounts?

25  A.   There were.

U.S. v. Manafort

1112

1  Q.   Who?

2  A.   The way that the accounts were set up in Cyprus is that

3  there were two directors from a legal firm that set up the

4  entities so they were the signature panels on the accounts.

5  Q.   With respect to the money that was in those accounts,

6  whose money was that?

7  A.   Mr. Manafort's.

8  Q.   And where did it come from?

9  A.   It came from income related to political campaigns that

10  he worked on in Ukraine.

11  Q.   Was that income to Mr. Manafort?

12  A.   It was.

13  Q.   You testified that you also pled guilty to making a false

14  statement to the FBI.  Can you explain that charge?

15  A.   Yes.  It was in regards to a meeting that Mr. Manafort

16  had with a member of the United States Congress.

17  Q.   And what false statement did you tell?

18  A.   It was a meeting that was, you know, over five years ago.

19  I was not at the meeting.  I was given information after the

20  meeting when I was presented with a memo from the government.

21  I had made a mistake and I lied on the -- on the basis of the

22  memo that the meeting had not occurred and it did.

23  Q.   When you made the false statement to the government, when

24  did you make that false statement to the government?

25  A.   During the interview sessions.

U.S. v. Manafort

1113

1    Q.    Okay.  Was that before or after you pled guilty?

2    A.    That was before I pled guilty.

3    Q.    As a result of making those false statements to the

4    government, was -- were there consequences?

5    A.    There were.

6    Q.    What were the consequences?

7    A.    The Government added a second charge of making a false

8    statement.

9    Q.    And did you plead guilty to that charge as well?

10   A.    I did.

11   Q.    Can you explain to the jury what effect that second

12   charge had on the amount of time you're facing in jail?

13   A.    Yes, it increased it from potentially five years to ten

14   years.

15   Q.    Okay.  You testified that you pled guilty.  When you pled

16   guilty did you appear in front of a federal judge?

17   A.    I did.

18   Q.    Did the judge explain to you what penalties you're

19   facing?

20   A.    She did.

21   Q.    For the Count 1 conspiracy against the United States

22   charge, what are the statutory penalties?

23   A.    It's up to five years imprisonment, up to a fine of

24   $250,000, and up to three years of supervised release.

25   Q.    With respect to the Count 2 false statement charge, what

─────U.S. v. Manafort─────

1114

1    penalties are you facing?

2    A.   Again, it was up to five years imprisonment, up to

3    $250,000 in fines, and up to three years of supervised

4    release.

5    Q.   And with respect to the total amount of time, jail time

6    you're facing, what is that?

7    A.   Up to ten years.

8    Q.   Does --

9            THE COURT:  What, if anything, were you told about

10   whether the two five-year maximums could run concurrently as

11   well as consecutively?

12           THE WITNESS:  I was advised by my attorney that

13   could happen but it was totally up to the judge, as I

14   understood.

15           THE COURT:  Next question.

16   BY MR. ANDRES:

17   Q.   Does your plea agreement estimate the amount of time you

18   may be facing in jail in terms of something called the

19   sentencing guidelines?

20   A.   It does.

21   Q.   What does it say?

22   A.   It indicates that I could serve up to -- from 57 to 71

23   months.

24   Q.   As part of your written agreement with the Government,

25   did you make -- did you make certain promises to the

U.S. v. Manafort

1115

1    Government?

2    A.    I did.

3    Q.    What did you promise to do?

4    A.    I promised to tell the truth, I promised to plea, I

5    promised to provide evidence, and I promised to testify if

6    required.

7    Q.    Okay.  Have you turned over evidence to the Government?

8    A.    I have.

9    Q.    What evidence have you turned over to the Government?

10   A.    Documents, e-mails, computers, and phones.

11   Q.    Okay.  As part of the written plea agreement, what

12   promises did the Government make to you?

13   A.    The Government promised to write a 5K1 letter.  It

14   promised not to bring any additional charges.

15         It also promised to drop the charges in regards to a

16   second indictment.

17         And then it also agreed not to oppose my attorney

18   filing a recommendation of probation at sentencing.

19   Q.    You testified that the Government agreed to dismiss a

20   second indictment.  Where was that indictment brought?

21   A.    Here in the Eastern District of Virginia.

22   Q.    And what crimes were you charged with in that indictment?

23   A.    Related to, primarily, tax fraud, bank fraud, and foreign

24   banks.

25   Q.    And were you indicted alone in that case?

U.S. v. Manafort

1116

1    A.    No.

2    Q.    Who else was charged?

3    A.    Mr. Manafort.

4    Q.    Were you charged with any crimes relating to your own

5    taxes?

6    A.    Yes.

7    Q.    Can you explain what charges were included in that

8    indictment as they related to your personal tax returns?

9    A.    Yes.  I was charged with underreporting income on my

10   personal account and then also not disclosing a foreign bank

11   account.

12   Q.    Were you also charged with FBAR charges?

13   A.    Yes.

14   Q.    Okay.  And bank fraud?

15   A.    Yes.

16   Q.    Were you guilty of those charges?

17   A.    Yes.

18   Q.    With respect to the income on your tax return that you

19   failed to disclose or your false filing, can you explain to

20   the jury what you did to make you guilty?

21   A.    Yes.  In regards to some of the payments that I received

22   for my compensation, I transferred those from a Cyprus bank

23   account to a UK bank account then transferred them to my U.S.

24   bank account.  And I did not report the additional income from

25   the UK account to the U.S. account.

U.S. v. Manafort

1117

1   Q.   During that time period, did you have a tax preparer?

2   A.   I did.

3   Q.   Did you use the same tax preparer as Mr. Manafort?

4   A.   No.

5   Q.   Okay.  Were you truthful with your tax preparer about

6   your other income?

7   A.   No.

8   Q.   Okay.  You also testified that you were charged with

9   filing tax returns as it related to overseas accounts.  Did

10  you have overseas accounts?

11  A.   I did.

12  Q.   Okay.  Where were they?

13  A.   They were based in the United Kingdom.

14  Q.   And did you report those on your tax return?

15  A.   I did not.

16  Q.   With respect to the bank fraud charges, what conduct did

17  that involve?

18  A.   That related to a series of loans that Mr. Manafort was

19  attempting to receive.

20  Q.   And did you help him with those loans?

21  A.   I did.

22  Q.   Did you provide fraudulent documents to banks?

23  A.   Yes.

24  Q.   Did you alter documents?

25  A.   Yes.

U.S. v. Manafort

1118

1  Q.   At the time you did that, did you know it was illegal to

2  send those documents to banks?

3  A.   Yes.

4  Q.   And did you benefit in any way from those loan

5  applications that Mr. Manafort made?

6  A.   No, I did not.

7  Q.   You testified that the Government agreed to dismiss the

8  second indictment in the Eastern District of Virginia.  Has

9  the Government done that?

10  A.   It has.

11  Q.   Are there circumstances where those charges could be

12  brought again?

13  A.   There is.

14  Q.   Under what circumstances could they be re-filed?

15  A.   If they -- there's a violation of the plea agreement or I

16  breach the plea agreement then those charges can be brought

17  against me.

18  Q.   If you lied during your testimony today, would that

19  violate your agreement?

20  A.   It would.

21  Q.   You testified that the Government also agreed not to

22  bring additional charges with respect to certain conduct.

23  What were you referring to?

24  A.   Yes.  I omitted information in a deposition.  I added

25  payments to expenses.  I also increased my income on a credit

─U.S. v. Manafort─

1   card and mortgage application and then also created an

2   inaccurate letter for a colleague.

3   Q.   As far as you're aware, how did the Government become

4   aware of these additional crimes?

5   A.   I presented those to the Government at my accord during

6   my interview sessions.

7   Q.   Okay.  Did you also tell the Government about additional

8   money that you took from Mr. Manafort that wasn't authorized?

9   A.   I did.

10  Q.   Okay.  Let me start with the mortgage fraud.  You

11  testified that you lied on a mortgage application.  Can you

12  explain to the jury what you did?

13  A.   Yes.  I increased my income level in regards to

14  submitting the application for the mortgage.

15  Q.   How about credit card applications?  Have you filed false

16  credit card applications?

17  A.   Yes.

18  Q.   What did you do?

19  A.   Increased the amount of income.

20  Q.   Have you filed false expense reports to your employers?

21  A.   Yes.

22  Q.   Okay.  You testified that you were not truthful during a

23  deposition.  Can you explain when that was and what happened?

24         THE COURT:  You said -- just a moment.  You said you

25  filed false expense reports to your employer?

U.S. v. Manafort

1120

1          THE WITNESS:  Yes.

2          THE COURT:  Is that Mr. Manafort?

3          THE WITNESS:  Yes.

4          THE COURT:  Did he know they were false.

5          THE WITNESS:  No.

6          THE COURT:  Next question.

7     BY MR. ANDRES:

8     Q.   Was it Mr. Manafort and other employers?

9     A.   Yes.

10    Q.   Okay.  You testified that you weren't truthful during

11    deposition.  Can you explain what happened and when that was?

12    A.   Yes.  It was in regards to a private equity fund that the

13    company had set up.  We -- the principals of the firm had been

14    deposed in separate settings.  During the course of that and

15    in preparation for that Mr. Manafort and I met on several

16    occasions and Mr. Manafort had asked me not to include certain

17    things in the deposition.

18    Q.   You testified about a colleague that you worked with,

19    Steve Brown.  Do you remember that?

20    A.   Yes.

21    Q.   Were you involved in a business with him?

22    A.   I was.

23    Q.   And were you involved in fraudulent conduct with respect

24    to that business?

25    A.   Yes.

1121

1   Q.   How so?

2   A.   Mr. Brown had asked me, as a favor, to write him a letter

3   in regards to an investment offer that he was making.  I

4   represented that the company that we are using had income

5   level that was not accurate.

6   Q.   You testified that you took money from Mr. Manafort that

7   wasn't authorized.  Can you explain specifically what you did?

8   A.   Yes.  In essence, I added money to expense reports and

9   created expense reports to receive the additional money.

10  Q.   And where did that money come from?

11  A.   Primarily from Cyprus.

12  Q.   Okay.  And approximately how much money did you take from

13  Mr. Manafort that wasn't authorized?

14  A.   I don't have an exact number, but approximately, I'd say,

15  several hundred thousand.

16  Q.   Okay.  And how were you able to take that money from

17  Mr. Manafort and not -- and he not notice?

18  A.   I had authority on some of the offshore accounts to move

19  that money.

20  Q.   Okay.  And were you paid money from those accounts that

21  Mr. Manafort authorized?

22  A.   Yes.

23  Q.   And how would you make those payments?

24  A.   Same basis, through wire transfers.

25  Q.   Okay.  And Mr. Manafort was aware of those?

1122

1  A.   Yes.

2  Q.   With respect to the money that was unauthorized, how

3  would you charge those?

4  A.   How do I charge?

5  Q.   What -- what was the process by which you would be able

6  to take that money that wasn't authorized?

7  A.   Yes.  So the way that the wire transfers worked is

8  typically Mr. Manafort would request, you know, me to make

9  wire transfers or he would do it himself.  Those transfer

10  requests would be sent to the law firm in Cyprus.  They had a

11  separate group that dealt with financial and accounting

12  matters.  They would then process the wire transfers that were

13  requested.

14  Q.   Okay.  And with respect to that money, you identified

15  them as expenses?

16  A.   Uh-huh, yes.

17  Q.   Okay.  And as you identified them expenses, do you know

18  if those charges were passed onto anybody else?

19  A.   Yes.  Typically, the firm took the expenses from any of

20  the employees that were working on the Ukrainian campaigns,

21  and we submitted those expenses back to the client in Ukraine.

22  Q.   Were you ever charged criminally for taking this money

23  from Mr. Manafort in your first indictment?

24  A.   No.

25  Q.   Were you ever charged with taking this money from

U.S. v. Manafort

1123

1    Mr. Manafort in your second indictment?

2    A.    No.

3    Q.    As far as you know, how does the Gov -- how did the

4    Government find out about these unauthorized monies?

5    A.    I made the Government aware of them in our interviews.

6    Q.    You testified that the Government promised that if your

7    cooperation was substantial, the Government would not oppose

8    your application for a sentence of probation.

9              Can you explain what that means?

10   A.    Yes.  It means that on the basis of the Government

11   writing a 5K1 letter, that if I provide substantial

12   cooperation, then my attorney can file a request for probation

13   that the Government would not oppose.

14   Q.    And has that recommendation --

15             THE COURT:  What's your understanding of who would

16   make the decision?

17             THE WITNESS:  The judge makes the decision.

18             THE COURT:  Which judge?

19             THE WITNESS:  The judge in D.C.

20             THE COURT:  Next question.

21   BY MR. ANDRES:

22   Q.    You testified about a 5K letter.  What is a 5K letter?

23   A.    A 5K1 letter is something that the Government writes.  It

24   is a summary of everything I've done to cooperate

25   substantially, and it also includes everything I've done wrong

U.S. v. Manafort

1124

1   and then that letter is presented to the judge.

2   Q.   And who writes the letter?

3   A.   The Government.

4   Q.   And who does the Government write the letter to?

5   A.   It writes it to the judge.

6   Q.   Is that letter important to you?

7   A.   It is.

8   Q.   Why?

9            THE COURT:  So we're clear, the judge in D.C.?

10           THE WITNESS:  The judge in D.C. yes, Your Honor.

11           THE COURT:  Next question.  Go ahead, Mr. Andres.

12   BY MR. ANDRES:

13   Q.   Who does the prosecutor write the letter to?  The judge

14   in D.C., you testified.

15           Is that letter important to you?

16   A.   Yes.

17   Q.   Why?

18   A.   It potentially reduces the amount of time that I can be

19   potentially incarcerated.

20   Q.   If the Government writes the letter, is the judge

21   obligated to give you a lower sentence?

22   A.   She is not.

23   Q.   Okay.  Do you understand what will happen to you if you

24   breach this agreement in some way?

25   A.   Yes.

U.S. v. Manafort

1125

1  Q.   What?

2  A.   I lose all the benefits associated with the plea

3  agreement.

4  Q.   And what happens to your guilty plea?

5  A.   The guilty plea would stand.

6  Q.   Would you be entitled to a sentencing reduction for your

7  cooperation?

8  A.   No.

9  Q.   Okay.  After your arrest, Mr. Gates, were you released on

10 bail?

11 A.   Yes.

12 Q.   Are there conditions with respect to your travel?

13 A.   There are.

14 Q.   Have you always complied with all those conditions?

15 A.   No.

16 Q.   In what respect did you not comply?

17 A.   In one instance I violated the curfew, it was set for

18 11:00, by about 15 minutes.  And then I notified the probation

19 office of that violation.

20 Q.   Okay.  Prior to your testimony here today, did you meet

21 with the Government to prepare?

22 A.   I did.

23 Q.   And during that time, did you review documents and other

24 materials?

25 A.   Yes.

1126

1  Q.   Approximately how many times did you meet with the

2  Government?

3  A.   Approximately 20 times.

4  Q.   Okay.  You testified that in 2006 you began working for

5  Mr. Manafort.  Can you explain to the jury what your

6  responsibilities were?

7  A.   Yes.  When I first started, my first role was to help the

8  firm finalize a private equity fund that it was starting.

9  Following that, I became more involved in the political

10  activities of the firm and the international elections it was

11  working on.

12  Q.   Okay.  Did Mr. Man -- did Davis Manafort have offices in

13  the United States at the time?

14  A.   It did.

15  Q.   Where?

16  A.   In Alexandria, Virginia.

17  Q.   How about offices in the Ukraine?

18  A.   It did.

19  Q.   Where was that located?

20  A.   In Kiev, Ukraine.

21  Q.   Did you work from both offices?

22  A.   Yes.

23  Q.   With respect to the Alexandria office, how many -- how

24  many employees worked there?

25  A.   It ranged over time over the years, but when I first

─────U.S. v. Manafort─────

1127

1    joined, there were approximately eight employees at the

2    company.

3    Q.   And how about the office in Kiev, how many employees were

4    employed there -- how many -- let me rephrase that.  Sorry.

5         With respect to the Kiev office, how many people

6    worked there?

7    A.   It, again, ranged over time depending on the amount of

8    work that was happening.  It ranged anywhere from, you know, 5

9    to 12 employees.

10   Q.   And who were some of the people that worked in the Kiev

11   office?

12   A.   Some of the original people were Konstantin Kilimnik,

13   Phillip Griffin, Vlad Sivkovych, and then several other local

14   employees that we had hired.

15   Q.   And what were Mr. Kilimnik's responsibilities in the Kiev

16   office?

17   A.   He was primarily Mr. Manafort's translator and one of the

18   principal people that interacted with the political people in

19   Ukraine.

20   Q.   And you said that he was a translator.  Did he speak

21   Ukrainian?

22   A.   He spoke Ukrainian and Russian and English.

23   Q.   Okay.  Did Mr. Kilimnik have a nickname?

24   A.   Yes.

25   Q.   What was it?

1128

1   A.   KK.

2   Q.   Were individuals in the Ukraine often referred to by

3   their initials?

4   A.   Yes.

5   Q.   Why?

6   A.   Because sometimes their names were a little difficult to

7   pronounce or long and it was easier to abbreviate in e-mails.

8   Q.   Okay.  During the time that you were in the United States

9   and Mr. Kilimnik was in the Ukraine, were you able to

10  communicate with him?

11  A.   Yes.

12  Q.   Were there any problems with respect to the time

13  difference?

14  A.   No.

15  Q.   Any problems with respect to the phones?

16  A.   No.

17  Q.   How about e-mail?

18  A.   No.

19  Q.   How about Mr. Manafort, did he communicate with

20  Mr. Kilimnik from the United States?

21  A.   Yes.

22  Q.   How do you know that?

23  A.   Because in some instances I was with him when he was

24  communicating with Mr. Kilimnik.

25  Q.   Were you able to help direct the efforts in the Ukraine

─── U.S. v. Manafort ───

1129

1   from the United States?

2   A.   Yes.

3   Q.   You testified that your first assignment at Davis

4   Manafort Partners related to a private equity fund.  Can you

5   explain what you did?

6   A.   Yes.  The firm was -- at the beginning of starting a

7   private equity fund, we were putting together the documents,

8   that constituted the fund and seeking investment at that time.

9   Q.   Okay.  When did you first start working on elections in

10  the Ukraine?

11  A.   The first election I worked on was the parliamentary

12  election in 2007.

13  Q.   And over what period of time did you work on the

14  elections?

15  A.   From 2007 to 2014.

16  Q.   Who did you report to with respect to your election work

17  in the Ukraine?

18  A.   Mr. Manafort.

19  Q.   Did you ever learn how Mr. Manafort first started working

20  on elections in the Ukraine?

21  A.   I did.

22  Q.   Okay.  First of all, when did he first start working

23  there?

24  A.   It was, I believe, 2005.

25  Q.   And what did you understand about how he first started

—————U.S. v. Manafort—————

1130

1    working there?

2    A.   He was introduced to a Ukrainian businessmen that he was

3    helping with a business project, which then later translated

4    to a political project because of the role of the businessmen.

5    Q.   And who was that businessman?

6    A.   His name was Rinat Akhmetov.

7    Q.   Who did you understand Mr. Akhmetov to be?

8    A.   He was one of the founders of the party that Mr. Manafort

9    worked for over the years and he was also a very wealthy

10   businessman in Ukraine.

11   Q.   Did you refer or people within your company refer to him

12   by his initials?

13   A.   Yes.

14   Q.   And what were they?

15   A.   RA.

16   Q.   Okay.  You said that he was a wealthy man.  Do you know

17   approximately what his net wealth was?

18   A.   I mean, in the papers it fluctuated over time, but it was

19   anywhere from --

20          THE COURT:  Do you know for any -- on any basis

21   other than what was in the newspapers.

22          THE WITNESS:  No.

23   BY MR. ANDRES:

24   Q.   Okay.

25          THE COURT:  All right.  Let's not venture on --

U.S. v. Manafort

1131

1    MR. ANDRES:  I understand.

2    THE COURT:  You don't need it.  It's not relevant.

3    Next question.

4    MR. ANDRES:  Understood.

5    BY MR. ANDRES:

6    Q.   Do you know what business Mr. Akhmetov was in?

7    A.   Yes.

8    Q.   What business?

9    A.   Energy and steel.

10   Q.   And did he hold a position in politics in the Ukraine?

11   A.   He did.

12   Q.   What position?

13   A.   He was a member of parliament for a number of years.

14   Q.   Was Mr. Akhmetov responsible for paying Davis Manafort --

15   Davis Manafort and DMP International for certain work?

16   A.   Yes, he was.

17   Q.   What work?

18   A.   Largely political work from the time that I started.

19   Q.   And how did he make those payments?

20   A.   Through wire transfers.

21   Q.   Okay.  Wire transfers from where to where?

22   A.   Generally it was from Cyprus to Cyprus.

23   Q.   Okay.  And did Mr. Akhmetov make those payments through

24   associates?

25   A.   Yes, in some cases he did.

1132

1    Q.    And did they have shelf companies?

2    A.    They did.

3    Q.    Where were those shelf companies located?

4    A.    In Cyprus.

5    Q.    I'm sorry, what?

6    A.    In Cyprus.

7    Q.    And in terms of those contracts or those issues, who

8    negotiated the payments for Mr. Akhmetov?

9    A.    Mr. Manafort.

10   Q.    And do you know how Mr. Manafort received those payments?

11   A.    Through a wire transfer.

12   Q.    You testified that Mr. Akhmetov asked Mr. Manafort to set

13   up the Party of Regions.  Can you explain to the jury what the

14   Party of Regions is?

15   A.    Yes.  The Party of Regions was a new political party.  At

16   the time, the purpose of it was to create a stable party in

17   Ukraine that brought together many of the different regions in

18   the country.

19   Q.    Did Mr. Manafort agree to do this work?

20   A.    Yes.

21   Q.    And at the start of the Party of Regions, what was the

22   initial work that Mr. Manafort did?

23   A.    It was primarily building the party.  So it started out

24   party structuring, party platform, creating party leadership,

25   and a party congress.  It was kind of, you know, building a

U.S. v. Manafort

1133

1    party 101.

2    Q.    Who was the leader of the Party of Regions at the time?

3    A.    Mr. Viktor Yanukovych.

4    Q.    Do you know if Mr. Manafort had a relationship with

5    Mr. Yanukovych?

6    A.    Yes.

7    Q.    What did you understand that to be?

8    A.    The relationship was such that Mr. Manafort, in essence,

9    brought him back from the proverbial political dead.

10   Mr. Yanukovych ran for the presidential election in 2004 and

11   ultimately lost.  And Mr. Manafort was successful in bringing

12   him back.

13   Q.    When you say "bringing him back," what does that mean?

14   A.    Bringing him back, back into the political spectrum.

15   Later on Mr. Yanukovych became prime minister with

16   Mr. Manafort's help and then later he won the presidency in

17   2010 in Ukraine.

18   Q.    And what role did Mr. Manafort have in those election

19   successes?

20   A.    Mr. Manafort ran the elections, you know, kind of from

21   start to finish.

22   Q.    And during the time that you worked for him, how did you

23   assess his political skills or his ability to work in the

24   Ukraine?

25   A.    He's probably one of the most, you know, politically

U.S. v. Manafort

1134

1   brilliant strategists I've ever worked with.

2   Q.   Did Mr. Manafort ever meet with President Yanukovych?

3   A.   Yes.

4   Q.   Frequently?

5   A.   I mean, I think, you know, most of the times that he was

6   in Ukraine, he would meet with him.

7   Q.   When you say "he was in Ukraine," who are you talking

8   about?

9   A.   Mr. Manafort.

10  Q.   Would you attend those meetings?

11  A.   No.

12  Q.   Why not?

13  A.   Those meetings were designed more for kind of the

14  principals to meet.  I was not at that level.

15  Q.   And with respect to President Yanukovych, was he referred

16  to in the company memos by a certain way?

17  A.   He was.

18  Q.   How?

19  A.   It was either VFY for his initials or sometimes BG or Big

20  Guy.

21  Q.   During the course of your work in the Ukraine, did you

22  travel there?

23  A.   Yes.

24  Q.   How often?

25  A.   It was frequently during the elections.  And then I did

─────U.S. v. Manafort─────

1135

1    some work for the private equity fund there as well.

2    Q.   Okay.  Was there a period of time when you weren't

3    traveling?

4    A.   Yes.  I traveled primarily from 2007 to 2010 and then

5    2012 to 2014.

6    Q.   Can I ask you to take a look at Government Exhibit 338A.

7         Do you see that?

8    A.   I do.

9    Q.   Can you tell me what's included in Government

10   Exhibit 338A?

11   A.   It's a copy of my U.S. passport.

12   Q.   Did you provide this passport to the Government as part

13   of your cooperation?

14   A.   I did.

15        MR. ANDRES:  Your Honor, the Government moves to

16   admit Government Exhibit 338A.

17        MR. DOWNING:  Without objection.

18        THE COURT:  Admitted.

19                        (Government's Exhibit No. 338A

20                        admitted into evidence.)

21        MR. ANDRES:  May we publish it?

22        THE COURT:  Yes, but I -- let's get to the heart of

23   the matter.  I doubt a passport --

24        MR. ANDRES:  Judge, we've been at the heart of

25   the --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

U.S. v. Manafort

1136

1          THE COURT:  Just listen to me.  For goodness sakes.

2    Don't speak when I speak.

3          My point was, I don't see clearly why a passport

4    makes a hill of beans.  And I'm going to admit it and allow

5    you to use it, but I want you to focus sharply on what matters

6    in this case so we can get this case done.

7          MR. ANDRES:  Your Honor, we have gone through the

8    relevant payments with this witness.  When he travels on his

9    passport is relevant, and that's why we're seeking to admit

10   it.

11         THE COURT:  All right.  You may use it.

12         MR. ANDRES:  Thank you.

13         THE COURT:  But I don't think there is any dispute

14   about when he was there.  Just ask him.

15         MR. ANDRES:  Well, this evidence has not been

16   entered yet.

17         THE COURT:  Just get on with it, please.

18         MR. ANDRES:  Thank you, Judge.

19   BY MR. ANDRES:

20   Q.   Can you turn to the first page?

21   A.   Yes.

22   Q.   And what's the period of time that's covered in this

23   passport?

24   A.   It's from April 2009 to April 2011.

25   Q.   Okay.  And are there passports stamps in here that relate

U.S. v. Manafort

1137

1  to the Ukraine?

2  A.    There are.

3  Q.    Okay.  And can I ask you to turn to page Bates No. 00020.

4  A.    Mine stops at 0017.

5  Q.    Do you see it on the screen?

6  A.    Yes.

7  Q.    What is that?

8  A.    That is entry and exit stamps into Ukraine.

9  Q.    Okay.  Can I ask you to take a look at Government's

10  Exhibit --

11        THE COURT:  Let me ask:  Mr. Downing, do you have

12  any dispute about when he was in the Ukraine?

13        THE WITNESS:  No, we don't, Your Honor.

14        THE COURT:  Why not have just a list of the dates he

15  was there that are undisputed.  We can get it into the record

16  and move on.

17        MR. ANDRES:  Well, for one, no one has asked for

18  that before and, two, the defense --

19        THE COURT:  I am.

20        MR. ANDRES:  -- the defense has never raised that

21  before and we're happy to do that, Judge.

22        THE COURT:  Good.  Do it.

23  BY MR. ANDRES:

24  Q.    Can you take a look at Government Exhibit 338B?

25        THE COURT:  I'd like to find ways, Mr. Andres, to

U.S. v. Manafort

1138

1  expedite the trial of this matter, and that's one way we can

2  do it rather than go through pages of a passport.

3         MR. ANDRES:  Judge, I appreciate that.  And as you

4  know, each night you've asked us for copies of the exhibits,

5  which we've done.  So we've done everything we can to move the

6  trial along, and I think we've succeeded in doing that.

7         THE COURT:  All right.  Well, you have, and I

8  appreciate what you've given me.  But I have no idea just by

9  looking at something that says "passport."

10        In other words, find a way to expedite.  You want to

11  show when he was in the Ukraine, fine.  Mr. Downing says he

12  doesn't have an objection, so you can show him some summary

13  and get it done in one question.

14        MR. ANDRES:  Thank you, Judge.

15        This next passport relates to travel in Cyprus,

16  which has not been admitted yet, so if it's okay --

17        THE COURT:  I'll admit it.  No objection, is there?

18        MR. DOWNING:  No objection, Your Honor.

19                      (Government's Exhibit No. 338B

20                      admitted into evidence.)

21  BY MR. ANDRES:

22  Q.   Can you take a look at Government Exhibit 338B?

23  A.   Yes.

24  Q.   What is that?

25  A.   It's a copy of my passport.

U.S. v. Manafort

1139

1  Q.   Over what time period?

2  A.   From April 2011 to April 2013.

3  Q.   Okay.  Can I ask you to turn to page, at the bottom,

4  00025?

5  A.   Okay.

6         MR. ANDRES:  Can I publish that, Your Honor?

7         THE COURT:  Yes, you may.  Let me be specific,

8  Mr. Andres, if you will submit to Mr. Downing what you want to

9  show as to when this witness was in the Ukraine or Cyprus, let

10  them look at it, see if they have any objection to it.  If

11  they don't, I'll admit that.  We'll be done with it.  We'll

12  move on.

13         MR. ANDRES:  Thank you, Judge.  It's just going to

14  take a minute.

15         THE COURT:  Well, you see, it creates -- all right.

16  Go on.

17  BY MR. ANDRES:

18  Q.   With respect to Government Exhibit 338 and the -- on the

19  screen there are number of -- or at least there's one passport

20  stamp from Laranka [sic].  Is that -- am I pronouncing that

21  right?

22  A.   Larnaka.

23  Q.   What is that?  What is Larnaka?

24  A.   Larnaka is the capitol of Cyprus.

25  Q.   Okay.  And did you travel to Cyprus --

U.S. v. Manafort

1140

1  A.   I did.

2  Q.   -- during the course of your work at DMP?

3  A.   Yes.

4  Q.   Okay.  And why did you travel to Cyprus?

5  A.   Primarily two reasons:  the first was that we worked on

6  some political election work for a candidate, and that

7  individual was also our attorney in Cyprus for our business

8  matters.

9  Q.   Okay.  What was the name of that individual?

10  A.   Kypros Chrysostomides.

11  Q.   Okay.  Did he have a nickname?

12  A.   He did.

13  Q.   What was it?

14  A.   Dr. K.

15  Q.   Okay.  With respect to Dr. K, you testified that you

16  worked on some political campaigns for him?

17  A.   Yes.

18  Q.   Can you explain what you did?

19  A.   Yes.  In 2008, Cyprus was having a presidential election.

20  Mr. Manafort had been contacted by a business associate and

21  asked us to meet with them and assess whether or not he had a

22  prospect of not only running in the race but potentially

23  winning.

24  Q.   Okay.  And did you meet with Dr. K?

25  A.   We did.

1141

1   Q.   Okay.  And you testified that Dr. K also performed

2   certain services with respect to your Cyprus accounts?

3   A.   Yes.

4   Q.   Can you explain what that was?

5   A.   Yes.  Dr. K's law firm opened up all of the Cyprus

6   accounts that were under Mr. Manafort's control.

7   Q.   Okay.  And how did you first meet Mr. -- Dr. K?

8   A.   Mr. Manafort invited me to a meeting with Dr. K in

9   Cyprus.

10  Q.   Okay.  Can I ask you to take a look at Government

11  Exhibit 356.

12          Can you tell me what that is?

13  A.   Yes.  This is a memo to a businessmen Mr. Manafort knew

14  from Mr. Manafort and Dr. K.

15  Q.   And does this relate to the work that you did for Dr. K

16  in Cyprus?

17  A.   It does.

18          MR. ANDRES:  The Government moves to admit 356.

19          MR. DOWNING:  No objection.

20          THE COURT:  Admitted.

21                    (Government's Exhibit No. 356

22                    admitted into evidence.)

23          MR. ANDRES:  May I publish it, Your Honor?

24          THE COURT:  Yes.

25  BY MR. ANDRES:

U.S. v. Manafort

1142

1   Q.   Starting from the top of the memo -- can you highlight

2   the top, please -- can you just explain who it's to, from, the

3   subject matter, and the date?

4   A.   Yes.  The "to" is to Oleg Deripaska.  The "from" is from

5   Mr. Manafort, and KC is also Kypros Chrysotomides.

6   Q.   And what does it say for the subject?

7   A.   The subject is Cyprus.

8   Q.   How about the date?

9   A.   The date is April 20, 2009.

10  Q.   And can you read the first paragraph?

11  A.   "Following several conversations in relation to the next

12  steps for KC in Cyprus, presented below is an interim report

13  that summarizes the strategy and the next steps pending your

14  agreement and approval."

15  Q.   Okay.  You testified earlier about your work with

16  Mr. Manafort in the Ukraine.  During the periods of time that

17  he was traveling, were you able to contact him?

18  A.   Yes.

19  Q.   Okay.  And how would you speak with him?

20  A.   Either usually by phone or e-mail.

21  Q.   And do you know if during the time that Mr. Manafort was

22  traveling, he was able to be in touch with his bill payer?

23  A.   Yes.

24  Q.   How do you know that?

25  A.   Because in some cases I had the e-mails forwarded to me

─U.S. v. Manafort─

1    by Mr. Manafort, you know, seeking action on a document or

2    other matter that he had received from the accountant or

3    bookkeeper.

4    Q.   Was there anything about Mr. Manafort's travel that

5    prevented him from speaking to his tax preparers?

6    A.   Not to my knowledge.

7    Q.   How did you know whether or not he was in contact with

8    his tax preparers?

9    A.   Again, I would get e-mails either forwarded by

10   Mr. Manafort or, in some cases, the accountants would reach

11   out to me and say they had talked to Paul and were trying to

12   follow up on certain actions.

13   Q.   You testified that you worked on elections in the

14   Ukraine.  What was the first election you worked on?

15   A.   The parliamentary election in 2007.

16   Q.   And can you describe how -- what work you did on that

17   election?

18   A.   Yes.  That was my first election.  I had primarily helped

19   by coordinating a number of the outside consultants that the

20   company used for that election, then also helping writing the

21   messaging and talking points for the Party of Regions.

22   Q.   Okay.  And can you describe how the parliamentary

23   elections work in the Ukraine?

24   A.   Yes.  Politics in Ukraine is a little different than the

25   United States.  They do not have elections by direct members.

U.S. v. Manafort

1144

1    It's done by proportional representation --

2              THE COURT:  Do you have an objection?

3              MR. DOWNING:  I do.  Objection, Your Honor,

4    irrelevant.

5              MR. ANDRES:  I'm not sure how this is irrelevant.

6    This is what Mr. Manafort is paid for, for his work in the

7    Ukraine.

8              THE COURT:  Well, you don't deny that he was paid.

9    You just deny that -- or the Government takes the position

10   that he didn't report everything he was paid for.  Nobody

11   denies that he did work over there.

12             MR. ANDRES:  Judge, there has not been a single

13   admission, not a single admission by the defense as to any

14   facts in this case.  The fact that they opened on it doesn't

15   mean that they made an admission.  It doesn't mean that the

16   Court's not going to instruct the jury they have to find it.

17   It doesn't mean we don't have the burden to do so.

18             THE COURT:  I don't see anything in any instruction,

19   that either side has submitted, that calls for an instruction

20   on this.

21             Let me -- go ahead and move on, Mr. Andres, and

22   we'll talk about it after we let the jury go home.

23             But we need to focus sharply.  What's in the

24   indictment, what the allegations are, and what each witness

25   can contribute to that.

1145

1      I certainly hope you don't mean to offer a history

2  of Ukrainian politics or anything of that sort, do you?

3           (Audience laughter.)

4           MR. ANDRES:  No.  Judge, to be clear, what --

5           THE COURT:  Do you?  Answer my question.

6           MR. ANDRES:  No.

7           THE COURT:  All right.  Well, keep that in mind.

8           Next question.

9           MR. ANDRES:  The Government intends to --

10          THE COURT:  Next question, sir.

11  BY MR. ANDRES:

12  Q.   With respect to the number of elections that you worked

13  on in the Ukraine, how many elections did you work on?

14  A.   I think over the period of time from 2007 to 2014, it was

15  eight to ten.

16  Q.   And what type of work did you do?

17  A.   Primarily, again, worked in pulling a series of

18  consultants together that we used externally.  Also, working

19  with our local staff to pull together messaging, talking

20  points, election integrity efforts, and media and political

21  matters and polling.

22  Q.   You testified that you -- did you work on the 2010

23  election of President Yanukovych?

24  A.   Yes.

25  Q.   Okay.  And who won that election?

U.S. v. Manafort

1146

1    A.    Mr. Yanukovych.

2    Q.    Can I show you what's been marked as Government

3    Exhibit 346?

4          Can you tell me what that is?

5    A.    Yes.  This is a memo from Mr. Manafort to our campaign

6    team and it's in regards to kind of a status of the campaign

7    three weeks out from the election date.

8    Q.    And what campaign does that refer to?

9    A.    This is in reference to -- let me check real quick -- the

10   presidential campaign in 2010.

11   Q.    Okay.  And did you work on that campaign?

12   A.    I did.

13   Q.    Okay.  And after that, can -- did you --

14   A.    Sorry, I apologize.  The date, this is the parliamentary

15   election in 2012.

16   Q.    And did DMP and Mr. Manafort work on that campaign?

17   A.    It did, yes.

18         MR. ANDRES:  Your Honor, the Government moves to

19   admit Government Exhibit 346.

20         MR. DOWNING:  No objection.

21         THE COURT:  It's admitted.  But let me give you an

22   opportunity, Mr. Andres, to tell me a bit more about why you

23   think it's relevant.  Come to the bench.

24         (Bench Conference.)

25         THE COURT:  All right.  Why is it relevant?

U.S. v. Manafort

1147

1       THE CSO:  Quiet.

2       MR. ANDRES:  Is there an objection, Judge?

3       THE COURT:  I want to know why it is relevant.  Yes,

4   I have an objection to the time this is taking.  This witness

5   has testified that he committed crimes, pointed them out.  You

6   have evidence that you've -- but you're asking him about what

7   he did in an election and it just doesn't seem relevant.  And

8   so I'm giving you an opportunity to tell me why.

9       MR. ANDRES:  I'm asking these questions because

10  these are the facts that are alleged in the indictment and

11  this is the money that he'll be paid for.  What he's going to

12  testify about shortly about who specifically paid for those

13  elections, for what accounts they used, how they did it.

14  There are a number of individuals --

15      THE COURT:  Ask him that directly.

16      MR. ANDRES:  Judge, you --

17      THE COURT:  You can ask the question directly.

18      MR. ANDRES:  And there's also no reason why I can't

19  ask the questions.

20      THE COURT:  There is, because we don't have

21  interminable time.  Don't look so puzzled (directing comment

22  to Mr. Asonye.)

23      You've tried cases in this Court before.

24      MR. ANDRES:  Judge, I disagree that speed is more

25  important than the substance.

U.S. v. Manafort

1148

1    THE COURT:  I agree that speed isn't more important

2 than substance, but a delay is unnecessary.

3    MR. ANDRES:  The suggestion that the Government is

4 somehow delaying the record does not reflect that.

5    THE COURT:  You're going into areas that don't seem

6 to be relevant.

7    MR. ANDRES:  I understand.  But Your Honor -- as

8 Your Honor now knows, I haven't previewed my entire case for

9 you.  So I don't know how exactly I'm supposed to explain to

10 the Court before I ever admit any of the evidence what's

11 coming next.  And so Your Honor has questions about what's

12 coming next --

13    THE COURT:  Look at me when you're talking to me.

14    MR. ANDRES:  I'm sorry, Judge, I was.

15    THE COURT:  No, you weren't.  You were looking at

16 down.

17    MR. ANDRES:  Because I don't want to get in trouble

18 for some facial expression.  I don't want to get yelled at

19 again by the Court for having some facial expression when I'm

20 not doing anything wrong, but trying my case.

21    So every instance the Court interrupts every single

22 one of the Government's directs, every single one.  On the

23 defense direct, they get to bring in documents that aren't

24 even in the relevant time frame.

25    THE COURT:  Well, why didn't you object?

U.S. v. Manafort

1          MR. ANDRES:  We did.

2          THE COURT:  Then I ruled on it.  You must be quiet.

3   One lawyer at a time.  You knew that.

4          (Directing comment to Mr. Asonye.)

5          MR. ANDRES:  I'm sorry, Judge.

6          THE COURT:  Well, I understand how frustrated you

7   are.  In fact, there's tears in your eyes right now.

8          MR. ANDRES:  There are not tears in my eyes, Judge.

9          THE COURT:  Well, they're watery.

10          Look, I want you to focus sharply on what you need

11   to prove -- to prove the crime.  And I don't understand what a

12   lot of these questions have to do with it.

13          Now, let me be clear about the trips to the Ukraine.

14   I'm going to permit you to show those, but I'd like you to

15   expedite things and I don't fault you for not doing this in

16   advance.  You could have, but you're not required to.  Give

17   him a list of when he was in the Ukraine, and ask them to do

18   that, then we don't have to spend time going page by page

19   through a passport.

20          Now, what is it you want to elicit from him about

21   the work on the campaigns?

22          MR. ANDRES:  The memos list the individuals who are

23   paying for the campaigns.  They are being updated repeatedly.

24   Their names have not been entered into evidence.

25          The last time we tried to go through the memos, with

─────U.S. v. Manafort─────

1   the search warrant witness, the Court prevented us from doing

2   that.  These are memos that Mr. Gates wrote for Mr. Manafort

3   or was copied on.

4        THE COURT:  And what do they show?

5        MR. ANDRES:  They show who the -- who's being

6   updated about the campaign.  And the people with the initials,

7   the businessmen here, the oligarchs.  We're not calling them

8   that obviously, but businessmen who are paying them for

9   the campaign.  This is the money trail Your Honor has been

10  asking for for some time and here we are, and yet, we're still

11  having problems submitting our case.

12       THE COURT:  How were they paid?  They were paid by

13  wire transfers through the Cyprus accounts.

14       MR. ANDRES:  Through shell companies.  So we have to

15  elicit the name of people who control the accounts.  Who the

16  pay masters were, the businessmen, what accounts they held.

17  There's documentary evidence which support that.  Your Honor

18  knows very well that Mr. Gates' credibility will be tested

19  severely on cross-examination.  And we're simply submitting

20  documents that are going to help how it is he knows what he

21  does.

22       MR. DOWNING:  Your Honor, I'm -- I get your point,

23  too.  I don't mind working with the Government.  If they give

24  us some kind of summary of the contracts for the consulting

25  services and the payments that go into the accounts, we'd be

U.S. v. Manafort

1151

1   more than happy to work on this.

2           And by the way, to be clear, this was something I

3   talked to Mr. Andres about before this trial, about getting

4   some of this stuff summarized, getting an agreement on it, and

5   moving through this case.

6           So I definitely did raise it with him and I did not

7   appreciate him saying that earlier.  That is not what

8   happened.

9           MR. ANDRES:  Okay.  So maybe Mr. Downing can send up

10  an e-mail that it doesn't exist.  And by the way, Judge,

11  you'll remember not long ago, I tried to show a witness a

12  summary chart and Your Honor wouldn't let it in.

13          THE COURT:  That's a different matter.

14          MR. ANDRES:  It's not a different matter.

15          THE COURT:  I say it's different.

16          Now, you're going to get a chance to introduce those

17  later, but the right way.

18          MR. ASONYE:  Can I say something on this point?

19          THE COURT:  No, you may not.

20          MR. DOWNING:  But I will -- I'll work with

21  Mr. Andres this evening, do my work.

22          THE COURT:  Look -- yes, and I want you-all to work

23  to see if you can expedite getting the evidence in this case.

24  You may continue with your examination now.

25          MR. ANDRES:  Okay.  Thank you, Judge.

U.S. v. Manafort

1152

1     (End of bench conference.)

2     THE COURT:  All right.  Mr. Andres, you may proceed.

3     MR. ANDRES:  Thank you, Your Honor.

4     THE COURT:  And I didn't exclude anything, so you

5  may proceed as you were doing.

6     MR. ANDRES:  Thank you, Judge.

7  BY MR. ANDRES:

8  Q.   Can you look at Government Exhibit 342?

9  A.   Yes.

10 Q.   Can you tell me what that is?

11 A.   This is an e-mail chain involving Mr. Kilimnik and

12 Mr. Manafort.

13 Q.   Okay.  And the attached -- the subject, can you read the

14 subject?

15 A.   The subject is ST documents.

16 Q.   And the reference to ST, is that an individual?

17 A.   It is.

18 Q.   Who is ST?

19 A.   His name is Serhiy Tihipko.

20 Q.   Okay.  And was he -- who is Serhiy Tihipko?

21 A.   Serhiy Tihipko is -- had his own political party and also

22 supported the Party of Regions that we were working for.  And

23 at the point of this e-mail, he was helping as a surrogate on

24 economic matters.

25 Q.   In the course of your work in the Ukraine, did

─U.S. v. Manafort─

1153

1  Mr. Tihipko make payments to Davis Manafort and DMP

2  International?

3  A.   Yes.

4  Q.   For what?

5  A.   For a lobbying project involving the EU in the U.S.

6  Q.   Okay.

7        MR. ANDRES:  Your Honor, the Government moves to

8  admit Government Exhibit 342.

9        MR. DOWNING:  No objection, Your Honor.

10        THE COURT:  Admitted.

11                      (Government's Exhibit No. 342

12                      admitted into evidence.)

13  BY MR. ANDRES:

14  Q.   With respect to the payments that ST made, or Serhiy

15  Tihipko, how were those payments made?

16  A.   By wire transfer.

17  Q.   Okay.  Wire transfer from where to where?

18  A.   From his company in Cyprus to Mr. Manafort's company in

19  Cyprus.

20  Q.   And did Mr. Tihipko, did he control certain shell

21  companies in Cyprus?

22  A.   Yes.

23  Q.   Do you know what the names of those were?

24  A.   Yes.  The one that was used by Mr. Tihipko was Dresler

25  Holdings, I believe, Dresler Holdings.

─────U.S. v. Manafort─────

1154

1    Q.    Okay.  And did they make payments to Mr. Manafort's

2    Cypriote holdings?

3    A.    Yes.

4    Q.    How do you know that?

5    A.    Because I was the one that helped organized the paperwork

6    to -- and initiate the wire transfer from their side.

7    Q.    Can you take a look at Government Exhibit 344?

8              Can you tell me what that is?

9    A.    Yes.  This is a memo drafted by Mr. Manafort in regards

10   to an election integrity program that we were working on for

11   the upcoming parliamentary elections in 2012.  And this was to

12   basically outline the strategy for how the Party of Regions

13   members would work with embassies, the media, and MGO's prior

14   to the campaign.

15             MR. ANDRES:  The Government moves to admit

16   Government Exhibit 344.

17             MR. DOWNING:  No objection.

18             THE COURT:  Admitted.

19                        (Government's Exhibit No. 344

20                        admitted into evidence.)

21             MR. ANDRES:  May I publish it?

22             THE COURT:  Yes.

23   BY MR. ANDRES:

24   Q.    Okay.  You testified, Mr. Gates, about the e-mail, the

25   top e-mail.  And I'd just ask you to look at the top e-mail

U.S. v. Manafort

1155

1   and tell me who the e-mail is to?

2   A.   The top e-mail is to Mr. Manafort.

3   Q.   And who's it from?

4   A.   Mr. Kilimnik.

5   Q.   And are you CC'd?

6   A.   I am.

7   Q.   What's the date?

8   A.   Date is July 12, 2012.

9   Q.   Okay.  Can you tell me what the subject of the e-mail is?

10  A.   The subject is EI, which means Election Integrity

11  Outreach International Plan.

12  Q.   Okay.  And in the e-mail, can you just read the first

13  sentence of the e-mail?  Who's it -- after it says, "Paul,"

14  can you just read that first sentence?

15  A.   Yeah.  "Attached is the final version of the memo.  It

16  was given to SL, Levenets, MFA, AK."

17  Q.   Okay.  The reference to SL, who is that?

18  A.   Serhiy Lyovochkin.

19  Q.   Okay.  During the course of the time that you worked in

20  the Ukraine, did Mr. Lyovochkin pay for certain services?

21  A.   He did.

22  Q.   Davis Manafort?

23  A.   Yes.

24  Q.   What did he pay for?

25  A.   He paid for political work and some policy work on behalf

---U.S. v. Manafort---

1  of the Party of Regions.

2  Q.   And without giving us a particular number, were those

3  payments in the millions of dollars?

4  A.   Yes.

5  Q.   Okay.  And did DMP International enter into series of

6  work contracts with them?

7  A.   Yes.

8  Q.   How did Mr. Lyovochkin pay for the work to DMP?

9  A.   Mr. Lyovochkin wired money from his Cyprus account to

10  Mr. Manafort's account in Cyprus.

11  Q.   And was his Cyprus account in the name of a shell

12  company?

13  A.   Yes.

14  Q.   What were the names?

15  A.   The two that Mr. Lyovochkin primarily used were Taunton

16  Limited and Telmar Investments.

17  Q.   And with respect to the way that Mr. Manafort received

18  those payments, where did he receive those payments?

19  A.   He received them in Cyprus.

20  Q.   Okay.  And did he -- when the money got to Cyprus, did he

21  move it to the United States immediately?

22  A.   In some cases, he moved some, but he left some in Cyprus

23  as well.

24  Q.   Did Mr. Manafort maintain those Cyprus accounts over a

25  period of time?

U.S. v. Manafort

1157

1   A.   Yes.

2   Q.   And was there money in those accounts?

3   A.   Yes.

4   Q.   Was it millions of dollars?

5   A.   Yes.

6   Q.   Can I ask you to turn to the memorandum attached to

7   Government Exhibit 344?

8        Can you tell me what that is?

9   A.   Yes.  This is the memo that Mr. Manafort drafted to

10  several people in the party of leadership, outlining what

11  needed to be done in terms of the election integrity efforts.

12  Q.   Okay.  Can you tell me who's on the "to" line?

13  A.   Yes.  SL is Mr. Serhiy Lyovochkin.

14       AK is Andriy Klyuyev.

15       ST is Serhiy Tihipko.

16       BVK is Borys Kolesnikov.

17       And KG is Kostyantyn Gryshchenko.

18  Q.   And who is KG?

19  A.   KG is Kostyantyn Gryshchenko.

20  Q.   And what was his position?

21  A.   At that time, I believe he was the Minister of Foreign

22  Affairs.

23  Q.   Okay.  With respect to the four other individuals, SL,

24  AK, ST, and BVK, were they businessmen in the Ukraine?

25  A.   They were.

─U.S. v. Manafort─

1158

1  Q.   Were they all involved in making payments to

2  Mr. Manafort?

3  A.   Yes.

4  Q.   Okay.  Did they make those payments through shell

5  companies?

6  A.   I should say the only one, Mr. Gryshchenko did not make

7  any payments.

8  Q.   Correct.  So all the people before KG?

9  A.   Correct.  That's -- yes.

10 Q.   Okay.  You've testified previously about SL.  Who is AK?

11 A.   AK is Andriy Klyuyev.  He was the first deputy prime

12 minister in the government.

13 Q.   Is he also a businessmen in the Ukraine?

14 A.   Yes.

15 Q.   And did he make payments to Mr. Manafort?

16 A.   Yes.  Not that many, though.

17 Q.   Okay.  What entities did he use?

18 A.   I think the primary one he used was Novirex Limited.

19 Q.   Okay.  And --

20         THE COURT:  What -- do you know what these payments

21 were for?

22         THE WITNESS:  Yes.

23         THE COURT:  What?

24         THE WITNESS:  Primarily political campaigns with

25 Mr. Klyuyev specifically, since he didn't make that many, and

———————U.S. v. Manafort———————

1159

1   this one was for polling work that was done.

2           THE COURT:  In other words, services?

3           THE WITNESS:  Services, yes.

4           THE COURT:  Services done in support of these

5   people's political campaigns?

6           THE WITNESS:  That's correct.

7           THE COURT:  So the people they supported.

8           THE WITNESS:  Yes.

9           THE COURT:  And you said payments were made by these

10  people or their entities, because you said --

11          THE WITNESS:  Their Cyprus entities, yes, Your

12  Honor.

13          THE COURT:  I beg your pardon?

14          THE WITNESS:  Their Cyprus entities.

15          THE COURT:  Yes, to Mr. Manafort.

16          THE WITNESS:  Correct.

17          THE COURT:  Or his entity?

18          THE WITNESS:  His Cyprus entity, yes.

19          THE COURT:  Next question.

20  BY MR. ANDRES:

21  Q.    The person with -- that's identified as BVK?

22  A.    Yes.

23  Q.    Can you tell me who that is?

24  A.    Yes.  That's Borys Kolesnikov.  He was in the party

25  leadership.  He's very closely associated with Rinat Akhmetov.

—U.S. v. Manafort—

1160

1    And then Mr. Kolesnikov is also the minister of transportation

2    in the government.

3    Q.   Okay.  And with respect BVK, was he a wealthy

4    businessmen?

5    A.   Yes, I think so.

6    Q.   Did he make payments to Mr. Manafort?

7    A.   He did.

8    Q.   And what were those payments for?

9    A.   Political work.

10   Q.   And did he make those payments through a series of shell

11   companies?

12   A.   He did.

13   Q.   Do you know what the names of those shell companies are?

14   A.   Some that I recall are Mistaro, Inlord Sales -- let's

15   see, Firemax.  I think there are some others as well.

16   Q.   Okay.  Do you have an understanding why these

17   businessmen --

18           THE COURT:  Go ahead.  Go ahead.

19   BY MR. ANDRES:

20   Q.   Do you have an understanding why these businessmen were

21   making payments for political campaigns in the Ukraine?

22   A.   Yes.  In Ukraine, there's no party structure like there

23   is in the U.S.  So you don't really have a Republican National

24   Committee or a Democratic National Committee, so there are no

25   political contributions in Ukraine.  And what typically

U.S. v. Manafort

1  happens is those people supporting a particular party come

2  together, a budget is created, and then the budget is divided

3  among those people who can contribute to those campaigns.

4  　　　　THE COURT:  So it is a political contribution.

5  　　　　THE WITNESS:  A very high one, yes, Your Honor.

6  　　　　THE COURT:  You've said they did it shelf -- through

7  shelf companies.

8  　　　　THE WITNESS:  Yes.

9  　　　　THE COURT:  What did you mean by that?

10 　　　　THE WITNESS:  Shelf companies are basically

11 companies in Cyprus that have already been set up and remain

12 on the corporate registry in Cyprus and that you're allowed to

13 use.  And it's cheaper than to set up a company that you

14 actually create a name for.

15 　　　　THE COURT:  Well, what does the term "shell" mean?

16 　　　　THE WITNESS:  I think it's shelf company.  You said

17 shell?  Yeah, it should be shelf, not shell.  Shelf, like

18 meaning they are already on the shelf.

19 　　　　THE COURT:  Oh, I see.

20 　　　　THE WITNESS:  Right.

21 　　　　THE COURT:  Are you saying s-h-e-l-f?

22 　　　　THE WITNESS:  Correct.

23 　　　　THE COURT:  I see.  All right.  Go ahead,

24 Mr. Andres.

25 BY MR. ANDRES:

—U.S. v. Manafort—

1162

1   Q.   You testified about the manner in which the -- well, let

2   me ask you this:  Did the businessmen in the Ukraine, did they

3   benefit in some way from supporting these elections?

4   A.   If the party was successful and that party came to power,

5   then yes.  Often they benefitted financially through contracts

6   or ownership of certain companies or percentages of companies.

7   Q.   You testified about this manner in which these payments

8   were made from the businessmen in the Ukraine to Mr. Manafort.

9   How did you first learn about that process?

10  A.   Mr. Manafort told me, and then later Mr. Kilimnik also

11  confirmed that information.

12  Q.   Anything to you about whether or not he was required to

13  open accounts in Cyprus?

14  A.   Yes.  He indicated that the Ukrainian businessmen and the

15  people that were working on the political parties had directed

16  him to set up Cyprus accounts because the payments would be

17  coming from Cyprus.  So it was easier for the Ukrainian

18  businessmen to make those payments.

19          THE COURT:  When you come to a good stopping point,

20  I take it you have more that we can't finish today.

21          MR. ANDRES:  I can stop now if you'd like, Your

22  Honor.

23          THE COURT:  Let's do that.

24          Mr. Gates, you may step down.

25          We will reconvene tomorrow at 9:30.  And in the

U.S. v. Manafort

1163

1  interim, you may not discuss your testimony with anyone at

2  all, whether lawyer or other.

3          THE WITNESS:  Okay.  Thank you.

4          (Witness excused.)

5          THE COURT:  Ladies and gentlemen, pass your books to

6  the right.  Mr. Flood will collect them, maintain their

7  security.

8          Remember, as always, to refrain from discussing the

9  matter with your family or anyone or undertaking any

10 investigation on your own.

11         And avoid, as I find it easy to do, the news or

12 anything, any discussions.

13         Let me ask Mr. Andres:  How much more do you

14 anticipate with this witness?

15         MR. ANDRES:  Approximately three hours.

16         THE COURT:  All right.  Gives you a forecast.  We'll

17 try, of course, to focus it sharply and ensure that -- that

18 time is spent well.

19         You may follow the court security officer out.  I'll

20 see you tomorrow morning at 9:30.  You filled out your menus,

21 I hope.

22         Good.  See you tomorrow morning.

23         (Jury dismissed.)

24         THE COURT:  All right.  You may be seated.

25         Mr. Andres, let me give you an opportunity to

U.S. v. Manafort

1164

1    educate me.  I understand that the -- Mr. Andres?

2            MR. ANDRES:  I'm listening, Judge.  I'm sorry.  I

3    was listening.

4            THE COURT:  It's customary, as Mr. Asonye will tell

5    you, when I address you to come to the podium and stand, but

6    you can be forgiven.

7            MR. ANDRES:  No, no.

8            THE COURT:  You can be forgiven that.

9            Anyway, Mr. Andres, I want to give you an

10   opportunity to explain to me why some of this is relevant.  I

11   understand that the Government has alleged in the indictment

12   that he received payments from these people in -- and from

13   these organizations and companies that he report on his

14   return.  And so I'm not sure that I see clearly what this has

15   to do -- for example, you asked a question:  Do these people

16   have something to gain from giving -- giving this money?

17           I don't see any earthly relevance to that.

18           I mean, I don't ask Mr. Koch or Mr. Soros whether

19   they have anything to gain from contributions they make.

20   These are people that are backing political parties and

21   political factions.

22           So maybe I'm not seeing something and maybe you can

23   explain that to me.

24           MR. ANDRES:  These people are not making political

25   contributions in the way that you suggest.  They're not

────────U.S. v. Manafort────────

1165

1  anything like any Americans.  I don't know why you keep

2  singling out these individuals.  I don't know anything about

3  their political connections or who they give money to.

4          These people are oligarchs.  They are oligarchs.

5  And that means they control a segment of the economy based on

6  the Government's allowing them to do that.  The Government,

7  who they support, then provides them with political cover so

8  that they can have a monopoly over certain areas of the

9  economy.

10          Now, Your Honor, and I've done my best --

11          THE COURT:  I'm glad you've explained that to me --

12          MR. ANDRES:  Yes.

13          THE COURT:  -- because that makes it even clearer to

14  me that it doesn't have anything to do with the allegations in

15  this case.

16          I think -- you know, I'm not here to debate with you

17  whether these are good people or bad people.  I raised early

18  on about the use of the term "oligarch."  I didn't -- it

19  throws dirt on these people.  They may deserve it.  I don't

20  know and I don't care.

21          What matters is whether he received money and he

22  didn't report it on his income tax.  It doesn't matter whether

23  these are good people, bad people, oligarchs, crooks, Mafia,

24  or whatever.  It doesn't matter.  What matters is that your

25  allegations that he received money that he didn't report on

U.S. v. Manafort

1166

1   his income tax, that's what matters.

2           MR. ANDRES:  Respectfully, Judge, that is not what

3   the law is.

4           The law is that what he earned as income matters,

5   not if these people gave it as a gift, I want to make sure

6   that's not clear, not if these people gave it for some other

7   reason and that Mr. Manafort earned it, that he earned

8   income --

9           THE COURT:  All right.  I see that.  I see that.

10  But you don't need to throw mud at these people or the cause

11  they supported or the reasons.  In fact, some early -- early

12  witnesses said Mr. Manafort was brilliant and so forth and

13  that it was an important aspect in -- I'm here, Mr. Andres.

14          MR. ANDRES:  I'm sorry, Judge, I'm listening.

15          THE COURT:  I know.  But when you look down, it's as

16  if to say, you know, that's BS.  I don't want to listen any

17  more from you.

18          MR. ANDRES:  Judge, you continue to interpret our

19  reactions in some way.  We don't do that to you and we're not

20  being disrespectful in any way.

21          THE COURT:  All right.  Well, then look at me.

22          MR. ANDRES:  Fine.

23          THE COURT:  Don't look down.  Don't roll your eyes.

24  Don't --

25          MR. ANDRES:  I'm not rolling -- I don't understand

U.S. v. Manafort

1167

1    how --

2              THE COURT:  You may not have rolled your eyes, but

3    you're not the only person sitting on that side.

4              MR. ANDRES:  I would find it interesting to see that

5    I was both looking down and you notice that I was rolling my

6    eyes, but I --

7              THE COURT:  I told you, Mr. Andres, I wasn't saying

8    you rolled your eyes.  I did make a comment about your eyes up

9    here, and I stand by that comment.

10             But, anyway, explain to me why it makes a difference

11   whether the payments came from people you think are immoral

12   and oligarchs or whatever other than that he earned the money.

13   I don't think anyone denies that he did work over there, that

14   he was successful, and they paid him millions of dollars.

15             And I think you have shown that it was paid through

16   these companies in Cyprus.  And you need to show, as I think

17   you have evidence, that he didn't report that money on his

18   income tax.

19             But I don't see any need to cast aspersions on

20   whether he was doing the Lord's work or some evil work over

21   there, do you?

22             MR. ANDRES:  I wasn't suggesting that in any way.  I

23   didn't say a word about oligarchs.  I didn't say a word about

24   anything.  But, Your Honor -- Your Honor --

25             THE COURT:  I stopped that early on.

———————U.S. v. Manafort———————

1      MR. ANDRES:  -- Your Honor then injected that these

2 were political contributions, and they're not really political

3 contributions.

4      THE COURT:  Why not?

5      MR. ANDRES:  Only with respect to Your Honor

6 injecting a question to the witness about -- because they're

7 not just political contributions, they are these self-serving

8 payments with respect to what the oligarchs are giving to

9 these politicians.

10      THE COURT:  You don't think people in the United

11 States when they give --

12      MR. ANDRES:  I'm not here to talk about what

13 political people do in a campaign.  I'm here to prove a fact.

14      THE COURT:  It is political contribution, but it

15 doesn't matter.

16      MR. ANDRES:  Fine.

17      THE COURT:  What matters is that he received

18 payments and it was for work and, therefore, it's income and

19 he didn't report it.  That's what matters.

20      MR. ANDRES:  Right.  And at every instance when we

21 try to describe the work, that he worked on elections, what he

22 did, Your Honor stops us and tell us to move on.  Judge, look

23 at --

24      THE COURT:  Oh, the record will reflect I have

25 rarely stopped you in this case.

U.S. v. Manafort

1169

1    MR. ANDRES:  I will stand by the record as well.

2    THE COURT:  All right.  Then you will lose.

3    All right.  I want to see this matter tried

4    expeditiously.  So I am requiring you and Mr. -- well, Downing

5    and anyone else -- for example, on these passports, I want you

6    to get together.  There's no dispute about when this fellow --

7    when this witness was in the Ukraine, and it ought to be a

8    simple piece of paper that you can agree to, a stipulation.

9    Going through the thing page by page is unnecessary.

10   And there are other things that I think -- if you want to show

11   that certain payments were made, and certainly you can do so.

12   What I don't think is necessary -- I haven't been

13   through these hundred-plus exhibits that you plan to go

14   through.  There were a couple of these e-mails trails that --

15   chains that you admitted that I don't think have much to do

16   with this.

17   All I'm asking is that you look at what you intend

18   to present and see if you can focus it very sharply.

19   MR. ANDRES:  Your Honor, it would be helpful for me

20   to do that if you could identify an e-mail chain that you've

21   admitted as relevant evidence, which is not relevant or how

22   it's not relevant --

23   THE COURT:  Well, I've admitted a lot of e-mail.

24   I'm not going to go through those.

25   MR. ANDRES:  Just asking for one example of a

U.S. v. Manafort

1170

1  document that you've admitted --

2      THE COURT:  I don't have to give you an example.  I

3  want you to shorten it.

4      MR. ANDRES:  Your Honor, I don't understand how

5  I'm -- this is a trial.  We're going to call witnesses.  We're

6  going to try to admit evidence.  I don't understand how I'm

7  supposed to combine with Mr. Downing so that he can approve

8  the Government's evidence before it's admitted.

9      I'm not casting any aspersions on Mr. Downing.  He

10  has his own work to do.

11      THE COURT:  He says he offered to do it.  You said

12  he didn't; is that right, Mr. Downing?

13      MR. ANDRES:  To do what?  To do what?

14      THE COURT:  What was it that you said you offered to

15  do and they said you didn't?

16      MR. DOWNING:  Your Honor, earlier in the case,

17  before all these witnesses were called to the vendors to talk

18  about the personal expenses, we said to the extent you have a

19  chart and you break it down by vendor, give us the detail.

20  We'll look at it.  If we don't have any objection to it, you

21  can put it in evidence.  So we feel no differently about the

22  issues that are coming up now.

23      He's got a chart that summarizes the payments that

24  came in, who made the payments, and the purpose of it.  We

25  will look at it.  And if we have no objections --

U.S. v. Manafort

1    THE COURT:  Well, didn't you object to a chart that

2  Mr. Asonye offered?

3    MR. DOWNING:  I think it was an objection to the

4  timing of a summary coming in.

5    THE COURT:  Well, in any event, this case has now

6  gone on -- is this the sixth day, I believe?

7    MR. ANDRES:  I think -- I think --

8    THE COURT:  I beg your pardon.

9    MR. ANDRES:  It might be the fifth.

10   THE COURT:  All right.  It's -- I think you're

11  right.  It is the fifth.

12   But we need to move the matter along.

13   And any way that you can think to do it, Mr. Andres,

14  would be appreciated by the Court, would be appreciated by the

15  jury.  And you should cooperate, Mr. Downing.

16   MR. DOWNING:  Understood.

17   THE COURT:  No reason to -- to extend this.  I still

18  am not sure, Mr. Andres, give me another try, tell me why it

19  matters, apart from the fact that whether it's income or a

20  gift, and nobody is going to contend any of this money was a

21  gift, but why it matters for us to go into detail about who

22  these contributors were and so forth.

23   MR. ANDRES:  That it prove -- it proves the flow of

24  money.  We have to prove where the money came from.  And,

25  again, Your Honor, we're all tired.  So I don't mean to be

U.S. v. Manafort

1172

1   disrespectful, but this seems to me the very type of evidence

2   that Your Honor was saying we should move on to, and here we

3   are.  So we're just trying to prove this.  We're trying to

4   prove that these men in the Ukraine, Rinat Akhmetov,

5   Sergei Lyovochkin, Borys Kolesnikov are the payers.  They pay

6   the money to the DMP.

7          Now, the way they do it are through companies, not

8   in their name, Cyprus companies, and Mr. Manafort's companies

9   that are in Cyprus, not in his name, and that's where the

10  money sits.  So there you have the foreign bank accounts which

11  form the basis of the false tax filing.

12         Okay.  That money is then moved to the United

13  States.  It's income.  It's not reported to his accountants.

14  It's used to pay a whole host of different things, and that's

15  the income that's not reported.

16         THE COURT:  Well, I agree with everything you've

17  said.

18         Now, tomorrow if you ask a question about who is

19  this guy and what does he do and how does he benefit from

20  giving this money, you will see why I am confused about why

21  that makes any difference.

22         MR. ANDRES:  Again, Your Honor, I was just trying to

23  make the record clear -- Mr. Gates never described these as

24  necessarily or simply as political contributions.  So I wanted

25  to complete his answer with respect to that.

U.S. v. Manafort

1       I'm not -- I'm certainly not going to ask any

2   questions I've already asked.  It is not going to happen.

3   That's not my goal.  I share your interest in moving it along.

4       I will say that I am -- I -- you know --

5       THE COURT:  Tell me why these are not political

6   contributions if they're trying to help get a candidate

7   elected and why it makes any difference.

8       The only thing that matters is that they paid

9   Mr. Manafort money that he didn't report.  That's what the

10  case is about.

11      MR. ANDRES:  I don't fundamentally disagree with

12  that except for the fact that I don't think it's appropriate

13  to not explain to the jury why they are making these payments,

14  right?

15      So why exactly these people are paying millions and

16  millions of dollars, more than $60 million over time to

17  Mr. Manafort.

18      It's not -- it's not extraneous or irrelevant to

19  explain that these people control industry and have the money

20  to make the payments.  That's all.  It's not ten questions.

21  It's one.  So --

22      THE COURT:  All right.  Well, it occurs to me that I

23  am unnecessarily -- I am unnecessarily extending this by

24  continuing this conversation.

25      But you are both under my firm desire that you

1174

1   should do what you can to expedite this matter and not spend

2   time on matters that aren't relevant.

3          MR. ANDRES:  I will do that, Judge, but the notion

4   that we're going to meet with Mr. Downing tonight to help him

5   understand what Mr. Gates' testimony is so we can

6   expedite it --

7          THE COURT:  I'm not requiring you to meet with

8   Mr. Downing.  I am requiring -- the only thing I've said is

9   give him the chart on the things and -- I'm up here.

10          MR. ANDRES:  Sorry.

11          THE COURT:  Give him a chart that says when he was

12   in the Ukraine.  We'll at least get rid of some of those

13   questions.  We don't have to have passports in the record.

14          MR. ANDRES:  Got it.  Past that.

15          THE COURT:  Good.  See, and if you can see other

16   areas where you can do it, do it.  But you're not required to

17   meet with him.

18          I do want you to make every effort to expedite this

19   matter.  And if meeting with Mr. Downing and getting him to

20   stipulate something will expedite it, wonderful.

21          MR. ANDRES:  We will do that, Judge.  You'll

22   remember from the opening statements that's central to the

23   defense case was that this whole -- whole conspiracy was

24   Mr. Gates doing so.  I would just ask the Court for a slight

25   bit of leniency in being able to introduce documents which

1    corroborate Mr. Gates' testimony, because, obviously, in every

2    case, I'm sure most that you've had, the credibility of a

3    cooperating witness is central.

4           We want to be able to corroborate that with

5    documentary evidence which he had, which we seized from

6    Mr. Manafort's house and the like.  So that's why with this

7    witness these documents are critical.  I will cut them down --

8           THE COURT:  All right.  That's a good explanation

9    and I will have that in mind.  Anything else you think I

10   should have in mind?

11          MR. ANDRES:  That's about it, Judge.  We're hoping

12   to finish tomorrow morning and with your instruction, we'll

13   get to moving it along.  For sure.  And I didn't mean to be

14   disrespectful.

15          THE COURT:  Don't worry about it.  I'm not concerned

16   about that at all.

17          I remember trying cases.  I don't think I ever

18   had -- I had big cases that I thought were important.  They

19   were important to me, important to my career.  And I remember

20   the stress and I remember the pressure.  And so I know that's

21   true for both of you -- I mean all of you.

22          This is a stressful time.  So I understand that.

23   But I'm trying to minimize the stress time is all I'm trying

24   to do.  And I think we can do it.

25          I don't think this case is as complex as it could be

U.S. v. Manafort

1176

1  made to be.  I think it's simpler than that.

2          And you do what you think you have to do.  And you

3  object if you think he's getting to this irrelevant stuff.

4          And I'll rule on it.

5          MR. ANDRES:  Thank you, Judge.  Have a good night.

6          THE COURT:  All right.  We're in recess until 9:30.

7          **(Proceedings adjourned at 5:50 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4   the Eastern District of Virginia, do hereby certify that I

5   reported by machine shorthand, in my official capacity, the

6   proceedings had and testimony adduced upon the Jury Trial

7   in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8   **MANAFORT, JR.,** Criminal Action No. 1:18-CR-83, in said

9   court on the 6th day of August, 2018.

10          I further certify that the foregoing 197 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16  name, this August 6, 2018.

17

18

19

20

21                          _____
                            Tonia M. Harris, RPR
22                          Official Court Reporter

23

24

25

                                                            1177

─────U.S. v. Manafort─────

1178

1               UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                ALEXANDRIA DIVISION

3  -----------------------------x
                            :
4  UNITED STATES OF AMERICA,    : Criminal Action No.
                          : 1:18-CR-83
5           versus           :
                          :
6  PAUL J. MANAFORT, JR.,      :
                          : August 7, 2018
7               Defendant. : Volume VI - A.M.
  -----------------------------x

8

               TRANSCRIPT OF JURY TRIAL
9        BEFORE THE HONORABLE T.S. ELLIS, III
            UNITED STATES DISTRICT JUDGE
10

  APPEARANCES:
11
  FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                    United States Attorney's Office
                    2100 Jamieson Avenue
13                    Alexandria, VA 22314
                        and
14                    GREG ANDRES, SAUSA
                    BRANDON LANG VAN GRACK, SAUSA
15                    Special Counsel's Office
                    U.S. Department of Justice
16                    950 Pennsylvania Avenue NW
                    Washington, D.C. 20530
17
  FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                    BRIAN KETCHAM, ESQ.
                    Kostelanetz & Fink LLP
19                    601 New Jersey Avenue NW
                    Suite 620
20                    Washington, DC 20001
                        and
21                    THOMAS E. ZEHNLE, ESQ.
                    Law Office of Thomas E. Zehnle
22                    601 New Jersey Avenue NW
                    Suite 620
23                    Washington, DC 20001
                        and
24                    KEVIN DOWNING, ESQ.
                    Law Office of Kevin Downing
25                    601 New Jersey Avenue NW
                    Suite 620

U.S. v. Manafort

1179

1
                                    Washington, DC 20001
                                       and
2                                   RICHARD WILLIAM WESTLING, ESQ.
                                    Epstein, Becker, & Green, PC
3                                   1227 25th Street NW
                                    Washington, DC 20037
4
OFFICIAL COURT REPORTER:            TONIA M. HARRIS, RPR
5                                   U.S. District Court, Ninth Floor
                                    401 Courthouse Square
6                                   Alexandria, VA 22314

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. v. Manafort

1180

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

Richard Gates (cont'd from 8/6/18)

      Direct examination by Mr. Andres................. 1185

EXHIBITS

On behalf of the Government:

Admitted

Number 66F............................................... 1190
Number 66B............................................... 1198
Number 350............................................... 1209
Number 352............................................... 1213
Number 364............................................... 1216
Number 370............................................... 1228
Number 427.  ............................................. 1232
Number 373............................................... 1258
Number 219............................................... 1260
Number 375............................................... 1261
Number 375............................................... 1263
Number 376............................................... 1264
Number 220............................................... 1268
Number 380............................................... 1280
Number 235............................................... 1284
Number 237............................................... 1289
Number 240............................................... 1291
Number 263............................................... 1291
Number 384............................................... 1293
Number 262............................................... 1295
Number 137............................................... 1296
Number 389............................................... 1303
Number 388............................................... 1304
Number 424............................................... 1306

MISCELLANY

Preliminary matters...................................... 1181
Certificate of Court Reporter............................ 1310

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1181

1       **P R O C E E D I N G S**

2    (Court proceedings commenced at 9:33 a.m.)

3           THE COURT:  All right.  The record will reflect that

4    counsel and the defendant are present, prepared to proceed.

5           Anything we need to deal with at the outset,

6    Mr. Andres?

7           MR. ANDRES:  Just briefly, Judge.  We have had a

8    chance to work with the defense, and we appreciate their

9    cooperation.  I understand that they are going to stipulate to

10   any venue issues, so we'll be able to avoid any evidence --

11          THE COURT:  Good.

12          MR. ANDRES:  -- with exhibits or witnesses.  And

13   maybe we can just get that on the record from the defendant.

14          THE COURT:  All right.  Well, you're both to be

15   complimented for that.

16          Now, there are other things.  I've received the

17   Government's briefs on the summaries.  The rules are pretty

18   clear on that, as are the cases.  The line that sometimes is

19   difficult to discern is an indistinct line is between the

20   presentation of voluminous data by way of charts and advocacy.

21          In other words, it is appropriate for the Government

22   to prepare summary charts.  It's not appropriate for the

23   Government to present charts that do that and advocate at the

24   same time by the way the matter is presented.  I'm not going

25   to look at all of it.  That's your problem.

1182

1      MR. DOWNING:  Understood.

2      THE COURT:  So if there's no objection, you need to

3  let me know and counsel for the Government so we can proceed

4  expeditiously.

5      Anything else this morning?

6      MR. ANDRES:  If we could just have our colleagues

7  from the defense side put on the record that they have no

8  objection to venue, that would be -- I think complete that

9  issue.

10     THE COURT:  I'm sorry, I didn't hear you,

11 Mr. Andres?

12     MR. ANDRES:  I just was asking Mr. Downing to

13 confirm that he's not going to object or consent to the venue

14 issue and I think the best way --

15     THE COURT:  All right.  Well, your representation

16 was sufficient for me.

17     MR. DOWNING:  We consent, Your Honor.

18     THE COURT:  Yes.  Okay.  I'm sure he would have

19 popped up if you had said something he didn't agree with.  And

20 if you represented to me that it was done that way, I accept

21 the representation of counsel.

22     All right.  You may bring the jury in, please.

23     (Jury in.)

24     THE COURT:  You may be seated.  Of course I can see

25 all of you are present and prepared to proceed.  For purposes

U.S. v. Manafort

1183

1    of the record, I will have Ms. Pham call the roll by the

2    numbers and we will proceed.

3            THE DEPUTY CLERK:  Ladies and gentlemen, as I call

4    your name, please answer "present" or "here."

5            Juror 0008.

6            THE JUROR:  Present.

7            THE DEPUTY CLERK:  Juror 0037.

8            THE JUROR:  Here.

9            THE DEPUTY CLERK:  Juror 0276.

10           THE JUROR:  Present.

11           THE DEPUTY CLERK:  Juror 0017.

12           THE JUROR:  Present.

13           THE DEPUTY CLERK:  Juror 0145.

14           THE JUROR:  Present.

15           THE DEPUTY CLERK:  Juror 0115.

16           THE JUROR:  Present.

17           THE DEPUTY CLERK:  Juror 0082.

18           THE JUROR:  Present.

19           THE DEPUTY CLERK:  Juror 0009.

20           THE JUROR:  Present.

21           THE DEPUTY CLERK:  Juror 0299.

22           THE JUROR:  Present.

23           THE DEPUTY CLERK:  Juror 0091.

24           THE JUROR:  Present.

25           THE DEPUTY CLERK:  Juror 0302.

1184

1   THE JUROR:  Present.

2   THE DEPUTY CLERK:  Juror 0060.

3   THE JUROR:  Present.

4   THE DEPUTY CLERK:  Juror 0296.

5   THE JUROR:  Present.

6   THE DEPUTY CLERK:  Juror 0054.

7   THE JUROR:  Present.

8   THE DEPUTY CLERK:  Juror 0127.

9   THE JUROR:  Present.

10   THE DEPUTY CLERK:  And Juror 0133.

11   THE JUROR:  Present.

12   THE DEPUTY CLERK:  Thank you.

13   THE COURT:  Once again, good morning, ladies and

14   gentlemen.

15   And I can understand your haziness on the number.

16   It brings to mind when I forgot my service number when I was

17   first a young member of the United States Navy.  And that was

18   a painful experience.  And to this day, some 60-some years

19   later, 647251.

20   (Audience laughter.)

21   Now, we'll proceed today.  Let me confirm that all

22   of you were able to adhere to the Court's instructions to

23   refrain from discussing the case with anyone or undertaking

24   any investigation.

25   THE JURORS:  Yes, Your Honor.

1        THE COURT:  Good.  Thank you.

2        All right.  Let's have Mr. Gates return.  And,

3  Mr. Andres, you may complete your examination, which I think

4  you indicated would be another --

5        MR. ANDRES:  Three to four hours, Judge.

6        THE COURT:  All right.

7        Good morning, sir.  You'll recall you're still under

8  oath, and you may resume the stand.

9        THE WITNESS:  Thank you.

10       (Witness seated.)

11       THE COURT:  All right.  Mr. Andres, you may proceed.

12       MR. ANDRES:  Thank you, Your Honor.

13  (Witness previously sworn 8/6/2018.)

14                    **DIRECT EXAMINATION**

15  BY MR. ANDRES:

16  Q.   Mr. Gates, yesterday you testified about a payment

17  structure from businessmen in Ukraine to Mr. Manafort's shelf

18  companies in the -- in Cyprus.  Do you remember that?

19  A.   Yes.

20  Q.   Okay.  With respect to the structure of those payments,

21  did Mr. Manafort tell you why he was paid through Cypriote

22  entities?

23  A.   Yes.  He indicated that the Ukrainian businessmen wanted

24  to set up Cyprus bank accounts in order to make transfers to

25  Mr. Manafort through entities that he needed to set up in

1    Cyprus as well.

2    Q.   During the course of that process, were you involved in

3    obtaining those payments from the Ukrainian businessmen?

4    A.   Yes.

5    Q.   Okay.  And did you learn the names of the Cypriote

6    entities that were controlled by the Ukraine businessmen?

7    A.   Yes.

8    Q.   Are you familiar with the name Bedel Ventures Limited?

9    A.   Yes.

10   Q.   Who controlled Bedel Ventures Limited?

11   A.   It was controlled by a businessman named Mr. Kolesnikov.

12   Q.   And where is he from?

13   A.   I believe he's from Ukraine.

14   Q.   And did he hold a position in the -- in the government in

15   Ukraine?

16   A.   He did.  In the time that they were in power, he held the

17   position of minister of transportation.  That was also a

18   leader in the party.

19   Q.   Are you aware of whether there were payments from Bedel

20   Ventures Limited to Mr. Manafort's Cypriote accounts?

21   A.   There were.

22   Q.   And what were those payments for?

23   A.   It was for political work for political campaigns.

24   Q.   During the course of your work for Mr. Manafort, did you

25   become familiar with an entity named Dresler Holdings Limited?

U.S. v. Manafort

1187

1   A.   Yes.

2   Q.   What was Dresler Holdings Limited?

3   A.   Dresler Holdings was an entity held by another Ukrainian

4   businessman, Serhiy Tihipko, who helped finance the lobbying

5   campaign in the United States and the European Union.

6   Q.   And those payments were made to Mr. Manafort?

7   A.   Yes.

8   Q.   Are you familiar with an entity called Firemax

9   Corporation?

10  A.   Yes.

11  Q.   What is Firemax Corporation?

12  A.   Firemax Corporation is an entity, again, that was held by

13  Mr. Kolesnikov.  It was used for political work.

14  Q.   Inlord Sales, LLP, can you tell me what that was?

15  A.   Yes.  That was an entity, again, held by Mr. Kolesnikov

16  for payments regarding political work.

17  Q.   Payments to Mr. Manafort?

18  A.   Yes.

19  Q.   How about Mistaro Ventures Limited?

20  A.   Mistaro Ventures was also Mr. Kolesnikov and, again,

21  payments for political work for Mr. Manafort.

22  Q.   Novirex Sales, LLP, are you familiar with that entity?

23  A.   Yes.

24  Q.   What is?

25  A.   Novirex was held by another businessman named Andriy

─────U.S. v. Manafort─────

1188

1  Klyuyev, and it was a payment for political work.

2  Q.   You said Andriy Klyuyev.

3  A.   Yes.

4  Q.   Was he identified by certain initials on memorandum and

5  otherwise at your company?

6  A.   He was.

7  Q.   What initials?

8  A.   AK.

9  Q.   How about Plymouth Consultants Limited, what was that?

10  A.   Plymouths Consultants Limited was an entity held by

11  Ukrainian businessman named Victor Pinchuk, and that was in

12  relation to a legal project.

13  Q.   How about Sea Chaika Corp., what did you understand that

14  to be?

15  A.   Sea Chaika Corp. was related to a non-Ukrainian

16  businessman, and it was in regards to expenses for a different

17  campaign.

18  Q.   And those payments were made into Mr. Manafort's Cypriote

19  bank accounts?

20  A.   Yes.

21  Q.   How about Taunton Business Limited, what was that?

22  A.   Taunton Business Limited is a company that was held by

23  Serhiy Lovochkin, and it was used for payments for political

24  work and for policy contract later on.

25  Q.   And how is Serhiy Lovochkin referenced in the various

U.S. v. Manafort

1  memos from DMP International?

2  A.   SL.

3  Q.   How about Telmar Investments Limited?

4  A.   Telmar was also held by Mr. Lovochkin, and it was

5  primarily used for political and policy work.

6  Q.   And who did he make payments to?

7  A.   Mr. Manafort.

8  Q.   Viewpoint Trade, LLP?

9  A.   Viewpoint Trade was a entity by Mr. Kolesnikov, and that

10  was used for political work.

11  Q.   Okay.  You testified about the various bank accounts and

12  entities used for the payments from the Ukrainian businessmen

13  to Mr. Manafort.

14        Was there a process in place to initiate payment?

15  A.   There was.

16  Q.   Did that involve the execution of consultancy agreements?

17  A.   It did.

18  Q.   Did you play a role with respect to the drafting of those

19  consultancy agreements?

20  A.   Yes.

21  Q.   Can you explain what the process was?

22  A.   Yes.  Early on Mr. Manafort would sit with the relevant

23  leaders of the party.  They would craft a budget for the

24  political campaign for any given year.  They would agree to an

25  amount and typically agree to a payment structure.

U.S. v. Manafort

1190

1        Once that payment structure was agreed to, I would

2    either be contacted by Mr. Manafort or Mr. Kilimnik to put

3    together a draft agreement, which outlined the terms of the

4    contract.

5        And then what they would typically do is we would be

6    given an amount.  I would put the amount into the contract.

7    Then we would have our Cypriote agent execute that contract,

8    send it back to Mr. Kilimnik, who would handle the contract on

9    the Ukrainian side.

10   Q.  Can I ask you to take a look at Government Exhibit 60 --

11   66F.

12        MR. ANDRES:  Your Honor, the Government moves to

13   admit 66F pursuant to 18 U.S.C. 3505.  They're international

14   business records that have been certified?

15        THE COURT:  Any objection?

16        MR. DOWNING:  No, Your Honor.

17        THE COURT:  Admitted.

18                         (Government's Exhibit No. 66F

19                          admitted into evidence.)

20   BY MR. ANDRES:

21   Q.  Mr. Gates, can I ask you to take a look at Government

22   Exhibit 66F?  Can you tell me, have you seen those documents

23   before?

24   A.  Yes.

25   Q.  Do they include some of the consultancy agreements that

U.S. v. Manafort

1    you were referring to?

2    A.    They do.

3    Q.    Do they also include loan agreements?

4    A.    Yes.

5    Q.    Let me start with Government Exhibit 66F at Page 11 at

6    the bottom.

7              MR. ANDRES:  Your Honor, may I publish this exhibit?

8              THE COURT:  You may.

9    BY MR. ANDRES:

10   Q.    Mr. Gates, can you tell me what's contained in Government

11   Exhibit 66F at Page 11?

12   A.    Yes.  This is an example of the consultancy agreement

13   that was a template given to us by our Cypriote attorney.  We

14   would typically fill in the details regarding the agreement

15   and the parties between which the payment was made and then it

16   would also contain the amount of that specific payment that

17   was going to be made.

18   Q.    Okay.  If you look at the agreement, can you tell me what

19   the date of the agreement is?

20   A.    The date of this agreement is 5 June 2012.

21   Q.    And can you identify who the parties are?

22   A.    Parties are Black Sea View Limited and Dresler Holdings

23   Limited.

24   Q.    What was Black Sea View Limited?

25   A.    Black Sea View Limited was an entity held by Mr. Manafort

─U.S. v. Manafort─

1192

1    in Cyprus.

2    Q.    And how about Dresler Holdings Limited?

3    A.    Dresler Holdings Limited was an entity held by Serhiy

4    Tihipko.

5    Q.    Can I ask you to turn to paragraph 4, which is on

6    Page 13?

7           What's contained in paragraph 4 of this consultancy

8    agreement?

9    A.    The amount that was actually paid in the contract.  So

10   this did not represent the total contract value, but just

11   actually how much money was being wired from the Ukrainian

12   businessmen.

13   Q.    Okay.  And how much is listed in this contract?

14   A.    In this contract it's $1.1 million.

15   Q.    Can I ask you to turn to the page at 66F, Page 15?

16           What was that, Mr. Gates?

17   A.    This is another consultancy agreement that was prepared

18   in regards to a payment for a different project.

19   Q.    Okay.  Do you know what project this is for?

20   A.    Since it was Telmar Investments, it was likely either

21   related to the parliamentary election in 2012 or it could have

22   been the policy work that was done as well.

23   Q.    Can you tell us what the date of this agreement is?

24   A.    1 June 2012.

25   Q.    And who are the parties?

U.S. v. Manafort

1193

1   A.    Black Sea View Limited and Telmar Investments Limited.

2   Q.    And you previously testified about Black Sea View

3   Limited.  What's Telmar Investments?

4   A.    Telmar Investments, again, is an entity held by Mr.

5   Lovochkin, a Ukrainian businessmen.

6   Q.    And Mr. Lovochkin is referred to as "SL" throughout the

7   company documents?

8   A.    Yes.

9   Q.    Can you turn to -- at paragraph 4, and tell us what the

10  amount agreed upon for some portion of this contract was?

11  A.    In this particular contract, the fee is for 1 million

12  euros.

13  Q.    Okay.  And does that constitute the full payment of the

14  contract?

15  A.    It does not.

16  Q.    Can you turn to Page 12 of the agreement?  I think

17  it's -- scratch that.  It's at the bottom of Page 21.  66F,

18  Page 21.

19          Do you see the reference there to Chrysostomides &

20  Company?

21  A.    Yes.

22  Q.    What is that?

23  A.    Chrysostomides is the company with the law firm that

24  Mr. Manafort employed to set up the various Cypriote entities

25  and which all Cypriote paperwork went to.

1194

1  Q.   And is that -- was that firm associated with Dr. K?

2  A.   Yes.

3  Q.   Can I ask you to turn to Page 25?

4       Can you tell me what this is?

5  A.   Again, it's another consultancy agreement for a specific

6  project.

7  Q.   And who is this agreement between?

8  A.   This agreement is between Black Sea View Limited and

9  Dresler Holdings Limited.

10 Q.   And what is Dresler Holdings?

11 A.   Dresler Holdings is an entity that was held by Serhiy

12 Tihipko.

13 Q.   Okay.  And what are his initials?

14 A.   ST.

15 Q.   Can I ask you to turn to Page 37?

16       Do you see that?

17 A.   Yes.

18 Q.   What's -- is there a consultancy agreement included on

19 Page 37?

20 A.   There is.

21 Q.   And who are the entities?

22 A.   Peranova Holdings Limited and Telmar Investments Limited.

23 Q.   And what's the date of the agreement?

24 A.   1 November 2011.

25 Q.   And you previously testified that Telmar related to

─U.S. v. Manafort─

1195

1    Serhiy Lovochkin.

2           What is Peranova Holdings Limited?

3    A.    Peranova Holdings Limited is a company that Mr. Manafort

4    set up in Cyprus.

5    Q.    And did Peranova Holdings Limited receive income from the

6    Ukraine business -- Ukrainian businessmen?

7    A.    It did.

8    Q.    Okay.  That's the same entity that you -- that you

9    represented -- or was that income ever represented as

10   something else to either Ms. Washkuhn or to the tax preparers?

11   A.    It was.

12   Q.    What was it classified as?

13   A.    It was classified as a loan.

14   Q.    Okay.  And who classified it as a loan?

15   A.    Mr. Manafort.

16   Q.    Okay.  Why did he do that?

17   A.    At the time, I believe that he was trying to decrease the

18   amount of taxable income for that particular tax year.

19   Q.    As far as you're aware, was there ever a loan extended

20   from Peranova Holdings?

21   A.    No.

22   Q.    Okay.  And who controlled Peranova Holdings?

23   A.    Mr. Manafort.

24   Q.    And was there consistently income to Peranova Holdings?

25   A.    There was.

U.S. v. Manafort

1196

1   Q.   And where did that come from?

2   A.   It came from the electoral work that we did in Cyprus.

3   Q.   Can I ask you to turn to Page --

4   A.   Excuse me, in Ukraine.

5   Q.   Can I ask you to turn to Page 64 of Government Exhibit

6   66F?

7         Can you tell me what that is?

8   A.   Another consultancy agreement.

9   Q.   And who's this between?

10  A.   Leviathan Advisors and Telmar Investments.

11  Q.   Okay.  You testified about Telmar.  What's Leviathan

12  Advisors?

13  A.   Leviathan Advisors is another entity that was set up by

14  Mr. Manafort in Cyprus.

15  Q.   Okay.  For what purpose?

16  A.   It was to receive payments.  In this case, it looks like

17  it was related to the policy contract.

18  Q.   And what was the purpose of these payments?

19  A.   The purpose of these payments was for policy work.

20  Q.   Can you turn to Paragraph 4 in the agreement, which is on

21  Page 41?

22         Can you identify for the jury what the terms of this

23  agreement were in terms of payment?

24  A.   Yes.  It was a fee of 3 million euros.

25  Q.   Okay.  Why is this contract in euros and not dollars?

U.S. v. Manafort

1197

1    A.    At a point in time, the Ukrainian businessmen started

2    using the euro currency as opposed to U.S. dollar currency

3    because, in some instances, it was easier to make payments,

4    and in other instances, the currency exchange rate was better

5    using the euro.

6    Q.    Can I ask you to turn to Page 75?

7          Do you see the signature page for this consultancy

8    agreement?

9    A.    Yes.

10   Q.    Who signed on behalf of the parties?

11   A.    So these are both the Cypriote directors of the companies

12   that represented each of the Cyprus entities.

13   Q.    Do you see a reference at the bottom of the page to

14   "Inter Jura CY"?

15   A.    Yes.

16   Q.    What is that?

17   A.    Inter Jura CY was a subsidiary company of

18   Mr. Chrysostomides.  In Cyprus, you have what they call

19   director companies and they just act as directors for the

20   various companies that are set up.  So in this case, Inter

21   Jura pertained to the Leviathan entity.

22   Q.    And the entities that were set up on behalf of

23   Mr. Manafort, Leviathan, for example, did they sell any

24   products?

25   A.    No.

─────U.S. v. Manafort─────

1198

1  Q.    Did they have any employees?

2  A.    No.

3  Q.    What was the purpose of those entities?

4  A.    The purpose of the entities was to accept payments and

5  make payments in and out of the companies.

6  Q.    Can I ask you to turn to Government Exhibit 66B?

7          MR. ANDRES:  Your Honor, the Government admits 66B

8  also pursuant to 18 U.S.C. 3505 international bank records

9  that have been certified.

10         MR. DOWNING:  No objection.

11         THE COURT:  Admitted.

12                        (Government's Exhibit No. 66B

13                        admitted into evidence.)

14  BY MR. ANDRES:

15  Q.   With respect to Government Exhibit 66B, Mr. Gates, can

16  you turn to Page -- at the bottom, it says Page 006?

17         MR. ANDRES:  May I publish that, Your Honor?

18         THE COURT:  Yes.

19  BY MR. ANDRES:

20  Q.   Can you tell me what that is, Mr. Gates?

21  A.    This is a -- again, a consultancy agreement between DMP

22  International and Telmar Investments Limited.

23  Q.   Okay.  And these agreements identified DMP International

24  directly?

25  A.    Yes.

U.S. v. Manafort

1199

1  Q.    And why have these changed that there's no reference to

2  the Cypriote entity?

3  A.    At a point in time, Mr. Manafort had worked with a

4  specific bank, and because of the difficulty in many cases of

5  getting payments from Cyprus to the United States, he

6  approached the bank directly and outlined for them the type of

7  work that he did.  As a result, they were willing to take on

8  the risk, if you will, of accepting payments from Cyprus.  So

9  then we were able to get the payments directly from the

10 Ukrainian businessmen into the business account in the United

11 States?

12        MR. DOWNING:  Your Honor, can I have a moment just

13 to ask a question of the Government?

14        (A pause in the proceedings.)

15        THE COURT:  Mr. Downing, I didn't quite hear you.

16        MR. DOWNING:  I'm sorry.  I just wanted to confer

17 with Government as to where we were in the exhibit.  Thank

18 you.

19        THE COURT:  All right.  You've done so.  Proceed.

20 BY MR. ANDRES:

21 Q.    And can you turn to Paragraph 4 of this document?

22        And can you identify what the terms of this document

23 were?

24 A.    Yes, this is for a payment of $1 million.

25 Q.    Okay.  And do you -- do you remember which project this

U.S. v. Manafort

1200

1   document -- this contract relates to?

2   A.   Yes, this would be in relation to a new political project

3   that Mr. Manafort began working on called the Opposition BLOC.

4   Q.   Okay.  At the point that the Opposition BLOC began, was

5   President Yanukovych, was he still in power?

6   A.   He was not.

7   Q.   And what had happened to the Party of Regions?

8   A.   The Party of Regions had dissolved for the most part.

9   Q.   Okay.  And with respect to this document -- let me show

10  you first, there's another one at Page 019 -- yeah, I'm

11  sorry -- yeah, 019.

12          Can you tell me what that is?

13  A.   Yes.  This is a consultancy agreement between DMP

14  International and Telmar Investments.

15  Q.   Okay.  And what does this project relate to?

16  A.   Again, this is related to the Opposition BLOC political

17  work.

18  Q.   Okay.  If you look at the last page of that contract,

19  031, you testified that the contract is in the name of DMP.

20  Who signs for DMP?

21  A.   In this case, because the transfer was occurring from

22  Cyprus, we had our Cypriote director sign it.

23  Q.   So even though the agreement is between DMP and Telmar,

24  the payment still goes to Cyprus?

25  A.   No, the payment went directly to DMP.

—U.S. v. Manafort—

1201

1  Q.   Okay.  And so why is Inter Jura signing on behalf of DMP?

2  A.   I have -- I don't know.

3  Q.   Okay.  But Inter Jura, who controls that entity?

4  A.   Inter Jura is controlled by Chrysostomides and company.

5  Q.   Okay.  I've shown you a series of consultancy agreements.

6  Is it fair to say there are more of these or these are

7  examples of the types of documents you used to get payment?

8  A.   Yes, they are.

9  Q.   Okay.  Let me ask you to turn back to Government Exhibit

10  66F and look at the first page.

11        Can you tell me what that is?

12  A.   Yes, this is a loan agreement that was constructed in

13  regards to the financial transfer between the two entities in

14  Cyprus.

15  Q.   Okay.  And what was the purpose of this loan document?

16  A.   So in Cyprus you also had to file what were called

17  audits.  And in order to ensure that all transactions were

18  recorded, there needed to be some sort of agreements between

19  the various entities that received payments and had outgoing

20  payments.  So it was, in essence, a way to make sure that

21  every financial transaction in Cyprus was tracked.

22  Q.   So as part of this Cyprus audit, did you track all of the

23  payments from the Ukraine businessmen to Mr. Manafort?

24  A.   Our law firm did, yes.

25  Q.   Okay.  And were you involved in that process?

1202

1   A.   Yes.

2   Q.   And was Mr. Manafort?

3   A.   He was aware of the process.  He wasn't involved from a

4   day-to-day basis.

5   Q.   Okay.  And in terms of those loan agreements, were there

6   actually loans between the Ukrainian businesses and the --

7   Mr. Manafort's Cypriote account?

8   A.   In Cyprus, they were documented as loans.  In reality, it

9   was basically money moving among the accounts.

10   Q.   Okay.  And for the --

11             THE COURT:  By that, do you mean they were

12   compensation?

13             THE WITNESS:  Yeah, so --

14             THE COURT:  For work done?

15             THE WITNESS:  Yes, correct, Your Honor.

16             THE COURT:  Compensation for work done.

17             THE WITNESS:  Yes.

18             THE COURT:  By the Manafort group.

19             THE WITNESS:  Yes.

20             THE COURT:  Next question.

21   BY MR. ANDRES:

22   Q.   Were you involved -- were those documents, were they

23   dated correctly, the loan agreements?

24   A.   They were -- the dates of the agreements are based on the

25   dates of the transactions.

—————U.S. v. Manafort—————

1203

1  Q.    Okay.

2  A.    But these -- a lot of the loan agreements are backdated

3  simply because in Cyprus, you have the ability to file your

4  audits two years after the calendar year in which the work was

5  done.  So they give you a little bit of time.

6  Q.    You testified earlier about payments from Ukrainian

7  businessmen to Mr. Manafort.  Did that include payments for

8  policy work?

9  A.    It did.

10  Q.    Okay.  What type of policy work did Mr. Manafort do in

11  the Ukraine?

12  A.    When Viktor Yanukovych was elected president and the

13  Party of Regions took control, Mr. Manafort entered into a

14  policy contract.  And we describe it as policy advisory in the

15  sense of once Mr. Yanukovych was elected, he was elected on a

16  platform of issues.  So Mr. Manafort worked with the local

17  political officials there to help implement those policy

18  initiatives based on those campaign promises.

19  Q.    And was there an agreement for a two-year policy contract

20  or payments over a two-year period of time?

21  A.    Well, it was -- it started out as potentially once the

22  president was elected, it was on an annual basis.  But the

23  belief was, is that it would be for the duration of the

24  president's tenure.

25  Q.    And in terms of the two years, at least, what were --

─U.S. v. Manafort─

1204

1  what were the terms or the payments?  What was the total

2  amount and what were the installment payments?

3  A.   Uh-huh.  So the total amount was $4 million a year.  And

4  I think one year, it was actually changed again from a

5  denomination point of view to 4 million euros, and then the

6  payments were broken up into $1 million quarterly payments.

7  Q.   Can I ask you to turn to Government Exhibit 359?

8        Can you tell me what that is when you get there?

9  Excuse me.

10 A.   Yes.  This is a memo that I prepared for Mr. Manafort in

11 regards to the payments that were outstanding and the payments

12 that had been made related to the policy contract work in

13 2011.

14 Q.   Let me just stop you there.

15       MR. ANDRES:  Your Honor, the Government moves to

16 admit Government Exhibit 359.  Oh, it's in evidence already,

17 Judge.  I'm sorry.  Excuse me.  May I publish it?

18       THE COURT:  Yes, you may.

19 BY MR. ANDRES:

20 Q.   Can we start with the top, Mr. Gates?

21       Can you explain who the document is to, from, the

22 subject, and the date?

23 A.   Yes.  The document is to SL and YN from Mr. Manafort.

24 The subject is consulting payments.  The date is October 11,

25 2011.

U.S. v. Manafort

1   Q.   You've testified previously about SL.   How about YN, who

2   is that?

3   A.   YN was Mr. Lovochkin's sister.   Her name was Yulia (ph).

4   Q.   Do you know what her last name was?

5   A.   Nemovskiy (ph), I think, Nemovskiy.

6   Q.   Okay.   And who's the -- who's the memorandum from?

7   A.   Mr. Manafort.

8   Q.   And the subject is consulting payments.   What does that

9   refer to?

10  A.   This refers to the policy contract work that Mr. Manafort

11  had at this time.

12  Q.   Can you read the first paragraph and explain it to the

13  jury?

14  A.   (As read):  "This document outlines the total fees owed

15  and the fees that have been paid in relation to the consulting

16  agreement between Telmar Investments and Leviathan Advisors

17  for March 2011 to 2012."

18  Q.   And what does that mean that the fees that have been paid

19  from Telmar to Leviathan?

20  A.   Again, Telmar is an entity that was held by Mr. Lovochkin

21  who was paying the policy contract.   So the terms, again, were

22  the four million, in this case, euros a year.   And if you look

23  at the document, you can see it's broken down by quarter.   So

24  it tracks the actual quarterly payment made.

25  Q.   And once the money gets to Leviathan, do you know what

U.S. v. Manafort

1206

1    Mr. Manafort does with it then?

2    A.    I don't.  I mean, he moved money from Leviathan in some

3    case to the United States.  In some cases, he left it in

4    Leviathan.

5    Q.    With respect to the Leviathan account in Cyprus, did you

6    ever report that to Heather Washkuhn, Mr. Manafort's

7    bookkeeper?

8    A.    No.

9    Q.    Did you ever report it to any of his tax preparers at

10   KWC?

11   A.    No.

12   Q.    There's a chart on the memo in Government Exhibit 359.

13         Can you explain what that is?

14         MR. ANDRES:  Your Honor, is that me with the

15   feedback?

16         THE WITNESS:  The chart indicates, again, the --

17   both the expenses and the quarterly payments that have both

18   been made and the outstanding balance that is still due.

19   BY MR. ANDRES:

20   Q.    And at the bottom where it says, "total contract," what

21   does that refer to?

22   A.    That's the total contract value for that year included in

23   the expenses.

24   Q.    And in what denomination is that listed?

25   A.    This contract is in euros.

U.S. v. Manafort

1207

1  Q.   Okay.  For the last -- can you just read the last line of

2  the memorandum?

3  A.   "I am requesting that this outstanding balance be paid as

4  soon as possible."

5  Q.   And what did you understand that to mean?

6  A.   That Mr. Manafort was looking for the remaining balance

7  that was due on the contract.

8  Q.   With respect to the policy work that Mr. Manafort is

9  being paid for in Government Exhibit 359, did you write memos

10 on behalf of Mr. Manafort to outline that work?

11 A.   Yes, in some cases, I did as well as the staff in

12 Ukraine.

13 Q.   Okay.  And who did those memos go to, for example?

14 A.   They would typically go to various members of the party

15 leadership, including Mr. Lovochkin, who, at this time, was

16 the chief of staff to the president, and in some cases, to the

17 president himself.

18 Q.   Can I ask you to turn to Government Exhibit 350?

19        Can you tell me what that is?

20 A.   This is a memo that was drafted by our two lobbying firms

21 that were hired in the United States, and they put together a

22 memo that went from Mr. Manafort to the president of the

23 Ukraine to describe the activity.

24 Q.   And what were those lobbying firms?

25 A.   It was Mercury Public Affairs and the Podesta Group.

─U.S. v. Manafort─

1208

1  Q.   And this is part of the work that you were doing for the

2  overall policy project?

3  A.   It was labeled as a different project called Engage

4  Ukraine, but it was related to policy, yes.

5  Q.   Okay.  And in terms of the payment for Mr. Manafort,

6  those were the payments that we just saw in the prior exhibit

7  from Serhiy Lovochkin?

8  A.   Some of those payments were, but there was a separate

9  payment specifically for the lobbying work from Mr. Tihipko.

10  Q.   I'm referring to the payments to Mr. Manafort, not the

11  payments that were --

12  A.   Oh, yes.

13  Q.   Okay.

14  A.   Payments to Mr. Manafort, correct.

15  Q.   And then just in terms -- you mentioned Engage Ukraine.

16  What was that?

17  A.   Engage Ukraine became the strategy for helping Ukraine

18  enter into the European Union, and as a result, a public

19  affairs effort was put together both in the EU and the U.S.

20  for that work.

21  Q.   Was there also a project referred to as the Hapsburg

22  Project?

23  A.   Yes.

24        MR. ANDRES:  Your Honor, the Government moves to

25  admit Government Exhibit 350.

U.S. v. Manafort

1209

1    MR. DOWNING:  No objection.

2    THE COURT:  Admitted.

3                    (Government's Exhibit No. 350

4                    admitted into evidence.)

5    MR. ANDRES:  May I publish it?

6    THE COURT:  Yes.

7  MR. DOWNING:

8  Q.   All right.  Zoom in on the top.

9         Just with respect to Government Exhibit 350 that you

10  testified about, can you identify the heading of the memo?

11  A.   Yes, it was to the president, Mr. Yanukovych, from

12  Mr. Manafort.

13  Q.   Okay.  And there's a reference to U.S. consultants

14  quarterly report.  What does that refer to?

15  A.   This refers to the report that was drafted by the two

16  U.S. consulting firms identified.

17  Q.   Okay.  I was asking you whether you were familiar with a

18  project called the Hapsburg Project.  What was that?

19  A.   The Hapsburg Project was a separate initiative that was

20  kind of tied into the overall effort to have Ukraine align

21  with the European Union.

22         The Hapsburg Group used former European politicians

23  to help interface with European politicians to work on that

24  effort.

25  Q.   Was there also work that you did together with

—————U.S. v. Manafort—————

1210

1  Mr. Manafort that involved hiring of an international law

2  firm?

3  A.   Yes.

4  Q.   Okay.  What law firm was that?

5  A.   Skadden Arps.

6  Q.   And work did that relate to?

7  A.   Skadden Arps related to a independent legal report that

8  was done in conjunction with a former political official that

9  had a trial in Ukraine.

10 Q.   You testified that, at some point, Mr. Manafort's work

11 for President Yanukovych and the Party of Regions came to an

12 end?

13 A.   It did.

14 Q.   Approximately, when was that?

15 A.   The last project we did for the Party of Regions was at

16 the beginning of 2014, and then we picked up with another

17 political project that also went to the end of 2014 in

18 October.

19 Q.   With respect to the time frame when President Yanukovych

20 lost power, what effect, if any, did that have on

21 Mr. Manafort's income stream?

22 A.   I would say that it decreased the income stream.

23 Q.   How?

24 A.   Because there was a change in the -- in the power

25 structure and a new political party needed to be created,

─U.S. v. Manafort─

1211

1    which meant that we had to go through and work to build a new

2    contract.

3    Q.    Did you work with the Opposition BLOC?

4    A.    I did.

5    Q.    And did the Opposition BLOC ever come to power within

6    Ukraine?

7    A.    It didn't come to power.  It won seats in Parliament.

8    Q.    Okay.  As a result of work that you and Mr. Manafort did

9    for the Opposition BLOC?

10   A.    Yes.

11   Q.    As a result of it being the minority party, were you able

12   to do additional work for Opposition BLOC?

13   A.    The hope was to do additional work for the Opposition

14   BLOC, but because most of the Opposition BLOC or a good

15   portion of it had been aligned with the Party of Regions, they

16   were, in essence, out of power.  So the income streams were

17   more difficult to come by.

18   Q.    Okay.  And did you continue to obtain additional work for

19   Mr. Manafort or obtain additional work for the Opposition

20   BLOC?

21   A.    No.

22   Q.    At some point, in addition to working for the Opposition

23   BLOC, did you also work on local elections?

24   A.    We worked on local elections in the prior year.

25   Q.    Okay.  And what election did that relate to?

U.S. v. Manafort

1212

1   A.   That related to the -- well, there was the presidential

2   election in 2014 that Mr. Manafort worked on very briefly.

3   And then the parliamentary election in 2014, which was at the

4   end of the year.

5   Q.   Okay.  For the presidential election, who did

6   Mr. Manafort work for?

7   A.   He was assisting the current president, Mr. Poroshenko.

8   Q.   And was he paid for that work?

9   A.   I don't believe he was.

10  Q.   Was that work substantial with -- did he have the same

11  position with respect to that campaign that he had for

12  president --

13  A.   No, he did not.

14  Q.   At some point did your work in the Ukraine come to an

15  end?

16  A.   Yes.

17  Q.   Approximately, when was that?

18  A.   The last election we worked on was the parliamentary

19  election of 2014.  And there was no other political campaign

20  work after that time.

21  Q.   And with respect to that work for the Opposition BLOC,

22  was Mr. Manafort paid in full?

23  A.   He was not.

24  Q.   Was he paid -- was part of his bill paid?

25  A.   Yes, I believe part of the bill was paid.

─────U.S. v. Manafort─────

1213

1  Q.   If you can turn to Government Exhibit 352.  Can you tell

2  me what that is?

3  A.   Yes.  This is a memo that Mr. Manafort drafted to the

4  leadership of the Opposition BLOC party following the

5  parliamentary election in 2014.

6           MR. ANDRES:  Your Honor, the Government moves to

7  admit Government Exhibit 352.

8           MR. DOWNING:  No objection.

9           THE COURT:  It's admitted.

10                          (Government's Exhibit No. 352

11                          admitted into evidence.)

12           MR. ANDRES:  May I publish it?

13           THE COURT:  You may.

14  BY MR. ANDRES:

15  Q.   With respect to the cover e-mail, can you explain what

16  that is?

17  A.   Yes.  It's an e-mail from Mr. Manafort to Mr. Kilimnik

18  and myself indicating that he has attached the final version

19  of the memo, which outlines the priorities of the Opposition

20  BLOC strategy moving forward.

21  Q.   And this is the work you were describing that was sort of

22  the last work you were doing in the Ukraine?

23  A.   Yes.  The hope was that this effort would lead to an

24  additional contract.

25  Q.   Mr. Manafort writes, "Your opinions on when we should

U.S. v. Manafort

1214

1  circulate the memo, the options are next week for when I

2  arrive in Kyiv on approximately November 10th."

3          Did you have an understanding from this e-mail where

4  Mr. Manafort was when he wrote it?

5  A.    I do not.

6  Q.    Okay.  Is it fair to understand it wasn't in Kyiv?

7  A.    Correct.

8  Q.    And was Mr. Manafort often able to manage his work in

9  Kyiv when he wasn't there?

10 A.    Yes.

11 Q.    And did you -- when you were not in Kyiv, were you able

12 to communicate with people there?

13 A.    Yes.

14 Q.    With respect to the memo that's attached to Government

15 Exhibit 352, can I just ask you to look at the top of that

16 memo?

17          And identify who it's to, who's CC'd, and who it's

18 from.

19 A.    Yes.  It's to Mr. Levochkin and Mr. Akhmetov who are

20 pretty much leading the new Opposition BLOC that's been

21 formed.  And CC'd OB leadership, included a series of other

22 Ukrainian businessmen that were part of the Opposition BLOC

23 party.

24 Q.    What role did Serhiy Lovochkin or what role did SL and RA

25 play with respect to the Opposition BLOC?

U.S. v. Manafort

1215

1   A.   They were principally the financiers of the new political

2   party.

3   Q.   You testified earlier that Mr. Manafort had difficulty

4   receiving payment for his work for the Opposition BLOC.  Can

5   you explain what efforts were made to obtain that payment?

6   A.   Yes.  There were a series of memos that Mr. Manafort had

7   sent to Mr. Kilimnik to translate and deliver.  In addition,

8   Mr. Manafort used Mr. Kilimnik to work with the Opposition

9   BLOC leadership to secure the payments.

10  Q.   And earlier you had testified about a process involving

11  consultancy agreements to initiate payment from the Ukraine

12  businessmen.  Did you follow that same procedure here?

13  A.   We did when the payments were made, yes.

14  Q.   Okay.  And with respect to that process to obtain the

15  payments from the Opposition BLOC, what role, if any, did you

16  play?

17  A.   Again, once Mr. Kilimnik or Mr. Manafort confirmed that a

18  payment was going to be made, I worked with the Cypriote law

19  firm to draft the consultancy agreement and then returned it

20  to Ukraine for execution.

21  Q.   Can I ask you to turn to Government's Exhibit 364?

22          Do you recognize that?

23  A.   Yes.

24  Q.   Are you listed on that e-mail?

25  A.   I am.

U.S. v. Manafort

1216

1  Q.   And is there attached documents?

2  A.   There is.

3  Q.   Were you involved in preparing those?

4  A.   Yes.

5  Q.   And did these documents in the e-mail relate to the

6  efforts to obtain payment from the Opposition BLOC?

7  A.   They did.

8           MR. ANDRES:  The Government moves to admit 364, Your

9  Honor.

10          MR. DOWNING:  No objection.

11          THE COURT:  Admitted.

12                      (Government's Exhibit No. 364

13                       admitted into evidence.)

14          MR. ANDRES:  May I publish it?

15          THE COURT:  You may.

16  BY MR. ANDRES:

17  Q.   Starting with the top e-mail in Government Exhibit 364,

18  can you identify who it's "to" and "from" and the date?

19  A.    It's to me from Mr. Kilimnik, and it's dated August 25,

20  2015.

21  Q.   Okay.  How about the subject?

22  A.   Subject is "Contract for 1."

23  Q.   Okay.  Starting with the e-mail all the way at the

24  bottom, there's an e-mail from Mr. Kilimnik at 11:07 a.m.  Can

25  you explain or summarize that e-mail?

─────U.S. v. Manafort─────

1217

1   A.   Yes.  Mr. Manafort and Mr. Kilimnik had been in contact

2   regarding the payment that Mr. Manafort was seeking from the

3   Opposition BLOC.  Mr. Kilimnik asked me to send the initial

4   pro forma documents, including the details that he had given

5   me to execute the payment.

6   Q.   There's a reference at the bottom that says, "This is to

7   calm Paul down."

8           What did you understand that to mean?

9   A.   The payment was well overdue.  The campaign occurred in

10  October of 2014.  So payment was significantly, you know,

11  overdue and Mr. Manafort was quite upset that the money had

12  not been sent.  So Mr. Kilimnik wanted to start the paperwork

13  process in order to, you know, create the -- create the

14  scenario that we were making the effort to get the payment.

15  Q.   And what was Mr. Manafort's financial situation in July

16  of 2015?

17  A.   It was, I'd say, substantially decreased in terms of the

18  amount of income he had received from prior years.

19  Q.   Was he having issues paying his bills?

20  A.   He was.

21  Q.   And at this time in July of 2015, did Mr. Manafort have

22  any work in the Ukraine?

23  A.   No, not in the Ukraine.

24  Q.   Did DMP International have any clients?

25  A.   No.

U.S. v. Manafort

1218

1  Q.   If you turn to the top portion of the e-mail there's a

2  reference that says, "I have no idea where this amount come

3  from, but this is SL's people's request anyway."

4         Can you explain that?

5  A.   Yes.  So, originally, Mr. Levochkin was going to send a

6  million per the agreement he and Mr. Manafort had entered

7  into.

8         Mr. Kilimnik then responded that the payment, in

9  essence, had been decreased and that they were going to be

10 sending a payment of 500,000 instead.

11 Q.   Okay.  Can you look at the attachment of Government

12 Exhibit 364?  Can you tell me what that is?

13 A.   Again, this is the pro forma contract which identifies

14 DMP International and Telmar Investments Limited, which was

15 Mr. Levochkin's entity.

16 Q.   And why you were attaching this to -- did you draft this?

17 A.   Yeah.  The Cypriote attorneys drafted the template.  I

18 entered the information in terms of the individual parties.

19 Q.   And the Telmar Investments, who controlled Telmar

20 Investments?

21 A.   Mr. Levochkin.

22 Q.   And if you look back at the e-mail, that's the reference

23 to "SL"?

24 A.   It is.

25 Q.   And do you know as of the time that you left DMP

───────U.S. v. Manafort───────

1219

1   International whether or not this contract was ever paid in

2   full?

3   A.   To my understanding, it was not paid in full.

4   Q.   You can take that down.

5        When you first began working for Mr. Manafort, did

6   you understand that he had Cypriote accounts?

7   A.   Yes.

8   Q.   And do you know who set those accounts up?

9   A.   I believe it was Mr. Manafort with the Cypriote attorney.

10  Q.   Okay.  And who is the Cypriote -- Cypriote -- Cypriotic

11  attorney?

12  A.   Kypros Chrysostomides.

13  Q.   Okay.  For efficiency --

14  A.   Dr. K.

15  Q.   -- did he have a nickname?

16  A.   Dr. K.

17  Q.   Okay.  Did there come a time when you met, yourself,

18  Dr. K?

19  A.   There was.

20  Q.   When?

21  A.   I met with Dr. K in 2007 with Mr. Manafort.

22  Q.   And where was -- where did that meeting take place?

23  A.   It occurred in Cyprus.

24  Q.   And why were you meeting with Dr. K?

25  A.   We were meeting with him for two purposes.  Mr. Manafort

—————U.S. v. Manafort—————

1220

1  had just met with our investor for the private equity fund and

2  the investor wanted to have Mr. Manafort meet with him to

3  engage in potential political project, and then also to have

4  him coordinate some of the activity on our private equity

5  fund.

6  Q.    Did you also meet with Dr. K about opening bank accounts

7  and entities in Cyprus?

8  A.    We did.

9  Q.    Okay.  Did Dr. K explain to you the process involved with

10  opening up the shelf companies?

11  A.    He did.

12  Q.    What did he say to you?

13          THE COURT:  Isn't that hearsay?  If there's no

14  objection, I'll permit it.  But we ought to avoid just

15  importing hearsay, putting to one side whether it's relevant.

16          MR. DOWNING:  Objection, Your Honor, hearsay.

17          THE COURT:  You're a little late.

18          (Audience laughter.)

19          THE COURT:  Mr. Andres, do you really need it?

20          MR. ANDRES:  No, Your Honor.  I can work around it.

21          THE COURT:  Thank you.

22  BY MR. ANDRES:

23  Q.    Based on your meetings with Dr. K, did you come to

24  understand the process for opening the entities in Cyprus?

25  A.    Yes.

─────U.S. v. Manafort─────

1221

1  Q.   And did you understand that there were some level of

2  secrecy involved?

3  A.   Yes.

4  Q.   Okay.  Can you explain what you understood -- and at

5  these meetings with Dr. K, was Mr. Manafort there?

6  A.   He was.

7  Q.   Can you explain what you understood the process for

8  setting up these shelf companies?

9  A.   Yes.  When you set up a shelf company in Cyprus, the

10 individual that was setting it up wasn't necessarily on any of

11 the paper work.  You had two directors, which were usually

12 within the law firm that was setting up the entities, and then

13 above that you had what they call two board members.  So, in

14 essence, you had four people controlling a Cypriote entity,

15 but the actual individual setting up the company name did not

16 appear on any of the incorporation material.

17 Q.   With respect to the companies that were ultimately set

18 up, do you know who was listed as the directors, secretaries,

19 board members?

20 A.   Yes.  The directors and board members were members

21 generally of Mr. -- Dr. K's firm.

22 Q.   So with respect to the Cypriote entities that were set up

23 for Mr. Manafort, did his name appear on any of those

24 documents?

25 A.   No.

U.S. v. Manafort

1222

1    Q.   Did you come to understand, based on your meeting with

2    Dr. K and Mr. Manafort, what the process was for setting up

3    bank accounts in Cyprus?

4    A.   Yes.  Dr. K explained that to us as well.

5    Q.   Can you describe that for the jury?

6    A.   The law firm handled everything with respect to opening

7    the accounts.  Initially in the earlier years they designated

8    a point of contact with the bank, but neither Mr. Manafort nor

9    myself had any interaction with the bank.  Later on that point

10   of contact came to be known what was an ultimate beneficial

11   owner.  And none of the information on the banking forms was

12   publicly disclosed in any way.

13   Q.   Was that an issue that was discussed in detail?

14   A.   Yes, by Dr. K.

15   Q.   And was that important to Mr. Manafort to understand how

16   his name would be represented on those documents?

17   A.   I believe he understood that his name would not be

18   represented, nor was mine.

19   Q.   Okay.  You testified about a variety of different names,

20   Peranova, Leviathan, Global Endeavor.  How were those names

21   picked?

22   A.   So, again, with the exception of a few of the entities,

23   all of those entities' names were selected by Dr. K's law firm

24   as shelf companies.

25   Q.   And with respect to all of the Cypriote entities that

─U.S. v. Manafort─

1223

1    Dr. K set up, did those companies -- did they exist for some

2    purpose or did they sell any product or provide any services?

3    A.    No, but it was very common for them to set up.

4    Q.    And what was --

5    A.    To conduct various work.

6    Q.    What was the sole purpose of those companies?

7    A.    In terms of setting them up in general or with respect to

8    Mr. Manafort?

9    Q.    Just in terms of what they -- in setting them up for

10   Mr. Manafort, what function did those companies play?

11   A.    Oh, they serve to play the role of accepting the money

12   from the Ukrainian businessmen for the political contracts and

13   then for Mr. Manafort to, you know, determine what would be

14   done with that money.

15   Q.    And in terms of the bank accounts, were they set up in

16   different denominations?

17   A.    They were.

18   Q.    What denominations?

19   A.    Primarily U.S. dollars and euros.

20   Q.    Okay.  And do you know what banks in Cyprus those

21   entities were set up at?

22   A.    As I recall, there aren't many banks in Cyprus, but it

23   was the Bank of Cyprus, Laiki Bank, and I think Marfin Popular

24   Bank.

25   Q.    And the money that was -- that was deposited in those

─U.S. v. Manafort─

1224

1   accounts for Mr. Manafort, was that income?

2   A.   It was.

3   Q.   And how did he earn it?

4   A.   Through political campaign work in Ukraine.

5   Q.   You testified earlier about on one of the contracts there

6   was a reference to Inter Jura.  What was Inter Jura?

7   A.   An Inter Jura was a subsidiary company of Dr. K's that

8   represented the directors of the Cypriote entities that were

9   assigned to the companies that anybody set up.

10  Q.   You testified that Mr. Manafort's name was not on the

11  entity in corporation documents but that it was on some of the

12  Cypriote bank accounts.  At some point did he ask that his

13  name be removed from those?

14  A.   He did.

15  Q.   Do you know why?

16  A.   Yes.  Mr. Manafort described to me that he was engaged in

17  a lawsuit with somebody from the Ukraine and there was concern

18  that the individual might be able to find some of the

19  information on Mr. Manafort and, specifically, who some of the

20  other Ukrainian businessmen that paid some of those contracts

21  might be.

22  Q.   Did you -- was his name removed?

23  A.   It was.

24  Q.   And did you ask to have your name removed?

25  A.   No, not in all cases.

U.S. v. Manafort

1225

1    Q.    At some point did you have your name removed?

2    A.    Yes.

3    Q.    Why did you want your name removed from the accounts?

4    A.    Well, at that time the number of accounts in Ukraine had

5    diminished in 2012 because of the banking collapse.  So it was

6    kind of a good time to make sure that most of the entities

7    were closed and our names were removed.

8    Q.    Okay.  And when there was a banking issue in Cyprus, were

9    the overseas accounts moved to another country?

10   A.    They were.

11   Q.    Where?

12   A.    They were moved to the Grenadines.

13   Q.    Is that the same country referred to as St. Vincent in

14   the Grenadines?

15   A.    It is, yes.

16   Q.    Do you know where that is?

17   A.    Somewhere in the Caribbean.

18   Q.    Okay.  And who -- who facilitated the movement of the

19   Cypriote accounts to St. Vincent in the Grenadines?

20   A.    Dr. K.

21   Q.    How was he able to do that?

22   A.    They have a relationship, apparently, between Cyprus and

23   the Grenadines, and so he was able to both open the entities,

24   which were actually designated in Cyprus, and then the actual

25   bank accounts as well.

U.S. v. Manafort

1226

1   Q.   And was the money moved to -- from the Cyprus accounts to

2   St. Vincent in the Grenadines?

3   A.   Yes.

4   Q.   Okay.  And when the accounts were opened there, do you

5   know the names of those accounts?

6   A.   Yes.  It was a very limited number.  There were only two

7   accounts, as I recall.

8   Q.   What were the names?

9   A.   Global Endeavor and Jeunet.

10  Q.   Do you know what bank or banks they were opened at?

11  A.   The name of the bank was Loyal Bank.

12  Q.   And whose name was the -- the St. Vincent in Grenadines

13  accounts opened in?

14  A.   At that time I believe we designated Mr. Kilimnik as the

15  point of contact for those.

16  Q.   Okay.  Is Mr. Kilimnik -- is he a U.S. citizen?

17  A.   He is not.

18  Q.   Were you able to move money from the Cypriote accounts

19  when they were in Cyprus?

20  A.   Yes.

21  Q.   And what was the process for moving money from the Cyprus

22  accounts to the United States or elsewhere?

23  A.   So, generally, it was all done again by the law firm.

24  The typical practice was that Mr. Manafort would send me a

25  list of wire requests or he would send the wires directly to a

U.S. v. Manafort

1   point of contact that we had at Dr. K's firm.  That contact

2   then coordinated with the bank to make the wire distributions.

3   Q.   Okay.  And do you know who the people were that you

4   contacted at Dr. K's law firm?

5   A.   I know the primary person that we used, yes.

6   Q.   Who was that?

7   A.   Her name was Christina.

8   Q.   And would you receive directions from Mr. Manafort about

9   how to move money between the different accounts?

10  A.   Yes.

11  Q.   Would you receive instruction from Mr. Manafort about

12  directing payments from Cyprus to vendors in the United

13  States?

14  A.   Yes.

15  Q.   How would that happen?

16  A.   Mr. Manafort would prepare an e-mail.  There was a

17  template that the law firm had given him to use.  It was very

18  minimal information at that time.  And Mr. Manafort would put

19  in the name of the vendors that he wanted paid, the amount,

20  and then he would send that either again directly to the bank

21  in some cases or he would send it to me to send over to the

22  bank.

23  Q.   Can I ask you to take a look at Government Exhibit 370?

24       Have you had a chance to review that?

25  A.   Yes.

─────U.S. v. Manafort─────

1228

1   Q.   Government Exhibit 370, is that an e-mail chain involving

2   you and Mr. Manafort?

3   A.   It is.

4   Q.   And does it involve the transfer of funds from Cypriote

5   accounts?

6   A.   It does.

7            MR. ANDRES:  The Government moves to admit

8   Government Exhibit 370, Your Honor.

9            MR. DOWNING:  No objection.

10           THE COURT:  Admitted.

11                      (Government's Exhibit No. 370

12                      admitted into evidence.)

13           MR. ANDRES:  May I publish it?

14           THE COURT:  Yes.

15  BY MR. ANDRES:

16  Q.   Starting with the top e-mail, Mr. Gates, can you tell me

17  who the e-mail is to and from?

18  A.   It's from Mr. Manafort to me.

19  Q.   Okay.  And what's the date?

20  A.   The date is November 29, 2011.

21  Q.   And what's the subject?

22  A.   Subject is "Payments."

23  Q.   Okay.  Can you start at the bottom e-mail at 22:38:24 and

24  describe to the jury what's -- what you're communicating to

25  Mr. Manafort there?

1229

1    A.    Yes.

2              (As read):  I write, "Mr. Manafort, for your review

3    and approval.  Let me know if you have any questions.  And

4    then I will transfer the money from the Leviathan account to

5    DMP International unless you direct otherwise."

6    Q.    It says, "Levi," L-e-v-i.  What's that a reference to?

7    A.    Levi is the abbreviation for Leviathan.

8    Q.    Okay.  And did Mr. Manafort explicitly approve that

9    payment?

10   A.    He did.

11   Q.    What did he say?

12   A.    "Yes, this is approved."

13   Q.    Okay.  And then there's a reference in the e-mail to

14   transferring money to P for the loan earlier this month.

15             What's the P reference?

16   A.    Yes.  So the reference to that is at some point we moved

17   money from Peranova to Leviathan and we were returning the

18   money, because, again, even within Mr. Manafort's Cyprus

19   entities, you could move money from one entity to the other,

20   but at the end of the day, it was going to be part of the

21   audit.  So it was just an exercise of moving the money back so

22   that we could account where it came from.

23   Q.    Okay.  Is this e-mail typical of communications between

24   you and Mr. Manafort with respect to the Cypriote accounts?

25   A.    Yes.  There were hundreds of these.

U.S. v. Manafort

1230

1   Q.   During the course of the time that you worked for

2   Mr. Manafort, do you know if he had any bill keepers?

3   A.   He did.

4   Q.   What bill keepers were you aware of?

5   A.   Initially, I was aware that he had been using KWC to do

6   the bills, but that he wanted to make a change.  He had hired

7   a gentlemen by the name of Hesham Ali, who at that time was

8   working with Heather Washkuhn; and then later on, Heather

9   Washkuhn directly took over the bill keeping.

10  Q.   Okay.  In terms of your interaction with Hesham Ali or

11  Heather Washkuhn, can you characterize what your relationship

12  was with the bill payers?

13  A.   Yes.  I would communicate frequently with them based on,

14  you know, various directions and instructions from

15  Mr. Manafort.  There were a number of instances where they

16  would reach out to me that they had received a request from

17  Paul and wanted some assistance in -- in fulfilling that

18  request.

19  Q.   Did you have the ability when you were dealing with the

20  bookkeepers to authorize payments?

21  A.   I did.

22  Q.   Okay.  And did you?

23  A.   I did.

24  Q.   At whose direction?

25  A.   Mr. Manafort's.

1231

1   Q.   And did those payments relate to Mr. Manafort's business

2   accounts or for his personal accounts?

3   A.   Business accounts.

4   Q.   Okay.  And once you authorized those payments, was there

5   a process in place where the banks had to confirm payment?

6   A.   Yes.  The banks, actually in this case, required a verbal

7   confirmation from any type of money that Mr. Manafort was

8   moving between his accounts.  So the typical process is that

9   Heather would put the list of bills together.

10        I would add the DMP bills.  And then once the total

11  amount of that wire was calculated, Mr. Manafort would do a

12  verbal approval with his bank.

13  Q.   During this time period, did you have access to an

14  electronic signature for Mr. Manafort?

15  A.   I did.

16  Q.   What's an electronic signature?

17  A.   An electronic signature is Mr. Manafort's signature that

18  can be used on PDF documents.

19  Q.   And did you use it on PDF documents?

20  A.   I did on occasions, yes.

21  Q.   What types of documents would you use it on?

22  A.   Primarily documents that Mr. Manafort had asked me to

23  sign on his behalf.  If he was traveling or needed to get

24  something into a particular entity or organization, he would

25  often ask me to create the document, sign it on his behalf,

—————U.S. v. Manafort—————

1232

1   and then send it to him.

2   Q.   Can I ask you to look at Government Exhibit 427?

3             Can you tell me what that is?

4   A.   Yes.  It's an e-mail from -- originally from Mr. Manafort

5   to me.

6             MR. ANDRES:  Okay.  Your Honor, the Government moves

7   to admit Government Exhibit 427.

8             MR. DOWNING:  No objection.

9             THE COURT:  Admitted.

10                            (Government's Exhibit No. 427

11                             admitted into evidence.)

12  BY MR. ANDRES:

13  Q.   With respect to the e-mail, can you -- looking at the top

14  e-mail, can you tell me who the e-mail is chain is between and

15  the date?

16  A.   Yes.  The top e-mail is from me to Mr. Manafort.  The

17  date is February 17, 2016.

18            MR. ANDRES:  May I publish it, Your Honor?

19            THE COURT:  Yes.

20  BY MR. ANDRES:

21  Q.   Focusing on the bottom e-mail where it says "R," can you

22  read that e-mail?

23  A.   "I need you to sign my name to another doc and return to

24  me.  I will be sending in 5 to 20 minutes.  It's on a quick

25  turnaround."

1   Q.   And who is that from?

2   A.   Mr. Manafort.

3   Q.   And what did you understand Mr. Manafort to ask you to be

4   doing?

5   A.   To take the document and attach his electronic signature

6   to it.

7   Q.   Did -- as you sit here today, do you have any idea what

8   that document was?

9   A.   I do not.

10   Q.   Okay.  And did you -- did you agree to sign it?

11   A.   I did.

12   Q.   And was it common for you to do that?

13   A.   Yes.

14   Q.   And would you always seek Mr. Manafort's approval?

15   A.   Yes.  Usually he reached out to me in order to sign the

16   document, but there were occasions where I reached out to him

17   on documents as well.

18   Q.   You testified earlier that Ms. Washkuhn was involved in

19   paying bills for Mr. Manafort.

20        Did you play a role in paying Mr. Manafort's bills?

21   A.   There were instances where I would pay some of the bills

22   from the DMP U.S. account.  Ms. Washkuhn and I both had access

23   to that account.

24   Q.   How about from the overseas accounts?

25   A.   Yes.

1234

1  Q.   Would you frequently make payments for Mr. Manafort from

2  the Cypriote accounts?

3  A.   Probably more frequently from the Cypriote accounts, yes.

4  Q.   Okay.  And when you made those payments, did you alert

5  Ms. Washkuhn?

6  A.   I did not.

7  Q.   Why not?

8  A.   Mr. Manafort had basically requested that we not need to

9  inform Ms. Washkuhn on those payments.

10  Q.   And when you paid those bills, do you know the types of

11  bills they were; that is, who were you paying from the

12  Cypriote accounts?

13  A.   I just knew them by name because, again, Mr. Manafort

14  would prepare wiring instructions.  So it would all be in a

15  document or an e-mail that he provided.  So I wouldn't

16  necessarily know what the payment was for, but over time I

17  learned who some of the vendors were.

18  Q.   And do you know if Mr. Manafort also paid some of those

19  bills directly himself?

20  A.   He did.

21  Q.   How did you know that?

22  A.   Because in some instances when he had asked me to check

23  on the balances of the account, money had been wired out and

24  they were reflected wire transfers that he had requested in

25  addition.

─U.S. v. Manafort─

1235

1   Q.   And what accounts did he use to make those payments?

2   A.   Cyprus accounts.  And obviously he made requests for the

3   U.S. accounts as well.

4   Q.   Are you familiar with an individual in a business -- an

5   individual named "Steve Jacobson" and the business name

6   "SP&C"?

7   A.   Yes.

8   Q.   What is that?

9   A.   That was one of the Mr. Manafort's contractors that I had

10  come to learn about in the process of doing some wires for

11  Mr. Manafort.

12  Q.   Okay.  And where did that money come from?

13  A.   I believe it came from a combination of offshore and U.S.

14  accounts.

15  Q.   And do you know what work Mr. Jacobson did for

16  Mr. Manafort?

17  A.   I believe it was work related to his New York apartment

18  and Bridgehampton home.

19  Q.   Have you ever been to Mr. Manafort's home in

20  Bridgehampton?

21  A.   I have not.

22  Q.   Are you familiar with a individual named "Joel Maxwell"?

23  A.   Yes.

24  Q.   Who is that?

25  A.   Joel Maxwell provided audio and visual technical support

1236

1   for Mr. Manafort.

2   Q.    Okay.  And was he paid from the overseas accounts?

3   A.    I believe he was, yes.

4   Q.    Have you ever sought services or has Mr. Maxwell done any

5   services at any -- at your residence?

6   A.    He has not.

7   Q.    So you're familiar with an entity named "Alan Couture"?

8   A.    Yes.

9   Q.    What is Alan Couture?

10  A.    It's a clothing store that Mr. Manafort had directed me

11  and Ms. Washkuhn to make payments over the year.

12  Q.    When you made payments to Alan Couture, where did the

13  money come from?

14  A.    It was a combination both from the offshore accounts and

15  the U.S. accounts.

16  Q.    And do you know what Alan Couture -- what business

17  they're in?

18  A.    I learned over time that they were in the clothing

19  business.

20  Q.    Have you ever purchased any clothing from Alan Couture?

21  A.    No.

22  Q.    Are you familiar with an entity known as "New Leaf

23  Landscaping"?

24  A.    Yes.

25  Q.    Did you make payments to New Leaf Landscaping?

U.S. v. Manafort

1237

1   A.   Yes, I did at Mr. Manafort's request.

2   Q.   For what services?

3   A.   I believe that was landscaping services for his home in

4   Bridgehampton.

5   Q.   Have you ever contracted or gotten any services from New

6   Leaf Landscaping?

7   A.   No.

8   Q.   When you made payments to New Leaf Landscaping, where

9   would the money come from?

10   A.   I believe, again, it was a combination of the Cyprus

11   accounts and the U.S. accounts.

12   Q.   And would you report those to Ms. Washkuhn?

13   A.   The U.S. payments were reported to Ms. Washkuhn.  The

14   ones from overseas were not.

15   Q.   Are you familiar with an entity known as the House of

16   Bijan?

17   A.   Yes.

18   Q.   What is that?

19   A.   I believe, again, that was another clothier.

20   Q.   And who did -- was Mr. Manafort a customer of House of

21   Bijan?

22   A.   Yes.

23   Q.   Did you make payments to that entity?

24   A.   I did.

25   Q.   And where did that money come from?

1238

1  A.   Again, I believe that was a combination of offshore and

2  U.S. accounts.

3  Q.   Have you ever ordered any clothes from the House of

4  Bijan?

5  A.   No.

6  Q.   Okay.  You testified that both you and Mr. Manafort were

7  wiring money directly from Cyprus to the vendors.

8         Do you know what benefit if any -- how that

9  benefitted Mr. Manafort?

10  A.   Well, in not reporting the wires that were done, they

11  were not disclosed on Mr. Manafort's U.S. business records.

12  Therefore, it was, in essence, diminishing the amount of

13  income that should have been reported on the tax return.

14  Q.   You testified that at some point the accounts moved from

15  Cyprus to St. Vincent's and the Grenadines; is that correct?

16  A.   That's correct.

17  Q.   The process for moving money from St. Vincent and the

18  Grenadines, was it different than the process you used in

19  Cyprus?

20  A.   It was.

21  Q.   How?

22  A.   The process in the Grenadines was a little more document

23  complex, because it was a different bank.  And, again, at that

24  time there were banking issues that had transpired over from

25  Europe into kind of the Caribbean area.  So they requested

U.S. v. Manafort

1239

1    much more documentation as evidence to initiate that wire

2    transfer.

3    Q.   And the payments from the St. Vincent's and the

4    Grenadines that you made, were they on behalf of Mr. Manafort?

5    A.   Yes.

6    Q.   And did you also make payments to yourself from those

7    accounts?

8    A.   I did.

9    Q.   And those were the unauthorized payments?

10   A.   Some were; some were not.

11   Q.   You testified that there was additional documentation

12   required for moving money from the St. Vincent's and the

13   Grenadines?

14   A.   Yes.

15   Q.   Did you create some of those documents?

16   A.   I did.

17   Q.   Okay.  Can you explain to the jury what you did in terms

18   of creating documents and why you did it?

19   A.   So Mr. Manafort had sent -- you know, would typically

20   send me a list of wire transfers.  But when we started making

21   the transfers from the Grenadines, because they required

22   additional documentation, I had asked Mr. Manafort for a

23   copies of the invoices.

24         In most occasions he didn't have the original

25   invoices, so we used a template that basically was for the

─────U.S. v. Manafort─────

1240

1    legitimate payment of that invoice.  But instead of being

2    addressed to Mr. Manafort, it needed to be addressed to the

3    company that the payment was actually coming from.  So I

4    edited the template and put the name of the company as opposed

5    to Mr. Manafort's name.

6    Q.    And because those payments were coming from St. Vincent's

7    and the Grenadines, what were the companies there that were

8    opened?

9    A.    The two companies, they were basically registered in

10   Cyprus but they were offshore.

11   Q.    And what were their names?

12   A.    Global Endeavour and Jeunet.

13   Q.    Okay.  Can I ask you to take a look at Government

14   Exhibit 67A.

15         MR. ANDRES:  These are already in evidence, Your

16   Honor.

17         THE COURT:  All right.

18         MR. ANDRES:  May I publish them?

19         THE COURT:  Yes.

20   BY MR. ANDRES:

21   Q.    Can I ask you to turn to page 2.  Do you recognize this

22   document, Mr. Gates?

23   A.    Yes.

24   Q.    Okay.  What is it?

25   A.    This is an invoice for amount -- a wire amount that

1241

1   Mr. Manafort had sent to me.  And this is the invoice that

2   went to the actual Grenadines entity where the payment came

3   from.

4   Q.   Who created this invoice?

5   A.   I did.

6   Q.   And based on what information?

7   A.   Information that Mr. Manafort had given to me about the

8   wire transfer.

9   Q.   Is it fair to say that this is a fake invoice?

10  A.   It's a -- yes, it's a modified invoice.

11  Q.   Okay.  It's fake in terms of the document itself?

12  A.   Correct.

13  Q.   And how about the payment that's being made, what -- what

14  is -- how would you characterize the payment?

15  A.   The payment was legitimate.  I mean, again, the effort

16  here was to -- instead of having it billed to -- with the name

17  of Mr. Manafort, because the payment was coming from this

18  company at Mr. Manafort's request, it had to have the name of

19  the company itself.

20  Q.   And so where it says "billed to," who's listed?

21  A.   Global Endeavour.

22  Q.   And having reviewed this now, you realize that there are

23  typographical errors or other errors on these documents?

24  A.   Yes.

25  Q.   Okay.  And where it says "Alan Couture," who -- who added

1242

1   that information?

2   A.   I took it off of the information that Mr. Manafort had

3   sent me in the wire request.

4   Q.   Okay.  Can I ask you to take a look -- and with respect

5   to that -- I'm sorry -- with respect to that second document,

6   what's the total amount of the payment that was made as a

7   result of the invoice that you sent?

8   A.   In this one the amount is 42,000.

9   Q.   And that's a payment to who?

10  A.   Alan Couture.

11  Q.   And was there a wire initiated as a result of you

12  submitting this document?

13  A.   Yes.

14  Q.   Okay.  Can I ask you to turn to, in the same exhibit,

15  Government exhibit, ending in the Bates No. 552?

16        Can you explain what this document is?

17  A.   Yes.  Again, this is an invoice that Mr. Manafort had

18  requested a payment for.  I put in the name of the company

19  Global Endeavour to initiate the wire transfer.

20  Q.   And what's Big Picture Solutions?

21  A.   I believe that was Mr. Maxwell's company, the audio and

22  visual technician.

23  Q.   Okay.  And you created this document?

24  A.   I did.

25  Q.   There's a stamp on the top right-hand side of the

U.S. v. Manafort

1243

1  invoice.  What's that?

2  A.   That's from the bank.

3  Q.   Okay.  Now, when you were creating these invoices, would

4  it be one for -- one from an invoice from one of these vendors

5  or did you aggregate them from time to time?

6  A.   I don't recall.  I believe it was one to one.

7  Q.   Okay.  And who were you relying on for that information?

8  A.   Well, these are based on wire transactions that

9  Mr. Manafort had requested, so I was using the information he

10  provided.

11  Q.   And at the time, he didn't have the invoices?

12  A.   No.

13  Q.   So he provided you a total amount to make a payment?

14  A.   Well, yeah.  He would send it in the description of how

15  much needed to be paid and who it needed to be paid to.

16       I do believe on some occasions there were invoices

17  that he did provide, but, again, it didn't matter because the

18  invoice to him was in his name and the invoice for the payment

19  needed to be in the company's name.

20  Q.   Okay.  If you look down a little further in the Big

21  Picture Solutions invoice that you -- that you created, where

22  it says "Description of services," where did that information

23  come from?

24  A.   That was usually just generic language that was already

25  either filled in the template or maybe I modified it on some

U.S. v. Manafort

1244

1    occasions.

2    Q.   Okay.  And, again, the payments for Mr. -- to Big Picture

3    Solutions were on behalf of who?

4    A.   Mr. Manafort.

5    Q.   And they were for services that were rendered?

6    A.   Yes, to my understanding.

7    Q.   Okay.  And did these invoices themselves -- did they ever

8    go to the vendors?

9    A.   No.

10   Q.   Who did they go to?

11   A.   They went to the bank.

12   Q.   Can you look at Government Exhibit -- at the page 636 in

13   the same exhibit?  What is that?

14   A.   Again, this is another invoice for work done by New Leaf

15   Landscape.

16   Q.   Okay.  And this is also an invoice that you created?

17   A.   It is.

18   Q.   Same process?

19   A.   Yes.

20   Q.   Okay.  And why did you create this invoice?

21   A.   Again, because Mr. Manafort wanted a wire transfer

22   initiated for this company.

23   Q.   And then, lastly, if you could turn to the last page in

24   the exhibit that ends in 452.

25            Can you tell me what that is?

─────U.S. v. Manafort─────

1245

1   A.   Again, finally, this is another invoice.  This time to

2   SP&C.

3   Q.   Same process?

4   A.   Same process.

5   Q.   You created this invoice?

6   A.   Yes.

7   Q.   And it was to initiate a payment?

8   A.   It was.

9   Q.   Mr. Gates, let me direct your attention to July of 2014.

10         Were you interviewed by the FBI at that time?

11  A.   Yes.

12  Q.   Okay.  Were you represented by counsel?

13  A.   I was.

14  Q.   At the time of the interview, did you understand why you

15  were being interviewed?

16  A.   Yes.

17  Q.   Why?

18  A.   We were asked to -- in the words of my attorney, to

19  voluntary help in regards to a forfeiture investigation the

20  Ukrainian Government was working on in conjunction with the

21  FBI.

22  Q.   Okay.  And at the time when you said "we," was somebody

23  else also interviewed?

24  A.   Yes.

25  Q.   Who?

U.S. v. Manafort

1246

1    A.    Mr. Manafort.

2    Q.    At the time did you understand whether you, yourself, was

3    under -- were under investigation?

4    A.    It was my understanding I was not.

5    Q.    And did you understand whether Mr. Manafort was under

6    investigation?

7    A.    It was my understanding he was not.

8    Q.    And how did you learn that Mr. Manafort was also being

9    interviewed?

10   A.    He told me.

11   Q.    Who was interviewed first?

12   A.    I was interviewed first.

13   Q.    During the interview were you asked questions about your

14   work in the Ukraine?

15   A.    Yes.

16   Q.    And were you asked questions about certain overseas

17   accounts?

18   A.    Yes.

19   Q.    At the time of that interview, what was the status of the

20   Cypriote accounts?

21   A.    The majority of the Cypriote accounts had been closed at

22   the time of the interview.

23   Q.    And in terms of the order of the interviews, who was

24   interviewed first, you or Mr. Manafort?

25   A.    I was interviewed first.

U.S. v. Manafort

1247

1   Q.   At some point, prior to Mr. Manafort's interview, did he

2   direct you to take certain action?

3   A.   He did.

4   Q.   What did he ask you to do?

5   A.   He asked me to travel to meet with one of the Ukrainian

6   businessmen to, one, notify him that we were going to be

7   interviewing with the FBI, and then to also determine the

8   status of the Ukrainian businessman's company because a lot of

9   the money came from the one particular company and we didn't

10   really have a lot of background on that company and wanted to

11   learn more.

12   Q.   Okay.  And who is the Ukrainian businessmen that you went

13   to see?

14   A.   Mr. Lovochkin.

15   Q.   And where did you go see him?

16   A.   In France.

17   Q.   And did he agree -- did he answer your questions?

18   A.   He did.

19   Q.   Okay.  Did -- at some point around this time, did you --

20   were you also aware of any negotiations with Mr. Lovochkin

21   about the payments that he was making to Mr. Manafort?

22   A.   Well, Mr. Manafort, in another exercise, was trying to

23   move all of his banking directly to one particular

24   institution.  So he was trying to have the payments -- the

25   contract payments for the Ukraine political work also sent to

1248

1  that bank as well.

2  Q.   And did Mr. Lovochkin agree to this arrangement?

3  A.   He did.

4  Q.   At that point, there was no longer a requirement to have

5  Cypriote or overseas accounts?

6  A.   At that time, no.

7  Q.   Excuse me?

8  A.   Yeah, at that time, no.

9  Q.   Mr. Gates, at some point during the course of the time

10  that you worked for Mr. Manafort, did you assist him in the

11  preparation of his tax returns?

12  A.   Yes.

13  Q.   Over what time period?

14  A.   I think my involvement specifically increased from 2010

15  forward.

16  Q.   And during that time period, did you work with

17  Mr. Manafort's tax preparers?

18  A.   I did.

19  Q.   Who did you understand them to be?

20  A.   At the time, it was Mr. Ayliff at KWC, who he later

21  brought on Ms. Cindy Laporta, and then there was some support

22  staff that worked with us as well.

23  Q.   How about Naji Lakkis?

24  A.   Yes.

25  Q.   Who is he?

U.S. v. Manafort

1249

1   A.   Mr. Lakkis was primarily Mr. Ayliff's assistant that

2   worked on the tax efforts in the early years.

3   Q.   And during the time starting in 2009 that you helped with

4   the taxes, was there a process in place together with KWC with

5   respect to the preparation of Mr. Manafort's taxes?

6   A.   Yes.

7   Q.   Can you explain what that was?

8   A.   In the -- in the early years, the process started that

9   Mr. Manafort had asked me to sit in some of the meetings with

10  his accountants because the business entities were something

11  that I was involved in and followed.  Over time, I was tasked

12  with gathering a lot of the questions and answers that the

13  bookkeepers and the tax accountants had in regards to

14  Mr. Manafort's taxes.

15          So the process would be that they -- the bookkeeper

16  would send the balance sheet and ledger to the accountants.

17  The accountants would review that and then they would prepare

18  a series of questions.  Those questions were, in the initial

19  stages, e-mailed to both of us.  Later on, they were e-mailed

20  just to me.  I would answer the questions that I could answer

21  and then I would typically either speak or meet with

22  Mr. Manafort and ask him for the remaining answers.  The

23  answers were compiled and then returned to the accountants.

24          THE COURT:  All right.  Is this a good time to take

25  our morning break, Mr. Andres?

U.S. v. Manafort

1250

1        MR. ANDRES:  Yes, Your Honor.

2        THE COURT:  All right.  Mr. Gates, you may step

3   down, sir.  During the recess, which will be until about

4   11:20, you may not discuss your testimony with anyone.

5        THE WITNESS:  Okay.

6        THE COURT:  Ladies and gentlemen, pass your books to

7   the right.  Mr. Flood will collect them, maintain their

8   security as usual.

9        During the recess, remember to refrain from

10  discussing the matter with anyone or undertaking any

11  investigation on your own and we will reconvene at 11:20.  You

12  may follow Mr. Flood out.

13        (Jury dismissed.)

14        THE COURT:  All right.  You may be seated.

15        Mr. Andres, what's your estimate now of what remains

16  in Mr. Gates' direct testimony?

17        MR. ANDRES:  I'd say two hours, Judge.

18        THE COURT:  All right.  See if you can compress it.

19  I mean, this morning when I asked you, you said three hours.

20        MR. ANDRES:  I --

21        THE COURT:  Now you've been at it for almost two

22  hours.

23        MR. ANDRES:  I understand my math doesn't add up

24  entirely, Judge, but I will do everything I can to expedite

25  it.

U.S. v. Manafort

1251

1          THE COURT:  Thank you.  Court stands in recess.

2          (Recess.)

3          THE COURT:  All right.  We're prepared to proceed.

4   Bring the jury in.

5          (Jury in.)

6          THE COURT:  All right.  You may be seated.

7          All right.  And let's have Mr. Gates return, please.

8          Mr. Gates, you'll recall that you're still under

9   oath, sir, and you may resume the stand.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  Mr. Andres, you may proceed.

12          MR. ANDRES:  Thank you, Your Honor.

13   BY MR. ANDRES:

14   Q.   Mr. Gates, you were testifying about your role with

15   respect to Mr. Manafort's tax returns.

16          What role specifically did you play in interacting

17   with the tax preparers?

18   A.   Again, I worked with the tax preparers on answering

19   questions that they submitted based on a balance sheet and

20   ledger that they put together based on what the -- the work

21   that Ms. Washkuhn did.

22   Q.   Were there times that you interacted directly with the

23   tax preparers?

24   A.   Yes.

25   Q.   Cindy Laporta?

1252

1  A.   Yes.

2  Q.   Philip Ayliff?

3  A.   Yes.

4  Q.   How about Mr. Manafort?  What did you know about his

5  interactions with his tax preparers?

6  A.   I knew he interacted with them.  He also reached out to

7  me in regards to requests that he wanted me to seek from the

8  accountants.

9  Q.   And with respect to your involvement, did you attend

10  meetings with Mr. Manafort and his tax preparers?

11  A.   I did.

12  Q.   Do you know what his relationship with Mr. Ayliff was?

13  A.   It was very longstanding.  It was preexisting before I

14  got there, but they seemed to have a longstanding

15  relationship.

16  Q.   Did you have an understanding, based on your discussions

17  with Mr. Manafort, that he understood the details of his tax

18  returns?

19  A.   Yes, it was my belief he did.

20  Q.   Did you make efforts to reduce the amount of income that

21  was reported on the tax returns?

22  A.   We did.

23  Q.   Okay.  What specifically did you do?

24  A.   I would say specifically the idea of exchanging income

25  for loans and putting those on the books enabled Mr. Manafort

1253

1   to reduce his overall tax liability.

2   Q.   Okay.  And did that relate to the Peranova loan?

3   A.   It did.

4   Q.   How about the Telmar loan?

5   A.   It did.

6   Q.   Okay.  And with respect to the income that was sent from

7   Cyprus to vendors or other locations, was that ever disclosed

8   to the tax preparers?

9   A.   It was not.

10  Q.   Did you have a discussion with Mr. Manafort about whether

11  those accounts should be disclosed?

12  A.   Yes.  Over the years, we had various discussions on them.

13  It was never an overt, you know, don't disclose the accounts,

14  but there were issues with the accounts, specifically such as

15  having signature authority, which because the Cyprus law firm

16  had the signature authority on the accounts, Mr. Manafort

17  would tend to use that as the reason for not informing the

18  accountants or the bookkeepers of those accounts.

19  Q.   And at any point during the time that those accounts in

20  Cyprus and St. Vincent and the Grenadines were opened, at any

21  time during that period, did Mr. Manafort not have control of

22  those accounts?

23  A.   No, he always had control.

24  Q.   And whose money was in those accounts?

25  A.   Mr. Manafort's.

U.S. v. Manafort

1254

1  Q.   You testified yesterday that from time to time, either

2  you or Mr. Manafort would circulate an agenda for meetings

3  that you would attend?

4  A.   Yes.

5  Q.   Or phone calls?

6  A.   Yes.

7  Q.   Can you explain what those agendas were and what the

8  purpose was?

9  A.   Sure.  The agendas were a way for Mr. Manafort to catch

10  up or for me to provide updates on a variety of issues related

11  to work in Ukraine, work in the U.S.  It could be related to

12  the tax preparation, gathering material for various

13  investments that Mr. Manafort had.  It was a wide range of

14  issues.

15  Q.   Can I ask you to look at Government Exhibit 372?

16  A.   Okay.

17  Q.   Can you tell me what that is?

18  A.   In this instance, it's an agenda that was prepared by

19  Mr. Manafort and outlines a number of the issues that we were

20  talking about at that particular time.

21       MR. ANDRES:  The Government moves to admit

22  Government Exhibit 372 -- oh, I'm sorry, Your Honor, it's in

23  evidence.  May I publish it?

24       THE COURT:  Yes.

25       MR. ANDRES:  Excuse me, Your Honor.

U.S. v. Manafort

1255

BY MR. ANDRES:

Q.   Mr. Gates, can you zoom in on the top half, please?

     Just read the heading of the document.

A.   Gates agenda, March 21, 2013.

Q.   Did you draft this or Mr. Manafort?

A.   Mr. Manafort did.

Q.   Okay.  And there is black writing and -- or typing and red typing.  Do you know what the distinction is?

A.   Yes.  So typically, Mr. Manafort would take notes during our calls and outline, in this case, once we had a discussion about an issue, identifying an action item related to that issue and who would carry it out and what the action item was.

Q.   And does this agenda reflect a meeting on or -- a meeting or a communication with Mr. Manafort on or around March 21, 2013?

A.   Yes.

Q.   Okay.  If you look at the first category under Ayliff, what's -- who's Ayliff?

A.   Mr. Ayliff is in reference to Philip Ayliff at KWC.

Q.   And there's a reference to k1's Global and L DONE.  What is that?

A.   That's in reference to businesses that Mr. Manafort had.

Q.   And then if you look at Number 2, it says, "do payment." Any idea what that is?

A.   I don't recall what that might be.

U.S. v. Manafort

1256

1   Q.   What about 3, "tax plan for April 15 done"?

2   A.   Yes, that's in reference to the tax preparation for that

3   tax year.

4   Q.   And Number 4, "Taxes - Assets Allocations"?

5   A.   Yes.  I don't know if this is -- well, I don't know what

6   that specific reference is for, but related to the tax

7   preparation.

8   Q.   During the March 21, 2013 meeting, were you discussing

9   Mr. Manafort's taxes with him?

10  A.   Yes.

11  Q.   Was that routine for you to do?

12  A.   It was.

13  Q.   If you look at the second section under KC, who's -- who

14  is KC?

15  A.   KC is Kypros Chrysostomides.

16  Q.   Is that the individual we've referred to as "Dr. K"?

17  A.   Dr. K, it is.

18  Q.   And if you look at Number 2, it says, "update on

19  movements."  What's that a reference to?

20  A.   Sure.  At this time, there are still liquidity issues in

21  Cyprus, so moving money in and out is difficult.  So

22  Mr. Manafort wanted an update on what we were doing in order

23  to facilitate faster transfers.

24  Q.   At the meeting on March 21, 2013, were you and

25  Mr. Manafort discussing this overseas bank accounts?

─U.S. v. Manafort─

1257

1    A.    Yes.

2    Q.    Okay.  If you look at the bottom, there's a reference to

3    Yanks.  What's that in reference to?

4    A.    That would be in regards to the Yankees season tickets

5    Mr. Manafort possessed.

6    Q.    Was Mr. Manafort a season ticket holder?

7    A.    He is.

8    Q.    With respect to the New York Yankees?

9    A.    Yes.

10   Q.    Okay.  Have you ever been a season ticket holder for the

11   New York Yankees?

12   A.    No.

13   Q.    Have you attended Yankee games using Mr. Manafort's

14   tickets?

15   A.    I have.

16   Q.    If you look on the next page, there's a reference to

17   Ukraine.  And can you tell me, for example, there's a

18   reference to the Gusenbauer trip.  What's that?

19   A.    Yes, that's in reference to Alfred Gusenbauer who was a

20   member of the project Hapsburg.  Mr. Gusenbauer used to be the

21   former chancellor of Austria.

22   Q.    I'm not going to go through anymore of this.  But having

23   reviewed this document, is it fair to say that in March 21,

24   2013, you're discussing issues relating to Ukraine with

25   Mr. Manafort?

1258

1  A.   Yes.

2  Q.   Okay.  Could I ask you to take a look at Government

3  Exhibit 373?

4           Can you tell me what that is, 373?

5  A.   Yes, it's an e-mail between Mr. Manafort and myself.

6  Q.   Okay.  And is this -- is -- are there attachments?

7  A.   Yes.  In this case, Mr. Manafort is attaching a copy of a

8  draft agenda, asking me to review it, and add items, which was

9  a typical process we used.

10  Q.   And that's reflected in the cover e-mail?

11  A.   Yes.

12           MR. ANDRES:  Your Honor, the Government moves to

13  admit 373.

14           MR. DOWNING:  No objection.

15           THE COURT:  Admitted.

16                          (Government's Exhibit No. 373

17                          admitted into evidence.)

18  Q.   At the bottom e-mail at 4:26 on December 13th, what does

19  Mr. Manafort say?

20  A.   (As read): "I would like to review the range of

21  outstanding items.  I have attached my agenda notes for the

22  call.  I am moving around all day, so best time to reach me is

23  8:00 a.m."

24  Q.   And is there an e-mail -- is there an agenda attached?

25  A.   There is.

U.S. v. Manafort

1259

1        MR. ANDRES:  May I publish, Your Honor?

2        THE COURT:  Yes.

3   BY MR. ANDRES:

4   Q.   If you look at the agenda for December 11th, there's a

5   reference to a No. 3, "Wires to send."

6        What is that a reference to?

7   A.   These are typically where Mr. Manafort would either say

8   he had some wires he would send me or he's already sent me and

9   he's looking for updates on the status.

10  Q.   Okay.  No. 8 refers to 2014 taxes.

11  A.   Yes.  That would be in reference to either looking at

12  something in preparation for the 2014 tax filing.

13  Q.   And No. 13 says, "Kyiv office - budget."

14       What is that a reference to?

15  A.   That is the office budget that we had in Kyiv still at

16  this time, indicating how many employees, our rent at the

17  local office, and other items.

18  Q.   Were these agendas typical?

19  A.   Yes.

20  Q.   How often would you receive or send an agenda to

21  Mr. Manafort?

22  A.   Oh, I mean, it could be, you know, as many as a couple a

23  week.  Sometimes they weren't as formal.  They were just

24  e-mails about catching up on certain items, but we typically

25  try to group items together, especially depending on travel

U.S. v. Manafort

1260

1   schedules.

2   Q.   I would ask you to take a look at Government Exhibit 219.

3        Can you tell me what that is?

4   A.   This is an e-mail from Conor O'Brien to myself, copying

5   Ms. Laporta and Mr. Ayliff.

6   Q.   Who is Conor O'Brien?

7   A.   Conor O'Brien works at KWC as well and works for

8   Ms. Laporta.

9   Q.   And does this e-mail relate to issues that you're

10  discussing with Mr. Manafort's tax preparers?

11  A.   It does.

12  Q.   Is Mr. Manafort included on this e-mail?

13  A.   He is not.

14  Q.   Okay.  The Government moves to admit 219.

15       MR. DOWNING:  Without objection.

16       THE COURT:  Admitted.

17                         (Government's Exhibit No. 219

18                          admitted into evidence.)

19  BY MR. ANDRES:

20  Q.   Mr. Gates --

21       MR. ANDRES:  May I publish, Your Honor?

22       THE COURT:  Yes.

23  BY MR. ANDRES:

24  Q.   Can you identify the -- who's on the e-mail and summarize

25  the e-mail for the jury?

U.S. v. Manafort

1261

1  A.   Yes.  The e-mail is from Conor O'Brien to myself and

2  Ms. Laporta -- I'm sorry -- copying Ms. Laporta and

3  Mr. Ayliff.  And this is in regards to a 2014 tax issue in

4  which Mr. Manafort believed his taxes were very high and we

5  needed to determine how we could lower the taxes, if at all

6  possible.

7            I was tasked by Mr. Manafort to go to Ms. Laporta

8  and ask her if there are ways in which we could do that, the

9  typical ways that we had been advised by KWC was, as always,

10 to convert income into loans and then also look at, you know,

11 other potential deductible expenses.

12 Q.   When you -- in the instances when you converted income to

13 loans, for example, in Peranova, what was that money?

14 A.   It was originally income.

15 Q.   Okay.  And can I ask you to take a look at Government

16 Exhibit 375?

17            Can you tell me what that is?

18 A.   Yes.  This is an e-mail exchange between me and

19 Mr. Manafort regarding his taxes.

20            MR. ANDRES:  The Government moves to admit

21 Government Exhibit 375.

22            MR. DOWNING:  No objection.

23            THE COURT:  Admitted.

24                        (Government's Exhibit No. 375

25                        admitted into evidence.)

─────U.S. v. Manafort─────

1262

1  BY MR. ANDRES:

2  Q.   With respect to the bottom e-mail on April 15, 2005,

3  can -- can you summarize that e-mail for the jury?

4  A.   Yes.  So as is standard in our process of meeting with

5  the accountants, they had provided an outline of

6  Mr. Manafort's potential tax impact.  I met with them,

7  gathered the information that they had prepared, and then put

8  it in a report to Mr. Manafort.

9  Q.   Okay.  And this is -- you're communicating those issues

10  to Mr. Manafort?

11  A.   Yes.

12  Q.   Again, you're discussing the tax returns with him?

13  A.   I am.

14  Q.   When he writes back at 4:20, what is his reaction?

15  A.   He's not happy.

16          "I just saw this.  WTF."

17          MR. ANDRES:  May I publish this, Your Honor?  I'm

18  sorry, excuse me.

19          THE COURT:  Let him finish his answer first.

20          Had you finished?

21          THE WITNESS:  I can continue reading, if you want.

22  BY MR. ANDRES:

23  Q.   I just asked you to summarize it.  Could you finish

24  summarizing it?

25  A.   Yes.

U.S. v. Manafort

1263

1          THE COURT:  All right.  You may publish if he's

2    finished.  Did you say you've finished?

3          THE WITNESS:  I did, Your Honor, yes.

4          THE COURT:  All right.  You may publish.

5          MR. ANDRES:  Judge, to the extent I hadn't, I move

6    to admit 375.

7          THE COURT:  I thought it was already admitted.

8          MR. ANDRES:  Okay.  Thank you, Judge.

9          THE COURT:  No objection, is there, Mr. Downing?

10         MR. DOWNING:  No objection.

11         THE COURT:  Admitted.

12                    (Government's Exhibit No. 375

13                    admitted into evidence.)

14   BY MR. ANDRES:

15   Q.   With respect to Mr. Manafort's reaction at 4:20, you

16   testified that he was upset.  Why was he upset?

17   A.   He was upset because a number of the items that had

18   originally been projected for his potential tax impact for

19   that year were off by the accountants.  And this is the first

20   time that, one, I was learning about it and then when I

21   communicated the information, obviously first time he was

22   learning about it as well.

23   Q.   And is it typical -- was this the typical process in

24   which you would discuss Mr. Manafort's taxes with him?

25   A.   Yes, in the latter years.

U.S. v. Manafort

1264

1   Q.   May I ask you to turn to Government's Exhibit 376?

2        Can you tell me what that is?

3   A.   Yes.  This is an e-mail exchange between myself and

4   Ms. Washkuhn.

5   Q.   And does it relate to the -- to -- to an incoming wire

6   from Telmar?

7   A.   It does.

8   Q.   Who is Telmar associated with?

9   A.   Telmar is associated with Mr. Lovochkin.

10       MR. ANDRES:  The Government moves to admit

11   Government Exhibit 376.

12       MR. DOWNING:  No objection.

13       THE COURT:  Admitted.

14                        (Government's Exhibit No. 376

15                        admitted into evidence.)

16   BY MR. ANDRES:

17   Q.   With respect to this document, can you explain what's

18   happening in your discussion with Ms. Washkuhn?

19   A.   Yes.  As is typical the case when Mr. Manafort is

20   notified that a wire payment is being made from the Ukrainian

21   businessmen, and at this point the wires are being sent

22   directly to the U.S., we would typically track the payment.

23       So once the payment hits, Ms. Washkuhn had the role

24   of either recording it as income or loan based on, you know,

25   direction of Mr. Manafort.

U.S. v. Manafort

1265

1  Q.   Okay.  And how is that -- how do you direct Ms. Washkuhn

2  to classify the Telmar payment?

3  A.   In this case, we disclosed it as a loan.

4  Q.   Okay.  And was it a loan?

5  A.   It was not.

6  Q.   During the time that you worked for Mr. Manafort and he

7  worked in the Ukraine, did Mr. Manafort ever receive a loan

8  from Serhiy Lovochkin?

9  A.   Not to my knowledge.

10  Q.   And the payments for Mr. Lovochkin to Mr. Manafort, what

11  were they?

12  A.   It was income for political work.

13  Q.   With respect -- when you identified the Telmar payment as

14  a loan for Ms. Washkuhn, was there an interest rate on that

15  loan?

16  A.   No.

17  Q.   Was there documentation?

18  A.   There wasn't at this point, but it was asked for later,

19  yes.

20  Q.   It was asked for because it didn't exist?

21  A.   Correct.

22  Q.   And did you create it?

23  A.   Ultimately, for this one, yes, we did.

24  Q.   You created a loan agreement for a loan that didn't

25  exist?

—U.S. v. Manafort—

1266

1  A.   Correct.

2  Q.   Why?

3  A.   At Mr. Manafort's direction.

4  Q.   Can you turn to Government Exhibit 160?

5       Can you tell me what that is?

6  A.   Yes.  This is an e-mail exchange between me and

7  Ms. Laporta.

8  Q.   Is there something attached?

9  A.   There is.

10       MR. ANDRES:  The Government moves to admit

11  Government Exhibit 160 -- oh, it's in evidence, Your Honor.

12       Thank you.  May I publish it?

13       THE COURT:  You may.

14  BY MR. ANDRES:

15  Q.   Mr. Gates, can you explain who this e-mail is from, who

16  it's to, and what it relates to?

17  A.   Yes.  It's to me -- excuse me -- to Ms. Laporta from me.

18  And it's in reference to me sending her a copy of the loan

19  agreement between Telmar and DMP, which she requested.

20  Q.   And what discussions are happening with the tax preparers

21  at this time?

22  A.   At this stage when the tax preparers saw that the loan

23  was on the books, they were more insistent on having loan

24  documentation to support that particular transaction.

25  Q.   Okay.  And you drafted this document on behalf of

U.S. v. Manafort

1267

1    Mr. Manafort?

2    A.    Yeah.   The document was provided by our Cypriote

3    attorneys and then I put in the relevant parties.

4    Q.    And in terms of the dates on the e-mail and the date of

5    the loan agreement, when you compare those, what do you find?

6    A.    So the loan agreement was executed on the 6th day

7    of March in 2014.

8    Q.    And was that, in fact, the day it was executed?

9    A.    The loan agreement?

10   Q.    Yeah.

11   A.    No, it was done at a later date.

12   Q.    Backdated it?

13   A.    Correct.

14   Q.    Because there was no loan?

15   A.    That is correct.

16   Q.    Can I ask you to turn to Government Exhibit 220?

17          Can you tell me what -- what's included in

18   Government Exhibit 220?

19   A.    Yes.   This is an e-mail regarding Mr. Manafort's taxes

20   for 2013.   Mr. O'Brien is seeking the engagement letter and

21   they are also seeking payment and then have a number of

22   questions regarding Mr. Manafort's tax return.

23          MR. ANDRES:   The Government moves to admit

24   Government Exhibit 220.

25          MR. DOWNING:   No objection.

U.S. v. Manafort

1268

1      THE COURT:  Admitted.

2                      (Government's Exhibit No. 220

3                      admitted into evidence.)

4  BY MR. ANDRES:

5  Q.    Can you tell us the date of this e-mail?

6  A.    October 7, 2015.

7  Q.    Okay.  And you said it was from Conor O'Brien.  Who is

8  that?

9  A.    I'm sorry, it's to Conor O'Brien from me.  Conor O'Brien

10  was Ms. Laporta's assistant at KWC.

11  Q.    Okay.  And was it -- did you from time to time pass on

12  the engagement letters to Mr. Manafort?

13  A.    I did.

14  Q.    Who signed those letters?

15  A.    In some cases, Mr. Manafort did, depending on where he

16  was.  In other cases, he had requested me to sign them and

17  submit them to KWC.

18  Q.    Okay.  And the engagement letters provide information

19  about certain foreign-related reporting requirements?

20  A.    I believe, yes, they do.

21  Q.    Okay.  At this time, had you previously had discussions

22  and interactions with the accountants about those

23  requirements?

24  A.    Yes, we had.

25  Q.    Can I ask you to turn to Government Exhibit 206?

1    It's already in evidence, Your Honor.

2    THE COURT:  All right.

3  BY MR. ANDRES:

4  Q.  Can you look at Government Exhibit 206 and tell me what

5  that is?

6  A.  Yes.  This is an e-mail from Mr. Lakkis to me copying

7  Mr. Ayliff, and it's in regards to Mr. Manafort's 2013 tax

8  return and asking for specific items, along with direction on

9  whether or not there's been a status change to any foreign

10  accounts Mr. Manafort might have.

11  Q.  And in the top e-mail, you write to Naji Lakkis.  Who is

12  that?

13  A.  Naji Lakkis worked for Mr. Ayliff at KWC.

14    MR. ANDRES:  May I publish this, Your Honor?

15    THE COURT:  You may.

16  BY MR. ANDRES:

17  Q.  With respect to the top, can you focus on the top?

18    You indicate, to your knowledge, nothing has

19  changed.  What do you mean by that?

20  A.  Yes.  After having a discussion with Mr. Manafort, I

21  relayed to Mr. Lakkis that nothing has changed with respect to

22  reporting of foreign bank accounts.

23  Q.  On June 24, 2013, did Mr. Manafort have foreign bank

24  accounts?

25  A.  He did.

U.S. v. Manafort

1270

1   Q.   Was this representation accurate -- not as to whether

2   something changed, but accurate as to whether or not there

3   were foreign bank accounts?

4   A.   It is not accurate.

5   Q.   Okay.  And you previously testified that over time you

6   learned from the accountants about various FBAR requirements;

7   is that correct?

8   A.   Yes.

9   Q.   Can you look at the bottom e-mail on June 17, 2013?

10          Do you see that?

11  A.   I do.

12  Q.   You're having a discussion -- or an e-mail -- excuse

13  me -- with Mr. Lakkis.  Do you see that?

14  A.   Yes.

15  Q.   And who else is included on that e-mail?

16  A.   Mr. Ayliff and Mr. O'Brien.

17  Q.   And what's the title of the e-mail?

18  A.   "Foreign account report due 6/30/13."

19  Q.   And in sum and substance, what is Mr. Lakkis asking you

20  about in that bottom e-mail?

21  A.   He's summarizing the regulation with respect to reporting

22  foreign bank accounts and then attaches the IRS reg with it.

23  Q.   And then with respect to A, can you read A?  What does it

24  say?

25  A.   "They had a financial interest (see below for

U.S. v. Manafort

1271

1   explanation) in or signature authority (see below for

2   explanation) over accounts outside of the United States."

3   Q.   And B?

4   A.   "The aggregate value of all foreign financial accounts

5   exceeds 10,000 at any time during 2012."

6   Q.   And as of June 2013, did Mr. Manafort have a financial

7   interest signature authority over accounts outside of the

8   United States?

9   A.   He did.

10  Q.   The aggregate value of those accounts, did it exceed

11  10,000?

12  A.   It did.

13  Q.   It far exceeded $10,000; isn't that true?

14  A.   Yes.

15  Q.   What was the amount of money in those accounts?

16  A.   I can't recall, but I venture to guess it's several

17  million dollars.

18  Q.   With respect to --

19          THE COURT:  Guesses are not admissible.

20          THE WITNESS:  Understood.

21          THE COURT:  So that's stricken, but you may ask

22  other questions if you think you can establish a value.  But

23  guesses not admissible.

24          MR. ANDRES:  Understood, Your Honor.

25  BY MR. ANDRES:

U.S. v. Manafort

1272

1   Q.   With respect to 2012, did DMP International,

2   Mr. Manafort, have a contract with the Ukraine?

3   A.   In 2012 it did.

4   Q.   Did that include a policy contract?

5   A.   Well, the policy contract had started earlier, but it was

6   continuing, yes.

7   Q.   Were there payments from the policy contract in 2012?

8   A.   Yes.

9   Q.   What was the total amount that was paid on the policy

10  contract in 2012?

11  A.   It would have been $4 million.

12  Q.   And where did that money go to?

13  A.   It went to a Cyprus bank account in Mr. Manafort's

14  control.

15  Q.   So in 2012, did Mr. Manafort have money in his Cyprus

16  accounts of at least $4 million?

17  A.   He did.

18  Q.   With respect to the document from Mr. Lakkis, it says,

19  "Last year we discussed the telecommunications company foreign

20  account as possible being reported."

21       What does that refer to?

22  A.   This refers to one of the investments from our private

23  equity fund that Mr. Manafort had.  And there was an

24  opportunity whereby Mr. Manafort wanted to exchange some of

25  the shares for loans that he had on his books over the years.

U.S. v. Manafort

1273

1    And we made this known to the accountants so that we could

2    figure out what type of tax impact it might have.

3    Q.   And in the course of that discussion about EVO Holdings,

4    was there a discussion about foreign bank accounts?

5    A.   There was.

6    Q.   And were there regulations explained?

7    A.   Yes, I believe they were.

8    Q.   Okay.  If you'd turn to the next page, Government

9    Exhibit 2585.

10            And if I could ask you to zoom in on the top.

11            What do you understand this to be?

12   A.   Based on Mr. Lakkis' e-mail, this was the attachment of

13   the financial regulation regarding ownership of foreign bank

14   accounts.

15   Q.   Okay.  And during this time period, were you having

16   discussions with Mr. Manafort about the disclosure of any

17   foreign bank accounts?

18   A.   Yes.

19   Q.   And did you have a discussion with him and pass on the

20   information from Mr. Lakkis?

21   A.   Yes, we did.

22   Q.   Okay.  I want to ask you to turn to Government

23   Exhibit 195.

24            Can you tell me what that is?

25            MR. ANDRES:  It's already in evidence, Your Honor.

—————U.S. v. Manafort—————

1274

1        THE COURT:  All right.

2        THE WITNESS:  Yes.  This is an e-mail chain from

3   Paul to me and then from me to Cindy.

4        MR. ANDRES:  May I publish it, Your Honor?

5        THE COURT:  You may.

6   BY MR. ANDRES:

7   Q.   Starting with the bottom e-mail on September 15, 2015,

8   can you explain what's happening and summarize this e-mail for

9   the jury?

10  A.   Yes.  It appears that KWC had sent Mr. Manafort the tax

11  forms to sign.  He signed the forms and then sent them to me

12  to forward to KWC.

13  Q.   Okay.  So these tax returns with respect to the year --

14  what year tax returns are these?

15  A.   It's 2014.

16  Q.   Okay.  It came from Mr. Manafort to you; is that right?

17  A.   Correct.

18  Q.   And then you sent them on to KWC?

19  A.   I did.

20  Q.   Do you know why Mr. Manafort didn't just send them

21  directly?

22  A.   I don't, but it wasn't unusual for him to just, from a

23  delegation point of view, send me documents to disburse among

24  other individuals.

25  Q.   And did you send those along to KWC?

U.S. v. Manafort

1275

1    A.    I did.

2    Q.    Did you make any changes to them?

3    A.    No.

4    Q.    Mr. Gates, let me direct your attention to late 2015.

5          Where were you working in 2015?

6    A.    At DMP International.

7    Q.    Did DMP International have any active clients?

8    A.    No.  We were attempting to secure a new contract with the

9    Opposition BLOC party in Ukraine, but at that time no new

10   contracts.

11   Q.    How about 2016?  Did you continue to work at DMP?

12   A.    I did.

13   Q.    Up until when?

14   A.    Approximately, March of 2016.

15   Q.    And what did you do in March of 2016?

16   A.    I went to work on -- for one of the presidential

17   campaigns.

18   Q.    And who hired you for that presidential campaign?

19   A.    Mr. Manafort.

20   Q.    And was he also working on the presidential campaign at

21   the time?

22   A.    He was.

23   Q.    With respect to the income that DMP was earning prior to

24   that, was he -- was DMP earning any income in 2016?

25   A.    Not to my knowledge.

U.S. v. Manafort

1276

1    Q.    How did you know?

2    A.    Ms. Washkuhn would typically prepare monthly

3    reconciliation pages with respect to both Mr. Manafort's

4    business and personal accounts so we'll have a snapshot of the

5    amount due in bills and then Ms. Washkuhn would request

6    funding for those payments.

7    Q.    In late 2015 and early 2016, how many people were

8    employed at DMP?

9    A.    Two.

10   Q.    Who were they?

11   A.    Myself and Alex Trusko.

12   Q.    And what was Mr. Kilimnik's status?

13   A.    He was still working with Mr. Manafort, but, to my

14   knowledge, he was being paid locally from Ukraine.

15   Q.    During the time that you worked for Mr. Manafort from

16   2006 to 2016, was Mr. Kilimnik always associated with the firm

17   in some way?

18   A.    Yes.

19   Q.    In 2016, do you -- if DMP wasn't making any money, do you

20   know how Mr. Manafort was paying your salary?

21   A.    Yes.  The salary and the bills of the company were being

22   paid by savings and investment accounts that Mr. Manafort had

23   at the time.

24   Q.    How did you know that?

25   A.    Based on information that Ms. Washkuhn had circulated.

U.S. v. Manafort

1277

1   Q.   During this time period, were you also -- did you have

2   other businesses that you were involved in?

3   A.   I did.

4   Q.   Were you involved in a company called Map Global

5   Holdings?

6   A.   Yes.

7   Q.   What was the name of that company?

8   A.   Map Global Holdings.

9   Q.   And what did that involve?

10  A.   It was PR and a movie production company.

11  Q.   Okay.  And did you make any money from that --

12  A.   I did.

13  Q.   -- company?

14  A.   I did.

15  Q.   Steve Brown involved in that company?

16  A.   He was.

17  Q.   Okay.  And that's the instance where you were involved in

18  backdating documents?

19  A.   Yes.

20  Q.   How about ID Watchdog, what was that?

21  A.   That was a company that I served as a board of directors

22  for.

23  Q.   During this time period in 2015 and 2016, was

24  Mr. Manafort having issues with his expenses?

25  A.   Yes.

U.S. v. Manafort

1278

1  Q.   What were the issues?

2  A.   There were a number of vendors that had reached out to

3  both myself and Ms. Washkuhn, indicating that the bills had

4  not been paid and asking when payment might be received.

5  Q.   During this time period, did Mr. Manafort begin applying

6  for bank loans?

7  A.   He did.

8  Q.   How did you know that?

9  A.   He had requested a team of people to begin pulling

10 together an assortment of documents in order for him to apply

11 for the bank loans.

12 Q.   Did he apply for one loan or more than one loan?

13 A.   It was more than one loan.

14 Q.   And what role did you play with respect to those loans?

15 A.   It varied depending on the loan.  But in large respect, I

16 was the point person for collecting all of the documents from

17 the various individuals and then submitting those to the

18 members of the various banks that Mr. Manafort directed.

19 Q.   In the process of doing that, did you provide false

20 information to any of the banks where Mr. Manafort applied for

21 a bank [sic]?

22 A.   Yes.

23 Q.   Did Mr. Manafort know that you were doing that?

24 A.   Yes.

25 Q.   How did he know?

U.S. v. Manafort

1279

1    A.   Because he had requested certain things be changed in

2    some of the documents.

3    Q.   And did you, in fact, alter those documents?

4    A.   Yes, we did.

5    Q.   Did you alter profit and loss documents?

6    A.   Yes.

7    Q.   How were you able to do that?

8    A.   At one point, I was tasked with -- by Mr. Manafort,

9    speaking with Ms. Laporta, to determine whether or not there

10   could be any other sources of income.

11          At the time Ms. Laporta indicated to us that the

12   only way that you can find more income is if you have loans on

13   the books, but in doing so you have to forgive a loan and if

14   you do that, there's a tax consequence with that as well.

15   Q.   Okay.  But when you altered the P&L documents, physically

16   you changed them from PDF documents to other types of

17   documents?

18   A.   Yes, to Word documents.

19   Q.   Okay.  Let me ask you to turn to Government Exhibit 380.

20   Can you tell me what this is?

21   A.   This is an e-mail to me from Mr. Manafort.

22   Q.   And does this relate to some of the loan applications

23   Mr. Manafort was making?

24   A.   It does.

25          MR. ANDRES:  The Government moves to admit

U.S. v. Manafort

1280

1    Government Exhibit 380.

2              MR. DOWNING:  No objection.

3              THE COURT:  Admitted.

4                        (Government's Exhibit No. 380

5                        admitted into evidence.)

6    BY MR. ANDRES:

7    Q.   Starting at the top, can you tell us who the e-mail is

8    from and to and the date?

9    A.   Yes.  It's to me from Mr. Manafort on January 6, 2016.

10   Subject is VIP time sensitive.

11             MR. ANDRES:  Your Honor, may I publish this

12   document?

13             THE COURT:  You may.

14   BY MR. ANDRES:

15   Q.   Okay.  And with respect to the document, what's the

16   title?

17   A.   VIP time sensitive.

18   Q.   Can you summarize the e-mail for the jury?

19   A.   Yes.  Mr. Manafort had requested me to reach out to

20   Mr. Ayliff in regards to a question that he wanted additional

21   information and was hoping for a specific answer in regards to

22   some of his properties that he was using to apply for the

23   loan.

24   Q.   Mr. Manafort said he wants to cash out refinance on the

25   Howard Street property.  What did you understand that to mean?

1281

1   A.   That a cash-out refinance is, if successfully you obtain

2   the mortgage, then part of what you get back is cash.

3   Q.   Mr. Manafort says, "For the maximum benefit I'm claiming

4   Howard Street as a second loan."

5            Do you know if Mr. Manafort has ever -- as a second

6   home, excuse me.

7            Has Mr. Manafort ever lived at Howard Street?

8   A.   To my knowledge, no.

9   Q.   Do you know what his primary residence was?

10  A.   At that time it was his house in Florida.

11  Q.   And how did you know his house in Florida was his primary

12  residence?

13  A.   Because I, along with one of our legal advisors and real

14  estate attorneys, changed the incorporation documentation to

15  have the company listed as a Florida-based company and then

16  Mr. Manafort changed his state of residence to Florida.

17  Q.   And the Howard Street property, what city and state was

18  that in?

19  A.   That was in New York City, New York.

20  Q.   When Mr. Manafort was in New York City, where did he

21  stay?

22  A.   He had an apartment on Fifth Avenue.

23  Q.   When Mr. Manafort said he -- in order to have a maximum

24  benefit that he's claiming Howard Street as a second home, do

25  you have an understanding what that referred to?

U.S. v. Manafort

1282

1   A.   Yes.   Just that he was looking for the most favorable

2   terms in the mortgage interest rate.

3   Q.   And do you know if there are different terms if the

4   property is a home or an investment property?

5   A.   Based on my conversation with Ms. Laporta, yeah, she

6   described that there were.

7   Q.   Okay.  And then he -- he says he needs to be in touch

8   with David Fallarino.  Who is that?

9   A.   David Fallarino was the banking representative at

10  Citizens Bank.

11  Q.   Okay.  And he asked you to get in touch with Mr. Ayliff.

12       Did you ever get in touch with Mr. Ayliff?

13  A.   I was not able to get in touch with Mr. Ayliff, but I was

14  able to speak with Ms. Laporta.

15  Q.   And what, if anything, did Ms. Laporta -- what did you

16  understand about what actions Ms. Laporta had taken as a

17  result of that conversation?

18  A.   Ms. Laporta had given some background information on the

19  various options and then she, I believe, had designated

20  Mr. Manafort to use this as a second home.

21  Q.   Can I ask you to take a look at Government Exhibit 235.

22       Can you tell me what that is?

23  A.   Originally this is an e-mail from Linda Francis in

24  regards to outstanding items she needed to process Paul's bank

25  loan application.

─────U.S. v. Manafort─────

1283

1   Q.   Who is Melinda Francis?

2   A.   She was a banking representative at Citizens Bank that

3   worked with Mr. Fallarino.

4   Q.   And do you know where Mr. Manafort was applying for -- or

5   the property -- excuse me.

6        Do you know what property he was seeking a loan with

7   respect to at Citizens Bank?

8   A.   Yes.  At Citizens I believe it was a property called

9   Union Street and also Baxter Street.

10  Q.   Okay.  Well, those were the mortgages.  With respect to

11  the actual loan, did it relate to Howard Street?

12  A.   Oh, yes, Howard Street.

13  Q.   So if you look at number -- the e-mail from Mr. Manafort

14  to Ms. Francis on February 21st, can you tell me what that

15  says?

16  A.   (As read): "Melinda, I have provided answers to the

17  questions that you posed in your e-mail.  My answers are in

18  red.  I will provide the requested documentation in the next

19  48 hours."

20        MR. ANDRES:  The Government moves to admit

21  Government Exhibit 235.

22        THE COURT:  Well, that portion of it I will admit.

23  Any objection to portion of it?

24        (A pause in the proceedings.)

25        MR. DOWNING:  No, Your Honor.

U.S. v. Manafort

1284

1    THE COURT:  Admitted.

2                         (Government's Exhibit No. 235

3                         admitted into evidence.)

4    THE COURT:  Next question.  And that's an e-mail

5  from Mr. Manafort, so it's clearly admissible.  I'm -- I'm not

6  sure you either need or want to have the hearsay testimony

7  from a person who isn't here and testifying.

8          MR. ANDRES:  Thank you, Your Honor.

9  BY MR. ANDRES:

10 Q.   With respect to the request for information, was there a

11 request for information about certain mortgages on properties

12 that Mr. Manafort owned?

13 A.   There was.

14 Q.   Okay.  Was there a request for information with respect

15 to the Union Street property?

16 A.   Yes.

17 Q.   Okay.  And how about the Baxter Street property?

18 A.   Yes.

19 Q.   Do you know when Mr. Manafort applied for the loan how he

20 represented the Union Street property?

21 A.   He represented that it had no mortgage on the property.

22 Q.   And did you understand that it did?

23 A.   I later came to learn that it did, yes.

24 Q.   Okay.  How did you learn that fact?

25 A.   From some documentation Mr. Manafort had requested me to

U.S. v. Manafort

1285

1  gather from his insurance representative.

2  Q.   Who is that?

3  A.   Donna Duggan.

4  Q.   And when you called Donna Duggan, what did you ask for?

5  A.   I asked her for the current insurance policies that

6  Mr. Manafort had asked me to obtain for him from her.

7  Q.   When you spoke to Ms. Duggan, did you ask for the current

8  policy or did you ask for a different copy?

9  A.   At the time I asked --

10       THE COURT:  The correct question is what did you ask

11  for, because otherwise you're only giving him two choices and

12  it's leading.  What did you ask for is the question.

13       THE WITNESS:  I asked for the current year policy.

14  BY MR. ANDRES:

15  Q.   Okay.  And did you later have a discussion with Ms. --

16  did you have a second discussion or interaction with

17  Ms. Duggan?

18  A.   Yes.

19  Q.   And what did you ask for then?

20  A.   At that point Mr. Manafort had asked me to get the prior

21  year policy.

22  Q.   Okay.  And did you?

23  A.   I did.

24  Q.   And what did you do with that document?

25  A.   I sent it to Melinda Francis at the bank.

─U.S. v. Manafort─

1286

1    Q.    And what did you represent that to be?

2    A.    These were two of the insurance policies Mr. Manafort had

3    asked me to obtain for him, and both of them showed that they

4    were free and clear of any mortgages.

5    Q.    And when you sent that document to Citizens Bank, was it

6    accurate?

7    A.    It was not.

8    Q.    How was it inaccurate?

9    A.    Because there was a mortgage listed on the Union Street

10   property.

11   Q.    Can I ask you to turn to Government Exhibit 237?

12          When you sent that inaccurate mortgage document to

13   the bank, did you know it was false?

14   A.    Yes.

15   Q.    And was Mr. Manafort involved in those e-mails?

16   A.    He was.

17   Q.    Can I ask you -- when you look at Government Exhibit 237,

18   can you tell me what that is?

19   A.    This is an e-mail from me to Ms. Francis.  I copied

20   Mr. Manafort and Ms. Washkuhn.  And this is in regard to the

21   some of the outstanding documents that the bank had required.

22   Q.    Okay.  And you were sending documents back and forth to

23   Ms. -- to Ms. Francis on behalf of Mr. Manafort?

24   A.    Yes.

25   Q.    And is there attachment to this document?

U.S. v. Manafort

1287

1   A.   There is.

2   Q.   And does that -- the attachment, is that the current

3   version of the insurance or is it the older version?

4          THE COURT:  Again, you're giving him two choices.

5          MR. ANDRES:  Understood, Your Honor.  I'm sorry.

6   BY MR. ANDRES:

7   Q.   With respect to the attachment, can you describe that to

8   the jury?

9   A.   Yes.  The effective date on the attachment is 10/12/2015,

10  which would have been the prior year policy.

11  Q.   Okay.  That document that you sent, what's the date of

12  that?  The e-mail, I'm sorry.

13  A.   The date of the e-mail is February 23, 2016.

14  Q.   Okay.  And the policy with respect to the Union Street

15  property, is that included in the document?

16  A.   Yes.

17  Q.   Okay.  And with respect to the Union Street property,

18  what's the effective date of that policy?

19  A.   The effective date is 10/12/2015.

20          MR. ANDRES:  Can I have one moment, Your Honor?

21          THE COURT:  Yes, you may.

22          (A pause in the proceedings.)

23          MR. ANDRES:  I'll move on and come back to this

24  document, Your Honor.

25          THE COURT:  I beg your pardon?

U.S. v. Manafort

1288

1    MR. ANDRES:  I said I was going to move on and come

2    back to this document, if that's okay.

3    THE COURT:  All right.

4    MR. ANDRES:  To move things along.

5    BY MR. ANDRES:

6    Q.    Can I ask you to take a look at Government Exhibit 240.

7    Actually, I'm sorry, Mr. Gates, can you turn back to

8    the prior exhibit, 235 -- 237.

9    Can you look at the document marked "7526," the last

10   four Bates numbers?

11   A.    Yes.

12   Q.    Do you see that?

13   A.    I do.

14   Q.    What's the property listed there?

15   A.    Property listed is 377 Union Street.

16   Q.    What's the effective date of that policy?

17   A.    2/1/2016.

18   Q.    And this is the document that's attached -- the -- the

19   insurance folders that's attached to Government's Exhibit 237;

20   is that right?

21   A.    Yes.

22   Q.    As far as you understood, how would you describe that

23   version of the policy?

24   A.    This was the most current policy that had been submitted

25   by the insurance brokers.

─────U.S. v. Manafort─────

1289

1  Q.   Can I ask you now to turn to Government's Exhibit 240?

2            MR. ANDRES:   Your Honor, I just want to make sure I

3  admit or I move to admit Government Exhibit 237 -- or 240.

4  I'm sorry.   240.

5            THE COURT:   Not admitted yet.

6            MR. ANDRES:   Move to admit it, Judge.

7            THE COURT:   Any objection to 240, which is a -- just

8  a moment -- e-mail chain that includes Mr. Manafort?   Any

9  objection.

10           MR. DOWNING:   One moment, Your Honor.

11           MR. ANDRES:   It's 237, Your Honor.

12           THE COURT:   Oh, it was 237?

13           MR. ANDRES:   Yes.

14           MR. DOWNING:   I thought you said 240.

15           THE COURT:   That's an e-mail chain Mr. --

16           MR. DOWNING:   No objection.

17           THE COURT:   No objection.   All right.   It's

18  admitted.

19                          (Government's Exhibit No. 237

20                           admitted into evidence.)

21  BY MR. ANDRES:

22  Q.   Can I ask you to turn to Government Exhibit 240 now?

23  A.   Yes.

24  Q.   Can you tell me what that is?

25  A.   This is an e-mail chain involving myself, Mr. Manafort,

—U.S. v. Manafort—

1290

1  Ms. Washkuhn, and Ms. Francis.

2  Q.   Okay.  And is Ms. Francis asking a question in this -- in

3  this e-mail?

4  A.   She is.

5  Q.   Is Mr. Manafort included in these e-mails?

6  A.   He is.

7  Q.   Okay.  And what is she asking?

8  A.   She's asking about the properties in question, Union

9  Street and Baxter Street, as being owned free and clear.

10  Their records indicate that one of the properties was not.

11  Q.   Has she received conflicting information, as you

12  understood at this time?

13  A.   She did.

14  Q.   Okay.  And what was the conflicting information?

15  A.   The conflicting information that she was given the

16  current year policy, which in the case of the one property

17  showed the mortgagee listed on it.

18  Q.   Okay.  Who had sent her the current policy?

19  A.   I'm sorry.

20  Q.   Who had sent her the current policy?

21  A.   I sent her the current policy.

22  Q.   Okay.  And is that consistent with what Mr. Manafort

23  listed on his application?

24  A.   The current policy was not accurate.

25  Q.   Okay.

1291

1   A.   Excuse me.   The current policy was accurate.

2   Mr. Manafort had asked me to submit the prior year policies.

3            MR. ANDRES:   Your Honor, the Government moves to

4   admit Government Exhibit 240.

5            MR. DOWNING:   No objection.

6            THE COURT:   Admitted.

7                          (Government's Exhibit No. 240

8                           admitted into evidence.)

9   BY MR. ANDRES:

10  Q.   Can I ask you now to look at Government Exhibit 263?

11           Can you tell me what that is?

12  A.   This is an e-mail from me to Donna Duggan.   Mr. Manafort

13  had requested that I reach out to Ms. Duggan to get some

14  information that he had already spoken to her about.

15  Q.   At the -- at the e-mail -- at the bottom e-mail, who is

16  that between?

17  A.   At the bottom e-mail is between myself and Ms. Duggan.

18           MR. ANDRES:   Your Honor, the Government moves to

19  admit 263.

20           MR. DOWNING:   Without objection.

21           THE COURT:   Admitted.

22                          (Government's Exhibit No. 263

23                           admitted into evidence.)

24  BY MR. ANDRES:

25  Q.   And can you summarize for the jury what's happening in

U.S. v. Manafort

1292

1   this e-mail?

2           MR. ANDRES:  May I publish it, Your Honor.

3           THE COURT:  You may.

4           THE WITNESS:  Yes.  Mr. Manafort asked that I reach

5   out to Ms. Duggan in order to get the prior year policy after

6   Ms. Francis had indicated that there was a discrepancy in the

7   current year policy.

8   BY MR. ANDRES:

9   Q.   And did you e-mail back and forth with Ms. Duggan?

10  A.   I did.

11  Q.   Did you eventually speak with her?

12  A.   I did.

13  Q.   And what specifically did you request?

14  A.   I requested the copy of the prior year policy per

15  Mr. Manafort.

16  Q.   And did she -- why did you do that?

17  A.   Because at the time Mr. Manafort had asked me to.

18  Q.   And did she provide that?

19  A.   She did.

20  Q.   I'm going to show you Government Exhibit 384.

21           Can you tell me what that is?

22  A.   It's an e-mail between me and Mr. Manafort.

23  Q.   Okay.  And does it relate to this issue that you've been

24  testifying about with Donna Duggan?

25  A.   It does.

U.S. v. Manafort

1293

1   Q.   And the Citizens Bank loan?

2   A.   Yes.

3            MR. ANDRES:  The Government moves to admit

4   Government Exhibit 384.

5            MR. DOWNING:  No objection.

6            THE COURT:  Admitted.

7                          (Government's Exhibit No. 384

8                           admitted into evidence.)

9            MR. ANDRES:  May I publish it?

10            THE COURT:  You may.

11   BY MR. ANDRES:

12   Q.   Can I focus on the e-mail at the bottom at 2:45?

13            Mr. Gates, can you explain that e-mail?

14   A.   Yes.  It is a follow-up for Mr. Manafort, indicating to

15   him that I was successful in reaching Ms. Duggan and told him

16   that we would have the amended policies very soon.

17   Q.   Okay.  So there were two insurance policies that you got

18   from Ms. Duggan; is that correct?

19   A.   Correct.

20   Q.   So with respect to the Baxter Street insurance policy,

21   the policy that was originally sent to the bank, how would you

22   describe that?

23   A.   That was accurate.

24   Q.   Okay.  How?

25   A.   In the sense that there was no mortgagee listed on that

U.S. v. Manafort

1294

1  insurance policy.

2  Q.   And did you get the right one?

3  A.   We did.

4  Q.   And what did you do with it?

5  A.   Submitted it to her.

6  Q.   With respect to the Union Street property, the one that

7  was originally submitted to the bank, was that the -- was that

8  correct?

9  A.   It was not correct.

10  Q.   Okay.  The one that was originally sent to the bank?

11  A.   The one that was -- the original policy was accurate.  It

12  reflected the mortgagee.

13  Q.   And what did you get from Ms. Duggan?

14  A.   Ms. Duggan sent us the prior year policy, which we then

15  forwarded to the bank.

16  Q.   And was that accurate?

17  A.   That was not accurate.

18  Q.   Okay.  And your e-mail here on February 24, 2016 with

19  Mr. Manafort, what are you discussing?

20  A.   Again, I'm updating Mr. Manafort on the status of his

21  request regarding the insurance policies.  He then asked me

22  who we're sending these to at Citizens, or if I had sent them

23  to anybody at Citizens, and I said that I would be sending

24  them to Melinda.

25  Q.   Okay.  Can I show you Government Exhibit 262?

U.S. v. Manafort

1      Can you tell me what that is?

2   A.   Yes.  These are the declaration pages for both Union

3   Street property and Baxter Street, forwarded to Mrs. Duggan to

4   myself and Ms. Azzam at UBS Bank.

5           MR. ANDRES:  The Government moves to admit 262.

6           MR. DOWNING:  No objection.

7           THE COURT:  Admitted.

8                     (Government's Exhibit No. 262

9                      admitted into evidence.)

10  BY MR. ANDRES:

11  Q.   Is this the document that Ms. Duggan sent you after you

12  spoke to her?

13  A.   It is.

14  Q.   And how would you characterize this policy that she sent

15  to you after you spoke to her?

16  A.   This was the prior year policy to the earlier one she had

17  sent.

18  Q.   Okay.  Can I show you now Government Exhibit 137?

19          What is Government Exhibit 137?

20  A.   This is an e-mail from me to Ms. Francis, copying

21  Mr. Manafort and Ms. Washkuhn.

22  Q.   Okay.

23  A.   In regards to the two properties.

24  Q.   And who is Melinda Francis?

25  A.   She's the representative at Citizens Bank.

U.S. v. Manafort

1296

1   Q.   Okay.  And what did you send her?

2   A.   I sent her the two previous year policies on the two

3   properties.

4   Q.   Where it says, "MC Brooklyn (Carol Gardens)," what's that

5   in reference to?

6   A.   That is Union Street.

7              MR. ANDRES:  The Government moves to admit

8   Government Exhibit 137.

9              MR. DOWNING:  No objection.

10             THE COURT:  It's admitted.

11                          (Government's Exhibit No. 137

12                          admitted into evidence.)

13  BY MR. ANDRES:

14  Q.   With respect to the --

15             MR. ANDRES:  Thank you, Your Honor.

16  BY MR. ANDRES:

17  Q.   With respect to MC Brooklyn, Carol Gardens, what property

18  is that?

19  A.   The Union Street property.

20  Q.   Okay.  And what -- how would you characterize the

21  insurance policy that you sent to Melinda Francis on this date

22  with respect to that property?

23  A.   So this e-mail attaches the two older policies, which

24  reflect no mortgagees on the properties.

25  Q.   Okay.  And with respect to Baxter Street, was there a

1  mortgage there?

2  A.   There was not.

3  Q.   Okay.  And with respect to Union Street, was there a

4  mortgage there?

5  A.   There was.

6  Q.   Okay.  During the course of the dealings with Citizens

7  Bank, did an issue arise with respect to Peranova?

8  A.   Yes.

9  Q.   Okay.  And what issue arose with respect to Peranova?

10 A.   The issue that arose was regarding the effort of

11 Mr. Manafort to find additional income for the mortgage

12 application.  This is when one of the loans that was on the

13 books at DMP had been forgiven and then was treated as income.

14 Q.   Okay.  So -- and that loan related to what entity?

15 A.   Peranova Holdings.

16 Q.   And during the course of the time that you worked for

17 Mr. -- what was Peranova?

18 A.   Peranova was a Cypriote entity and the controller was

19 Mr. Manafort.

20 Q.   During the time that you worked for Mr. Manafort, did

21 Peranova, the Cypriote entity, ever make a loan to

22 Mr. Manafort?

23 A.   It did not.

24 Q.   Were there payments from Peranova to Mr. Manafort?

25 A.   There were.

1298

1   Q.   What were they?

2   A.   Income.

3   Q.   Were they always income?

4   A.   To my knowledge, yes.

5   Q.   Can I ask you to look at Government Exhibit 163?

6        MR. ANDRES:  It's already admitted into evidence,

7   Your Honor.

8   BY MR. ANDRES:

9   Q.   Can you tell me what Government Exhibit 163 is?

10  A.   Yes.  It's an e-mail exchange initially between David

11  Fallarino and Cindy Laporta, and then later -- yes, and copies

12  Ms. Francis.

13  Q.   And with respect -- and you're on the top e-mail?

14  A.   I'm on the top and Mr. Manafort is as well.

15  Q.   And what's the -- what's the date of the e-mail, the top

16  one?

17  A.   February 4, 2016.

18  Q.   Okay.  Can you look at the e-mail on February 4 at four

19  o'clock where it says, "we qualify for everything," do you see

20  that?

21  A.   Yes.

22  Q.   Can you describe what's -- what's being conveyed to

23  Mr. Manafort there?

24  A.   Yes.  So after submitting a series of documents, the bank

25  came back and indicated areas that we were still lacking in

U.S. v. Manafort

1   documentation.  One of the areas that they described is based

2   on the information they received in terms of the

3   differentiating tax years, is there was a liquidity issue with

4   respect to Mr. Manafort's current year income.

5   Q.   Okay.  And did you solve that problem or was that problem

6   solved in some regard?

7   A.   I believe it was, yeah, solved partially.

8   Q.   Okay.  How?

9   A.   By converting the Peranova loan to income, we were able

10  then to treat that as income on the books for 2015.

11  Q.   And when you say, "converted," how did you convert that?

12  A.   We did a loan forgiveness letter between Peranova and DMP

13  International.

14  Q.   And who is Peranova?

15  A.   A company controlled by Mr. Manafort.

16  Q.   Did a loan forgiveness letter between Mr. Manafort and

17  Mr. Manafort?

18  A.   Yes.

19  Q.   And was the -- were the details of that loan forgiveness,

20  the dates, were they accurate?

21  A.   They were not.

22  Q.   And did Ms. Laporta help you with that process?

23  A.   She did.

24  Q.   Can I ask you to turn to Government Exhibit 164?

25           MR. ANDRES:  This is already in evidence, Your

U.S. v. Manafort

1300

1    Honor.

2    BY MR. ANDRES:

3    Q.   Can you take a look at Government Exhibit 164 and let me

4    know when you've had a chance to read it?

5    A.   Okay.

6    Q.   Can you look at the e-mail at 3:28 on the first page and

7    explain, summarize that for the jury?

8    A.   Yes.  Ms. Laporta is reaching out to me and she's says

9    that she will need documentation supporting the 1.5 million

10   loan forgiveness.  This is in order so that she can report it

11   to the banker.  So this is the letter that I had mentioned

12   earlier that she's requesting to demonstrate the loan.

13   Q.   Okay.  And how did you respond?

14   A.   I responded that I will get her the letter and then she

15   could do the cover letter that Mr. Manafort had requested.

16   Q.   At the time that you're discussing writing this letter,

17   had the loan, in fact, been forgiven?

18   A.   No.

19   Q.   It never existed in the first place?

20   A.   Correct.

21   Q.   Can I ask you to turn to Government Exhibit 165?

22            THE COURT:  But the money represented, was that

23   actual money paid to Mr. Manafort for services?

24            THE WITNESS:  It was.

25            THE COURT:  Next question.

U.S. v. Manafort

1301

1  BY MR. ANDRES:

2  Q.   Can I ask you to turn to Government 165?

3         MR. ANDRES:   Which is already in evidence, Your

4  Honor.

5         THE COURT:  All right.

6         We're going recess at 12:30, ladies and gentlemen.

7  BY MR. ANDRES:

8  Q.   When you look at Government Exhibit 165, can you describe

9  that for the jury, Mr. Gates?

10 A.   Yes.  This is the draft loan forgiveness letter that I

11 had sent to Ms. Laporta so that she could review and make sure

12 that nothing else needed to be included with it before I got

13 the signatures.

14 Q.   And what is the date on the e-mail that you send to

15 Ms. Laporta?

16 A.   It is February 8, 2016.

17        MR. ANDRES:  May I publish this, Your Honor?

18        THE COURT:  Yes.

19 BY MR. ANDRES:

20 Q.   Just highlight the date.

21        Where do you see the date on that e-mail?

22 A.   Where it says, "sent, Monday, 2/8/2016."

23 Q.   And who is the e-mail to?

24 A.   To Cindy Laporta from me.

25 Q.   And if you look now at the attachment, what is that?

U.S. v. Manafort

1302

1  A.    Peranova loan forgive.

2  Q.    Okay.  And what's the date on the letter?

3  A.    June 23, 2015.

4  Q.    When you wrote the letter, did you put the right date?

5  A.    No.  The income needed to be associated with 2015, so we

6  had to secure a date in that year.

7  Q.    And, again, the purpose for this document is to do what?

8  A.    To forgive a loan in order to treat loan as income in

9  2015.

10  Q.   And that was in relation to Mr. Manafort's bank loan

11  application?

12  A.   Bank loan application, that's correct.

13          THE COURT:  Was the money involved always income?

14          THE WITNESS:  It was.

15          THE COURT:  Next question.

16  BY MR. ANDRES:

17  Q.   Can I ask you to turn to Government Exhibit 166?

18  A.   Okay.

19          MR. ANDRES:  This is already in evidence, Your

20  Honor.

21          THE COURT:  All right.

22  BY MR. ANDRES:

23  Q.   Can I ask you to take a look at Government Exhibit 166

24  and explain who that e-mail is to and from and summarize it

25  for the jury?

U.S. v. Manafort

1303

1    A.   Yes.  It's to Ms. Laporta from me and it's in regards to

2    the loan letter that she, in essence, approved.  And then she

3    was going to originally do a cover e-mail of -- Mr. Manafort

4    had requested actually a cover letter with the KWC letterhead

5    on it because it was being submitted to the bank.  So I'm

6    asking her basically to do a letter instead of an e-mail.

7    Q.   Okay.  And this, again, relates to the Peranova loan

8    forgiveness issue?

9    A.   It does.

10   Q.   Okay.  Can I ask you to turn to Government Exhibit 389?

11        Can you describe Government Exhibit 389?

12   A.   This is an e-mail to Mr. Manafort from me.

13   Q.   Okay.

14        MR. ANDRES:  Your Honor, the Government moves to

15   admit Government Exhibit 389.

16        MR. DOWNING:  No objection.

17        THE COURT:  Admitted.

18                    (Government's Exhibit No. 389

19                    admitted into evidence.)

20   BY MR. ANDRES:

21   Q.   And can you describe what's happening here in the e-mail

22   from you to Mr. Manafort?

23   A.   Yes.  After Ms. Laporta approved the letter, I sent it to

24   Mr. Manafort to get his approval and sign off as well in case

25   he wanted to add anything.

U.S. v. Manafort

1304

1  Q.   And did he ultimately approve?

2  A.   Yes, he did.

3  Q.   Okay.  Can you turn to Government Exhibit 388?

4        Can you tell me what that is?

5  A.   Yes.  This is a continuation of the previous e-mail.

6  This shows that Mr. Manafort is fine with the letter and it

7  can go forward and he requests that it be on KWC's stationary,

8  and then I indicate that the cover note from Ms. Laporta will

9  be, but that the forgiveness letter would be on Peranova

10  letterhead since Peranova was forgiving the loan.

11        MR. ANDRES:  Government moves to admit Government

12  Exhibit 388.

13        MR. DOWNING:  No objection.

14        THE COURT:  Admitted.

15              (Government's Exhibit No. 388

16              admitted into evidence.)

17  BY MR. ANDRES:

18  Q.   Mr. Gates, with respect to the income that was at issue

19  in Peranova, there's -- do you know what year that was

20  actually earned?

21  A.   I believe it was 2012.

22  Q.   Okay.  It wasn't 2015; is that correct?

23  A.   That's correct.

24  Q.   Can I ask you to turn to Government Exhibit 167?

25        Can you tell me what that is?

U.S. v. Manafort

1305

1  A.   Yes.  This is the final letter that I send to Ms. Laporta

2  with the director of the signature from the Cypriote company.

3  Q.   Okay.  And who is the director from the Cypriote company?

4  A.   In this case, it was a woman by the name of

5  Ms. Chrysostomides.

6  Q.   Okay.  And is that an individual that's associated with

7  Dr. K?

8  A.   Dr. K's firm, that's correct.

9  Q.   Okay.  With respect to the e-mail in 167, what's the date

10 of that e-mail?

11 A.   February 9, 2016.

12 Q.   Okay.  And the -- and the letter that was signed?

13 A.   June 23, 2015.

14          MR. ANDRES:  The Government moves to admit 167.

15          MR. DOWNING:  No objection.

16          THE COURT:  Admitted.

17          Is this an appropriate time?  It's now virtually

18 12:30.

19          MR. ANDRES:  I have two documents left of this loan,

20 Judge.  Could I finish those?

21          THE COURT:  All right.  Go ahead.  You may do it.

22 BY MR. ANDRES:

23 Q.   Take a look at Government Exhibit 424.

24          Can you tell me what that is?

25 A.   Let's see.  Yes, this is in reference to the loan.

U.S. v. Manafort

1   Mr. Manafort is on an e-mail exchange with other individuals

2   from Citizens Bank, and this is where the requirement from the

3   bank saying that the letter from Ms. Laporta will need to be

4   on KWC letterhead.  So this is where Mr. Manafort is

5   requesting me to make sure that we get that on KWC letterhead.

6   Q.   Just to clarify, you said this relates to a loan.  It

7   relates to the loan application at Citizens Bank?

8   A.   Yes.

9   Q.   And also the --

10  A.   The Peranova loan, correct.

11          MR. ANDRES:  And the Government moves to admit 424,

12  Your Honor.

13          MR. DOWNING:  No objection.

14          THE COURT:  Admitted.

15                      (Government's Exhibit No. 424

16                      admitted into evidence.)

17  BY MR. ANDRES:

18  Q.   During the process of crafting the letter for the bank

19  and interacting with Ms. Laporta, was Mr. Manafort fully

20  informed of what was happening with respect to the Peranova

21  letter?

22  A.   Yes.

23  Q.   And did you include him on e-mails?

24  A.   Yes.

25  Q.   And the the e-mail in 424, Mr. Manafort is included in

U.S. v. Manafort

1307

1   that e-mail chain; is that right?

2   A.   He is.

3   Q.   And if you look at the top e-mail on 424, does it

4   reference a conversation between Mr. Manafort and Ms. Laporta?

5   A.   Well, it's a reference to me talking to Ms. Laporta and

6   updating Mr. Manafort.

7   Q.   I'm sorry, so that's -- that top e-mail is for you?

8   A.   Yes.

9   Q.   Okay.  And you were informing Mr. Manafort of what?

10  A.   That Cindy would put the letter on the letterhead.

11  Q.   Okay.  Let me show you Government Exhibit 168, the last

12  document, as it relates to this issue.

13          MR. ANDRES:  This is already in evidence, Your

14  Honor.

15          THE COURT:  All right.

16  BY MR. ANDRES:

17  Q.   Can you take a look at the exhibit at 168?  Tell me what

18  that is.

19  A.   Yes, this is in regard to another issue Mr. Fallarino

20  highlighted for Mr. Manafort and had asked Ms. Laporta to

21  become involved in terms of the ordinary income versus the

22  dividend income in regards to Mr. Manafort's income.

23  Q.   Okay.  But attached to this string of e-mails, if you

24  look at the last page, it's the forgiveness letter?

25  A.   It is.

1  Q.   Okay.  And in this -- is that forgiveness letter now

2  being sent to Citizens Bank?

3  A.   Yes, Ms. Laporta sent it with her cover note on the page

4  prior.

5  Q.   Okay.  And who was CC'd on that cover note?

6  A.   Let's see.

7  Q.   On the first page at 168?

8  A.   Oh, 168.  So it was myself and Mr. Manafort.

9       MR. ANDRES:  Your Honor, I can stop now if that's

10  appropriate.

11       THE COURT:  Yes.

12       All right.  You may step down, Mr. Gates.  And

13  remember, you may not discuss your testimony with anyone

14  during the luncheon recess.

15       THE WITNESS:  Understood.

16       THE COURT:  We'll reconvene at 1:35.

17       Mr. Andres, how much more do you anticipate with

18  this witness?

19       MR. ANDRES:  Less than an hour, Your Honor.

20       THE COURT:  Now, you've listed on your witness list

21  a number of witnesses.  We've heard thus far from 15.  This is

22  the fifteenth witness and we're not yet finished, and there

23  are twice that number on your list.  I assume not all of those

24  you expect to call?

25       MR. ANDRES:  That's absolutely true, Your Honor.

U.S. v. Manafort

1          THE COURT:  All right.  And when do you think you'll

2   finish your case in chief?

3          MR. ANDRES:  Your Honor, we're hoping by the end of

4   this week.  That's our intention.

5          THE COURT:  All right.  Pass your books to the

6   right, ladies and gentlemen.  You've done that.

7          Remember, during the luncheon recess not to discuss

8   the case with anyone or undertake any investigation on your

9   own.  I hope you enjoy your pheasant under glass or whatever

10  else you were able to see on the menu.  I've looked pretty

11  hard at Panera's menu, but I've never seen that.  So maybe if

12  you do get something engaging, you can tell me about it and

13  I'll take steps to get it.

14         Thank you.  We'll resume at -- well, let's resume at

15  1:35.

16         You may follow Mr. Flood out.

17         (Jury dismissed.)

18         (Lunch Recess 12:32 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said

9    court on the 7th day of August, 2018.

10         I further certify that the foregoing 133 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this August 7, 2018.

17

18

19

20         _____

21         Tonia M. Harris, RPR
           Official Court Reporter

22

23

24

25

                                                              1310

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
------------------------------x
UNITED STATES OF AMERICA,        .   Criminal Action No.
                                 .   1:18-CR-83
        versus                   .
                                 .
PAUL J. MANAFORT, JR.,           .
                                 .   August 7, 2018
            Defendant.           .   Volume VI-P.M.
------------------------------x
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:                UZO ASONYE, AUSA
                                   United States Attorney's Office
                                   2100 Jamieson Avenue
                                   Alexandria, VA 22314
                                     and
                                   GREG D. ANDRES, SAUSA
                                   BRANDON L. VAN GRACK, SAUSA
                                   Special Counsel's Office
                                   U.S. Department of Justice
                                   950 Pennsylvania Avenue, N.W.
                                   Washington, D.C. 20530

FOR THE DEFENDANT:                 JAY ROHIT NANAVATI, ESQ.
                                   BRIAN P. KETCHAM, ESQ.
                                   Kostelanetz & Fink LLP
                                   601 New Jersey Avenue, N.W.
                                   Suite 620
                                   Washington, D.C. 20001
                                     and
                                   THOMAS E. ZEHNLE, ESQ.
                                   Law Office of Thomas E. Zehnle
                                   601 New Jersey Avenue, N.W.
                                   Suite 620
                                   Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1311 - 1446)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1312

```
1   APPEARANCES:  (Cont'd.)

2   FOR THE DEFENDANT:            KEVIN M. DOWNING, ESQ.
                                 Law Office of Kevin M. Downing
3                                601 New Jersey Avenue, N.W.
                                 Suite 620
4                                Washington, D.C. 20001
                                   and
5                                RICHARD W. WESTLING, ESQ.
                                 Epstein, Becker & Green, P.C.
6                                1227 25th Street, N.W.
                                 Washington, D.C. 20037
7
    OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
8                                U.S. District Court, Fifth Floor
                                 401 Courthouse Square
9                                Alexandria, VA 22314
                                 (703)299-8595
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1313

1    <u>INDEX</u>

2

3    <u>WITNESS</u>                          <u>EXAMINATION</u>      <u>PAGE</u>

4    RICHARD GATES (Resumed)

                                     DIRECT           1314
5                                    CROSS            1361

6

7                        E X H I B I T S
8
     Government Exhibit No. 391 was received          1315
9    Government Exhibit No. 392 was received          1316
     Government Exhibit No. 398 was received          1328
10   Government Exhibit No. 377 was received          1329
     Government Exhibit No. 400 was received          1331
11
     Government Exhibit No. 403 was received          1334
12   Government Exhibit No. 405 was received          1336
     Government Exhibit No. 407 was received          1338
13   Government Exhibit No. 408 was received          1340
     Government Exhibit No. 409 was received          1341
14
     Government Exhibit No. 406 was received          1342
15   Government Exhibit No. 411 was received          1343
     Government Exhibit No. 399 was received          1348
16   Government Exhibit No. 402 was received          1350
     Government Exhibit No. 393 was received          1353
17
     Defendant's Exhibit No. 14 was received          1411
18   Defendant's Exhibit No. 15 was received          1415

19

20

21

22

23

24

25

1       A F T E R N O O N   S E S S I O N

2                           (Defendant present, Jury out.)

3              THE COURT:  All right.  You may call the jury,

4       please.

5                           (Jury present.)

6              THE COURT:  All right.  You may be seated.

7              Ladies and gentlemen, I hope your lunches were

8       adequate, satisfactory.  Good.

9              All right.  We'll proceed.  Let's bring Mr. Gates

10      back, please.

11       RICHARD GATES, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, RESUMED

12             THE COURT:  You'll recall, sir, you remain under

13      oath.

14             THE WITNESS:  I understand, Your Honor.

15             THE COURT:  You may resume the stand.

16             And, Mr. Andres, you may complete your direct

17      examination.

18             MR. ANDRES:  Thank you, Your Honor.

19                      DIRECT EXAMINATION (Cont'd.)

20      BY MR. ANDRES:

21      Q.   Mr. Gates, did you know whether or not Mr. Manafort was

22      involved in applying for a loan from the Banc of California?

23      A.   Yes, he was.

24      Q.   Were you involved in providing information to the bank for

25      that loan?

1  A.    I was.

2  Q.    Why were you involved?

3  A.    Mr. Manafort asked me to get a team of individuals,

4  including the accountants and bookkeeper, to pull together the

5  relevant documents for the loan application.

6  Q.    Can I ask you to take a look at Government Exhibit 391?

7  Do you have that document?  What is included in Government

8  Exhibit 391?

9  A.    This is an e-mail among myself, Mr. Manafort, and

10 Mr. Yohai in regards to the bank loan and the required

11 documents from the bankers.

12 Q.    What bank loan?

13 A.    This is for Banc of California.

14 Q.    And who's Mr. Yohai?

15 A.    Mr. Yohai is Mr. Manafort's son-in-law.

16        MR. ANDRES:   The Government moves to admit Government

17 Exhibit 391.

18        MR. DOWNING:   No objection.

19        THE COURT:   Admitted.

20        (Government Exhibit No. 391 was received in

21 evidence.)

22 BY MR. ANDRES:

23 Q.    If you can look at the bottom of the first page with

24 respect to that e-mail, there's an e-mail at 8:24 a.m.  Do you

25 see that?

1    A.    I do.

2    Q.    Okay.  Mr. Manafort writes:  "Rick, you are the

3    quarterback.  All information needs to go to you."

4          What did you understand that to mean?

5    A.    That means I was the point person designated with pulling

6    together all of the documents from the various individuals.

7    Q.    And with respect to this loan from the Banc of California,

8    who's the loan for?

9    A.    I understood it to be for Mr. Manafort.

10   Q.    Did you -- were you expecting or intending to get any of

11   the funds extended by the bank?

12   A.    No.

13   Q.    Can you look at Government Exhibit 392?  Can you tell me

14   what that is?

15   A.    Yes.  As part of the document package that needed to be

16   put together, the banks required a response to specific

17   questions about Mr. Manafort's properties.  Mr. Yohai, I

18   believe, and myself put this together and sent it to

19   Mr. Manafort for review.

20          MR. ANDRES:  The Government moves to admit 392, Your

21   Honor.

22          MR. DOWNING:  No objection.

23          THE COURT:  Yes, it's admitted.

24          (Government Exhibit No. 392 was received in

25   evidence.)

1           MR. ANDRES:  May I publish it?

2           THE COURT:  Yes, you may.

3    BY MR. ANDRES:

4    Q.   This e-mail in 392, it relates to the Banc of California

5    loan, Mr. Gates?

6    A.   It does.

7    Q.   And the e-mail from Mr. Manafort makes a reference-- the

8    top e-mail, can you tell me who that's from and who it's to?

9    A.   Yes.  It's to me from Mr. Manafort.

10   Q.   At what time?

11   A.   3:55 p.m.

12   Q.   And after Mr. Manafort writes, "Rick," can you read the

13   last sentence?

14   A.   Yes.

15           "I need to see the P&L and then we are fine."

16   Q.   And what did you understand that to mean?

17   A.   This is in reference to the profit and loss statement that

18   was required by the bank as one of the documents.

19   Q.   And based on your time at -- working for Mr. Manafort, who

20   created those documents?

21   A.   Ms. Washkuhn.

22   Q.   May I ask you to take a look at Government Exhibit 140?

23           MR. ANDRES:  This is in evidence, Your Honor.

24           THE COURT:  All right.

25           MR. ANDRES:  May I publish it?

1        THE COURT:  Yes, you may.

2   BY MR. ANDRES:

3   Q.   I ask you to take a look at the Government's Exhibit 140.

4   Can you tell me what this is?

5   A.   Yes.  This is an e-mail exchange between myself and

6   Ms. Washkuhn in terms of obtaining the profit and loss

7   statement for 2015.

8   Q.   And why are you asking Ms. Washkuhn for the P&L?

9   A.   I'm asking Ms. Washkuhn for the P&L because we need to add

10  additional income into the P&L in order to obtain an income

11  level that was equal to or close to prior years.

12  Q.   Did you need to alter the document?

13  A.   Yes.

14  Q.   And who directed you to get the P&L?

15  A.   Mr. Manafort did.

16  Q.   Who directed you to alter it?

17  A.   Mr. Manafort.

18  Q.   Can you look at the last e-mail in the chain from

19  Ms. Washkuhn at March 16th, 7:18 a.m.?

20        Can you read that e-mail?

21  A.   Yes.

22        (As read):  "Can you send me the Word document

23  version of the 2015 P&L for DMP International before

24  11:00 a.m.?  Paul wants me to add the accrual revenue, which we

25  have not received yet, in order to send it to the Banc of

1    California.  I have the PDF version you sent but it is slanted

2    and not completely clear."

3    Q.    When you say a Word version, what does that mean?

4    A.    A Word version is a Word document version that can be

5    edited more easily than a PDF document.

6    Q.    Okay.  And you said accrual revenue.  Did DMP have accrual

7    revenue?

8    A.    It was accrued revenue from 2014, not 2015.  This related

9    to the Opposition Bloc contract that had not been fully paid.

10   Q.    And the P&L that you're asking for is in what year?

11   A.    The P&L is for 2015.

12   Q.    And at that time, did DMP keep its books on a cash basis

13   or accrual basis?

14   A.    A cash basis.

15   Q.    And what's the difference?

16   A.    The difference is that cash basis records revenue the year

17   that you receive it.

18   Q.    And if you're keeping your books on a cash basis, can

19   you -- has it ever been your experience that you can add

20   accrual revenue?

21   A.    No.

22   Q.    Okay.  Look at Mrs. -- Ms. Washkuhn's response at 10:21.

23   When you're sending these e-mails, do you know where she is and

24   where you are?

25   A.    I believe I'm in Virginia and she's in California.

1   Q.   Okay.  Does -- how does she respond?

2   A.   "Hi, Rick.  I can resend the PDF, but there is no Word

3   version.  These are generated directly from our accounting

4   software."

5   Q.   Okay.  And do you write back?

6   A.   I do.

7   Q.   What did you write?

8   A.   I said:  "The version I have looks to be scanned and then

9   sent which is why it is not clear.  If you can send me the

10  original PDF version generated by the system that would be

11  great and work."

12  Q.   Okay.  And Ms. Washkuhn says that she can send it in about

13  an hour.  What's your response to that?

14  A.   I say:  "I am confused.  Why can't you e-mail the version

15  generated by your system?  Scanning does not work.  Your

16  scanner does not work well.  You should be able to send the

17  electronic version by e-mail."

18  Q.   And what time are you asking her to send it to you by?

19  A.   I had asked her to send it to me by 11:00 a.m. East Coast

20  time.

21  Q.   Okay.  Were you in a hurry to get these documents?

22  A.   Yes.

23  Q.   Why?

24  A.   Because Mr. Manafort in the earlier e-mail had indicated

25  that we needed to have all the documents to the bank by

1   9:00 a.m. Pacific time.

2   Q.   Okay.  And how does Ms. Washkuhn respond?  She says --

3   where it says, "The system prints," can you read that?

4   A.   "The system prints financial statements.  From there the

5   only way to e-mail them to you is to scan them and e-mail them.

6   That is our only option unless you want a hard copy in the

7   mail."

8   Q.   Okay.  And with respect to the -- your response to her,

9   what do you say about the accrued revenue?

10  A.   I ask her in any case, if she can't send a PDF version, if

11  she can add the amount of the accrued revenue on her end.

12  Q.   And what did she say?

13  A.   She says:  "Can't make that change on my end.  Books are

14  on cash basis, not accrual."

15  Q.   And what did you understand that to mean?

16  A.   Meaning that she couldn't take income from either prior

17  year or successive year and actually attribute it to the

18  current year.

19  Q.   And did you ultimately get a copy of this P&L?

20  A.   Not one that I could use.

21  Q.   Okay.  When you say "not one that you can use," what do

22  you mean by that?

23  A.   Meaning that she had sent the scanned version that I had

24  but that was in no position to be able to be edited.  So I

25  created a separate page for this document.

1  Q.   You ultimately altered the document?

2  A.   Yes.

3  Q.   Let me ask you to take a look first at Government

4  Exhibit 138.

5          MR. ANDRES:  This is in evidence, Your Honor.

6          THE COURT:  All right.

7          MR. ANDRES:  May I publish it to the jury?

8          THE COURT:  You may.

9  BY MR. ANDRES:

10  Q.   What is Government Exhibit 138?

11  A.   This is an e-mail from Ms. Lauren Tanner, who worked for

12  Ms. Washkuhn at her firm.

13  Q.   Okay.  And what does she attach?

14  A.   She attaches a copy of the DMP P&L.

15  Q.   And this is what you were requesting from Ms. Washkuhn?

16  A.   Yes.

17  Q.   Can you look on the 12th page -- is there an attachment?

18  A.   There is.

19  Q.   What is the attachment?

20  A.   The attachment is the statement of assets and liabilities

21  and balance sheet and P&L for DMP.

22  Q.   Okay.  Can you turn to the 12th page, which records the

23  net income?

24  A.   Okay.

25  Q.   What is recorded as the net income as of December 31,

Gates - Direct                                                    1323

1   2015?

2   A.   Net income is recorded as $400,744.

3   Q.   Okay.  Can you turn to --

4             MR. ANDRES:  The Government moves -- oh, it's in.

5   BY MR. ANDRES:

6   Q.   Can you turn to Government Exhibit 139?

7             MR. ANDRES:  And this is also in evidence, Your

8   Honor.

9             THE COURT:  All right.

10  BY MR. ANDRES:

11  Q.   139.  Do you see that document, Mr. Gates?

12  A.   I do.

13            MR. ANDRES:  May I publish it, Your Honor?  May I

14  publish it, Your Honor?

15            THE COURT:  You may.

16  BY MR. ANDRES:

17  Q.   Okay.  Can you look at the top e-mail here?

18  A.   Yes.

19  Q.   What is -- what is the document -- can you tell us who

20  it's from and summarize the document for the jury?

21  A.   Sure.  It's from me to Lauren Tanner, copying Heather

22  Washkuhn.

23  Q.   Okay.

24  A.   And then I indicate to her that, based on my previous call

25  with Ms. Washkuhn, the revised P&L had not been updated to

1    reflect the accrued income.

2    Q.   Okay.  And why were you trying to add the accrued income?

3    A.   To help bolster Mr. Manafort's income number in that year

4    for the bank application.

5    Q.   Okay.  And let me ask you to turn to Government

6    Exhibit 298.

7              MR. ANDRES:  That's admitted already, Your Honor.

8              THE COURT:  All right.

9    BY MR. ANDRES:

10   Q.   What's included in Government Exhibit 298?

11             MR. ANDRES:  May I publish it, Your Honor?

12             THE COURT:  You may.

13             THE WITNESS:  This is an e-mail on Mr. Manafort's

14   bankers at Banc of California that ultimately includes me,

15   copying Mr. Manafort and Mr. Yohai, and it attaches the 2015

16   P&L statement.

17   Q.   Does it attach the copy of the P&L statement that you

18   received from Lauren Tanner?

19   A.   It does not.

20   Q.   Can you take a look at the exhibit at 111, the Bates --

21   Government Exhibit 298, Bates stamp 111.

22   A.   Okay.

23   Q.   And can I ask you to zoom in on the net income?

24             What is the net income that's listed in this

25   document?

1  A.    The net income is $4.45 million.

2  Q.    And is that the same net income that -- or is that the

3  same document that you got from Ms. Washkuhn's firm?

4  A.    No, it is not.

5  Q.    And how is it different?

6  A.    It's a -- it adds approximately $6 million of income.

7  Q.    Who added that?

8  A.    I did.

9  Q.    And how did you come up with that figure?

10 A.    That figure included the loan forgiveness of 1.5 million

11 from the Peranova loan, and then it included the accrued

12 revenue of 2.6 million as well.

13 Q.    And with respect to the Peranova loan, when was that

14 earned?

15 A.    It was actually earned around 2012.

16 Q.    So did it belong in the 2015 P&L?

17 A.    No.

18 Q.    And with respect to the accrued interest, when did that

19 occur?

20 A.    The accrued income occurred in 2014.

21 Q.    And was it appropriate to add accrued interest into this

22 P&L?

23 A.    No.

24 Q.    Why not?

25 A.    Because the books were on a cashier basis according to

1    Ms. Washkuhn.

2    Q.   Was the document that you submitted attached to the e-mail

3    on March 16, 2016, to the Banc of California, was it accurate?

4    A.   It was not.

5    Q.   Was it false?

6    A.   Yes.

7    Q.   With respect to how much in income was it false?

8    A.   Yes.  Oh, how much?  Approximately $6 million.

9    Q.   Okay.  Let me ask you, with respect to Citizens Bank, did

10   there come a time that Mr. Manafort applied for another loan at

11   Citizens Bank?

12   A.   Yes, he did.

13   Q.   Did that relate to the Union Street property?

14   A.   It did.

15   Q.   And was there an issue again with respect to the Peranova

16   loan?

17   A.   Yes.

18   Q.   Can I ask you to turn to Government Exhibit 169?

19            MR. ANDRES:  This is already in evidence, Your Honor.

20            THE COURT:  All right.

21            MR. ANDRES:  May I publish it?

22            THE COURT:  You may.

23   BY MR. ANDRES:

24   Q.   What is included in Government Exhibit 169?

25   A.   This is an e-mail string among David Fallarino, Cindy

1   Laporta, Mr. Yohai, and Mr. Manafort in regards to information

2   that is needed for that second loan.

3   Q.    Okay.  And are you included in the e-mail as well?

4   A.    Yes.  Later I'm added to the e-mail.

5   Q.    And what did you understand the issue to be now as to the

6   second loan in Peranova?

7   A.    There are two issues.  The first, as I understood, was

8   that the -- there was an issue with ordinary business income

9   and distribution income, and then also, again, there was an

10  issue with the amount of income that Mr. Manafort had for that

11  given year.

12  Q.    And what did the income have to equal?

13  A.    Either kind of equal to or around the prior year.

14  Q.    And why is that?

15  A.    Because that's what was required by the bank in order to

16  obtain the loan.

17  Q.    And in 2016, was DMP's income around or equal to what it

18  was in 2014?

19  A.    No.

20  Q.    Why not?

21  A.    Because DMP had no clients at that time.

22  Q.    Can I ask you to turn to Government Exhibit 398?

23        Can you tell me what that is?

24  A.    Yes.  This is an e-mail string including Ms. Laporta,

25  Mr. Manafort, and myself in regards to the income issue that

Gates - Direct                                                    1328

1    Mr. Fallarino raised, and Ms. Laporta is going to begin the tax

2    preparation for that year, which is required by the bank for

3    the loan application, but the question that arises is the

4    income level.  And I write an e-mail to Mr. Manafort indicating

5    that --

6    Q.   Let me just stop you there.

7              MR. ANDRES:  Your Honor, may I move in Government

8    Exhibit 398?

9              THE COURT:  Yes, but let him finish his answer.

10             MR. ANDRES:  Sorry.

11             THE WITNESS:  Okay.  And I indicated to Mr. Manafort

12   that we're not going to have anywhere near the 2014 income

13   level for 2016.

14             THE COURT:  All right.  Any objection to the

15   admissibility of that exhibit?

16             MR. DOWNING:  No, Your Honor.

17             THE COURT:  It's admitted.

18             (Government Exhibit No. 398 was received in

19   evidence.)

20             THE COURT:  Next question.

21             MR. ANDRES:  May I publish it?

22             THE COURT:  I beg your pardon?

23             MR. ANDRES:  May I publish it?

24             THE COURT:  You may.

25   BY MR. ANDRES:

1   Q.   You testified that Cindy Laporta and others are on this

2   e-mail string.

3            With respect to the top e-mail alone, who's on that

4   e-mail?

5   A.   On that e-mail, it's just myself and Mr. Manafort.

6   Q.   Okay.  And what are you informing Mr. Manafort in this

7   e-mail?

8   A.   I'm informing him that we're not even going to come close

9   to the income level of 2014.

10  Q.   And, again, why is that?

11  A.   Because DMP at that time has no clients.

12  Q.   Can I ask you to turn to Government Exhibit 377?

13           Can you tell me what that is?

14  A.   This is an e-mail chain between myself and Mr. Manafort.

15  Q.   Okay.  And it relates to the Citizens Union loan?

16  A.   It does.

17  Q.   Is there a response to the e-mail in the prior exhibit?

18  A.   Yes.

19           MR. ANDRES:  The Government moves to admit 377.

20           MR. DOWNING:  No objection.

21           THE COURT:  It's admitted.

22           (Government Exhibit No. 377 was received in

23  evidence.)

24           MR. ANDRES:  Can I publish it?

25           THE COURT:  You may.

Gates - Direct                                                      1330

1    BY MR. ANDRES:

2    Q.   With respect to the top e-mail, does Mr. Manafort respond

3    to your -- your concerns about the level of income?

4    A.   He does.

5    Q.   Okay.  Can you read that e-mail at the top?

6    A.   Yes.  (As read): "Let's talk around 9 a.m.  I sent him an

7    e-mail that there was no way that he would have the 2015 tax

8    filing before October.  We can count the account receivables

9    from Ukraine approximately 2.5 million.  Send me the P&L that

10   we used for the other refis before we speak."

11   Q.   Okay.  And, again, the reference to the accounts

12   receivable?

13   A.   That's the reference to the money that had been earned in

14   2014 that had not been paid for that contract.

15   Q.   And it didn't relate to the 2015 P&L?

16   A.   It did not.

17   Q.   Can I ask you to turn to Government Exhibit 400?

18        Can you tell me what this is?

19   A.   Yes.  This is an e-mail response from Mr. Manafort to

20   Mr. Fallarino with regards to a number of documents that need

21   to be pulled together for the loan.

22        MR. ANDRES:  The Government seeks to admit Government

23   Exhibit 400.

24        MR. DOWNING:  No objection.

25        THE COURT:  Admitted.

1          (Government Exhibit No. 400 was received in

2    evidence.)

3          MR. ANDRES:  May I publish it?

4          THE COURT:  Yes.

5    BY MR. ANDRES:

6    Q.   With respect to the top e-mail, Mr. Gates, what does

7    Mr. Manafort write to David Fallarino?

8    A.   (As read): "David, I have asked Rick Gates to call you.

9    Among other responsibilities Rick manages the company and my

10   personal assets.  He will work with you to get what you need."

11   Q.   Okay.  At this time were you managing Mr. Manafort's

12   company?

13   A.   I was doing a lot of the administrative day-to-day items.

14   Q.   How about his personal assets?

15   A.   No.

16   Q.   Did you ever have any control over his personal assets?

17   A.   No.

18   Q.   Okay.  With respect to this loan, do you continue to work

19   on gathering information for the bank?

20   A.   Yes.

21   Q.   If you look below, there's an e-mail from Mr. Fallarino to

22   Mr. Manafort.  Do you see that?

23   A.   I do.

24   Q.   Can you read the first paragraph?

25   A.   (As read): "Without using 2015 taxes, we will have to get

1   creative in terms of income (The K1 income versus distributed

2   income on the DMP returns knocks us down significantly)."

3   Q.   And who's writing that e-mail?

4   A.   Mr. Fallarino.

5   Q.   And where does he work?

6   A.   Citizens Bank.

7   Q.   Okay.  And then what does he say in the second paragraph

8   with respect to Cindy Laporta?

9   A.   (As read): "I will get a letter from Cindy stating that

10   the 2015 K-1 income will be equal to the distribution income."

11   Q.   Can I ask you to take a look at Government Exhibit 173?

12        Can you tell me what that is?

13   A.   Yes.  This is the letter that Mr. Manafort asked me to

14   draft and send to Cindy in regards to the ordinary versus

15   distribution income.

16   Q.   Okay.  And this, again, relates to the Peranova loan?

17   A.   It does.

18   Q.   And this is a different loan application now?

19   A.   Correct.

20   Q.   Okay.

21        MR. ANDRES:  And the Government -- this is in

22   evidence, Your Honor.

23        THE COURT:  All right.

24        MR. ANDRES:  Can I publish it?

25        THE COURT:  Yes.  Has it already been -- we're not

1    reviewing testimony you've already elicited from someone else,

2    are we?

3            MR. ANDRES:  I believe Ms. Laporta may have testified

4    to several facts that Mr. Gates has his own information about

5    the loan.

6            THE COURT:  All right.  Proceed.

7    BY MR. ANDRES:

8    Q.   Can you summarize this e-mail for the jury?

9    A.   Yes.  This is a draft letter that I sent to Ms. Laporta in

10   order to fulfill Mr. Fallarino's request.

11   Q.   Okay.  And what does the letter -- can I turn to the

12   letter?

13           What can you tell me about the letter?

14   A.   Yes.  The purpose of the letter is to attest that the loan

15   forgiveness can be counted in the income of DMP.

16   Q.   And did you send that letter to Ms. Laporta?

17   A.   I did.

18   Q.   And what did she do with it?

19   A.   She, in the end, actually rewrote the letter and then sent

20   it to Mr. Fallarino.

21           MR. ANDRES:  Can I focus on the second-to-last line?

22   Q.   With respect to the line for the tax year 2015, is that

23   the part of the letter which Ms. Laporta changed?

24   A.   She changed more than just that, but, yes, that's one area

25   she changed.

1   Q.   She revised the letter?

2   A.   She did.

3   Q.   Okay.  Can you take a look at Government Exhibit 403?

4        Can you tell me what that is?

5   A.   Again, it's an e-mail chain initially starting with

6   Mr. Fallarino and Mr. Manafort, indicating that the letter has

7   been attached.

8   Q.   Okay.  And it's now been changed?

9   A.   Yes.

10        MR. ANDRES:   The Government moves to admit Government

11   Exhibit 403.

12        MR. DOWNING:   No objection.

13        THE COURT:   Admitted.

14        (Government Exhibit No. 403 was received in

15   evidence.)

16   BY MR. ANDRES:

17   Q.   With respect to the top e-mail, who wrote the top e-mail?

18   A.   Mr. Fallarino.

19   Q.   The top e-mail at 5-6-2016?

20   A.   5-6-2016.

21   Q.   Do you have Exhibit 403?

22   A.   403, yes.  I have to Mr. Fallarino, copying Ms. Rodriguez,

23   from Mr. Manafort.

24   Q.   Okay.  And can you read that e-mail?

25        MR. ANDRES:   May I publish this, Your Honor?

1              THE COURT:  Yes.

2              MR. ANDRES:  Focus on the top e-mail.

3    BY MR. ANDRES:

4    Q.   Who's writing that e-mail?

5    A.   Mr. Manafort is.

6    Q.   And what does he say?

7    A.   (As read): "Rick, please deal with Fallarino regarding the

8    change he needs in Laporta letter due this morning."

9    Q.   Okay.  And Mr. Manafort is asking you to do what?

10   A.   Seek the change in the letter that he requested.

11   Q.   And does that letter provide accurate information to the

12   bank?

13   A.   No, it does not.

14   Q.   How is it inaccurate?

15   A.   It states that I think Mr. Manafort's primary address is

16   different than the one they used.

17   Q.   But in terms of the letter from Cindy Laporta, what -- was

18   that letter accurate?

19   A.   Yes.  She includes the Peranova income in the ordinary

20   income in the letter for that year.

21   Q.   Okay.  And can I ask you to turn to Government

22   Exhibit 174?

23              What is that?

24   A.   This is the letter that Ms. Laporta wrote and sent to

25   Mr. Fallarino.

1             MR. ANDRES:  This is already in evidence, Your Honor.

2             THE COURT:  All right.

3    BY MR. ANDRES:

4    Q.   So you've been through the process of revising the letter;

5    is that right?

6    A.   Yes.

7    Q.   Mr. -- was Mr. Manafort updated as to each and every

8    effort with respect to that letter?

9    A.   Yes.

10   Q.   And then it's sent to the bank?

11   A.   It is.

12   Q.   And when it's sent to the bank, who sends it to the bank?

13   A.   Ms. Laporta sends it to the bank.

14   Q.   Can I ask you now to turn to Government Exhibit 405?

15            Can you tell me what Government Exhibit 405 is?

16   A.   Yes.  It's an e-mail exchange among Mr. Manafort,

17   Ms. Laporta, Ms. Washkuhn, later copying me on the -- asking

18   for them to send Mr. Manafort the 2015 P&L.

19            MR. ANDRES:  Your Honor, the Government moves to

20   admit 405.

21            MR. DOWNING:  No objection.

22            THE COURT:  Admitted.

23            (Government Exhibit No. 405 was received in

24   evidence.)

25            MR. ANDRES:  May I publish it?

1          THE COURT:  Yes, you may.

2   BY MR. ANDRES:

3   Q.   And can I focus on the top e-mail?

4          With respect to the document, you said that

5   Mr. Manafort is seeking the P&L.  Do you see on the top e-mail

6   what -- what the date of the P&L is?

7   A.   Yes.  It's July 31, 2016.

8   Q.   And in the top e-mail, does Mr. Manafort make a request of

9   you?

10  A.   He does.

11  Q.   What does he say?

12  A.   He asked me:  How do I convert the PDF document into a

13  Word document?

14  Q.   And as you understand it, when the P&L comes from

15  Ms. Washkuhn's firm, what form does it come in?

16  A.   It comes in a PDF format.

17  Q.   When Mr. Manafort said, "How do I convert into non-PDF

18  Word document," what did you understand that to mean?

19  A.   That he wanted me to convert it from PDF to a Word format

20  for his use.

21  Q.   Can you take a look at Government Exhibit 407?

22         What is this e-mail?

23  A.   This is a follow-on e-mail to the previous one in which I

24  respond to Mr. Manafort's e-mail about the document conversion.

25         MR. ANDRES:  Okay.  The Government moves to admit

1    407, Your Honor.

2              MR. DOWNING:  No objection.

3              THE COURT:  Admitted.

4              (Government Exhibit No. 407 was received in

5    evidence.)

6              MR. ANDRES:  May I publish it?

7              THE COURT:  Yes, you may.

8    BY MR. ANDRES:

9    Q.   Can I focus on the middle e-mail?

10             When Mr. Manafort writes, "How do I convert into

11   non-PDF Word document," what do you respond?

12   A.   I respond that I can do it and will send to him.

13   Q.   Okay.  And what time did you respond to that?

14   A.   2:01 p.m.

15   Q.   And then did Mr. Manafort inquire again?

16   A.   Yes.

17   Q.   And what did you say?

18   A.   I said, "About 15 minutes.  Almost home."

19   Q.   Okay.  And when you say "almost home," where are you going

20   to at this point?

21   A.   In Richmond.

22   Q.   Did you ultimately convert this document into a non-PDF?

23   A.   I did.

24   Q.   And when Mr. Manafort says "non-PDF," what do you

25   understand that to mean?

1  A.   Understand that to mean that he is going to make some sort

2  of change to it.

3  Q.   Okay.  You're going to convert it into what form or what

4  type of document?

5  A.   Into a Word document.

6  Q.   Okay.  And that's a word processing-related application?

7  A.   Yes, correct.

8  Q.   Can I ask you to take a look at Government Exhibit 408?

9  A.   Okay.

10 Q.   What is contained in Government Exhibit 408?

11 A.   This is the 2016 P&L document that I convert from a PDF to

12 a Microsoft Word document and send to Mr. Manafort.

13 Q.   This is the original document Mr. Manafort sent to you?

14 A.   It is.

15 Q.   Okay.  And when you convert a document from a PDF to a

16 Word or a word processing document, what, if anything, happens

17 to it?

18 A.   In often cases, depending on the complexity of the various

19 fonts and graphics used, the alignments can be messed up when

20 you convert the document.  Also, some of the numbers can change

21 to symbols.

22         MR. ANDRES:  Your Honor, the Government moves to

23 admit Government Exhibit 408 and asks to publish it.

24         MR. DOWNING:  No objection.

25         THE COURT:  Admitted.  You may do so.

1           (Government Exhibit No. 408 was received in

2    evidence.)

3    BY MR. ANDRES:

4    Q.   Focusing on the first e-mail, who is the e-mail from?

5    A.   The e-mail is from me.

6    Q.   From who?

7    A.   From me to Mr. Manafort.

8    Q.   And what's attached?  Can I show you the first attachment?

9    A.   Yes.  The attachment is the July 31, 2016, P&L statement.

10   Q.   Okay.  And there are various parentheses and other letters

11   and numbers mixed together.  What's that a result of?

12   A.   That's a result of converting it from a PDF to a Word

13   document format.

14   Q.   When you look at the net -- have you changed the numbers

15   here at all?

16   A.   No.

17   Q.   So when you look at the net income or loss, what was the

18   net income or loss of the document when you sent it to

19   Mr. Manafort?

20   A.   The net loss was $638,000.

21   Q.   Okay.  And then this is the document sent to Mr. Manafort?

22   A.   Yes.

23   Q.   And in what version is it in?

24   A.   Word document.

25   Q.   Can I ask you to take a look at Government Exhibit 409?

1          What is that?

2    A.   This is an e-mail to me from Mr. Manafort in regards to a

3    revised P&L he has attached.

4    Q.   And when he says revised P&L, what do -- what do you think

5    he means by that?

6    A.   When I saw the document, I saw that he had changed the

7    income number.

8          MR. ANDRES:  The Government moves to admit 409.

9          MR. DOWNING:  No objection.

10         THE COURT:  Admitted.

11         (Government Exhibit No. 409 was received in

12   evidence.)

13         MR. ANDRES:  May I publish it?

14         THE COURT:  Yes, you may.

15   BY MR. ANDRES:

16   Q.   Okay.  In terms of the first document, when Mr. Manafort

17   writes in all caps, what is he conveying to you?

18   A.   That he's attached the revised P&L and to call him and

19   discuss this and other matters.

20   Q.   Okay.  And can you turn to the next page?

21         And can you focus on net income?

22         What is listed as the net income?

23   A.   Net income is $3 million.

24   Q.   Okay.  And is the format of the document different?

25   A.   It is.

Gates - Direct                                                          1342

1   Q.   Okay.  And as of September of 2016, did DMP International

2   have any clients?

3   A.   It did not.

4   Q.   Were they making any money?

5   A.   No.

6   Q.   Was the number that Mr. Manafort included there, was it

7   accurate?

8   A.   No.

9   Q.   Was it off by how much money approximately?

10  A.   About 4.2 million.

11  Q.   Okay.  Can I ask you to turn to Government Exhibit 406?

12          Can you tell me what's included in Government

13  Exhibit 406?

14  A.   Yes.  It's an e-mail from Mr. Manafort to me.

15  Q.   And --

16  A.   Asking to convert the document and send to him.

17          MR. ANDRES:  The Government moves to admit Government

18  Exhibit 406 and seeks to publish it.

19          MR. DOWNING:  No objection.

20          THE COURT:  You may -- yes, it's admitted.  You may

21  do so.

22          (Government Exhibit No. 406 was received in

23  evidence.)

24  BY MR. ANDRES:

25  Q.   With respect to the top e-mail, who's that from?

1    A.    Mr. Manafort.

2    Q.    What does he ask you to do?

3    A.    He's asking me to convert the PDF -- convert the document

4    to a PDF and send to him.

5    Q.    And what's attached?

6    A.    Attached is the 2016 P&L statement that he modified.

7    Q.    Okay.  And with respect to the net income, what's listed

8    in the attachment?

9    A.    Net income is 3 million.

10   Q.    Okay.  And is that an accurate statement of DMP

11   International's P&L as of September 2016?

12   A.    It is not.

13   Q.    I'm going to ask you to turn to page 411 -- Exhibit 411,

14   excuse me, Government Exhibit 411.

15            What is that?

16   A.    It's an e-mail to Mr. Manafort from me, reconverting the

17   document and sending to him.

18   Q.    Okay.  And this also contains the false P&L?

19   A.    Yes.

20            MR. ANDRES:  Your Honor, the Government moves to

21   admit Government Exhibit 40- -- sorry, Government Exhibit 411.

22            MR. DOWNING:  No objection.

23            THE COURT:  Admitted.

24            (Government Exhibit No. 411 was received in

25   evidence.)

1          MR. ANDRES:  Can I publish it?

2          THE COURT:  Yes.  You need to -- I assume you need to

3    do so.

4          MR. ANDRES:  Yes, Judge, I'm --

5          THE COURT:  All right.  Proceed.

6    BY MR. ANDRES:

7    Q.   With respect to the document, can you turn to the second

8    page and identify the net income?

9    A.   Net income is 3 million.

10   Q.   Okay.  You can take that down.

11         Mr. Gates, you testified that you were arrested in

12   October of what year?

13   A.   2017.

14   Q.   Okay.  Prior to the time that you were arrested, were you

15   aware of the fact that you were under investigation?

16   A.   Yes.

17   Q.   Had you received subpoenas and other requests for

18   documents?

19   A.   I did.

20   Q.   Did you receive a subpoena for your overseas bank records?

21   A.   Yes.

22   Q.   And did you make a production of those documents?

23   A.   I did.

24   Q.   Okay.  At some point, did you have a conversation with

25   Mr. Manafort about those -- about that production or the

1  overseas bank records?

2  A.   I did.

3  Q.   What, if anything, did he tell you?

4  A.   Mr. Manafort indicated to me that he wasn't sure why I was

5  being dragged into the investigation and indicated that he

6  would have a representative signify that I had no ownership or

7  control over those, that I was an employee of DMP and had no

8  ability to have control over those accounts.

9  Q.   During the time that you worked for Mr. Manafort, did you

10  delete your e-mails from time to time?

11  A.   Yes.

12  Q.   In what instances did you delete your e-mails?

13  A.   I mean, typically, I tried to do a purge of e-mails, you

14  know, throughout the year, just given the volume of e-mails I

15  typically received.

16  Q.   Were there instances where you deleted e-mails so that

17  they -- the Government or other entities wouldn't find out

18  about them?

19  A.   Yes, there was one instance.

20  Q.   Okay.  During the time that you communicated with

21  Mr. Manafort, did you ever use encrypted applications?

22  A.   We did.

23  Q.   What are encrypted applications?

24  A.   Well, encrypted applications are supposed to protect the

25  communications between two individuals.

1   Q.   Okay.  Did you frequently use those applications?

2   A.   I would say so in the later years, yes.

3   Q.   And what are some of the encrypted applications that you

4   used?

5   A.   Signal, Viber, I think were the primary two.  I think we

6   had used an application called Box at one point.

7   Q.   You testified that at some point, you began working for

8   the Trump campaign; is that correct?

9   A.   Yes.

10  Q.   Approximately, when was that?

11  A.   March of 2016.

12  Q.   And was Mr. Manafort also working for the Trump campaign?

13  A.   He was.

14  Q.   What was his position?

15  A.   At that moment, he was the convention manager.

16  Q.   And did he later have a different position?

17  A.   He did.

18  Q.   Okay.  What position?

19  A.   He ultimately became chairman of the campaign.

20  Q.   Do you know, did there come a point when Mr. Manafort left

21  the campaign?

22  A.   Yes.

23  Q.   Approximately, when was that?

24  A.   It was in late August.

25  Q.   And did you continue on?

1    A.    I did.

2    Q.    Okay.  After your work on the campaign, did you have

3    another job with respect to the administration?

4    A.    Yes.

5    Q.    What was it?

6    A.    Following the campaign, I went to work for the

7    inauguration.

8    Q.    Okay.  Let me ask you to look at Government Exhibit 397.

9    A.    Okay.

10   Q.    Can you tell me what Government Exhibit 397 is?

11   A.    Yes.  It's an e-mail exchange among a number of the staff

12   in regards to an economic advisory council that we're putting

13   together.

14   Q.    Okay.  And that's economic advisory council for the Trump

15   campaign?

16   A.    That's correct.

17   Q.    Okay.  Can I just focus you on the page, at the bottom it

18   says 3 of 66?

19   A.    Okay.

20   Q.    Is there an individual named Stephen Calk listed?

21   A.    Yes.

22   Q.    Okay.  And what is he being nominated to?

23   A.    To the economic advisory council for the campaign.

24   Q.    And do you know if he ultimately was on that?

25   A.    I believe he was.

1    Q.    Okay.  Can I ask you to turn to Government Exhibit 399?

2          Do you see that?

3    A.    I do.

4    Q.    What is Government Exhibit 399?

5    A.    It's an e-mail from Mr. Manafort to me in regards to

6    Mr. Calk.

7    Q.    Okay.

8          MR. ANDRES:  The Government moves to admit Government

9    Exhibit 399.

10         MR. DOWNING:  Your Honor, could I have a moment,

11   please?

12         THE COURT:  Yes.

13         MR. DOWNING:  I don't have that exhibit available to

14   me.  I think it was produced electronically this morning.  If I

15   could have a copy, I'll take a quick look at it.

16         THE COURT:  It was produced when?

17         MR. DOWNING:  This morning.

18         MR. ANDRES:  I don't think it -- I don't want to

19   respond, Your Honor, but I'm happy to -- Kevin?

20         MR. DOWNING:  Oh, do you have a copy?  Thank you.

21         No objection.

22         THE COURT:  All right.  It's admitted.

23         (Government Exhibit No. 399 was received in

24   evidence.)

25         MR. ANDRES:  May I publish it, Your Honor?

1              THE COURT:  Yes.

2              MR. ANDRES:  399.  I'm going to use the ELMO, Your

3    Honor.

4    BY MR. ANDRES:

5    Q.   Mr. Gates, who's this e-mail from?

6    A.   From Mr. Manafort.

7    Q.   And who is it to?

8    A.   To me.

9    Q.   And what's the date?

10   A.   November 24, 2016.

11   Q.   On November 24, 2016, where were you working?

12   A.   I was working for the presidential inaugural committee.

13   Q.   And where was Mr. Manafort working?

14   A.   I don't know.

15   Q.   And can you read that e-mail?

16   A.   "Rick, we need to discuss Steve Calk for Secretary of

17   Army.  I hear the list is being considered this weekend."

18   Q.   Is that the same Steve Calk who was previously identified

19   on the economic council?

20   A.   Yes.

21   Q.   Can I ask you to turn to Government Exhibit 402?

22              Do you see that?

23   A.   I do.

24   Q.   What is that?

25   A.   It's an e-mail from Mr. Manafort to me in regards to a

Gates - Direct                                                    1350

1    list.

2           MR. ANDRES:  And the Government moves to admit

3    Government Exhibit 402.

4           Can you pass that?

5           THE COURT:  How many more of these are there that he

6    may not have seen?

7           MR. ANDRES:  I think this is the last one, Judge.

8           THE COURT:  I take it all of this relates to a person

9    who had some contact with the bank these loans were being

10   applied for?

11          MR. ANDRES:  That's correct, Your Honor.

12          THE COURT:  All right.

13          MR. DOWNING:  No objection.

14          THE COURT:  All right.  It's admitted.

15          (Government Exhibit No. 402 was received in

16   evidence.)

17          MR. ANDRES:  May I publish it, Your Honor?

18          THE COURT:  Yes.

19   BY MR. ANDRES:

20   Q.   With respect to the e-mail in Government Exhibit 402,

21   what's the date of that e-mail?

22   A.   December 23, 2016.

23   Q.   And who's it from?

24   A.   Mr. Manafort.

25   Q.   And who is it to?

1   A.    To me.

2   Q.    And what does it pertain to?

3   A.    It pertains to individuals that Mr. Manafort would like to

4   invite to the inauguration.

5   Q.    And where were you working at the time?

6   A.    At the inaugural committee.

7   Q.    Okay.  And how about Mr. Manafort?

8   A.    I don't know.

9   Q.    If you turn to the last page of that, 15 of 26 --

10  actually, the second-to-last page, excuse me, 14 of 26.

11        Second from the bottom, can you read the name there?

12  A.    Yes.  Stephen Calk and Stephen Calk, Jr.

13  Q.    And was Mr. Manafort asking for tickets to the

14  inauguration for Stephen Calk?

15  A.    Yes.

16  Q.    Okay.  You can take that down.

17        Mr. Gates, you've testified at various times that

18  Mr. Manafort had season tickets to the New York Yankees; is

19  that correct?

20  A.    Yes.

21  Q.    Okay.  And over what period of time was Mr. Manafort a

22  season ticket holder?

23  A.    From at least the time I was there in 2006 to 2016.

24  Q.    Okay.  Did there come a time when he had difficulty paying

25  for those tickets?

Gates - Direct                                                    1352

1   A.   Yes.

2   Q.   Approximately, when was that?

3   A.   In 2016.

4   Q.   Did he task you with -- do you -- did he task you with --

5              THE COURT:  What, if anything, did he task you with,

6   with respect to the tickets?

7   BY MR. ANDRES:

8   Q.   What, if anything, did he --

9              THE COURT:  That means it's not leading.

10             MR. ANDRES:  I -- that's a great question, Judge.

11  Thanks.

12                          (Laughter.)

13             THE COURT:  Now, if they only paid me as much as they

14  pay you.

15                          (Laughter.)

16             THE COURT:  Next.  Go ahead.

17  BY MR. ANDRES:

18  Q.   What, if anything, did Mr. Manafort ask you to do with

19  respect to the tickets?

20  A.   He asked me to do him a favor.  I was still on the

21  campaign at the time, and it was very, you know, work

22  intensive.  So he asked me to sign a letter for him that

23  attributed the cost of the Yankees tickets to me instead of

24  him.

25  Q.   Okay.  And did it -- did the letter make a reference to

Gates - Direct                                                          1353

1    borrowing his credit card?

2    A.    It did, I believe, yes.

3    Q.    Okay.  Did you ever borrow Mr. Manafort's credit card to

4    buy Yankees tickets?

5    A.    No.

6    Q.    Did you ever purchase Yankees tickets, season Yankees

7    tickets for yourself?

8    A.    No.

9    Q.    Okay.  Were you previously involved in helping to resolve

10   the payment issue?

11   A.    Yes.

12   Q.    Okay.  I'm going to ask you to turn to Government

13   Exhibit 393.

14            Can you tell me what that is?

15   A.    Yes.  This is an e-mail that Mr. Manafort originally

16   received from the New York Yankees in regards to the payment

17   for his accounts.

18            MR. ANDRES:  Your Honor, the Government moves to

19   admit Government Exhibit 393.

20            MR. DOWNING:  No objection.

21            THE COURT:  All right.  It's admitted.

22            (Government Exhibit No. 393 was received in

23   evidence.)

24            MR. ANDRES:  May I publish it?

25            THE COURT:  Is it necessary?  We're going to get this

1   finished soon.

2             MR. ANDRES:  It's the last document, Your Honor.

3             THE COURT:  All right.  And what does this document

4   that you want to publish show that isn't already in evidence?

5             MR. ANDRES:  It shows the issue with respect to the

6   payment plan and the communications with the New York Yankees.

7             THE COURT:  Didn't he already testify to that?

8             MR. ANDRES:  Not to the specifics.

9             THE COURT:  All right.  Go ahead, publish it.

10            MR. ANDRES:  Thank you, Your Honor.

11  BY MR. ANDRES:

12  Q.   Mr. Gates, can you tell me what's described in Government

13  Exhibit 393?

14  A.   Yes.  It's an e-mail from the New York Yankees regarding

15  Mr. Manafort's payment for season tickets.

16  Q.   And do you know approximately what the debt was or what

17  the payment was that was owed?

18  A.   I believe at the time, the Yankees tickets usually ranged

19  in kind of the 210- to $225,000 range.

20  Q.   And was that -- was that money assessed to a particular

21  credit card for Mr. Manafort?

22  A.   It was.

23  Q.   And was that credit card paid on time?

24  A.   Not at that time.

25            MR. ANDRES:  Your Honor, may I have one moment?

1            THE COURT:  Yes.

2  BY MR. ANDRES:

3  Q.   Mr. Gates, you testified that in your plea agreement, the

4  Government promised to write you a 5K letter; is that correct?

5  A.   Yes.

6  Q.   Has that letter been written yet?

7  A.   No.

8  Q.   Have you been sentenced yet?

9  A.   No.

10 Q.   As you sit here today, do you know what your sentence is

11 going to be?

12 A.   I do not.

13            MR. ANDRES:  I have no further questions, Your Honor.

14            THE COURT:  But in addition, did the Government

15 promise to seek or not to object to a request for probation?

16            THE WITNESS:  It did.

17            THE COURT:  Anything else?

18            MR. ANDRES:  No, Judge.

19            THE COURT:  All right.  I'm going to take a recess so

20 you -- give you an opportunity, Mr. Downing.

21            Pass your books to the right, ladies and gentlemen.

22 The court security officer will collect them, maintain their

23 security during the recess, and we will recess until quarter --

24 quarter of three give you enough time, Mr. Downing?

25            MR. DOWNING:  Thank you, Your Honor.

1    THE COURT:  All right.  Quarter of three.  If you

2  need longer, tell Mr. Flood.

3    MR. DOWNING:  I will.

4    THE COURT:  And I expect you to use any extra time to

5  focus sharply your cross-examination.

6    MR. DOWNING:  Understood.

7    THE COURT:  All right.  Remember to refrain from

8  discussing the matter among yourselves or with anyone or

9  undertaking any investigation.  Follow Mr. Flood out.  Soft

10  drinks are available back there.

11    (Jury out.)

12    THE COURT:  Court stands in recess.

13    (Recess from 2:25 p.m., until 3:07 p.m.)

14    (Defendant present, Jury out.)

15    THE COURT:  All right.  Mr. Downing, have you had

16  enough time?

17    MR. DOWNING:  I have, Your Honor.  Thank you.

18    THE COURT:  All right.  Let me ask something because

19  I want to see if I can forestall any objections or resolve them

20  first.  Do you intend to examine Mr. Gates on what benefits he

21  got from this deal with the Government, that is, what he

22  avoided?

23    MR. DOWNING:  Yes.

24    THE COURT:  So I take it you intend -- as I

25  understand it, he pled guilty to charges in Washington, not

1   here.

2           MR. DOWNING:  Correct.

3           THE COURT:  But the charges against him here were

4   dismissed as a result of that deal.

5           MR. DOWNING:  Correct.

6           THE COURT:  Do you intend to go over the charges here

7   that are no longer against him and what -- how many years he

8   faced for all those?

9           MR. DOWNING:  I do.

10          THE COURT:  And that's -- Mr. Andres, that's

11  perfectly appropriate, isn't it?

12          MR. ANDRES:  Perfectly.

13          THE COURT:  All right.

14                          (Laughter.)

15          THE COURT:  Because you've made judgments in other

16  parts of this case not to do that.

17          MR. DOWNING:  I did, Your Honor.  That's correct.  Or

18  we did.

19          One other issue I'd like to address with the Court

20  beforehand:  There was a motion -- oh, we need to do that

21  sidebar?

22          MR. ANDRES:  Yes.

23          MR. DOWNING:  The Government would like a sidebar to

24  talk about it.

25          THE COURT:  All right.  You may do that.

1          (Bench conference on the record.)

2          THE COURT:  Yes, sir.

3          MR. DOWNING:  The government raised an issue about if

4  we were going to question --

5          THE COURT:  I'm sorry, if you-all could step back a

6  bit?

7          MR. DOWNING:  If we were to --

8          THE COURT:  My mother smoked when she was pregnant,

9  or I'd be as tall as you are.  My father was six-one.

10          Go ahead.

11          MR. DOWNING:  The government raised an issue whether

12  or not we were going to cross-examine Mr. Gates about specific

13  acts of marital infidelity.  We don't plan on doing that, but

14  we plan on questioning him about what we call his, you know,

15  separate secret life and how --

16          THE COURT:  Whose separate secret life?

17          MR. DOWNING:  Mr. Gates.

18          THE COURT:  Oh.

19          MR. DOWNING:  And how it relates to money he had

20  stolen, embezzled, and things that he was doing, but

21  specifically as to infidelity, we do not think we're going to

22  get into that.

23          THE COURT:  All right.  And is there anything for me

24  to consider and decide in that regard?

25          MR. ANDRES:  No.  I believe that the issue that we

1   raised originally, Judge, was that the Fourth Circuit has held

2   that if somebody cheats on their wife or whatever, it's not

3   necessarily indicative of truthfulness.  Mr. Downing has

4   indicated he's not going to go there, and so we don't have any

5   issue.

6           MR. DOWNING:  Well, I want to be clear.

7           THE COURT:  Yeah, I --

8           MR. DOWNING:  We're not going to go into specific

9   acts of infidelity, but we are definitely implying that he was

10  leading a separate secret life from Mr. Manafort and from

11  others.

12          THE COURT:  Well, if that's -- am I right that what

13  you're thinking of doing is you're thinking of showing that he

14  needed money --

15          MR. DOWNING:  Yes.

16          THE COURT:  -- and therefore he took money that

17  wasn't his for another purpose?

18          MR. DOWNING:  Yes.

19          THE COURT:  I don't see anything wrong with that.  Do

20  you, Mr. Andres?

21          MR. ANDRES:  Yeah, just as long as there's not some

22  suggestion he's spending that money on things that are, that

23  are, you know, would somehow suggest marital infidelity.

24          MR. DOWNING:  Well, I think --

25          MR. ANDRES:  I mean, I don't know how that's

1   appropriate.  They can ask whatever they want about how he's

2   spending his money, but he's got to answer yes to those

3   questions in the first place.  I don't know that he will, but

4   putting that aside --

5          THE COURT:  You're not going to ask him directly

6   whether he was faithful to his wife?

7          MR. DOWNING:  Correct, but I will ask him about

8   keeping an apartment in London and going to fancy restaurants

9   and staying in fancy hotels, stuff like that, but no, I'm not

10  going to ask him about a specific act of infidelity.

11         THE COURT:  And so he needed money.

12         MR. DOWNING:  Correct.

13         THE COURT:  And you're going to establish or try to

14  establish that he stole money from Manafort for that purpose.

15         MR. DOWNING:  Yes, Your Honor.

16         THE COURT:  It seems to me perfectly appropriate.

17         MR. ANDRES:  Totally agree, Judge.

18         THE COURT:  All right.  Anything else we need to

19  discuss?

20         MR. ANDRES:  No, Judge.  Thank you.

21         MR. DOWNING:  Thank you.

22         THE COURT:  All right.  Let's go.

23         (End of bench conference.)

24         THE COURT:  All right.  Let's have Mr. Gates return,

25  please.

1          Oh, she's wonderful.  She's a jewel.  Without

2   Ms. Pham, I would fall on my face every day.  Bring the jury

3   in.

4                         (Laughter.)

5          THE COURT:  I just told her supervisor this morning

6   that she's a jewel.

7                         (Jury present.)

8          THE COURT:  All right.  You may be seated.  Thank you

9   for your patience, ladies and gentlemen, but I assure you it

10  was necessary.  Neither side objected and neither side was

11  responsible for this delay.  It's necessary to do it.

12         All right.  Now, I'll have Mr. Gates return.

13         Mr. Gates, you'll recall, sir, that you remain under

14  oath.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  You may resume the stand.

17         And, Mr. Downing, you may begin your

18  cross-examination.

19         MR. DOWNING:  Thank you, Your Honor.

20                       CROSS-EXAMINATION

21  BY MR. DOWNING:

22  Q.   Good afternoon, Mr. Gates.

23  A.   Good afternoon.

24  Q.   I think, as you know, I represent Mr. Manafort, and we're

25  here to ask you some questions about events leading up to your

1   testimony here today and your 20-some-odd interviews with the

2   Office of Special Counsel on the way here.

3           THE COURT:  You'll have to speak up just a bit,

4   Mr. Downing, for my benefit.

5   BY MR. DOWNING:

6   Q.   Mr. Gates, why don't we go back to the period of January

7   of this year?

8           You had occasion to sit down with your lawyer in the

9   Office of Special Counsel to discuss matters surrounding this

10  case?

11  A.   I did.

12  Q.   And did you meet on more than one occasion with the Office

13  of Special Counsel before entering into a plea agreement?

14  A.   We did.

15  Q.   Did you meet approximately three or four times before you

16  entered your plea?

17  A.   Yes, I'd say that's accurate.

18  Q.   And during the three or four times that you met with the

19  Office of Special Counsel, did you provide to them false and

20  misleading information?

21  A.   Not at that time, no.

22  Q.   Not at that time.

23  A.   No.

24  Q.   Do you recall when you first started giving false and

25  misleading information to the Office of Special Counsel?

1  A.   I was charged with a second count that was prior to the

2  plea agreement.

3  Q.   The second count was prior to the plea agreement?

4          THE COURT:  I don't think that was responsive to his

5  question.  Re-ask your question.

6          THE WITNESS:  Can you repeat the question, please?

7  BY MR. DOWNING:

8  Q.   When did you first start providing false and misleading

9  information to the Office of Special Counsel?

10  A.   I didn't provide false and misleading information to the

11  Special Counsel's office.

12  Q.   And then why did the Office of Special Counsel have you

13  plead guilty to providing false information to the Office of

14  Special Counsel?

15  A.   Under the one instance I did.

16          THE COURT:  I'm sorry, I didn't hear you.

17          THE WITNESS:  Under the one instance I did.

18          THE COURT:  Well, so previously, you said you didn't

19  provide false information.

20          THE WITNESS:  That's correct.  Your Honor, my

21  information leading up to the one count, up to that point, I

22  had not provided false and misleading information.

23          THE COURT:  Next question.

24  BY MR. DOWNING:

25  Q.   So just to get an idea of timeframe, you pled in February

1    of this year?

2    A.   Yes.

3    Q.   And you met with the Special Counsel starting in late

4    January of this year?

5    A.   I believe that's correct.

6    Q.   And prior to you entering your plea, when did you provide

7    false and misleading information to the Government?

8    A.   There were instances where I struggled with the

9    interviews, certainly recalling details and facts about various

10   questions that the Special Counsel asked.  So there's no

11   question that I struggled to -- to get all the information out.

12   Q.   So it sounds to me, as you sit here today, you're not

13   saying you knowingly, intentionally provided false and

14   misleading information.  You just had a bad recollection; is

15   that correct?

16   A.   To some extent, yes.

17             THE COURT:  But I thought you said you pled guilty to

18   providing false information?

19             THE WITNESS:  I did, Your Honor, to one count.

20             THE COURT:  All right.  You just said you just had a

21   bad memory.  Did you provide false information or did you have

22   just a bad memory?

23             THE WITNESS:  Your Honor, I provided false

24   information to the Special Counsel prior to my plea agreement.

25             THE COURT:  Next question.

1    BY MR. DOWNING:

2    Q.    Prior to your plea agreement?

3    A.    Yes.

4    Q.    But not after your plea agreement?

5    A.    No.

6    Q.    And how many times did you meet with the Office of Special

7    Counsel after you entered into your plea agreement?

8    A.    Approximately 20 times.

9    Q.    Now, do you know how the Office of Special Counsel found

10   out that you had provided false and misleading information to

11   them?

12   A.    No, I do not.

13   Q.    Were you confronted by the Office of Special Counsel in an

14   interview about providing false and misleading information?

15   A.    I was.

16   Q.    And who confronted you?

17   A.    I believe it was Mr. Weissman.

18   Q.    And when he confronted you, did he indicate to you that

19   you had -- you had no chance of getting a plea agreement

20   because you had lied intentionally during a proffer session?

21   A.    He indicated that in order to move forward with the plea

22   agreement I would have to accept the second charge.

23   Q.    And did you have a plea agreement drafted for you at that

24   time?

25   A.    I don't recall if it was drafted at that time.

1  Q.   Did you know the terms and conditions of your plea

2  agreement at that time?

3  A.   I was aware of some of them, yes.

4  Q.   And when you met with the Office of Special Counsel at

5  each meeting, did they tell you you were required to provide

6  truthful information?

7  A.   Yes.

8  Q.   And after they discovered that you had intentionally

9  provided false and misleading information, did they tell you

10 they would not offer you a plea?

11 A.   They never made that indication.

12 Q.   But, instead, they told you they added a charge; is that

13 correct?

14 A.   That's correct.

15 Q.   Even though you knowingly and intentionally lied?

16 A.   Yes.

17 Q.   And subsequent to that, you did sign a plea agreement with

18 the Office of Special Counsel, correct?

19 A.   That is correct.

20 Q.   And that agreement, once again, requires you to provide

21 truthful information?

22 A.   That's correct.

23 Q.   Not to be intentionally false or misleading; is that

24 correct?

25 A.   Correct.

1   Q.   And in your plea agreement, despite the fact that you had

2   a plea to two counts with a total exposure to you of ten years

3   in jail, the Office of Special Counsel agreed that your lawyer

4   could file a recommendation with a judge in Washington, D.C.,

5   to say that even though you had committed these crimes and

6   admitted to it and lied during the process, that you should get

7   probation; is that correct?

8   A.   No, they were not responsible for indicating what the

9   sentence might be.  That's up to the judge.

10  Q.   So let me repeat the question.  The terms of your plea

11  agreement let your lawyer argue that you should have probation

12  and no jail time; is that correct?

13  A.   That is correct.

14  Q.   And it would be unopposed by the Office of Special

15  Counsel; is that correct?

16  A.   If I fulfilled the requirements in the plea agreement,

17  yes.

18  Q.   Even though before you got the plea agreement, you

19  violated the terms and conditions of your proffer with them?

20  A.   I don't know all the terms related prior to the proffer.

21  I knew when I signed the plea agreement what the terms were.

22  Q.   Well, you did know that the proffer agreement -- the most

23  important term was that you tell the truth?

24  A.   That's correct.

25  Q.   And you violated that before you even got a plea

1  agreement?

2              MR. ANDRES:  Objection, Judge.  That misstates both

3  the proffer agreement and the nature of it.

4              THE COURT:  I'll overrule the objection.  If he

5  misstates something in his mind, he can testify to it.

6              You may disagree with the accuracy of it, but your

7  mindset is not what's important; it's his.

8              MR. ANDRES:  Understood.

9  BY MR. DOWNING:

10 Q.   So is that correct?  That was one of the most important

11 things for you to do, tell the truth?

12 A.   Yes.

13 Q.   So let's talk about some of the information that you

14 provided during your proffers on the fraudulent activity that

15 you were involved in and let's start with Global Sites.

16             Do you want to explain what Global Sites is?

17 A.   Yes.  Global Sites is a company set up by Mr. Manafort and

18 a partner of his in New York in regards to a high-frequency

19 trading business.

20 Q.   And that was a gentleman named Arthur Cohen, correct?

21 A.   It was.

22 Q.   And "it was" because he's deceased, correct?

23 A.   Correct.

24 Q.   And he had expertise in the area of high-speed trading?

25 A.   He did not, but people affiliated with him did.

1    Q.   And Mr. Manafort made an investment with Mr. Cohen in

2    Global Sites; is that correct?

3    A.   That is correct.

4    Q.   And there came a time where you got involved with that

5    investment; is that correct?

6    A.   Yes.

7    Q.   And you had represented to Mr. Cohen that of the

8    $1.5 million that Mr. Manafort invested -- he invested 1.5, did

9    he not?

10   A.   I don't recall the exact amount.  I believe it was more,

11   though.

12   Q.   And you represented to Mr. Cohen of the amount of money

13   that Mr. Manafort invested, $250,000 of that was your money?

14   A.   That's correct.

15   Q.   And you represented that it was a bonus?

16   A.   That's correct.

17   Q.   And that's what you told the Office of Special Counsel?

18   A.   Yes.

19   Q.   Now, this is in 2012 when this investment took place?

20   A.   No, it was in 2011, I believe.

21   Q.   2011.  In 2011, what was your salary at DMP?

22   A.   I believe it was approximately 240,000.

23   Q.   And you, in 2011, received a bonus that year of about

24   $60,000; is that correct?

25   A.   I believe that was -- I don't know.  I don't have the --

Gates - Cross                                                          1370

1    Q.    About 60 to put you at $300,000?

2    A.    That would be correct.

3    Q.    And you sit here today, and you're telling this jury to

4    believe that on top of the 60,000 that Mr. Manafort allocated

5    another 250,000 to you for a bonus?

6    A.    Yes, that's correct.

7    Q.    That's correct?  And that that would be your investment

8    with Mr. Cohen?

9    A.    The investment with Mr. Cohen was actually through a

10   promissory note as well.

11   Q.    Oh, we're going to get to the promissory note.  That's

12   next up.

13            But so the first 250, you represented that

14   Mr. Manafort said it was a bonus for you; is that correct?

15   A.    Yes.

16   Q.    And have you seen any e-mails presented to you in any of

17   your meetings with the Office of Special Counsel that

18   Mr. Manafort communicated that you were going to be paid a

19   $250,000 bonus?

20   A.    I do not believe there are any e-mails.

21   Q.    So let's get to the promissory note, Part 2 of this

22   investment, correct?

23   A.    Yes.

24   Q.    And the second part of the investment is approximately a

25   $700,000 investment split between you and Mr. Cohen; is that

1    correct?

2    A.    Correct.

3    Q.    And I think you represented to the Office of Special

4    Counsel that $350,000 that you provided to Mr. Cohen came out

5    of the Cypriot funds; is that correct?

6    A.    It came from the Cypriot funds to my accounts in the form

7    of bonuses and other payments, which, over time, I paid back

8    Mr. Cohen.

9    Q.    And in what year did you get the $350,000 bonus?

10   A.    It wasn't a singular year.  It was over, I think, a period

11   of four years.

12   Q.    Four years.  So in 2011, you got a $250,000 bonus for one

13   year, but then it took three years to accumulate the 350,000;

14   is that correct?

15   A.    Yes, in order for me to repay the promissory note.

16   Q.    And as you sit here today, do you want the jury to believe

17   that Mr. Manafort authorized you to take $350,000 out of the

18   Cypriot account?

19   A.    I've already admitted to the fact that I took unauthorized

20   funds from Mr. Manafort.

21   Q.    So they weren't bonuses?

22   A.    No, they were bonuses.

23   Q.    Well, how can it be unauthorized?

24   A.    I thought you were talking about additional funds that I

25   already admitted to.

1    Q.    Oh, okay.  I can see where the confusion comes from?

2                MR. DOWNING:  May I --

3                THE COURT:  Hand it to the court security officer.

4    There's a rule that you can't stray from the podium.  The court

5    security officer will hand the witness anything the witness

6    needs.

7    BY MR. DOWNING:

8    Q.    Now, please take a look at what's been marked Defendant's

9    Exhibit 17.

10               So, Mr. Gates, just take a minute to look over this

11   exhibit, kind of look at the -- the totals for years 2010 to

12   2014.  Give me a ballpark total number for all those items, if

13   you could.

14   A.    It looks like approximately 2.7, 2.8.

15   Q.    It's about $3 million, correct?

16   A.    Okay.

17   Q.    And about how many entries are contained on this -- this

18   document?

19   A.    I'd venture to guess somewhere around 40.

20   Q.    Somewhere around 40 entries?

21               And do you recall this document being a compilation

22   of unreported income that you had been initially indicted for

23   in this district?

24   A.    Yes.

25   Q.    And included on this -- on this -- in this document are

1  some very large dollar entries that are coming out of various

2  Cypriot entities; is that correct?

3  A.   That's correct.

4  Q.   And each and every one of the transactions that was --

5  that's contained on this document, as included in your original

6  indictment here, they were authorized by you; isn't that

7  correct?

8  A.   Yes.  Some were authorized by Mr. Manafort, but there were

9  unauthorized transfers as well.

10 Q.   So what I would imagine is -- can you -- do you recall

11 talking to the Office of Special Counsel about having some

12 unauthorized transfers out of the Cypriot accounts?

13 A.   I believe I indicated that to them, yes.

14 Q.   And do you recall saying that you thought there were about

15 six that were unauthorized?

16 A.   No, I don't have any recollection.

17 Q.   Totaling about $420,000, do you remember that?

18 A.   I do not.

19 Q.   Can you pick out the six that you represented to the

20 Office of Special Counsel were authorized?

21 A.   No, I cannot.

22 Q.   Can you pick out the 420,000 out of this list that you

23 represented were authorized?

24 A.   I cannot.

25 Q.   Now, as you sit here today, are you representing that

1  particular transactions on here were authorized by

2  Mr. Manafort?

3  A.   Yes.

4  Q.   But you can't recall if it was the six that you

5  represented to the Office of Special Counsel?

6  A.   It's actually not the amount.  It's for the purpose of

7  what it was for.  That's how I can tell.

8  Q.   Okay.  One moment.

9          Now, Mr. Gates, the transactions that I have in front

10 of you totaling $3 million, can you explain to me what these

11 transactions are for?

12 A.   Yes.  Some of them were unauthorized transactions, which I

13 admitted to.  Others were --

14 Q.   So let's slow down.  Which were the unauthorized

15 transactions?

16 A.   I don't know in general.  I'm saying I made that

17 statement.

18 Q.   And other than unauthorized transaction, do you have a

19 dollar amount that you can give to the jury were unauthorized

20 out of the 3 million?

21 A.   Out of this 3 million, no, I cannot.

22 Q.   And in addition to unauthorized ones, do you see

23 transactions that you -- you can identify as being some kind of

24 legitimate amount of money?

25 A.   Yes.

1   Q.   That you were duly owed?

2   A.   Correct.

3   Q.   Which ones are those?

4   A.   The series of transactions from Bletilla Ventures, while

5   not all of these were authorized, many of them were authorized

6   in the form of increased income from Mr. Manafort in regards to

7   the lobbying project that we took on between the years of 2012

8   and 2014, and that also included expenses as well.

9   Q.   What kind of expenses?

10  A.   In this case, some legitimate, some not.

11  Q.   What does that mean?  Can you explain that?

12  A.   Yes.  That means that some expenses had been approved by

13  Mr. Manafort and others had not been approved.

14  Q.   And why would they need to be approved by Mr. Manafort?

15  A.   Because all expenses at some point needed to be approved

16  by him.

17  Q.   And they were unrelated to the business of DMP

18  International; is that correct?

19  A.   These expenses?

20  Q.   Yes.

21  A.   Some were in relation to DMP, but others were not.

22  Q.   They were personal, correct?

23  A.   Some were personal, yes.

24  Q.   A substantial amount of them were personal, correct?

25  A.   That's possible, yes.

1   Q.    Why do you say it's possible?

2   A.    Because I don't know the exact breakdown based on this

3   sheet that you indicated -- or that you gave to me in terms of

4   what they exactly are.

5   Q.    Did you have a scheme that you developed to put personal

6   expenses as legitimate business expenses and have them paid

7   through these offshore accounts?

8          Was that a scheme you perpetrated?

9   A.    It wasn't a scheme.  I just added expense numbers to the

10  reports.

11  Q.    You added what?

12  A.    Numbers to the expense reports.

13  Q.    Or did you just submit your total AmEx bill and say, I'll

14  have the whole thing paid, thank you?

15  A.    I don't believe it was submitted overseas because we

16  didn't submit that type of documentation.

17  Q.    Did you have amounts paid to you in the full amount of

18  your AmEx bill?

19  A.    Yes.

20  Q.    That included substantial personal expenditures?

21  A.    Yes, that's possible.

22  Q.    What do you mean it's possible?

23          Is that part of your scheme?  Did you do that?

24  A.    I don't have the AmEx statements in front of me, so I

25  don't know what you're referring to.

1  Q.   Did you knowingly and intentionally have personal expenses

2  paid for through the Cypriot accounts of DMP International?

3  A.   Yes.  I've already stated that.

4  Q.   And it was part of the scheme that you perpetrated over

5  several years; is that correct?

6  A.   I submitted expense reports that were not authorized over

7  several years, that's correct.

8  Q.   And this is not something you disclosed to the Office of

9  Special Counsel, did you?

10  A.   Yes, it is.

11  Q.   Was this the seven times that you were talking about that

12  you had unauthorized transfers?

13  A.   No, I don't believe I indicated a number with the

14  Special --

15  Q.   Was this the 125,000 you stole out of SunTrust account

16  from Mr. Manafort?

17  A.   I don't know what you're referring to.

18  Q.   Did you not get questioned by the Office of Special

19  Counsel about closing a DMP SunTrust account?

20  A.   I don't recall.

21  Q.   You don't recall it having a balance of $125,000?

22  A.   No.

23  Q.   You don't recall telling the Office of Special Counsel

24  that 100 of it was a bonus for you?

25  A.   It's possible.

1   Q.    It's possible you said it or it's possible it's a bonus?

2   A.    It's possible that it's both.

3   Q.    And then when you told them the last 25,000 was used to

4   open a PNC bank account, were you confronted by Mr. Weissmann

5   that no such thing ever happened?

6   A.    I don't recall.

7   Q.    You know --

8          THE COURT:  I'm sorry, what was your answer?

9          THE WITNESS:  I said I don't recall.

10  BY MR. DOWNING:

11  Q.    Mr. Gates, you seem to have perfect recollection on direct

12  examination.  You have such a hard time now having recollection

13  about the same period of time.

14          Why is that?

15  A.    Well, I think you're referring to statements that I

16  haven't seen, so I don't know where you're getting the

17  information from.

18  Q.    You haven't seen the 302s?

19  A.    No, I have not.

20  Q.    Have you been confronted with information you provided by

21  the Office of Special Counsel?

22  A.    On the 302s?

23  Q.    Yes.

24  A.    Not to my knowledge.

25  Q.    Have they confronted you with so many lies that you can't

1    remember any of it?

2    A.    No.

3    Q.    No what?

4    A.    No, they presented me with -- in the interview sessions, I

5    answered the questions.  There was an agent in the room taking

6    notes, but I have never seen the notes in regards to those

7    conversations.

8    Q.    Okay.  We'll keep going on.

9          So the issue I talked to you about, a scheme where

10   you submit personal expenses to get reimbursed, like from DMP,

11   you did offshore, you did the same thing when you were at the

12   inaugural committee, didn't you?

13   A.    No, I did not.

14   Q.    You did not?  You did not tell the Office of Special

15   Counsel that you were submitting personal expenses to the

16   inaugural committee and getting reimbursed for it?

17   A.    Oh, I'm not sure if I told them that or not.  But to my

18   recollection, the inaugural expenses were reviewed very

19   closely.

20   Q.    Did you submit personal expenses to the inaugural

21   committee --

22   A.    I don't recall.

23   Q.    -- for reimbursement?

24   A.    It's possible.

25   Q.    Now, during your meetings with the Office of Special

1  Counsel, did you have occasion to talk about an entity called

2  Map Global Holdings?

3  A.   I did.

4  Q.   And -- well, let me go back for one second.  I'll just

5  finish on this other issue.

6         So after investing the 250,000 and 350,000 that came

7  from DMP International accounts, you were paid out in two

8  installments on that investment, were you not?

9  A.   I was.

10  Q.   And you were paid out 800,000 -- half of the first part of

11  the payout, correct?

12  A.   I believe that's correct.

13  Q.   And 1.7 million on the second payout, correct?

14  A.   Well, the 1.7 was split between the two partners.

15  Q.   That was the first payment.  The second one you got

16  another 1.7, did you not?

17  A.   Oh, okay.  I don't remember if it was 1.7.

18  Q.   So you got $2.5 million.  When you got to 2.5 million, did

19  you ever think about paying the money back to DMP or

20  Mr. Manafort?

21  A.   No, I did not.

22  Q.   No.  What did you do with it?

23  A.   We put it into investment accounts.

24  Q.   Who's "we"?

25  A.   My family.

1    Q.   And did you take any of that money to pay for anything

2    else?

3    A.   The 2.5?

4    Q.   Yeah.

5    A.   I don't understand the question.

6    Q.   Well, you just said you just did an investment.  Who is

7    "we"?

8    A.   Myself and my wife.

9    Q.   You and your wife?

10   A.   Yes.

11   Q.   But there's another Richard Gates, right?  Another Rick

12   Gates?  The secret life of Rick Gates, where you maintain a

13   separate life in London, in other places throughout the

14   country; isn't that true?

15   A.   There was a period of time, almost ten years ago, when I

16   had a relationship, yes.

17   Q.   And over that period of time, you used money from these

18   offshore accounts to pay for your lifestyle, your secret life,

19   did you not?

20   A.   No.  I believe those were payments that resulted in bonus

21   money that I used for that, and I used family money or money

22   from my family account as well.

23   Q.   So more bonus money.

24   A.   It was, yes.

25   Q.   To the tune of $3 million?

1   A.    No.

2   Q.    Do you have a number, as you sit here today, that you

3   would like to provide as a possible number?

4   A.    I don't have an exact number because of the figures, but

5   it was far less than 3 million.

6   Q.    And as part of your secret life, did you maintain a flat?

7   Is that what they call it in London, an apartment?

8   A.    There was a period of time when I was in a flat in London

9   for about two months.

10  Q.    And you spent a lot of time flying first class back and

11  forth to London and the United States; isn't that correct?

12  A.    Yes.   Usually on my transits to Ukraine, correct.

13  Q.    And usually those were expenses that went through the

14  offshore accounts for DMP International; isn't that correct?

15  A.    No.   Those probably went through the U.S. account because

16  Mr. Manafort's card was associated with the U.S. account.

17  Q.    Are you sure about that?

18  A.    I'm not, but I believe that to be the case.

19  Q.    And if we had records that indicated that you submitted

20  the expense reports to the Cypriot accounts and to the accounts

21  in St. Vincent's and the Grenadines, would you be surprised?

22  A.    I'd be happy to take a look.

23  Q.    Would you be surprised?

24  A.    Would I be surprised about the money coming from Cyprus?

25  Q.    That you went to the foreign banks, represented that you

1    had business expenses when they were not, and had them cut

2    checks or wire transfer money to you?

3    A.    No.  I've already admitted that I've taken unauthorized

4    expenses --

5    Q.    To fund your separate secret life?

6    A.    I -- yes, I acknowledge I had a period of time where I had

7    another relationship.

8    Q.    And did that also include spending money on fancy hotels

9    and fancy dinners and trips to Vegas?

10   A.    I don't believe to Vegas, but there were some trips in

11   Europe, yes.

12   Q.    You don't think you had to pay for her to go to Vegas?

13   A.    No.

14   Q.    How about buying sound equipment, audio equipment, do you

15   think the offshore accounts paid for that?

16   A.    No, I don't think so.

17   Q.    How about you going to Whole Foods down in Richmond, do

18   you think the offshore accounts paid for that?

19   A.    No.  That was out of my family --

20   Q.    As you sit here today, you're going to deny --

21            THE COURT:  You didn't give him a chance to finish

22   his answer.

23            MR. DOWNING:  Sorry.

24            THE COURT:  You may finish your answer.

25            THE WITNESS:  Thank you.  In Richmond, it was Whole

1    Foods, that's not offshore money.

2    BY MR. DOWNING:

3    Q.   And, and you said you wouldn't be -- the offshore accounts

4    wouldn't be -- you wouldn't have submitted false requests for

5    reimbursements for trips to Las Vegas?

6    A.   The business trips, there was business trips that I took

7    to Las Vegas to, I believe, meet Mr. Brown, and I don't

8    believe -- I don't know if I expensed those.  I believe I

9    expensed those to the U.S.

10   Q.   But Mr. Brown is not related to DMP International; isn't

11   that correct?

12   A.   That is correct.

13   Q.   You were conducting separate business and investment with

14   Mr. Brown; is that correct?

15   A.   Yes.

16   Q.   And so it would have been inappropriate -- it would have

17   actually been an embezzlement if you were trying to get

18   reimbursed for those trips through DMP's accounts; is that

19   correct?

20   A.   That would be correct.

21   Q.   And now let's get to Mr. Brown since you mentioned his

22   name.  During your meetings with the Office of Special Counsel,

23   did you have occasion to be confronted with your involvement

24   with Mr. Brown and Map Global Holdings?

25   A.   I did.

1  Q.   And what, if anything, did the Office of Special Counsel

2  confront you with?

3  A.   They confronted me first by asking about the relationship,

4  about how the company was structured, and about some of the

5  business deals that Mr. Brown was involved in, and then later

6  on, they confronted me in regards to a letter that I prepared

7  for Mr. Brown.

8  Q.   Was Map Global Holdings some type of Ponzi scheme?

9  A.   Map was not.

10 Q.   What was?

11 A.   I don't know what you're referring to.  Map was not a --

12 map was a PR and movie production company.

13 Q.   And what is it that you were doing for Map that the Office

14 of Special Counsel confronted you with?

15 A.   They were interested in two things.  One was a project

16 that we had worked on to create a Swiss documentary, and then

17 other questions arose not related to Map but specifically to

18 Mr. Brown about a Ponzi scheme.

19 Q.   Weren't there issues with you being involved with putting

20 together falsified financial statements?

21 A.   For Mr. Brown, yes.  I acknowledged that.

22 Q.   And what do you mean for Mr. Brown?  What does that mean?

23 A.   You're referring to?

24 Q.   Was it a personal financial statement?  A corporate

25 financial statement?

1    A.    No.  It was a letter that Mr. Brown asked me to prepare

2    for him in regards to an investment he was working on.

3    Q.    And what was false and misleading about the letter?

4    A.    The letter was a request from Mr. Brown to have a company

5    indicate that it might be interested investing in one of the

6    movies so that he could use it in another negotiation.

7    Q.    And it was not true?  It was just false?

8    A.    The amount of money listed in the letter was not true;

9    that's correct.

10   Q.    And how much was listed in the letter?

11   A.    I don't recall.

12   Q.    Millions?

13   A.    Yes.

14   Q.    And, in fact, did you know how much money was actually

15   involved?

16   A.    No.  Mr. Brown never indicated to me.

17   Q.    And you didn't ask him before you signed the letter?

18   A.    No, because I did it as a -- as a favor, similar as I did

19   the letter to Mr. Manafort.

20   Q.    So you committed fraud with Mr. Brown as a favor?

21   A.    I did.  I admitted to that.

22   Q.    And there's also another issue that went on with Mr. Brown

23   and his company that involved false entries on the general

24   ledgers.  And apparently do you recall --

25              THE COURT:  Is that a question?

1    BY MR. DOWNING:

2    Q.   Yeah, do you recall that?

3    A.   Which general ledger?  For Map?

4    Q.   Map Global Holdings.

5    A.   I'd have to look at it to see.

6    Q.   Do you recall receiving payments from Map Global Holdings?

7    A.   I did for PR work, yes.

8    Q.   What kind of amounts did you receive?

9    A.   200,000, roughly.

10   Q.   And do you recall that on the ledgers of Map Global

11   Holdings they were recorded as distributions for Steve Brown?

12   A.   Not in my -- not my entries.  I don't know about

13   Mr. Brown.  Mr. Brown had different entries.

14   Q.   You didn't make the general ledger entries for Map Global?

15   A.   I made the general ledger entries and reviewed with our

16   accountant.

17   Q.   And you did not make entries that were recording payments

18   to you as distributions to Steve Brown?

19   A.   I wasn't making recordings that gave money to Mr. Brown

20   and indicating that they were mine.

21   Q.   So there did not have a -- there was not an occasion when

22   you told the Office of Special Counsel that distributions

23   recorded as distributions to Steve Brown were actually received

24   by you in your bank account?

25   A.   The money in the Map, because it was a Map bank account,

1  and then the distributions were divided between myself and

2  Mr. Brown.

3  Q.   Okay.  One more time I have to ask the question, I'm

4  sorry.

5  A.   Sure.

6  Q.   You did not tell the Office of Special Counsel that

7  payments to you were being disguised on Map Global Holdings'

8  general ledger as distributions for Steve Brown?  You did not

9  say that?

10  A.   I don't recall saying that, no.

11  Q.   Do you recall being confronted with that?

12  A.   No, I don't.

13  Q.   Now, with respect to Map Global Holdings, was there any

14  discussions with the Office of Special Counsel as to what kind

15  of federal crimes you committed when you signed that letter and

16  provided it for Mr. Brown, the potential investments that he

17  had, I guess?

18       What would you call that type of letter?

19  A.   The letter was for a potential investment in a movie

20  project that he was working on.

21  Q.   So he was representing that he had certain backing, is

22  that what it was?

23  A.   Yes.

24  Q.   Okay.  So you're saying, "Hey, we have these investors.

25  You want to invest with us too," correct?

1    A.    That's what I understood.

2    Q.    Is that like a lulling letter?  Is that what you would

3    call it?

4    A.    He didn't call it that.

5    Q.    Would you?

6    A.    I don't know, because I wasn't privy to the negotiations.

7    Q.    Did the government indicate to you what kind of federal

8    crimes you committed when you did that?

9    A.    I think they indicated that it was fraud.

10   Q.    It was fraud?

11   A.    Yes.

12   Q.    Any securities fraud?

13   A.    I don't recall them indicating that.

14   Q.    Mail/wire fraud?

15   A.    I don't recall.

16   Q.    Any money received with respect to that letter by

17   Mr. Brown?

18   A.    Not to my knowledge.

19   Q.    But it wasn't discussed that crimes that would constitute;

20   is that correct?

21   A.    Other than fraud, I don't believe so, but I don't recall.

22   Q.    And was there any discussion about you pleaing to that

23   fraud?

24   A.    It was represented as an additional crime as part of my

25   plea agreement, yes.

1   Q.   But you didn't need to plea to it?

2   A.   No, because as part of the plea agreement, the government

3   agreed that it would not bring -- or would not prosecute for

4   additional charges, and I believe that was one that I raised in

5   addition with them.

6   Q.   You don't believe you were confronted with it.  You

7   believe you raised it?

8   A.   No, no.  I mean, the relationship with Mr. Brown I raised.

9   The letter itself, I was confronted with the letter.

10  Q.   Now, there's also an issue the Office of Special

11  Counsel -- Office of Special Counsel -- excuse me -- raised

12  with you regarding potential insider trading.  Is that --

13  insider trading, do you know what that is?

14  A.   That's correct.

15  Q.   Did they raise an issue with you about potential insider

16  trading?

17  A.   They did.

18  Q.   Can you explain to the jury what insider trading is?

19  A.   Yes.  To my understanding, it's when somebody that has a

20  position in a company is able to provide information that's not

21  available to the public.

22  Q.   And can that be considered fraud too?

23  A.   I don't know that.  I don't know the law in that regard.

24  Q.   Were you advised by the Office of Special Counsel that

25  there are federal statutes that criminalize insider trading?

1   A.   I believe they mentioned that there were statutes

2   regarding that, yes.

3   Q.   Did they mention that you would be prosecuted for that?

4   A.   No, they did not.

5   Q.   Now, when you were confronted about this insider

6   trading --

7            THE COURT:  Did you understand you could be

8   prosecuted for that?

9            THE WITNESS:  Oh, I understood that I could be

10  prosecuted, yes.

11           THE COURT:  Next question.

12  BY MR. DOWNING:

13  Q.   Well, in fact, you had received a letter from the SEC, did

14  you not, making an inquiry about this?

15  A.   I did.

16  Q.   And did you raise that issue with the Office of Special

17  Counsel or were you confronted with that letter?

18  A.   As I recall, I think I acknowledged that I had received a

19  letter.  I don't know if they asked it as a question or in the

20  context of talking about that entity, if I -- if I informed

21  them that I had received a letter.

22  Q.   And what entity did that involve?

23  A.   That was a company called ID Watchdog.

24  Q.   And what was the allegation about the insider trading?

25  A.   The allegation was in regards to a conversation and

1    whether or not it occurred with my brother, who I did not know

2    if he had invested in the company or not.

3    Q.   Was there also an issue about you receiving certain

4    warrants on the eve of an IPO for this company or a purchase?

5    A.   Yes.

6    Q.   And can you explain what that was?

7    A.   Yes.  So a number of board directors did not exercise

8    their warrants before the expiration date, but it was very

9    close to the expiration date.  And the CFO of the company

10   allowed the various board members, as I recall, to exercise

11   those warrants.

12   Q.   And what kind of -- what kind of warrants did you get to

13   exercise?

14   A.   I think it was a total of, I think, around 250,000

15   warrants.

16   Q.   And what year was that?

17   A.   The exercise of the warrants, I believe, was in 2017.

18   Q.   And did the Office of Special Counsel indicate whether or

19   not, at the time, there was an ongoing investigation against

20   you regarding insider trading?

21   A.   I don't recall if they had an investigation.

22   Q.   Did you retain a lawyer to represent you with respect to

23   an ongoing investigation by the SEC?

24   A.   No.

25   Q.   And did the Office of Special Counsel indicate that you

1  would have to plead guilty for your actions with respect to

2  that activity?

3  A.    No, they did not.

4  Q.    Now, in addition to these various fraud schemes, you also

5  had discussions with the Office of Special Counsel about your

6  failure to report income on your tax returns; is that correct?

7  A.    That is correct.

8  Q.    And one such occasion had to do with an investment you

9  made in a Facebook IPO; is that correct?

10 A.    I don't recall.

11 Q.    Do you recall what you disclosed to the Office of Special

12 Counsel about unreported income from various investments?

13 A.    I do not.

14 Q.    Did you disclose unreported income from various

15 investments?

16 A.    I believe I did.  It may have been generally, that I

17 indicated that I did not disclose all of my income.

18 Q.    Do you recall disclosing to the Office of Special Counsel

19 that you did not report the $2.5 million proceeds from your

20 activities with Mr. Cohen on your original tax returns?

21 A.    Well, that would have been on the 2017 tax return, which

22 has not been filed yet.

23 Q.    So you didn't represent that you failed to report it on

24 the original return, but you did report it on an amended tax

25 return; is that correct?

1   A.   I don't think it's been reported yet.  It's an action that

2   occurred in 2017.  That tax year has not been filed.  The

3   original has not been filed.

4   Q.   So you did not make any such representation to the Office

5   of Special Counsel?

6   A.   I don't believe I did.

7   Q.   Did you have occasion to talk to the Office of Special

8   Counsel or disclose that you had filed amended tax returns in

9   the summer of 2017?

10  A.   Yes.

11  Q.   And do you recall being confronted by the Office of

12  Special Counsel about falsities in the amended return?

13  A.   Yes.

14  Q.   And what were the falsities that you were confronted with?

15  A.   At the time, my attorney had indicated that I should put a

16  letter into the tax returns, because at subject was the foreign

17  bank accounts that were controlled by Mr. Manafort.  As was

18  stated earlier, Mr. Manafort had accepted that he had control

19  and signature authority over those accounts, but we were not in

20  the position, as I recall, with the Special Counsel to

21  determine whether or not they would accept that position or

22  not.

23         So my attorney had submitted, with the tax return, a

24  letter stating that we would have to investigate the --

25  further, the foreign bank accounts because of the situation

1    going on with the Special Counsel's office.

2    Q.    So, Mr. Gates, did the Office of Special Counsel state to

3    you they felt that you failed to report offshore bank accounts

4    on your amended tax return?

5    A.    They did.

6    Q.    And the amended tax returns, if I understand this

7    correctly, the timing of them was that the Office of Special

8    Counsel had been conducting an investigation for some time?

9    A.    Correct.

10   Q.    And you knew of it, correct?

11   A.    That's correct.

12   Q.    Did you also get confronted with leaving off well over

13   $1 million on your amended tax return?

14   A.    I don't recall if that was the number.

15   Q.    Do you recall that it was a large number?

16   A.    I don't recall what number that they allocated or

17   indicated that I had not paid in taxes.

18   Q.    Do you recall what it related to?

19   A.    I do not.

20   Q.    Do you recall if it related to income from offshore

21   accounts?

22   A.    Oh, I'm sorry, yes, it did relate to income from offshore

23   accounts.

24   Q.    So you do recall that?

25   A.    Now, with you recollecting my memory, yes.

1   Q.   So I want to go back to the EDVA indictment.  The original

2   indictment that I believe you testified, I'll ask the question

3   again, that the --

4            THE COURT:  Let me just say EDVA means Eastern

5   District of Virginia.

6            MR. DOWNING:  Oh, thank you, Your Honor.

7   BY MR. DOWNING:

8   Q.   As part of your plea agreement, the Office of Special

9   Counsel agreed to dismiss the charges against you here in the

10  Eastern District of Virginia; is that correct?

11  A.   That is correct.

12  Q.   And those charges included filing false tax returns for

13  several years; is that correct?

14  A.   Yes, that's correct.

15  Q.   And it included failure to file FBARs for several years?

16  A.   Yes.

17  Q.   And it included bank fraud charges?

18  A.   Yes.

19  Q.   And conspiracy to commit bank fraud, is that correct?

20  A.   Yes.

21  Q.   And did the Office of Special Counsel indicate to you that

22  you could be looking at as much as 290 months in jail?

23  A.   I don't think they ever indicated a number, but I don't

24  recall.

25  Q.   Oh, I stand corrected.  It's 290 years.

1        Did they indicate to you that you could go to jail

2   for 290 years?

3   A.   Same response, but I like your first answer better.

4                        (Laughter.)

5   Q.   What is the response?

6        THE COURT:   I'm sorry?

7        THE WITNESS:   Sorry, Your Honor.   I said that it's

8   the same answer.   I don't recall the Special Counsel indicating

9   to me the total number of maximum years that I could serve for

10  the second indictment.

11       THE COURT:   Well, what did you understand the maximum

12  years you could be sentenced to?

13       THE WITNESS:   It was -- I understood it to be quite

14  significant.

15       THE COURT:   All right.   Do you -- did you -- can you

16  quantify that?   Did you have, in your mind, a number?

17       THE WITNESS:   I knew it was in excess of 50 to 100

18  years, yes.

19       THE COURT:   Next question.

20       MR. DOWNING:   Thank you, Your Honor.

21  BY MR. DOWNING:

22  Q.   Now, in terms of your cooperation with the Office of

23  Special Counsel after you took your plea, did you have occasion

24  to be interviewed by other members of the Office of Special

25  Counsel about the Trump campaign?

1    A.    Yes.

2    Q.    And were you interviewed on several occasions about your

3    time at the Trump campaign?

4             MR. ANDRES:  Objection, Your Honor.

5             THE COURT:  All right.  Do you need to come to the

6    bench?

7             MR. ANDRES:  Please.

8             THE COURT:  All right.  You may do so.

9             (Pages 1399 through 1405 filed under seal.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ladies and gentlemen -- ladies and

2    gentlemen, I want to thank you in advance for your patience,

3    because we're going to take another break now, and hope you'll

4    have a soft drink.

5          But it won't be a long break.  It will be -- well, it

6    will be -- we'll recess until 4:30 and then go at least until

7    5:30, and we'll see where we are.  Thank you for your patience.

8    I can assure you that this is necessary.

9          Pass your books to the right.  Mr. Flood will collect

10   them, maintain their security.  And remember to refrain from

11   discussing the matter amongst yourselves or with anyone or

12   undertaking any investigation.  You may follow Mr. Flood out.

13         All right.  Court stands in recess until -- I said

14   4:30.

15         Oh, Mr. Gates, you may step down, sir, but you must

16   remember that you may not discuss your testimony with anyone.

17         THE WITNESS:  Thank you.

18         MR. ANDRES:  Thank you, Your Honor.

19          (Recess from 4:04 p.m., until 4:28 p.m.)

20                         (Defendant present, Jury out.)

21         THE COURT:  Did you have something?

22         MR. DOWNING:  No.

23         THE COURT:  Mr. Nanavati?

24         MR. NANAVATI:  Yes.

25         THE COURT:  That's yours.  It was delivered to the

1    clerks.  The marshals opened it.  I have not looked at it.  I

2    have no idea what it is and don't care.

3            MR. NANAVATI:  Thank you, Your Honor.

4            THE COURT:  All right.  Bring in the jury, please.

5                        (Jury present.)

6            THE COURT:  All right.  You may be seated.  Thank you

7    again for your patience.

8            Let's have Mr. Gates return.  And we will recess

9    sharply at 5:30.

10           All right.  Mr. Gates, you'll recall you remain under

11   oath.  You may resume the stand.

12           THE WITNESS:  Thank you.

13           THE COURT:  All right.  Mr. Downing, you may proceed.

14           MR. DOWNING:  Thank you, Your Honor.

15   BY MR. DOWNING:

16   Q.   Mr. Gates, I'd like you to go back and take a look at what

17   was marked as Defendant's Exhibit 17, the compilation of

18   $3 million in wires from DMP's offshore accounts.  Do you have

19   that in front of you?

20   A.   I do.

21   Q.   And there's a section starting in 2010 -- 2011, I'm

22   sorry -- 9/9/2011, and it says -- the name on it is "Jemina" --

23   is it Jemina?  Is that correct?

24   A.   Jemina.

25   Q.   Jemina, J-e-m-i-n-a, LLC.

1    And do you see on 9/9/2011, there was a wire transfer

2  from Peranova for $48,500 to Jemina?  Do you see that?

3  A.    I do.

4  Q.    And then if you go to the next page, and for a series of

5  entries for July 8, 2013, do you see that?

6  A.    July 8?

7  Q.    Yeah.  Do you see that for Jemina LLC, 7/8/2013 from

8  Marziola?

9  A.    Yes, I do.

10  Q.    In the amount of $72,500?

11  A.    Yes.

12  Q.    And there's an entry for September 4, 2013, also from

13  Marziola to Jemina for $89,807?

14  A.    Yes.

15  Q.    There's another entry on 10/22/2013 from Cypriot agent to

16  Jemina for $119,844.  Do you see that?

17  A.    I do.

18  Q.    What is Cypriot agent?

19  A.    I don't know.

20  Q.    Did you have some side deal in Cyprus where you were

21  getting money funneled to you from a law firm or an accounting

22  firm?

23  A.    No, there was no side deal.

24  Q.    Well, what is Cypriot agent?

25  A.    Oh, Cypriot agent could be in reference to when the

1    Cypriot accounts were closed Dr. K had consolidated those

2    accounts into a -- what he called a client account.  So that

3    could be in reference to that.

4    Q.   And those Cypriot agent, the next three entries are 10/22,

5    11/12, and 12/22/13 -- excuse me -- December 20, 2013, all say

6    "Cypriot agent," correct?

7    A.   Yes.

8    Q.   119,844, 80,000, and $90,000; is that correct?

9    A.   That is.

10   Q.   And can we go down to 2014?

11           There's two more entries for Cypriot agent to Jemina,

12   correct?

13   A.   Yes.

14   Q.   February 2014 and April for $60,044 and $44,068, is that

15   correct?

16   A.   That is.

17   Q.   All to Jemina?

18   A.   Yes.

19   Q.   And then the last one is 10/6/2014 from Global Endeavour

20   to Jemina for $65,000, correct?

21   A.   Yes.

22   Q.   So that's several hundred thousand dollars that were going

23   to Jemina, correct?

24   A.   Yes, it is.

25   Q.   Now, I'd like you to take a look at what's been put in

1   front of you and marked as Defense Exhibit 14.  Do you see

2   that?

3   A.   I do.

4   Q.   And -- and what is that document?

5   A.   The first one appears to be the wiring instructions.

6   Q.   And these are wire instructions from?

7   A.   It appears to be from -- I'm sorry -- it's a confirmation

8   statement from Loyal Bank.

9   Q.   And for which account?

10  A.   This would be Global Endeavour.

11  Q.   And that's what it says on the bottom right-hand side,

12  correct?

13  A.   Yes.

14  Q.   And this is a wire transfer for $65,000?

15  A.   Yes.

16  Q.   And where is it headed?

17  A.   It appears to Jemina.

18  Q.   And what is the date of that?

19  A.   It's way at the bottom.  It looks like 8/9/2014.

20  Q.   And can you turn to the next page?  And what is that

21  document?

22  A.   This says, "Checklist for Confirmation of Wire Request."

23  Q.   And is that a corresponding document for the front page

24  for the wire transfer?

25  A.   Yes, it appears to be.

1   Q.    And it's the same bank, correct?

2   A.    It is.

3   Q.    And on the next page?

4   A.    This is a pro forma invoice that I -- that I drafted in

5   regards to the documentation needed from Global Endeavour.

6   Q.    And for the total of six- -- excuse me -- $65,000,

7   correct?

8   A.    That is correct.

9   Q.    And can you turn to the next page?  What is that document?

10              THE COURT:  Do you plan to offer this document?

11              MR. DOWNING:  I do.

12              THE COURT:  All right.  Any objections to it?

13              MR. ANDRES:  No, Your Honor.

14              THE COURT:  All right.  It's admitted.

15              (Defendant's Exhibit No. 14 was received in

16   evidence.)

17              THE COURT:  So let's see if we can move it along.

18              THE WITNESS:  It appears to be applicant check

19   details.

20              THE COURT:  What's the question to Mr. Gates?

21              MR. DOWNING:  I was just asking if he understood what

22   the next document was, if he knows what it is.

23              THE WITNESS:  No, I've never seen it.

24   BY MR. DOWNING:

25   Q.    And the next page?

1    A.    This is the consultancy agreement that was required by the

2    account of the bank in order to make a wire transfer.

3    Q.    Okay.  This says it's Global Endeavour, Inc., and Jemina;

4    is that correct?

5    A.    Yes.

6    Q.    Jemina.

7             And what is this supposed to be, a consultancy

8    agreement?

9    A.    Yes.  The bank required supporting documentation, so they

10   required both an agreement and a invoice.

11   Q.    So when you say the bank required it, what do you mean?

12   What does that mean?  I don't understand.

13   A.    It means that the bank, in order to make the wire transfer

14   effective, required the two pieces of supporting documentation.

15   Q.    And the supporting documentation is false and misleading,

16   is it not?

17   A.    The -- in order to do the wire, yes, it was.

18   Q.    There was no consultancy agreement between Global

19   Endeavour and Jemina?

20   A.    That's correct.  It was in order to get the wire

21   transacted out of the account.

22   Q.    And did you have occasion to discuss Jemina with the

23   Office of Special Counsel?

24   A.    I'm not -- I don't recall if they discussed that or not.

25             THE COURT:  Mr. Gates, is that your signature at the

1    end of this document?  At the end of the so-called consultancy

2    agreement?

3              THE WITNESS:  No, it is not.

4              THE COURT:  Do you recognize the signature?

5              THE WITNESS:  Yes.  These were the signatures for

6    Global Endeavour, and it appears some of that I had signed on

7    behalf of Jemina from the Cyprus law firm.

8              THE COURT:  So you did sign it?

9              THE WITNESS:  I personally didn't sign it, but I had

10   a representative sign it, yes.

11             THE COURT:  Next question.

12   BY MR. DOWNING:

13   Q.   So the invoice attached for $65,000, it says, "For

14   professional fees," is a false document, correct?

15   A.   Yes, it is.

16   Q.   And the consultancy agreement is a false document,

17   correct?

18   A.   Yes.  They were supporting documentation in order to get

19   the wire transaction.

20   Q.   And the account to which the wire went to for Jemina,

21   that's your account, is it not?

22   A.   It is.

23   Q.   And all the transfer we just talked about for Jemina were

24   similar to this, correct?

25   A.   I don't know which accounts they came from but --

1  Q.   Well, we went through that before but they're all under

2  the same consultancy agreement, correct?

3  A.   Yes.

4  Q.   A fake and phony consultancy agreement?

5  A.   Yes.

6  Q.   And the original -- the consultancy agreement itself is

7  something you drafted?

8  A.   No, that was drafted by the -- the template was drafted by

9  the Cyprus law firm and then that was the same one I've used to

10 edit other things.

11 Q.   So you've asked them to update it for this particular

12 false and misleading information?

13 A.   No, I updated it.  I used their template.

14 Q.   And you sent it to them?

15 A.   Correct.

16 Q.   Now, getting back to Exhibit 17, Defense Exhibit 17, I

17 draw your attention to the last page.  For November 25, 2014,

18 there's a transfer from Global Endeavour to Bade LLC for

19 $120,000.

20        Do you see that?

21 A.   I do.

22 Q.   Now, can you look at what's been marked Defense

23 Exhibit 15?  15.

24        MR. DOWNING:  And, Your Honor, we move Defendant's

25 Exhibit 15 into evidence.

1          MR. ANDRES:  None.  No objection.

2          THE COURT:  Admitted.

3          (Defendant's Exhibit No. 15 was received in

4   evidence.)

5          THE COURT:  Next question.

6   BY MR. DOWNING:

7   Q.   The first page, can you explain to the jury what the first

8   page is of Defendant's Exhibit 15?

9   A.   The first page is a wire confirmation request.

10  Q.   For $120,000?

11  A.   It is.

12  Q.   And it's set to go to Bade LLC; is that correct?

13  A.   Yes.

14  Q.   And the attached invoice from Bade LLC, do you see that?

15  A.   I do.

16  Q.   And it says it's for professional fees for $120,000?

17  A.   Yes.

18  Q.   And Bade LLC, is that an entity that you set up?

19  A.   It is.

20  Q.   And that's a bank account that you're the holder of?

21  A.   It is.

22  Q.   And this invoice is a false and phony invoice, correct?

23  A.   It is.

24  Q.   And there were no professional services provided with

25  respect to receiving 120,000, correct?

1    A.    Correct.  These were more expenses.

2    Q.    These are for what?

3              THE COURT:  Where did the money come from?

4              THE WITNESS:  The money came from Global Endeavour,

5    one of the offshore accounts.

6              THE COURT:  And -- but where did the money come from?

7              THE WITNESS:  Oh, the money came in conjunction to

8    expense reports that I created in order to get the money wired

9    out of the account.

10             THE COURT:  Yeah.  That tells me how you got the

11   money, you say by -- by using these false expense reports, but

12   I want to know whose money it was.

13             THE WITNESS:  Oh.  In this case it was Mr. Manafort's

14   money.

15             THE COURT:  Next question.

16   BY MR. DOWNING:

17   Q.    It's one of the -- the money -- the account that it came

18   out of, Global Endeavour, was one of DMP International's

19   offshore accounts, correct?

20   A.    Yes.  It's one of the accounts controlled by Mr. Manafort.

21   Q.    So I want to see if I can understand this.  You're saying

22   $120,000 are expenses?

23   A.    Well, it was a series of -- as I recall, there were two

24   different payments.  The invoice is broken down.  So the

25   description on the invoice was not necessarily consistent with

1   what the, you know, payment may have been for.

2   Q.   Are these payments for your secret life?

3   A.   No, they're not.

4        MR. ANDRES:  Your Honor, can the witness answer the

5   question?

6        THE COURT:  Yes, he can.

7        MR. DOWNING:  I thought he did.

8        THE COURT:  What's the answer to the question?

9        THE WITNESS:  The answer is:  No, they're not.

10  BY MR. DOWNING:

11  Q.   So what exactly are you telling us these expenses are to

12  the tune of $120,000?

13  A.   As I said, at least one of them -- I, you know, could go

14  back and try to refresh, but one of them is fabricated.  It's

15  not a true expense report.  For example, one of the entries, I

16  think you showed me, was a bonus from Mr. Manafort, and I

17  believe this one to be one as well.

18  Q.   Okay.  One more time.

19  A.   Yes.

20  Q.   First, you said it was reimbursement for expenses.

21  A.   For both, correct.

22  Q.   And now you're saying it's a bonus.

23  A.   Yes.  One -- there's -- you have two entries on here, on

24  the invoice.

25  Q.   And the entries say, "Professional fees"?

1   A.    That's correct.   That was the notation used to actually

2   transact the wire from the bank in the Grenadines.

3   Q.    So why exactly would it not say, "Reimbursement for

4   expenses," attach an invoice for DMP International-related

5   business expenses?

6   A.    As I said, I fabricated the invoice.

7   Q.    Why?

8   A.    Because I was -- in essence, I was living beyond my means.

9   I was -- it was a difficult time.   I was living, you know, more

10  than I should have.   I, you know, I regret it, clearly, and,

11  you know, I'm taking responsibility for it, but I made a

12  mistake.

13  Q.    So -- so this truly is not related to DMP International's

14  business.   This is related to your secret life.   That's what

15  this is about?

16  A.    It's not a secret life since this went to an account that

17  my wife is aware of but --

18  Q.    Was she aware of your secret life, too?

19  A.    She was.

20  Q.    So, Mr. Gates, just to be clear, because you've said it

21  several different things, but it is truly just an embezzlement,

22  correct?

23  A.    This is money that I've taken from Mr. Manafort that was

24  unauthorized.   I've already indicated that.   I've said that.

25  Q.    It's not authorized?

1  A.   I said it's unauthorized, that's correct.

2  Q.   It's an embezzlement, is it not?

3  A.   You can choose -- sure.  You can choose whatever word

4  you'd like.

5  Q.   Well, why don't you use the word?  It's an embezzlement?

6  A.   It is an unauthorized transaction that I took from

7  Mr. Manafort.

8  Q.   Why won't you say "embezzlement"?

9  A.   What difference does it make?

10  Q.   Why won't you say "embezzlement"?

11  A.   It was embezzlement from Mr. Manafort.

12         THE COURT:  I've admitted 15, 17 -- not 17.  I've

13  admitted 14 and 15; is that correct?

14         MR. DOWNING:  That's correct, Your Honor.

15         THE COURT:  All right.

16         MR. DOWNING:  Not 17.

17         THE COURT:  Not 17 as yet.

18  BY MR. DOWNING:

19  Q.   Mr. Gates, I'd like to ask you a few questions about your

20  activities with respect to DMP International and these -- you

21  know, DMP's offshore bank accounts.  You came -- I think you

22  indicated earlier that you left DMP for a few years and you

23  came back.

24         Do you recall when you came back to DMP?

25  A.   I'm not sure what you mean by leaving DMP.

1    Q.   You went off on some business venture, didn't you?

2    A.   You'd have to give me more information.  I'm not sure what

3    you mean.

4    Q.   Well, I thought you testified the other day that you

5    worked at Davis Manafort for a while and then you went off to

6    some tech company.

7         Didn't you testify to that?

8    A.   What's the name of the tech company?

9    Q.   I don't know.  G-something?

10        MR. ANDRES:  Judge, could we have questions and

11   answers as opposed to a discussion here?

12        THE COURT:  I don't see that as an objection.  I'll

13   overrule it.

14        Go ahead, Mr. Downing.

15   BY MR. DOWNING:

16   Q.   Was there a period of time when you left working for

17   Mr. Manafort and went off to some tech venture?

18   A.   I don't -- you have to give me more information.  I'm not

19   sure what you mean.

20        THE COURT:  Well, just with that information, can you

21   give an answer?

22        THE WITNESS:  Yeah.  I mean, I've never left the

23   employ of Mr. Manafort from 2006 to 2016.

24   BY MR. DOWNING:

25   Q.   No, I asked before that.  G-Tech?

1    A.   Oh, I'm sorry, yes.  Yes.  That was my second job after

2    going to Black, Manafort, Stone and Kelly.

3    Q.   And how many years did you spend at G-Tech?

4    A.   I believe it was about four years.

5    Q.   And then you came back in 2006 to Davis Manafort, correct?

6    A.   No.  Actually, I came back, I went to work for Business

7    Strategies & Insight, then Scientific Games.  And then from

8    Scientific Games, I came to Davis Manafort Partners.

9    Q.   In 2006?

10   A.   In 2006.

11   Q.   Okay.  Here we are in 2006.  I'm going to ask you some

12   questions about 2006.

13   A.   Yes.

14   Q.   When you came back in 2006, was Davis Manafort a smaller

15   operation than it had been before you left?

16   A.   It had approximately nine employees when I joined in 2006.

17   Q.   And before when you worked there?

18   A.   So I started with DMP --

19             MR. ANDRES:  Objection, Judge.  It misrepresents --

20             THE COURT:  Just a moment.

21             MR. DOWNING:  I'm just asking when --

22             THE WITNESS:  I started with Davis Manafort --

23             MR. ANDRES:  I'm objecting to the question.

24             THE COURT:  Wait just a moment.  What's your

25   question, Mr. Downing?

1   BY MR. DOWNING:

2   Q.   Before you left to go off with G-Tech, how big was Davis

3   Manafort?

4           THE COURT:  All right.  Before you answer, what's the

5   objection?

6           MR. ANDRES:  Yeah.  There was no Davis Manafort

7   before that time.  There was Davis Manafort --

8           THE COURT:  Well, you can't testify.  What's your

9   objection?

10          MR. ANDRES:  He's misrepresenting the entities that

11  existed.  They were two entirely different --

12          THE COURT:  Well, he will have to answer the

13  question.  If something is wrong with the question, presumably

14  he'll know that, but you can't get up and tell the Court -- I'm

15  addressing you.

16          MR. ANDRES:  I'm sorry.

17          THE COURT:  You can't simply tell the Court in your

18  view what's right.  This is for the witness.

19          MR. ANDRES:  Thank you, Judge.

20          THE COURT:  All right.  Proceed.

21          MR. DOWNING:  Thank you, Your Honor.

22  BY MR. DOWNING:

23  Q.   Before you went off to work for G-Tech, the entity that

24  you were working about with Mr. Manafort, what was it called?

25  A.   That was Black, Manafort, Stone and Kelly.

1  Q.    Okay.  So that company that you were working for back --

2  A.    Yes.

3  Q.    -- back in that day, was that a larger company than what

4  you had joined Manafort again in 2006?

5  A.    It was.

6  Q.    Okay.  How much smaller was it?

7  A.    How much smaller was Davis Manafort?

8  Q.    Yes.

9  A.    It was significantly smaller.  I mean, Davis Manafort was

10  a offshoot of Black, Manafort, Stone and Kelly by some of the

11  partners.

12  Q.    And when you returned in 2006, I think you indicated on

13  your direct you took on more responsibilities.

14  A.    Over the years, that's correct.

15  Q.    Over the years.  And can you give a little detail of the

16  types of responsibilities that you took on over the years?

17  A.    Yes.  It started out as being more engaged in the

18  political campaigns.  I was asked to help set up the private

19  equity fund, as I mentioned.  It also included a number of

20  administrative responsibilities.  I think, as I stated, as the

21  number of employees decreased over the years, more

22  responsibilities were split with the few staff that remained.

23  Q.    And in terms of the administrative responsibilities, can

24  you explain what types of administrative responsibilities you

25  took over?

Gates - Cross                                                        1424

1    A.   Yes.  It was a series of things such as managing the

2    company's healthcare, some of the information with the

3    accountants that I've stated, working with the bookkeeper as an

4    example, and also doing some of the other things that

5    Mr. Manafort assigned, including working with some of his real

6    estate attorneys.

7    Q.   And in addition to these -- these responsibilities that

8    you had, there was also some travel that came along with your

9    job?

10   A.   There was.

11   Q.   And can you explain what kind of travel you did?  Did you

12   do travel within the United States?

13   A.   I did travel within the United States as well as

14   international travel.

15   Q.   And where in the United States did you travel to?

16   A.   I know a lot in New York, because Mr. Manafort would meet

17   up there, and then also in kind of around the Washington, D.C.,

18   area.  And then depending on if there were various meetings

19   that Mr. Manafort wanted me to attend, in some cases I would

20   join him.

21   Q.   And how about international?

22   A.   Internationally, it was primarily Cyprus and Ukraine, and

23   then, again, there were a host of other countries that we had

24   meetings in that we would go to.

25   Q.   And when did you -- when you came back in 2006, when did

1    you start getting involved with the offshore -- Davis

2    Manafort's offshore accounts?

3    A.    I believe it was started in late 2007, when I met with

4    Mr. Chrysostomides, and then additional responsibilities were

5    assigned to me, you know, over the subsequent years.

6    Q.    And as you came up to speed and you were working on Davis

7    Manafort's international accounts, were you also working with

8    the accountants year in and year out in terms of getting tax

9    returns ready and prepared for Davis Man- -- DMP, DMP

10   International, and Mr. Manafort?

11   A.    Yes.  I was working with the accountants and the

12   bookkeeper.

13   Q.    And year in and year out, the questions seem to come out

14   about offshore bank accounts; is that correct?

15   A.    Yes.

16   Q.    And in 2013, or go ahead a little bit, there was an issue

17   that popped up about an EVO Holdings account.

18          Do you remember that?

19   A.    I do.

20   Q.    And the question was whether or not an FBAR had to be

21   filed by Mr. Manafort for his investment in EVO Holdings.

22          Do you remember that?

23   A.    I do.

24   Q.    And that particular inquiry you happened to be involved

25   with with accounts over at KWC?

1   A.   Yes.

2   Q.   And the issue that developed was a bit of a complicated

3   issue, was it not?

4   A.   I would say so, yes.

5   Q.   And the issue that came up had to do with whether or not

6   Mr. Manafort had the requisite control to be required to file

7   an FBAR; is that correct?

8   A.   Yeah.  Actually, that year it was about foreign shares,

9   not foreign bank account.

10  Q.   Foreign shares, ownership.

11  A.   Yes, yes.

12  Q.   And there was a question about how to determine if he had

13  control, correct?

14  A.   Yes.

15  Q.   And the question was difficult enough that the folks at

16  KWC had to get an expert involved, correct?

17  A.   I don't recall who the expert was.

18          MR. DOWNING:  Would you please bring up Exhibit 201?

19  It's already been in evidence.

20          May we publish, Your Honor?

21          THE COURT:  Which exhibit?

22          MR. DOWNING:  Yes, 201.

23          THE COURT:  And it's already in evidence?

24          MR. DOWNING:  It is.

25          THE COURT:  All right.  You may do so.

1    BY MR. DOWNING:

2    Q.   Mr. Gates, please take a look at Government Exhibit 201.

3    A.   Yes.

4    Q.   And if we can flip to the second page, please?  Thank you.

5    A.   Oh, so there's no additional expert.  This is KWC.

6    Q.   Right.  It's someone in their tax department, correct?

7    A.   Yes.  This is Naji Lakkis.

8    Q.   Okay.  And they got someone with some tax expertise in

9    this area involved to determine that, in fact, an FBAR did not

10   have to be filed; is that correct?

11   A.   Yes, it appears that's their recommendation.

12   Q.   And, Mr. Gates, you don't have any expertise in the area

13   of FBAR, do you?

14   A.   I do not.

15   Q.   Have you ever read any of the IRS regulations on them?

16   A.   I have not read them in full, but I've seen them, yes.

17   Q.   You've seen parts of them, correct?

18   A.   Correct.

19   Q.   And when you were presented with KWC's expert opinion on

20   this, they have asked you a question about whether or not this

21   would be the same for another year, correct?

22   A.   Yes.

23   Q.   And you respond, "I will call you tomorrow, but based on

24   the structure, as I've learned today, we do not need to file

25   for Paul."

1           Is that correct?

2    A.   Can you show me where that is?

3    Q.   It's in the top.  It's in the box.

4    A.   Yes, I see it.

5    Q.   On page 1.  Do you see that?

6    A.   Yes.

7    Q.   And what did you mean when you said, "I will call you

8    tomorrow, but based on the structure, as I learned today"?

9    What did you mean by that?

10   A.   Yes.  I believe that was initially the structure that had

11   been proposed to KWC in which they looked at the ownership

12   percentage of EVO Holdings.

13   Q.   But you weren't making any decisions on whether or not the

14   FBAR had to be filed.  KWC was, correct?

15   A.   With respect to the foreign taxes.  However, there was an

16   associated bank account with EVO Holdings that Mr. Manafort had

17   control of.

18   Q.   But the question here, you weren't making the decision as

19   to whether or not an FBAR had to be filed, correct?

20   A.   Not an FBAR on EVO Holdings.  This related to the shares.

21   Q.   Maybe I'll be clearer.  You weren't making the decision

22   here.  It was KWC that was making the decision; is that

23   correct?

24   A.   Yes.  Based on a previous e-mail, I believe, that's not

25   here, once KWC asked the questions about it, I contacted the

1   accountants in -- or the law firm in Cyprus to ask them the

2   complete structure of EVO Holdings.

3   Q.   Okay.  Can you turn to page 2 again?

4        And that's an e-mail from -- is it Lakkis?

5   A.   Naji Lakkis, yes.

6   Q.   Lakkis.  To you, correct, dated June 26, 2012?

7   A.   Correct, copying Mr. Ayliff and Mr. O'Conor (sic).

8   Q.   And they're both employees of KWC, correct?

9   A.   Yes.

10  Q.   Okay.  And it says, "Hello, Rick."  And can you read the

11  "Based on our conversation"?

12  A.   (As read): "Based on our conversation, the only foreign

13  financial account that Paul may need to report on the FBAR is

14  the telecommunications entity.  If this is incorrect, please

15  let me know."

16  Q.   And did you ever let him know if he thought it was

17  incorrect?

18  A.   No.  Because at Mr. Manafort's request, he asked me not to

19  disclose the other foreign bank accounts.

20  Q.   And do you have an e-mail in which Mr. Manafort told you

21  that?

22  A.   There is an e-mail where he is asked directly the same

23  question and he responds no.

24  Q.   I'm asking you:  Communication between you and

25  Mr. Manafort?

1   A.    No.  A lot of our communication occurred verbally,

2   especially on subjects like this.

3   Q.    Actually, it's interesting you raise that question.

4   Because in direct, every time you wanted to say something that

5   would make Mr. Manafort be involved with your activity, you

6   said, "We had discussions."  Every single time.

7   A.    Correct.

8   Q.    And there's no record of any such discussions, are there?

9   A.    I think there's a strong record that there are a number of

10  discussions that occurred, but for the most part, Mr. Manafort

11  would employ both phone and e-mail in those discussions.

12  Q.    So with respect to every time you said "discussions" on

13  direct, this jury is supposed to just believe you; is that

14  correct?

15  A.    Yes, they are.

16  Q.    Uncorroborated believe you?

17  A.    Yes.

18  Q.    After all the lies you told and fraud you've committed,

19  you expect this jury to believe you?

20  A.    Yes.

21  Q.    Uncorroborated?

22  A.    Yes.

23  Q.    Do you hope the Office of Special Counsel thinks the same

24  way?

25  A.    Yes.

1   Q.   Because they're the ones that are going to write you the

2   5K1 letter?

3   A.   They will.

4   Q.   They're the ones that are going to let your lawyer say you

5   get probation unopposed?

6   A.   Yes.

7   Q.   Even if you lie?

8   A.   But I haven't, and I'm here to --

9   Q.   And the jury is supposed to believe that?

10  A.   Yes.  Because I'm here to tell the truth.  I'm here

11  because I made a decision to take responsibility for my

12  actions.  Mr. Manafort had the same path.  I'm here.

13  Q.   Responsibility?  Probation is responsibility for your

14  conduct?

15  A.   I don't know the sentence.

16  Q.   That's your responsibility, probation?

17  A.   The sentence is decided by the judge.

18  Q.   It seems like the government agreed you can get probation?

19  A.   The government doesn't decide.

20  Q.   For all your crimes, for all your fraud, that's your

21  responsibility?

22  A.   I have accepted responsibility.  I'm taking it and I'm

23  trying to change, yes.

24  Q.   Have you returned any of the money you stole from

25  Mr. Manafort and his entities?

1    A.    I have not.

2    Q.    When you filed a financial disclosure form after you were

3    arrested, did you indicate on the form that you have money

4    stashed away in investments?

5    A.    I don't recall filing a financial form, but if I did, I

6    would accurately report that information.

7    Q.    Do you recall representing to the Court or Pretrial

8    Services that other than your home, you really have very few

9    assets?

10   A.    No.  We included all the assets that I have.

11   Q.    Did you include the assets that you invested from your

12   embezzlement?

13   A.    I'm not sure what you mean.

14   Q.    The monies we just talked about you were unauthorized to

15   take from DMP International's accounts or Mr. Manafort.

16   A.    Most of those went into my personal account.

17   Q.    And where are they now?

18   A.    Well, those were spent over the years.

19   Q.    Oh, so you can't return it to Mr. Manafort, can you?

20   A.    No, I cannot.

21   Q.    So you're really not taking responsibility, are you?

22   A.    On that subject, no.

23   Q.    What about on the insider trading?  What about the

24   ill-gotten gains you got in insider trading?  Did you return

25   those?

Gates - Cross                                                    1433

1    A.   First, they weren't ill-gotten gains, and I paid for those

2    out of bonuses and payments that I worked off a promissory note

3    over years.

4    Q.   The $2.5 million from the investment from stolen money

5    from Mr. Manafort, any intent to return that to Mr. Manafort?

6    A.   No, because it wasn't stolen.

7    Q.   Mr. Gates, are there other frauds that you've committed

8    for which you cannot reimburse or get restitution for their

9    victims as you sit here today?

10   A.   No.

11   Q.   Now, with respect to these offshore accounts and the

12   accountants, KWC, there was testimony from Ms. Laporta that she

13   had conversations with you about the offshore accounts, the

14   Davis Manafort offshore accounts.  Is that correct?

15        Do you recall having conversations?

16   A.   Yes.  Several people at KWC had discussions with me and

17   Mr. Manafort.

18   Q.   And she stated that when she had talked to you, that you

19   had stated that the accounts were set up in a manner to not

20   have to be reported in the United States.

21        Do you recall telling her that?

22   A.   I may have, but I don't recall.

23   Q.   You don't recall that, either?

24   A.   No.  Well, specifically what I recall telling KWC is the

25   information that Mr. Manafort and I discussed is that it was

1    unnecessary to report foreign accounts because, in his view, he

2    did not have signature authority over the account.

3    Q.   And do you recall telling the Office of Special Counsel

4    that same thing?

5    A.   Yes.  Initially in my discussions with them, I indicated

6    to them that is why Mr. Manafort did not file his foreign

7    accounts.

8    Q.   And how many times did you say you met with the Office of

9    Special Counsel to prep for trial?

10   A.   Approximately 20 times.

11   Q.   No, to prep the trial.  Was it 20 trial preps or was it

12   trial prep closer to this trial?

13   A.   I think it was about 20 hours.

14   Q.   Twenty hours.

15   A.   Yes.

16   Q.   And in the 20 hours, did the Office of Special Counsel

17   prep you at all with respect to your conversation with

18   Ms. Laporta?

19   A.   No.

20   Q.   Show you any documents?

21   A.   I was shown documents, yes.

22   Q.   About that conversation?

23   A.   I don't recall.  If you have a copy, I can look at it.

24   Q.   And is that why you don't recall a conversation?  You

25   weren't prepped?

1   A.   No.  If you'd just show me a copy, I'd be happy to tell

2   you.

3   Q.   I asked you a different question.

4   A.   Repeat the question.

5   Q.   If you weren't prepped by the Office of Special Counsel,

6   have you been prepped to say, "I don't recall"?

7   A.   No.

8   Q.   Mr. Gates, in -- you gave direct testimony that as an

9   initial matter, you learned that the Cyprus accounts were set

10  up for ease of transfers from the folks in the Ukraine that

11  were going to pay for consulting services; is that correct?

12  A.   That's what Mr. Manafort indicated, yes.

13  Q.   And over time, a lot of activity went on through those

14  accounts in Cyprus with respect to money being paid for

15  consulting services; is that correct?

16  A.   That is correct.

17  Q.   Now, you had testified on direct that all of the money

18  that came in was the income of Mr. Manafort or DMP or DMP

19  International; is that correct?

20  A.   Of the income that was asked, yes, that's correct.

21  Q.   I'm sorry, can you --

22  A.   Yes.  What I mean is when we went through the documents

23  indicating the values of the contracts, those contracts were

24  specifically for the majority of political work.

25  Q.   Majority of political work.

1    A.    Yes.

2    Q.    And do you know what other amounts were for?

3    A.    Well, yes.  For example, there was one amount that was for

4    the lobbying effort that the firm undertook for the European

5    Union and the U.S.

6    Q.    And there was also considerable amounts of money that came

7    in that were supposed to be paid out to other consultants,

8    correct?

9    A.    That's correct.

10   Q.    And -- and millions of dollars, not small amounts of

11   money, correct?

12   A.    Correct.

13   Q.    And so all the money that came in was not the income of

14   DMP International.  It actually was the income of a lot of

15   different consultants; isn't that correct?

16   A.    That is correct.

17   Q.    And there were transfers made through those accounts into

18   the United States to a lot of those consultants, correct?

19   A.    Yes.

20   Q.    And to other parts of the world to consultants, correct?

21   A.    That is correct.

22   Q.    And millions of dollars.

23            In addition to facilitating this flow of funds from

24   Cyprus, did there come a time where Mr. Manafort and DMP were

25   having difficulties banking in the United States?

1    A.    Yes.

2    Q.    And what do you know about that?

3    A.    As I understood, in some of the wire transfers from

4    Cyprus, over a period of time, some of the U.S. banking

5    institutions reached out to the firm, me and Mr. Manafort,

6    indicating that the accounts would be closed because of, I

7    think, what was -- they never really reported.  They just said

8    that they have the option of closing the account, but it was

9    quickly learned that the reason they did not keep the accounts

10   open was because the money was coming from Cyprus.

11   Q.    And it was a difficult issue, correct?

12   A.    Yes.

13   Q.    I mean, not knowing whether or not your bank is going to

14   honor a transaction or transfer money can make banking and

15   doing business very difficult, correct?

16   A.    Yes, it can.

17   Q.    Now, when it came to dealing with payments out of Cyprus

18   into the United States, were there any procedures that were put

19   in place to prevent amounts from being bounced back from U.S.

20   bank accounts?

21   A.    There were no protections that I'm aware of.  We followed

22   the wiring -- or the instructions by the Cypriot law firm that

23   requested specific information about a wire, and then either

24   Mr. Manafort or I would send those wire requests to the Cyprus

25   banks.  They would then make the subsequent wire transfer.

1    Q.   With respect to sending the request to the Cypriot banks,

2    did you have occasion to make up invoices that weren't the

3    invoice of, let's say, a contractor that was getting paid?

4    A.   Yes.  As I disclosed earlier, that's correct.

5    Q.   You did.  And can you explain why you did that?

6    A.   Yes, because in that instance, as I said, the invoice

7    couldn't be in the name of Mr. Manafort.  It had to be in the

8    name of the company.

9    Q.   But you didn't just -- if a $375,000 invoice came in the

10   door, you didn't just make up a $375,000 invoice, did you?

11   A.   If that was the wire request from Mr. Manafort, yes, we

12   did.

13   Q.   And would there be a reason to take a $375,000 invoice and

14   break it down into five separate invoices?

15   A.   Yes.  There was a period of time, I think, as I disclosed

16   earlier, beginning in 2012 through part of 2013, when Cyprus

17   had experienced a banking collapse.  So within the country,

18   internally, they put what were called liquidity restrictions.

19   So you were only allowed to withdraw a certain amount of money

20   from the country over a defined period of time.  So that's why

21   the invoices were broken up into various amounts.

22   Q.   And you testified on direct that you actually had a

23   template and you'd make it look like it was an outside vendor's

24   invoice, but you were doing it for that very reason?

25   A.   No, that was related to the Grenadines.  Cyprus was

1  different.  Cyprus had a much simpler process, for the most

2  part.  It was one that they had given to Mr. Manafort and I

3  regarding five lines of information that were required.

4  Q.   And what was the -- what was the procedure in the

5  Grenadines?  And that would be Global Endeavour, correct?

6  A.   Correct.  And Global, the process in the Grenadines, as I

7  explained earlier, you had to have more documentation

8  associated with the account.  I will say, though, in Cyprus,

9  after the banking collapse in 2012, there, as I recall, was a

10  more substantial requirement in terms of documentation.

11         So there could possibly be invoices that were

12  created, i.e., breaking down the payments for the banks in

13  Cyprus.

14  Q.   And with respect to your signature authority on accounts,

15  were you instructed by Mr. Manafort at the end of 2011 to no

16  longer be a signatory on the accounts in Cyprus?

17  A.   Mr. Manafort had requested me to remove him in 2012.

18  Q.   And yourself?

19  A.   Yes.

20  Q.   But you didn't?

21  A.   I removed myself from some of the accounts; that's

22  correct.

23  Q.   But not all?

24  A.   Not all of them.

25  Q.   And was that so you can continue to maintain authority to

1  be able to embezzle funds from DMP International's accounts

2  offshore?

3  A.   No.  And let me go back.  Mr. Manafort never requested I

4  take my name off.  It was his request to take his name off and

5  have his name expunged from the records.

6  Q.   So you did not tell the Office of Special Counsel in an

7  interview that in 2012 Mr. Manafort told you to remove yourself

8  as a signator, but you did not?

9  A.   I don't recall telling them that I was to remove myself.

10 The request was to remove Mr. Manafort, and then Mr. Kilimnik

11 and myself split the various accounts that were still open.

12 But at that point in 2012, a number of the accounts were

13 closed.

14 Q.   So on direct, you were -- excuse me one second.

15          On direct, you briefly talked about an account

16 called -- or an entity called "Pompolo"?

17 A.   Yes.

18 Q.   What is that entity?

19 A.   Pompolo was an entity that we created in the UK after

20 conversing with Mr. Manafort about the problems in Cyprus with

21 moving money from Cyprus to the United States and having some

22 of those banks close.  We conferred with our attorneys down in

23 Cyprus to see if there was a better way that we could get money

24 over to the United States without having the U.S. bank account

25 closed.

1           Because Cyprus has a relationship with the U.K., it

2  was recommended to us to set up an entity in the U.K. and then

3  transfer the money from Cyprus to the U.K. and then U.K. to the

4  U.S.

5  Q.   And did you, in fact -- was -- in fact, was a company set

6  up?

7  A.   Yes, it was.

8  Q.   Pompolo?

9  A.   Yes.

10  Q.   And what bank in the U.K. was that account set up with?

11  A.   That was set up at HSBC.

12  Q.   And at the same time an account was set up at HSBC in

13  London, was an account also opened in HSBC in New York?

14  A.   It was, yes.  Well, I take that back.  I think we already

15  had the HSBC account in New York opened.  The one in the UK was

16  an addition.

17  Q.   And was the idea that being interbank at HSBC might be

18  easier to get the money into the country?

19  A.   Yes, at that time.

20  Q.   And did you -- were attempts made to do that?

21  A.   As I recall, yes.

22  Q.   And were they successful?

23  A.   I believe so, yes.

24  Q.   Now, when I asked you earlier about what Cypriot agent

25  was, I think your explanation after saying, "I don't recall,"

1  was that it had something to do with Dr. K, we'll call him?

2  A.   Yes.

3  Q.   And him consolidating amounts that were from the offshore

4  accounts, DMP's offshore accounts that were closed, is that

5  correct?

6  A.   Yes.

7  Q.   And you mentioned that you think that -- those were the

8  amounts that were transferred to you, correct?

9  A.   Yes.

10 Q.   And can you -- can you explain -- or what did you explain

11 to Dr. K as to why you would be entitled to get these kind of

12 payments?  Did you talk to him?

13 A.   No.  Dr. K never requested any information about the

14 payments, Mr. Manafort or I had sent through the wire

15 transfers.  If any documentation was needed, somebody in his

16 accounts department would reach out to either me or

17 Mr. Manafort.  But Dr. K specifically never had any inquiries.

18 Q.   So with respect to Dr. K, you didn't really deal much with

19 him directly, did you?

20 A.   Over the years, it was less frequent.  He also had another

21 gentleman, another lawyer in his firm, that was working with

22 him.

23 Q.   And who was that?

24 A.   I believe his name was George Ioannou.

25 Q.   And with respect to initiating wire transfers, I think you

1    indicated you dealt with Dr. K's daughter?

2    A.   No, his -- he had an accounts department.  His daughter

3    was actually an attorney.

4    Q.   His accounts department.  Who did you deal with in the

5    accounts department?

6    A.   The woman I recall is Christina.  I don't -- she had a

7    long last name.

8    Q.   And with respect to initiating a wire transfer, you

9    clearly, with Dr. K's firm, had the complete authority to make

10   any transfer that you had requested?

11   A.   Yes.  Mr. Manafort had given me the authority at the

12   beginning with Dr. K, so that's correct.

13   Q.   And with respect to the transfers that you've made, and

14   especially from Defendant's Exhibit 17, the $3 million, you

15   were never questioned about making those transfers, were you?

16   A.   No.

17   Q.   Not until you came here?

18   A.   That's correct.

19            THE COURT:  Questioned by whom?

20   BY MR. DOWNING:

21   Q.   By anybody?

22   A.   Well, I mean, we were asked for supporting documentation,

23   but no specific inquiries into any of the amounts that were

24   wired.

25   Q.   And Mr. Manafort wasn't keeping after you on this stuff,

1  was he?

2  A.   Mr. Manafort, in my opinion, kept fairly frequent updates

3  on the information from the accounts.  Mr. Manafort was very

4  good about knowing where the money is and knowing where to

5  spend it.

6  Q.   So it's pretty --

7           THE COURT:  Well, he missed the amounts of money you

8  stole from him, though, didn't he?

9           THE WITNESS:  Yes, that's correct.

10           THE COURT:  So he didn't do it that closely.

11                         (Laughter.)

12           THE COURT:  How much more do you have with this

13  witness?

14           MR. DOWNING:  Quite a bit, Your Honor.

15           THE COURT:  All right.  I think, ladies and

16  gentlemen, I promised you we would cease sharply at 5:30

17  because one of you has child care responsibilities.  Pass your

18  books to the right.  We'll do it now.

19           Mr. Gates, you may step down, sir, and you will

20  recall you must refrain from discussing your testimony with

21  anyone, and we will convene tomorrow morning at 9:30.

22                    (Witness stood down.)

23           THE COURT:  And give me a quantitative estimate,

24  Mr. Downing.

25           MR. DOWNING:  One moment, please.

1    I was going to try to hedge my bet, but my colleagues

2  say if I tell you I should get done in an hour, it looks like

3  we can do it.

4    THE COURT:  All right.  Good.

5    Remember to refrain from discussing the matter with

6  anyone.  Don't look at TV or anything else on this case.  Put

7  it out of your mind.  Don't do any investigation.  I'll see you

8  tomorrow morning at 9:30.

9    Have you filled in your menus?

10    THE JURORS:  Yes, Your Honor.

11    THE COURT:  It doesn't get any more exciting, does

12  it?

13    (Laughter.)

14    MR. DOWNING:  You mean the menu?

15    THE COURT:  Yes, and -- that's right, the menu

16  doesn't.

17    (Laughter.)

18    THE COURT:  But if it's not suitable to you, you'll

19  have to stand behind me in lines at Panera.  You may follow

20  Mr. Flood out.

21    (Jury out.)

22    THE COURT:  All right.  Court will stand in recess

23  until 8:30 tomorrow in another matter, and I'll stand -- start

24  this matter at 9:30.  Court stands in recess.

25    MR. ANDRES:  Thank you, Your Honor.  Have a nice

1446

1    night.

2              THE COURT:  I beg your pardon?

3              MR. ANDRES:  I said have a nice night.  Thank you,

4    Your Honor.

5              THE COURT:  Oh, thank you.  You-all do the same.

6        (Recess from 5:20 p.m., until 9:30 a.m., August 8, 2018.)

7

8                    CERTIFICATE OF THE REPORTER

9        I certify that the foregoing is a correct transcript of

10   the record of proceedings in the above-entitled matter.

11

12

13                              _____
                                            /s/
14                                  Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,      .  Criminal Action No.
                               .  1:18-CR-83
        versus                 .
                               .
PAUL J. MANAFORT, JR.,         .
                               .  August 8, 2018
            Defendant.         .  Volume VII-A.M.
------------------------------x

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            UZO ASONYE, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               GREG D. ANDRES, SAUSA
                               BRANDON L. VAN GRACK, SAUSA
                               Special Counsel's Office
                               U.S. Department of Justice
                               950 Pennsylvania Avenue, N.W.
                               Washington, D.C. 20530

FOR THE DEFENDANT:             JAY ROHIT NANAVATI, ESQ.
                               BRIAN P. KETCHAM, ESQ.
                               Kostelanetz & Fink LLP
                               601 New Jersey Avenue, N.W.
                               Suite 620
                               Washington, D.C. 20001
                                 and
                               THOMAS E. ZEHNLE, ESQ.
                               Law Office of Thomas E. Zehnle
                               601 New Jersey Avenue, N.W.
                               Suite 620
                               Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1447 - 1566)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1448

```
1   APPEARANCES:  (Cont'd.)

2   FOR THE DEFENDANT:              KEVIN M. DOWNING, ESQ.
                                   Law Office of Kevin M. Downing
3                                  601 New Jersey Avenue, N.W.
                                   Suite 620
4                                  Washington, D.C. 20001
                                     and
5                                  RICHARD W. WESTLING, ESQ.
                                   Epstein, Becker & Green, P.C.
6                                  1227 25th Street, N.W.
                                   Washington, D.C. 20037
7
    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
8                                  U.S. District Court, Fifth Floor
                                   401 Courthouse Square
9                                  Alexandria, VA 22314
                                   (703)299-8595
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1449

1                                    INDEX

2

WITNESS                          EXAMINATION      PAGE

3

4    RICHARD GATES (Resumed)

                                 CROSS            1453
5                                REDIRECT         1459
                                 RECROSS          1502
6
     MORGAN MAGIONOS
7                                DIRECT           1537

8

9                            E X H I B I T S

10

     Defendant's Exhibit No. 17 was received          1484
11   Government Exhibit Nos. 66A, 66C, 66D, 66E, 66G,  1542
     67B, and 67C were received
12   Government Exhibit No. 63 was received            1546
     Government Exhibit Nos. 447A thru 447Q and 456    1549
13   were received

14

15

16

17

18

19

20

21

22

23

24

25

1450

1    P R O C E E D I N G S

2                    (Defendant present, Jury out.)

3         THE COURT:  All right.  This is U.S. against Paul

4    Manafort.  It's 18-CR-83.  The record will reflect that counsel

5    and the defendant are present and prepared to proceed.

6         Let's see.  We were in the midst of your

7    cross-examination?

8         MR. DOWNING:  We're almost done, Your Honor.

9         THE COURT:  All right.  Let's bring the jury in.

10   I'll ask you in front of the jury how much more you have, and

11   then I'll ask you how much you have by way of redirect.

12        Can you give me the news now?

13                    (Laughter.)

14        THE COURT:  That will save -- that will save me from

15   grimacing or some other facial -- go ahead, sir.

16        MR. ANDRES:  I would say less than 30 minutes, Your

17   Honor.

18        THE COURT:  Ah.  Maybe you want that.

19                    (Laughter.)

20        THE COURT:  All right.  You may bring the jury in.

21        Thank you, Mr. Andres.

22        THE COURT SECURITY OFFICER:  One of them is

23   indisposed.

24                    (Jury present.)

25        THE COURT:  All right.  You may be seated.

1451

1          Good morning, ladies and gentlemen.  As always, we

2   will commence the day with the calling of the roll by numbers.

3          THE CLERK:  Ladies and gentlemen, as I call your

4   number, please answer "present" or "here."

5          Juror 0008.

6          THE JUROR:  Present.

7          THE CLERK:  Juror 0037.

8          THE JUROR:  Present.

9          THE CLERK:  Juror 0276.

10          THE JUROR:  Present.

11          THE CLERK:  Juror 0017.

12          THE JUROR:  Present.

13          THE CLERK:  Juror 0145.

14          THE JUROR:  Present.

15          THE CLERK:  Juror 0115.

16          THE JUROR:  Present.

17          THE CLERK:  Juror 0082.

18          THE JUROR:  Present.

19          THE CLERK:  Juror 0009.

20          THE JUROR:  Present.

21          THE CLERK:  Juror 0299.

22          THE JUROR:  Present.

23          THE CLERK:  Juror 0091.

24          THE JUROR:  Present.

25          THE CLERK:  Juror 0302.

1   THE JUROR:  Present.

2   THE CLERK:  Juror 0060.

3   THE JUROR:  Present.

4   THE CLERK:  Juror 0296.

5   THE JUROR:  Present.

6   THE CLERK:  Juror 0054.

7   THE JUROR:  Present.

8   THE CLERK:  Juror 0127.

9   THE JUROR:  Present.

10  THE CLERK:  And 0133.

11  THE JUROR:  Present.

12  THE COURT:  All right.  Good morning, again, ladies

13  and gentlemen, and let me begin again by asking you to confirm

14  to me that you were successful in following the Court's

15  instructions to refrain from discussing the matter among

16  yourselves or with anyone or undertaking any investigation.

17  THE JURORS:  Yes, Your Honor.

18  THE COURT:  Thank you.

19  All right.  We're in the midst of the

20  cross-examination of Mr. Gates, and, Mr. Downing, your estimate

21  of how much more, I think, was about a half an hour or 45

22  minutes?

23  MR. DOWNING:  I think I might even get down to

24  15 minutes, Your Honor.

25  THE COURT:  All right.  And, Mr. Andres, your

1    prediction as to how much redirect you would have was?

2            MR. ANDRES:  Less than a half-hour, Your Honor.

3            THE COURT:  Less than a half-hour, good.

4            All right.  Bring Mr. Gates in, please.

5    RICHARD GATES, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, RESUMED

6            THE COURT:  Mr. Gates, you'll recall, sir, you remain

7    under oath.  You may resume the stand.

8            THE WITNESS:  Thank you.

9                    CROSS-EXAMINATION (Cont'd.)

10   BY MR. DOWNING:

11   Q.   Good morning, Mr. Gates.

12           THE COURT:  All right.  Mr. Downing, you may proceed

13   and I'll give you some latitude for continuity purposes.

14           MR. DOWNING:  Thank you, Your Honor.

15   BY MR. DOWNING:

16   Q.   Mr. Gates, on direct examination from the Government, you

17   were asked some questions about an interview that you gave in

18   July of 2014.  Do you remember that?

19   A.   I do.

20   Q.   And it was an interview with FBI agents, correct?

21   A.   Yes.

22   Q.   And at that interview were also lawyers from the

23   Department of Justice, correct?

24   A.   That is correct.

25   Q.   And you were brought into that interview to discuss

Gates - Cross                                                    1454

1  payments that had come out of the Ukraine into DMP's offshore

2  accounts; is that correct?

3  A.   Yes, that was one of the topics.

4  Q.   And overall, the investigation you were told was about

5  monies that Mr. Yanukovych may have inappropriately taken out

6  of the Country of Ukraine; is that correct?

7  A.   That was what was described to us, yes.

8  Q.   And both you and Mr. Manafort met with the FBI; is that

9  correct?

10  A.   Yes.

11  Q.   And both you and Mr. Manafort disclosed to the FBI the

12  offshore accounts in Cyprus that we've been discussing,

13  correct?

14  A.   I don't know what was in Mr. Manafort's interview, but I

15  did disclose some of the accounts, yes.

16  Q.   And you also disclosed that there were also accounts in

17  St. Vincent's and the Grenadines, correct?

18  A.   I believe so, yes.

19  Q.   And this interview took place in July of 2014?

20  A.   Yes.

21  Q.   And when you met with Mr. Manafort, before having this

22  interview, did Mr. Manafort tell you that you should disclose

23  the activity in the Cypriot accounts?

24  A.   He indicated that we should be open and provide the

25  information about the questions that were asked of us.

Gates - Cross                                                          1455

1   Q.   So I'm going to ask you to take a look at what's been

2   marked Defendant's Exhibit 22.

3            And if you could turn in to Page 3?  And take a

4   minute and read through that.

5            THE COURT:  This is a number of pages.  Do you want

6   him to read the whole thing?

7            MR. DOWNING:  I asked him to pay attention to Page 3,

8   Your Honor.

9            THE COURT:  All right.

10  BY MR. DOWNING:

11  Q.   And the first two paragraphs on Page 4, please, Mr. Gates.

12  A.   Okay.  Okay.

13  Q.   So, Mr. Gates, as part of the FBI interview, you had

14  disclosed that DMP and Mr. Manafort had been hired as

15  consultants to assist in campaigns in the Ukraine, correct?

16  A.   That is correct.

17  Q.   And you also disclosed that payments that came into

18  accounts that were set up in Cyprus were for the offshore

19  consulting in the Ukraine; is that correct?

20  A.   Yes.

21  Q.   And you also disclosed to the FBI that you had been told

22  or Mr. Manafort had been told to open accounts in Cyprus for

23  the ease of payment from the Ukraine; is that correct?

24  A.   Yes, that was one of the reasons.

25  Q.   And you also indicated that invoices -- you had prepared

1    invoices for campaign assistance that were also paid into the

2    accounts that were held in Cyprus by DMP International,

3    correct?

4    A.   That is correct.

5    Q.   And you identified accounts such as Lucicle, correct?

6    A.   Yes.

7    Q.   You identified Bletilla Ventures?

8    A.   Yes.

9    Q.   You identified Leviathan Advisors?

10   A.   Yes.

11   Q.   Yiakora was also identified by you?

12   A.   Yes.

13   Q.   And LOAV, correct?

14   A.   Yes.

15   Q.   And all of these -- you also identified Global Endeavours

16   as something that was set up in St. Vincent's, correct?

17   A.   Yes.  The entity itself was set up in Cyprus.  The bank

18   account was in the Grenadines.

19   Q.   So you and Mr. Manafort agreed to be open and truthful

20   about the activities in Cyprus and in the Ukraine, correct?

21   A.   Yes.

22   Q.   And you felt that the interview you gave in 2014 was a

23   truthful interview about the operations of DMP in the Ukraine

24   and in Cyprus, didn't you?

25   A.   Yes.

1  Q.   Did you have occasion to talk to Mr. Manafort after your

2  interview?

3  A.   I did.

4  Q.   And after his interview?

5  A.   Yes.

6  Q.   And did he indicate to you that he was also truthful with

7  the FBI in his interview?

8  A.   To the extent of my recollection, yes.

9  Q.   Now, there were some questions of you about some loans and

10 the activities in acquiring loans in the 2015-2016 time frame?

11 A.   Yes.

12 Q.   Do you recall that?

13       And there were -- there were some questions of you

14 about decreasing income and DMP International's activities; is

15 that correct?

16 A.   Yes.

17 Q.   And that a lot of the campaigns had been done and were

18 finished; is that correct?

19 A.   Yes.  The last campaign was October of 2014.

20 Q.   Now, I believe you --

21       THE COURT:  I'm sorry.  I didn't hear that.

22       THE WITNESS:  Oh, sorry, Your Honor.  The last

23 campaign was in October of 2014.

24       THE COURT:  Next question.

25 BY MR. DOWNING:

1   Q.   I believe you also testified that there was some

2   outstanding monies that were due to DMP for one of the

3   campaigns that DMP ran?

4   A.   For the last campaign, correct.

5   Q.   And who was the gentleman, Porochkin?  Poroshenko, is that

6   right?

7   A.   The outstanding amount was related to the Opposition Bloc.

8   Q.   The Opposition Bloc?

9   A.   It was a parliamentary election.

10  Q.   Thank you.  And the outstanding amount was approximately

11  $2.4 million?

12  A.   That is correct.

13  Q.   And there were efforts by Mr. Manafort and others to try

14  to collect that money; is that correct?

15  A.   That is correct.

16  Q.   And those efforts continued through 2016; is that correct?

17  A.   Yes.

18  Q.   And with respect to Mr. Manafort's overall financial

19  picture, were you aware in the 2015-2016 time frame, that

20  Mr. Manafort had a net worth of around $20 million?

21  A.   No.  I was not privy to his personal assets.

22  Q.   Did you have any idea?

23  A.   I had some idea from some of the accounting statements

24  that Ms. Washkuhn had sent over, but that related more to the

25  business.

1  Q.   And where would you -- if at the time you were looking at

2  these accounting records, where -- in 2015 and '16, where did

3  you think his net worth was?

4  A.   Net worth, I don't know because of the value of the

5  properties.  I thought somewhere in the realm of 6 to 10

6  million.

7            MR. DOWNING:  No further questions.

8            THE COURT:  Any redirect?

9            MR. ANDRES:  Yes, Your Honor.

10           THE COURT:  All right.  You may proceed.

11                       REDIRECT EXAMINATION

12 BY MR. ANDRES:

13 Q.   Now, Mr. Gates, Mr. Downing asked you on cross-examination

14 about some -- about your interview with the FBI in July 2014.

15 Do you remember that?

16 A.   I do.

17 Q.   Okay.  And at the time of that interview, did you

18 understand that you were under investigation?

19 A.   I understood that we were not under investigation.

20 Q.   And did you understand that Mr. Manafort was under

21 investigation?

22 A.   I understood he was not under investigation either.

23 Q.   And you were interviewed by FBI agents; is that correct?

24 A.   We were.

25 Q.   Was anyone from the IRS there?

1   A.    No.  I believe it was DOJ.

2   Q.    Were you asked to produce your tax returns?

3   A.    No.

4   Q.    Was Mr. Manafort, if you know, asked to produce his tax

5   returns?

6   A.    I don't know.

7   Q.    Okay.  At the time of the interview, were the Cypriot

8   accounts closed?

9   A.    The majority of the Cypriot accounts were closed, yes.

10  Q.    Okay.  And at the time of the interview, had Mr. Manafort

11  asked you to take certain action?

12  A.    He did.

13  Q.    What did he ask you to do?

14  A.    He asked me to go meet with one of the Russian -- excuse

15  me, the Ukrainian businessman and to inform him of the FBI

16  interview.

17  Q.    And why did he ask you to do that?

18  A.    He asked me to do that because he wanted to know more

19  information about one of the entities that was paying

20  Mr. Manafort and to understand if that entity was viewed as a

21  clean entity, meaning that it had only been used to make

22  payments to Mr. Manafort.

23  Q.    And during that interview, there was a reference to

24  various of the Cypriot accounts; is that correct?

25  A.    Yes.

1   Q.   Do you remember the names of any of those accounts?

2   A.   I do.  It was similar to the names that I testified to on,

3   I guess, Monday.  It was Leviathan, Bletilla, Actinet,

4   Peranova, Global Highways, Serangon, Lucicle, and then there

5   was an additional list that I provided to the FBI that day of

6   accounts that they did not have.

7   Q.   Did you tell the FBI that there was hidden income in those

8   accounts?

9   A.   No, I did not.

10  Q.   Did you tell the FBI that you didn't -- or were you asked

11  by the FBI whether or not you identified those accounts on your

12  tax return?

13  A.   I don't recall if we were.

14  Q.   And do you know if Mr. Manafort was asked those questions?

15  A.   No, I don't.

16  Q.   And when you pled guilty in front of the judge in

17  Washington, D.C., did your guilty plea relate to those

18  accounts?

19  A.   No.

20  Q.   Your guilty plea to conspire --

21  A.   Oh, to the Cyprus accounts?

22  Q.   Yes?

23  A.   Yes, I did.  Sorry.

24  Q.   How did your guilty plea relate to the Cyprus accounts?

25  A.   The guilty plea related to the Cyprus accounts to the

1   extent that I was wiring money for Mr. Manafort from those

2   accounts and then not reporting the income in the United States

3   nor the foreign bank accounts.

4   Q.   Okay.  And after this FBI interview, was there any

5   follow-up?

6   A.   No, there was not.

7   Q.   Okay.  And you weren't present during Mr. Manafort's

8   interview, were you?

9   A.   I was not.

10  Q.   And you're not aware -- are you aware from the details of

11  which accounts he was asked about?

12  A.   I was not.

13  Q.   Okay.  Would you be surprised if he -- if you learned that

14  he said he only had a recollection about certain accounts?

15  A.   I don't know how many accounts Mr. Manafort recalls.

16  Q.   But to be clear, the subject matter of that interview was

17  the subject matter of your guilty plea in large respect?

18  A.   It was, yes.

19          THE COURT:  Well, what was the subject of his guilty

20  plea is recorded in the plea agreement.

21          Were you charged in the District of Columbia with --

22  how many counts?

23          THE WITNESS:  I believe it was 12 counts, Your Honor.

24          THE COURT:  And all of those counts with the

25  exception of the one or two that you pled guilty to, I think

Gates - Redirect                                                    1463

1    one, were dismissed as a result of your plea; is that right?

2              THE WITNESS:  I believe so.

3              THE COURT:  So you pled guilty to two counts, one of

4    which was in the indictment in the District of Columbia, and

5    the other one related to conduct outside of that.

6              THE WITNESS:  That is correct.

7              THE COURT:  Next question.

8    BY MR. ANDRES:

9    Q.   With respect to the Count 1 conspiracy against the United

10   States that you pled guilty to, did that relate to the foreign

11   Cypriot accounts?

12   A.   It did.

13   Q.   And did it relate to the filing of a false tax return for

14   Mr. Manafort?

15   A.   It did.

16   Q.   And did it relate to the filing of a false tax return as

17   it related to income?

18   A.   It did.

19   Q.   And was that income hidden in the accounts in Cyprus?

20   A.   It was.

21   Q.   And did it relate to a false filing as it related to the

22   failure to disclose foreign bank accounts?

23   A.   It did.

24   Q.   And did that relate to the Cypriot accounts?

25   A.   Yes.

1    Q.    And did you plead guilty to conspiring to fail to file

2    FBAR accounts for Mr. Manafort's foreign bank accounts?

3    A.    I did.

4    Q.    And did that relate to the overseas accounts in the

5    Cyprus?

6    A.    They did.

7    Q.    On cross-examination, Mr. Gates, you were asked about your

8    guilty plea and whether or not you made false statements to the

9    FBI.  Do you remember that?

10   A.    I do.

11   Q.    Mr. Gates, did you make false statements to the FBI?

12   A.    Only the one second count.

13   Q.    And that, that was a false statement that you made to the

14   FBI?

15            THE COURT:  You're leading now.

16            THE WITNESS:  Oh, to the FBI?  No, it was not to the

17   FBI.

18            THE COURT:  This jury is not going to know what

19   question you asked.  Re-ask your question.

20            MR. ANDRES:  Sure.  Certainly, Judge.

21   BY MR. ANDRES:

22   Q.    You pled guilty to making a false statement to the FBI; is

23   that correct?

24   A.    Yes.

25   Q.    You were asked about that on cross-examination by

1  Mr. Downing?

2  A.    Correct.

3  Q.    What did you say to the FBI and the Government that was

4  false?

5  A.    I indicated to them that I had been aware of a meeting

6  that Mr. Manafort attended with a United States Congressman and

7  had met with Mr. Manafort in 2016 regarding that meeting.

8          When the FBI confronted me with a document that

9  showed that Mr. Manafort had, in fact, met with the Congressman

10  and discussed a specific issue, I had not informed the FBI of

11  that, and I was under oath, and I made a mistake, and I regret

12  it.

13  Q.    And that statement was false?

14  A.    It was.

15  Q.    You knowingly and intentionally made a false statement to

16  the FBI?

17  A.    That is correct.

18  Q.    As you sit here today, do you have any doubt in your mind

19  as to whether that was a false statement?

20  A.    No.

21  Q.    You were asked questions about your plea agreement on

22  cross-examination by Mr. Downing.  Do you remember that?

23  A.    Yes.

24  Q.    Do you remember that Mr. Downing asked you about the

25  possibility of getting probation?

1   A.   Yes.

2   Q.   And do you remember that Mr. Downing asked if the terms of

3   your plea agreement let your lawyer argue that you should have

4   probation and no jail time?  Do you remember that?

5   A.   I do.

6   Q.   And Mr. Downing asked you if such a motion would be

7   unopposed by the Special Counsel's Office?  Do you remember

8   that?

9   A.   Yes.

10  Q.   With respect to the promises that have been made with your

11  plea agreement, are they all contained in your written plea

12  agreement?

13  A.   They are.

14  Q.   Okay.  And you testified about your written plea agreement

15  during your direct examination; is that right?

16  A.   I did.

17  Q.   I'd like to ask you to turn to Government Exhibit 2F,

18  which is already in evidence.

19           MR. ANDRES:  Can I publish that, Your Honor?

20           THE COURT:  Yes, you may.

21  BY MR. ANDRES:

22  Q.   Can you tell me what Government Exhibit 2F is?

23  A.   This is a copy of my plea agreement.

24  Q.   Okay.  And this contains all of the promises in it from

25  the Government; is that correct?

Gates - Redirect                                                      1467

1   A.    That is correct.

2   Q.    And all the promises that you made to the Government?

3   A.    Yes.

4   Q.    And this document was entered into the docket in the

5   District Court in Washington, D.C.; is that correct?

6   A.    Yes.

7   Q.    Can I ask you to turn to Paragraph 9 on Page 6?

8   A.    Okay.

9   Q.    On Paragraph 9, what is the title of Paragraph 9?

10  A.    "Government's Obligations."

11  Q.    Okay.  And -- okay.

12         And Paragraph 9 starts on Page 6; is that right?

13  A.    Yes, it does.

14  Q.    And it continues onto Page 7?

15  A.    Yes.

16  Q.    Okay.  With respect to the first full sentence on Page 7,

17  can you read that to the jury?

18  A.    Yes.  "The Government will bring to the Court's attention

19  at the time of sentencing the nature and extent of your

20  client's cooperation or lack of cooperation."

21  Q.    I'm sorry, Mr. Gates, on Page 7?

22  A.    Oh, sorry.

23  Q.    The first full sentence that starts with "Defendant."

24  A.    "Defendant will then be free to argue for any sentence

25  below the advisory Sentencing Guidelines range calculated by

1  the Probation Office, including probation."

2  Q.   And read the next sentence.

3  A.   "Depending on the precise nature of the defendant's

4  substantial assistance, the Office may not oppose defendant's

5  application."

6  Q.   Did the, did the Government agree in this document to not

7  oppose a sentence of probation?

8  A.   No, it did not.

9  Q.   Okay.  When Mr. Downing was questioning you on

10  cross-examination, did he show you this document?

11  A.   No, he did not.

12  Q.   Has the Government made any promise to you about what your

13  sentence will be?

14  A.   No, it has not.

15  Q.   On cross-examination, you were asked questions about your

16  stealing money or embezzlement from Mr. Manafort.  Do you

17  remember that?

18  A.   I do.

19  Q.   Have you ever been charged with any crimes relating to

20  that money?

21  A.   I have not.

22  Q.   In your first indictment in Washington, were you charged

23  with any crimes?

24  A.   No.

25  Q.   How about here in the Eastern District of Virginia?

1   A.    No.

2   Q.    Did Mr. Manafort ever confront you about that?

3   A.    He did not.

4   Q.    As far as you understand, your understanding, how did the

5   Government know that you embezzled money from Mr. Manafort?

6   A.    I told the Government that I did.

7   Q.    And how did Mr. Downing know, to the best of your

8   understanding, that you -- that you embezzled money from

9   Mr. Manafort?

10  A.    As I understood, Mr. Downing received the 302 reports from

11  the FBI during my interviews, so that he was able to gather the

12  information from that document.

13  Q.    With respect to --

14              MR. DOWNING:  Objection, Your Honor.  Speculation.

15              THE COURT:  That's not an objection.

16              MR. DOWNING:  How would he know how I learned of this

17  fraud?

18              THE COURT:  The proper way to have proceeded is when

19  he asked the question, you should have objected.  He's asked

20  and answered the question, and I'm going to overrule the

21  objection.

22              But you don't know, one way or the other, how he

23  learned of it, do you?

24              THE WITNESS:  I do not.

25              THE COURT:  All right.  That takes care of it.

1  BY MR. ANDRES:

2  Q.   With respect to --

3            MR. ANDRES:  May I continue, Your Honor?  I'm sorry.

4            THE COURT:  Yes, you may.

5  BY MR. ANDRES:

6  Q.   With --

7            THE COURT:  But finish.

8  BY MR. ANDRES:

9  Q.   With respect to the funds that you took from Mr. Manafort,

10 how did you charge those?

11 A.   When you say "charge," what do you mean?

12 Q.   Did you charge them as expenses?

13 A.   Yes, the majority, yes.

14 Q.   Okay.  And with respect to expenses, how were those paid

15 for?

16 A.   The expenses, across the board for the company, for the

17 most part, were ultimately reimbursed to the Ukrainian clients.

18 Q.   So Mr. Manafort wouldn't have noticed any loss in his

19 money or income because the money was passed on to --

20           THE COURT:  The question is now leading.

21 BY MR. ANDRES:

22 Q.   With respect to those funds, who paid for them?

23 A.   The Ukrainian businessman.

24 Q.   During the cross-examination, you were asked questions

25 about the FBAR filings and KWC.  Do you remember that?

1    A.    I do.

2    Q.    And you pled guilty to -- to conspiring with Mr. Manafort

3    to fail to file FBARs; is that correct?

4    A.    That is correct.

5    Q.    And that related to overseas accounts?

6    A.    It did.

7    Q.    And what foreign countries were those accounts in?

8    A.    Cyprus, the Grenadines, and one in the United Kingdom.

9    Q.    And they involved bank accounts?

10   A.    They did.

11   Q.    Mr. Gates, did you need to -- did you need to consult with

12   an expert to know that Cyprus was a foreign country?

13   A.    No.

14   Q.    Did you need to consult with an expert to know that those

15   were bank accounts?

16   A.    No.

17   Q.    Did you need to consult with an expert to know that the

18   money Mr. Manafort earned from the income in foreign bank

19   accounts in Cyprus had to be disclosed on your tax returns?

20   A.    No.

21   Q.    With respect to your own conduct, you were charged with

22   respect to failing to file FBARs for your own accounts as well;

23   is that correct?

24   A.    That is correct.

25   Q.    And where were those accounts located?

1  A.   United Kingdom.

2  Q.   Did you consult with an expert to know that the United

3  Kingdom was a foreign country?

4  A.   No, I did not.

5  Q.   And did you consult with an expert --

6        THE COURT:  This is all irrelevant to this case.

7        MR. ANDRES:  He was asked -- I'm sorry.  Your Honor,

8  I'll move on.

9        THE COURT:  Yes, you will.

10  BY MR. ANDRES:

11  Q.   With respect to EVO Holdings, you were asked questions

12  about EVO Holdings on cross-examination.  Do you remember that?

13  A.   I do.

14  Q.   Can you explain to the jury what EVO Holdings is?

15  A.   EVO Holdings is a Cyprus-based company that was set up to

16  hold an asset that was purchased through Mr. Manafort's private

17  equity fund.

18  Q.   Okay.  Were there any bank accounts related to EVO

19  Holdings?

20  A.   There was.

21  Q.   What bank accounts?

22  A.   It was an EVO Holdings bank account in Cyprus.

23  Q.   Okay.  During the discussion about the EVO Holdings

24  issues, there were communications with Mr. Manafort's tax

25  accountants; is that right?

1    A.    Correct.

2    Q.    The accountants at KWC?

3    A.    Yes.

4    Q.    And Mr. Downing asked you about that on cross-examination?

5    A.    He did.

6    Q.    Okay.  During the discussion about EVO Holdings, did

7    anyone disclose to the tax accountants or the tax preparers

8    that there was a foreign bank account related to EVO Holdings?

9    A.    No.  The only piece of information that was disclosed was

10   that there were foreign shares.

11   Q.    And at any time during the time that you worked on

12   Mr. Manafort's taxes, did either you or Mr. Manafort disclose

13   to the tax preparers that there were foreign accounts?

14   A.    No.

15   Q.    And if you give false information, Mr. Gates, to tax

16   preparers, can you expect appropriate advice?

17   A.    No.

18   Q.    You were asked questions on cross-examination about your

19   trial preparation.  Do you remember that?

20   A.    I do.

21   Q.    Mr. Downing asked you if anyone from the Special Counsel's

22   office told you how to answer any questions; is that right?

23   A.    Yes.

24   Q.    Were you told how to answer any questions?

25   A.    The only answer I was told is to tell the truth.

Gates - Redirect                                                         1474

1    Q.    You were shown a series of exhibits by Mr. Manafort -- I'm

2    sorry -- by Mr. Downing.  Do you remember that?

3    A.    Yes.

4    Q.    You were shown Defense Exhibit 14.

5    A.    Yes.

6    Q.    Do you have that up there?

7    A.    I do.

8    Q.    What does that relate to, Defense Exhibit 14?

9    A.    It relates to a wire transfer request from one of the

10   offshore accounts.

11   Q.    And for what account?

12   A.    Global Endeavour.

13   Q.    Who set up Global Endeavour?

14   A.    Our lawyers in Cyprus.

15   Q.    Who specifically?

16   A.    At the direction of Mr. Manafort.

17   Q.    And what money was included in the Global Endeavor

18   account?

19   A.    Funds from the Ukrainian political elections.

20   Q.    And that's a foreign bank account; is that right?

21   A.    That's correct.

22   Q.    And Mr. Manafort had money in it?

23   A.    He did.

24   Q.    Did he disclose that on his taxes?

25   A.    To my knowledge, no.

1    Q.   And that's what you pled guilty to as part of the Count 1

2    conspiracy; is that correct?

3    A.   That is correct.

4    Q.   Can you look at Government Exhibit -- I'm sorry -- Defense

5    Exhibit 15?

6              THE COURT:  And avoid leading.

7              MR. ANDRES:  Yes, sir.

8              THE WITNESS:  Okay.

9    BY MR. ANDRES:

10   Q.   What is Defense Exhibit 15?

11   A.   It's another wire request form for an offshore account.

12   Q.   What offshore account?

13   A.   Again, it's Global Endeavour.

14   Q.   And who set up Global Endeavour?

15   A.   It was at the direction of Mr. Manafort.

16             THE COURT:  He didn't ask you whose direction.  He

17   asked:  Who set it up?

18             THE WITNESS:  Okay.  The Cypriot attorneys set it up.

19             THE COURT:  Next question.

20   BY MR. ANDRES:

21   Q.   And what funds were included in that?

22   A.   Funds from the work from political campaigns.

23   Q.   Okay.  Do you have Defense Exhibit 17 there as well?

24   A.   No.

25   Q.   It's a chart.

Gates - Redirect                                                    1476

A.   No, I do not.

          MR. ANDRES:  Do you have it, 17?  Oh, it's right
here.  Can I use that?

          MR. DOWNING:  Yeah, sure.

          MR. ANDRES:  Okay.  Mr. Flood, can I ask you --

          MR. DOWNING:  Your Honor, we don't object to
Defendant's Exhibit 17 being admitted into evidence at this
time.

          MR. ANDRES:  It's not admitted, Your Honor.  We're
not asking to admit it.

          THE COURT:  You don't want to admit it?

          MR. ANDRES:  No, I'm not asking to admit it.

          MR. DOWNING:  Your Honor, we would move it in as a
1006 summary that's been authenticated as accurate by the
United States Government.

          THE COURT:  All right.  I think I've heard a 1006
argument in another context.  Do you oppose its admission?

          MR. ANDRES:  Your Honor --

          THE COURT:  I'm just asking.  Yes or no?

          MR. ANDRES:  Yes.  It's not complete.

          THE COURT:  All right.

          MR. DOWNING:  Your Honor, I believe that is an
inaccurate representation by the United States Government.
That came directly out of a charging instrument that this
Government returned in this district.  That's what this is.

1    It's a copy of that.  It is definitely complete.

2           MR. ANDRES:  Your Honor, I'm happy to respond or come

3    to the sidebar, whatever Your Honor pleases.

4           THE COURT:  You do want to use this document?

5           MR. ANDRES:  I'm going to use it in the same way

6    defense did, by asking the defense -- the witness to look at

7    it.  But --

8           THE COURT:  All right.

9           MR. ANDRES:  -- this is a copy of the --

10          THE COURT:  But they're now offering -- they're going

11   to offer it, so I'll have to consider whether I admit it, and

12   the allegation -- I'll have you come to the bench, but the

13   allegation is that the document came from the Government, was

14   attached to a charging document.

15          Come to the bench.

16          (Bench conference on the record.)

17          THE COURT:  Mr. Downing, where do you think the

18   document came from?

19          MR. DOWNING:  This is a line-by-line copy of what was

20   contained in the indictment that was returned here in the

21   Eastern District of Virginia.

22          THE COURT:  This exact document --

23          MR. DOWNING:  Correct.

24          THE COURT:  -- or did somebody copy it?

25          MR. DOWNING:  Copy, an exact copy.

Gates - Redirect                                                      1478

1            THE COURT:  She's got to get all of us --

2            MR. DOWNING:  Sorry.

3            THE COURT:  -- and if we're both talking, she can't

4    get us.

5            Is this a verbatim, exact copy of something that was

6    attached to the indictment?

7            MR. DOWNING:  Yes.  We represent it is.

8            THE COURT:  All right.  And you want to offer it?

9            MR. DOWNING:  Yes, as a summary.  This is the

10   $3 million that we questioned Mr. Gates about in his

11   embezzlement.

12           THE COURT:  And you also want to question this

13   witness about this?

14           MR. ANDRES:  Not if it's going to be admitted as an

15   exhibit, Your Honor.  I'm happy to wait, but I'd like to

16   address that.

17           THE COURT:  Yes, go ahead.

18           MR. ANDRES:  Okay.  First of all, I'm on questioning

19   now, and I'm not aware that defense is allowed to admit

20   exhibits while I'm there.  Putting that aside, I think the

21   indictment --

22           THE COURT:  I think you should put it aside because I

23   am going to get a request to have it admitted --

24           MR. ANDRES:  Fair enough.

25           THE COURT:  -- so I need to deal with it.

1          But you're correct to point out that this isn't the

2    time to admit a piece of evidence on behalf of the defendant.

3    I understand that.

4          MR. ANDRES:  This is from the indictment, Judge.  If

5    you're going to send the indictment back to the jury --

6          THE COURT:  I'm not.

7          MR. ANDRES:  Well, this is the --

8          THE COURT:  At the moment, I'm not.  I'm going to

9    give you an opportunity and you an opportunity to address

10   whether I should.  I'm inclined not to.  I'll give you a

11   preview of what I'm thinking, and you can address it.  You may

12   want it; you may not want it.  I don't know.

13         There's a great deal in the indictment that's sort of

14   argument.  It's the government's argument about these sleazy

15   people, and I'm not inclined to admit anything other than the

16   exact counts and none of the previous paragraphs.  On the other

17   hand, I'm inclined to leave it all out.  I expect you've given

18   enough information.  But this isn't the time to decide whether

19   I'm going to send something back with the jury.  I will give

20   you an opportunity to tell me what you think about that, and I

21   will give you an opportunity to tell me as well.

22         Now, what -- Mr. Andres is correct, this isn't an

23   opportunity for you to offer because he's in the midst of his,

24   but if I'm going to admit it, if I were Mr. Andres, I'd like to

25   know that now before I am questioning a witness.

Gates - Redirect                                                    1480

1           Wouldn't you?

2           MR. ANDRES:  Yes, Judge.

3           THE COURT:  All right.  So I'm going to consider it

4    now.

5           MR. ANDRES:  My argument, Judge, is this is part of

6    the indictment, and if Mr. Downing wants to include it, he

7    should have to include the entire indictment.  Snipping pieces

8    out of it are misleading.

9           I don't doubt at all --

10          THE COURT:  You mean what you attached makes the

11   indictment misleading?

12          MR. ANDRES:  No, it's not attached.

13          THE COURT:  I'm not moved by an argument that he

14   either has to swallow the whole pill or none of it.  All I'm

15   interested in is whether if he offers -- you're going to offer

16   it.

17          MR. DOWNING:  Yes, Your Honor.

18          THE COURT:  And if you're going to object to it,

19   let's resolve that now.

20          MR. ANDRES:  That was my argument, Judge.  If you're

21   going to -- if that's unpersuasive to you, then I'm ready to

22   proceed, and I don't have any objection to it being admitted,

23   and that's that.  I just don't think it's -- listen, I have

24   objected.  I don't doubt that Mr. Downing took this from the

25   indictment.  That's fine.  We can check it afterwards.

1          THE COURT:  Well, I hope somebody from the government

2     checked it before they attached it to an indictment.

3          MR. ANDRES:  It's not attached, Judge.  It's in the

4     indictment.

5          THE COURT:  Oh.

6          MR. ANDRES:  It's not an attachment.  This is the

7     body of the indictment.  That's the problem.

8          THE COURT:  I see.  I see.

9          MR. ANDRES:  The indictment -- and the reason -- I'm

10    sorry, the reason why I raised the question of whether you're

11    going to admit the indictment is this is tantamount to

12    including the indictment and sending it back to the jury,

13    because it's part of the indictment.

14         THE COURT:  Well, I assume, though, that the

15    government would have checked something.  They wouldn't put

16    something false in an indictment.

17         MR. ANDRES:  That's not the issue.

18         THE COURT:  Well, it's an issue for me.

19         MR. ANDRES:  No, the question isn't whether there's

20    something inaccurate in the indictment.  I'm saying I didn't

21    take what Mr. Downing has marked as Government (sic) Exhibit

22    17, which we got for the first time last night, I haven't

23    checked that against the indictment to see if it matches up.

24    I'm not doubting that it --

25         THE COURT:  Well, I will give you that opportunity if

1    I admit it.  You may certainly go and check it.

2              Go ahead.

3              MR. ANDRES:  That's it.  This is the indictment.

4    This is excerpts from the indictment, and that's what my

5    objection is, is it's only part of the indictment, and

6    that's -- unless Your Honor is going to send the whole

7    indictment back, I think it's misleading.

8              THE COURT:  All right.  What's your view?

9              MR. DOWNING:  The chart itself was in the indictment

10   as a --

11             THE COURT:  The chart.  You're referring to --

12             MR. DOWNING:  This is the chart.

13             THE COURT:  -- these three pages?

14             MR. DOWNING:  Correct.  Appear in the indictment as a

15   summary of the transfers that came from the offshore accounts

16   of DMP International that went to Mr. Gates and to Mr. Gates'

17   account for which he did not report on his tax return.  That's

18   exactly what I asked him about yesterday.

19             It also represents items that we believe are

20   embezzlement.  We also questioned about that.

21             That's the purpose of this, using this chart.  That's

22   it.

23             THE COURT:  I'll give you an opportunity to look and

24   ensure that it is complete and that they haven't omitted

25   something, but -- and, of course, you have an opportunity --

1   your case isn't closed yet.  You may do as you wish.

2                MR. ANDRES:  Okay.

3                THE COURT:  But I don't have it in the record yet.

4   We'll have to do that on recross if you -- yes?

5                MR. ASONYE:  We were just consulting with each other.

6                THE COURT:  All right.  If you do that, please ask --

7   please say you need an opportunity to consult.  Then you can

8   consult with him.  And I'm talking, and it interrupts me.  You

9   understand that.  I think you would feel the same way.

10               Do you need an opportunity to consult?

11               MR. ASONYE:  No.  No, we don't.  I said my piece,

12  Your Honor.

13               THE COURT:  Anything further, Mr. Downing?

14               MR. DOWNING:  No, Your Honor.

15               THE COURT:  All right.  We had this bench conference.

16  I'm not clear that I have any issue in front of me.  If you

17  wish to offer this as an exhibit at the appropriate time, I'll

18  consider it.  You may state your objection then, and I will

19  rule on it.

20               As of this time, there's -- at this moment, I don't

21  think I have a question before me.

22               MR. ANDRES:  Your Honor, I don't object to its

23  admission since you're going to admit it, and we might as well

24  do it now because if he's going to get to admit it and show it,

25  I think to avoid a re-redirect examination, we might as well

1    get it over with.

2            So if Mr. Downing wants to admit it now, that's fine.

3    I'm going to ask to publish it, and I'll ask Mr. Gates about

4    it.

5            MR. DOWNING:  So, Your Honor, I move Defense Exhibit

6    17 into evidence.

7            THE COURT:  17, all right.  I'll overrule the

8    objection and admit it.

9            (Defendant's Exhibit No. 17 was received in

10   evidence.)

11           MR. ANDRES:  Thank you, sir.

12           THE COURT:  You'll be entitled to ask him questions

13   on re-redirect.

14           MR. ANDRES:  Oh, so not now?

15           THE COURT:  Yes.

16           MR. ANDRES:  Oh, yeah.  This is just the first

17   redirect.  I'm not -- the point was to avoid all the rest of

18   it.

19           THE COURT:  All right.  Well, that's right, because

20   you're in the midst of redirect.

21           MR. ANDRES:  Just the first one, Judge.  I know it

22   feels like the fifth one.

23           THE COURT:  I hope it's the last one.

24           MR. ANDRES:  I'm trying.

25           THE COURT:  Go ahead.

1              MR. ANDRES:  Thank you.

2              (End of bench conference.)

3              THE COURT:  All right.  You may proceed.

4              MR. ANDRES:  Okay.

5              THE COURT:  For the record, I have admitted Defense

6    Exhibit 17 over the objection of the Government.  Proceed.

7              MR. ANDRES:  May I publish it, Your Honor?

8              THE COURT:  Yes, you may.

9    BY MR. ANDRES:

10   Q.    Mr. Gates, do you have document Defense Exhibit 17?

11   A.    Not yet.

12   Q.    You don't have it?

13   A.    No.

14             MR. ANDRES:  Do you have another copy?

15             THE COURT:  He has it in front of him on the screen.

16             MR. ANDRES:  Oh, fine.

17             THE COURT:  Or at least one screen of it.  It's three

18   pages.

19             MR. ANDRES:  Okay.

20   BY MR. ANDRES:

21   Q.    Mr. Gates, the -- the chart in Government's 17 includes

22   charges that were brought against you in the Eastern District

23   of Virginia; is that correct?

24   A.    It does.

25   Q.    And with respect to those charges, they relate to your

1    income taxes?

2    A.    They do.

3    Q.    And the failure for you to declare income?

4    A.    That is correct.

5    Q.    With respect to those charges, were you guilty of all

6    those charges?

7    A.    Yes.

8    Q.    And do they also relate to your failure to, to disclose

9    foreign bank accounts on your tax returns?

10   A.    They do.

11   Q.    And were you guilty of all those charges?

12   A.    Yes.

13   Q.    Mr. Downing asked you questions about these various

14   transfers.  Those were identified by the Government; isn't it

15   true?

16   A.    That is correct.

17   Q.    And they were included in your indictment?

18   A.    Yes.

19   Q.    Can I ask you to look at the chart, the first entries for

20   Serangon -- I may be mispronouncing it, so excuse me --

21   Serangon Holdings Limited?

22            Do you see that?

23   A.    I do.

24   Q.    And what does it say about the country of origin?

25   A.    Cyprus.

Gates - Redirect                                                    1487

1    Q.   And what is Serangon Holdings Limited?

2    A.   It was an entity set up in Cyprus.

3    Q.   Okay.  By who?

4    A.   At the direction of Mr. Manafort.

5    Q.   And whose money was in it?

6              THE COURT:  Well, he didn't ask you that.  He asked

7    you:  Who set it up?

8              THE WITNESS:  The Cypriot attorneys set it up.

9              THE COURT:  Next question.

10   BY MR. ANDRES:

11   Q.   Who asked the Cypriot lawyers to set it up?

12   A.   In this account, I don't know specifically, but either

13   Mr. Manafort asked the Cypriot attorney or he asked me to ask

14   the Cypriot attorney.

15   Q.   During the time that you were dealing with Mr. Manafort's

16   tax preparers, did either you or Mr. Manafort disclose Serangon

17   Holdings?

18   A.   No, we did not.

19   Q.   There's another listing a few down before the shading for

20   Global Highway Limited.  What is Global Highway Limited?

21   A.   Global Highway Limited is another entity in Cyprus.

22   Q.   And who controlled that?

23   A.   Mr. Manafort.

24   Q.   And whose money was in that?

25   A.   Mr. Manafort's.

1    Q.    Did you disclose that account to Mr. Manafort's tax

2    preparers?

3    A.    We did not.

4    Q.    And below that --

5              THE COURT:  I'm sorry, what was your answer?

6              THE WITNESS:  We did not, Your Honor.

7              THE COURT:  Are you saying "we" or "I"?

8              THE WITNESS:  I did not.

9              THE COURT:  Next question.

10   BY MR. ANDRES:

11   Q.    Do you know if Mr. Manafort disclosed that to your tax --

12   to his tax preparers?

13   A.    To my knowledge, no, he did not.

14   Q.    Below that is Peranova.

15   A.    Yes.

16   Q.    What is Peranova?

17   A.    Peranova is another Cyprus attorney that was used for

18   political work.

19   Q.    And who controlled that?

20   A.    Mr. Manafort.

21   Q.    Did you disclose that to Mr. Manafort's tax preparers?

22   A.    I did not.

23   Q.    Why not?

24   A.    Because Mr. Manafort had asked us not to -- said we did

25   not need to disclose the foreign accounts to the accountants.

1   Q.    Okay.  And then for Peranova there are two entries.  One

2   is for $48,000.  Is that money you drew from that account?

3   A.    It is.

4   Q.    Okay.  And the other was for $100,000; is that right?

5   A.    That is correct.

6   Q.    And what year is that in?

7   A.    That is tax year 2011.

8   Q.    And that money was income to Mr. Manafort; is that

9   correct?

10  A.    This actually was income to me.

11  Q.    Income to you, but the money when it first went to

12  Peranova, what was that?

13  A.    That was income from the political work.

14  Q.    And that was never a loan, right?

15  A.    That's correct.

16  Q.    There was no loan from some businessman in the Ukraine to

17  Mr. Manafort --

18          THE COURT:  You're leading.

19  BY MR. ANDRES:

20  Q.    Was there ever a loan from a businessman in the Ukraine to

21  Mr. Manafort that you were aware of?

22  A.    No.

23  Q.    Okay.  Just one more.  At the bottom there it says,

24  "Bletilla Ventures."  What is that?

25  A.    Bletilla is another company that was incorporated in

1   Cyprus.

2   Q.   Okay.  And who controlled that?

3   A.   Mr. Manafort.

4   Q.   And did you disclose that to Mr. Manafort's tax preparers?

5   A.   I did not.

6   Q.   Why not?

7   A.   At the direction of Mr. Manafort.

8          MR. ANDRES:  Can I just have one moment to look at

9   the chart, Judge?

10          THE COURT:  Yes, you may.

11          MR. ANDRES:  I'm just trying to speed this along.

12          Just one or two more questions about the chart.

13  BY MR. ANDRES:

14  Q.   Do you see a reference to Pompolo Limited?

15  A.   Yes.

16  Q.   What is that?

17  A.   Pompolo Limited is an entity that was set up in the United

18  Kingdom.

19  Q.   Okay.  And who controlled that entity?

20  A.   That was controlled by me and Mr. Manafort.

21  Q.   Okay.  And did you disclose that to your tax preparer?

22  A.   I did not.

23  Q.   Under that is Lucicle.

24  A.   Yes.

25  Q.   What is Lucicle?

1  A.    Lucicle is a company based in Cyprus.

2  Q.    Okay.  And who controlled that entity?

3  A.    Mr. Manafort.

4  Q.    Under that Mr. Downing asked some questions about Cypriot

5  Agent.  Do you see that?

6  A.    I do.

7  Q.    You didn't have your own lawyer in Cyprus, did you?

8  A.    I did not.

9  Q.    You didn't have your own accounts in Cyprus, did you?

10  A.    No.

11  Q.    At some point, the accounts moved from Cyprus to the

12  Grenadines, St. Vincent and the Grenadines?

13  A.    Correct.

14  Q.    And was there a transition period?

15  A.    There was.

16  Q.    What happened in that transition period?

17  A.    In terms of?

18  Q.    In terms of where the money was put, what accounts, where

19  was the money held?

20  A.    The money -- oh, the remaining money was held in the

21  Cypriot Agent account in Cyprus.

22  Q.    By Dr. K, is that right?

23  A.    That's correct.

24  Q.    The Cypriot Agent account is not yours, is it?

25  A.    No.  It was actually an internal account that actually

1    designated by the company that the money remained in that

2    company, so it was simply a list of all the companies that we

3    had had prior to Cyprus and the remaining balance in those

4    companies.

5    Q.   Do you remember that Mr. Downing asked you questions about

6    Mr. Manafort having trouble moving the money from Cyprus to the

7    United States?

8              Do you remember that?

9    A.   Yes.

10   Q.   And he asked you if that caused difficulties?

11   A.   Yes.

12   Q.   And it caused problems for Mr. Manafort's business?

13   A.   Yes.

14   Q.   Do you know why banks in the United States wouldn't accept

15   Mr. Manafort's money from Cyprus?

16             THE COURT:  Wouldn't this be hearsay?

17             MR. ANDRES:  It's his understanding.

18             THE COURT:  His understanding isn't relevant.

19             MR. ANDRES:  Well, that's what he was asked about.

20             MR. DOWNING:  Actually, his answer was yes, he was --

21   the banks didn't tell him why.  That was his statement

22   yesterday, Your Honor, but objection.  Calls for hearsay.

23             MR. ANDRES:  But he asked the exact same question,

24   Your Honor.

25             THE COURT:  His understanding isn't really relevant,

Gates - Redirect                                                    1493

1    is it?

2             MR. ANDRES:  It is.

3             THE COURT:  Mr. Downing?

4             MR. DOWNING:  Your Honor, I believe yesterday when I

5    asked Mr. Gates if he knew why the accounts were closed, he

6    said the banks did not indicate.  They just closed the

7    accounts.

8             So I don't think he's got a personal understanding of

9    why the banks closed the accounts.  That was his testimony

10   yesterday.

11            MR. ANDRES:  We could ask him.

12            THE COURT:  All right.  I'll permit it, although it

13   leaves open the question of why he didn't answer it in the

14   first place when he was asked the question.

15   BY MR. ANDRES:

16   Q.   Mr. Gates, do you have an understanding as to why U.S.

17   banks wouldn't accept Mr. Manafort's money from Cyprus?

18   A.   It wasn't Mr. Manafort's --

19            THE COURT:  Do you have an understanding?

20            THE WITNESS:  I have a response from one of the banks

21   that we banked with, yes, Your Honor.

22            THE COURT:  I thought you answered Mr. Downing's

23   question that the banks didn't tell you.

24            THE WITNESS:  That's correct, that was the answer.

25            THE COURT:  Now, you're remembering that one bank

Gates - Redirect                                                    1494

1    told you.

2            THE WITNESS:  No, no.  The one bank had indicated to

3    us that they are able to --

4            THE COURT:  Just a moment.  Now you're telling that

5    the bank had indicated something to you?

6            THE WITNESS:  Yeah.  It follows with my answer

7    yesterday, Your Honor.

8            THE COURT:  All right.  That would be hearsay, so

9    I'll exclude that.  Continue.

10   BY MR. ANDRES:

11   Q.   Did anything about the fact that Mr. --

12           THE COURT:  By hearsay, ladies and gentlemen, I mean

13   that if I permitted a witness to testify as to what that

14   witness had been told by somebody else, that somebody else

15   couldn't be cross-examined here in court, so that's why it's

16   excluded.

17           Proceed, Mr. Andres.

18   BY MR. ANDRES:

19   Q.   Did anything about the fact that Mr. Manafort had a hard

20   time moving his money from Cyprus to the United States, did

21   anything about that prevent him, as you understand it, from

22   disclosing his overseas accounts to his tax payers?

23   A.   No.

24   Q.   Yesterday, Mr. Downing asked you some questions about a

25   relationship that you had.

1          Do you remember that?

2     A.    I do.

3     Q.    How long did that last?

4     A.    Approximately five months.

5     Q.    And have you discussed that with your wife?

6     A.    I have.

7     Q.    How long ago was that?

8     A.    Almost ten years ago.

9     Q.    When it happened, did you -- did you tell Mr. Manafort?

10    A.    I did.

11    Q.    And was he supportive?

12    A.    He was.

13    Q.    Did he fire you?

14    A.    He did not.

15    Q.    Mr. Downing asked you some questions about bonuses that

16    you received.

17          Do you remember that?

18    A.    I do.

19    Q.    Where did those bonuses -- how were they made?

20    A.    They were paid from Cyprus.

21    Q.    Okay.  And those bonuses weren't disclosed to the tax

22    preparers, were they?

23    A.    No.  I failed to report those on my income tax.

24    Q.    Did Mr. Manafort report it to his tax payers?

25    A.    He did not.

1    Q.   That was his secret, right?

2    A.   As I understand, yes.

3    Q.   Did he report it to Ms. Washkuhn?

4    A.   He did not.

5               THE COURT:  Just a moment.

6               MR. DOWNING:  Objection, Your Honor.  There is no

7    evidence that Mr. Manafort knew that he was taking this money.

8    This is embezzlement.  This isn't a bonus.  How could he ask

9    him what --

10              THE COURT:  That's not the question that's being

11   asked.  The question that's being asked is whether Mr. Manafort

12   reported bonuses that were paid to him.

13              MR. DOWNING:  That's not what I understood the

14   question --

15              THE COURT:  Is that your question, Mr. Andres?

16              MR. ANDRES:  Yeah.

17              THE COURT:  I beg your pardon?

18              MR. ANDRES:  Yes, Judge.

19              THE COURT:  All right.  Be careful about that.  This

20   is not an informal proceeding.

21              MR. ANDRES:  Understood.  With --

22              THE COURT:  I'm not done yet.  There's an objection

23   pending.  So what's your objection?

24              MR. DOWNING:  My objection, I thought he was asking a

25   question about was the money he took out of these offshore

1   accounts that was unknown to Mr. Manafort that he calls

2   bonuses, that were reported by Mr. Manafort on tax returns.

3   That's what I understood the question.

4            THE COURT:  That was the question, wasn't it,

5   Mr. Andres?

6            MR. ANDRES:  Yes.

7            THE COURT:  I beg your pardon?

8            MR. ANDRES:  Yes, Judge.

9            THE COURT:  All right.  I'll overrule the objection.

10  He may answer.

11           THE WITNESS:  Sorry, can you repeat the question?

12  BY MR. ANDRES:

13  Q.   With respect to the --

14           THE COURT:  He wants to know whether the monies that

15  were paid to Mr. Manafort as bonuses were reported on his

16  income taxes, if you know.

17           THE WITNESS:  The money that was paid to Mr. Manafort

18  was not reported as income.

19           THE COURT:  Next question.

20  BY MR. ANDRES:

21  Q.   Mr. Downing asked you some questions about your indictment

22  here in the Eastern District of Virginia.  Do you remember

23  that?

24  A.   I do.

25  Q.   He said that you might be facing a substantial amount of

Gates - Redirect                                                      1498

1    jail time for that.

2              Do you remember that?

3    A.   Yes.

4    Q.   Somewhere in the neighborhood of 200 years in jail?

5    A.   Correct.

6    Q.   Is that your understanding that you were facing that

7    amount of time?

8    A.   No.  I thought it was a lower amount.

9    Q.   Are there --

10             THE COURT:  What was the lower amount that you

11   thought?

12             THE WITNESS:  I thought it was somewhere in the range

13   of a hundred years, Your Honor.

14             THE COURT:  A hundred years.  Next question.

15             MR. ANDRES:  Fair enough.

16             THE COURT:  Go ahead, Mr. Andres.

17             MR. ANDRES:  Fair enough.

18   BY MR. ANDRES:

19   Q.   That indictment has been dismissed?

20   A.   It has.

21   Q.   Are there circumstances under which that indictment can be

22   brought again?

23   A.   There are.

24   Q.   What are they?

25   A.   If I fail to tell the truth here today, the Special

1    Counsel can claim a breach of the plea agreement, and they can

2    indict me on those charges.

3    Q.   And if you were indicted on that, how much time would you

4    be facing?

5    A.   A significant amount.

6    Q.   Hundred years by your account.

7    A.   Yes.

8    Q.   With respect --

9           THE COURT:  I'll strike that.  That's your testimony,

10   but you may ask him.

11   BY MR. ANDRES:

12   Q.   So how much time are you facing?

13   A.   To my knowledge, up to a hundred years.

14   Q.   Okay.  And with respect to the charges in the Eastern

15   District of Virginia indictment, you were guilty of all those

16   charges, right?

17   A.   Yes.

18   Q.   And if you had lied here today and those charges were

19   brought again, would you have any defense to those?

20   A.   No.

21   Q.   Mr. Downing asked you some questions --

22          THE COURT:  Just so we're clear -- no, go ahead,

23   Mr. Andres.

24   BY MR. ANDRES:

25   Q.   Mr. Downing asked you some questions about your

1   sentencing.  Do you remember that?

2   A.    I do.

3   Q.    And you're going to be sentenced by a federal judge in

4   Washington, D.C.; is that correct?

5   A.    That is correct.

6   Q.    With respect to all of the things that you've testified

7   today, will that judge know about all of the criminal activity

8   you're involved in?

9   A.    She will.

10  Q.    Okay.  With respect to the embezzlement from Mr. Manafort,

11  will that judge know about that?

12  A.    She will.

13  Q.    And with respect to your own failing to file tax returns,

14  will the judge know about that?

15  A.    Yes, she will.

16  Q.    How will she know about that?

17  A.    Because the government prepares a letter which indicates

18  all of the criminal activity conducted.

19  Q.    And will that judge have access to this transcript?

20  A.    I assume so, yes.

21  Q.    Okay.  And so at the time of sentencing, is it your

22  understanding that the judge will take into consideration the

23  totality of your conduct?

24  A.    Yes.  That's what is expressed to me.

25  Q.    That includes your criminal conduct?

1   A.    It does.

2   Q.    And your cooperation?

3   A.    That's correct.

4   Q.    And as you sit here today, do you have any idea what your

5   sentence will be?

6   A.    None.

7   Q.    As you sit here today, Mr. Gates, do you have any doubt in

8   your mind, if you lied, that the Special Counsel's Office would

9   rip up your plea agreement?

10   A.    No doubt at all.

11            MR. ANDRES:  Judge, may I have a moment?

12            THE COURT:  Yes, you may.

13            MR. ANDRES:  Just one other quick area, Your Honor.

14            If I could go back to Defense Exhibit 17?

15            14.  Defense Exhibit 14.

16   BY MR. ANDRES:

17   Q.    Do you have that in front of you, Defense Exhibit 14?

18   A.    I do.

19            MR. ANDRES:  Okay.  May I just have one moment, Your

20   Honor?

21            THE COURT:  Yes.

22            MR. ANDRES:  I'm finished, Your Honor.  Thank you.

23            THE COURT:  I'm sorry?

24            MR. ANDRES:  I'm finished with my examination.  Thank

25   you.

1              THE COURT:  All right.  Mr. Downing?

2              MR. DOWNING:  Thank you, Your Honor.

3         Can I get a copy of the plea agreement?

4                       RECROSS EXAMINATION

5    BY MR. DOWNING:

6    Q.   Can we go back to Defense Exhibit 17?

7              Mr. Gates, you've had an opportunity to look at

8    what's been marked as Defense Exhibit 17, haven't you?

9    A.   Yes, I have.

10   Q.   Today and yesterday?

11   A.   Yes.

12   Q.   And I think you ballparked yesterday --

13             THE COURT:  Well, have you seen this chart before?

14             THE WITNESS:  Yesterday, yes, Your Honor.

15             THE COURT:  Before yesterday, have you seen it?

16             THE WITNESS:  Before yesterday?  Yes, I did see it in

17   the indictment, Your Honor.

18             THE COURT:  Next question.

19   BY MR. DOWNING:

20   Q.   The indictment here in EDVA, correct?

21   A.   That's correct.

22   Q.   And yesterday you ballparked that the total amount of

23   these wire transfers to your accounts was somewhere between 2.7

24   and 3 million dollars, correct?

25   A.   I believe that's correct, yes.

1  Q.   And this is all monies that you directed from DMP

2  International's offshore accounts to your personal accounts,

3  correct?

4  A.   That is correct.

5  Q.   And these monies are part of what we discussed yesterday,

6  your embezzlement from DMP and Mr. Manafort, correct?

7  A.   That is correct.

8  Q.   And they come from various entities in Cyprus as well as,

9  I believe, Global Endeavour is there for St. Vincent and the

10 Grenadines, correct?

11 A.   I don't see Global Endeavour here, but I think on that

12 previous page, yes, that's correct.

13 Q.   Okay.  And it spans from what years, 2010 to 2014?

14 A.   I don't have the last page, but I think that's correct.

15 Yes, November 2014.

16 Q.   Okay.  Not to rehash too much of yesterday, but I believe

17 Mr. Andres has made a big fact of the point that if you don't

18 tell the truth, that they can tear up your plea agreement?

19 A.   That's true.

20 Q.   Who prepped you for trial?

21 A.   My attorney.

22 Q.   And from the Government?

23 A.   I met with -- I met with Special Counsel.

24 Q.   Who?

25 A.   Mr. Andres and various FBI agents.

1    Q.    Any other lawyers from the Office of Special Counsel you

2    met with for trial prep?

3    A.    For trial prep?  I don't recall if there are any others.

4    Q.    And about on how many occasions did you meet with

5    Mr. Andres to prep for trial?

6    A.    Approximately 20.

7    Q.    How many?

8    A.    Approximately 20.

9    Q.    And in your trial preparation, this issue came up about an

10   extramarital affair that you may have had, correct?

11   A.    It did.

12   Q.    And when I asked you yesterday about your secret life, you

13   said you had made a mistake, correct?

14   A.    I did.

15   Q.    And that it was a short period of time and you rectified

16   it?

17   A.    Yes.

18   Q.    Do you recall telling the Office of Special Counsel that

19   you actually engaged in four extramarital affairs?

20           MR. ANDRES:  Objection, Your Honor.  Relevance.

21           MR. DOWNING:  It's going to go to you ripping up his

22   plea agreement for lying yesterday.

23           MR. ANDRES:  Your Honor, if we're going to testify,

24   maybe we could come to the sidebar?

25           THE COURT:  Yes, I think you're right, Mr. Andres.

1        (Bench conference on the record.)

2        THE COURT:  All right, there's an objection on the

3   basis of relevance.  Let me hear you, Mr. Andres.

4        MR. ANDRES:  Well, Judge, as a procedural matter,

5   Your Honor said that we weren't going to discuss any of this

6   stuff.  In fact, Your Honor ruled there would be no mention of

7   extramarital affairs without a bench conference.

8        Mr. Downing has violated that, obviously, but what is

9   the possible relevance of whether or not Mr. Gates had other

10  extramarital affairs?  What's the possible relevance of that?

11       MR. DOWNING:  I'm just throwing out the fact that

12  yesterday, first of all, Mr. Gates volunteered that he had the

13  affair.  I did not directly ask that, so I did not violate any

14  court order or agreement.

15       MR. ANDRES:  I would disagree with that.

16       MR. DOWNING:  Second of all --

17       THE COURT:  I'll be the judge of that.

18       MR. ANDRES:  I understand.  I'm just letting --

19       THE COURT:  That's not really what I need to pay

20  attention to now.  The question is whether this question is

21  relevant.  You said it isn't, and you've explained why you

22  think it isn't relevant, and I understand you want to make

23  clear that you think he's violated the Court's order.

24       That's not what I'm concerned with now.  What I'm

25  concerned with right now is whether this question is relevant.

1    Why do you think it's relevant?

2              MR. DOWNING:  Well, yesterday, he offered up that he

3    had an affair, one affair.  It was a short period of time.

4    We've, we've alleged and the basis for questioning about this,

5    we called it the secret life of the affair, that it stretched

6    over a period of time and it explained why he was embezzling

7    all of this money.

8              He, in fact, did not have one affair.  He told the

9    Office of Special Counsel he had multiple affairs, which goes

10   to the very issue of why we started questioning about this, his

11   lifestyle that he was leading, his secret life.  But, in fact,

12   it also goes to his credibility.  He lied on the stand

13   yesterday about it.

14             THE COURT:  Well, I think it is true that the

15   cross-examination referred to it as a secret life, and you did

16   not elicit that it was an affair.  It was pretty obvious that

17   it was.  Just now, you've raised it without coming to the

18   bench.  You should have come to the bench.

19             It's no secret.  The real question is whether -- the

20   multiple affairs question, and you contend that that's relevant

21   because there's been a great deal of testimony about whether

22   the -- if he's lied, he loses his immunity, and you want to

23   bring out that he's lied?  Is that what you want?

24             MR. DOWNING:  Correct.

25             THE COURT:  Where is it he's lied?

1            MR. DOWNING:  He said he had an affair, one affair.

2            THE COURT:  Who said that?

3            MR. DOWNING:  Yesterday, Mr. Gates said it.  He,

4   unsolicited by me, he blurted it out, and that it was over a

5   short period of time.

6            It was not one affair.  He told the Office of Special

7   Counsel it was multiple affairs and it took place over a period

8   of time, which goes to the motivation, his secret life, for

9   embezzling the money.  So it all ties into that.

10           THE COURT:  Yes, but that's not really -- the only

11  thing that's relevant is this whole thing is about whether or

12  not he's going to lose the benefit of his plea agreement if he

13  doesn't tell the truth.  That's what you've been asking.  And

14  did you want to establish that he didn't tell the truth in this

15  case?

16           MR. DOWNING:  Yes.

17           THE COURT:  Well, the problem with that is he wasn't

18  asked a question directly:  How many affairs did you have?  He,

19  I think you're correct, blurted out that he had an affair.

20  Consistent with my instructions to you, you didn't ask him,

21  because you weren't permitted to --

22           MR. DOWNING:  Correct.

23           THE COURT:  -- how many affairs did you have?

24           MR. DOWNING:  And, Your Honor, I apologize because I

25  thought since he opened the door to it by blurting it out

1    unsolicited, that it wasn't a violation of our agreement, so I

2    apologize.

3           THE COURT:  Well, that wasn't a violation.  That

4    wasn't a violation.  What Mr. Andres says is a violation is

5    what you said here in open court, but I'm not concerned with

6    that now.

7           I think the question about multiple affairs is not

8    relevant, and I'm not going to permit it.  It's not relevant

9    because I don't see how it bears on his credibility here.

10          In other words, well, you might argue, I suppose --

11   that's what interests me, is how does the multiple versus one

12   affair lead to this jury's consideration of whether he's been

13   truthful?

14          MR. DOWNING:  So I think overall what he was trying

15   to do was minimize the reason or the basis which caused him to

16   decide to embezzle the funds.  He made it sound like it was a

17   very short period of time and that it was over.

18          What I'm trying to say is he embezzled funds from

19   2010 to 2014, and those affairs span that period of time.  It

20   wasn't a short, five-month period.

21          THE COURT:  Well, I'll tell you what I think you can

22   do, but let me inquire of Mr. Andres.

23          I'm here.

24          MR. ANDRES:  I'm looking.

25          THE COURT:  He wants to show that this person is not

1  worthy of credibility, of course, and he did testify on direct

2  testimony that he had a secret life -- that's the term used --

3  he admitted that and he said -- I don't know whether he

4  admitted one affair, but it sort of sounded like that, and I

5  think what Mr. Downing wants to do is to point out that that

6  wasn't truthful.

7          The problem, Mr. Downing, is he wasn't asked:  Did

8  you only have one affair, because I wouldn't have permitted it.

9  What I will permit now is for you to establish that his secret

10 life spanned years.

11         MR. DOWNING:  Okay.

12         MR. ANDRES:  Your Honor, I object to that for the

13 following reason.

14         THE COURT:  All right.

15         MR. ANDRES:  I don't know the parlance of "affairs"

16 and "sexual encounters" --

17         THE COURT:  Good.

18         MR. ANDRES:  Thank you.  And the like.  I don't think

19 Mr. Gates would say that he had another affair, and I don't

20 think Mr. Downing can prove that, and he can bring up the 302

21 and the other document that said that.

22         THE COURT:  Well, the only thing I'm letting him,

23 letting him bring out is how long this secret life spanned.

24         MR. ANDRES:  Well, so if I could finish, Mr. Gates

25 had, I don't know what to call it, but he had sex with other

1   women aside from his wife more than once.  That is not

2   something that's relevant in any way.

3            Mr. Gates --

4            THE COURT:  It is relevant if it's inconsistent with

5   any other testimony he's given because this jury has to decide

6   whether or not to believe this witness.  So if he has been less

7   than candid, less than truthful in his testimony, they have an

8   opportunity to bring that out.

9            You have a wonderful brow furrowing --

10           MR. ASONYE:  I'm just, Your Honor --

11           MR. ANDRES:  Your Honor, the problem that Mr. Downing

12  is going to say is:  You had four affairs.

13           And he's going to say:  No, I didn't.

14           THE COURT:  No, I didn't permit him to ask that.

15  What I'm permitting him to ask is did his secret life span a

16  number of years, and that's all.

17           MR. DOWNING:  I got it.

18           THE COURT:  That's all.  Now, what's your objection

19  to that?

20           MR. ANDRES:  My objection is that Mr. Downing never

21  tied any of the payments that he alleges, and only him, have

22  anything to do with the, quote-unquote, secret life.  Mr. Gates

23  said that he didn't use any money from Mr. Manafort for that,

24  so what's --

25           THE COURT:  I don't care.  What I care about is

1    whether there is information from which a jury can make a

2    judgment about whether to believe this witness.  So I'm going

3    to permit that.

4            MR. ANDRES:  Can I just understand what specifically

5    you're going to permit?

6            THE COURT:  Yes.  I've said it; I'll say it again:

7    I'm going to permit Mr. Downing to inquire whether his secret

8    life, that's one question --

9            MR. DOWNING:  Yes.

10           THE COURT:  -- spanned whatever years it is.

11           MR. DOWNING:  Okay.

12           THE COURT:  And that's it.

13           MR. ANDRES:  And there's not going to be follow-up or

14   there's not going to be --

15           THE COURT:  Unless you do it.

16           MR. ANDRES:  Okay.  Thank you.

17           THE COURT:  I mean, you-all seem to be good at that.

18   He wanted an exhibit admitted.  I admitted it, and it turned

19   out that he used that.  Maybe -- be careful what you ask for.

20           MR. DOWNING:  I agree.  I'll make it brief.

21           MR. ANDRES:  Thank you, Judge.

22           (End of bench conference.)

23           THE COURT:  All right.  Mr. Downing, you may proceed

24   in accordance with the Court's ruling at the bench.

25   BY MR. DOWNING:

1    Q.   Mr. Gates, I asked you some questions about Defendant's

2    Exhibit 17 and the time frame over which it spanned.  It was

3    from 2010 to 2014.

4         Yesterday, I referred to your secret life, and I

5    believe you testified yesterday that you were spending beyond

6    your means, and there was a reason for your taking this

7    money --

8         THE COURT:  Well, never mind summarizing his

9    testimony.  Get to the question.

10   BY MR. DOWNING:

11   Q.   Well, the question is:  The secret life that we were

12   talking about spanned this period of time that's evidenced in

13   Exhibit 17?

14   A.   Mr. Downing, I'd say I've made many mistakes over many

15   years, and I regret them.

16        THE COURT:  This isn't the time for that.  Just

17   answer his question directly.

18        THE WITNESS:  I understand.  Yes, it did.

19   BY MR. DOWNING:

20   Q.   It is?

21   A.   Yes.

22        MR. DOWNING:  No further questions.

23        THE COURT:  Anything further?

24             (No response.)

25        THE COURT:  All right.  Thank you.

1    Anything further, Mr. Andres?

2    MR. ANDRES:  No, Your Honor.

3    THE COURT:  Mr. Gates, you may step down.

4    THE WITNESS:  Thank you, Your Honor.

5    (Witness excused.)

6    THE COURT:  All right.  Who is the next witness,

7    Mr. Andres?

8    MR. ANDRES:  Forensic Accountant Morgan Magionos,

9    from the FBI.

10   THE COURT:  All right.  Now, do I have something that

11   you submitted that I need to decide before that witness

12   testifies?

13   MR. ANDRES:  Yes, Judge.

14   THE COURT:  All right.  Pass your books to the right,

15   ladies and gentlemen.  The court security officer will collect

16   your books and maintain their security.

17   Remember to refrain from discussing the matter among

18   yourselves or with anyone or undertaking any investigation on

19   your own.  We will reconvene -- I have this issue to consider

20   and we will reconvene at -- how long is this next witness?

21   MR. ANDRES:  Two hours.

22   THE COURT:  All right.  We'll reconvene at 11:30 --

23   at, yes, let's make it 11:25 -- 11:30, and I'll resolve it.

24   Follow Mr. Flood out.

25   (Jury out.)

1514

 1          THE COURT:  Mr. -- just a moment.

 2          Mr. Andres, would you give me a brief summary of this

 3   witness and this -- you submitted a memorandum relating to

 4   this.  I don't believe I received anything from the defendants

 5   in response.

 6          MR. WESTLING:  You did not, Your Honor.

 7          THE COURT:  All right.  But your -- is it your

 8   witness?

 9          MR. WESTLING:  It is, Your Honor.

10          THE COURT:  All right.  You can respond orally.

11          MR. WESTLING:  I'll be happy to.

12          THE COURT:  Do you have any objection to the

13   admissibility?

14          MR. WESTLING:  Well, I think that as a practical

15   matter, Your Honor, we don't have objections to the use of

16   summaries.  There's some issues in some of these charts

17   regarding information that's being put in related to domestic

18   expenditures that we're not entirely clear of the relevance of

19   that, because we understand those were actually captured and

20   put on the tax returns.

21          In addition, Your Honor, there are some exhibits the

22   Government has listed for this witness that relate to e-mails

23   and other things that I don't think fit under sort of the

24   general mantle of a summary witness.  It's one thing to say I'm

25   going to come and summarize transactions and other things.

1  It's another to say I'm going to refer to other testimony or

2  the e-mails that have already been admitted into evidence, and

3  so that would be our concern with this witness.

4          THE COURT:  Well, let me go and read Mr. Andres'

5  brief that was submitted.

6          I think I mentioned earlier, Mr. Andres, that, of

7  course, summaries of voluminous data can be summarized if the

8  admissible evidence is submitted and available to the Court and

9  opposing counsel, but it isn't a device through which a party

10 can summarize its arguments; in other words, you can't use it

11 as a means of doing that.  But do you have the charts that you

12 want this witness to testify to as exhibits listed?

13         MR. ANDRES:  Yes, Judge.

14         THE COURT:  What are they so that I may look at

15 those?  Are they listed in your brief and attached to it?

16         MR. ANDRES:  I believe they are, Judge, but if it's

17 faster, we can just e-mail them as soon as we take a break.

18 That might be the most expeditious way to do it.

19         THE COURT:  All right.  All right.

20         MR. ANDRES:  Can I -- can I suggest just two other

21 things?

22         THE COURT:  Yes.

23         MR. ANDRES:  I'm happy to, if Your Honor is

24 interested, in giving a quick overview of the testimony.

25         THE COURT:  Yes.

1    MR. ANDRES:  And then I think if I could work with

2  Mr. -- with defense counsel in terms of understanding their

3  objections, then we could try to work that out because we do

4  not intend to --

5    THE COURT:  Excellent idea.

6    MR. ANDRES:  -- admit other testimony or other, other

7  e-mails.

8    I'm not sure I understand that, but I'm happy to

9  clarify.  So Morgan Magionos is a forensic accountant with the

10  FBI, been involved in this investigation for some time.  She's

11  done tracing work to trace the payments from the Ukraine to

12  Cyprus to the United States to the vendors in a variety of

13  different ways, and that's principally what she'll testify

14  about is all of the movement of the money.  And those are the

15  charts that we provided.

16    There were a series of charts that related to the

17  purchase of real property.  Some of those had pictures of the

18  real property on them.  We now have two versions, one with

19  pictures and one without.  To the extent that there's an

20  objection, I don't think listing the photographs of the houses

21  is necessarily prejudicial, but in either case, we're not

22  arguing that.  So that's A, let's call that Part A of her

23  testimony.

24    Secondly, during the course of reviewing those

25  materials, which involve a substantial number of foreign bank

1   accounts, as well as bank account information that Mr. Manafort

2   produced pursuant to a Title 31 subpoena, there are a handful

3   of e-mails that Mr. Manafort included that are his statements

4   that relate to the tracing exercise that she'll testify to, and

5   those, again, are his statements.  So all of that, again, I put

6   in Category A.

7           Category B are Mr. Manafort's e-mail statements that

8   are admissible as his statements, that is a different project,

9   if you will, than simply her tracing project.  But they involve

10  a range of issues in the case, whether it's the bank frauds or

11  other things, but they're defendant's statements.

12          That brief has more recently come to Your Honor, I

13  think, in the last day or two and is the issue that hasn't been

14  involved.  The 1006 issue has been resolved, and I certainly

15  appreciate the difference between a summary witness --

16          THE COURT:  I'm sorry, you say it has been resolved?

17  I don't recall ruling on the 1006 issue.

18          MR. ANDRES:  You did, Your Honor, and with the

19  admonition that we're not to use it as a summation.

20          THE COURT:  Oh, I see.

21          MR. ANDRES:  I understand the difference between a

22  summary witness.  I'm not going to give my closing witness

23  through this witness.

24          THE COURT:  All right.

25          MR. ANDRES:  The issue about whether to read her

1518

1    e-mails -- the e-mails that -- of Mr. Manafort as his

2    statements is something we briefed.  I'm not sure what the

3    defense position is, but our position are there's a stipulation

4    that they're authentic and these are the defendant's

5    statements.  So there's a handful that we seek to read through

6    Special Agent --

7            THE COURT:  Yes, that's, I think, the objection as I

8    understood it.  You can have the document admitted and it's

9    admitted, but you can't have a witness read it who doesn't know

10   anything about it other than that she's an FBI agent.

11           MR. WESTLING:  That's the objection, Your Honor.

12           MR. ANDRES:  Well, Judge, if I could address that,

13   agents take statements from witnesses all the time, and they

14   don't have to know all the background.  Drug agents seize drugs

15   all the time.  They don't have to have personal knowledge of

16   the drugs that they seize in order to testify.

17           THE COURT:  And that's quite true.

18           MR. ANDRES:  Right?  So --

19           THE COURT:  But this is merely a means of conveying

20   to the jury through the mouth of an agent -- these -- she had

21   nothing to do with -- is it a woman?

22           MR. ANDRES:  Yes, Judge.

23           THE COURT:  She had nothing to do with this.  In

24   other words, it isn't -- these aren't statements Mr. Manafort

25   made to her.  They're statements he made, and I'll think about

1   that.  None of cases you've cited thus far is that, but if I've

2   missed it, I want you to call my attention to it.

3          MR. ANDRES:  I think we did cite a case in

4   particular, Judge, that allows for the reading of the e-mails.

5          The question is not -- we'll do it in any way that's

6   appropriate.  We're not trying to prejudice, but again, the

7   issue is to get the evidence in front of the jury.

8          THE COURT:  Well, the documents would be admitted

9   because they're statements of the defendant.  It's clearly

10  admissible.  But using an agent to make the case is not,

11  because these statements weren't made to an agent, and all the

12  agent is doing is testifying to the -- what it says.

13         Tell me what case you're relying on.

14         MR. ANDRES:  I'm obviously getting some help here,

15  Judge, but there's a Sixth Circuit case, *United States v.*

16  *Kilpatrick*, that says agents are free to read aloud from

17  admitted documents, and then there's another case, and this

18  one's in the Fifth --

19         THE COURT:  Well, I'll look at that, but, you know,

20  you're cherry-picking that statement.  Who knows whether that

21  agent could read aloud from it because that agent was involved

22  in some other part of the investigation where that statement,

23  that admission by a party was important.  I'll look at the

24  case.

25         Certainly, the exhibit is admissible.  It does become

1   part of the record.  I'll just look at whether the appropriate

2   way to do it is simply to admit it.  You, in your argument, can

3   direct the jury:  You know, I think you ought to look

4   specifically at this, and so forth, rather than -- what she's

5   doing is simply repeating what you want her to do.  She's

6   reading those documents.

7            And I'm going to look at the -- what you say is the

8   Sixth Circuit case, but I'm not inclined to do it, but I may.

9   But as I said, you do get the documents to come into the

10  record.  They're perfectly admissible.  You do get to argue

11  them.  That's perfectly appropriate.

12            MR. ANDRES:  Thank you, Your Honor.

13            Just before you leave, Bucket 3 for Forensic

14  Accountant Magionos is just to admit some telephone records.

15  Again, as a custodian, they're business records that are coming

16  in, and she's going to identify certain of the telephone

17  records that are relevant to another part of the case.

18            Again, the telephone records themselves are

19  voluminous, and she has a chart that identifies.  I'm not going

20  to ask her as to what they relate to or anything else, but

21  rather just to identify those phone calls.

22            THE COURT:  All right.  Let's do this:  We're going

23  to take the recess.  I want you to look at all of the charts

24  that are being offered --

25            MR. WESTLING:  Yes, Your Honor.

1    THE COURT:  -- as summaries of data under 1006,

2  because voluminous data can be presented to a jury by way of a

3  chart if the chart is not argumentative.

4    If it simply portrays in an organized fashion the

5  data that is admissible and if you're satisfied and don't have

6  an objection as to its accuracy, you get a chance to look at

7  it.

8    So number one, I want you to look at that and tell me

9  whether you have any objection to these charts that Mr. Andres

10  wants to introduce under 1006.  He has to introduce all of

11  the -- or make available all of the underlying data that would

12  be admissible, and then you can determine whether or not it's

13  an accurate summary.

14    MR. WESTLING:  Yes, Your Honor.

15    THE COURT:  But obviously, it's got to be neutral.

16  In other words, you can't offer a summary that has some numbers

17  in black and some numbers in red and some numbers with stars by

18  it, because that's an argument.  They can do that in closing

19  argument.  You can, you can do that, but it won't go back to

20  the jury room.  It'll be a demonstrative then.

21    Okay.  So that's the first thing I want you to do.  I

22  want to know whether there's any objection.

23    Second, do you know what exhibits Mr. Andres intends

24  to introduce through this witness because you provided that,

25  Mr. Andres?

1    MR. ANDRES:  Yes, Judge.

2    THE COURT:  I want to know if there's any objection

3 to those.  I think, for the most part, they're all

4 Mr. Manafort's statements, are they not?

5    MR. ANDRES:  Yes, Your Honor.

6    THE COURT:  So there's no objection on the basis of

7 hearsay, but there may be some other objection, and I want to

8 know that.

9    MR. WESTLING:  Yes, Your Honor.

10    THE COURT:  And I want to resolve it.

11    There was a third -- oh, yes, and you were going to

12 get together with Mr. Andres to see if you could agree on if

13 you have an objection, give him notice of that, so I can hear

14 informed argument.

15    Now, tell me once again, what that Sixth Circuit case

16 was?

17    MR. ANDRES:  Your Honor, if I could hand up, I'm

18 happy to brief it, but I'm happy to provide you with a copy.

19 It does have highlighting, but it --

20    THE COURT:  No, I'll look it up.  Just give me the --

21    MR. ANDRES:  Okay.  Sure, here it is.  *United States*

22 *v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015).

23    THE COURT:  All right.  I'm sure somebody helpfully

24 wrote that down.

25    MR. ANDRES:  I'm happy to -- I'm happy to repeat it.

1523

1           (Laughter.)

2           THE COURT:  No, that's fine.  All right.  Anything --

3           MR. ANDRES:  It's not a -- it's not a secret.

4           THE COURT:  Now, Mr. Flood will have to tell the jury

5    that we'll probably be a little later.  Let's make it 11:45 we

6    will reconvene.

7           Anything further at this time?  Are we clear now?

8           MR. WESTLING:  Yes, Your Honor.

9           THE COURT:  Let's proceed.

10          MR. ANDRES:  Okay.  Thank you, Your Honor.

11          THE COURT:  Court stands in recess.

12          (Recess from 11:08 a.m., until 11:43 a.m.)

13               (Jury out.)

14          THE COURT:  All right.  All right.  When we recessed,

15   I did not have any sense of the scope.  I now have it, and I

16   need some more clarification, but I want to give you some

17   guidance as well.

18          The focus, my focus was these charts that I received

19   a two- or three-page memorandum on, maybe it was two, no

20   specific charts were referred to, but you did give me an out --

21   not an outline but a -- as you've been doing, Mr. -- yes -- as

22   you've been doing, Mr. Andres, you've given me a chart of this

23   witness and the exhibits you want to offer through her.  She's

24   a forensic accountant.  So I've looked at some of those.

25          And, Mr. Wesley, I don't know what you're objecting

1  to.  So you need -- just a moment -- what you're objecting to,

2  so that's what I expected you and Mr. Andres to review.  There

3  may be no objections; there may be a slew of them.  I just

4  don't know.

5          Now, let me give you some guidance that might resolve

6  it.  I told Mr. Andres that I would admit, of course, documents

7  under -- charts under 1006, if they are a way of conveying to

8  the jury in a neutral manner the content of voluminous

9  documents, but that they couldn't be disguised advocacy, that

10 is, as evidence.

11         So I began to look at some of these charts, and it

12 seemed to me, Mr. Westling, that they did that.  I didn't see

13 any problem with them.  For example, Exhibit 61, all it says is

14 the names of certain foreign entities, a date created, and a

15 corporation location, and these are names that I think all have

16 been mentioned in the record.  So I would assume this forensic

17 accountant determined, Mr. Andres, where these people were

18 created, when they were created, and then on the basis of

19 admissible records, and where they are incorporated.

20         Am I right about that?

21         MR. ANDRES:  Yes, Your Honor.

22         THE COURT:  So that seems to me that that would be

23 admissible under 1006, and I don't know if there's an

24 objection, but at some point --

25         MR. WESTLING:  There is not as to that one, Your

1    Honor.

2            THE COURT:  Well, I'm not surprised.  But then I go

3    on and there's this much, and at some point I needed to have

4    some guidance on what's really at issue between the parties.

5    Now, that's one issue.  I'll come back to it.

6            The second issue is whether this witness could read

7    e-mails that are otherwise admissible into the record.  The

8    answer to that is, yes, in some instances, but not in all.  In

9    other words, you can't have someone who's an agent come in and

10   read e-mails that that agent has nothing to do with other than

11   to read, and if she -- he or she was involved in the

12   investigation, but if in preparing her testimony, this

13   witness -- and in making these charts she used this evidence,

14   assuming it's admissible, in other words, a statement by

15   Mr. Manafort which is admissible, she could certainly read

16   that, but, of course, nobody would doubt that I can't go in and

17   find one of these nice people off the street in the morning and

18   say, "Come in, I want you to read a bunch of e-mails for me,"

19   of course not.  Even though the e-mails may be admissible, they

20   have to have some context.  Remember, the defendant can't -- or

21   you can't cross-examine most of these anyway because maybe

22   there are other people on the e-mail and so forth.

23           But anyway, so those are the two questions.  One is

24   these charts, clearly charts that summarize voluminous

25   information in a neutral way to present to the jury that's

1  appropriate under 1006.  It's up to you, Mr. Westling, whether

2  the predicates are met; namely, whether the documents have been

3  admitted in evidence, that is, the underlying data, and whether

4  the chart is accurate in its representation of that data.  I'm

5  not going to go through it; that's your problem.  And then I

6  need to know what the, what the objections are.

7          And for the second thing, you've got a list,

8  Mr. Westling, of all the documents Mr. Andres intends to

9  introduce through this witness.  If you have an objection to

10  those, I expected you and Mr. Andres to talk about it and see

11  if you could obviate the necessity for us to have yet another

12  bench conference, which I dearly wish to avoid.

13          MR. ANDRES:  Can I -- can I try first, Your Honor?

14          THE COURT:  Yes, of course.

15          MR. ANDRES:  So here's my understanding, and

16  Mr. Westling can correct me.  As to the 1006 charts, there's

17  a -- one issue was cumulative, which Mr. Westling will handle,

18  but, otherwise, there's not an objection to the admission.

19  There are --

20          THE COURT:  Except for cumulativeness?

21          MR. ANDRES:  Mr. Westling will handle that.  I'll

22  leave that.  I think -- and I don't want to speak for him, but

23  generally there's not an objection with respect to one

24  exception.  There are flow charts that cover the property that

25  was purchased.  So it shows the movement to the various

1   accounts.  They're different than the charts.  We've agreed

2   that the -- we'd be allowed to show it so that Forensic

3   Accountant Magionos can describe her tracing activity, but

4   we're not going to admit those as exhibits.

5          THE COURT:  All right.  So it's a demonstrative in

6   effect?

7          MR. ANDRES:  For this witness.

8          MR. WESTLING:  That's correct, Your Honor.

9          MR. ANDRES:  Correct.  And then there's --

10          THE COURT:  Then you may use it in closing argument,

11   if you wish.

12          MR. ANDRES:  That would be wonderful.

13          THE COURT:  But the jury will be told you're not

14   going to have it in the jury room and it is not itself

15   evidence.

16          MR. ANDRES:  Understood.  And then there's a fourth

17   chart that also falls into that category with respect to

18   FARA -- the FARA filing, and it has -- it does summarize

19   voluminous evidence, but it also makes the comparison, which

20   there is some arguments that that could be argument, and we

21   don't want to fight about that, and we're going to put that

22   chart in as well as demonstrative evidence.  So --

23          THE COURT:  What chart is that?

24          MR. ANDRES:  It's called the FARA chart.  I don't

25   know offhand --

1    MR. WESTLING:  I believe it's Exhibit 80, Your Honor.

2    THE COURT:  Just a moment.  Let's see if I -- all

3  right.  I do have Exhibit 80.  Go on.

4    MR. ANDRES:  So half of that chart summarizes

5  voluminous evidence.  I think it's the right side that goes

6  through all of the things that are in the general ledger, all

7  of the things that are in the bank account.  That is truly

8  voluminous evidence.

9    On the opposite side of that is a summary of what's

10  in Mr. Manafort's FARA filing, which is a document that is not

11  voluminous.  We don't contend it is, and to the extent that the

12  defense is arguing that this is some sort of argumentative

13  summation point, we're not going to seek to admit that as

14  evidence but rather have the accountant explain what she did

15  and the comparison that she made.  And like the other charts,

16  it will come in as a demonstrative exhibit but it won't be

17  admitted.

18    THE COURT:  All right.

19    MR. WESTLING:  And we have no problem with that, Your

20  Honor.

21    THE COURT:  All right.  That's a sensible resolution.

22    Now, your objection as to cumulativeness, of course,

23  we've heard testimony about how -- about the payment to the

24  clothiers, payment to the landscapers and other entities, and

25  we've heard these people who actually received payment testify

1    that, yes, I sent that bill, yes, I got that payment, and the

2    payment came to me from this entity.

3             And is it your argument that we don't need to hear

4    that evidence again?

5             MR. WESTLING:  That is my argument, Your Honor.

6             THE COURT:  Well, it was fairly clear.  What is it

7    that you intend to offer about that?  There were lots of

8    payments.  I mean, I just said clothiers and landscapers.

9    There were other payments, and I think the evidence showed they

10   came from Cyprus.  Am I correct?

11            MR. ANDRES:  Yes, Your Honor.  The point of Forensic

12   Accountant Magionos is to -- and we're not going to spend a lot

13   of time on this.  I'm really hoping it's not going to take two

14   hours.  I think we can get through it much quicker, but it is

15   to put together the whole picture.  So she -- they put it in

16   one part of the picture, which is the domestic half.  She's

17   going to put in the foreign half and she'll reference the

18   domestic half as well to show the connection between the

19   domestic payments and the foreign payments, and this is --

20            THE COURT:  Well, the domestic payments came from a

21   foreign bank.

22            MR. ANDRES:  Correct.  But what the, what the -- she

23   can trace the wire remittance from those foreign accounts, and

24   Your Honor will remember that when, when Your Honor asked that

25   we not admit the domestic chart payments through the, through

1    the vendors, that you said through an appropriate FBI agent,

2    this is that appropriate FBI agent.

3           So it's not cumulative in the sense that it puts the

4    whole picture together.  And again, we are not -- we are

5    absolutely not going through every entry but rather to

6    summarize the charts so that the evidence is -- is in properly.

7           THE COURT:  All right.  What's your -- why is that

8    cumulative, Mr. Westling?

9           MR. WESTLING:  Well, Your Honor, I guess simply

10   because we've heard it all before, and so I don't think that

11   it's appropriate to have this witness get on the stand and

12   repeat for each vendor the specific transactions, sort of

13   transaction by transaction, which is at least what the charts

14   seem to suggest is going to happen and would have to happen for

15   the charts to be admitted.

16          THE COURT:  Well, do you intend to argue to the jury

17   that there was no evidence that the payments for his clothes

18   came from a Cyprus bank account?

19          MR. WESTLING:  We do not intend to argue that, Your

20   Honor.

21          THE COURT:  There was evidence of that, I think.

22          MR. WESTLING:  There was.

23          THE COURT:  Well, I'm looking for a way, Mr. Andres,

24   that you-all could shorten this matter.  You know, one way is

25   the accountant could be asked:  Did you examine the records to

1    see whether any payments were made to Clothier A from Cyprus

2    bank accounts between this time period?

3            Yes, I did.

4            And how much was that?

5            And then you're done, right?

6            MR. ANDRES:  Judge, I don't -- we're putting on a --

7    not an expert but a forensic accountant whose done a tremendous

8    amount of work.  I think it's important the jury understand her

9    work.  I'm not going through every transaction, even close.

10           THE COURT:  Look, it isn't relevant if she spent her

11   life doing it.  I'm not going to spend my life doing it,

12   neither is the jury.  So the amount of work she's done is not

13   really relevant to us.

14           What I'm looking for is a means -- and you can

15   express your gratitude to her, and so can the Department of

16   Justice.

17                        (Laughter.)

18           THE COURT:  But we need to find a way to focus

19   sharply.  I think your use of charts helps.

20           MR. ANDRES:  Your Honor, I think the compromise is to

21   not go through every transaction, which was never our intent,

22   but it's important to show that the transactions, the domestic

23   transactions match the foreign transactions.  And we're not

24   going to go through every one.  We're absolutely not intending

25   to do that.

1    THE COURT:  All right.  I do remember some testimony,

2  I don't remember all of it in detail, but I think you did

3  elicit testimony that the clothing bills, the landscaping

4  bills, the other bills were paid from wire transfers from an

5  account in Cyprus.  Was that elicited?

6    MR. ANDRES:  A substantial number of those witnesses

7  said that they didn't know whose accounts those were.

8    THE COURT:  Oh, I agree with you.  You can show that.

9  But one chart shows that.  In fact, that's 60 -- that's 61,

10  although, it doesn't say whose accounts that is, but that --

11  I'm sure you've got other charts that does that.

12    That was my goal, Mr. Andres, is not to repeat things

13  and not to -- and I think you share that view.

14    MR. ANDRES:  I do, Your Honor.  And I don't intend to

15  repeat things, but I don't think it's -- that means that the

16  subject matter itself won't come up, that is, where the

17  payments resulted.  I'm not going to ask these people about --

18  I'm not going to ask this -- this agent -- or this accountant

19  about all of the transactions or even close to all of them.

20  I'm just going to ask for a summary so that she can establish

21  the work that she did.

22    I wasn't suggesting that we all be thankful for the

23  work that she did.  I was suggesting that it's important that

24  the jury understand what she did so that the charts -- she can

25  explain her process with the charts.  That's really all.  And,

1  again, I don't think this is going to be voluminous.  I

2  certainly don't think it's going to be cumulative.

3          THE COURT:  Mr. Westling, have you looked at all of

4  these charts?

5          MR. WESTLING:  I have, Your Honor, and I'll give the

6  Court an example.  If you look at No. 72, I think this is an

7  example of a proper summary.  It seems to include a summary of

8  all of the transactions that are foreign transactions that paid

9  vendors on one page as compared to the numerous charts that are

10  sort of vendor by vendor.

11          THE COURT:  I'm looking at 72.  All right.  It does

12  it by year, payments to vendors, how much.  What's missing,

13  however, Mr. Westling, is whether these vendors were paid by

14  wire transfers from Cyprus accounts.

15          MR. WESTLING:  Well, I suspect, Your Honor, that the

16  testimony of the witness would be that's what she gathered to

17  come up with these numbers.

18          THE COURT:  Well, another one-page chart could take

19  care of that.  I think the better way to put it, Mr. Andres, is

20  you want -- it's not a matter of gratitude for all the work the

21  witness has done, but you want to impress on the jury that

22  there's no doubt about the path of this money.

23          I agree that you may do that.  On the other hand, I

24  have to take into account the fact that they're not

25  disagreeing, they're not disputing it, and as a concession to

1    the shortness of life, we need to get it done.  I take your

2    representation that you don't plan to go through it transaction

3    by transaction.  I'm glad to hear that.  I don't know that I'd

4    permit it, but in any event, I'm glad to hear that.

5             Have you gone through all these exhibits,

6    Mr. Westling?

7             MR. WESTLING:  I have, Your Honor.

8             THE COURT:  Now, which ones do you say are cumulative

9    and why?

10            MR. WESTLING:  Well, I guess I would say that all of

11   the charts that relate to vendors, which include 65A, 65B, 65C,

12   65D, 65E, 65F, 65G, 65H, 65I, 65J, 65K, 65L, and 65M, which are

13   summaries of all of the transactions on a per-vendor basis,

14   which we've heard about from many folks on the stand or through

15   stipulations, are cumulative, Your Honor.

16            I will say, to be fair to my conversation with

17   Mr. Andres in trying to work this out, that we also note that

18   some of those we believe are proper summaries.  I still think

19   they are cumulative, but there's a number that have five or

20   less than ten transactions, which I think Mr. Andres has said

21   he probably is not going to use in an effort to shorten the

22   witness.  So we have made an effort to kind of work through

23   this.

24            THE COURT:  Yes, and I appreciate that, but now we

25   need to bring it to a close and it's lunchtime.  I take it you

1  were -- the two of you were under way in your effort to see if

2  you could focus this sharply.

3         MR. ANDRES:  Judge, I wouldn't agree with that at

4  all.  We've been focused sharply for a long time.  These

5  exhibits have been with the defense for at least a month.

6  We're not delaying this trial.  We're not spending any more

7  time --

8         THE COURT:  I didn't say that you are delaying it.  I

9  asked whether you were in the process with Mr. Westling of --

10 of seeing if you could reach agreement on these many exhibits.

11        MR. ANDRES:  I think we're largely in agreement and

12 we're ready to proceed, with the exception, I don't -- we don't

13 agree that they're cumulative.  We're not going to spend a lot

14 of time on them.  But, again, it's important, and Your Honor

15 said previously that the charts that we tried to admit through

16 the vendors will more appropriately come through an FBI agent.

17 We've now done that, and we're now going to walk through this

18 in what I think would be an expeditious fashion.

19        And it's important to tie those specific receipts to

20 specific payments.  It's not enough to simply do a chart with

21 all of the payments.  You have to show the relationship between

22 the receipts and the payments.

23        The other thing, Your Honor, is --

24        THE COURT:  If there's a dispute, you do.  Otherwise,

25 you wouldn't.

1    MR. ANDRES:  Well, Judge, again -- again, I apologize

2  if this is argumentative, but if the defense has not stipulated

3  to anything, which they haven't, not a single thing in terms of

4  these charts --

5    THE COURT:  Do you want to stipulate to anything here

6  in these charts, Mr. Westling?

7    MR. WESTLING:  I think we're willing to stipulate to

8  the information in Chart No. 72, Your Honor.

9    MR. ANDRES:  Judge, I'm not -- I'm at a loss.  We've

10 prepared our case.  We're ready to go.  We're not taking any

11 more time.  You tell us constantly we need to focus sharply.

12 Here we are ready to go and the defense now wants to stipulate.

13 Who's going to write up a stipulation?  It would be quicker to

14 put the witness on and get started.

15    THE COURT:  He's stipulating to what -- the

16 information on 72; is that correct?

17    MR. WESTLING:  That's correct, Your Honor.

18    THE COURT:  All right.  What we're going to do is

19 we're going to get the jury in.  You can proceed.  Do it

20 quickly.  Every time an objection is made, I'm going to have

21 you at the bench, and neither side is going to profit from

22 that.  I generally -- judges should be patient.  They made a

23 mistake when they confirmed me.

24    (Laughter.)

25    THE COURT:  I'm not very patient, so don't try my

1    patience either.

2            Bring the jury in.

3            And if the e-mail does not relate to the work that

4    she did, she's not going to read it.

5            MR. ANDRES:  Judge, I'd like to address that after,

6    after lunch.  I'm not going to -- in this session won't raise

7    that, but I'd like to address that at some point.

8            THE COURT:  You've already submitted a brief on it.

9            MR. ANDRES:  I understand, but I --

10           THE COURT:  And the brief was two pages, said a Sixth

11   Circuit case, which I've gone and read.  That's a throwaway

12   line.

13                        (Jury present.)

14           THE COURT:  All right.  You may be seated.

15           All right.  Call your next witness, Mr. Andres.

16           MR. ANDRES:  Your Honor, the Government calls

17   Morgan Magionos, a forensic accountant from the FBI.

18           THE COURT:  All right.  Come forward and take the

19   oath, please, ma'am.

20           MORGAN MAGIONOS, GOVERNMENT'S WITNESS, SWORN

21           THE COURT:  All right.  You may proceed, Mr. Andres.

22                      DIRECT EXAMINATION

23   BY MR. ANDRES:

24   Q.   Please state your name and spell it for the record.

25   A.   Morgan Magionos, M-a-g-i-o-n-o-s.

Magionos - Direct                                                          1538

1    Q.    Are you currently employed?

2    A.    Yes.

3    Q.    Where are you employed?

4    A.    The FBI.

5    Q.    And what's your title at the FBI?

6    A.    Forensic accountant.

7    Q.    Did you receive training from the FBI for this position?

8    A.    I did.

9    Q.    What training?

10   A.    I attended a six-week training session where we studied

11   forensic accounting investigative techniques and legal studies.

12   Q.    And how long have you been a forensic accountant at the

13   FBI?

14   A.    Eight years.

15   Q.    Have you been assigned to the investigation of

16   Paul Manafort?

17   A.    Yes.

18   Q.    And what was your role on that investigation?

19   A.    The financial analysis.

20   Q.    Did that involve tracing?

21   A.    Yes.

22   Q.    What is tracing?

23   A.    Tracing is following a transaction from origination to the

24   ultimate destination.

25   Q.    And over the course of your career in the FBI, how many

1  tracing and financial investigations have you been involved in?

2  A.    Over 25 investigations.

3  Q.    Can you briefly describe your educational background?

4  A.    Yes.  I have a Bachelor of Music in Cello Performance from

5  Manhattan School of Music, and I studied accounting at Portland

6  State University's postbaccalaureate program.

7  Q.    With respect to the program at Portland State University,

8  can you describe what that entailed?

9  A.    Yes.  It entailed taking 68 credit hours of accounting and

10  business-related courses, such as economics, statistics, and

11  finance.

12  Q.    And what was the purpose of that course?

13  A.    It allowed me to take the credit hours necessary to sit

14  for the CPA exam.

15  Q.    What is the CPA exam?

16  A.    It's a four-part exam that is one of the steps in becoming

17  licensed as a CPA.

18  Q.    During the time that you were in school at Portland State,

19  did you also work?

20  A.    I did.

21  Q.    Where did you work?

22  A.    I worked for a local architecture and engineering firm.

23  Q.    Okay.  And did you also work at an accounting firm at some

24  point?

25  A.    I did.

1  Q.   What accounting firm?

2  A.   Deloitte & Touche.

3  Q.   What's Deloitte & Touche?

4  A.   It's an international audit, tax, and consulting firm.

5  Q.   And over what period of time did you work there?

6  A.   From 2007 to 2010.

7  Q.   And can you describe your responsibilities?

8  A.   Yes.  I audited the financial statements of for-profit and

9  not-for-profit entities.

10 Q.   Did you hold any professional licenses or certificates?

11 A.   I do.

12 Q.   What license or certificates do you hold?

13 A.   I'm a certified public accountant and a certified fraud

14 examiner.

15 Q.   And with respect to the certified public accountant

16 license, what did you have to do to earn that license?

17 A.   It requires educational experience, such as a bachelor's

18 degree and additional coursework in accounting.  It requires

19 passing a four-part examination, at least one year of practical

20 experience, and then continuing professional education.

21 Q.   And what year did you receive your CPA license?

22 A.   2009.

23 Q.   Are you required to complete annual training to maintain

24 that license?

25 A.   Yes.

1  Q.   What does that involve?

2  A.   It requires 40 hours of continuing professional education

3  every year.

4  Q.   And have you maintained that license in good standing

5  since 2009?

6  A.   Yes.

7  Q.   You also testified that you're a certified fraud examiner.

8  What does it mean to be a certified fraud examiner?

9  A.   The certification denotes experience in investigating and

10 preventing fraud.

11 Q.   What -- what are the requirements?

12 A.   It requires educational and professional experience as

13 well as taking a -- and passing a four-part examination.

14 Q.   And what year did you obtain your certified fraud

15 certificate?

16 A.   2011.

17 Q.   Are you required to complete annual training to maintain

18 that designation?

19 A.   Yes.

20 Q.   What -- what did that require?

21 A.   It requires 20 hours of continuing professional education.

22 Q.   And have you maintained that designation since 2011?

23 A.   Yes.

24 Q.   You testified that as part of the Manafort investigation

25 you did a financial analysis.  What was the purpose of that

1    review?

2    A.    The purpose of the review was to determine sources of

3    funds into foreign bank accounts and then also determine the

4    ultimate destination of transfers from those foreign bank

5    accounts.

6    Q.    As part of that review, did you rely on particular

7    documents?

8    A.    Yes.

9    Q.    What documents?

10   A.    I relied on documents from foreign -- foreign accounts as

11   well as domestic bank accounts, title records, vendor records,

12   business records, tax records, and accounting records.

13            MR. ANDRES:  Your Honor, at this point, the

14   Government moves to admit Government Exhibit 66A, 66C, 66D,

15   66E, 66G, 67B, and 67C, all of which are foreign financial

16   records, and we move to admit them pursuant to Title 18, United

17   States Code, 3505.

18            MR. WESTLING:  No objection, Your Honor.

19            THE COURT:  Admitted.

20            (Government Exhibit Nos. 66A, 66C, 66D, 66E, 66G,

21   67B, and 67C were received in evidence.)

22            THE COURT:  Next question.

23   BY MR. ANDRES:

24   Q.    Let me ask you to take a look at Government Exhibit 63.

25   Can you tell me what that is?

1    A.   This is a chart that lists foreign bank accounts.

2    Q.   Okay.  And what information did you rely on to create this

3    chart?

4    A.   I relied on bank account applications and account opening

5    documents from Cyprus, St. Vincent and the Grenadines, and from

6    HSBC U.K.

7    Q.   Okay.  And how did you obtain those documents?

8    A.   I obtained the records from Cyprus, St. Vincent and the

9    Grenadines through an MLAT, a mutual legal assistance treaty,

10   and the records from HSBC U.K. were provided via subpoena.

11   Q.   And were the documents that you relied on in creating the

12   chart in Government Exhibit 63, were they voluminous?

13   A.   Yes.

14   Q.   Okay.

15         MR. ANDRES:  Your Honor, the Government would -- let

16   me --

17   BY MR. ANDRES:

18   Q.   Before I do that, let me ask you to turn to Government

19   Exhibit 66, 66C.

20         What's included in Government Exhibit 66C?

21         MR. ANDRES:  Mr. Flood?

22         THE COURT SECURITY OFFICER:  We have five volumes

23   here.

24         MR. ANDRES:  Yeah.

25         THE COURT SECURITY OFFICER:  Do you know which one

1    it's in?

2              MR. ANDRES:  I believe it's in the first volume.

3              THE WITNESS:  They're the MLAT records.

4              MR. ANDRES:  66C?

5              THE COURT:  Is it a chart?

6              MR. ANDRES:  No, it's the underlying records.  Do you

7    have those?

8              THE WITNESS:  Not up here.

9              THE COURT:  Have they been admitted?

10             MR. ANDRES:  I just admitted them, Your Honor.

11             THE COURT:  All right.  And what --

12             MR. ANDRES:  Yes.

13             THE COURT:  -- is the question before this witness?

14             What is the question before this witness?

15             MR. ANDRES:  The question was to have her turn to the

16   exhibit that's been admitted.

17             THE COURT:  What is the question you're going to put

18   to her?

19             MR. ANDRES:  I'm going to ask her what the records --

20   what the document is.

21             THE COURT:  All right.  You may show that to the

22   witness.  And let me state so the record is clear:  There was

23   an objection as to cumulative.  I'll overrule that objection,

24   but you may reassert it as to a specific matter.

25             MR. WESTLING:  Thank you, Your Honor.

1          THE COURT:  Proceed.

2          MR. ANDRES:  If I may, I just want to make sure I

3    have the right exhibit, Your Honor.  Can I have a moment?

4          THE COURT:  Yes, you may -- you may.

5          MR. ANDRES:  Your Honor, may Mr. Binder go and

6    facilitate looking for the exhibit in those boxes?

7          THE COURT:  Yes, you may.

8          MR. ANDRES:  Thank you.

9          THE COURT:  Can you go to something else while he

10   does that?

11         MR. ANDRES:  Sure.

12   BY MR. ANDRES:

13   Q.   Government Exhibit -- in the course of the -- creating the

14   chart in 66C, did you rely on bank records from abroad?

15   A.   I did.

16   Q.   What bank records?

17   A.   I relied on records provided by Cyprus, St. Vincent and

18   the Grenadines, and HSBC U.K.

19   Q.   And did that include bank account records?

20   A.   Yes.

21   Q.   Okay.  And did you also get records from the particular

22   banks?

23   A.   I did.

24   Q.   Okay.  And did you include that information in 66C?

25   A.   Yes, 63.  Yes, I did.

Magionos - Direct                                                    1546

1    Q.   63, yes.  And --

2            THE COURT:  You were saying 66.  Which exhibit is it?

3            THE WITNESS:  63, sir.

4            THE COURT:  Is that the summary that you prepared?

5            THE WITNESS:  Yes.

6            THE COURT:  And is that based on these exhibits that

7    Mr. Andres has asked you about?

8            THE WITNESS:  Yes.

9            THE COURT:  I've admitted the 63, haven't I,

10   Mr. Andres?  I think I have.

11           MR. ANDRES:  I didn't move to admit it yet, but I'll

12   do that now, Your Honor.

13           MR. WESTLING:  No objection, Your Honor.

14           THE COURT:  It's admitted.

15           (Government Exhibit No. 63 was received in evidence.)

16           MR. ANDRES:  May I publish it, Your Honor?

17           THE COURT:  Yes, you may.

18           MR. ANDRES:  Okay.

19   BY MR. ANDRES:

20   Q.   Can I ask you to turn to Government Exhibit 63, the chart?

21           You testified that you relied on overseas bank

22   records.  Did that include records from HSBC?

23   A.   Yes, it did.

24   Q.   And what records came from HSBC?

25   A.   A bank account opening document and wires and bank

Magionos - Direct                                                    1547

1    statements for Pompolo Limited.

2    Q.   Okay.  Did you also rely on documents provided by

3    Mr. Manafort?

4    A.   Yes, I did.

5    Q.   And that was pursuant to a subpoena?

6    A.   Yes.

7    Q.   Okay.  With respect to those documents from Mr. Manafort,

8    Government Exhibit 447A through Q, what did -- what are those

9    documents?

10   A.   Those documents include account opening documents, bank

11   statements, and wires.

12          MR. ANDRES:  The Government moves to admit Government

13   Exhibit 447A through Q.

14          MR. WESTLING:  I think, assuming you're going to put

15   in the stipulation, no objection.

16          MR. ANDRES:  Thank you.

17          THE COURT:  I didn't hear that.

18          MR. WESTLING:  There's a -- there's a related

19   stipulation, Your Honor, that I wanted to be ensured the

20   Government was going to be offering, and with that proviso, we

21   have no objection to the records.

22          THE COURT:  What's the stipulation, Mr. Andres?

23          MR. ANDRES:  The stipulation relates to those

24   records, Your Honor.  I'm happy to offer it now, I just need to

25   find it.  I'm sorry, I apologize.

1           It's Government Exhibit 456.

2           THE COURT:  What's the number of the stipulation?

3           MR. ANDRES:  456.  I'm going to hand up a copy to

4   Mr. Flood.

5           THE COURT:  No, I have it here.  I should have it

6   here.

7           No, I don't.  Mine goes to 451, so hand that to the

8   court security officer.

9           MR. ANDRES:  Thank you.

10          THE COURT:  Ladies and gentlemen, the parties

11  stipulate that in August and September of 2017, the United

12  States served several federal subpoenas for records, including

13  foreign bank records on Paul Manafort and DMP International.

14          In response, on October 20, 2017, the documents in

15  Government Exhibits 447A through Q were produced, and the

16  parties stipulate that the documents, Exhibits 447A through Q,

17  are admissible as trial exhibits.

18          On October 20, 2017, a duly-appointed agent also made

19  the following representation to the Government concerning the

20  documents described in Exhibit 2 with respect to the offshore

21  bank account information that we produced -- the "we" means

22  that these entities have produced the documents -- produced.

23  These are accounts of DMP International.

24          Mr. Rick Gates had no control over, no financial

25  interest, and ownership interest in these accounts.  He was not

1    a trustee as defined by U.S. law.  He was merely an employee of

2    DMP International and only had authority to act as an employee

3    with respect to these accounts.

4              Anything further?

5              MR. ANDRES:  Your Honor, the "we" references the

6    parties in No. 1, which is not just the entities.  It's also

7    Mr. Manafort.

8              THE COURT:  I see.  Yes, that's correct.

9              MR. ANDRES:  Thank you, Your Honor.

10             THE COURT:  You may proceed.  And 456 is admitted.

11             (Government Exhibit Nos. 447A thru 447Q and 456 were

12   received in evidence.)

13             MR. ANDRES:  Thank you, Your Honor.

14   BY MR. ANDRES:

15   Q.   Forensic Accountant Magionos, can you look at the chart in

16   Government Exhibit 63 and explain what that is?

17   A.   Yes.  This chart summarizes account opening documents as

18   provided by accounts in Cyprus, St. Vincent and the Grenadines,

19   and the United Kingdom.  The first column lists the account

20   name and account number as well as the financial institution

21   where the account is located.

22             The second column lists the account opening date or

23   the balance forward date.

24             The third column lists the account close date or the

25   final transaction date.

1            The next column lists the beneficial owner listed on

2     the bank account application.

3            And then the last column lists the authorized signers

4     listed on the bank account application.

5     Q.   And how many accounts are listed in this chart?

6     A.   Thirty-one.

7     Q.   Okay.  And those charts -- those accounts, you received

8     information about those accounts through your investigation?

9     A.   Yes.

10    Q.   Okay.  And listed on the accounts are the beneficial

11    owners.  Where did that information come from?

12    A.   That information came directly from the account opening

13    documents and bank account applications.

14    Q.   Okay.  And what denomination are the different accounts in

15    that you identify in your chart?

16    A.   They're either in U.S. dollar, euro, or British pound.

17    Q.   And how are you able to distinguish between those two

18    currencies?

19            THE COURT:  There were three currencies.

20            THE WITNESS:  It depended on the account number,

21    so --

22            THE COURT:  She said three currencies.

23            MR. ANDRES:  Yeah.

24            THE COURT:  But that's all right.

25            Go ahead, Mr. Andres.

1  BY MR. ANDRES:

2  Q.   How were you able to distinguish between those three

3  currencies?

4  A.   It depended on the account number.  The second digit for

5  the Cypriot accounts denoted either a 32 or an 11.  32 shows a

6  U.S. dollar account, the 11 shows a euro account.

7  Q.   And without going through each account, can you tell us

8  the names -- so, for example, when you look at the entry in

9  No. 1, it says "Actinet"; is that correct?

10 A.   Yes.

11 Q.   And there's more than one account for Actinet?

12 A.   Yes.

13 Q.   How do you -- how can you explain that?

14 A.   There were two accounts, a U.S. dollar account and a euro

15 account at Bank of Cyprus; and then there were two accounts at

16 Hellenic Bank, again, a U.S. dollar account and a euro account.

17 Q.   Okay.  And without going through each of the accounts in

18 terms of the banks and denomination, can you identify for the

19 jury the names of each of the entities that had bank accounts

20 that are in the chart in Government Exhibit 63?

21 A.   You want me to read the names?

22 Q.   Yes.

23 A.   Actinet Trading Limited; Black Sea View Limited; Bletilla

24 Ventures Limited; Global Highway Limited; Leviathan Advisors

25 Limited; LOAV Advisors Limited; Lucicle Consultants Limited;

1  Marziola Holdings Limited; Olivenia Trading Limited; Peranova

2  Holdings Limited; Serangon Holdings Limited; Yiakora Ventures

3  Limited; Pompolo Limited; Global Endeavour, Inc.; and Jeunet

4  Limited.

5  Q.   Okay.  And when you look at those -- the names in those

6  accounts, did you compare them to the documents produced by

7  Mr. Manafort?

8  A.   Yes.

9  Q.   And what did you find?

10  A.   I found that all of the accounts listed in this exhibit

11  were included in Mr. Manafort's production except for the

12  Peranova Holdings euro account and then the Pompolo Limited

13  account.

14  Q.   Okay.  And how were those different?

15  A.   They just were not provided by Mr. Manafort.

16  Q.   Okay.  But you received documentation from overseas

17  relating to those entities?

18  A.   I did.

19  Q.   And with respect to the accounts in the chart, what

20  countries are those accounts located?

21  A.   They're located in Cyprus, St. Vincent and the Grenadines,

22  and the United Kingdom.

23  Q.   Okay.  In Column No. 5, you have the beneficial owner

24  listed.  Without going through each of the accounts, who were

25  the individuals that are identified as the beneficial owners?

1  A.    It was either Mr. Manafort, Mr. Gates, or Mr. Kilimnik.

2  Q.    Okay.  And where did you determine that information from?

3  A.    By reviewing the account opening documentation.

4  Q.    Okay.  And then in the final column, it's listed

5  authorized signatures listed on the bank account application.

6  Where did that information come from?

7  A.    That information came from the bank account opening docs

8  that we received.

9  Q.    And again, without going through each and every account,

10 who are the names listed on those -- on those accounts?

11 A.    Either Mr. Manafort and Mr. Gates or a group of

12 individuals located in Cyprus:  Eleni Chrysostomides,

13 Chrystalla Pitsilli Dekatris, Myrianthi Christou, Evelina

14 Georgiades, or Georgoula Mavrides.

15 Q.    I'm not even going to try to pronounce those, but in the

16 course of your investigation, those individuals that you just

17 mentioned, did you understand that they were associated with a

18 particular entity?

19 A.    Yes.

20 Q.    What entity?

21 A.    They were associated with Dr. Kypros Chrysostomides' law

22 firm.

23 Q.    Is he also known as Dr. K?

24 A.    Yes.

25 Q.    Okay.  And how did you decide what accounts to include in

1    your chart in Government Exhibit 63?

2    A.   I included accounts that actually had transactional

3    activity or were relevant to the investigating --

4    investigation, meaning they had transfers into their accounts

5    from other foreign entities, and they made transfers to vendors

6    for real estate purchases to DMP International or Davis

7    Manafort Partners or Mr. Manafort, his family, and related

8    entities.

9    Q.   Okay.  And over what time period did you -- did that

10   relate to?

11   A.   2010 through 2014.

12   Q.   Okay.  You testified that you've gotten these records.

13   Can you identify now the banks that are listed in your chart?

14   A.   Yes.  The banks are Bank of Cyprus, Hellenic Bank, Loyal

15   Bank, and HSBC U.K.

16   Q.   Okay.  Can I ask you to look at the entry in No. 1 and 2

17   and identify who the beneficial owner is?

18   A.   Yes.  The beneficial owner is listed as Mr. Manafort, and

19   then as of January 21, 2013, Mr. Kilimnik.

20   Q.   Okay.  Can I ask you to take a look at Government

21   Exhibit 66D, which is in evidence, and tell me what that is?

22   A.   This is an account opening document and bank account

23   application.

24   Q.   Okay.  And can you take a look at Government Exhibit 4385

25   and tell me what that is?

1  A.   Yes.  This shows the beneficial owner for Actinet Trading

2  Limited, and it shows Mr. Manafort as the beneficial owner.

3  Q.   Okay.  I'm sorry, who's listed as the beneficial owners?

4  A.   Mr. Manafort.

5  Q.   Okay.  And can you turn to 4395 and tell me what that is?

6  A.   This is a signature card.

7  Q.   And who's listed on that document?

8  A.   Eleni Chrysostomides, Chrystalla Pitsilli Dekatris, and

9  Myrianthi Christou.

10 Q.   Can I ask you to turn to Government Exhibit -- to page

11 4401 of Government Exhibit 66D?

12 A.   Okay.

13         MR. ANDRES:  Your Honor, can I publish this document?

14         THE COURT:  Is it admitted?

15         MR. ANDRES:  Yes.

16         THE COURT:  You may.

17 BY MR. ANDRES:

18 Q.   Is there a page number listed on the bottom of there?  The

19 Bates number is 4401?

20 A.   Yes.

21 Q.   What's the page number listed?

22 A.   It's the last page.

23 Q.   Okay.  Okay.  Can you tell me what was included in the

24 bank records that you received in Government Exhibit 66D at

25 4401?

1   A.    Yes.  This is a copy of Mr. Manafort's passport.

2   Q.    And where did you find that document?

3   A.    In the account opening documents.

4   Q.    And where did those come from?

5   A.    From Cyprus.

6   Q.    Okay.  You testified that with respect to the banks,

7   Hellenic Bank was one of the banks that provided documents.

8         Was there a correlation between the dates of the

9   first transaction and those records and the relevant dates at

10  the Bank of Cyprus?

11  A.    Yes.

12  Q.    Can you explain what that was?

13  A.    So when the accounts at the Bank of Cyprus closed, soon

14  after, there were transfers from those accounts directly to

15  Hellenic Bank.

16  Q.    Okay.  And did you -- was there -- did you find that the

17  opening -- or the opening balance and the dates of the first

18  transaction or the opening dates of the records at Hellenic

19  Bank, that they matched up or there was some issue between

20  those?

21  A.    As far as Hellenic Bank goes, they did not provide the

22  account opening date or closing date, like the bank of Cyprus

23  did, and as a result, I used the balance forward date that was

24  listed on the statements as the account opening date, and then

25  I used the final transaction date as the date of the account

1   closing.

2   Q.   Okay.

3          THE COURT:  When you say, "they did not provide,"

4   you're referring to the bank?

5          THE WITNESS:  That's correct.

6          THE COURT:  Next question.

7   BY MR. ANDRES:

8   Q.   With respect to Item 7 on Government Exhibit 63, can you

9   tell me what that is?

10  A.   This is a summary of the account opening documents for

11  Bletilla Ventures Limited.

12  Q.   Okay.  And with respect to those documents -- to that

13  account, can I ask you to look at Government Exhibit 66D and

14  turn to Page 4480?

15         Can you tell me what that is?

16  A.   This is a page that lists the beneficial owner for

17  Bletilla Ventures Limited.

18  Q.   Okay.

19         MR. ANDRES:  May I publish that, Your Honor?

20         THE COURT:  You may.  It's been admitted, hasn't it?

21         MR. ANDRES:  Yes.

22  BY MR. ANDRES:

23  Q.   Do you see in the middle of the page, at the bottom, what

24  the number is?

25  A.   It's 4480.

1    Q.   It's -- not the Bates number, I'm sorry.  The -- in the

2    middle of the bottom, there's a number that says 66D-page and

3    the page number.  Do you not see that?

4    A.   No.

5              MR. ANDRES:  Okay.  I'll move on, Your Honor.

6    BY MR. ANDRES:

7    Q.   What is that document that you have?

8    A.   This lists the beneficial owner for Bletilla Ventures

9    Limited.

10   Q.   And what's the date of that?

11   A.   It is February 1, 2012.

12   Q.   Okay.  Can I ask you to look at Entry 14 on your chart?

13             Can you tell me what that is?

14   A.   This summarizes the account opening docs for LOAV Advisors

15   Limited.

16   Q.   Okay.  Can I ask you to look at Government Exhibit 66D and

17   the Bates No. 5105?

18             Can you tell me what that is?

19   A.   Yes.  This lists the beneficial owner and comes from the

20   bank account opening docs.

21   Q.   Okay.  And who's listed as the beneficial owner?

22   A.   Mr. Gates and Mr. Manafort.

23   Q.   Okay.  And is that the information you relied on with

24   respect to creating the chart in Government Exhibit 63?

25   A.   Yes.

1    Q.   And what's the date of the document 5105?

2    A.   The date is October 8, 2007.

3    Q.   Okay.  Can I ask you to look at the entries at 15 and 16?

4         Tell me what those are.

5    A.   Yes.  These summarize the account opening documents for

6    Lucicle Consultants Limited.

7    Q.   Okay.  And with respect to the signature cards for those

8    accounts, 15 and 16, can you take a look at Government

9    Exhibit 66D and Page 4248?

10        Tell me what that is.

11   A.   Yes.  This is a signature card for Lucicle Consultants

12   Limited.

13   Q.   Okay.  And can I ask you to turn to Page 4239?

14        What's included there?

15   A.   It's a copy of Mr. Manafort's passport.

16   Q.   Okay.  And where did you receive that document?

17   A.   From the account opening documents provided by Bank of

18   Cyprus.

19   Q.   And what account was that related to?

20   A.   Lucicle Consultants Limited.

21   Q.   Okay.  Can I ask you to take a look at the entry at

22   No. 20?

23        Can you tell me what that is?

24   A.   This summarizes the bank account opening docs for Marziola

25   Holdings Limited.

1    Q.    And you testified earlier that the individuals listed on

2    the column on the far right were associated with Dr. K.   How

3    did you learn that?

4    A.    Through the investigation, reviewing e-mails.

5    Q.    Okay.  And with regard to entry No. 26, Serangon Holdings,

6    where did the information in the chart come from as it related

7    to Government Exhibit -- with respect to No. 26?

8    A.    It was from the bank account opening documents from Bank

9    of Cyprus.

10   Q.    Okay.  And is it fair to say that in the context of

11   reviewing these records, you found other instances where

12   Mr. Manafort's passport was included?

13   A.    Yes.

14   Q.    And that was produced as part of the account opening

15   documents?

16   A.    Yes.

17   Q.    Do you know generally when the date was that the -- that

18   the accounts in Cyprus was closed?

19   A.    They were closed in 2013.

20   Q.    Okay.  And during the course of the investigation, did you

21   learn that Mr. Manafort was interviewed at some point?

22   A.    Yes.

23   Q.    And when did that interview take place?

24   A.    In July of 2014.

25   Q.    And did you also learn that Mr. Gates was interviewed at

1  some point?

2  A.   Yes.

3  Q.   And when was that?

4  A.   In July of 2014.

5  Q.   That was after the accounts in Cyprus were closed?

6  A.   Yes.

7          THE COURT:  When we finish with this exhibit, we'll

8  recess for lunch.

9          MR. ANDRES:  Okay.  Thank you, Judge.  Just one other

10 question.

11 BY MR. ANDRES:

12 Q.   You testified that Mr. Manafort produced certain documents

13 pursuant to a Title 31 subpoena; is that correct?

14 A.   Yes.

15         MR. WESTLING:  Your Honor, I just want to object.  I

16 don't think that's what the stipulation says.  I think it says

17 they were produced by DMP International.

18         MR. ANDRES:  Your Honor, the stipulation, it

19 obviously stands for itself.  I'll rephrase the question.

20         THE COURT:  All right.

21 BY MR. ANDRES:

22 Q.   There were documents produced by Mr. Manafort and his

23 entities; is that correct?

24 A.   Yes.

25 Q.   And you relied on those at some point?

1    A.    Yes.

2    Q.    And that involved -- or that included bank records from

3    Cyprus; is that correct?

4    A.    That's correct.

5    Q.    Do you know when Mr. Manafort made that production?

6              MR. WESTLING:  Again, objection.  Same objection,

7    Your Honor.

8              THE COURT:  What's the objection?

9              MR. WESTLING:  It's misstating what's in the

10   stipulation, which clearly states these were produced by DMP

11   International.

12             THE COURT:  All right.  Go on.  I'll overrule the

13   objection.  Answer the question.

14   BY MR. ANDRES:

15   Q.    I'm just asking for the approximate date of the

16   production.

17   A.    The date of the production was October 20, 2017.

18             THE COURT:  And so far as you know from the

19   documents, was that production by DMP International?

20             THE WITNESS:  I don't know.

21             THE COURT:  All right.  Ladies and gentlemen --

22   you're done now?

23             MR. ANDRES:  Yes, Your Honor.

24             THE COURT:  All right.  Pass your books to the right.

25   The court security officer will collect them, maintain their

Magionos - Direct                                                    1563

1  security.  Remember to refrain from discussing the matter among

2  yourselves or with anyone or undertaking any investigation on

3  your own.

4          Your lunches should be there.  I hope they are

5  adequate.  You may follow the court security officer out.

6                          (Jury out.)

7          THE COURT:  All right.  You may be seated for a

8  moment.

9          Mr. Westling, I think you are aware of -- oh, I beg

10  your pardon.  Ms. Magionos, you -- did I pronounce your name

11  correctly?

12          THE WITNESS:  Yes.

13          THE COURT:  You may take the luncheon recess.

14          THE WITNESS:  Thank you.

15          THE COURT:  You may step down.  During your recess,

16  you may not discuss this -- your testimony with anyone,

17  including lawyers.

18          THE WITNESS:  Okay.  Thank you.

19          THE COURT:  You may depart.

20                          (Witness stood down.)

21          THE COURT:  Mr. Westling, you have the benefit of

22  receiving, I think, notice of what exhibits the Government

23  intends to offer through this witness.  Am I correct?

24          MR. WESTLING:  That's correct, Your Honor.

25          THE COURT:  If you have any objections to those

1   exhibits, I want you to disclose to Mr. -- well, yes, I want

2   you to disclose to Mr. Andres what your objection is to a

3   specific exhibit, see if you can reach accommodation.  If not,

4   I'll rule on it, but we want to move along fairly expeditiously

5   if we can.

6           Is that clear?

7           MR. WESTLING:  Yes, Your Honor.

8           THE COURT:  And the other thing is I don't know,

9   Mr. Andres, whether you intend to have her read e-mails.  She

10  may read admissible e-mails if they pertain to her

11  investigation, but you may not read -- have her read e-mails

12  that she didn't use, if they weren't part of her -- that's not

13  the way to present evidence.  Am I clear?

14          MR. ANDRES:  You are, Your Honor.  I just -- just for

15  the record, I understand your ruling.  It's the Government's

16  position that agents can read evidence that's admitted, so our

17  basis for asking that the other --

18          THE COURT:  She's not even an agent.

19          MR. ANDRES:  If what Your Honor is suggesting is

20  that --

21          THE COURT:  I'm suggesting that if you want -- I told

22  you that it's admissible, and I don't know whether you've

23  already offered it, but it would be admitted, if it's an

24  admission and there's no other objection to it.

25          What I find problematic, troublesome is that you are

1   going to have a witness read it, a witness who didn't use it in

2   her investigation, and she's just reading something that's in

3   the record.  You do that in your closing, if you want to, after

4   I admit it.

5            MR. ANDRES:  Understood, Judge, but does that mean

6   that an agent who was involved in those aspects of the

7   investigation could read that or --

8            THE COURT:  Yes, it does.

9            MR. ANDRES:  Okay.  Thank you.  That's very helpful,

10  Judge.

11           THE COURT:  But you can't get somebody who has

12  nothing to do with it to sit there and read it.

13           MR. ANDRES:  I completely understand, Your Honor.

14           THE COURT:  And how in the world could a defendant

15  cross-examine this?  It's very difficult to anyone, but that

16  would make it impossible if the witness would simply say, "I

17  don't know.  I was just given this to read."

18           MR. ANDRES:  Thank you, Your Honor.

19           THE COURT:  All right.  We will, we will recess

20  until -- let's make it 1:35, and then we'll continue.

21           How much more do you anticipate, Mr. Andres?

22           MR. ANDRES:  At least another hour, Your Honor.

23           THE COURT:  I thought we were shortening it.

24           MR. ANDRES:  Well, we were.  We started -- I don't

25  think I've been speaking for much longer than 15 or 20 minutes,

1566

1    but I'm sure there's a record of that somewhere.

2              THE COURT:  I'm not limiting it.  I'm merely asking

3    that you make an effort to shorten it even more if you can.

4              MR. ANDRES:  Enjoy your lunch, Judge.

5              THE COURT:  Court stands in recess.

6              (Recess from 12:40 p.m., until 1:35 p.m.)

7

8                       CERTIFICATE OF THE REPORTER

9         I certify that the foregoing is a correct transcript of

10   the record of proceedings in the above-entitled matter.

11

12

13                              _____
                                          /s/
14                                 Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25