# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      )  Criminal Action
                                     )  No. 19-CR-125
 4                    Plaintiff,     )
                                     )  JURY TRIAL
 5    vs.                            )  DAY 9 - Morning
                                     )  Public Transcript
 6    Gregory B. Craig,              )  Washington, DC
                                     )  August 22, 2019
 7                    Defendant.     )  Time:  9:30 a.m.
      _____
 8
              TRANSCRIPT OF JURY TRIAL - DAY 9 - MORNING
 9                         HELD BEFORE
           THE HONORABLE JUDGE AMY BERMAN JACKSON
10               UNITED STATES DISTRICT JUDGE
      _____
11
                    A P P E A R A N C E S
12
13    For Plaintiff:     Fernando Campoamor-Sanchez
                         Molly Gulland Gaston
14                       U.S. Attorney's Office FOR THE
                            DISTRICT OF COLUMBIA
15                       555 Fourth Street, NW
                         Washington, DC 20530
16                       (202) 252-7698
                         Email: Fernando.campoamor-sanchez@usdoj.gov
17                       Email: Molly.gaston@usdoj.gov
                         Jason Bradley Adam McCullough
18                       U.S. Department of Justice
                         950 Pennsylvania Avenue, NW
19                       Washington, DC 20530
                         (202) 233-0986
20                       Email: Jason.mccullough@usdoj.gov

21    For Defendant:     William James Murphy
                         William W. Taylor, III
22                       Adam B. Abelson
                         ZUCKERMAN SPAEDER, LLP
23                       100 East Pratt Street
                         Suite 2440
24                       Baltimore, MD 21202
                         (410) 949-1146
25                       Email: Wmurphy@zuckerman.com
                         Email: Wtaylor@zuckerman.com
                         Email: Aabelson@zuckerman.com
```

1                      **Paula M. Junghans**
                       **Ezra B. Marcus**
2              ZUCKERMAN SPAEDER, LLP
               1800 M Street, NW
3              Suite 1000
               Washington, DC 20036
4              (202) 778-1814
               Email: Pjunghans@zuckerman.com
5              Email: Emarcus@zuckerman.com

6    _____

7    Court Reporter:    Janice E. Dickman, RMR, CRR, CRC
                        Official Court Reporter
8                       United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
9                       Washington, DC  20001
                        202-354-3267

10

11

12                          INDEX

13   Witness:

14    Richard Gates

15      Direct Examination By Mr. Campoamor-Sanchez..........1812

16      Cross-Examination By Ms. Junghans...................1893

17                      *   *   *

18

19

20

21

22

23

24

25

```
1              THE COURTROOM DEPUTY:  All rise.  The United States

2    District Court for the District of Columbia is now in session,

3    the Honorable Richard --

4              THE COURT:  Do I look like the Honorable

5    Richard Leon?  I don't think so.

6              All right.  All right.

7              THE COURTROOM DEPUTY:  It's only 9:30.

8              THE COURT:  Have everybody put their names on the

9    record, and then we can --

10             THE COURTROOM DEPUTY:  Your Honor, this is Criminal

11   Case Number 19-125, the United States of America v. Gregory B.

12   Craig.

13             Counsel, please approach the lectern and identify

14   yourself and your colleagues for the record.

15             MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

16             Molly Gaston, Jason McCullough, and

17   Fernandez Campoamor for the United States.  And with us is

18   paralegal specialist Amanda Rohde.

19             THE COURT:  Good morning.

20             MS. JUNGHANS:  Good morning, Your Honor.

21             Paula Junghans, Bill Murphy, Bill Taylor and

22   Adam Abelson and Ezra Marcus for Mr. Craig.

23             THE COURT:  All right.

24             MS. JUNGHANS:  And Mr. Craig is present.

25             THE COURT:  Good morning, everybody.  I think
```

1    you've -- the parties have both been informed, we -- Mr. Haley

2    received a note from a juror yesterday evening, or earlier this

3    morning, asking to be excused.  We don't have any further

4    information.  My intention would be to bring him in, let him

5    sit in the witness stand, ask him if it's a matter that he

6    would prefer to discuss in private at the bench, or not.

7            If he says it is, then we'll do it at the bench.  It

8    will be on the record, though.  And if he's comfortable sitting

9    there, then we'll let him sit there.  And we'll find out what

10   it is before we figure out what to do about it.  But if some

11   discussion is required, we will have him step out before we

12   discuss it.

13           Does anybody else think we should do anything else?

14           MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

15           MS. JUNGHANS:  No, Your Honor.

16           THE COURT:  All right.

17           Can you bring in the juror, Mr. Haley, and ask him to

18   have a seat.

19           (Whereupon the juror enters the courtroom.)

20           THE JUROR:  Good morning, Your Honor.

21           THE COURT:  Good morning, sir.

22           I understand that Mr. Haley received an email from

23   you, asking if you could be excused from jury service.

24           Are you the one that sent the email to Mr. Haley?

25           THE JUROR:  Yes, ma'am.

```
1              THE COURT:  All right.  Now, I would like to ask you

2     the circumstances behind your request.  If it's very personal

3     and you would like to come to the bench with the husher on, we

4     can accommodate that.

5              THE JUROR:  Yes, ma'am.

6              THE COURT:  There would still be a public record

7     being transcribed of what you're saying.  So, is it something

8     that you can discuss from there, or would you prefer to come to

9     the bench?

10             THE JUROR:  I would prefer to come to the bench, if I

11    may, ma'am.

12             THE COURT:  All right, sir.

13             Can I have somebody from both sides?

14             (Bench discussion:)

15    ████████████████████████████████████████████

16    ███████████████████████████████████████████████████

17    █████████████████████████████████████████████████████████

18    ██████████████████████████████████████████████████████

19    ███████████████████████████████████████████████████████████

20    ██████████████████████████████████████████████████████

21    ███████████████████████████████████████████████████████████

22    ████████████████████████████

23    ████████████████████████████████████████████████████████

24    ███████████████████████████████████████████████████████

25    ███████████████████████████████████████████████████████
```

1806





1808



1809





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        (Whereupon the juror exits the courtroom.)

16        (Open court:)

17              THE COURT:  That portion of the transcript will be

18   sealed, given the fact that it contained the jurors's personal

19   medical information.  And the juror is not going to be excused

20   at this time.

21              All right.  Are we ready to bring the jury in to

22   start this morning's proceedings?

23              MR. CAMPOAMOR-SANCHEZ:  Yes.  Do you want me to bring

24   the witness in?

25              THE COURT:  Yeah.  You can have him ready to go.

1    I'll have you call him when the jury is seated.

2              Thank you.

3              (Whereupon the jury enters the courtroom.)

4              THE COURTROOM DEPUTY:  All present, Your Honor.

5              THE COURT:  All right.  Good morning.  I note

6    everyone is present.  And when I arrived this morning, I could

7    hear that many of you were here early, so I very much

8    appreciate that.

9              I take it that everyone has managed to follow the

10   instructions and not do have any research or have conversations

11   about the case overnight.

12             Okay.  Everybody is nodding their heads.

13             There has been, you may notice, a little bit of a

14   seating rejiggering this morning.  It is just for the physical

15   convenience of one of the jurors, and it has nothing to do

16   with -- it is -- no negative inferences should be drawn about

17   any of you for any reason.  We just changed the seats to

18   convenience one of you.  And we thank you for your flexibility

19   about that.

20             All right.  You can call your next witness.

21             MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

22             The government calls Richard Gates.

23                       RICHARD GATES,

24   was called as a witness and, having been first duly sworn, was

25   examined and testified as follows:

```
 1              THE COURT:  You can proceed.

 2              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

 3                        DIRECT EXAMINATION

 4   BY MR. CAMPOAMOR-SANCHEZ:

 5   Q.  Good morning, sir.

 6   A.  Good morning.

 7   Q.  Can you please tell us your name and spell it for the

 8   record?

 9   A.  Yes.  Richard W. Gates, G-A-T-E-S.

10   Q.  How old are you, sir?

11   A.  I am 47 years old.

12   Q.  Without telling us where you live -- or without telling us

13   your specific address, where do you live?

14   A.  In Richmond, Virginia.

15   Q.  Are you married, sir?

16   A.  I am.

17   Q.  Do you have kids?

18   A.  I do.  I have four kids.

19   Q.  Can you please tell us your educational background?

20   A.  Yes.  I received a bachelor of arts from the College of

21   William & Mary, and then I received my master's of arts in

22   public policy from George Washington University.

23   Q.  Sir, do you have any military experience?

24   A.  I do.

25   Q.  What is that?
```

1   A.   I served in the Virginia Army National Guard for six and a

2   half years.

3   Q.   Did you receive an honorable discharge?

4   A.   I did.

5   Q.   Now, sir, are you currently unemployed?

6   A.   I am.

7   Q.   We're going to get back to that in a few minutes.

8            But, first of all, do you know a man by the name of

9   Paul Manafort?

10   A.   I do.

11   Q.   How is it that you know Mr. Manafort?

12   A.   I worked for Mr. Manafort for approximately ten years, at

13   his firm.

14   Q.   And what time span was that, those ten years,

15   approximately?

16   A.   That was from 2006 until 2016.

17   Q.   In what type of work was Mr. Manafort engaged during that

18   time period, just generally?

19   A.   Yeah.   There were two things that I was primarily working

20   on:   One was a private equity fund that his firm had set up,

21   and the other was, Mr. Manafort had done a lot of work in

22   political consulting, both in the United States and

23   internationally.

24   Q.   And that was going to be my next question.

25            So were some of those political projects overseas?

```
1    A.   Yes, they were.

2    Q.   Where?

3    A.   Primarily Ukraine, but there were other projects in

4    Montenegro, in Cyprus, in Pakistan, and a number of other

5    countries as well.

6    Q.   And did you, yourself, travel and work in Ukraine?

7    A.   I did.

8    Q.   Approximately what period of time did you work in Ukraine?

9    A.   From 2007 to about 2014, was the last project.

10   Q.   What kind of work -- if you could tell the ladies and

11   gentlemen of the jury, what kind of work were you doing in

12   Ukraine, generally?

13   A.   Um-hum.  So, primarily in Ukraine, we were doing party

14   building and political campaigns for various candidates.  So,

15   in the period of 2007 to 2014, I helped by managing the

16   consultants that were hired in the United States that helped

17   with various parts of the election campaign.

18        So that could be anything from grassroots efforts,

19   which entailed a lot of working on the ground.  There was

20   election integrity, in terms of bringing groups from other

21   parts of the world to come and monitor the elections.  And then

22   there was also the media and advertising components which we

23   worked on for the various candidates.

24   Q.   And how would you describe your role, vis-à-vis

25   Mr. Manafort?
```

1   A.   Yes.  So I was an employee of Davis Manafort.  Mr. Manafort

2   was the principal.  We had a series of different consultants

3   through the years and a couple of employees.  But, the firm was

4   relatively small, and we hired different consultants for

5   different work that we needed.

6   Q.   If I can direct your attention now, briefly, to 2012.

7            Okay.  Can you give us a brief description of what

8   was the political situation in Ukraine in 2012?

9   A.   Um-hum.  The primary issue for Ukraine at that time was to

10  gain entry into the European Union.  Ukraine is an interesting

11  country, in terms of its geography and where it's located,

12  right on the border with Europe and with Russia.  So, there was

13  kind of a constant tug and pull over which direction it would

14  go.

15           So, at the time in 2010, when we ran a campaign for

16  the president that was elected that year, the primary issue was

17  moving Ukraine to the west and getting them into the European

18  Union.

19  Q.   And were there any -- in 2012, any significant roadblocks

20  to sort of helping Ukraine move to the west --

21  A.   Yes.

22  Q.   -- or the European Union?

23  A.   Yes.

24  Q.   What was that?

25  A.   Ukraine was a young democracy.  It had, at that time, I

1    think, just three presidents that were elected by the people.

2    In one situation, a former prime minister was put on trial for

3    various criminal charges that she participated in while she was

4    prime minister.

5          As a result, that created some political tension in

6    Europe with respect to many of the European leaders believing

7    it was a politically motivated event.  So it was difficult for

8    Ukraine to kind of, you know, think about the idea of moving

9    into the European Union.  But, then, also, the idea that they

10   needed to look at criminal justice reform, and in that context

11   politically targeting, you know, previous leaders in the

12   country.

13   Q.  And was the criticism of Ukraine about that issue limited

14   to Europe?

15   A.  No, it was global.  But, it was primarily Europe and the

16   United States that were the main two -- you know, I would say,

17   proponents of making sure this issue was resolved.

18   Q.  Now, who was the president of Ukraine in 2012?

19   A.  At that time, it was a gentleman by the name of

20   Viktor Yanukovych.

21   Q.  Did you and/or Mr. Manafort play any role in

22   Mr. Yanukovych's election?

23   A.  Yes.  We ran Mr. Yanukovych's election in 2010, when he ran

24   for president.

25   Q.  You and Mr. Manafort helped to get him elected?

1    A.  Yes.

2    Q.  Was Mr. Manafort and, therefore, you also working for -- or

3    still working for Mr. Yanukovych in 2012?

4    A.  Yes, we were.

5    Q.  And what was -- what was the role or what was the work that

6    you and Mr. Manafort were doing in Ukraine in 2012?

7    A.  Yeah.  So there were a number of efforts ongoing.  One,

8    obviously, was the effort to get Ukraine into the EU, so that

9    had many different components to it.

10          Another effort that we worked on was a project that

11   included the law firm of Skadden Arps in doing a -- what we

12   call the Tymoshenko Report.  It was a review of the trial of

13   Mrs. Tymoshenko.

14          And then we were also consulting on various policy

15   issues at the time that were relatively localized matters.

16   Q.  So, I think you mentioned the law firm Skadden.

17          So what kind of companies or consultants were you and

18   Mr. Manafort employing in 2012 for these purposes?

19   A.  Yep.  So, in addition to Skadden, a public relations firm

20   called FTI Consulting was hired.  And then later on, we hired

21   two additional firms in Washington.  And a number of firms in

22   Europe were also hired for the project.

23   Q.  Now, why was Skadden Arps hired in 2012?

24   A.  So, Skadden was viewed as a very reputable law firm.  It

25   was the belief that a Western oriented law firm was needed

1    to --

2              MS. JUNGHANS:  Objection.  It's not clear whether the

3    witness is speaking from his personal knowledge or if he's

4    conveying views or opinions of others.

5              THE COURT:  All right.

6              Were you involved in the decision to bring Skadden

7    Arps on to write this report?

8              THE WITNESS:  No, ma'am.

9              THE COURT:  Do you know who made the decision?

10             THE WITNESS:  Yes.  The decision was made by

11   Mr. Manafort.

12             THE COURT:  Okay.  And who explained to you why the

13   decision was made?

14             THE WITNESS:  Mr. Manafort.

15             THE COURT:  Thank you.

16             Do you still have an objection?

17             MS. JUNGHANS:  I do.

18             THE COURT:  All right.  Can we approach the bench?

19             (Bench discussion:)

20             MS. JUNGHANS:  Well, I think this is the problem we

21   anticipated, is that he didn't do most of these things himself.

22   What he knows he knows because he was told by Manafort.  Even

23   though this is maybe sort of general background, I think it's

24   on the same point, the same principle.

25             THE COURT:  All right.  Well, the question is, he is

1    talking about something that he learned from out-of-court

2    statements of Mr. Manafort.  But, I'm not sure that they're

3    asking him for any statement that goes to the truth of some

4    matter asserted.  I think he's saying that he understood that

5    he picked Skadden for other reasons.  I believe Mr. Schoen has

6    testified why they picked Skadden.  So, I'm not sure that we're

7    getting into some hearsay statement.

8              MR. CAMPOAMOR-SANCHEZ:  Yeah.  If --

9              MS. JUNGHANS:  I'm sorry.

10             MR. CAMPOAMOR-SANCHEZ:  I didn't want to interrupt.

11             MS. JUNGHANS:  As I said, Your Honor, I appreciate

12   this particular statement may not be momentous, but, I think

13   we're launching into a recitation of what we did.  And "we"

14   didn't; Manafort did, and he only knows about it because

15   Manafort told him.

16             THE COURT:  I think he was the foot soldier for a lot

17   of things that were done.  And I think -- as we move into more

18   specifics, I think it's important to say -- ask him what he

19   personally did as opposed to what David -- Mr. Manafort did.

20   And you can ask him, Did you do it at anyone's direction?

21             And he can say he did it at Manafort's direction, or

22   was it his own initiation.  But, he can certainly say, as other

23   witnesses have said -- I think people have testified, I did X.

24   And so it's a direction.

25             And did you speak to so and so?

```
 1                    Yes.

 2                    As a result of that, what did you do?

 3                    I did X, Y, and Z.

 4                    I think we can try to limit how much of what

 5      Mr. Manafort said comes in.  But, I think, since he was acting

 6      at a person's direction, in and of itself, doesn't violate

 7      hearsay.

 8                    MR. CAMPOAMOR-SANCHEZ:  And can I --

 9                    MS. JUNGHANS:  Sure.  Sorry.

10                    MR. CAMPOAMOR-SANCHEZ:  Thank you.

11                    So -- yeah.  So, I'm not trying to suggest -- and I

12      think what the witness was making reference to is, Manafort is

13      making the decisions.  But he is part of the team that is

14      implementing all these things, and this is -- I'm just

15      literally setting up the background about whether we're going

16      to --

17                    THE COURT:  This particular decision, after I talked

18      to him, it seems to have been pretty -- he wasn't consulted,

19      Mr. Gates wasn't consulted --

20                    MR. CAMPOAMOR-SANCHEZ:  Correct.

21                    THE COURT:  -- because of Manafort.  I think he was

22      told why.  And I think he was told why, Manafort says why he

23      did what he did, isn't particularly objectionable.  But I do

24      take your point that you don't want to open the door to have

25      just everything Manafort says comes in as a Manafort exception
```

```
 1        to the hearsay rule.  It may happen.  Precisely.

 2               MS. JUNGHANS:  Precisely.

 3               MR. CAMPOAMOR-SANCHEZ:  I'm not trying to do that.

 4        I'm just trying to lay the background for the --

 5               THE COURT:  As we move forward, I think it's going to

 6        be very important to say, you know, What did you do, as opposed

 7        to, What did Davis Manafort do, and then it will be clearer.

 8               MR. CAMPOAMOR-SANCHEZ:  Right.

 9               MS. JUNGHANS:  Thank you.

10               THE COURT:  All right.  Thank you.

11               (Open court:)

12        BY MR. CAMPOAMOR-SANCHEZ:

13        Q.  Did you know -- and please tell us where you know this

14        from -- but, did you know what the purpose was of hiring

15        Skadden Arps --

16        A.  Yes.

17        Q.  -- in 2012?

18        A.  Yes, I do.  And the information was conveyed to me by

19        Mr. Manafort.  The purpose of Skadden being hired was --

20               MS. JUNGHANS:  Objection.

21               THE COURT:  I'm sorry.  I think that we just ruled

22        that he could testify why he understood, based on what

23        Mr. Manafort said, that they were choosing -- they were hiring

24        that firm with respect to this issue.

25               All right.  Go ahead.
```

1    A.   There were two components to it:   One, Skadden was viewed

2    as a very credible Western firm.   And number two, Mr. Craig was

3    a very experienced and credible attorney that would give the

4    project visibility globally.   And given his success, both

5    inside and outside of the law, it was very relevant to have

6    somebody of that stature associated with the Report,

7    particularly for the Western leaders to believe that it was an

8    independent and credible report.

9    BY MR. CAMPOAMOR-SANCHEZ:

10   Q.   If you know, why would an independent report help Ukraine?

11   A.   An independent report would help Ukraine for a number of

12   reasons.   The primary one was, this could not have been a

13   Ukrainian report.   Ukraine, kind of, evaluating its own

14   judicial system, especially at that time, given the -- that it

15   was a young democracy, was not very effective.

16          So, you needed, particularly with the EU involved and

17   the United States, a Western-oriented firm to be able to lead

18   this effort, particularly one that had experience doing this in

19   the past.

20   Q.   Did you, personally, have a role regarding the Skadden

21   engagement?

22   A.   I did.

23   Q.   And what was your role?

24   A.   I was primarily the intermediary for a number of people

25   that were associated with Skadden and FTI.   We had a small team

1    of people in Ukraine that dealt with local issues.  I primarily

2    liaised with one lawyer in particular from Skadden.

3    Mr. Manafort typically managed my delegation.

4              So, I was an intermediary for various parts of the

5    Skadden Report.

6    Q.  And did you have any involvement in the PR strategy rollout

7    for the Skadden Report?

8    A.  Yes, I did.

9    Q.  What was, just generally, your role for that process?

10   A.  I was the primarily link between our firm and FTI.  In that

11   capacity, I worked with Jonathan Hawker, who was the primary

12   point of contact for us in regards to an overall media and a

13   government relations plan related to the rollout of the Report.

14   Q.  All right.  Mr. Gates, before we get to the specifics, what

15   transpired in 2012, I want to go back to the issue of your

16   current unemployment.

17             Why are you currently unemployed?

18   A.  I'm currently unemployed.  I was indicted in 2017 in

19   relation to a larger investigation.  Since that time, I have

20   largely been unemployed.

21   Q.  And, sir, are you currently pending sentencing for a number

22   of charges?

23   A.  I am.

24   Q.  All right.  And let's take a look at what's already in

25   evidence as Government's Exhibit 625.  Hopefully, you have a

1    copy of that in front.  But, if not, we'll also put the first

2    page on the screen.

3              Do you recognize what's Government's Exhibit 625?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  This is a copy of my plea agreement.

7    Q.  Okay.  And --

8    A.  With the government.

9    Q.  And if we can take a look at -- under charges.

10             And let me just ask you, first of all, sir, did you

11   plead guilty, in the case referenced in your plea agreement, to

12   conspiracy against the United States?

13   A.  I did.

14   Q.  And was this plea part of a cooperation agreement?

15   A.  It was.

16   Q.  And did you also plead guilty, sir, to making a false

17   statement to the Special Counsel's Office, Robert Mueller's

18   office?

19   A.  I did.

20   Q.  Let me ask you, first of all, what is the maximum penalty

21   you can receive for the charge of conspiracy?

22   A.  Up to five years.

23   Q.  How about for the penalty for making a false statement to

24   the Special Counsel's Office?

25   A.  That's up to five years, as well.

1    Q.  And are you familiar with what is called the estimated

2    guidelines range?

3    A.  Yes, I've learned.

4              MR. CAMPOAMOR-SANCHEZ:  If we could take a look now

5    at page 3, at the bottom.  Zoom in.

6    MR. CAMPOAMOR-SANCHEZ:

7    Q.  And what is the calculated and estimated guidelines range

8    of your sentence for the charges you pled guilty to?

9    A.  The estimated range is from 57 to 71 months.

10   Q.  So, Mr. Gates, under a cooperation agreement, what is it

11   that you agreed to do?

12   A.  So, I agreed to tell the truth.  I agreed to provide

13   documents and other material to the United States government.

14   And agreed to help them in any cases or trials that they were

15   working on.

16   Q.  Have you, in fact, testified in a different trial for --

17   pursuant to this cooperation agreement?

18   A.  I have.

19   Q.  Did you, in fact, provide evidence to government

20   investigators about what they were looking for?

21   A.  Yes, I did.

22   Q.  Have you met with government investigators?

23   A.  Yes.

24   Q.  And answered their questions?

25   A.  Yes, I have.

```
1    Q.  About how many times, if you know?

2    A.  Over the course of almost two years, probably, you know, at

3    least 40 times.  Probably more.

4    Q.  Now, what is the most important --

5                THE COURT:  Is that with respect to more than one

6    matter or is that just with respect to this matter?

7                THE WITNESS:  No, ma'am, that was multiple matters.

8                MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

9    BY MR. CAMPOAMOR-SANCHEZ:

10   Q.  Yeah.  I did not mean to suggest that you met with the

11   government 40 times on this case.

12               Sir, what is the most important thing you are

13   required to do under this cooperation plea agreement?

14   A.  To tell the truth.

15   Q.  Now, did the government also make you some promises under

16   this agreement?

17   A.  It laid out some conditions in the agreement, yes.

18   Q.  All right.  So, let's take a look at some of those.

19               If we can look at page 2, the heading under

20   Additional Charges.

21               What was one of the things the government agreed to

22   do?

23   A.  One of the things the government did was, they agreed to

24   drop additional charges that were brought in 2017.

25   Q.  So another separate case?
```

1    A.  Yes.

2    Q.  In another jurisdiction?

3    A.  Correct.

4    Q.  All right.  And did the government also agree not to

5    prosecute you for other charges?

6    A.  It did.

7    Q.  What are we talking about there?

8    A.  Those were charges related to some previous activity in

9    regards to taxes, tax returns, FARA registration, and other

10   activities.

11   Q.  And as part of this cooperation agreement, were you

12   required to sort of inform the government about other things

13   that may have been crimes that you committed?

14   A.  Yes.

15   Q.  All right.  So, in addition to the charges, did the

16   government also make you other promise with regards to your

17   cooperation?

18           And if we can look at page 5.

19           You can explain to the ladies and gentlemen of the

20   jury what else the government agreed to do.

21   A.  Yes.  I think this is actually what I agreed to.  But,

22   the -- the government also agreed to, upon my cooperation --

23   Q.  Oh, no, you're right.

24   A.  Yeah.

25   Q.  Thank you.  You're correcting me and you're absolutely

 1    right.

 2              If we can go to page 6, paragraph 9.

 3    A.  The government agreed to write what was called a 5K1

 4    letter, which outlines everything I've done right, everything

 5    I've done wrong.  And the 5K1 letter would be a document that

 6    would kind of codify all of my activity in cooperation for the

 7    judge's review.

 8    Q.  And what does that 5K letter -- if the government provides

 9    one, what would that do?

10    A.  It could potentially reduce the sentence that was on the

11    previous page.

12    Q.  So, sir -- and let me ask you, anything else that the

13    government specified or provided?

14    A.  Yeah.  The government also agreed not to oppose my motion

15    to request probation, if we -- you move in that direction.

16    Q.  Is that located at the top on page 7, where I'm reading,

17    "Depending on the precise nature of the defendant's substantial

18    assistance, the office may not oppose defendant's application"?

19    A.  Yes.

20    Q.  All right.  So, there's not a guarantee, but, assuming that

21    you cooperated, that's what the government agreed to do?

22    A.  Correct.

23    Q.  All right.

24              Now, sir, we've been talking about the government and

25    what it promised you.  But, who, ultimately, is responsible for

```
 1    sentencing you?
 2    A.  The judge in my case.
 3    Q.  What do you think will happen to you if the judge in your
 4    case decides that you're not being truthful?
 5              MS. JUNGHANS:  Objection.
 6              THE COURT:  He can answer the question.
 7    A.  I think the judge would find it not good.  And also the
 8    government could tear up my, you know, plea agreement if I'm
 9    not telling the truth.
10    BY MR. CAMPOAMOR-SANCHEZ:
11    Q.  And who is the judge that will sentence you in this case?
12    A.  She's right here, next to me, Mrs. -- Judge Jackson.
13    Q.  All right.  Mr. Gates, let's move on, then.
14              Can you please tell the ladies and gentlemen of the
15    jury, what is the first task you actually remember
16    accomplishing with regards to the Skadden engagement?
17    A.  The first task that I was given was to make a wire transfer
18    to the Skadden law firm as the beginnings of the Report.  In
19    that process, Mr. Manafort described to me in a little --
20              MS. JUNGHANS:  Objection.
21              THE COURT:  All right.  Just -- your task was to send
22    a wire transfer?
23              THE WITNESS:  Yes, ma'am.
24              THE COURT:  All right.  At Mr. Manafort's direction?
25              THE WITNESS:  Yes.
```

1           THE COURT:  Okay.

2           So, ask your next question.

3           MR. CAMPOAMOR-SANCHEZ:  Yes.

4   BY MR. CAMPOAMOR-SANCHEZ:

5   Q.  And how was it that you process or arranged -- not

6   "process."

7           How do you accomplish that task?

8   A.  Yes.  Mr. Manafort described to me --

9           THE COURT:  I think the concern is, there's just

10  general rules about people on the witness stand saying what

11  somebody else said when the somebody else isn't here and only

12  you're here.  So, if he asks you a question about what you did,

13  if you could just answer what you did, without offering up what

14  you were told by Mr. Manafort, unless the question specifically

15  calls for what you were told by Mr. Manafort, that might ease

16  the interruptions.

17          THE WITNESS:  Okay.  Sure.

18          MR. CAMPOAMOR-SANCHEZ:  And, Your Honor, would it be

19  possible for him to describe the instructions he received as to

20  how to accomplish the payment?  Would that be acceptable to the

21  Court?

22          THE COURT:  Well, just that it had to be wired to X,

23  Y, Z place?

24          MR. CAMPOAMOR-SANCHEZ:  Yes, I believe, and through a

25  particular method, a particular company.

1          THE COURT:  Why don't we just find out what he did.

2          MR. CAMPOAMOR-SANCHEZ:  Okay.

3     BY MR. CAMPOAMOR-SANCHEZ:

4     Q.  What did you do?

5     A.  Yes.  So, I was tasked by Mr. Manafort to make a wire to

6     Skadden.  And in that process, I was told that we would be --

7     that our firm would be receiving a --

8          MS. JUNGHANS:  Objection.

9          THE COURT:  All right.  Just, what happened?  What

10    did you do?

11         THE WITNESS:  Um-hum.  So, I -- I sent a wire to

12    Skadden through a -- an account that belonged to Mr. Manafort

13    that had received an incoming transfer by a Ukrainian business

14    man in order to make that payment to Skadden.

15    BY MR. CAMPOAMOR-SANCHEZ:

16    Q.  And what was the name of the account that was used to make

17    that payment to Skadden?

18    A.  Black Sea View Limited.

19    Q.  And where was that account located?

20    A.  In Cyprus.

21    Q.  Let me ask you, from your own knowledge, was the Skadden

22    Report or the Skadden engagement limited to writing the Report

23    on the Tymoshenko prosecution, or did it include something

24    else?

25    A.  No.  There was other activity that Skadden was working on

1    in relation to another case.

2    Q.  And what was that other case you're making reference to?

3    A.  The other case was another case involving the former prime

4    minister, Yulia Tymoshenko, and her trial.

5    Q.  Was that a case that also happened in the past, or was that

6    a case that was upcoming in the future?

7    A.  That was a case that was upcoming.

8    Q.  So, let me ask you, did -- I believe you told us, but now

9    that you sort of started with the engagement, what were your

10   responsibilities, if any, regarding public relations as it

11   relates to the Skadden Report on the Tymoshenko trial?

12   A.  Sure.  So one of the additional tasks that I was given was

13   to help find a PR firm that had expertise in legal matters.

14   And we started -- I started working with an attorney from

15   Skadden who had a company that the firm had used -- which was

16   FTI -- in other matters.  And it was a firm that we vetted and

17   looked at to use in this project.

18   Q.  And who was the attorney at Skadden that you were dealing

19   with related to that?

20   A.  At that time, it was a gentleman by the name of

21   Alex van der Zwaan.

22   Q.  Were there any issues with regards to the contracting

23   process or hiring of FTI to do that work?

24   A.  Yes.  There were -- early on there were -- just kind of as

25   the project kicked off, I like to say, there were a lot of

1    cooks in the kitchen.  And there was some discussion about how

2    Skadden --

3              MS. JUNGHANS:  Objection.

4    A.  -- excuse me, how FTI --

5              THE COURT:  Wait.  Let him just -- he can say that a

6    topic was discussed and that it was an issue.

7              So what was the issue bringing FTI on board, without

8    saying exactly what Mr. Manafort -- what was the nature of the

9    problem?

10             THE WITNESS:  Yeah.  The nature of the problem is,

11   given the client and -- meaning, the Ukrainian government --

12   the nature of the issue was who FTI was going to be

13   subcontracted under.  There were a number of parties that we

14   were trying to get FTI organized under.  And that was, in

15   essence, the issue.

16   BY MR. CAMPOAMOR-SANCHEZ:

17   Q.  Okay.  And did that issue ultimately get resolved?

18   A.  It did.

19   Q.  Did it resolve quickly or did it take some time?

20   A.  No.  It took quite a bit of time.

21   Q.  So was FTI paid, ultimately, for their work?

22   A.  They were.

23   Q.  Were they paid in full, though, for all their expenses?

24   A.  No, they were not.

25   Q.  And why was that?

1   A.  At the time FTI started, they had deployed a pretty

2   significant team on the ground.  They had not technically been

3   approved by the client, but it was in the works.  It took some

4   time in order to get everything lined up, in terms of their

5   contract and the payment mechanism of who would actually pay

6   them.

7           They were ultimately paid, but, in fact, it was

8   Mr. Manafort who advanced FTI their fees and dealt with the

9   client behind the scenes to help get that payment taken care of.

10  Q.  In addition to FTI, were, ultimately, other firms involved

11  with the public relations campaign associated with the rollout

12  of the Skadden Report in the United States?

13  A.  Yes.  In the United States, there were two specific firms

14  that were originally not hired for the Skadden Report, but it

15  became one of their tasks as kind of an overall strategic plan

16  for consulting in Washington, D.C.

17  Q.  Let me show you what's been admitted as Government's

18  Exhibit 166.  Should be on your screen, but, hopefully, you

19  also have it in front of you.

20          MR. CAMPOAMOR-SANCHEZ:  And if we can zoom in.  Thank

21  you.

22  MR. CAMPOAMOR-SANCHEZ:

23  Q.  What are we looking at in Government's Exhibit 166?

24  A.  This is an email from me to most of the individuals from

25  both teams here in the U.S., and then it also includes some of

1    our European firms that were hired.

2    Q.   Who were the teams in the U.S. that you were dealing with

3    here?

4    A.   The two in the U.S. were Mercury consulting and the Podesta

5    Group.

6    Q.   And you said there were some Europeans in here as well?

7    A.   Yes.

8    Q.   And what kind of firm or group were they associated with?

9    A.   So, in Europe we used a series of bigger firms,

10   Burson-Marsteller, FleishmanHillard.  And they were tasked with

11   the same thing but just doing it in Europe.

12   Q.   And how about Ms. Ina Kirsch?  Who was she with?

13   A.   Ms. Ina Kirsch was the executive director of an

14   organization called the European Centre for a Modern Ukraine.

15   Q.   And why was she being copied on this?

16   A.   Ina was part of the kind of governing group that hired the

17   European consultants on behalf of the client.

18   Q.   So taking a look at the actual body of the email that you

19   wrote.  You write here, at the bottom of the first paragraph,

20   "The names you provide will be potentially put into direct

21   contact with the lawyers working on the case for background

22   information, Q&A, and interviews/meetings."

23            Can you explain what you were trying to convey in

24   that sentence?

25   A.   Yes.  At that time, we were going through kind of different

1    iterations of how we would run a public relations and

2    government relations campaign.  Part of the original plan,

3    although it changed, was that lawyers from Skadden would do

4    background briefings on their report and their work.  And the

5    reasoning for that was that there would be no better group to

6    be able to talk about their work than the group that actually

7    did the work.

8    Q.  Now, you mentioned public relations and government

9    relations.  Are those two separate things?

10   A.  Yes.  Kind of in the way that we set up the strategic plan,

11   there were kind of two components.  There was clearly the

12   public relations component.  But, just as important was the

13   government relations component, and that was ensuring that,

14   particularly leaders in the west, in Europe, were apprised of

15   the Report and knew of its findings and conclusions.

16   Q.  And, if you know, what was the idea behind using these

17   companies for this purpose?

18   A.  Yeah.  These companies had contacts, both in the public

19   relations world, they knew journalists, some had actually

20   worked for some of the publications that we were looking at.

21   So, it was a way of setting up kind of a very methodical way of

22   reaching out to people, both in the public relations world and

23   the government relations world, with some built-in

24   relationships to help foster the project through.

25   Q.  And, finally, is the date of this email June 24th, 2012?

1   A.  Yes, it is.

2   Q.  All right.

3         MR. CAMPOAMOR-SANCHEZ:  You can take that down.

4   MR. CAMPOAMOR-SANCHEZ:

5   Q.  Now, let me ask you, Mr. Gates, during this project, did

6   you have much contact with Mr. Greg Craig?

7   A.  No, I didn't have much direct contact.  I think I met with

8   Mr. Craig a total of five times, sometimes in different

9   matters.  But, that was, I think, the extent of it.  And then

10  some emails and communications.

11  Q.  Okay.  And would you recognize him, though?

12  A.  Yes.

13  Q.  And do you see him in the courtroom here today?

14  A.  I do.

15  Q.  Can you tell us where he's seated and what he's wearing?

16  A.  He is a wearing a blue suit and -- it looks like a sort of

17  red tie.  He's sitting right over there (indicating.)

18        THE COURT:  All right.  The record will reflect he's

19  referring to the defendant.

20  BY MR. CAMPOAMOR-SANCHEZ:

21  Q.  If you know, who was the main contact between your firm and

22  Mr. Craig?

23  A.  Mr. Manafort.

24  Q.  Okay.  Now, without telling us about the actual statements,

25  would you find out about those contacts that Mr. Manafort had

1   with Mr. Craig?

2   A.  Yes.  The ones that he informed me of, I did.

3   Q.  So he would brief you on them?

4   A.  Yes, he would.

5   Q.  And why were you briefed on those?

6   A.  I was briefed because a lot of the conversations between he

7   and Mr. Craig resulted in action items that I and other people

8   on the team had to carry out.

9   Q.  And I think you said it, but just to be clear.  So, who was

10  your main point of contact at Skadden, if you had one?

11  A.  Mine, it was Alex van der Zwaan, who is an attorney for

12  Skadden.

13  Q.  And for FTI, who would have been your main point of

14  contact?

15  A.  FTI, it was Jonathan Hawker.

16  Q.  Now, let me ask you, did you, personally, have some

17  opportunities to discuss the media rollout plan with Mr. Craig?

18  A.  Yes.

19  Q.  Tell us about that.

20  A.  Sure.  The first was early on in the project, in which we

21  had a very general discussion about a potential media plan and

22  government relations plan in terms of what Mr. Craig might do

23  specifically.  It was broad in nature.  Although --

24              MS. JUNGHANS:  Objection.  Leading.  Time and place.

25              THE COURT:  Well, he's talking about at the first

1    meeting.  The direct is allowed to conduct its direct.

2         All right.  You can continue your answer.

3    A.   Okay.  Timeframe, I think it was June, July.

4         The -- following that, there was a second meeting in

5    September, in New York, which I was part of a group that met

6    Mr. Craig; and at which time, we also had discussions on public

7    relations and government relations.

8    BY MR. CAMPOAMOR-SANCHEZ:

9    Q.   Okay.  So, let me ask you, first, do you have a

10   recollection of the defendant ever suggesting that a reporter

11   be used as part of the media rollout plan?

12   A.   I do.

13   Q.   Tell us about that recollection.

14   A.   Yeah.  The first recollection is that Mr. Craig had named a

15   reporter from *The New York Times* as somebody that might be

16   interested in writing this and that he had a specific

17   relationship with that could -- he could reach out to and help

18   with that effort.

19   Q.   Did he explain to you how he knew that reporter?

20   A.   He just said, historically.

21   Q.   And do you recall the name?

22   A.   The name was David Sanger.

23   Q.   And in terms of when you first heard Mr. Craig mention

24   that, is that in relationship to the second meeting at the

25   Harvard Club?  Or was that in relation to the first meeting

1   earlier, that you just were talking about?

2   A.   The first mention was at the first meeting.  And then it

3   came up in more detail in the second meeting, in December.

4   Q.   When Mr. Craig mentioned Mr. Sanger for the first time, did

5   you do anything about it?

6   A.   Yes.  Later on I looked up Mr. Sanger, because one of the

7   things that both our firm and FTI were trying to determine, how

8   good of a reporter Mr. Sanger was, and kind of the general

9   areas of topics that he covered in his reporting.

10  Q.   And when you say you looked him up, what does that mean?

11  A.   Sure.  Basically, did a Google search, just to see, you

12  know, who he was and kind of his expertise.

13  Q.   Okay.  And do you recall anything else that Mr. -- I'm

14  sorry -- that Mr. Craig said about Mr. Sanger about why he

15  could be a good reporter for this?

16  A.   He said that Mr. Sanger is a tough reporter but a fair

17  reporter, and that we wouldn't necessarily get a positive

18  article, but we would get a good article, and he was very

19  credible in the space.  And that would, you know, obviously,

20  help with our PR strategy.

21  Q.   Moving on to a slightly different topic.

22          Was there a specific strategy about how the Report

23  would be released?

24  A.   Yes.  The idea behind our PR strategy is -- it was that if

25  we were able to get a first article, and not knowing if the

1    article was going to be positive or neutral, the idea was that

2    most of the other reporters would follow the lead off of that.

3    And that's kind of a very common practice.  Journalists

4    typically don't like to do all of their own legwork, so they

5    borrow from other reporters.

6            And by getting a story in there that could actually

7    capture the essence of the Report, at least in a neutral way,

8    would be great for us and the client, because then the other

9    journalists would likely cover in that same fashion.

10           So it was kind of like a domino effect, where if you

11   get one good article, then a lot of the other articles would

12   follow suit.

13   Q.  Now, Mr. Gates, who was the reporter that was ultimately

14   selected, in the United States, to be the person to get this

15   article?

16           MS. JUNGHANS:  Objection.  Selected by whom?

17           THE COURT:  He gets to ask his questions.  There's

18   no -- that's not an objectionable question.

19           Overruled.

20           Who was the reporter selected.  If he asks him who

21   selected him, and if he doesn't know, then he won't be able to

22   answer.  But, he can ask the question he asked.

23           Who was the reporter selected to be the one in the

24   United States?

25           THE WITNESS:  The reporter selected was David Sanger

1    from *The New York Times*.

2    BY MR. CAMPOAMOR-SANCHEZ:

3    Q.   Who made the decision to use Sanger of *The New York Times*?

4    A.   Mr. Manafort.

5    Q.   And --

6              MS. JUNGHANS:   Objection.   Move to strike.   Hearsay.

7              THE COURT:   Can you approach the bench?

8              MR. CAMPOAMOR-SANCHEZ:   Yes.

9              THE COURT:   You can talk, but we're just going to

10   talk up here.

11             (Bench discussion:)

12             THE COURT:   It's not bringing in a statement of

13   Mr. Manafort for the truth of the matter asserted.

14             MS. JUNGHANS:   Well, actually, I think it is.   It's

15   him saying Manafort told him he chose David Sanger.

16             THE COURT:   He is allowed to say, if he was at

17   meetings where decisions were made, that Mr. Manafort made the

18   decision.

19             MS. JUNGHANS:   Well, but he didn't say he was at a

20   meeting where Mr. Manafort made a decision.   He just said it

21   happened and he learned about it.

22             THE COURT:   What's your response to that?

23             MR. CAMPOAMOR-SANCHEZ:   So, he is in a lot of

24   meetings with Mr. Manafort.   And, actually, I thought they

25   would like to hear that from his perspective, the person that

1    made the call that that would be the reporter that the story

2    would be seeded and leaked to was Mr. Manafort.  That's who

3    made the call.  And that's the instructions he received.

4         He's the one that -- we're going to get to the plan,

5    right, where Mr. Sanger is included.  I'm going to get to the

6    document, and he's going to say, Yeah, I put that there, and I

7    put that there because Mr. Manafort told me.  But I am going to

8    have some follow-up questions as to when that happened

9    time-wise.  It's an instruction he received.

10        Who selected him?

11        Manafort did.

12        MS. JUNGHANS:  No.  No.  An instruction is do

13   something.  It's -- I mean, it may be right on the Report, but

14   to say Manafort told me to write this on the Report is one

15   thing.  To say Manafort made the decision to choose the

16   reporter is a different thing.

17        MR. CAMPOAMOR-SANCHEZ:  It's not a different thing.

18        MS. JUNGHANS:  I think it is.

19        MR. CAMPOAMOR-SANCHEZ:  He knows that because he had

20   the conversation.  Somebody told him to do it and he did it.

21        THE COURT:  All right.  All right.  I'm going to ask

22   if he was at a meeting where Manafort said, I made the

23   decision.  This is my decision to do this, or if Manafort

24   simply told him that a decision had been made.

25        MR. CAMPOAMOR-SANCHEZ:  Okay.

```
1              THE COURT:  And then we'll go on from there.  All

2     right.

3              MS. JUNGHANS:  Okay.  I mean, I'm trying not to jump

4     up.  But, at the same time, I think we're getting a lot of

5     hearsay that's sort of sneaking in because he says -- you know,

6     he doesn't frame it, at least at first blush, as a hearsay

7     statement.

8              THE COURT:  I think he's trying to frame it properly,

9     and sometimes the witness is answering the way a normal person

10    would answer, as opposed to a witness bound by the hearsay

11    rules.

12             MS. JUNGHANS:  I understand that.

13             THE COURT:  And so I think everybody is doing the

14    best they can here, and I don't think there's anything

15    nefarious going on.  And with respect to objections, I think

16    some of them are relative to him and some aren't, and we're

17    trying to move along.  And I will try to get to the bottom of

18    this particular objection before he's allowed to speak further

19    about it.

20             MR. CAMPOAMOR-SANCHEZ:  Thank you.

21             MS. JUNGHANS:  Thank you, Your Honor.

22             (Open court:)

23             THE COURT:  All right.  Mr. Gates, just try to answer

24    my questions as directly as you can.

25             Were you at a meeting at which Mr. Manafort made a
```

1    decision about this issue?

2              THE WITNESS:  I don't recall if it was a meeting or a

3    phone call, but he told me the decision.

4              THE COURT:  So he told you what to do?

5              THE WITNESS:  Correct.

6              THE COURT:  That Mr. Sanger would be the person?

7              THE WITNESS:  Yes.

8              THE COURT:  So you can't say, from your personal

9    knowledge, whether he made that decision or someone else told

10   him to do it and then he was carrying it on to you?

11             THE WITNESS:  That is true, yes.

12             THE COURT:  All right.

13             Ask your next question.

14   BY MR. CAMPOAMOR-SANCHEZ:

15   Q.  All right.  And, Mr. Gates, when Manafort gave you that

16   instruction, was that after Mr. Craig had suggested the name of

17   David Sanger previously?

18   A.  Yes.

19   Q.  Before the defendant mentioned Mr. Sanger, to your

20   knowledge, had Mr. Sanger ever been considered to be the

21   journalist to seed the Report?

22   A.  Not to my knowledge.

23   Q.  All right.  Let's move on.

24             In the months before the release, was there more than

25   one PR plan produced?

1    A.   Yes.

2    Q.   Why were there multiple plans produced?

3    A.   There were a lot of false starts with the release of the

4    Report.   There were issues on multiple sides.   And then as we

5    continued to get close to each release of the Report, the

6    Report was refined.   There were additional firms added.   So,

7    there was more skill sets brought to the overall strategic

8    effort.   So it continued to kind of morph.   It was kind of a

9    living, breathing document that we continued to work on.

10   Q.   Now, through all of these multiple plans that you

11   described, did the strategy change, ever, about seeding the

12   Report to a journalist?

13   A.   No, the strategy never changed about seeding the Report.

14   Q.   All right.   You told us a little bit about a meeting that

15   happened in New York.

16   A.   Um-hum.

17   Q.   Let's talk about that.   Was that a meeting that you had in

18   person with the defendant and others?

19   A.   It was.

20   Q.   And do you recall approximately when that happened?

21   A.   That was in late September.

22   Q.   And where did that meeting take place?

23   A.   It took place at the Harvard Club in New York City.

24   Q.   What was the purpose of that meeting?

25   A.   The purpose of the meeting was, in large part, to level set

1       on several issues.

2                       THE COURT:  Now you're using PR speak.

3                       What is "level set"?

4                       THE WITNESS:  Sorry.  Sorry.

5                       It was a meeting that was called in order to review a

6       number of the topics that related both to the Report, the

7       Tymoshenko Report, in terms of its content, and then also for

8       the media and government relations rollout plan.

9       BY MR. CAMPOAMOR-SANCHEZ:

10      Q.  Before the meeting took place, did you receive an updated

11      media rollout plan?  Yeah.  Before the meeting, did you receive

12      an updated media plan?

13      A.  Yes.

14      Q.  Let's take a look at Government's Exhibit 254 that is

15      already in evidence.

16                      We can take a look at the top.

17                      THE COURT:  Is it 284 or 254?

18                      MR. CAMPOAMOR-SANCHEZ:  2-5-4, Your Honor.

19                      THE COURT:  Okay.

20      BY MR. CAMPOAMOR-SANCHEZ:

21      Q.  Do you recall this email, Mr. Gates?

22      A.  I do.

23      Q.  And what is this email?

24      A.  This was an email sent by Mr. Hawker after a conversation

25      with Mr. Manafort and myself in regards to getting all the

1    documents out in advance of the meeting.

2    Q.  And is Mr. Craig one of the recipients of Government's

3    Exhibit 254?

4    A.  He is.

5    Q.  If we can please take a look at page 2 of the exhibit.

6              What are -- and I'll zoom in.

7              But, what are we looking at here, if you recognize,

8    sir?  Or do you want me to zoom in right now?

9    A.  Yeah.  This document is an agenda that was drafted by

10   Mr. Hawker, with help and input from me.

11   Q.  And was this agenda followed at the meeting at the Harvard

12   Club?

13   A.  Yes.  I don't know if it was followed exactly by number,

14   but all the topics were covered at the meeting.

15   Q.  And if you know from personal knowledge, was there a

16   meeting that took place before the Harvard Club meeting with

17   the other people that attended?

18   A.  There was.

19   Q.  And who was that meeting between?

20   A.  Mr. Manafort and Mr. Craig.

21   Q.  And when did that meeting happen?

22   A.  That meeting happened prior to our meeting.  It happened --

23   I believe it was the night before.

24   Q.  Were you at that meeting?

25   A.  I was not at that meeting.

1   Q.  So you don't know what was discussed at that meeting?

2   A.  I do not.

3   Q.  All right.  Do you know what the purpose was of having that

4   meeting?

5   A.  Yes.  Part of the purpose --

6               MS. JUNGHANS:  Objection.  Objection.  Foundation.

7               THE COURT:  Were you part of the planning of why

8   there -- why or whether there should be such a meeting?

9               THE WITNESS:  Yes.

10              THE COURT:  So, what did you understand the purpose

11  of the meeting to be?

12              THE WITNESS:  The purpose of the meeting was for Paul

13  to talk to Mr. Craig in relation to some of the issues that had

14  come up that were raised by Mr. Hawker with respect to PR

15  specifically, and then also some of the content of the Report.

16              THE COURT:  All right.  I don't think we can talk

17  more about the meeting --

18              MR. CAMPOAMOR-SANCHEZ:  No.

19              THE COURT:  -- that he didn't attend.  Okay.

20              MR. CAMPOAMOR-SANCHEZ:  I do not intend to.

21  BY MR. CAMPOAMOR-SANCHEZ:

22  Q.  All right.  So, let's take a look at the agenda here.

23              And what is Point Number 1?  What does that relate

24  to?

25  A.  Point Number 1 is kind of an overall update on the status

1    of the actual report that was being prepared by Skadden.

2    Q.   How about Point Number 2?

3    A.   Point 2 was something that Mr. Hawker prepared.  It was

4    called a -- just a message review.  It was a series of

5    documents that went to explain to people externally what the

6    Report is about and what the conclusions were.

7    Q.   How about Point Number 3?

8    A.   Three was the PR plan, and that related to specific roles

9    of different parties.

10   Q.   And as we look at Point B, what parties does that relate

11   to?

12   A.   It relates to Skadden and Mr. Craig's roles.

13   Q.   So what does that mean, when we see this in this -- when we

14   see this in the agenda as "PR Plan B, SKA/GC role"?

15   A.   So, as we got closer to the rollout of the Report, we had

16   to refine and kind of nail down a number of the actions item in

17   the Report.  And so part of the purpose of the meeting was to

18   specifically ask, you know, Mr. Craig what he was going to be

19   doing with respect to both the PR and GR portions of the Report

20   rollout.

21   Q.   And if we could go a little further down.  Points 4 and 5.

22        And when it reads "Ukraine activity," what does that

23   relate to?

24   A.   So, the Ukraine activity was what was going to happen

25   internally from Ukraine, in terms of all the players that were

1    involved and what they would be doing in relation to the Report

2    rollout.

3    Q.  And specifically -- now, let's talk about 5 and 5.B.

4         What does that relate to?

5    A.  5.B relates to the role that we were going to conduct with

6    respect to, kind of, the other Western groups.  An

7    international plan that was a component of the overall

8    strategy.

9    Q.  And if we could move down to Point 6.

10        Just generally, when it says "Skadden Arps reaction,"

11   what does that relate to?

12   A.  So there were a number of issues that had come up with

13   respect to Skadden's contract with the Ministry of Justice, and

14   then specifically on the independence of the Report and how it

15   was going to be viewed by the international community.

16        So part of the action items that Jonathan prepared --

17   or, excuse me -- some of the documents he prepared were kind

18   of -- just kind of Q&A, questions and answers, of if certain

19   things came up, how would any of us respond to those questions.

20   Q.  And where it says in 6.B "fees," what does that relate to?

21   A.  Yes.  There was an issue early on with respect to the way

22   that the government was looking at contracting with Skadden.

23   It had a procurement process that it had to abide by.  And as a

24   way to not address that, they lowered the Skadden fees

25   considerably early on, and there were issues with respect to

1    external parties that thought the fees were too low.  And, so,

2    that became a talking point --

3              MS. JUNGHANS:  Objection.

4              THE COURT:  There's been a lot of testimony about

5    this already and documents about this.  He asked him what the

6    issue was, and he's saying the issue was that external people

7    were complaining about it.  I think he can say that.  I don't

8    think he can --

9              MS. JUNGHANS:  Well, Your Honor, I think he's just

10   citing an awful lot of information.

11             THE COURT:  All right.  Let's talk at the bench.

12             (Bench discussion:)

13             MS. JUNGHANS:  He said -- he just began to say,

14   "External parties thought."  He's -- I'm trying not to

15   interrupt, but he's recounting everybody's opinions, everybody

16   else's views.  And I don't think he should be doing this.

17             THE COURT:  He's saying this is an issue, this is an

18   issue because external parties were complaining about it and

19   being public about the complaints about it, all of which is

20   already in the record in great detail, and which Skadden

21   witnesses have testified about.

22             MS. JUNGHANS:  Well, actually, they haven't; they've

23   just read a bunch of documents.

24             THE COURT:  No.  It came up with Mr. Haskell.  He

25   didn't just read documents.  It's come up.  It's out there.  I

1    don't think -- I think it was just about -- the end of the

2    point was that there were issues where people externally had

3    expressed concerns about the fees.  Those documents are in

4    evidence.

5            And all he can say is, We were figuring out how we

6    were going to address the issue, and I don't think that's

7    hearsay.  It doesn't get to the truth of the matter.  It's a

8    fact that people were talking, and that they had to figure out

9    what they were going to do about it.

10           MS. JUNGHANS:  Well, if he wants to say it that

11   way --

12           THE COURT:  That's what he said.

13           MS. JUNGHANS:  I'm sorry, Your Honor.  I'm not

14   hearing it that way.

15           THE COURT:  All right.  I heard it that way.  Well, I

16   don't think he -- he wasn't speaking for the truth of what

17   Mr. Vlasenko complained about.  He just said people had

18   complained.

19           MS. JUNGHANS:  Right.  But then he's saying, you

20   know, decisions were made to structure the arrangement in a

21   certain way, decisions that he didn't make, that, apparently,

22   he's trying to convey what other people wanted to do and the

23   purpose for what they wanted to do it.

24           THE COURT:  Where it's set up, where we were at, they

25   were dealing with this issue.  So, I think we can -- I mean,

1    again, The dispute about the size and the nature of the fees

2    was something that you wanted to discuss at the meeting?  He

3    can ask that leading question, and then we can go on.

4              MS. JUNGHANS:  Very well.  Thank you.

5              THE COURT:  All right.

6              (Open court:)

7    BY MR. CAMPOAMOR-SANCHEZ:

8    Q.  Mr. Gates, was the issue of Skadden fees and how was that

9    perceived or talked about, was that one of the issues that was

10   planned to be discussed at the Harvard Club meeting?

11   A.  It was.

12   Q.  All right.  So let's move on to the master control grid

13   that was also sent to you by Mr. Hawker.

14             MR. CAMPOAMOR-SANCHEZ:  We can look at page 3 from

15   the exhibit, and the top of page 4 -- yes -- 6, 7, and 8.

16   MR. CAMPOAMOR-SANCHEZ:

17   Q.  So, Mr. Gates, when we're looking at line 7, "2000 project

18   team engagement with Bloomberg," and then below that, "GC/SKA,"

19   what does that mean?

20   A.  So, at that time, we had looked at using a couple of

21   different reporters, including Mr. Sanger and Bloomberg.  We

22   had put this, in this case, into the grid, that Mr. Craig and

23   Skadden would engage with them to, basically, do a kind of

24   pre-briefing on the Report.

25   Q.  And was that one of the items that was discussed at the

1    Harvard Club meeting?

2    A.  It was.

3    Q.  And what do you recall Mr. Craig saying at the Harvard Club

4    meeting?

5    A.  Prior to the meeting, and part of the reason for the

6    meeting, Mr. Craig had showed some concern about doing media

7    events.  When we got to the meeting on the 23rd, we were

8    looking at a very detailed plan, in terms of the exact number

9    of reporters and politicians that Mr. Craig might be doing

10   engagement with.

11   Q.  Okay.  And what do you recall the defendant saying about

12   that issue at the meeting?

13   A.  At that time, he was -- in the end, he was willing to do

14   David Sanger, but wanted to significantly reduce the amount of

15   contact he had with, primarily, media.

16   Q.  So what was your perception of the defendant at the

17   meeting, in terms of his willingness to help with the PR?

18            MS. JUNGHANS:  Objection.

19            THE COURT:  All right.  What did he say about whether

20   he was willing or not?

21            THE WITNESS:  He was willing on specific things, but

22   not nearly the number of things that we had hoped and planned

23   for.

24   BY MR. CAMPOAMOR-SANCHEZ:

25   Q.  Did you take some notes at the meeting?

1    A.  I did take notes.

2    Q.  And what was your focus when you were taking notes at the

3    meeting?

4    A.  The -- we knew the meeting -- or, I knew the meeting was

5    going to be complex, given the agenda.  So, I wanted to make

6    sure that we tried to codify, as much as possible, both related

7    to the content of the Report and any action items that were

8    going to result from discussions on PR and other matters.

9    Q.  All right.  Let's take a look at Government's Exhibit 258.

10   It's already in evidence.

11             And then we can look first at the bottom part of the

12   email.

13             What are we looking at there?

14   A.  This is an email from Jonathan Hawker to me, requesting if

15   he could see the notes that I had taken at the meeting.

16   Q.  And do you respond to Mr. Hawker?

17   A.  I did.

18   Q.  And what did you tell him?

19   A.  I said, "Here you go.  You might not understand all of it,

20   but this is my shorthand."

21   Q.  So let's take a look at page 2 of this exhibit.

22             And are these some of the notes that you took?

23   A.  Yes, they are.

24   Q.  Okay.  Let's focus first on the top.

25             THE COURT:  Were you typing at the meeting or did you

1    type up handwritten notes after the meeting?

2         THE WITNESS:  I was typing at the meeting.

3    BY MR. CAMPOAMOR-SANCHEZ:

4    Q.  And the top reads, "Tymoshenko Report."  And then it says,

5    "media strategy."

6         So, what is this section we're looking at here?

7    A.  So, this specific section actually goes a little bit beyond

8    media.  But, the idea was for Jonathan and I specifically to

9    capture as much action-oriented material about the PR plan,

10   because we were continuing to update it and we needed to refine

11   it.  And, again, even from this point it changed multiple

12   times.  But, we wanted to make sure that we captured as much as

13   possible from Mr. Craig at the meeting.

14   Q.  And when you say "from Mr. Craig" -- so, when you write

15   "The single biggest issue for us," and what follows, who was

16   saying that?

17   A.  So that piece, I believe that was Mr. Craig had made

18   that -- or, you know, had made a comment that I -- I took notes

19   on right here.

20   Q.  How about the second issue?  "The other issue is the

21   witness issue"?

22   A.  Mr. Craig, as well.

23   Q.  How about the third line?  "This was not 'selective and/or

24   political' prosecution"?

25   A.  I believe that was Mr. Craig, as well.

1    Q.  And when it says "GC, he has a preamble that 'Ukraine did a

2    good job overall in the trial process,'" who was saying that?

3    A.  That was Mr. Craig.

4    Q.  Well, let me ask you, do you recall any of these that were

5    not Mr. Craig's?

6    A.  Yes.  Let's see.

7    Q.  Want you to focus in on the middle of the page?

8    A.  Yeah.  I'm sorry.  I can't read.

9            What exhibit is it?

10   Q.  It says 258.  You should have a hardcopy in front of you,

11   as well.

12   A.  All right.  The line with "The new CPC will fix a number of

13   these issues," I believe that was Mr. Manafort.  CPC related to

14   their criminal procedure code.  They were going through a

15   series of judicial reforms, and this was one of the items that

16   was discussed.

17   Q.  Okay.

18   A.  The next line, "We need a list of hypothetical Q&As," was

19   Mr. Hawker.

20   Q.  And, I'm sorry.  Which line is that?

21   A.  Sorry.  "We need a list of hypothetical Q&As to address

22   major issues."

23   Q.  The very next line after the one you were just reading?

24   A.  Yes.

25   Q.  So that was Mr. Hawker?

1      A.   Mr. Hawker.

2           I'm not quite certain about the next line.  I believe

3      that was Mr. Craig, but can't be certain.

4      Q.   The one that days --

5      A.   Yeah.  "Yulia Tymoshenko got two witnesses that were not on

6      the witness list."

7      Q.   Okay.

8      A.   "The key is to know the facts of the case and to

9      structure," again, that was my shorthand for things that

10     Mr. Craig was saying about the Report.

11          The next line, "She was behaving the way she did for

12     political and PR purposes of Mr. Craig."

13          Same with the next line, "Opposition politicians have

14     been on trial."

15          And then the next line, I believe, was Mr. Manafort.

16     "We need to use the facts of the Report to define and fill the

17     holes that Yulia Tymoshenko had created via a PR campaign."

18          Same with the next line, it was Mr. Manafort.  "Not

19     using Ukraine law, but using Western thinking and standards

20     to -- to address the Report."

21     Q.   Okay.

22     A.   And then, I think it -- I believe it picks up back with

23     Mr. Craig.  "The absence of a jury trial does not diminish the

24     case and is not required for a fair trial."

25     Q.   Let's look at -- you have an item that says just "Issues."

 1              What is -- at the bottom.

 2              What is that about.  What are those issues about?

 3    A.   Yep.  So these issues, again, were in the context of the

 4    meeting, and things that needed to be fixed with the Report.

 5    In one case, it was a translation.  And then we needed to

 6    review the four conclusions in the Report.  And then there were

 7    some ideas discussed.  One of them was looking at, you know, in

 8    terms of how the Report could, you know, cause a review of the

 9    judge, the lawyer to file an application in the case.

10    Q.   Can we go to the next page?

11              MR. CAMPOAMOR-SANCHEZ:  Zoom in.

12              Thank you.

13    MR. CAMPOAMOR-SANCHEZ:

14    Q.   What are we looking at here under the title PR Items?

15    A.   Yeah.  So this was a meeting -- at the point of the meeting

16    where we were able to refine the PR section of the Report and

17    how we talked about it.  So, out of that came a number of

18    action items that we took away from the meeting and began

19    inputting into both the Report and, you know, executing the

20    action items.

21    Q.   So are these potential action items you are listing below?

22    A.   Yes.

23    Q.   So the first line says, "Hawker, RG-AVZ to link up SA PR

24    person."

25              What does that mean?

1    A.  Yep.  One of the items that we had agreed to, as you can

2    see in the next line, was to put the Report online, on the

3    Skadden website.  So, the task was for myself, Mr. Hawker, and

4    Mr. van der Zwaan to link up with the designated Skadden Arps

5    PR communications director and coordinate when that report

6    would go up online.

7    Q.  In the next it says, "September 27, GC will be in Cairo for

8    the week."

9         What does that have to do with PR items?

10   A.  Yeah.  So, we had talked about the rollout of the Report,

11   and specifically focusing on debriefings that Mr. Craig would

12   give, both with some reporters and some politicians.  And I

13   made note of that because we were trying to coordinate with his

14   travel schedule, to see if he could do some of those meetings

15   in Europe, on his way back from Cairo.

16   Q.  Well, let's go for a second to the last line.  It says, "GC

17   to possibly meet with Fule in transit to Europe."

18   A.  Yes.

19   Q.  What is that?

20   A.  Yeah.  So, Stefan Fule was in charge of the committee that,

21   basically, processes requests to join the European Union.  So,

22   one of the meetings that we wanted -- or, Mr. Manafort wanted

23   to set up for Mr. Craig was to have him meet and debrief

24   Mr. Fule.  An opportunity to do that was going to be in

25   transit, when Mr. Craig was coming back from Cairo.

1    Q.  And the line that says "KK to get Hawker the information on

2    the financing of SA by MOJ," what does that relate to?

3    A.  Yeah.  So, "KK" refers to a colleague on the ground that

4    worked for Mr. Manafort.  And this was in relation to that fees

5    issue.  KK was the point person on the ground in Ukraine

6    dealing with the Ministry of Justice to try to fix the

7    contractual language with respect to Skadden and the contract

8    with the Ministry of Justice.

9    Q.  That related to the fees?

10   A.  It related to the fees, yes.

11   Q.  And let me ask you --

12            MR. CAMPOAMOR-SANCHEZ:  We can zoom out now.

13   MR. CAMPOAMOR-SANCHEZ:

14   Q.  There is no mention of either Sanger or any other

15   journalist in this list.

16   A.  Correct, not in the notes.

17   Q.  And why not?

18   A.  We had discussions.  It was -- I was aware of Sanger and

19   Mr. Hawker was aware of Sanger.  There was no need to put it

20   into the notes specifically.  You know, we tend to keep it

21   updated in the grid.  The key for us from that meeting was to

22   determine how much and to what extent Mr. Craig would be

23   willing to take on some of the roles that we had outlined.

24   Q.  And after the meeting, was Mr. Craig willing to do some of

25   those?

1    A.  He was.

2    Q.  And what was that?

3    A.  Well, specifically, he continued to reach out to

4    Mr. Sanger.  And then he agreed to certain key politicians in

5    Europe, but had significantly reduced the number of people that

6    we had wanted him to reach out to.

7    Q.  Now, sir, do you know if Mr. Craig changed his mind after

8    the Harvard Club meeting?

9    A.  I do not.

10   Q.  And this relates to something I asked you earlier.  But,

11   after the Harvard Club meeting, were additional media plans

12   prepared?

13   A.  There were.

14   Q.  And was that for the same reasons you outlined previously?

15   A.  Yes.  So, again, as we continued to go through different

16   iterations, and until the Report was released, we just kept

17   making changes to it.

18   Q.  So, in addition to FTI, were other firms at this time

19   working to potentially help out with the Skadden release?

20   A.  Yes.

21   Q.  Who were those?

22   A.  In the United States, it was Podesta and Mercury; and then

23   in Europe, it was a series of firms that we had hired.

24   Q.  Let's look at Government's Exhibit 281, already in

25   evidence.

1    What is this email, sir?

2    A.   So, this is a document that I had requested of the two U.S.

3    firms specifically, and had sent this document to Mr. Hawker.

4    Q.   Okay.  And the subject line says, "Matrix-actions."  And

5    then attachments, "D.C. consultants plan 9-28-1012."

6         What does that -- we see "D.C. consultants plan."

7    What does that relate to?

8    A.   As we got closer to the release of the Report, I was

9    directed to Mr. Manafort to reach out to both firms, ask them

10   who they thought should get a copy of the Report, and

11   potentially be debriefed by, you know, somebody either at

12   Skadden or the government or somebody collectively involved in

13   the project.

14        So, it pertained specifically to, basically, the

15   relationships that the two firms in D.C. had, both in the PR

16   sphere and in the government relations sphere.

17   Q.   And why did you send this to Mr. Hawker?

18   A.   I sent it to Mr. Hawker because he was keeping the master

19   control grid.  So, this was just, again, kind of additional

20   information that we had collected from the consultants that was

21   going to go into the overall strategic plan.

22   Q.   Can we then take a look at Page Number 2.

23        And what are we looking at at the top, where it says,

24   "Engage Ukraine, project map, Washington, D.C. consultants"?

25   A.   So, the Engage Ukraine was kind of a bigger banner for

1    spearheading a project that would kind of target both U.S.

2    legislators and U.S. media with respect to Ukraine's overall

3    effort.  So it went beyond the Skadden Report, but the Skadden

4    Report was a component of it.

5    Q.  An there is an item line to the left that says, "Skadden

6    Report," and then it has some action items.  Do you see?

7    A.  Yes.

8    Q.  It reads, "Finalize report release strategy for the U.S.

9    Identify key reporter and outlet that can 'leak' story,

10   possibly Bloomberg, but this needs to be vetted and ensure we

11   get a balanced piece."

12           What does that relate to?  What does that mean?

13   A.  Yep.  So, at this point in the project, Mr. Manafort had

14   directed me and Mr. Hawker to keep the idea of potentially

15   using David Sanger off any material that was going back and

16   forth between the two D.C. firms.  We had not, you know, fully

17   finalized the plan yet.  And just as a precaution, Mr. Manafort

18   didn't want it to leak out that we might --

19           MS. JUNGHANS:  Objection.

20           THE COURT:  All right.  He told you not to put the

21   name?

22           THE WITNESS:  Correct.

23           THE COURT:  All right.

24   BY MR. CAMPOAMOR-SANCHEZ:

25   Q.  I just want to make sure we're clear.

1           So, without telling us what somebody else told you,

2   was there a reason that Sanger's name was not included here?

3   A.   Yes.

4   Q.   And who gave you that instruction?

5   A.   Mr. Manafort.

6           MS. JUNGHANS:   Objection.

7           THE COURT:   Well, he just -- it's repeated.

8           But, all right.   Ask your next question.

9           MR. CAMPOAMOR-SANCHEZ:   Yes, Your Honor.

10  BY MR. CAMPOAMOR-SANCHEZ:

11  Q.   Now, do you recall, as you sit here today, when the Sanger

12  name first made it into any of the media plans?

13  A.   I recall it was later in the game, in terms of actually

14  getting onto paper.

15  Q.   You're not sure?

16  A.   I'm not sure of the specific date.

17  Q.   Do you know a woman by the name of Lucy-Claire Saunders?

18  A.   Yes.

19  Q.   Who is she?

20  A.   Lucy-Claire Saunders was a -- or, is a -- was an associate

21  with one of the firms that we used, Mercury Consulting.

22  Q.   Okay.   And who was the principal at Mercury that you worked

23  with?

24  A.   Vin Weber.

25  Q.   And did Ms. Saunders have any responsibility for the

1    Skadden Report?

2    A.  Yes.  Ms. Saunders was tasked as the point person for

3    Mercury that would coordinate the Mercury activity for the

4    Skadden Report.

5    Q.  And if we can look at Government's Exhibit 306, already in

6    evidence.

7            MR. CAMPOAMOR-SANCHEZ:  And if we can zoom in on the

8    top part of the document.

9    MR. CAMPOAMOR-SANCHEZ:

10   Q.  Do you recognize this document?

11   A.  I do.

12   Q.  What is it?

13   A.  This is a document that Ms. Saunders prepared on behalf of

14   representing the European Centre for a Modern Ukraine, in terms

15   of the rollout of the Skadden Report and how strategically it

16   would work, in terms of the first article.  And then the

17   subsequent actions that we took.

18   Q.  And is Sanger's name included here?

19   A.  It is.

20   Q.  As well as Mr. Hunt?

21   A.  Yes.

22   Q.  As you sit here today, do you know whose idea it was to

23   suggest Al Hunt of Bloomberg?

24   A.  I do.

25   Q.  Who was it?

```
 1    A.   It was Mr. Weber.

 2    Q.   All right.

 3              MR. CAMPOAMOR-SANCHEZ:  You can take that down.

 4    MR. CAMPOAMOR-SANCHEZ:

 5    Q.   Let's move on to the Report release.

 6              Do you recall, sitting here today, when was it that

 7    you notified others about the release of the Report?

 8    A.   I think we notified them on multiple times because we

 9    thought there were going to be different releases.  But,

10    ultimately, it was the end of November, at which point we had

11    tentatively been given the green light to release in early

12    December.

13    Q.   Okay.  Can we take a look at Government's Exhibit 316,

14    already in evidence.

15              MR. CAMPOAMOR-SANCHEZ:  And can we focus in on the

16    bottom part?

17    MR. CAMPOAMOR-SANCHEZ:

18    Q.   Do you recognize that, sir?

19    A.   Yes.

20    Q.   And what is it?

21    A.   This is an email from me to members of the PR team.  And it

22    was to set up a conference call because we had been given the

23    green light to release the Report.  So, we were actually going

24    to, finally, take action.

25    Q.   And who gave you the green light to notify others that the
```

1    Report was coming?

2    A.  Mr. Manafort did.

3    Q.  And -- I'm sorry?

4    A.  Mr. Manafort.

5    Q.  Okay.

6           And, did the media rollout, at this point, still rely

7    on seeding as a strategy?

8    A.  It did.

9    Q.  And at this point, who was the reporter that was going to

10   be used in the U.S. for that seeding strategy?

11   A.  At this point, to my knowledge, it was Mr. Sanger.

12   Q.  Let's take a look at Government's Exhibit 322.

13          Do you recognize 322?

14   A.  Yes.

15   Q.  And what is this email?

16   A.  So, as we built out the plan, at the time of the release,

17   we had to get very specific.  So, this is an email that

18   Mr. Hawker sent to me in regards to what we considered Phase

19   One.  And that was kind of the immediate, first contact with

20   the reporter.  And then from there, it would expand to the

21   other journalists that we had identified.

22   Q.  And when you say "Phase One," what does that mean?

23   A.  Phase One, we believed that there were going to be multiple

24   phases to this project, to the PR plan.  So Phase One, again,

25   was the immediate, first contact with that first reporter.  And

1    then there was a tier of select reporters in key jurisdictions

2    that we identified that we wanted to make sure that we got to

3    very early in the process.

4    Q.  If you look at the second page of this exhibit.

5         What are we looking at here?

6    A.  So, this is that first waive of, Here are the key reporters

7    in each of the jurisdictions, and publications that we were

8    going to reach out to once the Report was launched.

9    Q.  And for the United States, who's now listed as being that

10   reporter?

11   A.  David Sanger.

12   Q.  And if we go back to the email, that is as of which date?

13   A.  The date is December 6.

14   Q.  Let me ask you, sir, did the defendant have a role to play

15   in the media rollout plan that you were -- well, let me ask you

16   this first:  What was your role now for the actual rollout?

17   What were you charged with doing?

18   A.  So, my role was to coordinate the activity between FTI and

19   then with some of my colleagues on the ground in Ukraine, in

20   terms of the other agencies.  And then, also, it had to deal

21   with the two D.C. firms, Podesta and Mercury, that I had to

22   coordinate with as well.

23   Q.  Okay.  And as part of -- as part of your role, did you come

24   to know whether the defendant himself had a role to play in the

25   media PR plan?

1     A.  I did.

2             MS. JUNGHANS:  Objection.

3             THE COURT:  Well, did you know whether he had a role

4     to play in the PR plan that you were coordinating?

5             THE WITNESS:  Yes.

6             THE COURT:  Ask your next question.

7     BY MR. CAMPOAMOR-SANCHEZ:

8     Q.  What was the role?

9     A.  That role was to pre-brief the reporter from *The New York*

10    *Times*, David Sanger, on the Report, at which point it would be

11    an embargoed article.  But, it would be the first article out

12    of the gate for the project.

13    Q.  All right.  And --

14            THE COURT:  What does "embargoed" mean?

15            THE WITNESS:  Embargoed means that you give the

16    reporter material in advance of putting it out publicly, and

17    then you allow that reporter a period of time to write a story

18    before anybody else can write the story.  So, it gives them

19    kind of first crack at writing that story.

20    BY MR. CAMPOAMOR-SANCHEZ:

21    Q.  All right.  And, Mr. Gates, did you expect the

22    on-the-record interview by Mr. Craig to be this glowing

23    endorsement of Ukraine?

24            MS. JUNGHANS:  Objection.

25            THE COURT:  Overruled.

1    A.  No, we didn't, actually.

2    BY MR. CAMPOAMOR-SANCHEZ:

3    Q.  Why?  Why not?

4    A.  Mr. Craig made very clear that, you know, he didn't know

5    how David Sanger might write the Report.  He was a tough

6    reporter, he described.  It didn't necessarily mean we were

7    going to get a positive report, but we would hopefully get a

8    neutral report.  But, given the credibility of *The New York*

9    *Times* and Mr. Sanger, it was worth the risk to look at using a

10   credible reporter like that.

11   Q.  And were some of your consultants, to your knowledge,

12   opposed to the idea of releasing the Report?

13   A.  Yes.

14   Q.  And why was that?

15   A.  One of the --

16            MS. JUNGHANS:  Objection.

17            THE COURT:  All right.  Okay.

18            Approach the bench.

19            (Bench discussion:)

20            THE COURT:  I think he can say whether anyone

21   objected to the release.  If they objected to him, that's not a

22   statement of fact, that's a statement of an opinion, "I

23   object."

24            So, if he has personal knowledge that anyone didn't

25   think it should be released, why can't he say that?

1          MR. CAMPOAMOR-SANCHEZ:  And, Your Honor, and to add

2     to this, part of the reason I'm asking this question is, the

3     defense has made it abundantly clear that they intended to ask

4     Mr. Gates about the fact that others at Mercury and/or Podesta

5     had opposed the public relations report because, according to

6     them, it was such a glowing endorsement of the pro-Tymoshenko

7     camp.

8          And, so, I'm getting out the fact that he knew about

9     that and, still, the decision went forward to release the

10    Report.

11         MS. JUNGHANS:  That's true.  But when I tried to --

12         THE COURT:  But the decision to release the Report

13    wasn't necessarily his decision to make, so --

14         MR. CAMPOAMOR-SANCHEZ:  It was not.  But --

15         THE COURT:  So the question you asked initially was:

16    Did you -- did you know -- did you expect that the Sanger

17    article was going to be a glowing endorsement?

18         MR. CAMPOAMOR-SANCHEZ:  Correct.

19         THE COURT:  And then the next question was:  Did you

20    know whether any consultants objected to releasing the Report?

21         And I think he can say whether he did or he didn't

22    and whether they did or they didn't.  I don't think he can

23    opine as to their reasons because --

24         MR. CAMPOAMOR-SANCHEZ:  Right.  I'm not intending to

25    ask about the reasons.

```
 1              MS. JUNGHANS:  Right, I agree that they can't.  But,
 2     when we tried to elicit testimony, even if there was objection,
 3     we were precluded from offering it.
 4              MR. CAMPOAMOR-SANCHEZ:  That's not true.
 5              MS. JUNGHANS:  I don't think so.
 6              MR. CAMPOAMOR-SANCHEZ:  That is not true.  That is
 7     not correct.
 8              MS. JUNGHANS:  Well, then I will be able to explore
 9     with him, I assume, not only that they objected, but why they
10     objected.
11              THE COURT:  So you're going to ask for all the
12     hearsay you just --
13              MS. JUNGHANS:  Well, I don't want to.  But -- but, I
14     mean, I -- there's obviously an effort going on here to make
15     Mr. Gates's testimony as short and nondescriptive as possible.
16              THE COURT:  There's nothing wrong with that.  But,
17     okay.
18              MS. JUNGHANS:  Well, that's neither here nor there.
19              And I just think that, you know, if we're not going
20     to air these issues altogether, we shouldn't air them at all.
21              THE COURT:  You have injected them into this trial,
22     in great detail.  You've actually called your own witnesses
23     during the course of the government's case to make sure that
24     this issue got fully vetted.  So, the fact that the Report
25     wasn't a glowing endorsement of the Yanukovych regime and the
```

```
1    Tymoshenko trial is a significant --
2              MS. JUNGHANS:  It is.
3              THE COURT:  -- part of your case.  So, to say he
4    can't ask this question now, and perhaps taking the sting out
5    of what's coming, is a pretty legitimate thing to do.
6              MS. JUNGHANS:  Right.  Right.
7              THE COURT:  And I think the question was -- and he
8    can bring it without saying what they said -- were you aware
9    that any consultants objected to the release of the Report at
10   all, and then go on to the next question.
11             MS. JUNGHANS:  All right.  Thank you.
12             (Open court:)
13   MR. CAMPOAMOR-SANCHEZ:
14   Q.  Mr. Gates, without telling us why or what they said, were
15   some of the consultants opposed to the release of the Skadden
16   report?
17   A.  Yes.
18   Q.  Were those opinions communicated to Mr. Manafort?
19   A.  Yes.
20   Q.  Was a decision made to go forward anyway?
21   A.  Yes.
22   Q.  Now, who, if anybody, was responsible for notifying
23   Mr. Craig that the Report had gotten a green light and was
24   about to be released?
25   A.  My recollection was Mr. Hawker.
```

1    Q.  Do you know or do you remember if Mr. Hawker did that?

2    A.  He did.

3    Q.  How do you know that?

4    A.  Because I was copied on an email that he sent.

5    Q.  All right.  We're going to get to some of those emails.

6    But, let me first ask you about Government's Exhibit 327, also

7    in evidence.

8             And what are we -- well, let's look at the bottom

9    part first.

10            Is that an email from you on December the 10th?

11   A.  Yes.

12   Q.  The subject reads what?

13   A.  "Master grid."

14   Q.  What is this document that is attached to this email as

15   master grid?

16   A.  So, this is a document that Mr. Hawker had largely created,

17   the document that we continued to refine over many months.  And

18   this was the final grid prior to release date that we then

19   circulated to some of our other PR consultants.

20   Q.  And did you, yourself, help to sort of craft or create this

21   document?

22   A.  I did.

23   Q.  All right.  Let's first look at what's on the side.

24            And what is it?

25   A.  The right-hand side is a legend that we just prepared

1    because we knew this grid was now going to be viewed by other

2    parties.  So, it was just simply a way to explain to them which

3    groups were responsible for which actions.

4    Q.  And this master control grid, is this sort of the last one

5    before the release?

6    A.  I believe it is, yes.

7    Q.  And that -- I mean, if you want to look at it, December the

8    10th is when you sent it?

9    A.  Yes.

10   Q.  Is that on or about --

11   A.  Yeah, that would be the last one.

12   Q.  All right.  We can come out.

13        And let me focus, now, your attention on lines -- oh,

14   I'm sorry -- starting on December the 12th, Wednesday, through

15   the end of the page.

16        What are we looking at here, this part of the

17   document?

18   A.  So, this is -- announcement day is A Day.  So, that was

19   going to be Thursday morning.  And then this reflects the

20   pre-briefing of Mr. Sanger and the embargo of the article prior

21   to the Report actually being publicly released.

22   Q.  And, so, when we look at the 1300 hours, when it says "FTI

23   and GC," can you read what it says?

24   A.  Yes.

25        "The Report will be given to David Sanger of *The New*

1    *York Times*, who will have an exclusive on the material for 24

2    hours."

3    Q.  And if we go look at the next line, 1900.

4            What are the initials there?

5    A.  "GC" is Greg Craig.

6    Q.  Okay.  And what does it say?

7    A.  It says, "Greg Craig will give a on-recorder interview with

8    *The New York Times*."

9    Q.  Is that a misspelling?

10   A.  I think that was Mr. Hawker, yes.

11   Q.  Okay.

12           And then what does it say under that?

13   A.  "Sanger will write an article to be placed in *The New York*

14   *Times* that will be released Thursday morning, midnight."

15   Q.  And then when was the release supposed to take place?

16   A.  The release was supposed to take place at 7 a.m.

17   Q.  So, above that, where we were reading, it says, "List to

18   include the following individuals:  Barosso, Fule, Schultz,

19   Obama, Boehner, Reid," and then it lists those.

20           Did that happen?

21   A.  To my knowledge, the -- not all of them did.

22   Q.  Which actually happened, if you know?

23   A.  The only one I'm aware is Mr. Fule.

24   Q.  Okay.  Was somebody actually supposed to talk to

25   President Obama at the time?

```
 1    A.  I think it was more of his staff.  I don't think it was him

 2    directly.

 3    Q.  So not President Obama himself?

 4    A.  The representative of the Obama administration.

 5    Q.  Okay.  All right.

 6              MR. CAMPOAMOR-SANCHEZ:  You can take that down.

 7    MR. CAMPOAMOR-SANCHEZ:

 8    Q.  All right.  Did Mr. Craig carry on those tasks as

 9    identified in the media -- in the master control grid?

10    A.  Some of them.

11    Q.  Okay.  Well, specifically as it relates to Mr. Sanger and

12    The New York Times?

13    A.  Yes, that did occur.

14    Q.  Had other tasks been assigned, according to the master

15    control grid, to Mr. Craig?

16    A.  Yes.

17    Q.  What were those?

18    A.  A good number of them were for Mr. Craig to pre-brief

19    politicians -- key politicians, primarily in Europe.  And, to

20    my knowledge, none of those occurred.

21    Q.  Now, did anybody from Skadden serve in as a stand-in for

22    Mr. Craig related to those efforts?

23    A.  Yes.

24    Q.  Who was that?

25    A.  Mr. van der Zwaan.
```

1    Q.  And who did Mr. van der Zwaan talk to?

2    A.  He talked to a gentleman, Aleksander Kaczynski, who is the

3    former president of Poland.

4    Q.  And what was Mr. Kaczynski's role at the time?

5    A.  At the time, he was a large proponent of Ukraine entering

6    into the European Union.  And he was also tasked with writing

7    a, kind of, independent report on behalf of Europe to the

8    European Commission on Ukraine, and its ability to get into the

9    European Union.

10   Q.  And why was it important to brief him about the contents of

11   the Skadden Report?

12   A.  He played a key role.  So, out of all the European

13   politicians, maybe outside of Mr. Barosso, who was president at

14   the time, it was extremely important get to Mr. Kaczynski

15   because he had a significant role in discussing the future of

16   Ukraine in the European Union.

17   Q.  Was Mr. Craig aware of the fact that Mr. van der Zwaan was

18   going to be doing this briefing of this high-ranking

19   politician?

20   A.  Yes, he was.

21   Q.  Let's take a look at Government's Exhibit 331, which is in

22   evidence.

23            Let's start with your email.

24            First of all, this is an email from you?

25   A.  It is.

1    Q.  All right.  What's the date?

2    A.  The date is December 11th.

3    Q.  And who was this email to?

4    A.  To Mr. Craig.

5    Q.  So, let me ask you, first, were you in contact, from time

6    to time, with Mr. Craig during this media rollout plan?

7    A.  Yes.

8    Q.  This is one of those examples?

9    A.  Yes.

10   Q.  All right.  And what are you asking Mr. Craig here?

11   A.  One of the issues that came up was to, obviously, pre-brief

12   some of the politicians.  Mr. Craig had indicated that he was

13   not going to be engaging in that activity.  So, I was requested

14   by Mr. Manafort to ask if Alex van der Zwaan could do the

15   briefing instead.

16   Q.  And why is the subject "Update"?

17   A.  It's an update because we're getting ready to release the

18   Report.  And we knew, I think at this point, that Mr. Craig was

19   pulling away from briefing the politicians.  But, we needed to

20   find kind of a stopgap to make sure that somebody from Skadden

21   was briefing key members of these delegations.

22   Q.  And I'll read the last lines.  Let me know if I read it

23   correctly.

24          "Ideally, we use Alex to do briefings, which would

25   happen tomorrow in Warsaw.  I wanted to run it by you in case

1  you were interested in handling personally, but I am

2  speculating that might not be the case.  Please let me know if

3  we can proceed or if you would like to discuss further.  Thank

4  you."

5           And did Mr. Craig respond to your email?

6  A.  He did.

7  Q.  What did he say?

8  A.  He said, "I cannot go to Poland tomorrow."

9  Q.  And then you respond to him?

10  A.  Yes.  "Okay.  I figured that might be the case.  I will let

11  the Ministry know, and tell them to work with Alex."

12  Q.  When you say "and tell them to work with Alex," what do you

13  mean?

14  A.  Alex van der Zwaan.

15  Q.  And then you thanked him for it?

16  A.  Yes.

17  Q.  And did, in fact, Mr. van der Zwaan conduct the briefing,

18  as requested, in Warsaw?

19  A.  He did.

20  Q.  Now, were you, sir, responsible for sort of keeping tabs on

21  the progress of the media rollout plan?

22  A.  I was.

23  Q.  And why were you?

24  A.  I was tasked with putting together kind of a summary of

25  events, primarily for Mr. Manafort, so that he could

1    communicate it to the client.

2    Q.  And how were you keeping tabs on what was going on with the

3    seeding with regards to Mr. Sanger of *The New York Times*?

4    A.  With respect to Mr. Sanger, Mr. Hawker was keeping me

5    updated on that progress.

6    Q.  Now, let me ask you, if Mr. Sanger had elected not to

7    proceed with this piece, was there a backup plan in place?

8    A.  Tentatively, yes.

9    Q.  And what was that backup plan?

10   A.  The backup plan was to use Bloomberg.

11   Q.  Okay.  All right.  Were you copied on some of the

12   communications between Mr. Hawker and Mr. Craig related to the

13   seeding of Mr. Sanger?

14   A.  Yes.

15   Q.  Let's look at Government's Exhibit 360.

16          THE COURT:  Mr. Campoamor-Sanchez, I was hoping that

17   we would finish the direct before we had a break, but, we're a

18   little past our usual break time.  So, I wondered,

19   approximately how much more direct do you have?

20          MR. CAMPOAMOR-SANCHEZ:  About ten minutes.  Maybe I

21   can cut it down a little more, but maybe it makes sense to take

22   a little break.  But, I really have between five and ten

23   minutes left.

24          THE COURT:  All right.  Okay.  The back row is

25   definitely in a Let's keep -- well, the front row, too.

1    All right.  Well, since everybody seems to be

2    suggesting we complete the direct before the break, that's what

3    we'll do.  But, if a juror decides that that timing is not

4    working for them personally, as you know, you can just raise

5    your hand, and I will try to take note of it.

6            You can proceed.

7            MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

8            And I will try to be brief.

9    MR. CAMPOAMOR-SANCHEZ:

10   Q.  All right.  Let's look at 360.  And if we look at the

11   bottom two emails.

12           Below, we see the email from Mr. Craig to Mr. Hawker

13   about electronic delivery.

14           Well, let me ask you, first, was Mr. Hawker actually

15   keeping you updated about what was happening with Mr. Sanger

16   and *The New York Times*?

17   A.  He was.

18   Q.  All right.  And this is an email from Mr. Hawker, and he

19   copied you, Re:  Electronic delivery.  And it reads, "Thanks,

20   Greg, that's great, and I've shared with Rick."

21           Had Mr. Hawker actually shared that with you?

22   A.  He did.

23   Q.  The fact that there had been a delivery to Mr. Sanger?

24   A.  Um-hum.

25   Q.  You have to say Yes or No.

1    A.  Yes.

2    Q.  All right.

3          "We're both keeping our fingers crossed for David and

4    thank you for your efforts here, especially handling the

5    Report.  Although we understand that he needs to run it by the

6    Deputy for ED, Rick has pointed out that if the meeting in

7    which this is discussed is at 11 a.m., it would leave us little

8    time to take the Report to your contact at the *Post*, or to

9    Al Hunt, if the *Times* decided to go with it."

10          Did you, in fact, point that out to Mr. Hawker at the

11   time?

12   A.  I did.

13   Q.  Were you concerned about that?

14   A.  Yes.

15   Q.  Why were you concerned?

16   A.  Because, as always, you make great plans, but sometimes

17   those plans change.  If certain time metrics hadn't been met,

18   we were going to be in a difficult position of trying to get

19   that initial seeded article out.

20   Q.  And how would that impact you if that did not happen?

21   A.  That would have stunned us, to say the least.

22   Q.  And then he finishes.

23          "Did you get a view of how keen David was to run

24   this, and his confidence in getting to print, based on your

25   conversation?  Rick is wondering whether we should wait until

1    David reports back before engaging with the *Post*.  What are

2    your thoughts?"

3            Now, what do you recall about potential engagement

4    with the *Post*?

5    A.  My recollection of that is that Mr. Craig had another

6    contact.  It wasn't as significant as Mr. Sanger at the *Times*.

7    I don't even recall the name of it.  We'd never really

8    considered it.  Mr. Hunt, however, came from another

9    consultant, so we had a little more background and information

10   on him as a backup.

11   Q.  And the timing of this is on December 11th, 2012?

12   A.  It is.

13   Q.  And was that before the Report had been released by the

14   Ministry of Justice?

15   A.  Yes.

16   Q.  Do you also inform others -- or, were you keeping others

17   informed of the progress of the media rollout plan as it

18   related to what was going on with *The New York Times*?

19   A.  Yes.

20   Q.  Let's take a look at Government's Exhibit 361, also in

21   evidence.

22           If you can get some context, and you can look at,

23   first, this email, second email from the top.

24           It's an email from Mr. Sager to you and others -- or,

25   to Mr. van der Zwaan, copying you and others; is that right?

1    A.  That's correct.

2    Q.  It says, "Warsaw."

3            What does that relate to?

4    A.  Warsaw was in reference to the trip Mr. van der Zwaan was

5    going to make to brief Mr. Kaczynski.

6    Q.  And there was a below email there from Mr. van der Zwaan,

7    reporting that after speaking with Greg, he has approved the

8    briefing of politicians, but had not approved discussions by

9    him with the media; is that right?

10   A.  That's correct.

11   Q.  So what is Mr. Sager asking you here to do?

12   A.  Mr. Sager is asking me if we can limit the kind of

13   pre-briefing by Mr. Craig to one specific reporter.

14   Q.  And that is *ANSA*?

15   A.  That is correct.

16   Q.  And let's look at your response to the email at the top.

17           What do you respond?

18   A.  I said that "We are waiting for Greg to finish dealing with

19   *The New York Times* right now, but we'll plan to have him do it

20   tomorrow.  I will be sending him an email first thing Kyiv

21   time."

22   Q.  All right.  Do you even know if you actually sent him an

23   email or not?

24   A.  I don't recall.

25   Q.  But, what are you conveying here, that you were waiting for

1    him to finish dealing with *The New York Times*?

2    A.  Yeah.  So, we, again, wanted to hold off.  And if the

3    interview with Mr. Sanger was, in fact, going to happen and

4    could be completed, then we didn't want to jeopardize the rest

5    of the strategy.  So, we were willing to wait a little bit to

6    see if that could be accomplished.

7    Q.  Was that more important than the interview with the *Times*?

8    A.  It was.

9    Q.  Now, ultimately --

10           MR. CAMPOAMOR-SANCHEZ:  You can take that down.

11   MR. CAMPOAMOR-SANCHEZ:

12   Q.  Ultimately, did *The New York Times* publish an article

13   before the Report was released by the Ministry of Justice?

14   A.  Yes, it did.

15   Q.  And did Mr. Craig actually provide an on-the-record

16   interview to *The New York Times* that appeared in that article?

17   A.  He did.

18   Q.  And had he been asked to do so on Ukraine's behalf?

19   A.  Yes.

20   Q.  Now, let's look at, finally, last exhibit, Government's

21   383.

22           Let's look at the email.

23           Now, you recognize this email, Mr. Gates?

24   A.  I do.

25   Q.  What is it?

1    A.   This is one of the email updates that I'm sending to

2    Mr. Manafort, as well as some other members of the PR team, to

3    keep them updated on the progress.

4    Q.   What is the subject line?

5    A.   The subject is, "Report coverage."

6    Q.   Okay.  And as of what time, according to your email, is

7    this report coverage update happening?

8    A.   This was sent at --

9    Q.   Well, let's read your own email, the first line.

10   A.   Oh, the first line.

11           "Here is an update as of 8 a.m. Ukraine time."

12   Q.   Is that accurate, the time?

13   A.   That is accurate, yes.

14   Q.   And then you say, "Below are two articles thus far that

15   have been published from *The New York Times* and *The Telegraph*."

16           And you say, "Overall" -- well, let me ask you,

17   first, at this point, had the Ministry report been released?

18   A.   No.

19   Q.   So this is before the release of the Report by the Ukraine

20   Ministry?

21   A.   That's correct.

22   Q.   "Overall, the strategy of targeting a few select

23   journalists was absolutely the right one."

24           What strategy are you referring to?

25   A.   The strategy of seeding the Report with one journalist.

1    Q.  Then you go on.

2            "There are good quotes on selective prosecution in

3    the articles.  My only disappointment is one of GC's quotes in

4    the New York Time article."

5            And then you say, "But that was part of the strategy

6    in using him via *The New York Times*."

7            What was the strategy of using Mr. Craig via *The New*

8    *York Times*?  What does that mean?

9    A.  It means that we knew the Report was independent.  Greg was

10   going to, you know, make reference to that.  But, more

11   importantly, we knew it may not necessarily be a positive

12   article, but we were willing to take the risk, given that,

13   again, Mr. Sanger was a very credible reporter.

14   Q.  Then he goes on.

15           "He's much more direct and positive on the same

16   matter in *The Telegraph* article.  We are getting ready to

17   release the MOJ statement and the Report.  More coverage

18   coming."

19   A.  Correct.

20   Q.  All right.  Now, did you, in fact, keep Manafort and others

21   updated of the progress of the seeding and then the articles

22   that followed?

23   A.  I did.

24   Q.  So what was your assessment of the success of the media

25   rollout plan, including the seeding of *The New York Times*?

1    A.  So, the overall strategy worked.  As you can see in my

2    email, the article wasn't the greatest, but it, at least, was

3    viewed neutrally.  So, it did have an impact on some of the

4    articles that came out, which were, in some cases, more

5    positive.  So, from our standpoint, the success of it was very

6    great.

7    Q.  And did Mr. Craig willingly participate in the media

8    rollout plan as to *The New York Times*?

9              MS. JUNGHANS:  Objection.

10             THE COURT:  I think it's a little argumentative.

11   But, I think he's already established that.

12             Ask your next question.

13             MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

14             THE WITNESS:  Yes.

15             I'm sorry.

16             MR. CAMPOAMOR-SANCHEZ:  No.  No.

17             THE COURT:  If I sustain an objection, then you don't

18   get to answer.

19             The question and the answer have been stricken.

20             THE WITNESS:  Sorry.

21   MR. CAMPOAMOR-SANCHEZ:

22   Q.  Did Mr. Craig carry out the role that he had promised to

23   carry out as it related to *The New York Times*?

24   A.  He did.

25             MS. JUNGHANS:  Objection.  It's also argumentative.

1    THE COURT:  I think he can ask the question.

2    Did Mr. Craig -- can you answer that question?

3    THE WITNESS:  I can.

4    THE COURT:  All right.  What's the answer?

5    THE WITNESS:  Yes, he did.

6    MR. CAMPOAMOR-SANCHEZ:  Thank you.

7    No further questions.

8    THE COURT:  All right.  We're going to take a break

9    before we have cross-examination of this witness.  So, I'm

10   going to ask you, please, to not discuss anything that's

11   happened this morning or anything that's happened so far in the

12   case.  The case has not yet been given to you to decide.

13   You're excused.  We'll try to resume again at 11:30.

14   Maybe 11:35 by the time we all gather.  You can leave your

15   notebooks on your chairs.

16   (Whereupon the jury leaves the courtroom.)

17   THE COURT:  All right.  Everyone is excused, and

18   we'll resume in ten minutes.

19   MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

20   (Recess.)

21   THE COURTROOM DEPUTY:  Your Honor, recalling Case

22   Number 19-125, United States of America v. Gregory B. Craig.

23   THE COURT:  All right.  Can we proceed with

24   cross-examination?

25   MS. JUNGHANS:  Yes, Your Honor.

1           THE COURT:  All right.  Let's bring the jury in.

2           (Whereupon the jury enters the courtroom.)

3           THE COURTROOM DEPUTY:  All present.

4           THE COURT:  You can be seated.

5           Mr. Gates, I want to remind you that you're still

6    under oath.

7           Note that all of our jurors are back.  I assume no

8    one has tried to discuss this case with you during your

9    break.

10          Ms. Junghans, you can proceed.

11          MS. JUNGHANS:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MS. JUNGHANS:

14   Q.  Mr. Gates, I'm Paula Junghans.  I represent Mr. Craig, and

15   I am going to have some questions for you.

16          MS. JUNGHANS:  Let's put up Government Exhibit 625,

17   please.

18   BY MS. JUNGHANS:

19   Q.  Mr. Gates, this is the plea agreement that you identified

20   on your direct examination, pursuant to which you appear in

21   court today -- or, part of -- it's part of why you're here.

22          Now, Mr. Campoamor asked you about some of the items

23   of it, but I want to ask you about some more.

24          MS. JUNGHANS:  John, would you pull up this first

25   section, Charges and Statutory Penalties?

1    BY MS. JUNGHANS:

2    Q.  And this details the crimes to which you pled guilty,

3    correct?

4    A.  Yes, ma'am.

5    Q.  Okay.  And 371, a conspiracy to violate 26 U.S.C. 7206(1),

6    that's the tax evasion statue, right?

7    A.  I don't believe it was tax evasion.  It was filing false

8    tax returns.

9    Q.  You're right, filing false tax returns.

10           And then 31 U.S.C. 5312 and 5322(b), that has to do

11   with failing to file reports of foreign bank accounts, right?

12   A.  It does.

13   Q.  And then 22 U.S.C. Section 612 and 618, that's FARA, right?

14   A.  Yes, ma'am.

15   Q.  So you pled guilty to conspiring to violate all of those

16   federal statutes?

17   A.  I did.

18   Q.  And you also pled guilty to one count of 1001, which is

19   making a false statement, right?

20   A.  I did.

21   Q.  And the false statement in this case was made to the Office

22   of Special Counsel, which was conducting an investigation?

23   A.  That is correct.

24   Q.  Now, the tax evasion offenses -- tax -- false tax return

25   conspiracy here and the foreign bank account conspiracy is a

1    conspiracy that you participated in with Paul Manafort, right?

2    A.  Yes, ma'am.

3    Q.  He was the other coconspirator?

4    A.  Yes.

5    Q.  Were there any others?

6    A.  No.

7    Q.  And it was about filing false tax returns for Mr. Manafort?

8    A.  Yes.

9    Q.  And about both his and your obligations to file reports of

10   foreign bank accounts that were not filed?

11   A.  That's correct.

12   Q.  And that's because Mr. Manafort had bank accounts in a

13   number of countries around the world, right?

14   A.  Yes.

15   Q.  Okay.  Including a number of large accounts in Cyprus?

16   A.  Yes.

17   Q.  And those accounts were accounts that had -- even though

18   you didn't own the money in the account, you had the ability to

19   cause money to go out of the account on Mr. Manafort's

20   direction, right?

21   A.  I did.

22   Q.  In fact, sometimes not on Mr. Manafort's direction?

23   A.  Correct.

24   Q.  And those activities related to those accounts and to

25   Mr. Manafort's false tax returns occurred during the period

1    that you were doing work in Ukraine, including the work you've

2    described involving Mr. Craig?

3    A.   That's correct.

4    Q.   Now, if you --

5            MS. JUNGHANS:   Can you scroll down, John, to

6    Section 4?

7            Okay.   There.

8    BY MS. JUNGHANS:

9    Q.   Now, you mentioned, in response to questions on direct,

10   that you understood what your guidelines range was.

11           But, you understand that in a money case, the

12   guidelines are driven by the amount of money involved, right?

13   A.   That's what I've learned, yes.

14   Q.   Pardon?

15   A.   That's what I learned through the process, yes.

16   Q.   Right.   And in a tax case particularly, they're driven by

17   the amount of tax that should have been paid by the taxpayer in

18   question that was not paid, right?

19   A.   Yes, to my understanding.

20   Q.   And as it states here, in this case, the amount that you

21   helped Mr. Manafort hide from the Internal Revenue Service is

22   more than $9.5 million?

23   A.   That's correct.

24   Q.   And it also says that the source of income was from

25   criminal activity?

1    A.   The aggravating -- oh, yes.  I see that, yes.

2    Q.   That caused your guideline level to go up, right?

3    A.   Yes.

4    Q.   Now, the FARA violations -- well, actually, let's turn

5    to --

6              MS. JUNGHANS:  Can we have up Government Exhibit 626,

7    please?

8    BY MS. JUNGHANS:

9    Q.   And when you enter into a plea agreement, there's a

10   companion document to it called the Statement of the Offense,

11   right?

12   A.   Yes.

13   Q.   And that actually sets out the facts.  Not just the list

14   of the statutes to which you're pleading guilty, but the

15   facts that support your guilty plea, that make it a crime,

16   correct?

17   A.   Yes.

18   Q.   Okay.  And in this case, as it says here, "The facts do not

19   constitute all of the facts known to the parties, but they

20   demonstrate that sufficient facts exists to establish that the

21   crime was committed," right?

22   A.   Yes.

23   Q.   And what the Statement of the Offense sets forth --

24             MS. JUNGHANS:  John, if you could go over to page --

25   sorry -- page 3, the FARA scheme.

```
1    BY MS. JUNGHANS:
2    Q.  -- is that you understood that it was illegal to engage in
3    activities in the United States as an agent of a foreign
4    principal without registering, and that you and Mr. Manafort
5    engaged in the scheme to avoid registering for your company,
6    correct, and for yourselves?
7    A.  Correct.
8    Q.  And part of what you did here was to create this entity --
9            MS. JUNGHANS:  If you scroll down to the lower part
10   of paragraph 7, please, John.
11   BY MS. JUNGHANS:
12   Q.  You created -- well, an entity was created called the
13   European Centre for a Modern Ukraine, and you acted as the
14   voice of -- and we'll call it ECFMU.
15           You acted as its representative in dealing with
16   various parties, did you not?
17   A.  I was not an employee of the entity.  But, I was a
18   intermediary for the executive director of the entity, yes.
19   Q.  The executive director was a woman named Ina, or Ina
20   Kirsch, correct?
21   A.  Ina Kirsch, yes.
22   Q.  Ina Kirsch?
23   A.  Ina, yes.
24   Q.  And ECFMU was, in fact, an arm of the Ukraine government?
25   A.  It was a arm of a specific member of the government.  He
```

1    served a role in the government.

2    Q.  Pardon me?

3    A.  He served a role inside the government.  It was not a

4    direct arm of the entire government.

5    Q.  But it was associated with the Ukrainian government.  It

6    was not an independent, nonprofit organization, right?

7    A.  Yes, that's correct.

8    Q.  Okay.  And you assisted, on behalf of ECFMU, in

9    retaining the firms that we've heard about, Podesta and

10   Mercury, right?

11   A.  That is correct.

12   Q.  And you represented to them that, in fact, ECFMU was an

13   independent, nonprofit entity, did you not?

14   A.  That's correct.

15   Q.  You lied to them?

16   A.  I did.

17   Q.  And eventually, it dawned on them that, in fact, it was a

18   governmental --

19            MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

20   Relevance.  Beyond the scope.

21            THE COURT:  Are we going to spend a lot more time on

22   this?

23            MS. JUNGHANS:  Not too much time, Your Honor.  But I

24   believe it goes to the witness's -- well, not too much.

25            THE COURT:  All right.  Go ahead.

1     BY MS. JUNGHANS:

2     Q.  And so when you were dealing with Podesta and Mercury, you

3     were, in fact, attempting to advance the interests of Ukraine?

4     A.  Yes.  And that was codified in emails to Mercury and

5     Podesta at the early stages of the relationship.

6     Q.  Now, when the time came -- eventually, the time came that

7     you -- there was an inquiry to you -- when I say "you," and

8     Mr. Manafort -- about the activities of ECFMU, right, by the

9     FARA Unit of the Department of Justice?

10    A.  Yes.

11              MR. CAMPOAMOR-SANCHEZ:  Relevance.

12              THE COURT:  All right.  Can we approach the bench?

13              (Bench discussion:)

14              MR. CAMPOAMOR-SANCHEZ:  He's admitted to what he pled

15    about.  And, so, you know, the purpose of the cross...

16              THE COURT:  I just heard somebody talking.  I wasn't

17    sure if someone was trying to get my attention.

18              MR. CAMPOAMOR-SANCHEZ:  Well, it's not relevant.

19    It's beyond the scope.  And other than the fact that the

20    lawyers for folks that worked for the Centre here -- I really

21    don't know what the purpose of this line of questioning is.

22              MS. JUNGHANS:  I have absolutely no -- I -- I'm not

23    playing to the audience, if that's what you're saying.  I think

24    it goes to his credibility.

25              THE COURT:  Okay.  He lied to them.  That goes to

```
 1    credibility.

 2                 MR. CAMPOAMOR-SANCHEZ:  Right.

 3                 MS. JUNGHANS:  And then he lied to the FARA Unit.  He

 4    lied to the lawyer who was representing him before the FARA.

 5                 THE COURT:  Is that alleged to be him, or is that

 6    alleged to be Mr. Manafort?

 7                 MS. JUNGHANS:  No, it's alleged to be both of them.

 8                 THE COURT:  That they lied to their lawyer, who

 9    then --

10                 MS. JUNGHANS:  He went to the FARA Unit and said they

11    don't have to register because this isn't a Ukrainian entity.

12                 MR. CAMPOAMOR-SANCHEZ:  If she wants to ask whether

13    he lied to a lawyer about FARA registration, that's one thing,

14    but that's not what I'm hearing with ECFMU questions.

15                 MS. JUNGHANS:  That was the subject matter of the

16    lie.

17                 MR. CAMPOAMOR-SANCHEZ:  But what does it matter --

18                 THE COURT:  He didn't know that Manafort -- Manafort

19    pled guilty to -- that was part of Manafort's Statement of

20    Offense.  I'm not sure it was a part of his Statement of

21    Offense.

22                 So, just remind me, he drafted the letters to the

23    lawyer?

24                 MS. JUNGHANS:  No.  I think he participated, is my

25    understanding, from reading his 302s.
```

1      MR. CAMPOAMOR-SANCHEZ:  He did not send a letter, is

2  my understanding.  As the lawyer that was interfacing with FARA

3  asked him questions, they did not provide truthful answers, and

4  then he made those representations.

5      MS. JUNGHANS:  That would be called a lie.

6      THE COURT:  All right.  Now, I will say that if

7  you're going to bring up this stuff, you need to read it

8  accurately.  Because there was a paragraph that came up that he

9  said, in his Statement of Offense, the conspiracy that he

10  agreed that for FARA avoidance was that it was FARA avoidance

11  by DMI, Manafort, and others.  And I know that Manafort

12  specifically involved causing others to avoid FARA

13  registration, and I don't know that you want to go down that

14  road too far.

15      MS. JUNGHANS:  No, Your Honor.  I'm not going

16  backwards.  I'm just going forward.

17      MR. CAMPOAMOR-SANCHEZ:  In fact, she wanted to make

18  sure I did not ask or get into comments about Mr. Craig's FARA

19  knowledge of registration, and I didn't.

20      MS. JUNGHANS:  And I'm not asking about him.  I'm

21  asking about his truthfulness.

22      THE COURT:  All right.  Well, I think it needs to be

23  very focused.

24      MR. CAMPOAMOR-SANCHEZ:  Yes.

25      (Open court:)

1    BY MS. JUNGHANS:

2    Q.  Mr. Gates, I was asking you about when you had an inquiry

3    from the FARA Unit of the Department of Justice, you did not

4    answer their inquiries truthfully; isn't that right?

5              THE COURT:  When you say you, do you mean Davis

6    Manafort?

7    BY MS. JUNGHANS:

8    Q.  You personally.  No, you personally.

9    A.  I personally answered truthfully.

10   Q.  Davis Manafort did not?

11   A.  Mr. Manafort did not.  I don't know about Davis Manafort.

12   Q.  Well, he is Davis Manafort, isn't he?

13   A.  He's the owner, yes.

14   Q.  Okay.  And isn't it also true that -- well, never mind.

15   Let's go on.

16              Now, under this plea agreement -- the plea agreement

17   was in lieu of charges that had been previously brought against

18   you, correct?

19   A.  Yes.

20   Q.  In other words, you were first indicted.  And, in fact, you

21   were indicted both in the District of Columbia and in Virginia,

22   right?

23   A.  That is correct.

24   Q.  Okay.  And then those charges were dropped and what's in

25   the plea agreement was substituted, correct?

1    A.   The charges in Virginia were dropped, correct.

2    Q.   Yes.  And, in fact, some of the charges in D.C. were

3    dropped?

4    A.   That is correct.

5    Q.   And one of the things that was dropped was the charge of

6    money laundering?

7    A.   Yes.

8    Q.   And one of the things that was dropped was a claim by the

9    government for monetary forfeiture, correct?

10   A.   Yes.

11   Q.   Okay.  And under this agreement, you have no obligation to

12   pay any kind of restitution, right?

13   A.   As I understand, that's determined by the judge.

14   Q.   Well, there's no -- there's no amount of restitution set

15   forth in the plea agreement, correct?

16   A.   That is correct, to my understanding, yes.

17   Q.   And now, you are required, under your agreement, as you've

18   already said, to meet with the government?

19   A.   Yes.

20   Q.   And you've done that more than 40 times since you started

21   this process?

22   A.   I have.

23   Q.   About lots and lots of different things?

24   A.   Correct.

25   Q.   Okay.  One or two times about the matters that bring us

```
1    here today?
2    A.  Yes.
3    Q.  Okay.  And you've been interviewed by more than 30
4    government lawyers and agents?
5    A.  I don't have the exact number.  That sounds pretty good.
6    Q.  A lot?
7    A.  Yes.
8    Q.  Okay.  And you were also required under your plea agreement
9    to provide all documents relative to the matters that the
10   government's interested in, right?
11   A.  Yes.
12   Q.  But you can't do that, can you -- you couldn't do that?
13   A.  I'm not sure what you mean.
14   Q.  Because you deleted a lot of materials that were on your
15   computers related to the work that you did in Ukraine, right?
16   A.  Yes.
17   Q.  Okay.  And so that the record as to your own activities
18   that you maintained is not complete?
19   A.  Correct.  On an annual basis, I deleted documents from all
20   different types of email accounts.
21   Q.  Well, you deleted them, in part, in purpose -- on purpose,
22   so the government wouldn't have access to them; isn't that
23   right?
24   A.  Not in relation to the FARA letter.  I think you're
25   referring --
```

```
1    Q.  No.  I'm not asking you about that.  I'm just asking you in

2    general, didn't you delete them so anybody wouldn't see what

3    you were doing?

4    A.  There was an instance related to a completely separate

5    matter that I deleted documents for, yes.

6    Q.  All right.  Now, you also get, under your plea agreement, a

7    promise that you will not be prosecuted for other crimes that

8    you've committed, correct?

9    A.  That is correct.

10   Q.  And you've committed quite a few, haven't you?

11   A.  Yes.

12   Q.  You've committed tax evasion with respect to your own

13   taxes, in addition to helping Mr. Manafort conceal his tax

14   liabilities?

15   A.  I don't believe it was ever tax evasion; it was filing

16   false tax returns.

17   Q.  Okay.  Well, you make a distinction.

18           Filing a false tax return is to file a tax return

19   that has a statement on it -- a statement of material fact

20   that's not true, that the person knows is not true?

21   A.  Okay.

22           MR. CAMPOAMOR-SANCHEZ:  Objection.

23           THE COURT:  There are legal distinctions between the

24   counts.

25           MS. JUNGHANS:  There are.  And I'm trying -- if the
```

1    witness wants to define them, I can do that.

2              THE COURT:  Well, I think -- he's allowed to answer

3    your questions as he understands it.  So, if you're going to

4    quibble with him about matters of law, I don't think that he

5    should be testifying to matters of law or you should be

6    testifying to matters --

7              MS. JUNGHANS:  No.  Let me -- let me try again, Your

8    Honor.

9              THE COURT:  All right.

10             MS. JUNGHANS:  Okay.

11   BY MS. JUNGHANS:

12   Q.  The conspiracy that you pled guilty to with respect to

13   Mr. Manafort's taxes is a conspiracy to violate 7206(1) of

14   Title 26, which you've just pointed to, right?

15   A.  Yes.

16   Q.  Okay.  And that is the crime of filing a false tax return?

17   A.  Correct.

18   Q.  Okay.  Leaving that aside, turning to your own crimes with

19   respect to your own tax matters.

20   A.  Yes.

21   Q.  Okay.  You have committed tax evasion, have you not?

22   A.  There were unpaid taxes on my tax returns, yes.

23   Q.  Well, you're not saying simply that you filed tax returns

24   that showed an amount due that you didn't pay?

25   A.  I didn't pay the full amount of taxes on my taxes owed.

1    Q.  Right.  But you didn't report all the income that you had

2    either --

3    A.  That's correct.

4    Q.  -- did you?

5            For a number of years running?

6    A.  I don't know the total number of years.  But, yeah, there

7    was several occasions where I did not report the full amount of

8    taxes owed.

9    Q.  Well, in -- for the tax year 2010, you omitted more than

10   half a million dollars in income, did you not?

11   A.  I don't believe the number was that high.

12   Q.  You don't?

13          Did you lie about the -- your control over foreign

14   bank accounts?

15   A.  Yes.

16   Q.  For the year 2011, did you omit about 200-and-some-thousand

17   dollars in taxes?

18   A.  I don't know the exact number.

19   Q.  Have you attempted to figure it out?

20   A.  No.  Early on, when I pled, we didn't figure it out.  I did

21   review some documents at different junctures, but I never owed

22   the total amount.

23          I did subsequently -- actually, before the plea, have

24   revised tax documents submitted to the IRS to fix any mistakes

25   that were made in the past.

```
1    Q.  So that you would look good to the Court that you had fixed
2    your prior --
3    A.  Do the right thing.
4              MR. CAMPOAMOR-SANCHEZ:  Objection.
5    BY MS. JUNGHANS:
6    Q.  For the year 2011, you also took false expense deductions,
7    did you not?
8    A.  I did.
9    Q.  And you also lied about your control over the bank accounts
10   that you controlled?
11   A.  That's correct.
12   Q.  Okay.  And you had foreign bank accounts for yourself, as
13   well as the accounts that you managed for Mr. Manafort, right?
14   A.  Correct.
15   Q.  And in 2012, same thing, omitted income --
16   A.  Yes.
17   Q.  -- lied about foreign bank accounts?
18   A.  Yes.
19   Q.  In 2013, you omitted about $1 million in income?
20   A.  I don't believe that's the correct number.  But, I did omit
21   taxes, yes.
22   Q.  And, again, you continued to lie about your foreign bank
23   accounts?
24   A.  Correct.  We did not file foreign bank accounts.
25   Q.  2016, you omitted $800,000 that you got from a company
```

1    called IDW?

2    A.  In 2016?  No, I don't believe that money was -- the 2016

3    tax return was a good tax return.  It should have been filed

4    properly.

5    Q.  All right.  Well, maybe check that over the break.

6              For all the tax returns that you just described that

7    were false, you lied to the preparer who put them together for

8    you?

9    A.  Yes.

10   Q.  And you lied to the government of Cyprus to avoid tax on

11   accounts that you had there?

12   A.  Yes.

13   Q.  And to conceal the fact that you had taken money out of

14   those accounts?

15   A.  Yes.

16   Q.  And, in fact, you took money from Mr. Manafort himself?

17   A.  That's correct.

18   Q.  So that you were able to write checks on or arrange wire

19   transfers out of the accounts that Mr. Manafort had in Cyprus,

20   and you just helped yourself from time to time without telling

21   him?

22   A.  Yes.

23   Q.  And you didn't pay tax on that money either?

24   A.  Correct.

25   Q.  And all of that has been forgiven as part of your plea

1    agreement, at least from a criminal perspective, right?

2    A.  Yes.

3    Q.  And you've lied to the SEC in an insider trading inquiry?

4    A.  No, that's not correct.

5    Q.  You didn't fail to tell the SEC, when you were being asked

6    about Equifax's -- Equifax's acquisition of this company called

7    IDW, that you had tipped your father and brother when they

8    asked you?

9    A.  No.

10   Q.  You lied to banks to borrow money for yourself?

11   A.  Yes.

12   Q.  And, in fact, you had Mr. Manafort sign a letter so that

13   you could give it to Morgan Stanley, claiming that you had more

14   income than you had so you could get a loan from Morgan

15   Stanley?

16   A.  Correct.

17   Q.  And you altered other kinds of documents to give to the

18   banks to get those loans?

19   A.  Yes.

20   Q.  You lied to Visa so you could get a higher grade credit

21   card?

22   A.  Yes.

23   Q.  You lied to the government of Ukraine, your own client,

24   about the amounts that Davis Manafort paid to employees in the

25   Ukraine?

1    A.   I -- you have to be more specific.  I don't know what

2    you're talking about.

3    Q.   Do you remember -- I know you can't possibly remember every

4    date you've been interviewed by various federal agents.  But,

5    do you remember being interviewed on February 12th, 2018, by

6    Mr. Weissmann, Mr. Andres, and others?

7    A.   There were interviews.  I don't know if they were

8    specifically there, but I'll take your word for it.

9    Q.   And I apologize.  I think I have the wrong date.  So, let

10   me -- let me verify that, and I'll come back.

11   A.   Okay.  I won't take your word for it.

12   Q.   Pardon me?  I'm sorry, I didn't hear what you said.

13   A.   I thought you were correct, but since you said you weren't

14   correct, I said I won't take your word for it.

15   Q.   Well, sir, you're the one who knows whether you lied to

16   Ukraine or not?

17   A.   Well, I never had any interaction with the government of

18   Ukraine, specific individuals.  So when you're making that

19   statement, I'm not clear on what you're trying to ask.

20            THE COURT:  I think you're arguing with him now.

21            MS. JUNGHANS:  I'm trying not to, Your Honor.

22            THE COURT:  All right.

23            MS. JUNGHANS:  I would like to come back to it,

24   actually --

25            THE COURT:  All right.  You may.

1          MS. JUNGHANS:  -- when I check the document.

2          THE COURT:  Well, ask your next question rather than

3     making comments.

4          MS. JUNGHANS:  Okay.

5     BY MS. JUNGHANS:

6     Q.  Did you lie in the deposition about Black Sea Cable and a

7     company called Pericles?

8     A.  Yes.

9     Q.  To conceal Mr. Manafort's control over bank accounts in

10    Cyprus?

11    A.  That is correct.

12    Q.  You did.

13          Now, after you left the -- after Davis Manafort

14    folded -- for want of a better term -- what did you do after

15    that?

16    A.  The next role I served was under Mr. Manafort at the

17    Donald J. Trump for President campaign.

18    Q.  And Mr. Manafort was campaign manager for a period of time?

19    A.  He was.

20    Q.  And you worked in the campaign also, under Mr. Manafort's

21    direction?

22    A.  I did.

23    Q.  Okay.  And during that period of time, did you submit

24    expenses to be reimbursed by the Trump campaign to which you

25    were not entitled?

 1    A.   For the Trump campaign?  No, I don't recall that I did.

 2    Q.   To the Inaugural Committee?

 3    A.   No.

 4    Q.   To any organization associated with the campaign?

 5    A.   No.

 6    Q.   Now -- all right.  Let's talk about -- well, actually, let

 7    me ask you one more question.

 8              You said that you had filed amended tax returns right

 9    around the time you entered your guilty plea?

10    A.   That's correct.

11    Q.   Have you paid the taxes associated with them?

12    A.   Some, not all.

13    Q.   How much do you owe?

14    A.   At this time, I --

15              MR. CAMPOAMOR-SANCHEZ:  Objection.

16              THE COURT:  Sustained.

17    BY MS. JUNGHANS:

18    Q.   Now, let's go back to the period of time when -- that you

19    were talking about this morning on direct, when the Skadden

20    project got off -- the Skadden Report project got off the

21    ground.

22              I believe you said that "We hired Skadden," correct?

23    A.   Yes.

24    Q.   Who's "we"?

25    A.   Davis Manafort.

1    Q.  Well, actually, the Ministry of Justice engaged Skadden,

2    correct?

3    A.  On an official basis, yes.

4    Q.  Are you saying that unofficially Skadden was working for

5    Davis Manafort?

6    A.  No, not working for Davis Manafort.  Again, when I was

7    asked the question about what the first task was by

8    Mr. Manafort, it was to wire Skadden money.  At that point in

9    time he explained to me how --

10   Q.  No, I'm not asking you that.

11   A.  Okay.

12   Q.  I'm just asking you, Skadden was engaged by the Ministry of

13   Ukraine -- the Ministry of Justice of Ukraine; is that correct?

14   A.  Yes, that is correct.

15   Q.  And you were separately engaged by the government of

16   Ukraine?

17   A.  Actually, it's the Party of Regions, but that's correct.

18   Q.  The Party of Regions?

19   A.  Yes.

20   Q.  And that's a political party that Mr. Yanukovych headed,

21   correct?

22   A.  That is correct.

23   Q.  The fellow who you had helped to get him elected?

24   A.  Yes.

25   Q.  So, Skadden was not Davis Manafort's client?

1    A.  That is correct.

2    Q.  Or, put it the other way around, David Manafort was not

3    Skadden's client.  Skadden's client was the Ministry of

4    Ukraine?

5    A.  Correct.

6    Q.  The same with respect to FTI, correct?

7    A.  Yes.

8    Q.  I believe you also said, "We hired FTI."

9            But, in fact, the Ministry of Justice hired FTI?

10   A.  The Ministry of Justice hired FTI at a later point.  We

11   paid FTI through proceeds from Mr. Manafort.

12   Q.  Okay.  And FTI didn't get paid everything?

13   A.  Correct.

14   Q.  Now, let's look at Government Exhibit 166, which you were

15   asked about on direct.

16            And you said, I believe, that in the very beginning

17   of this, while the Report was still in process, you began to

18   think about media activities related to the Report?

19   A.  Yes.

20   Q.  And that you sent this email to a bunch of people

21   soliciting names of --

22            MS. JUNGHANS:  If you go to the first line, please,

23   John, after "Team."

24   BY MS. JUNGHANS:

25   Q.  "I need you to identify a list with media, GR's government

1   relations," right?

2   A.   Correct.

3   Q.   "And third-party contacts that we will need to engage with

4   the SA firm"?

5   A.   Yes.

6   Q.   Now, the first person on this email is Ina Kirsch?

7   A.   That's correct.

8   Q.   That's the person you've already mentioned is related to

9   ECFMU?

10   A.   Yes.

11   Q.   Tell us, again, who all these other people are.

12   A.   They are a series of consultants from firms, both in Europe

13   and the United States, that we hired.

14   Q.   You hired --

15   A.   That the -- in part, the ECFMU hired.

16   Q.   Well, you, acting on behalf of the ECFMU, put these people

17   together, right?

18   A.   Correct.

19   Q.   And how many firms -- I mean, there's a number of

20   individuals here, but how many firms does this represent?

21   A.   I believe there were four firms in Europe and two in the

22   United States, in total.

23   Q.   So the two in the United States were Podesta and Mercury?

24   A.   Yes.

25   Q.   And the four -- the other two in Europe were

1    FleishmanHillard and Burson-Marsteller?

2    A.   FleishmanHillard, Burson-Marsteller.  There was one in

3    France and one in Germany.

4    Q.   So you had six firms altogether?

5    A.   I believe so, yes.

6    Q.   Now, you didn't disclose to Mr. Craig that you had hired

7    any of these people, right?

8    A.   Correct.  These firms were not hired in conjunction with

9    the Skadden Report -- or, that was not the impetus for hiring

10   them.

11   Q.   Well, you say in the first -- the second line, "Contacts

12   that we will need to engage the SA firm."

13            That's Skadden, right?

14   A.   Yeah.  Because the Skadden Report was a component of a

15   greater plan called Engage Ukraine, which I mentioned earlier.

16   So, this is just one facet of it.

17   Q.   Well, nevertheless, you didn't tell Skadden that you had

18   engaged six PR firms to do work related to the work that

19   Skadden was doing?

20   A.   Correct.

21   Q.   And when you -- did you get -- did you get responses to

22   this?  Did you get names?

23   A.   Yes, I did.

24   Q.   Okay.  And you didn't share those with Skadden either?

25   With, particularly, with Mr. Craig?

 1    A.  They were in the media matrix that we provided to Mr. Craig

 2    and Mr. van der Zwaan.

 3    Q.  Well, actually, you didn't provide the media matrix to

 4    Mr. Craig directly until September, right?

 5    A.  I never provided the media matrix directly.  It was

 6    generally done through Mr. Hawker.

 7    Q.  Right.  Now, in -- when you -- you got this -- let's look

 8    at --

 9         MS. JUNGHANS:  Can we have up, please, Exhibit 77,

10    Defendant's Exhibit 77?

11    BY MS. JUNGHANS:

12    Q.  And, sir, there's a binder in front of you.  If you'd

13    prefer to look at the exhibits in hardcopy, you should be able

14    to find it.  They're organized defense and government.

15    A.  Okay.

16    Q.  Now, this is an email from yourself.  If you look at the

17    top -- oh, I'm sorry.  I'll wait until you have it.

18    A.  Okay.

19    Q.  This is from yourself to Jon Aarons from Jonathan Hawker,

20    FTI.  And it says the subject is "Asset tracing."

21         Just so it's clear, what was that?

22    A.  That was a project proposed by FTI to look at assets that

23    the previous government had either taken or confiscated.  And

24    as part of the new government coming in, it was an idea to find

25    out where those assets went.

1    Q.  Okay.  Which never went anywhere, right?

2    A.  Correct.

3    Q.  But, in spite of that, that heading sort of carrying

4    through here, the attachment here is referred do as the "SA

5    outreach list final, July 2, 2012."

6            Do you see that?

7    A.  Yes.

8    Q.  Okay.  And if you turn to that document, which begins at

9    the page marked 77-4.  It's got this enormous list of contacts.

10           And is this what you're referring to, contacts that

11   you had collected from the inquiry you had made of the six PR

12   firms?

13   A.  Yes, this looks like it.

14   Q.  Okay.  And if you go to the last page here, 77-7, at the

15   bottom.

16           MS. JUNGHANS:  If you could highlight, John, please,

17   the part that says, "Media."

18   BY MS. JUNGHANS:

19   Q.  The contact that is listed -- there is a contact listed at

20   *The New York Times*, right?

21   A.  That's correct.

22   Q.  And that name is Steven Lee Myers, right?

23   A.  Yes.

24   Q.  Where did that come from?

25   A.  Mr. Hawker.

1    Q.   Okay.  Not from Mr. Craig?

2    A.   No.

3    Q.   And -- but, this is in -- let's see.  This is July 10th.

4         And I believe you told us on direct that around this

5    time you had already discussed with Mr. Craig David Sanger?

6    A.   Correct, in broad terms.

7    Q.   In broad terms.  But not good enough terms that he would

8    make it onto the media list?

9         MR. CAMPOAMOR-SANCHEZ:  Objection.

10   A.   Correct.

11        THE COURT:  Overruled.

12   BY MS. JUNGHANS:

13   Q.   So you didn't think it was serious?

14   A.   No.  We just hadn't gotten to a point in the media grid to

15   actually go through and identify.  There are other names in

16   here that are not as concrete either.  This was kind of a straw

17   man.  Meaning, it was an initial document put together by

18   Mr. Hawker in order to identify key reporters at certain

19   publications.

20   Q.   Okay.  So, the written record is that the correspondent who

21   was being considered from *The New York Times* was

22   Steven Lee Myers?

23   A.   No.  That was a --

24        MR. CAMPOAMOR-SANCHEZ:  Object to the form of the

25   question.

```
 1              THE COURT:  Yeah.  I don't think he said that.
 2              MS. JUNGHANS:  I apologize.  Did I misspeak?  What
 3    did I say?
 4              I said, "The written record here" --
 5              THE COURT:  That's the part that I think --
 6              MS. JUNGHANS:  "The written record" --
 7              THE COURT:  Steven Myers is listed here.
 8              MS. JUNGHANS:  Yes.
 9              THE COURT:  Okay.
10              MS. JUNGHANS:  "The written record is that the" --
11              MR. CAMPOAMOR-SANCHEZ:  Object to the form of the
12    question.
13              MS. JUNGHANS:  The written --
14              MR. CAMPOAMOR-SANCHEZ:  Mischaracterizing the
15    document.
16              MS. JUNGHANS:  It is a written record.
17              THE COURT:  It is a plan dated July 12th.
18              MS. JUNGHANS:  Let me -- I think my question was
19    clear, but let me try again.
20    BY MS. JUNGHANS:
21    Q.  What was put down in writing at this time, was that the
22    correspondent who was being considered was Steven Lee Myers,
23    correct?
24    A.  It wasn't necessarily being considered.  It was
25    Mr. Hawker's -- he put that name in there, along with other
```

1       names that were placeholders of key publications.  We hadn't

2       identified who specifically at those publications would be

3       selected.

4       Q.  Okay.  But the only writing we have that --

5              MR. CAMPOAMOR-SANCHEZ:  Objection to the "writing."

6       It mischaracterizes the record.

7              THE COURT:  All right.  Let's talk about this

8       writing.

9              MS. JUNGHANS:  The writing.

10             THE COURT:  This writing?

11             MS. JUNGHANS:  Yes, this writing.  This writing.

12             THE COURT:  Okay.  I think he's answered -- you've

13      asked and answered multiple times.

14      BY MS. JUNGHANS:

15      Q.  This writing, as of July 10th -- and, actually, it says

16      that the document list was created on July 2nd.  This writing

17      says that the correspondent from *The New York Times* who was

18      being considered was Steven Lee Myers.

19      A.  Correct.

20      Q.  And whoever else was in somebody's head, it was not reduced

21      to writing, correct, in this document?

22      A.  Correct.

23      Q.  Do you know of any other document issued at this time that

24      reflected that Greg Craig had suggested David Sanger?

25      A.  At the time of July 10th?

```
 1    Q.  Yes, sir.

 2    A.  No.

 3    Q.  Now, these plans and strategies and all that, as you said,

 4    evolved over time, right?

 5    A.  That is correct.

 6    Q.  And there was a lot of work done on these things in

 7    anticipation of the release of the Report, correct?

 8    A.  Yes.

 9    Q.  Okay.  And, in fact, if we go to --

10         MS. JUNGHANS:  Can we have up, please, Government

11    Exhibit 176?

12    BY MS. JUNGHANS:

13    Q.  Now, this is from Mr. Aarons to you and some others

14    related to Project Veritas, the communications strategy,

15    right?

16    A.  Yes.

17    Q.  And Veritas is -- actually, let's just look at -- well,

18    Veritas is the name that was given to trying to counter

19    Yulia Tymoshenko, right?

20    A.  Project Veritas was given as the name for the overall PR

21    and GR plan for the rollout of the Skadden Report.

22    Q.  Well, if you look at page 1 of this document --

23         MS. JUNGHANS:  John, if you could go to the next

24    page.  It's actually 2 of the PDF, and the paragraph that

25    begins, "We have called this Project Veritas."
```

1   BY MS. JUNGHANS:

2   Q.   It says, "We will refer in this document to the

3   prosecutions and the accused, collectively, as Veritas."

4           The accused is Yulia Tymoshenko, is it not?

5   A.   It is.

6   Q.   Okay.  So is it not the case that the purpose of the

7   project was to not only talk about the Skadden Report, but to

8   counter Ms. Tymoshenko's interests?

9   A.   What do you mean by "interests"?

10  Q.   Well, you've said that there was a lot of controversy about

11  her situation in Ukraine, right?

12  A.   Yes.

13  Q.   And she claimed that she had been wrongfully prosecuted and

14  she was being wrongfully detained and there was political

15  persecution and all sorts of noise that she was making, right?

16  A.   Correct.

17  Q.   And the Yanukovych government wanted to counter her, to

18  fight back against her, correct?

19  A.   They wanted to make sure that the record was clear on the

20  crimes that she had committed and the justification for the

21  trial, that's correct.

22  Q.   Right.  So they wanted to defend that they had acted

23  properly in going after her, correct?

24  A.   Yes.  Because it was a big part of their entry into the

25  European Union.

1    Q.  Right.  And there were forces in the world who thought

2    that, in fact, prosecuting a prior -- a -- prosecuting the

3    previous prime minister of the country was a bad thing to do?

4    A.  There were individuals.  I don't know what you mean by

5    "forces," but there were people specifically concerned about

6    the way that the trial had occurred, yes.

7    Q.  Right.  And the Ukrainian government wanted the message to

8    get out that the Ukrainian government hadn't done anything

9    wrong in going after her?

10   A.  That was the general intent, yes.

11   Q.  Exactly.  Now, this document was before the Report was

12   finished, right?

13   A.  Yes, it was.

14   Q.  Okay.  And, so, neither you nor anybody else had seen a

15   draft of the Report at this time, correct?

16   A.  I believe that's correct, yes.

17   Q.  Okay.  And didn't know what it was going to say?

18   A.  Correct.

19   Q.  But, nevertheless, the communications strategy was set

20   forth by Mr. Hawker to you, right?

21   A.  Yes.

22   Q.  Okay.  And if you look at page 6, at the top --

23              MS. JUNGHANS:  I'm sorry, John.  Page 7 of the PDF.

24   BY MS. JUNGHANS:

25   Q.  -- it says, "The Report will conclude that the trial was

1    valid, the crime was committed, and the sentence was

2    appropriate."

3    A.  Correct.

4    Q.  You had no idea what the Report was going to conclude, did

5    you?

6    A.  That's correct.  This was a placeholder for when we

7    eventually got the information.  But, this is Mr. Hawker's

8    first attempt at trying to establish the kinds of information

9    that would be necessary to show in the rollout of the Report.

10   Q.  Well, you could have said, the Report will conclude that

11   the trial was flawed.

12            MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

13   question.

14            THE COURT:  He didn't draft this.

15            MS. JUNGHANS:  No.

16   BY MS. JUNGHANS:

17   Q.  You agreed with it, though, right?

18            THE COURT:  Agreed with the plan or the sentence?

19            MS. JUNGHANS:  No, this sentence.

20            THE COURT:  I think he has said what the sentence is.

21            MS. JUNGHANS:  Right.  Well, let me try again.

22   BY MS. JUNGHANS:

23   Q.  This was Mr. Hawker's expression, right, of what might be?

24   A.  Yes.

25   Q.  And I think he says in the earlier portion of it, "If given

1    a free hand" -- look at page --

2              MS. JUNGHANS:  It's page 2 of the PDF, John, on --

3    paragraph that says, "We have been asked."

4    BY MS. JUNGHANS:

5    Q.  "We have been asked to explain how we would address the

6    Skadden publication if given a completely free hand," right?

7    A.  Yes.

8    Q.  And the person who asked him to do that was you?

9    A.  At the direction of Mr. Manafort, yes.

10   Q.  But it was you?

11   A.  Well, it was asked -- it was requested for Mr. Hawker to

12   put together a full communications strategy, based on their

13   experience in other jurisdictions.

14   Q.  And you had been in communication with Mr. Hawker about how

15   the government of Ukraine wanted its position to be expressed?

16   A.  Yes.

17   Q.  Okay.  So, when Mr. -- when Mr. Hawker wrote on --

18             MS. JUNGHANS:  Go back to page 7 of the PDF, please,

19   John.

20             Yes.  Thank you.

21   BY MS. JUNGHANS:

22   Q.  "The Report will conclude that the trial was valid, the

23   crime was committed, and the sentence was appropriate," that's

24   what you hoped the Report would conclude, too, right?

25   A.  Well, we believed at the time that the -- that the trial

 1    was appropriate, but we didn't have all the information.  What

 2    we needed was the independence of a third-party report from a

 3    prominent law firm in order to establish some of these, you

 4    know, potential ideas.  That's correct.

 5    Q.  All right.  Now, at this point, had you had this

 6    conversation that you say you had with Mr. Craig about

 7    David Sanger?  This is now July 14th.

 8    A.  I don't recall specifically the date of the meeting.

 9    Q.  Where do you -- where did that conversation take place?

10    A.  Yeah.  I recall that conversation took place at his office.

11    Q.  In?

12    A.  D.C.  Sorry.  Washington, D.C.

13    Q.  Was anybody else there?

14    A.  Yes.  It was myself, Mr. Manafort, and Mr. van der Zwaan.

15    Q.  Now, you kept working on this, right?

16    A.  Working on what?

17    Q.  The plan.

18    A.  Yes.

19    Q.  The communication strategy?

20    A.  Yes.

21    Q.  And, again --

22            MS. JUNGHANS:  Let's go to Government Exhibit 189.

23    BY MS. JUNGHANS:

24    Q.  So, this is now July 28th, 2012, couple weeks after the one

25    we just looked at.

1    And this is you sending to Mr. Aarons and Mr. Hawker

2    a revised media plan, right?

3    A.   Yes.

4    Q.   Now, it's the case, isn't it, that frequently they would

5    write things -- primarily Mr. Hawker would write things, but

6    then you would take the documents and revise them?

7    A.   Yes.  I would show them to Mr. Manafort, get his comments,

8    add my comments, and then recirculate to Mr. Hawker.

9    Q.   Okay.  And what you were trying to communicate to

10   Mr. Hawker is what you hoped the strategy would be and what you

11   hoped the Report would say?

12   A.   We had, along the way, worked with Mr. Hawker to refine the

13   messaging.  I'm not sure what specific document this is.  If

14   you show me the content of it, then I could be more specific.

15   Q.   Okay.  Well, let's do that.  Let's look at the revised

16   media plan.  And let's look at page 1.

17       And, in fact, if you look at the top of this, this is

18   formulated as from PJM -- that's Mr. Manafort, right?

19   A.   Correct.

20   Q.   -- to SL.

21       And that's Serhiy Lyovochkin, right?

22   A.   It's actually Serhiy Lyovochkin.

23   Q.   Lyovochkin.  Okay.  Thank you.

24       And he was?

25   A.   He was, at the time, the president of Ukraine's chief of

1    staff.

2    Q.  Okay.  And, so, this was something that you actually

3    expected to go to the client?

4    A.  Yes.  This is something Mr. Manafort had requested me to

5    put together, based off of Mr. Hawker's media plan, but it was

6    a shortened version of that plan.

7    Q.  Okay.  And if you look at page 3 of the PDF --

8             MS. JUNGHANS:  John, please.

9             And go down to the second bullet point.

10            Could you blow up the upper part?

11            Thank you.  And go to the second bullet point.

12   BY MS. JUNGHANS:

13   Q.  Again, it says, "The Report will conclude the trial was

14   valid, that crimes were committed by YT" -- that's

15   Yulia Tymoshenko, right?

16   A.  Yes.

17   Q.  -- "but that some irregularities existed not in line with

18   Western jurisprudence," right?

19   A.  Yes.

20   Q.  Now, if you drop down to the bottom bullet point there.

21            It says, "SA" -- that's Skadden, right?

22   A.  Yes.

23   Q.  -- "cannot proactively lead in communications, given their

24   restrictions by FARA registration and disclosure," correct?

25   A.  Correct.

1    Q.  Now, had you had this conversation that you said you had

2    with Mr. Craig about David Sanger before this?

3    A.  What was the date of this report, again?

4    Q.  July 28th.

5    A.  Yes, I would have had that conversation before.

6    Q.  So, is it your testimony that although Mr. Craig may have

7    mentioned David Sanger, he also said, "We are not going to

8    proactively lead in communications"?

9             MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

10   question.

11            May we approach?

12            THE COURT:  Yes.

13            (Bench discussion:)

14            MR. CAMPOAMOR-SANCHEZ:  One, it's very argumentative.

15            But, two, you know, I stayed away, in part because of

16   the objections, about all the communications Mr. Manafort is

17   having with Mr. Craig.  And, you know, I believe she's opening

18   the door to me getting a lot of those communications in, in

19   light of how the question is being presented.

20            THE COURT:  All right.  You have put a document up

21   there that has a sentence in it, and, so are you going to ask

22   him -- you didn't ask him why he wrote it or where he got that

23   information from.

24            MS. JUNGHANS:  The question I just asked him was,

25   "Did Mr. Craig also tell you, when he mentioned David Sanger,

```
 1          that he couldn't be proactive in communications?"

 2                    I didn't ask --

 3                    MR. CAMPOAMOR-SANCHEZ:  What she asked is, Despite

 4          the fact you claimed this, and then that.

 5                    That's what you asked.

 6                    THE COURT:  All right.  Do you want to know if

 7          Mr. Craig said that to him?  Is that your question?

 8                    MS. JUNGHANS:  Yes.  Yes.

 9                    THE COURT:  Okay.  Well, ask him that question.  You

10          are sort of linking things up with -- it's usually the preface

11          for the question I think is prompting the objections more than

12          the questions.  They use your words, not necessarily the words

13          of the answer before that you're purporting to summarize, and

14          so that's why he's objecting.

15                    MS. JUNGHANS:  Okay.  But, I'm asking only about his

16          conversation he claims to have had --

17                    THE COURT:  Okay.  Well, then ask that.  But, what

18          I'm saying is, when you lay your predicates and your

19          foundations for your questions that tell the story the way you

20          want to tell the story, if they don't align exactly with what's

21          been said before, he's going to object.  He has a point.  And

22          that can be avoided, if you just ask the second half of the

23          question after the comma.

24                    MS. JUNGHANS:  Thank you.

25                    (Open court:)
```

1    BY MS. JUNGHANS:

2    Q.  Focusing your attention, again, sir, on that last bullet

3    point.

4              Did Mr. Craig tell you that Skadden cannot

5    proactively lead in communications?

6    A.  He did not tell me specifically; he told Mr. Hawker.

7    Q.  Okay.  And Mr. Hawker told you?

8    A.  Yeah.  Put it into the original memo.

9    Q.  Okay.  Now, then you go on and recite, down lower in the

10   page --

11             MS. JUNGHANS:  John, if you would just go down to

12   Item Number 6.

13   BY MS. JUNGHANS:

14   Q.  There's this information about a small number of

15   international journalists should be briefed in advance of the

16   publication of the Report, and formally contacted, etcetera,

17   right?

18   A.  Yes.

19   Q.  Now, you've said, I believe, that as of this time,

20   Mr. Craig had already told you that David Sanger would be the,

21   kind of, international journalist who should be briefed in

22   advance, right?

23   A.  It was on the U.S. side.  It wasn't an international

24   journalist.

25   Q.  Oh, you don't consider Mr. Sanger an international

1    journalist?

2    A.  No.

3    Q.  Okay.

4              Now, if you go to the next page.

5              And there is a whole section here called Post Report

6    Release.  And the very first item is, "GC will do briefings

7    and interviews with key stakeholders, as listed on the

8    attachment."

9    A.  I think the exact is, "He will need to do," not "will do."

10   Q.  Okay.  So this was something you wanted but he had not

11   committed to do?

12   A.  Correct.  He, at this stage, had agreed to help, generally,

13   again, but we hadn't defined the plan with much specificity at

14   that time.

15   Q.  Okay.  And then you go on lower on the -- in Item 11,

16   "Consideration should be given to him visiting Moscow, and that

17   he should do a roundtable in Berlin," etcetera, right?

18   A.  Correct.

19   Q.  So this was your wish list of what Mr. Craig would do?

20   A.  Yes.

21   Q.  Okay.  None of which he had committed to do?

22   A.  Correct.

23   Q.  Now, if you look at the bottom of the page, in Item 18.

24             The very last sentence says, "We have to be firm in

25   the position that this report concludes that a crime was

1  committed, and that the weight of evidence would have secured a

2  conviction under a Western-style system, irrespective of any

3  minor procedural issues."

4  A.  Yes.

5  Q.  Now, did you have any understanding that the Report was

6  going to take a position as to whether a crime was committed?

7  A.  At that time, we did not know what the Report was going to

8  say.  And, so, with specific reference to a crime committed, we

9  didn't know what the conclusion was going to cite.

10  Q.  But, you were drafting a memorandum to go to your client

11  that said, "We have to be firm in the position that the Report

12  concludes that a crime was committed."

13  A.  The idea was that the government was going to need to be

14  firm in the position.  But, up until this point, this was,

15  again, an idea.  This wasn't -- again, because we didn't have

16  the Report.  So, we were still waiting to see what the

17  conclusion of the Report would be.

18  Q.  Well, I'm a little confused, Mr. Gates, because it doesn't

19  say, We hope the Report will conclude.

20  A.  Um-hum.

21  Q.  It says, "We have to be firm in the position that the

22  Report concludes," present tense.

23             MR. CAMPOAMOR-SANCHEZ:  Objection.  Asked and

24  answered.

25             THE COURT:  I think it has been asked and answered.

1   BY MS. JUNGHANS:

2   Q.  Well, what I'm trying to get to, sir, is, you were telling

3   your client that the Report concludes something, and it hadn't

4   concluded anything at this point; isn't that right?

5   A.  That is correct.

6   Q.  Now --

7        MS. JUNGHANS:  Your Honor, whenever you -- you can

8   tell me when you want me to stop for lunch.

9        THE COURT:  I will.

10        MS. JUNGHANS:  Okay.

11        THE COURT:  But, I think we should go a little bit

12   longer.  Would you like to estimate how much more you have?

13        MS. JUNGHANS:  Oh, a while.  Certainly not enough to

14   be finished before lunch.

15        THE COURT:  Well, I predicted that.

16        But, in general, what are we talking about?

17        MS. JUNGHANS:  Your Honor, I'm guessing two hours.

18        THE COURT:  All right.  Well, let's go for a little

19   bit longer, since we've recently had a break.

20        MS. JUNGHANS:  Okay.

21   BY MS. JUNGHANS:

22   Q.  Now, on August the 5th --

23        MS. JUNGHANS:  Let's have Government Exhibit 207.

24   BY MS. JUNGHANS:

25   Q.  This is now August the 5th of 2012.

1       And at that point, did you expect that the release of

2    the Report was imminent?

3    A.  So, in August we -- yes.  Now, we were back working on the

4    belief that the Report would be released, because the summer

5    had passed, and we were trying to get it out before summer.

6       So, at this point in time, we were gearing up with

7    the belief that the Report would be released.

8    Q.  And the decision about when to release the Report or

9    whether to release the Report lay with the client, correct?

10   A.  To my understanding, yes.

11   Q.  It certainly wasn't Mr. Craig's decision?

12   A.  No.

13   Q.  Or yours?

14   A.  No.

15   Q.  So -- but, while it was still out there, in the sense of

16   while it was unreleased, you all kept working away at refining

17   these plans, correct?

18   A.  Correct.

19   Q.  Okay.  And on August the 5th, Mr. Hawker sent you something

20   called a draft plan of the Veritas master control plan.

21       Do you recall this?

22   A.  I would have to look at the document.

23   Q.  Okay.

24       MS. JUNGHANS:  Let's turn to the first page of this,

25   John.  It's called master control grid.

 1    BY MS. JUNGHANS:

 2    Q.  Now, Mr. Hawker did a lot of these things, right?

 3    A.  He did.

 4    Q.  And sometimes you edited them and sometimes you just

 5    reviewed them?

 6    A.  Correct.

 7    Q.  If you go to the next page of this one.

 8            It says, at the top, the first bullet point -- or,

 9    the first item on the graph says -- and this is -- strike that.

10            This anticipates what's going to happen on the day of

11    the release.  It purports to set out, hour by hour, what

12    everybody is going to do, correct?

13    A.  Yes.

14    Q.  Okay.  And whatever the release date might be?

15    A.  Correct.

16    Q.  Okay.  And it says, "The first thing that's going to happen

17    is that drafts are going to be shared with Charlie."

18    A.  Correct.

19    Q.  Who's Charlie?

20    A.  I don't recall who Charlie is.  It's a code name, I think,

21    Jonathan used for somebody, I don't recall, though.

22    Q.  Okay.  So why were you talking in code?

23    A.  Jonathan typically talked in code quite a bit.  When there

24    were issues or areas where we weren't clear on who it might be,

25    that he would put just kind of a -- a name in there as a

1    placeholder, similar to what he did in other versions.

2    Q.  So if you scroll down to line 10.

3            "The plan anticipates that Charlie and GC" -- that's

4    Mr. Craig, right?

5    A.  Yes.

6    Q.  -- "will discuss changes and sign off," correct?

7    A.  Correct.

8    Q.  And that "Mr. Craig will have a conference" -- the next

9    line.

10           "Mr. Craig will have a conference call" -- or, "that

11   there will be a conference call between FTI in Kyiv and

12   Mr. Craig to discuss the statement."  Is that right?

13   A.  The Skadden statement, yes.

14   Q.  Okay.  Turn to the next page, please.

15           It anticipates, in line 24, that the judge is going

16   to be sent on a foreign trip.

17           What does that mean?

18   A.  I think that's in reference to the general prosecutor,

19   Mr. Pshonka, being -- he was planning to come over to the

20   United States.

21   Q.  Well, isn't it a fact that the -- well, the judge -- Mr. --

22   strike that.

23           Mr. Pshonka isn't a judge; he's the prosecutor,

24   right?

25   A.  At the time.  But, apparently, he was a judge prior to

1    that.

2    Q.  This doesn't refer to the judge from the Yulia Tymoshenko

3    trial being sent out of town so he wouldn't be available to

4    answer questions?

5    A.  I don't know.

6    Q.  Now, it also contemplates, on line 32, that there would be

7    meetings between Mr. Craig and Cox, Kwaniewski, and the

8    Ukrainian commissioner for human rights?

9    A.  Yes.

10   Q.  And if we go to the next page.

11            A number of items.  Like, for example, in line 39,

12   Mr. Craig is going to do something.  In line 43, Mr. Craig is

13   going to provide counterpoints.

14            And if you go to the next page --

15            THE COURT:  Can we -- can we put a question mark

16   somewhere?

17            MS. JUNGHANS:  I think he said yes.

18            THE COURT:  Those are on there?

19   BY MS. JUNGHANS:

20   Q.  You agree?

21   A.  These are on the grid, yes.

22   Q.  Thank you, sir.

23            And if you go to the next page.

24            In lines 53 through 57, it sets out something of a

25   world tour for Mr. Craig, right?

```
 1    A.  Yes.

 2    Q.  Now, he hadn't, at this point, agreed to do any of this,

 3    had he?

 4    A.  That is correct.

 5    Q.  In fact, this document was not shared with him, correct?

 6              MR. CAMPOAMOR-SANCHEZ:  Objection.

 7    A.  I did not share it with him.

 8              Sorry.

 9              THE COURT:  All right.  Do you know?

10              THE WITNESS:  I don't.  I did not share it with him.

11    BY MS. JUNGHANS:

12    Q.  Okay.  Well, you sent it to -- if you go back to page 1.

13              The people you sent it to were Jon Aarons,

14    John Hawker, and Alex van der Zwaan.  You did not send it to

15    Greg Craig.

16    A.  Actually, Jonathan Hawker sent this to me, based on the

17    email.

18    Q.  I'm sorry, sir.  I'm looking at the wrong one.  You are

19    correct.  You are correct.

20              This is just Jonathan Hawker to you?

21    A.  Correct.

22    Q.  So Jonathan Hawker, at least on the surface of this, did

23    not send it to Greg Craig?

24    A.  To my knowledge.

25    Q.  And you did not send it to Greg Craig?
```

1    A.  I did not.

2    Q.  Okay.

3              Now, let's go to Government Exhibit 220.

4              This is now August 24th, 2012.  And if you look at

5    the bottom email, it's from yourself to Mr. Hawker and

6    Mr. Aarons at FTI.

7    A.  Yes.

8    Q.  And you say, "It looks like we will be moving forward next

9    week.  In the interim, I need you guys to think of a few

10   friendly reporters that we can outreach to when the Report is

11   made public."

12             Do you see that?

13   A.  I do.

14   Q.  Now, this is sometime after you've told us you already had

15   a conversation with Greg Craig identifying David Sanger?

16   A.  Correct.

17   Q.  Did you say -- well, you obviously did not say, Hey, guys,

18   we could use David Sanger?

19   A.  No.  This actually alluded to additional reporters.  I'm

20   not saying it mentions David Sanger, but this was more of a

21   question, that we needed more reporters to solicit this to,

22   friendly reporters.

23   Q.  Did you ever, during this period of time, advise Mr. Hawker

24   that Mr. Craig had identified David Sanger a month or two

25   before and -- did you ever tell him that?

1    A.  To my recollection, Mr. Hawker was aware of Sanger --

2    Mr. Sanger potentially being involved.  But, I don't know

3    specifically when we had that conversation.

4    Q.  Well, okay.  Because you said he was aware.

5         But, are you saying you told him?

6    A.  No, I did not tell him.

7    Q.  So, how was he aware?

8    A.  It was my understanding he was aware from Mr. Craig.

9    Q.  You're saying Jonathan Hawker, you believe --

10        THE COURT:  Do you know how Mr. Hawker became aware?

11        THE WITNESS:  I do not.

12        THE COURT:  Okay.  Next question.

13   BY MS. JUNGHANS:

14   Q.  Okay.  You don't know?

15   A.  That's correct.

16   Q.  And you did not take any steps to include David Sanger in

17   the email to Jonathan Hawker?

18   A.  Not in this specific email, no.

19   Q.  Pardon me?

20   A.  Not in this specific email that you're referencing here,

21   no.

22   Q.  Right.  On the next -- can you turn to Defendant's Exhibit

23   98?

24        This is from Jon Aarons to you.  I think -- well, if

25   you look at the bottom of the page, it repeats or incorporates

1    the email we were just discussing where you were asking for a

2    list of reporters.

3            And Mr. Aarons responds to you with a list he says

4    that he previously sent you, and there are reporters all

5    throughout Europe, right?

6    A.  Yes.

7    Q.  Okay.  Were you expecting to get, also, reporters in the

8    United States?

9    A.  I don't recall.  I don't know if they left those off or --

10   this was the list that they provided.

11   Q.  Okay.

12   A.  We weren't specific.

13   Q.  But, if you look at what is attached here, is another

14   version of the communications strategy document.

15           Do you see that?

16   A.  (No response.)

17   Q.  And if you look at page -- it's -- well, look at page 5.

18   A.  Is this exhibit 98?

19   Q.  I'm sorry.  The PDF page is 98-7.  It's page 5 of the memo,

20   but it's page 7 of the PDF.

21   A.  Okay.

22           MS. JUNGHANS:  John, could you go to the previous

23   page?  I don't know why mine are numbered differently.  But --

24   okay.

25   BY MS. JUNGHANS:

1    Q.  Item 2, still saying, "The Report will conclude that the

2    trial was valid, the crime was committed, and the sentence was

3    appropriate," right?

4    A.  Yes.

5    Q.  Now, by this time had you had any more insight into what

6    the Report said?

7    A.  So, there were -- the Report, as it was being drafted, had

8    content to it, but the conclusions had not been written yet.

9    So we still didn't have an understanding of what the

10   conclusions might contain.  But there were elements of the

11   Report -- I would have to go back.  I think at this time, we

12   had seen at least some of it.

13   Q.  Did Mr. Craig give it to you?

14   A.  He did not.

15   Q.  In fact, he wouldn't give it to you, right?

16   A.  It was my understanding that Mr. van der Zwaan had given it

17   to Mr. Hawker and copied me.  I had not seen a copy of the

18   Report at that time, though.

19   Q.  Well, in fact, Mr. van der Zwaan, at your request, allowed

20   Mr. Hawker to enter his hotel room in Kyiv and have

21   Mr. van der Zwaan leave a copy of the Report behind so that

22   Mr. Hawker could see it; isn't that right?

23   A.  That's correct.

24   Q.  And you got Alex van der Zwaan to do that, in spite of the

25   fact that Greg Craig had refused to disclose the Report to you

1    or to Mr. Hawker?

2             MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

3    question.

4    A.  Can you repeat the question, please?

5    BY MS. JUNGHANS:

6    Q.  Mr. Craig had declined to disclose the Report to

7    Mr. Hawker?

8    A.  To my knowledge, yes.

9    Q.  Or to you?

10   A.  Yes.

11   Q.  And you were friendly with Alex van der Zwaan, were you

12   not?

13   A.  Yes.  We socialized.

14   Q.  You socialized in Kyiv?

15   A.  In London, Kyiv, Washington.

16   Q.  You hung out?

17   A.  Yes.

18   Q.  You went to parties and nightclubs -- or, dinners and

19   nightclubs together?

20   A.  We went to dinners.

21   Q.  And Mr. van der Zwaan, you understood, was Mr. Craig's

22   associate?

23   A.  Yes.

24   Q.  Subject to Mr. Craig's discretion?

25   A.  Yes.

1    Q.  But, nevertheless, you persuaded Mr. van der Zwaan to

2    disclose the Report to Mr. Hawker, against Mr. Craig's

3    instructions?

4    A.  Yes.

5    Q.  Did you offer him anything for that?

6    A.  No.

7    Q.  Well, around that time, you were trying to get Alex

8    van der Zwaan to come to work for Davis Manafort, were you not?

9    A.  Well, Alex had expressed interest in looking at other

10   opportunities.  One opportunity was potentially working for

11   Davis Manafort.  Another opportunity was looking at expanding

12   the Skadden office in Eastern Europe.  So, at that time, he had

13   indicated that he wanted to stay at Skadden long enough to make

14   partner before, you know, any decision was made.

15   Q.  Okay.  And whatever -- for whatever reason, he accepted

16   your request -- or, he acted in response to your request, and

17   he contradicted Mr. Craig's instruction and gave the Report to

18   Mr. Hawker?

19   A.  Yes.  We had a situation where Mr. Hawker could not

20   continue with the outline until he had some information from

21   the Report.  Mr. Manafort had asked me to --

22   Q.  I didn't ask you, sir, to tell us --

23            THE COURT:  Well, you strung together many

24   statements, and I think he's responding to them.

25            Go ahead.

1    A.  Mr. Manafort had asked me to see if we could get a copy of

2    the Report in advance, to have Jonathan write the matrix.  I

3    communicated that to Alex.  The initial response I got was, No,

4    the Report was not ready.

5            I went back to Alex to ask him if he could let

6    Jonathan at least see snippets of the Report, at which time,

7    then Mr. van der Zwaan arranged for Mr. Hawker to receive parts

8    of it.

9    BY MS. JUNGHANS:

10   Q.  And none of you, to your knowledge, told Mr. Craig you were

11   doing that?

12   A.  I did not.

13   Q.  Now, so, after Mr. Hawker had seen the Report, that had

14   occurred prior to the exhibit we're looking at, August 24th,

15   right?

16   A.  I don't --

17           MR. CAMPOAMOR-SANCHEZ:  Objection to the form.  I

18   think misstates the evidence.

19           MS. JUNGHANS:  Let me --

20           THE COURT:  All right.

21   BY MS. JUNGHANS:

22   Q.  Do you know when it occurred?

23   A.  I don't know when Mr. Hawker saw the Report.  There were

24   multiple movements in terms of, we could see it, we couldn't

25   see it, the Report was ready, it wasn't ready.  So I don't have

1    a specific date.  If you could tell me the date, then I

2    could --

3    Q.  Well, sir, I wasn't there.  I mean, do you recall --

4    A.  Well, I wasn't there either.

5              THE COURT:  He doesn't know the date.

6              THE WITNESS:  Yeah.

7              THE COURT:  Ask your next question.

8    BY MS. JUNGHANS:

9    Q.  Do you recall it being before the end of July?

10   A.  I don't.

11   Q.  So, if you look at this document that Mr. -- that FTI was

12   generating, it still said, "The Report will conclude that the

13   trial was valid, the crime was committed, and the sentence was

14   appropriate," right?

15   A.  Yes.

16   Q.  So, either Mr. Hawker had seen the Report at this time and

17   knew that the Report did not conclude this -- that's one

18   possibility, right?

19   A.  It could be a possibility, yes.

20   Q.  -- or he had not seen the Report and was still hoping

21   that's what it would say?

22   A.  Keep in mind this was just a placeholder until we got

23   details from the Report.  So, this went on for quite some time.

24   And this was not the only instance where there were things in

25   this document that we put in that, yes, you could suggest we

 1    were hoping for, but we didn't know the definitive answer.  And

 2    until we got the Report, we couldn't fill in the details.

 3    Q.  And the placeholder was what you wanted the message to be?

 4    A.  That was certainly one of the messages, yes.

 5    Q.  Now, if you look at --

 6            MS. JUNGHANS:  If you go to page 12 of the PDF,

 7    please, John.

 8            And go -- actually, keep going to the next page.  No.

 9    Page 12 of the PDF.  There's a list of reporters.

10            Go to the prior page, please.

11            There you go.

12    BY MS. JUNGHANS:

13    Q.  So there's a list of reporters, and the reporter who's

14    listed for *The New York Times* is still Steven Lee Myers --

15    A.  Correct.

16    Q.  -- right?

17            Not David Sanger?

18    A.  Yes.

19    Q.  By this time, do you think you had communicated to

20    Mr. Hawker that Greg Craig was suggesting Davis Sanger?

21            MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

22    question.  Misstates the facts in evidence.

23            THE COURT:  Well, do you know if you had given the

24    name David Sanger to Mr. Hawker by the time this report -- this

25    draft of the plan --

```
 1              THE WITNESS:  In August, I don't believe so.

 2    BY MS. JUNGHANS:

 3    Q.  Okay.  Mr. Craig had given it to you --

 4              THE COURT:  Okay.  Why don't we approach the bench.

 5              MS. JUNGHANS:  No, Your Honor.  I'll just go to the

 6    next question.

 7              THE COURT:  Okay.

 8              MS. JUNGHANS:  Okay.

 9    BY MS. JUNGHANS:

10    Q.  Now, go to Government Exhibit 232, please.

11              August -- no, strike that.  That's September 12th,

12    2012.  So, two weeks or so after what we just looked at?

13    A.  Yes.

14    Q.  All right.  Okay.

15              And you say -- this is from you to Mr. Hawker and

16    Mr. Kilimnik, right?

17    A.  Correct.

18    Q.  -- "We're getting close to the release of the Report.  We

19    need to have the following prepared for me by 2 p.m."

20              And the first item on your agenda was the headline --

21    A.  Yes.

22    Q.  -- right?

23              Now, at this point, did you know -- excuse me -- did

24    you know how long the Report appeared it was going to be?

25    A.  No, because the Report still wasn't finalized at this time.
```

1    Q.   Excuse me.

2              But, you knew it wasn't going to be ten pages?

3    A.   Oh, no.   We suspected it would be much longer.

4    Q.   Hundreds of pages?

5    A.   We didn't know the total number until the end.

6    Q.   Okay.   Okay.   But, the reason you wanted the headline was

7    because you knew that this dense report, when it came out, was

8    not likely to be read in its entirety by too many people,

9    right?

10   A.   Correct.

11   Q.   And, in fact, even if there were news articles about the

12   Report, people might not read the whole article; they might

13   just read the headline?

14   A.   Correct.

15   Q.   That's part of what you think about in your business,

16   right?

17   A.   That is correct.

18   Q.   So you were -- the first thing on your agenda was, The

19   headline, let's get that --

20   A.   Yes.

21   Q.   -- correct?

22              Okay.   And then Number 5 was, "What media are we

23   privately leaking to?"

24              And you say, "Remember, I want to use Bloomberg in

25   the United States."

1   A.   Yes.

2   Q.   What happened to David Sanger?

3   A.   At this time, there was concern raised by one of the other

4   consultants in terms of Sanger and whether or not he would

5   actually put out a favorable article.  So, there was a

6   recommendation made that we consider another reporter.

7            We, at that time, looked at Bloomberg.  The reporter

8   that was recommended was actually more related to TV.  So, we

9   thought that we would look at one in print and one in TV, as

10  well.  Bloomberg was going to be the television.

11  Q.   You had never discussed a television reporter with

12  Mr. Craig, right?

13  A.   No.

14  Q.   So, there's no indication in here that you had, by then,

15  told Mr. Hawker about the suggestion of Mr. Sanger?

16  A.   By this point, I believe that Mr. Hawker was aware that

17  Mr. Sanger was a possibility.

18  Q.   Okay.  Now, the same day, Mr. Hawker sent you yet another

19  version of the messaging documents, right?

20           If you go to government -- defendant -- ah --

21  Defendant's Exhibit 126.

22           And this is Mr. Hawker sending you more versions of

23  these things, right?

24  A.   Yes.

25  Q.   Okay.  And what -- if you turn to the next page.  Let's

1    just see what the first page looks like.

2            He actually is putting together here a proposed set

3    of question and answers that the Ministry of Justice might

4    answer when the Report was released, correct?

5    A.  Yes.

6    Q.  Okay.  And if you look at page -- the next page.

7            MS. JUNGHANS:  126-3, John.  In about the lower --

8    "You can say," that part.

9    BY MS. JUNGHANS:

10   Q.  One of the questions -- and, again, this is writing -- this

11   is anticipating, What if this question is asked?  What are we

12   going to say, right?

13   A.  Yes.

14   Q.  And the question that he anticipated was, "You say you have

15   only just received the Report and are just reading it.  Isn't

16   it odd, given that you paid for it, you were not provided with

17   a draft?

18           "Answer:  We wanted an independent report.  It would

19   not have been independent if we had requested a draft," right?

20   A.  Yes.

21   Q.  Well, that's not a truthful statement, is it?

22   A.  These were statements designed by Mr. Hawker initially to

23   look at how we might potentially answer these questions or how

24   people from the Ministry of Justice would answer those

25   questions.  But, in fact, a draft had been seen by multiple

1    groups before the final report was released.

2    Q.  So the answer to my question is, yes, it's not a truthful

3    statement?

4              MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

5              THE COURT:  The statement that Mr. Hawker put in this

6    draft as a possible answer to a Q&A was not accurate?

7              THE WITNESS:  That is correct.

8              THE COURT:  Okay.

9    BY MS. JUNGHANS:

10   Q.  And was that okay with you?

11   A.  Frankly, I'd -- he had sent so many documents.  I did not

12   review every document in detail.

13   Q.  Okay.

14             MS. JUNGHANS:  Scroll down to the part that says

15   "Findings."

16   BY MS. JUNGHANS:

17   Q.  "The Report is inconclusive on political motivation.

18   Surely this was the key point you wanted to address.  Are you

19   disappointed?"

20             This was, again, a question he imagined might come

21   up, right?

22   A.  Yes.

23   Q.  And the issue of political -- whether the prosecution of

24   Ms. Tymoshenko was politically motivated was the most important

25   issue for the government of Ukraine to dispel, correct?

1    A.  Yes, it was a major provision that needed to be dispelled.

2    Q.  Okay.  I mean, the issues about how the trial was conducted

3    were important, but they were secondary to this question of

4    whether this was a political prosecution of a former prime

5    minister?

6    A.  I'd say, both were important.  But, the political

7    motivation piece was central to the Western leaders from other

8    European countries seeing that Ukraine did not do this through

9    political motivation.

10   Q.  And so the -- the hypothetical statement -- or, the

11   hypothetical question -- excuse me -- starts out with the

12   premise, "The Report is inconclusive on political motivation."

13        That's a true statement, isn't it?

14   A.  Contrary...

15        THE COURT:  Well, at the time it was written or right

16   now?

17   BY MS. JUNGHANS:

18   Q.  At the time it was written -- at the time it was written,

19   you understood that the Report did not take a position on

20   whether there was a political motivation for the prosecution?

21   A.  At the time of the Report, I recall that there was a

22   statement about political motivation, but it was more extensive

23   than what Jonathan boiled it down to.  So this is a sound bite

24   based on one of the greater conclusions in the Report --

25   Q.  All right.

1    A.   -- about political motivation.

2    Q.   We're going to get to the Report.

3              But, is it your testimony that at that time you

4    believed -- well, strike that.

5              Let's look at the answer.

6              "On the contrary" -- the proposed answer.

7              "On the contrary.  The Report clearly states that

8    there is no evidence of political motivation."

9    A.   Yes.

10   Q.   The Report did not take a position about whether there was

11   political motivation, right?  Correct?

12   A.   My recollection of the Report was that there was -- that

13   the -- that there was no evidence of political motivation.

14   Q.   Are you distinguishing political motivation from selective

15   prosecution?

16   A.   No, we're not separating the two.  We are trying to show

17   that the trial was not done out of political malice toward a

18   former opponent.

19   Q.   And the issue was -- there's two issues.  One is whether

20   Ms. Tymoshenko presented enough evidence of political

21   prosecution that her conviction could be overturned because of

22   it, right?

23   A.   Correct.

24   Q.   And then there's the larger issue of whether Skadden

25   surveyed information outside the trial to make a conclusion

1   about political prosecution?

2   A.  I'm not sure about the second piece, but the first piece is

3   correct.

4   Q.  Okay.  Well, you know that Skadden only reviewed the record

5   of the trial, correct?

6   A.  Correct.

7           MR. TAYLOR:  Could we approach, Your Honor?

8           THE COURT:  Yes.

9           And I was thinking I was going to let her finish this

10   document before we broke for lunch.

11           MS. JUNGHANS:  And I just have one more, possibly two

12   more, questions.

13           THE COURT:  All right.  Well, let me hear from

14   Mr. Taylor and then you'll ask your questions and --

15           MR. TAYLOR:  It relates to the -- when we get a

16   break.

17           THE COURT:  Okay.  All right.

18           Your colleague says it's going to be in two

19   questions.

20           MR. TAYLOR:  You asked me to rise my hand.

21           THE COURT:  All right.  All right.

22           MS. JUNGHANS:  I think everybody is ready for lunch.

23   You'll probably be relieved.

24           THE COURT:  All right.  Why don't we do it now, then?

25           MS. JUNGHANS:  Sure, let's do that.

```
 1                THE COURT:  All right.

 2                Thank you, Mr. Taylor.

 3                All right.  Members of the jury, please don't discuss

 4      this case among yourselves or with anyone else during the

 5      break.  It is 1 p.m.  We'll resume at 2 p.m.

 6                So, please enjoy your lunch, and don't discuss the

 7      case or research it in any way.

 8                Thank you.

 9                (Whereupon the jury leaves the courtroom.)

10                THE COURT:  All right.  Everyone is excused.  The

11      witness also gets a lunch, hopefully.

12                I'll see you at 2 o'clock.

13                               *   *   *

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                         Dated this 22nd day of August, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

## $

**$800,000** [1] - 1909:25

## '

**'leak'** [1] - 1865:9
**'selective** [1] - 1857:23
**'Ukraine** [1] - 1858:1

## /

**/s** [1] - 1961:12

## 1

**1** [7] - 1849:23, 1849:25, 1909:19, 1924:22, 1930:16, 1942:12, 1960:5
**10** [1] - 1940:2
**100** [1] - 1801:22
**1000** [1] - 1802:3
**1001** [1] - 1894:18
**10th** [5] - 1876:10, 1877:8, 1921:3, 1923:15, 1923:25
**11** [2] - 1885:7, 1935:15
**11:30** [1] - 1892:13
**11:35** [1] - 1892:14
**11th** [2] - 1881:2, 1886:11
**12** [2] - 1951:6, 1951:9
**126** [1] - 1954:21
**126-3** [1] - 1955:7
**12th** [4] - 1877:14, 1912:5, 1922:17, 1952:11
**1300** [1] - 1877:22
**14th** [1] - 1929:7
**166** [3] - 1834:18, 1834:23, 1916:14
**176** [1] - 1924:11
**18** [1] - 1935:23
**1800** [1] - 1802:2
**189** [1] - 1929:22
**19-125** [2] - 1803:11, 1892:22
**19-CR-125** [1] - 1801:3
**1900** [1] - 1878:3

## 2

**2** [13] - 1826:19, 1848:5, 1850:2, 1850:3, 1856:21, 1864:22, 1920:5, 1924:24, 1928:2, 1946:1, 1952:19, 1960:5, 1960:12
**2-5-4** [1] - 1847:18
**200-and-some-thousand** [1] - 1908:16
**2000** [1] - 1854:17
**20001** [2] - 1802:9, 1961:15
**20036** [1] - 1802:3
**2006** [1] - 1813:16

**2007** [2] - 1814:9, 1814:15
**2010** [3] - 1815:15, 1816:23, 1908:9
**2011** [2] - 1908:16, 1909:6
**2012** [18] - 1815:6, 1815:8, 1815:19, 1816:18, 1817:3, 1817:6, 1817:18, 1817:23, 1821:17, 1823:15, 1836:25, 1886:11, 1909:15, 1920:5, 1929:24, 1937:25, 1943:4, 1952:12
**2013** [1] - 1909:19
**2014** [2] - 1814:9, 1814:15
**2016** [4] - 1813:16, 1909:25, 1910:2
**2017** [2] - 1823:18, 1826:24
**2018** [1] - 1912:5
**2019** [2] - 1801:6, 1961:9
**202** [3] - 1801:15, 1801:19, 1802:4
**202-354-3267** [1] - 1802:9
**20530** [2] - 1801:15, 1801:18
**207** [1] - 1937:23
**21202** [1] - 1801:23
**22** [2] - 1801:6, 1894:13
**220** [1] - 1943:3
**22nd** [1] - 1961:9
**232** [1] - 1952:10
**233-0986** [1] - 1801:19
**23rd** [1] - 1855:7
**24** [2] - 1878:1, 1940:15
**2440** [1] - 1801:23
**24th** [3] - 1836:25, 1943:4, 1949:14
**252-7698** [1] - 1801:15
**254** [2] - 1847:14, 1847:17, 1848:3
**258** [2] - 1856:9, 1858:10
**26** [2] - 1894:5, 1907:14
**27** [1] - 1861:7
**281** [1] - 1863:24
**284** [1] - 1847:17
**28th** [2] - 1929:24, 1932:4
**2nd** [1] - 1923:16

## 3

**3** [5] - 1825:5, 1850:7, 1854:14, 1897:25, 1931:7
**30** [1] - 1905:3
**302s** [1] - 1901:25
**306** [1] - 1867:5
**31** [1] - 1894:10
**316** [1] - 1868:13
**32** [1] - 1941:6
**322** [2] - 1869:12, 1869:13
**327** [1] - 1876:6
**331** [1] - 1880:21
**333** [2] - 1802:8, 1961:14

**360** [2] - 1883:15, 1884:10
**361** [1] - 1886:20
**371** [1] - 1894:5
**383** [1] - 1888:21
**39** [1] - 1941:11

## 4

**4** [3] - 1850:21, 1854:15, 1896:6
**40** [3] - 1826:3, 1826:11, 1904:20
**410** [1] - 1801:24
**43** [1] - 1941:12
**47** [1] - 1812:11

## 5

**5** [6] - 1827:18, 1850:21, 1851:3, 1945:17, 1945:19, 1953:22
**5.B** [2] - 1851:3, 1851:5
**53** [1] - 1941:24
**5312** [1] - 1894:10
**5322(b** [1] - 1894:10
**555** [1] - 1801:14
**57** [2] - 1825:9, 1941:24
**5K** [1] - 1828:8
**5K1** [2] - 1828:3, 1828:5
**5th** [3] - 1937:22, 1937:25, 1938:19

## 6

**6** [6] - 1828:2, 1851:9, 1854:15, 1870:13, 1926:22, 1934:12
**6.B** [1] - 1851:20
**612** [1] - 1894:13
**618** [1] - 1894:13
**625** [3] - 1823:25, 1824:3, 1893:16
**626** [1] - 1897:6
**6523** [2] - 1802:8, 1961:14

## 7

**7** [8] - 1828:16, 1854:15, 1854:17, 1878:16, 1898:10, 1926:23, 1928:18, 1945:20
**71** [1] - 1825:9
**7206(1** [2] - 1894:5, 1907:13
**77** [2] - 1919:9, 1919:10
**77-4** [1] - 1920:9
**77-7** [1] - 1920:14
**778-1814** [1] - 1802:4

## 8

**8** [2] - 1854:15, 1889:11

# 9

**9** [3] - 1801:5, 1801:8, 1828:2
**9-28-1012** [1] - 1864:5
**9.5** [1] - 1896:22
**949-1146** [1] - 1801:24
**950** [1] - 1801:18
**98** [2] - 1944:23, 1945:18
**98-7** [1] - 1945:19
**9:30** [2] - 1801:7, 1803:7

# A

**a.m** [4] - 1801:7, 1878:16,
1885:7, 1889:11
**Aabelson@zuckerman.com** [1]
- 1801:25
**Aarons** [7] - 1919:19, 1924:13,
1930:1, 1942:13, 1943:6,
1944:24, 1945:3
**Abelson** [2] - 1801:21, 1803:22
**abide** [1] - 1851:23
**ability** [3] - 1880:8, 1895:18,
1961:8
**able** [8] - 1822:17, 1836:6,
1840:25, 1841:21, 1860:16,
1874:8, 1910:18, 1919:13
**absence** [1] - 1859:23
**absolutely** [3] - 1827:25,
1889:23, 1900:22
**abundantly** [1] - 1873:3
**acceptable** [1] - 1830:20
**accepted** [1] - 1948:15
**access** [1] - 1905:22
**accommodate** [1] - 1805:4
**accomplish** [2] - 1830:7,
1830:20
**accomplished** [1] - 1888:6
**accomplishing** [1] - 1829:16
**according** [3] - 1873:5,
1879:14, 1889:6
**account** [6] - 1831:12, 1831:16,
1831:19, 1894:25, 1895:18,
1895:19
**accounts** [19] - 1894:11,
1895:10, 1895:12, 1895:15,
1895:17, 1895:24, 1905:20,
1908:14, 1909:9, 1909:12,
1909:13, 1909:17, 1909:23,
1909:24, 1910:11, 1910:14,
1910:19, 1913:9
**accurate** [4] - 1889:12,
1889:13, 1956:6, 1961:6
**accurately** [1] - 1902:8
**accused** [2] - 1925:3, 1925:4
**acquisition** [1] - 1911:6
**acted** [4] - 1898:13, 1898:15,
1925:22, 1948:16
**acting** [2] - 1820:5, 1917:16
**action** [9] - 1838:7, 1851:16,

1856:7, 1857:9, 1860:18,
1860:20, 1860:21, 1865:6,
1868:24
**Action** [1] - 1801:3
**action-oriented** [1] - 1857:9
**actions** [4] - 1850:16, 1864:4,
1867:17, 1877:3
**activities** [6] - 1827:10,
1895:24, 1898:3, 1900:8,
1905:17, 1916:18
**activity** [9] - 1827:8, 1828:6,
1831:25, 1850:22, 1850:24,
1867:3, 1870:18, 1881:13,
1896:25
**actual** [4] - 1835:18, 1837:24,
1850:1, 1870:16
**Adam** [3] - 1801:17, 1801:21,
1803:22
**add** [2] - 1873:1, 1930:8
**added** [1] - 1846:6
**addition** [5] - 1817:19, 1827:15,
1834:10, 1863:18, 1906:13
**Additional** [1] - 1826:20
**additional** [7] - 1817:21,
1826:24, 1832:12, 1846:6,
1863:11, 1864:19, 1943:19
**address** [7] - 1812:13, 1851:24,
1853:6, 1858:21, 1859:20,
1928:5, 1956:18
**administration** [1] - 1879:4
**admitted** [2] - 1834:17, 1900:14
**advance** [6] - 1848:1, 1871:16,
1900:3, 1934:15, 1934:22,
1949:2
**advanced** [1] - 1834:8
**advertising** [1] - 1814:22
**advise** [1] - 1943:23
**agencies** [1] - 1870:20
**agenda** [7] - 1848:9, 1848:11,
1849:22, 1850:14, 1856:5,
1952:20, 1953:18
**agent** [1] - 1898:3
**agents** [2] - 1905:4, 1912:4
**aggravating** [1] - 1897:1
**agree** [3] - 1827:4, 1874:1,
1941:20
**agreed** [19] - 1825:11, 1825:12,
1825:14, 1826:21, 1826:23,
1827:20, 1827:21, 1827:22,
1828:3, 1828:14, 1828:21,
1861:1, 1863:4, 1902:10,
1927:17, 1927:18, 1935:12,
1942:2
**agreement** [21] - 1824:6,
1824:11, 1824:14, 1825:10,
1825:17, 1826:13, 1826:16,
1826:17, 1827:11, 1829:8,
1893:19, 1897:9, 1903:16,
1903:25, 1904:11, 1904:15,
1904:17, 1905:8, 1906:6, 1911:1

**ahead** [3] - 1821:25, 1899:25,
1948:25
**air** [2] - 1874:20
**Al** [2] - 1867:23, 1885:9
**Aleksander** [1] - 1880:2
**Alex** [14] - 1832:21, 1838:11,
1881:14, 1881:24, 1882:11,
1882:12, 1882:14, 1942:14,
1946:24, 1947:11, 1948:7,
1948:9, 1949:3, 1949:5
**align** [1] - 1933:20
**alleged** [3] - 1901:5, 1901:6,
1901:7
**allow** [1] - 1871:17
**allowed** [5] - 1839:1, 1842:16,
1844:18, 1907:2, 1946:19
**alluded** [1] - 1943:19
**almost** [1] - 1826:2
**altered** [1] - 1911:17
**altogether** [2] - 1874:20, 1918:4
**Amanda** [1] - 1803:18
**amended** [1] - 1914:8
**America** [3] - 1801:3, 1803:11,
1892:22
**amount** [9] - 1855:14, 1896:12,
1896:17, 1896:20, 1904:14,
1907:24, 1907:25, 1908:7,
1908:22
**amounts** [1] - 1911:24
**AMY** [1] - 1801:9
**andres** [1] - 1912:6
**announcement** [1] - 1877:18
**annual** [1] - 1905:19
**ANSA** [1] - 1887:14
**answer** [23] - 1829:6, 1830:13,
1839:2, 1841:22, 1844:10,
1844:23, 1891:18, 1891:19,
1892:2, 1892:4, 1903:4, 1907:2,
1933:13, 1941:4, 1951:1,
1955:4, 1955:18, 1955:23,
1955:24, 1956:2, 1956:6,
1958:5, 1958:6
**answered** [6] - 1825:24, 1903:9,
1923:12, 1923:13, 1936:24,
1936:25
**answering** [1] - 1844:9
**answers** [3] - 1851:18, 1902:3,
1955:3
**anticipated** [2] - 1818:21,
1955:14
**anticipates** [3] - 1939:10,
1940:3, 1940:15
**anticipating** [1] - 1955:11
**anticipation** [1] - 1924:7
**anyway** [1] - 1875:20
**apologize** [2] - 1912:9, 1922:2
**appear** [1] - 1893:20
**appeared** [2] - 1888:16,
1952:24
**application** [2] - 1828:18,

1860:9
**appreciate** [2] - 1811:8, 1819:11
**apprised** [1] - 1836:14
**approach** [8] - 1803:13, 1818:18, 1842:7, 1872:18, 1900:12, 1932:11, 1952:4, 1959:7
**appropriate** [5] - 1927:2, 1928:23, 1929:1, 1946:3, 1950:14
**approved** [3] - 1834:3, 1887:7, 1887:8
**areas** [2] - 1840:9, 1939:24
**arguing** [1] - 1912:20
**argumentative** [3] - 1891:10, 1891:25, 1932:14
**arm** [3] - 1898:24, 1898:25, 1899:4
**Army** [1] - 1813:1
**Arps** [6] - 1817:11, 1817:23, 1818:7, 1821:15, 1851:10, 1861:4
**arrange** [1] - 1910:18
**arranged** [2] - 1830:5, 1949:7
**arrangement** [1] - 1853:20
**arrived** [1] - 1811:6
**article** [21] - 1840:18, 1840:25, 1841:1, 1841:11, 1841:15, 1867:16, 1871:11, 1873:17, 1877:20, 1878:13, 1885:19, 1888:12, 1888:16, 1890:4, 1890:12, 1890:16, 1891:2, 1953:12, 1954:5
**articles** [6] - 1841:11, 1889:14, 1890:3, 1890:21, 1891:4, 1953:11
**arts** [2] - 1812:20, 1812:21
**aside** [1] - 1907:18
**asserted** [2] - 1819:4, 1842:13
**assessment** [1] - 1890:24
**Asset** [1] - 1919:20
**assets** [2] - 1919:22, 1919:25
**assigned** [1] - 1879:14
**assistance** [1] - 1828:18
**assisted** [1] - 1899:8
**associate** [2] - 1866:20, 1947:22
**associated** [7] - 1822:6, 1822:25, 1834:11, 1835:8, 1899:5, 1914:4, 1914:11
**assume** [2] - 1874:9, 1893:7
**assuming** [1] - 1828:20
**attached** [2] - 1876:14, 1945:13
**attachment** [2] - 1920:4, 1935:8
**attachments** [1] - 1864:5
**attempt** [1] - 1927:8
**attempted** [1] - 1908:19
**attempting** [1] - 1900:3
**attend** [1] - 1849:19

**attended** [1] - 1848:17
**attention** [4] - 1815:6, 1877:13, 1900:17, 1934:2
**attorney** [4] - 1822:3, 1832:14, 1832:18, 1838:11
**Attorney's** [1] - 1801:13
**audience** [1] - 1900:23
**August** [10] - 1801:6, 1937:22, 1937:25, 1938:3, 1938:19, 1943:4, 1949:14, 1952:1, 1952:11, 1961:9
**available** [1] - 1941:3
**Avenue** [2] - 1801:18, 1802:8, 1961:14
**avoid** [3] - 1898:5, 1902:12, 1910:10
**avoidance** [2] - 1902:10
**avoided** [1] - 1933:22
**AVZ** [1] - 1860:23
**aware** [11] - 1862:18, 1862:19, 1875:8, 1878:23, 1880:17, 1944:1, 1944:4, 1944:7, 1944:8, 1944:10, 1954:16
**awful** [1] - 1852:10

# B

**bachelor** [1] - 1812:20
**background** [7] - 1812:19, 1818:23, 1820:15, 1821:4, 1835:21, 1836:4, 1886:9
**backup** [4] - 1883:7, 1883:9, 1883:10, 1886:10
**backwards** [1] - 1902:16
**bad** [1] - 1926:3
**balanced** [1] - 1865:11
**Baltimore** [1] - 1801:23
**bank** [1] - 1894:11, 1894:25, 1895:10, 1895:12, 1908:14, 1909:9, 1909:12, 1909:17, 1909:22, 1909:24, 1913:9
**banks** [2] - 1911:10, 1911:18
**banner** [1] - 1864:25
**Barosso** [1] - 1878:18
**barosso** [1] - 1880:13
**based** [6] - 1821:22, 1885:24, 1928:12, 1931:5, 1942:16, 1957:24
**basis** [2] - 1905:19, 1915:3
**became** [3] - 1834:15, 1852:2, 1944:10
**BEFORE** [1] - 1801:9
**began** [3] - 1852:13, 1860:18, 1916:17
**beginning** [1] - 1916:16
**beginnings** [1] - 1829:18
**begins** [2] - 1920:8, 1924:25
**behalf** [6] - 1835:17, 1867:13, 1880:7, 1888:18, 1899:8, 1917:16

**behaving** [1] - 1859:11
**behind** [5] - 1805:2, 1834:9, 1836:16, 1840:24, 1946:21
**belief** [3] - 1817:25, 1938:4, 1938:7
**belonged** [1] - 1831:12
**Below** [1] - 1889:14
**below** [4] - 1854:18, 1860:21, 1884:12, 1887:6
**bench** [18] - 1804:6, 1804:7, 1805:3, 1805:9, 1805:10, 1805:14, 1818:18, 1818:19, 1842:7, 1842:11, 1852:11, 1852:12, 1872:18, 1872:19, 1900:12, 1900:13, 1932:13, 1952:4
**Berlin** [1] - 1935:17
**BERMAN** [1] - 1801:9
**best** [2] - 1844:14, 1961:8
**better** [2] - 1836:5, 1913:14
**between** [19] - 1823:10, 1837:21, 1838:6, 1848:19, 1865:16, 1870:18, 1883:12, 1883:22, 1906:23, 1940:11, 1941:7
**beyond** [4] - 1857:7, 1865:3, 1899:20, 1900:19
**big** [1] - 1925:24
**bigger** [2] - 1835:9, 1864:25
**biggest** [1] - 1857:15
**Bill** [2] - 1803:21
**binder** [1] - 1919:12
**bit** [8] - 1811:13, 1833:20, 1846:14, 1857:7, 1888:5, 1937:11, 1937:19, 1939:23
**bite** [1] - 1957:23
**black** [1] - 1831:18
**Black** [1] - 1913:6
**Bloomberg** [8] - 1854:18, 1854:21, 1865:10, 1867:23, 1883:10, 1953:24, 1954:7, 1954:10
**blow** [1] - 1931:10
**blue** [1] - 1837:16
**blush** [1] - 1844:6
**board** [1] - 1833:7
**body** [1] - 1835:18
**Boehner** [1] - 1878:19
**boiled** [1] - 1957:23
**border** [1] - 1815:12
**borrow** [2] - 1841:5, 1911:10
**bottom** [13] - 1825:5, 1835:19, 1844:17, 1856:11, 1860:1, 1868:16, 1876:8, 1884:11, 1920:15, 1931:20, 1935:23, 1943:5, 1944:25
**bound** [1] - 1844:10
**Bradley** [1] - 1801:17
**break** [10] - 1883:17, 1883:18, 1883:22, 1884:2, 1892:8,

1893:9, 1910:5, 1937:19, 1959:16, 1960:5

**breathing** [1] - 1846:9
**brief** [8] - 1815:7, 1838:3, 1871:9, 1879:18, 1880:10, 1881:11, 1884:8, 1887:5
**briefed** [4] - 1838:5, 1838:6, 1934:15, 1934:21
**briefing** [9] - 1854:24, 1877:20, 1880:18, 1881:15, 1881:19, 1881:21, 1882:17, 1887:8, 1887:13
**briefings** [3] - 1836:4, 1881:24, 1935:6
**briefly** [1] - 1815:6
**bring** [9] - 1804:4, 1804:17, 1810:21, 1810:23, 1818:6, 1875:8, 1893:1, 1902:7, 1904:25
**bringing** [3] - 1814:20, 1833:7, 1842:12
**broad** [2] - 1838:23, 1921:6, 1921:7
**broke** [1] - 1959:10
**brother** [1] - 1911:7
**brought** [3] - 1826:24, 1846:7, 1903:17
**building** [1] - 1814:14
**built** [2] - 1836:23, 1869:16
**built-in** [1] - 1836:23
**bullet** [5] - 1931:9, 1931:11, 1931:20, 1934:2, 1939:8
**bunch** [2] - 1852:23, 1916:20
**Burson** [3] - 1835:10, 1918:1, 1918:2
**Burson-Marsteller** [3] - 1835:10, 1918:1, 1918:2
**business** [2] - 1831:13, 1953:15
**BY** [73] - 1812:4, 1821:12, 1822:9, 1826:9, 1829:10, 1830:4, 1831:3, 1831:15, 1833:16, 1837:20, 1839:8, 1842:2, 1845:14, 1847:9, 1847:20, 1849:21, 1854:7, 1855:24, 1857:3, 1865:24, 1866:10, 1871:7, 1871:20, 1872:2, 1893:13, 1893:18, 1894:1, 1896:8, 1897:8, 1898:1, 1898:11, 1900:1, 1903:1, 1903:7, 1907:11, 1909:5, 1913:5, 1914:17, 1916:24, 1919:11, 1920:18, 1921:12, 1922:20, 1923:14, 1924:12, 1925:1, 1926:24, 1927:16, 1927:22, 1928:4, 1928:21, 1929:23, 1931:12, 1934:1, 1934:13, 1937:1, 1937:21, 1937:24, 1939:1, 1941:19, 1942:11, 1944:13, 1945:25, 1947:5, 1949:21, 1950:8, 1951:12, 1952:2, 1952:9,

1955:9, 1956:9, 1956:16, 1957:17

## C

**Cable** [1] - 1913:6
**Cairo** [3] - 1861:7, 1861:15, 1861:25
**calculated** [1] - 1825:7
**camp** [1] - 1873:7
**campaign** [11] - 1814:17, 1815:15, 1834:11, 1836:2, 1859:17, 1913:17, 1913:18, 1913:20, 1913:24, 1914:1, 1914:4
**campaigns** [1] - 1814:14
**Campoamor** [5] - 1801:12, 1802:15, 1803:17, 1883:16, 1893:22
**CAMPOAMOR** [116] - 1803:15, 1804:14, 1810:23, 1811:21, 1812:2, 1812:4, 1819:8, 1819:10, 1820:8, 1820:10, 1820:20, 1821:3, 1821:8, 1821:12, 1822:9, 1825:4, 1825:6, 1826:8, 1826:9, 1829:10, 1830:3, 1830:4, 1830:18, 1830:24, 1831:2, 1831:3, 1831:15, 1833:16, 1834:20, 1834:22, 1837:3, 1837:4, 1837:20, 1839:8, 1842:2, 1842:8, 1842:23, 1843:17, 1843:19, 1843:25, 1844:20, 1845:14, 1847:9, 1847:18, 1847:20, 1849:18, 1849:20, 1849:21, 1854:7, 1854:14, 1854:16, 1855:24, 1857:3, 1860:11, 1860:13, 1862:12, 1862:13, 1865:24, 1866:9, 1866:10, 1867:7, 1867:9, 1868:3, 1868:4, 1868:15, 1868:17, 1871:7, 1871:20, 1872:2, 1873:1, 1873:14, 1873:18, 1873:24, 1874:4, 1874:6, 1875:13, 1879:6, 1879:7, 1883:20, 1884:7, 1884:9, 1888:10, 1888:11, 1891:13, 1891:16, 1891:21, 1892:6, 1892:19, 1899:19, 1900:11, 1900:14, 1900:18, 1901:2, 1901:12, 1901:17, 1902:1, 1902:17, 1902:24, 1906:22, 1909:4, 1914:15, 1921:9, 1921:24, 1922:11, 1922:14, 1923:5, 1927:12, 1932:9, 1932:14, 1933:3, 1936:23, 1942:6, 1947:2, 1949:17, 1951:21, 1956:4
**Campoamor-Sanchez** [2] -

1801:12, 1883:16
**CAMPOAMOR-SANCHEZ** [116]
- 1803:15, 1804:14, 1810:23, 1811:21, 1812:2, 1812:4, 1819:8, 1819:10, 1820:8, 1820:10, 1820:20, 1821:3, 1821:8, 1821:12, 1822:9, 1825:4, 1825:6, 1826:8, 1826:9, 1829:10, 1830:3, 1830:4, 1830:18, 1830:24, 1831:2, 1831:3, 1831:15, 1833:16, 1834:20, 1834:22, 1837:3, 1837:4, 1837:20, 1839:8, 1842:2, 1842:8, 1842:23, 1843:17, 1843:19, 1843:25, 1844:20, 1845:14, 1847:9, 1847:18, 1847:20, 1849:18, 1849:20, 1849:21, 1854:7, 1854:14, 1854:16, 1855:24, 1857:3, 1860:11, 1860:13, 1862:12, 1862:13, 1865:24, 1866:9, 1866:10, 1867:7, 1867:9, 1868:3, 1868:4, 1868:15, 1868:17, 1871:7, 1871:20, 1872:2, 1873:1, 1873:14, 1873:18, 1873:24, 1874:4, 1874:6, 1875:13, 1879:6, 1879:7, 1883:20, 1884:7, 1884:9, 1888:10, 1888:11, 1891:13, 1891:16, 1891:21, 1892:6, 1892:19, 1899:19, 1900:11, 1900:14, 1900:18, 1901:2, 1901:12, 1901:17, 1902:1, 1902:17, 1902:24, 1906:22, 1909:4, 1914:15, 1921:9, 1921:24, 1922:11, 1922:14, 1923:5, 1927:12, 1932:9, 1932:14, 1933:3, 1936:23, 1942:6, 1947:2, 1949:17, 1951:21, 1956:4
**Campoamor-Sanchez..........
1812** [1] - 1802:15
**candidates** [2] - 1814:14, 1814:23
**cannot** [3] - 1882:8, 1931:23, 1934:4
**capacity** [1] - 1823:11
**capture** [2] - 1841:7, 1857:9
**captured** [1] - 1857:12
**card** [1] - 1911:21
**care** [1] - 1834:9
**carry** [4] - 1838:8, 1879:8, 1891:22, 1891:23
**carrying** [2] - 1845:10, 1920:3
**Case** [2] - 1803:11, 1892:21
**case** [37] - 1811:11, 1824:11, 1826:11, 1826:25, 1829:2, 1829:4, 1829:11, 1832:1, 1832:2, 1832:3, 1832:5, 1832:6,

1832:7, 1835:21, 1854:22, 1859:8, 1859:24, 1860:5, 1860:9, 1874:23, 1875:3, 1881:25, 1882:2, 1882:10, 1892:12, 1893:8, 1894:21, 1896:11, 1896:16, 1896:20, 1897:18, 1925:6, 1930:4, 1960:4, 1960:7
**cases** [2] - 1825:14, 1891:4
**caused** [1] - 1897:2
**causing** [1] - 1902:12
**central** [1] - 1957:7
**Centre** [4] - 1835:14, 1867:14, 1898:13, 1900:20
**certain** [7] - 1851:18, 1853:21, 1859:2, 1859:3, 1863:4, 1885:17, 1921:18
**certainly** [4] - 1819:22, 1937:13, 1938:11, 1951:4
**CERTIFICATE** [1] - 1961:2
**certify** [1] - 1961:5
**chairs** [1] - 1892:15
**change** [2] - 1846:11, 1885:17
**changed** [5] - 1811:17, 1836:3, 1846:13, 1857:11, 1863:7
**changes** [2] - 1863:17, 1940:6
**charge** [3] - 1824:21, 1861:20, 1904:5
**charged** [1] - 1870:17
**charges** [12] - 1816:3, 1823:22, 1824:9, 1825:8, 1826:24, 1827:5, 1827:8, 1827:15, 1903:17, 1903:24, 1904:1, 1904:2
**Charges** [2] - 1826:20, 1893:25
**Charlie** [4] - 1939:17, 1939:19, 1939:20, 1940:3
**check** [2] - 1910:5, 1913:1
**checks** [1] - 1910:18
**chief** [1] - 1930:25
**choose** [1] - 1843:15
**choosing** [1] - 1821:23
**chose** [1] - 1842:15
**circulated** [1] - 1876:19
**circumstances** [1] - 1805:2
**cite** [1] - 1936:9
**citing** [1] - 1852:10
**City** [1] - 1846:23
**claim** [1] - 1904:8
**claimed** [2] - 1925:13, 1933:4
**claiming** [1] - 1911:13
**claims** [1] - 1933:16
**Claire** [2] - 1866:17, 1866:20
**clear** [10] - 1818:2, 1838:9, 1865:25, 1872:4, 1873:3, 1912:19, 1919:21, 1922:19, 1925:19, 1939:24
**clearer** [1] - 1821:7
**clearly** [2] - 1836:11, 1958:7
**client** [14] - 1833:11, 1834:3,

1834:9, 1835:17, 1841:8, 1883:1, 1911:23, 1915:25, 1916:3, 1931:3, 1936:10, 1937:3, 1938:9
**close** [2] - 1846:5, 1952:18
**closer** [2] - 1850:15, 1864:8
**Club** [9] - 1839:25, 1846:23, 1848:12, 1848:16, 1854:10, 1855:1, 1855:3, 1863:8, 1863:11
**coconspirator** [1] - 1895:3
**code** [4] - 1858:14, 1939:20, 1939:22, 1939:23
**codified** [1] - 1900:4
**codify** [2] - 1828:6, 1856:6
**colleague** [2] - 1862:3, 1959:18
**colleagues** [2] - 1803:14, 1870:19
**collected** [2] - 1864:20, 1920:11
**collectively** [2] - 1864:12, 1925:3
**College** [1] - 1812:20
**COLUMBIA** [2] - 1801:1, 1801:14
**Columbia** [2] - 1803:2, 1903:21
**comfortable** [1] - 1804:8
**coming** [5] - 1861:25, 1869:1, 1875:5, 1890:18, 1919:24
**comma** [1] - 1933:23
**comment** [1] - 1857:18
**comments** [4] - 1902:18, 1913:3, 1930:7, 1930:8
**Commission** [1] - 1880:8
**commissioner** [1] - 1941:8
**committed** [18] - 1827:13, 1897:21, 1906:8, 1906:10, 1906:12, 1907:21, 1925:20, 1927:1, 1928:23, 1931:14, 1935:11, 1935:21, 1936:1, 1936:6, 1936:8, 1936:12, 1946:2, 1950:13
**Committee** [1] - 1914:2
**committee** [1] - 1861:20
**common** [1] - 1841:3
**communicate** [2] - 1883:1, 1930:9
**communicated** [3] - 1875:18, 1949:3, 1951:19
**communication** [2] - 1928:14, 1929:19
**communications** [13] - 1837:10, 1861:5, 1883:12, 1924:14, 1926:19, 1928:12, 1931:23, 1932:8, 1932:16, 1932:18, 1933:1, 1934:5, 1945:14
**community** [1] - 1851:15
**companies** [3] - 1817:17, 1836:17, 1836:18
**companion** [1] - 1897:10
**company** [6] - 1830:25,

1832:15, 1898:5, 1909:25, 1911:6, 1913:7
**complained** [2] - 1853:17, 1853:18
**complaining** [2] - 1852:7, 1852:18
**complaints** [1] - 1852:19
**complete** [3] - 1884:2, 1905:18, 1961:7
**completed** [1] - 1888:4
**completely** [2] - 1906:4, 1928:6
**complex** [1] - 1856:5
**component** [3] - 1836:12, 1836:13, 1851:7, 1865:4, 1918:14
**components** [4] - 1814:22, 1817:9, 1822:1, 1836:11
**computers** [1] - 1905:15
**conceal** [3] - 1906:13, 1910:13, 1913:9
**concern** [3] - 1830:9, 1855:6, 1954:3
**concerned** [3] - 1885:13, 1885:15, 1926:5
**concerns** [1] - 1853:3
**conclude** [10] - 1926:25, 1927:4, 1927:10, 1928:22, 1928:24, 1931:13, 1936:19, 1946:1, 1950:12, 1950:17
**concluded** [1] - 1937:4
**concludes** [4] - 1935:25, 1936:12, 1936:22, 1937:3
**conclusion** [2] - 1936:9, 1936:17, 1958:25
**conclusions** [6] - 1836:15, 1850:6, 1860:6, 1946:8, 1946:10, 1957:24
**concrete** [1] - 1921:16
**conditions** [1] - 1826:17
**conduct** [3] - 1839:1, 1851:5, 1882:17
**conducted** [1] - 1957:2
**conducting** [1] - 1894:22
**conference** [4] - 1868:22, 1940:8, 1940:10, 1940:11
**confidence** [1] - 1885:24
**confiscated** [1] - 1919:23
**confused** [1] - 1936:18
**conjunction** [1] - 1918:8
**consider** [2] - 1934:25, 1954:6
**considerably** [1] - 1851:25
**Consideration** [1] - 1935:16
**considered** [7] - 1845:20, 1869:18, 1886:8, 1921:21, 1922:22, 1922:24, 1923:18
**conspiracy** [9] - 1824:12, 1824:21, 1894:5, 1894:25, 1895:1, 1902:9, 1907:12, 1907:13
**conspiring** [1] - 1894:15

**constant** [1] - 1815:13
**constitute** [1] - 1897:19
**constitutes** [1] - 1961:6
**Constitution** [2] - 1802:8, 1961:14
**consultant** [1] - 1886:9
**consultants** [16] - 1814:16, 1815:2, 1815:4, 1817:17, 1835:17, 1864:5, 1864:6, 1864:20, 1864:24, 1872:11, 1873:20, 1875:9, 1875:15, 1876:19, 1917:12, 1954:4
**consulted** [2] - 1820:18, 1820:19
**Consulting** [2] - 1817:20, 1866:21
**consulting** [4] - 1813:22, 1817:14, 1834:16, 1835:4
**contact** [15] - 1823:12, 1835:21, 1837:6, 1837:7, 1837:21, 1838:10, 1838:14, 1855:15, 1869:19, 1869:25, 1881:5, 1885:8, 1886:6, 1920:19
**contacted** [1] - 1934:16
**contacts** [5] - 1836:18, 1837:25, 1917:3, 1920:9, 1920:10
**Contacts** [1] - 1918:11
**contain** [1] - 1946:10
**contained** [1] - 1810:18
**contemplates** [1] - 1941:6
**content** [5] - 1847:7, 1849:15, 1856:7, 1930:14, 1946:8
**contents** [1] - 1880:10
**context** [3] - 1816:10, 1860:3, 1886:22
**continue** [2] - 1839:2, 1948:20
**continued** [7] - 1846:5, 1846:8, 1846:9, 1863:3, 1863:15, 1876:17, 1909:22
**continuing** [1] - 1857:10
**contract** [3] - 1834:5, 1851:13, 1862:7
**contracting** [2] - 1832:22, 1851:22
**contractual** [1] - 1862:7
**contradicted** [1] - 1948:17
**contrary** [2] - 1958:6, 1958:7
**contrary..** [1] - 1957:14
**control** [10] - 1854:12, 1864:19, 1877:4, 1879:9, 1879:15, 1908:13, 1909:9, 1913:9, 1938:20, 1938:25
**controlled** [1] - 1909:10
**controversy** [1] - 1925:10
**convenience** [2] - 1811:15, 1811:18
**conversation** [11] - 1843:20, 1847:24, 1885:25, 1929:6, 1929:9, 1929:10, 1932:1,

1932:5, 1933:16, 1943:15, 1944:3
**conversations** [2] - 1811:10, 1838:6
**convey** [2] - 1835:23, 1853:22
**conveyed** [1] - 1821:18
**conveying** [2] - 1818:4, 1887:25
**conviction** [2] - 1936:2, 1958:21
**cooks** [1] - 1833:1
**cooperated** [1] - 1828:21
**cooperation** [8] - 1824:14, 1825:10, 1825:17, 1826:13, 1827:11, 1827:17, 1827:22, 1828:6
**coordinate** [5] - 1861:5, 1861:13, 1867:3, 1870:18, 1870:22
**coordinating** [1] - 1871:4
**copied** [5] - 1835:15, 1876:4, 1883:11, 1884:19, 1946:17
**copy** [6] - 1824:1, 1824:6, 1864:10, 1946:17, 1946:21, 1949:1
**copying** [1] - 1886:25
**correct** [126] - 1820:20, 1827:3, 1828:22, 1845:5, 1862:16, 1865:22, 1873:18, 1874:7, 1887:1, 1887:10, 1887:15, 1889:21, 1890:19, 1894:3, 1894:23, 1895:11, 1895:23, 1896:3, 1896:23, 1897:16, 1898:6, 1898:7, 1898:20, 1899:7, 1899:11, 1899:14, 1903:18, 1903:23, 1903:25, 1904:1, 1904:4, 1904:9, 1904:15, 1904:16, 1904:24, 1905:19, 1906:8, 1906:9, 1907:17, 1908:3, 1909:11, 1909:14, 1909:20, 1909:24, 1910:17, 1910:24, 1911:4, 1911:16, 1912:13, 1912:14, 1913:11, 1914:10, 1914:22, 1915:2, 1915:13, 1915:14, 1915:17, 1915:21, 1915:22, 1916:1, 1916:5, 1916:6, 1916:13, 1917:2, 1917:7, 1917:18, 1918:8, 1918:20, 1920:2, 1920:21, 1921:6, 1921:10, 1922:23, 1923:19, 1923:21, 1923:22, 1924:5, 1924:7, 1925:16, 1925:18, 1925:21, 1925:23, 1926:15, 1926:16, 1926:18, 1927:3, 1927:6, 1929:4, 1930:19, 1931:24, 1931:25, 1935:12, 1935:18, 1935:22, 1937:5, 1938:9, 1938:17, 1938:18, 1939:6, 1939:12, 1939:15,

1939:18, 1940:6, 1940:7, 1942:4, 1942:5, 1942:19, 1942:21, 1943:16, 1944:15, 1946:23, 1951:15, 1952:17, 1953:10, 1953:14, 1953:17, 1953:21, 1955:4, 1956:7, 1956:25, 1958:11, 1958:23, 1959:3, 1959:5, 1959:6
**correcting** [1] - 1827:25
**correctly** [1] - 1881:23
**correspondent** [2] - 1921:20, 1922:22, 1923:17
**counsel** [1] - 1803:13
**Counsel** [1] - 1894:22
**Counsel's** [2] - 1824:17, 1824:24
**count** [1] - 1894:18
**counter** [3] - 1924:18, 1925:8, 1925:17
**counterpoints** [1] - 1941:13
**countries** [3] - 1814:5, 1895:13, 1957:8
**country** [3] - 1815:11, 1816:12, 1926:3
**counts** [1] - 1906:24
**couple** [3] - 1815:3, 1854:20, 1929:24
**course** [2] - 1826:2, 1874:23
**Court** [6] - 1802:7, 1802:7, 1803:2, 1830:21, 1909:1, 1961:13
**court** [9] - 1810:16, 1819:1, 1821:11, 1844:22, 1854:6, 1875:12, 1893:21, 1902:25, 1933:25
**COURT** [163] - 1801:1, 1803:4, 1803:8, 1803:19, 1803:23, 1803:25, 1804:16, 1804:21, 1805:1, 1805:6, 1805:12, 1810:17, 1810:25, 1811:5, 1812:1, 1818:5, 1818:9, 1818:12, 1818:15, 1818:18, 1818:25, 1819:16, 1820:17, 1820:21, 1821:5, 1821:10, 1821:21, 1826:5, 1829:6, 1829:21, 1829:24, 1830:1, 1830:9, 1830:22, 1831:1, 1831:9, 1833:5, 1837:18, 1838:25, 1841:17, 1842:7, 1842:9, 1842:12, 1842:16, 1842:22, 1843:21, 1844:1, 1844:8, 1844:13, 1844:23, 1845:4, 1845:6, 1845:8, 1845:12, 1847:2, 1847:17, 1847:19, 1849:7, 1849:10, 1849:16, 1849:19, 1852:4, 1852:11, 1852:17, 1852:24, 1853:12, 1853:15, 1853:24, 1854:5, 1855:19, 1856:25, 1865:20, 1865:23, 1866:7,

1871:3, 1871:6, 1871:14, 1871:25, 1872:17, 1872:20, 1873:12, 1873:15, 1873:19, 1874:11, 1874:16, 1874:21, 1875:3, 1875:7, 1883:16, 1883:24, 1891:10, 1891:17, 1892:1, 1892:4, 1892:8, 1892:17, 1892:23, 1893:1, 1893:4, 1899:21, 1899:25, 1900:12, 1900:16, 1900:25, 1901:5, 1901:8, 1901:18, 1902:6, 1902:22, 1903:5, 1906:23, 1907:2, 1907:9, 1912:20, 1912:22, 1912:25, 1913:2, 1914:16, 1921:11, 1922:1, 1922:5, 1922:7, 1922:9, 1922:17, 1923:7, 1923:10, 1923:12, 1927:14, 1927:18, 1927:20, 1932:12, 1932:20, 1933:6, 1933:9, 1933:17, 1936:25, 1937:9, 1937:11, 1937:15, 1937:18, 1941:15, 1941:18, 1942:9, 1944:10, 1944:12, 1948:23, 1949:20, 1950:5, 1950:7, 1951:23, 1952:4, 1952:7, 1956:5, 1956:8, 1957:15, 1959:8, 1959:13, 1959:17, 1959:21, 1959:24, 1960:1, 1960:10, 1961:2

**Courthouse** [1] - 1802:8
**COURTROOM** [6] - 1803:1, 1803:7, 1803:10, 1811:4, 1892:21, 1893:3
**courtroom** [7] - 1804:19, 1810:15, 1811:3, 1837:13, 1892:16, 1893:2, 1960:9
**cover** [1] - 1841:9
**coverage** [3] - 1889:5, 1889:7, 1890:17
**covered** [2] - 1840:9, 1848:14
**Cox** [1] - 1941:7
**CPC** [2] - 1858:12, 1858:13
**crack** [1] - 1871:19
**craft** [1] - 1876:20
**Craig** [105] - 1801:6, 1803:12, 1803:24, 1822:2, 1837:6, 1837:8, 1837:22, 1838:1, 1838:7, 1838:17, 1838:22, 1839:6, 1839:14, 1839:23, 1840:4, 1840:14, 1845:16, 1848:2, 1848:20, 1849:13, 1850:18, 1854:22, 1855:3, 1855:6, 1855:9, 1857:13, 1857:14, 1857:17, 1857:22, 1857:25, 1858:3, 1859:3, 1859:10, 1859:12, 1859:23, 1861:11, 1861:23, 1861:25, 1862:22, 1862:24, 1863:7, 1871:22, 1872:4, 1875:23, 1878:5, 1878:7, 1879:8,

1879:15, 1879:18, 1879:22, 1880:17, 1881:4, 1881:6, 1881:10, 1881:12, 1881:18, 1882:5, 1883:12, 1884:12, 1886:5, 1887:13, 1888:15, 1890:7, 1891:7, 1891:22, 1892:2, 1892:22, 1893:14, 1896:2, 1918:6, 1918:25, 1919:1, 1919:4, 1921:1, 1921:5, 1923:24, 1929:6, 1932:2, 1932:6, 1932:17, 1932:25, 1933:7, 1934:4, 1934:20, 1935:19, 1940:4, 1940:8, 1940:10, 1940:12, 1941:7, 1941:12, 1941:25, 1942:15, 1942:23, 1942:25, 1943:15, 1943:24, 1944:8, 1946:13, 1946:25, 1949:10, 1951:20, 1952:3, 1954:12
**craig** [2] - 1803:22, 1947:6
**Craig's** [8] - 1850:12, 1858:5, 1902:18, 1938:11, 1947:21, 1947:24, 1948:2, 1948:17
**CRC** [2] - 1802:7, 1961:13
**create** [2] - 1876:20, 1898:8
**created** [6] - 1816:5, 1859:17, 1876:16, 1898:12, 1923:16
**credibility** [3] - 1872:8, 1900:24, 1901:1
**credible** [6] - 1822:2, 1822:3, 1822:8, 1840:19, 1872:10, 1890:13
**credit** [1] - 1911:20
**crime** [11] - 1897:15, 1897:21, 1907:16, 1927:1, 1928:23, 1935:25, 1936:6, 1936:8, 1936:12, 1946:2, 1950:13
**crimes** [6] - 1827:13, 1894:2, 1906:7, 1907:18, 1925:20, 1931:14
**criminal** [5] - 1816:3, 1816:10, 1858:14, 1896:25, 1911:1
**Criminal** [2] - 1801:3, 1803:10
**criticism** [1] - 1816:13
**cross** [2] - 1892:9, 1892:24
**CROSS** [1] - 1893:12
**Cross** [1] - 1802:16
**cross-examination** [2] - 1892:9, 1892:24
**CROSS-EXAMINATION** [1] - 1893:12
**Cross-Examination** [1] - 1802:16
**cross..** [1] - 1900:15
**crossed** [1] - 1885:3
**CRR** [2] - 1802:7, 1961:13
**current** [1] - 1823:16
**cut** [1] - 1883:21
**Cyprus** [6] - 1814:4, 1831:20, 1895:15, 1910:10, 1910:19,

1913:10

# D

**D.C** [11] - 1834:16, 1864:5, 1864:6, 1864:15, 1864:24, 1865:16, 1870:21, 1904:2, 1929:12, 1961:15
**date** [15] - 1836:25, 1866:16, 1870:12, 1870:13, 1876:18, 1881:1, 1881:2, 1912:4, 1912:9, 1929:8, 1932:3, 1939:14, 1950:1, 1950:5
**Dated** [1] - 1961:9
**dated** [1] - 1922:17
**David** [30] - 1819:19, 1839:22, 1841:23, 1842:15, 1845:17, 1855:14, 1865:15, 1870:11, 1871:10, 1872:5, 1877:25, 1885:3, 1885:23, 1886:1, 1916:2, 1921:5, 1923:24, 1929:7, 1932:2, 1932:7, 1932:25, 1934:20, 1943:15, 1943:18, 1943:20, 1943:24, 1944:16, 1951:17, 1951:24, 1954:2
**Davis** [15] - 1815:1, 1821:7, 1903:5, 1903:10, 1903:11, 1903:12, 1911:24, 1913:13, 1914:25, 1915:5, 1915:6, 1915:25, 1948:8, 1948:11, 1951:20
**dawned** [1] - 1899:17
**DAY** [1] - 1801:8
**days** [1] - 1859:4
**DC** [5] - 1801:6, 1801:15, 1801:18, 1802:3, 1802:9
**deal** [1] - 1870:20
**dealing** [8] - 1832:18, 1835:2, 1853:25, 1862:6, 1887:18, 1888:1, 1898:15, 1900:2
**dealt** [2] - 1823:1, 1834:8
**debrief** [1] - 1861:23
**debriefed** [1] - 1864:11
**debriefings** [1] - 1861:11
**December** [8] - 1840:3, 1868:12, 1870:13, 1876:10, 1877:7, 1877:14, 1881:2, 1886:11
**decide** [1] - 1892:12
**decided** [1] - 1885:9
**decides** [2] - 1829:4, 1884:3
**decision** [22] - 1818:6, 1818:9, 1818:10, 1818:13, 1820:17, 1842:3, 1842:18, 1842:20, 1843:15, 1843:23, 1843:24, 1845:1, 1845:3, 1845:9, 1873:9, 1873:12, 1873:13, 1875:20, 1938:8, 1938:11, 1948:14
**decisions** [4] - 1820:13,

1842:17, 1853:20, 1853:21
**declined** [1] - 1947:6
**deductions** [1] - 1909:6
**defend** [1] - 1925:22
**Defendant** [2] - 1801:7, 1801:20
**defendant** [9] - 1837:19, 1839:10, 1845:19, 1846:18, 1855:11, 1855:16, 1870:14, 1870:24, 1954:20
**defendant's** [2] - 1828:17, 1828:18
**Defendant's** [3] - 1919:10, 1944:22, 1954:21
**defense** [2] - 1873:3, 1919:14
**define** [2] - 1859:16, 1907:1
**defined** [1] - 1935:13
**definitely** [1] - 1883:25
**definitive** [1] - 1951:1
**delegation** [1] - 1823:3
**delegations** [1] - 1881:21
**delete** [1] - 1906:2
**deleted** [4] - 1905:14, 1905:19, 1905:21, 1906:5
**delivery** [3] - 1884:13, 1884:19, 1884:23
**democracy** [2] - 1815:25, 1822:15
**demonstrate** [1] - 1897:20
**dense** [1] - 1953:7
**Department** [3] - 1801:17, 1900:9, 1903:3
**deployed** [1] - 1834:1
**deposition** [1] - 1913:6
**DEPUTY** [6] - 1803:1, 1803:7, 1803:10, 1811:4, 1892:21, 1893:3
**Deputy** [1] - 1885:6
**der** [24] - 1832:21, 1838:11, 1861:4, 1879:25, 1880:1, 1880:17, 1881:14, 1882:14, 1882:17, 1886:25, 1887:4, 1887:6, 1919:2, 1929:14, 1942:14, 1946:16, 1946:19, 1946:21, 1946:24, 1947:11, 1947:21, 1948:1, 1948:8, 1949:7
**describe** [2] - 1814:24, 1830:19
**described** [6] - 1829:19, 1830:8, 1846:11, 1872:6, 1896:2, 1910:6
**description** [1] - 1815:7
**designated** [1] - 1861:4
**designed** [1] - 1955:22
**Despite** [1] - 1933:3
**detail** [4] - 1840:3, 1852:20, 1874:22, 1956:12
**detailed** [1] - 1855:8
**details** [3] - 1894:2, 1950:23, 1951:2
**detained** [1] - 1925:14
**determine** [2] - 1840:7, 1862:22

**determined** [1] - 1904:13
**DICKMAN** [1] - 1961:5
**Dickman** [2] - 1802:7, 1961:13
**different** [17] - 1815:2, 1815:4, 1815:5, 1817:9, 1825:16, 1835:25, 1837:8, 1840:21, 1843:16, 1843:17, 1850:9, 1854:21, 1863:15, 1868:9, 1904:23, 1905:20, 1908:21
**differently** [1] - 1945:23
**difficult** [2] - 1816:7, 1885:18
**diminish** [1] - 1859:23
**dinners** [2] - 1947:18, 1947:20
**DIRECT** [1] - 1812:3
**direct** [15] - 1815:6, 1835:20, 1837:7, 1839:1, 1883:17, 1883:19, 1884:2, 1890:15, 1893:20, 1896:9, 1899:4, 1914:19, 1916:15, 1921:4
**Direct** [1] - 1802:15
**directed** [2] - 1864:9, 1865:14
**direction** [11] - 1815:13, 1819:20, 1819:21, 1819:24, 1820:6, 1828:15, 1829:24, 1895:20, 1895:22, 1913:21, 1928:9
**directly** [4] - 1844:24, 1879:2, 1919:4, 1919:5
**director** [4] - 1835:13, 1861:5, 1898:18, 1898:19
**disappointed** [1] - 1956:19
**disappointment** [1] - 1890:3
**discharge** [1] - 1813:3
**disclose** [4] - 1918:6, 1946:25, 1947:6, 1948:2
**disclosure** [1] - 1931:24
**discretion** [1] - 1947:24
**discuss** [12] - 1804:6, 1804:12, 1805:8, 1838:17, 1854:2, 1882:3, 1892:10, 1893:8, 1940:6, 1940:12, 1960:3, 1960:6
**discussed** [9] - 1833:6, 1849:1, 1854:10, 1854:25, 1858:16, 1860:7, 1885:7, 1921:5, 1954:11
**discussing** [2] - 1880:15, 1945:1
**discussion** [10] - 1804:11, 1805:14, 1818:19, 1833:1, 1838:21, 1842:11, 1852:12, 1872:19, 1900:13, 1932:13
**discussions** [4] - 1839:6, 1856:8, 1862:18, 1887:8
**dispel** [1] - 1956:25
**dispelled** [1] - 1957:1
**dispute** [1] - 1854:1
**distinction** [1] - 1906:17
**distinctions** [1] - 1906:23
**distinguishing** [1] - 1958:14
**DISTRICT** [4] - 1801:1, 1801:1, 1801:10, 1801:14

**District** [3] - 1803:2, 1903:21
**DMI** [1] - 1902:11
**document** [34] - 1828:5, 1843:6, 1846:9, 1848:9, 1864:2, 1864:3, 1867:8, 1867:10, 1867:13, 1876:14, 1876:16, 1876:17, 1876:21, 1877:17, 1897:10, 1913:1, 1920:8, 1921:17, 1922:15, 1923:16, 1923:21, 1923:23, 1924:22, 1925:2, 1926:11, 1930:13, 1932:20, 1938:22, 1942:5, 1945:14, 1950:11, 1950:25, 1956:12, 1959:10
**documents** [17] - 1825:13, 1848:1, 1850:5, 1851:17, 1852:5, 1852:23, 1852:25, 1853:3, 1905:9, 1905:19, 1906:5, 1908:21, 1908:24, 1911:17, 1930:6, 1954:19, 1956:11
**dollars** [2] - 1908:10, 1908:17
**domino** [1] - 1841:10
**Donald** [1] - 1913:17
**done** [9] - 1813:21, 1819:17, 1828:4, 1828:5, 1904:20, 1919:6, 1924:6, 1926:8, 1958:17
**door** [2] - 1820:24, 1932:18
**down** [19] - 1837:3, 1850:16, 1850:21, 1851:9, 1868:3, 1879:6, 1883:21, 1888:10, 1896:5, 1898:9, 1902:13, 1922:21, 1931:9, 1931:20, 1934:9, 1934:11, 1940:2, 1956:14, 1957:23
**draft** [8] - 1926:15, 1927:14, 1938:20, 1951:25, 1955:17, 1955:19, 1955:25, 1956:6
**drafted** [3] - 1848:9, 1901:22, 1946:7
**drafting** [1] - 1936:10
**drafts** [1] - 1939:17
**drawn** [1] - 1811:16
**driven** [2] - 1896:12, 1896:16
**drop** [2] - 1826:24, 1931:20
**dropped** [5] - 1903:24, 1904:1, 1904:3, 1904:5, 1904:8
**due** [1] - 1907:24
**duly** [1] - 1811:24
**during** [9] - 1813:17, 1837:5, 1874:23, 1881:6, 1893:8, 1895:25, 1913:23, 1943:23, 1960:4

## E

**early** [9] - 1811:7, 1832:24, 1838:20, 1851:21, 1851:25, 1868:11, 1870:3, 1900:5, 1908:20

**ease** [1] - 1830:15
**East** [1] - 1801:22
**Eastern** [1] - 1948:12
**ECFMU** [9] - 1898:14, 1898:24, 1899:8, 1899:12, 1900:8, 1901:14, 1917:9, 1917:15, 1917:16
**ED** [1] - 1885:6
**edited** [1] - 1939:4
**educational** [1] - 1812:19
**effect** [1] - 1841:10
**effective** [1] - 1822:15
**effort** [7] - 1817:8, 1817:10, 1822:18, 1839:18, 1846:8, 1865:3, 1874:14
**efforts** [4] - 1814:18, 1817:7, 1879:22, 1885:4
**either** [9] - 1862:14, 1864:11, 1908:2, 1910:23, 1918:24, 1919:23, 1921:16, 1950:4, 1950:16
**elected** [5] - 1815:16, 1816:1, 1816:25, 1883:6, 1915:23
**election** [4] - 1814:17, 1814:20, 1816:22, 1816:23
**elections** [1] - 1814:21
**electronic** [2] - 1884:13, 1884:19
**elements** [1] - 1946:10
**elicit** [1] - 1874:2
**email** [47] - 1804:22, 1804:24, 1834:24, 1835:18, 1836:25, 1847:21, 1847:23, 1847:24, 1856:12, 1856:14, 1864:1, 1868:21, 1869:15, 1869:17, 1870:12, 1876:4, 1876:10, 1876:14, 1880:23, 1880:24, 1881:3, 1882:5, 1884:12, 1884:18, 1886:23, 1886:24, 1887:6, 1887:16, 1887:20, 1887:23, 1888:22, 1888:23, 1889:1, 1889:6, 1889:9, 1891:2, 1905:20, 1916:20, 1917:6, 1919:16, 1942:17, 1943:5, 1944:17, 1944:18, 1944:20, 1945:1
**Email** [8] - 1801:16, 1801:16, 1801:19, 1801:24, 1801:25, 1801:25, 1802:4, 1802:5
**emails** [4] - 1837:10, 1876:5, 1884:11, 1900:4
**emarcus@zuckerman.com** [1] - 1802:5
**embargo** [1] - 1877:20
**embargoed** [3] - 1871:11, 1871:14, 1871:15
**employee** [2] - 1815:1, 1898:17
**employees** [2] - 1815:3, 1911:24
**employing** [1] - 1817:18

**end** [6] - 1853:1, 1855:13, 1868:10, 1877:15, 1950:9, 1953:5
**endorsement** [4] - 1871:23, 1873:6, 1873:17, 1874:25
**Engage** [3] - 1864:24, 1864:25, 1918:15
**engage** [4] - 1854:23, 1898:2, 1917:3, 1918:12
**engaged** [6] - 1813:17, 1898:5, 1915:1, 1915:12, 1915:15, 1918:18
**engagement** [7] - 1822:21, 1829:16, 1831:22, 1832:9, 1854:18, 1855:10, 1886:3
**engaging** [2] - 1881:13, 1886:1
**enjoy** [1] - 1960:6
**enormous** [1] - 1920:9
**ensure** [1] - 1865:10
**ensuring** [1] - 1836:13
**entailed** [1] - 1814:19
**enter** [2] - 1897:9, 1946:20
**entered** [1] - 1914:9
**entering** [1] - 1880:5
**enters** [3] - 1804:19, 1811:3, 1893:2
**entire** [1] - 1899:4
**entirety** [1] - 1953:8
**entitled** [1] - 1913:25
**entity** [6] - 1898:8, 1898:12, 1898:17, 1898:18, 1899:13, 1901:11
**entry** [2] - 1815:10, 1925:24
**Equifax's** [2] - 1911:6
**equity** [1] - 1813:20
**especially** [2] - 1822:14, 1885:4
**essence** [2] - 1833:15, 1841:7
**establish** [3] - 1897:20, 1927:8, 1929:3
**established** [1] - 1891:11
**estimate** [1] - 1937:12
**estimated** [3] - 1825:1, 1825:7, 1825:9
**etcetera** [2] - 1934:16, 1935:17
**EU** [2] - 1817:8, 1822:16
**Europe** [19] - 1815:12, 1816:6, 1816:14, 1816:15, 1817:22, 1835:9, 1835:11, 1836:14, 1861:15, 1861:17, 1863:5, 1863:23, 1879:19, 1880:7, 1917:12, 1917:21, 1917:25, 1945:5, 1948:12
**European** [18] - 1815:10, 1815:17, 1815:22, 1816:6, 1816:9, 1835:1, 1835:14, 1835:17, 1861:21, 1867:14, 1880:6, 1880:8, 1880:9, 1880:12, 1880:16, 1898:13, 1925:25, 1957:8
**Europeans** [1] - 1835:6

**evaluating** [1] - 1822:13
**evasion** [6] - 1894:6, 1894:7, 1894:24, 1906:12, 1906:15, 1907:21
**evening** [1] - 1804:2
**event** [1] - 1816:7
**events** [2] - 1855:7, 1882:25
**eventually** [1] - 1899:17, 1900:6, 1927:7
**evidence** [17] - 1823:25, 1825:19, 1847:15, 1853:4, 1856:10, 1863:25, 1867:6, 1868:14, 1876:7, 1880:22, 1886:21, 1936:1, 1949:18, 1951:22, 1958:8, 1958:13, 1958:20
**evolved** [1] - 1924:4
**exact** [4] - 1855:8, 1905:5, 1908:18, 1935:9
**exactly** [4] - 1833:8, 1848:13, 1926:11, 1933:20
**Examination** [2] - 1802:15, 1802:16
**EXAMINATION** [2] - 1812:3, 1893:12
**examination** [3] - 1892:9, 1892:24, 1893:20
**examined** [1] - 1811:25
**example** [1] - 1941:11
**examples** [1] - 1881:8
**exception** [1] - 1820:25
**exclusive** [1] - 1878:1
**excuse** [5] - 1833:4, 1851:17, 1952:23, 1953:1, 1957:11
**excused** [6] - 1804:3, 1804:23, 1810:19, 1892:13, 1892:17, 1960:10
**executing** [1] - 1860:19
**executive** [3] - 1835:13, 1898:18, 1898:19
**exhibit** [8] - 1848:5, 1854:15, 1856:21, 1858:9, 1870:4, 1888:20, 1945:18, 1949:14
**Exhibit** [27] - 1823:25, 1824:3, 1834:18, 1834:23, 1847:14, 1848:3, 1856:9, 1863:24, 1867:5, 1868:13, 1869:12, 1876:6, 1880:21, 1883:15, 1886:20, 1893:16, 1897:6, 1916:14, 1919:9, 1919:10, 1924:11, 1929:22, 1937:23, 1943:3, 1944:22, 1952:10, 1954:21
**exhibits** [1] - 1919:13
**existed** [1] - 1931:17
**exists** [1] - 1897:20
**exits** [1] - 1810:15
**expand** [1] - 1869:20
**expanding** [1] - 1948:11
**expect** [3] - 1871:21, 1873:16,

1938:1
**expected** [1] - 1931:3
**expecting** [1] - 1945:7
**expense** [1] - 1909:6
**expenses** [2] - 1833:23, 1913:24
**experience** [3] - 1812:23, 1822:18, 1928:13
**experienced** [1] - 1822:3
**expertise** [2] - 1832:13, 1840:12
**explain** [6] - 1827:19, 1835:23, 1839:19, 1850:5, 1877:2, 1928:5
**explained** [2] - 1818:12, 1915:9
**explore** [1] - 1874:8
**expressed** [3] - 1853:3, 1928:15, 1948:9
**expression** [1] - 1927:23
**extensive** [1] - 1957:22
**extent** [2] - 1837:9, 1862:22
**external** [3] - 1852:1, 1852:6, 1852:18
**External** [1] - 1852:14
**externally** [2] - 1850:5, 1853:2
**extremely** [1] - 1880:14
**Ezra** [2] - 1802:1, 1803:22

## F

**facet** [1] - 1918:16
**fact** [40] - 1810:18, 1825:16, 1825:19, 1834:7, 1853:8, 1872:22, 1873:4, 1873:8, 1874:24, 1880:17, 1882:17, 1884:23, 1885:10, 1888:3, 1890:20, 1895:22, 1898:24, 1899:12, 1899:17, 1900:3, 1900:19, 1902:17, 1903:20, 1904:2, 1906:19, 1910:13, 1910:16, 1911:12, 1916:9, 1924:9, 1926:2, 1930:17, 1933:4, 1940:21, 1942:5, 1946:15, 1946:19, 1946:25, 1953:11, 1955:25
**facts** [8] - 1859:8, 1859:16, 1897:13, 1897:15, 1897:18, 1897:19, 1897:20, 1951:22
**fail** [1] - 1911:5
**failing** [1] - 1894:11
**fair** [2] - 1840:16, 1859:24
**false** [15] - 1824:16, 1824:23, 1846:3, 1894:7, 1894:9, 1894:19, 1894:21, 1894:24, 1895:7, 1895:25, 1906:16, 1906:18, 1907:16, 1909:6, 1910:7
**familiar** [1] - 1825:1
**far** [3] - 1889:14, 1892:11, 1902:14
**FARA** [17] - 1827:9, 1894:13,

1897:4, 1897:25, 1900:9, 1901:3, 1901:4, 1901:10, 1901:13, 1902:2, 1902:10, 1902:12, 1902:18, 1903:3, 1905:24, 1931:24
**fashion** [1] - 1841:9
**father** [1] - 1911:7
**favorable** [1] - 1954:5
**February** [1] - 1912:5
**federal** [2] - 1894:16, 1912:4
**fees** [10] - 1834:8, 1851:20, 1851:24, 1852:1, 1853:3, 1854:1, 1854:8, 1862:4, 1862:9, 1862:10
**fellow** [1] - 1915:23
**Fernandez** [1] - 1803:17
**Fernando** [1] - 1801:12
**fernando.campoamor** [1] - 1801:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 1801:16
**few** [4] - 1813:7, 1889:22, 1906:10, 1943:9
**fight** [1] - 1925:18
**figure** [4] - 1804:10, 1853:8, 1908:19, 1908:20
**figured** [1] - 1882:10
**figuring** [1] - 1853:5
**file** [5] - 1860:9, 1894:11, 1895:9, 1906:18, 1909:24
**filed** [4] - 1895:10, 1907:23, 1910:3, 1914:8
**filing** [6] - 1894:7, 1894:9, 1895:7, 1906:15, 1906:18, 1907:16
**fill** [2] - 1859:16, 1951:2
**final** [3] - 1876:18, 1920:5, 1956:1
**Finalize** [1] - 1865:8
**finalized** [2] - 1865:17, 1952:25
**finally** [3] - 1836:25, 1868:24, 1888:20
**financing** [1] - 1862:2
**Findings** [1] - 1956:15
**findings** [1] - 1836:15
**fingers** [1] - 1885:3
**finish** [4] - 1883:17, 1887:18, 1888:1, 1959:9
**finished** [2] - 1926:12, 1937:14
**finishes** [1] - 1885:22
**firm** [27] - 1813:13, 1813:20, 1815:3, 1817:11, 1817:16, 1817:19, 1817:24, 1817:25, 1821:24, 1822:2, 1822:17, 1823:10, 1829:18, 1831:7, 1832:13, 1832:15, 1832:16, 1835:8, 1837:21, 1840:7, 1917:4, 1918:12, 1929:3, 1935:24, 1936:11, 1936:14,

1936:21
**firms** [24] - 1817:21, 1834:10, 1834:13, 1835:1, 1835:9, 1846:6, 1863:18, 1863:23, 1864:3, 1864:9, 1864:15, 1865:16, 1866:21, 1870:21, 1899:9, 1917:12, 1917:19, 1917:20, 1917:21, 1918:4, 1918:8, 1918:18, 1920:12
**first** [58] - 1811:24, 1813:8, 1824:1, 1824:10, 1824:20, 1829:15, 1829:17, 1835:19, 1838:20, 1838:25, 1839:9, 1839:14, 1839:23, 1839:25, 1840:2, 1840:4, 1840:25, 1844:6, 1856:11, 1856:24, 1860:23, 1866:12, 1867:16, 1869:19, 1869:25, 1870:6, 1870:16, 1871:11, 1871:19, 1876:6, 1876:9, 1876:23, 1880:24, 1881:5, 1884:14, 1886:23, 1887:20, 1889:9, 1889:10, 1889:17, 1893:24, 1903:20, 1915:7, 1916:22, 1917:6, 1918:11, 1927:8, 1935:6, 1938:24, 1939:8, 1939:9, 1939:16, 1952:20, 1953:18, 1955:1, 1959:2
**five** [4] - 1824:22, 1824:25, 1837:8, 1883:22
**fix** [3] - 1858:12, 1862:6, 1908:24
**fixed** [2] - 1860:4, 1909:1
**flawed** [1] - 1927:11
**FleishmanHillard** [3] - 1835:10, 1918:1, 1918:2
**flexibility** [1] - 1811:18
**focus** [5] - 1856:2, 1856:24, 1858:7, 1868:15, 1877:13
**focused** [1] - 1902:23
**focusing** [2] - 1861:11, 1934:2
**folded** [1] - 1913:14
**folks** [1] - 1900:20
**follow** [4] - 1811:9, 1841:2, 1841:12, 1843:8
**follow-up** [1] - 1843:8
**followed** [3] - 1848:11, 1848:13, 1890:22
**following** [3] - 1839:4, 1878:18, 1952:19
**follows** [2] - 1811:25, 1857:15
**foot** [1] - 1819:16
**FOR** [2] - 1801:1, 1801:13
**forces** [2] - 1926:1, 1926:5
**foregoing** [1] - 1961:6
**foreign** [10] - 1894:11, 1894:25, 1895:10, 1898:3, 1908:13, 1909:12, 1909:17, 1909:22, 1909:24, 1940:16
**forfeiture** [1] - 1904:9

**forgiven** [1] - 1910:25
**form** [8] - 1921:24, 1922:11, 1927:12, 1932:9, 1947:2, 1949:17, 1951:21, 1956:4
**formally** [1] - 1934:16
**former** [5] - 1816:2, 1832:3, 1880:3, 1957:4, 1958:18
**formulated** [1] - 1930:18
**forth** [4] - 1865:16, 1897:23, 1904:15, 1926:20
**forward** [5] - 1821:5, 1873:9, 1875:20, 1902:16, 1943:8
**foster** [1] - 1836:24
**foundation** [1] - 1849:6
**foundations** [1] - 1933:19
**four** [4] - 1812:18, 1860:6, 1917:21, 1917:25
**Fourth** [1] - 1801:14
**frame** [2] - 1844:6, 1844:8
**France** [1] - 1918:3
**frankly** [1] - 1956:11
**free** [2] - 1928:1, 1928:6
**frequently** [1] - 1930:4
**friendly** [3] - 1943:10, 1943:22, 1947:11
**front** [5] - 1824:1, 1834:19, 1858:10, 1883:25, 1919:12
**FTI** [30] - 1817:20, 1822:25, 1823:10, 1832:16, 1832:23, 1833:4, 1833:7, 1833:12, 1833:14, 1833:21, 1834:1, 1834:8, 1834:10, 1838:13, 1838:15, 1840:7, 1863:18, 1870:18, 1877:22, 1916:6, 1916:8, 1916:9, 1916:10, 1916:11, 1916:12, 1919:20, 1919:22, 1940:11, 1943:6, 1950:11
**Fule** [5] - 1861:17, 1861:20, 1861:24, 1878:18, 1878:23
**full** [5] - 1833:23, 1907:25, 1908:7, 1928:12, 1961:7
**fully** [2] - 1865:16, 1874:24
**fund** [1] - 1813:20
**future** [2] - 1832:6, 1880:15

## G

**G-A-T-E-S** [1] - 1812:9
**gain** [1] - 1815:10
**game** [1] - 1866:13
**Gaston** [2] - 1801:13, 1803:16
**gate** [1] - 1871:12
**GATES** [1] - 1811:23
**gates** [1] - 1893:5
**Gates** [22] - 1802:14, 1811:22, 1812:9, 1820:19, 1823:14, 1825:10, 1829:13, 1837:5, 1841:13, 1844:23, 1845:15, 1847:21, 1854:8, 1854:17,

1871:21, 1873:4, 1875:14, 1888:23, 1893:14, 1893:19, 1903:2, 1936:18
**Gates's** [1] - 1874:15
**gather** [1] - 1892:14
**GC** [7] - 1858:1, 1861:7, 1861:16, 1877:23, 1878:5, 1935:6, 1940:3
**GC's** [1] - 1890:3
**GC/SKA** [1] - 1854:18
**gearing** [1] - 1938:6
**general** [8] - 1818:23, 1830:10, 1838:21, 1840:8, 1906:2, 1926:10, 1937:16, 1940:18
**generally** [6] - 1813:18, 1814:12, 1823:9, 1851:10, 1919:6, 1935:12
**generating** [1] - 1950:12
**gentleman** [3] - 1816:19, 1832:20, 1880:2
**gentlemen** [3] - 1814:11, 1827:19, 1829:14
**geography** [1] - 1815:11
**George** [1] - 1812:22
**Germany** [1] - 1918:3
**given** [23] - 1810:18, 1822:4, 1822:14, 1829:17, 1832:12, 1833:11, 1856:5, 1868:11, 1868:22, 1872:8, 1877:25, 1890:12, 1892:12, 1924:18, 1924:20, 1927:25, 1928:6, 1931:23, 1935:16, 1946:16, 1951:23, 1952:3, 1955:16
**global** [1] - 1816:15
**globally** [1] - 1822:4
**glowing** [4] - 1871:22, 1873:6, 1873:17, 1874:25
**Google** [1] - 1840:11
**governing** [1] - 1835:16
**government** [58] - 1811:22, 1823:13, 1824:8, 1825:13, 1825:19, 1825:22, 1826:11, 1826:15, 1826:21, 1826:23, 1827:4, 1827:12, 1827:16, 1827:20, 1827:22, 1828:3, 1828:8, 1828:13, 1828:14, 1828:21, 1828:24, 1829:8, 1833:11, 1836:2, 1836:8, 1836:13, 1836:23, 1838:22, 1839:7, 1847:8, 1851:22, 1864:12, 1864:16, 1898:24, 1898:25, 1899:1, 1899:3, 1899:4, 1899:5, 1904:9, 1904:18, 1905:4, 1905:22, 1910:10, 1911:23, 1912:17, 1915:15, 1916:25, 1919:14, 1919:23, 1919:24, 1925:17, 1926:7, 1926:8, 1928:15, 1936:13, 1954:20, 1956:25
**Government** [8] - 1893:16,

1897:6, 1916:14, 1924:10, 1929:22, 1937:23, 1943:3, 1952:10
**government's** [2] - 1874:23, 1905:10
**Government's** [16] - 1823:25, 1824:3, 1834:17, 1834:23, 1847:14, 1848:2, 1856:9, 1863:24, 1867:5, 1868:13, 1869:12, 1876:6, 1880:21, 1883:15, 1886:20, 1888:20
**governmental** [1] - 1899:18
**GR** [2] - 1850:19, 1924:21
**GR's** [1] - 1916:25
**grade** [1] - 1911:20
**graph** [1] - 1939:9
**grassroots** [1] - 1814:18
**great** [6] - 1841:8, 1852:20, 1874:22, 1884:20, 1885:16, 1891:6
**greater** [2] - 1918:15, 1957:24
**greatest** [1] - 1891:2
**green** [4] - 1868:11, 1868:23, 1868:25, 1875:23
**Greg** [14] - 1837:6, 1878:5, 1878:7, 1884:20, 1887:7, 1887:18, 1890:9, 1923:24, 1942:15, 1942:23, 1942:25, 1943:15, 1946:25, 1951:20
**Gregory** [3] - 1801:6, 1803:11, 1892:22
**grid** [14] - 1854:12, 1854:22, 1862:21, 1864:19, 1876:13, 1876:15, 1876:18, 1877:1, 1877:4, 1879:9, 1879:15, 1921:14, 1938:25, 1941:21
**ground** [6] - 1814:19, 1834:2, 1862:3, 1862:5, 1870:19, 1914:21
**Group** [1] - 1835:5
**group** [5] - 1835:8, 1835:16, 1836:5, 1836:6, 1839:5
**groups** [4] - 1814:20, 1851:6, 1877:3, 1956:1
**guarantee** [1] - 1828:20
**Guard** [1] - 1813:1
**guessing** [1] - 1937:17
**guideline** [1] - 1897:2
**guidelines** [4] - 1825:2, 1825:7, 1896:10, 1896:12
**guilty** [11] - 1824:11, 1824:16, 1825:8, 1894:2, 1894:15, 1894:18, 1897:14, 1897:15, 1901:19, 1907:12, 1914:9
**Gulland** [1] - 1801:13
**guys** [2] - 1943:9, 1943:17

## H

**Haley** [4] - 1804:1, 1804:17,

1804:22, 1804:24
**half** [3] - 1813:2, 1908:10, 1933:22
**hand** [5] - 1876:25, 1884:5, 1928:1, 1928:6, 1959:20
**handling** [2] - 1882:1, 1885:4
**handwritten** [1] - 1857:1
**hardcopy** [2] - 1858:10, 1919:13
**Harvard** [9] - 1839:25, 1846:23, 1848:11, 1848:16, 1854:10, 1855:1, 1855:3, 1863:8, 1863:11
**Haskell** [1] - 1852:24
**hawker** [4] - 1861:3, 1883:12, 1949:7, 1955:22
**Hawker** [76] - 1823:11, 1838:15, 1847:24, 1848:10, 1849:14, 1850:3, 1854:13, 1856:14, 1856:16, 1858:19, 1858:25, 1859:1, 1860:23, 1862:1, 1862:19, 1864:3, 1864:17, 1864:18, 1865:14, 1869:18, 1875:25, 1876:1, 1876:16, 1878:10, 1883:4, 1884:12, 1884:14, 1884:18, 1884:21, 1885:10, 1919:6, 1919:19, 1920:25, 1921:18, 1926:20, 1928:11, 1928:14, 1928:17, 1930:1, 1930:5, 1930:8, 1930:10, 1930:12, 1934:6, 1934:7, 1938:19, 1939:2, 1942:14, 1942:16, 1942:20, 1942:22, 1943:5, 1943:23, 1944:1, 1944:9, 1944:10, 1944:17, 1946:17, 1946:20, 1946:22, 1947:1, 1947:7, 1948:2, 1948:18, 1948:19, 1949:13, 1949:23, 1950:16, 1951:20, 1951:24, 1952:15, 1954:15, 1954:16, 1954:18, 1954:22, 1956:5
**Hawker's** [4] - 1922:25, 1927:7, 1927:23, 1931:5
**head** [1] - 1923:20
**headed** [1] - 1915:20
**heading** [2] - 1826:19, 1920:3
**headline** [4] - 1952:20, 1953:6, 1953:13, 1953:19
**heads** [1] - 1811:12
**hear** [4] - 1811:7, 1842:25, 1912:12, 1959:13
**heard** [4] - 1839:23, 1853:15, 1899:9, 1900:16
**hearing** [2] - 1853:14, 1901:14
**hearsay** [9] - 1819:7, 1820:7, 1821:1, 1842:6, 1844:5, 1844:6, 1844:10, 1853:7, 1874:12
**HELD** [1] - 1801:9
**help** [13] - 1822:10, 1822:11, 1825:14, 1832:13, 1834:9,

1836:24, 1839:17, 1840:20, 1848:10, 1855:17, 1863:19, 1876:20, 1935:12
**helped** [6] - 1814:15, 1814:16, 1816:25, 1896:21, 1910:20, 1915:23
**helping** [2] - 1815:20, 1906:13
**hereby** [1] - 1961:5
**hide** [1] - 1896:21
**high** [2] - 1880:18, 1908:11
**high-ranking** [1] - 1880:18
**higher** [1] - 1911:20
**highlight** [1] - 1920:16
**himself** [4] - 1818:21, 1870:24, 1879:3, 1910:16
**hired** [20] - 1814:16, 1815:4, 1817:20, 1817:22, 1817:23, 1821:19, 1834:14, 1835:1, 1835:16, 1863:23, 1914:22, 1916:8, 1916:9, 1916:10, 1917:13, 1917:14, 1917:15, 1918:6, 1918:8
**hiring** [4] - 1821:14, 1821:23, 1832:23, 1918:9
**historically** [1] - 1839:20
**hold** [1] - 1888:2
**holes** [1] - 1859:17
**Honor** [33] - 1803:10, 1803:15, 1803:20, 1804:14, 1804:15, 1804:20, 1811:4, 1811:21, 1812:2, 1819:11, 1826:8, 1830:18, 1844:21, 1847:18, 1852:9, 1853:13, 1866:9, 1873:1, 1884:7, 1891:13, 1892:19, 1892:21, 1892:25, 1893:11, 1899:19, 1899:23, 1902:15, 1907:8, 1912:21, 1937:7, 1937:17, 1952:5, 1959:7
**HONORABLE** [1] - 1801:9
**Honorable** [2] - 1803:3, 1803:4
**honorable** [1] - 1813:3
**hope** [1] - 1936:19
**hoped** [4] - 1855:22, 1928:24, 1930:10, 1930:11
**hopefully** [4] - 1823:25, 1834:18, 1872:7, 1960:11
**hoping** [3] - 1883:16, 1950:20, 1951:1
**hotel** [1] - 1946:20
**hour** [2] - 1939:11
**hours** [3] - 1877:22, 1878:2, 1937:17
**hum** [6] - 1814:13, 1815:9, 1831:11, 1846:16, 1884:24, 1936:20
**human** [1] - 1941:8
**hundreds** [1] - 1953:4
**hung** [1] - 1947:16
**hunt** [1] - 1867:20
**Hunt** [3] - 1867:23, 1885:9,

1886:8
**husher** [1] - 1805:3
**hypothetical** [4] - 1858:18, 1858:21, 1957:10, 1957:11

**I**

**idea** [13] - 1816:8, 1816:9, 1836:16, 1840:24, 1841:1, 1857:8, 1865:14, 1867:22, 1872:12, 1919:24, 1927:4, 1936:13, 1936:15
**ideally** [1] - 1881:24
**ideas** [2] - 1860:7, 1929:4
**identified** [6] - 1869:21, 1870:2, 1879:9, 1893:19, 1923:2, 1943:24
**identify** [4] - 1803:13, 1916:25, 1921:15, 1921:18
**Identify** [1] - 1865:9
**identifying** [1] - 1943:15
**IDW** [2] - 1910:1, 1911:7
**Ill** [1] - 1801:21
**illegal** [1] - 1898:2
**imagined** [1] - 1956:20
**immediate** [2] - 1869:19, 1869:25
**imminent** [1] - 1938:2
**impact** [2] - 1885:20, 1891:3
**impetus** [1] - 1918:9
**implementing** [1] - 1820:14
**important** [11] - 1819:18, 1821:6, 1826:4, 1826:12, 1836:12, 1880:10, 1880:14, 1888:7, 1956:24, 1957:3, 1957:6
**importantly** [1] - 1890:11
**IN** [1] - 1801:1
**ina** [2] - 1835:12, 1898:23
**Ina** [7] - 1835:13, 1835:16, 1898:19, 1898:21, 1898:22, 1917:6
**inaugural** [1] - 1914:2
**include** [3] - 1831:23, 1878:18, 1944:16
**included** [4] - 1817:11, 1843:5, 1866:2, 1867:18
**includes** [1] - 1834:25
**including** [4] - 1854:21, 1890:25, 1895:15, 1896:1
**income** [6] - 1896:24, 1908:1, 1908:10, 1909:15, 1909:19, 1911:14
**incoming** [1] - 1831:13
**inconclusive** [2] - 1956:17, 1957:12
**incorporates** [1] - 1944:25
**independence** [2] - 1851:14, 1929:2
**independent** [9] - 1822:8, 1822:10, 1822:11, 1880:7,

1890:9, 1899:6, 1899:13, 1955:18, 1955:19
**INDEX** [1] - 1802:12
**indicated** [2] - 1881:12, 1948:13
**indicating** [1] - 1837:17
**indication** [1] - 1954:14
**indicted** [3] - 1823:18, 1903:20, 1903:21
**individuals** [5] - 1834:24, 1878:18, 1912:18, 1917:20, 1926:4
**inferences** [1] - 1811:16
**inform** [2] - 1827:12, 1886:16
**information** [15] - 1804:4, 1810:19, 1821:18, 1835:22, 1852:10, 1862:1, 1864:20, 1886:9, 1927:7, 1927:8, 1929:1, 1932:23, 1934:14, 1948:20, 1958:25
**informed** [3] - 1804:1, 1838:2, 1886:17
**initial** [3] - 1885:19, 1921:17, 1949:3
**initials** [1] - 1878:4
**initiation** [1] - 1819:22
**injected** [1] - 1874:21
**input** [1] - 1848:10
**inputting** [1] - 1860:19
**inquiries** [1] - 1903:4
**inquiry** [4] - 1900:7, 1903:2, 1911:3, 1920:11
**inside** [2] - 1822:5, 1899:3
**insider** [1] - 1911:3
**insight** [1] - 1946:5
**instance** [2] - 1906:4, 1950:24
**instead** [1] - 1881:15
**instruction** [5] - 1843:9, 1843:12, 1845:16, 1866:4, 1948:17
**instructions** [4] - 1811:10, 1830:19, 1843:3, 1948:3
**integrity** [1] - 1814:20
**intend** [1] - 1849:20
**intended** [1] - 1873:3
**intending** [1] - 1873:24
**intent** [1] - 1926:10
**intention** [1] - 1804:4
**interaction** [1] - 1912:17
**interest** [1] - 1948:9
**interested** [3] - 1839:16, 1882:1, 1905:10
**interesting** [1] - 1815:10
**interests** [3] - 1900:3, 1925:8, 1925:9
**interfacing** [1] - 1902:2
**interim** [1] - 1943:9
**intermediary** [3] - 1822:24, 1823:4, 1898:18
**Internal** [1] - 1896:21

**internally** [1] - 1850:25
**international** [6] - 1851:7, 1851:15, 1934:15, 1934:21, 1934:23, 1934:25
**internationally** [1] - 1813:23
**interrupt** [2] - 1819:10, 1852:15
**interruptions** [1] - 1830:16
**interview** [5] - 1871:22, 1878:7, 1888:3, 1888:7, 1888:16
**interviewed** [3] - 1905:3, 1912:4, 1912:5
**interviews** [2] - 1912:7, 1935:7
**interviews/meetings** [1] - 1835:22
**investigation** [2] - 1823:19, 1894:22
**investigators** [2] - 1825:20, 1825:22
**involved** [8] - 1818:6, 1822:16, 1834:10, 1851:1, 1864:12, 1896:12, 1902:12, 1944:2
**involvement** [1] - 1823:6
**involving** [2] - 1832:3, 1896:2
**irregularities** [1] - 1931:17
**irrespective** [1] - 1936:2
**IRS** [1] - 1908:24
**issue** [31] - 1815:9, 1815:16, 1816:13, 1816:17, 1821:24, 1823:15, 1833:6, 1833:7, 1833:12, 1833:15, 1833:17, 1845:1, 1851:21, 1852:6, 1852:17, 1852:18, 1853:6, 1853:25, 1854:8, 1855:12, 1857:15, 1857:20, 1857:21, 1862:5, 1874:24, 1956:23, 1956:25, 1958:19, 1958:24
**issued** [1] - 1923:23
**issues** [20] - 1817:15, 1823:1, 1832:22, 1846:4, 1847:1, 1849:13, 1851:12, 1851:25, 1853:2, 1854:9, 1858:13, 1858:22, 1860:2, 1860:3, 1874:20, 1881:11, 1936:3, 1939:24, 1957:2, 1958:19
**Issues** [1] - 1859:25
**Item** [3] - 1934:12, 1935:15, 1935:23
**item** [7] - 1850:16, 1859:25, 1865:5, 1935:6, 1939:9, 1946:1, 1952:20
**items** [13] - 1838:7, 1851:16, 1854:25, 1856:7, 1858:15, 1860:18, 1860:20, 1860:21, 1861:1, 1861:9, 1865:6, 1893:22, 1941:11
**Items** [1] - 1860:14
**iterations** [2] - 1836:1, 1863:16
**itself** [1] - 1820:6

**J**

**JACKSON** [1] - 1801:9
**Jackson** [1] - 1829:12
**James** [1] - 1801:20
**JANICE** [1] - 1961:5
**Janice** [2] - 1802:7, 1961:13
**Jason** [2] - 1801:17, 1803:16
**jason.mccullough@usdoj. gov** [1] - 1801:19
**jeopardize** [1] - 1888:4
**job** [1] - 1858:2
**John** [17] - 1893:24, 1896:5, 1897:24, 1898:10, 1916:23, 1920:16, 1924:23, 1926:23, 1928:2, 1928:19, 1931:8, 1934:11, 1938:25, 1942:14, 1945:22, 1951:7, 1955:7
**join** [1] - 1861:21
**Jon** [3] - 1919:19, 1942:13, 1944:24
**Jonathan** [16] - 1823:11, 1838:15, 1851:16, 1856:14, 1857:8, 1919:19, 1939:21, 1939:23, 1942:16, 1942:20, 1942:22, 1944:9, 1944:17, 1949:2, 1949:6, 1957:23
**journalist** [7] - 1845:21, 1846:12, 1862:15, 1889:25, 1934:21, 1934:24, 1935:1
**journalists** [6] - 1836:19, 1841:3, 1841:9, 1869:21, 1889:23, 1934:15
**JUDGE** [2] - 1801:9, 1801:10
**judge** [11] - 1829:2, 1829:3, 1829:7, 1829:11, 1860:9, 1904:13, 1940:15, 1940:21, 1940:23, 1940:25, 1941:2
**Judge** [1] - 1829:12
**judge's** [1] - 1828:7
**judicial** [2] - 1822:14, 1858:15
**July** [11] - 1839:3, 1920:5, 1921:3, 1922:17, 1923:15, 1923:16, 1923:25, 1929:7, 1929:24, 1932:4, 1950:9
**jump** [1] - 1844:3
**junctures** [1] - 1908:21
**June** [2] - 1836:25, 1839:3
**JUNGHANS** [172] - 1803:20, 1803:24, 1804:15, 1818:2, 1818:17, 1818:20, 1819:9, 1819:11, 1820:9, 1821:2, 1821:9, 1821:20, 1829:5, 1829:20, 1831:8, 1833:3, 1838:24, 1841:16, 1842:6, 1842:14, 1842:19, 1843:12, 1843:18, 1844:3, 1844:12, 1844:21, 1849:6, 1852:3, 1852:9, 1852:13, 1852:22, 1853:10, 1853:13, 1853:19,

1854:4, 1855:18, 1865:19,
1866:6, 1871:2, 1871:24,
1872:16, 1873:11, 1874:1,
1874:5, 1874:8, 1874:13,
1874:18, 1875:2, 1875:6,
1875:11, 1891:9, 1891:25,
1892:25, 1893:11, 1893:13,
1893:16, 1893:18, 1893:24,
1894:1, 1896:5, 1896:8, 1897:6,
1897:8, 1897:24, 1898:1,
1898:9, 1898:11, 1899:23,
1900:1, 1900:22, 1901:3,
1901:7, 1901:10, 1901:15,
1901:24, 1902:5, 1902:15,
1902:20, 1903:1, 1903:7,
1906:25, 1907:7, 1907:10,
1907:11, 1909:5, 1912:21,
1912:23, 1913:1, 1913:4,
1913:5, 1914:17, 1916:22,
1916:24, 1919:9, 1919:11,
1920:16, 1920:18, 1921:12,
1922:2, 1922:6, 1922:8,
1922:10, 1922:13, 1922:16,
1922:18, 1922:20, 1923:9,
1923:11, 1923:14, 1924:10,
1924:12, 1924:23, 1925:1,
1926:23, 1926:24, 1927:15,
1927:16, 1927:19, 1927:21,
1927:22, 1928:2, 1928:4,
1928:18, 1928:21, 1929:22,
1929:23, 1931:8, 1931:12,
1932:24, 1933:8, 1933:15,
1933:24, 1934:1, 1934:11,
1934:13, 1937:1, 1937:7,
1937:10, 1937:13, 1937:17,
1937:20, 1937:21, 1937:23,
1937:24, 1938:24, 1939:1,
1941:17, 1941:19, 1942:11,
1944:13, 1945:22, 1945:25,
1947:5, 1949:9, 1949:19,
1949:21, 1950:8, 1951:6,
1951:12, 1952:2, 1952:5,
1952:8, 1952:9, 1955:7, 1955:9,
1956:9, 1956:14, 1956:16,
1957:17, 1959:11, 1959:22,
1959:25
   **Junghans** [4] - 1802:1,
1803:21, 1893:10, 1893:14
   **Junghans....................1893** [1]
- 1802:16
   **jurisdiction** [1] - 1827:2
   **jurisdictions** [3] - 1870:1,
1870:7, 1928:13
   **jurisprudence** [1] - 1931:18
   **juror** [6] - 1804:2, 1804:17,
1804:19, 1810:15, 1810:19,
1884:3
   **JUROR** [4] - 1804:20, 1804:25,
1805:5, 1805:10
   **jurors** [2] - 1811:15, 1893:7

   **jurors's** [1] - 1810:18
   **JURY** [2] - 1801:4, 1801:8
   **jury** [13] - 1804:23, 1810:21,
1811:1, 1811:3, 1814:11,
1827:20, 1829:15, 1859:23,
1892:16, 1893:1, 1893:2,
1960:3, 1960:9
   **Justice** [14] - 1801:17, 1851:13,
1862:6, 1862:8, 1886:14,
1888:13, 1900:9, 1903:3,
1915:1, 1915:13, 1916:9,
1916:10, 1955:3, 1955:24
   **justice** [1] - 1816:10
   **justification** [1] - 1925:20

## K

   **Kaczynski** [1] - 1880:2
   **kaczynski** [2] - 1880:14, 1887:5
   **kaczynski's** [1] - 1880:4
   **keen** [1] - 1885:23
   **keep** [7] - 1862:20, 1865:14,
1883:25, 1889:3, 1890:20,
1950:22, 1951:8
   **keeping** [7] - 1864:18, 1882:20,
1883:2, 1883:4, 1884:15,
1885:3, 1886:16
   **kept** [3] - 1863:16, 1929:15,
1938:16
   **key** [13] - 1859:8, 1862:21,
1863:4, 1865:9, 1870:1, 1870:6,
1879:19, 1880:12, 1881:21,
1921:18, 1923:1, 1935:7,
1956:18
   **kicked** [1] - 1832:25
   **kids** [2] - 1812:17, 1812:18
   **Kilimnik** [1] - 1952:16
   **kind** [40] - 1814:10, 1814:11,
1815:13, 1816:8, 1817:17,
1822:13, 1828:6, 1832:24,
1834:15, 1835:8, 1835:16,
1835:25, 1836:10, 1836:11,
1836:21, 1840:8, 1840:12,
1841:3, 1841:10, 1846:8,
1849:25, 1850:16, 1851:6,
1851:17, 1851:18, 1854:23,
1864:19, 1864:25, 1865:1,
1869:19, 1871:19, 1880:7,
1881:20, 1882:24, 1887:12,
1904:12, 1921:16, 1934:21,
1939:25
   **kinds** [2] - 1911:17, 1927:8
   **Kirsch** [6] - 1835:12, 1835:13,
1898:20, 1898:21, 1898:22,
1917:6
   **kitchen** [1] - 1833:1
   **KK** [3] - 1862:1, 1862:3, 1862:5
   **knowing** [1] - 1840:25
   **knowledge** [15] - 1818:3,
1831:21, 1845:9, 1845:20,

1845:22, 1848:15, 1869:11,
1872:11, 1872:24, 1878:21,
1879:20, 1902:19, 1942:24,
1947:8, 1949:10
   **known** [1] - 1897:19
   **knows** [6] - 1818:22, 1819:14,
1843:19, 1906:20, 1912:15
   **Kwaniewski** [1] - 1941:7
   **Kyiv** [5] - 1887:20, 1940:11,
1946:20, 1947:14, 1947:15

## L

   **ladies** [3] - 1814:10, 1827:19,
1829:14
   **laid** [1] - 1826:17
   **language** [1] - 1862:7
   **large** [3] - 1846:25, 1880:5,
1895:15
   **largely** [2] - 1823:20, 1876:16
   **larger** [2] - 1823:19, 1958:24
   **last** [9] - 1814:9, 1861:16,
1877:4, 1877:11, 1881:22,
1888:20, 1920:14, 1934:2,
1935:24
   **late** [1] - 1846:21
   **launched** [1] - 1870:8
   **launching** [1] - 1819:13
   **laundering** [1] - 1904:6
   **law** [10] - 1817:11, 1817:16,
1817:24, 1817:25, 1822:5,
1829:18, 1859:19, 1907:4,
1907:5, 1929:3
   **lawyer** [7] - 1823:2, 1860:9,
1901:4, 1901:8, 1901:13,
1901:23, 1902:2
   **lawyers** [4] - 1835:21, 1836:3,
1900:20, 1905:4
   **lay** [3] - 1821:4, 1933:18,
1938:9
   **lead** [5] - 1822:17, 1841:2,
1931:23, 1932:8, 1934:5
   **leaders** [5] - 1816:6, 1816:11,
1822:7, 1836:14, 1957:7
   **leading** [2] - 1838:24, 1854:3
   **leak** [1] - 1865:18
   **leaked** [1] - 1843:2
   **leaking** [1] - 1953:23
   **learned** [5] - 1819:1, 1825:3,
1842:21, 1896:13, 1896:15
   **least** [9] - 1826:3, 1841:7,
1844:6, 1885:21, 1891:2,
1911:1, 1942:22, 1946:12,
1949:6
   **leave** [3] - 1885:7, 1892:14,
1946:21
   **leaves** [2] - 1892:16, 1960:9
   **leaving** [1] - 1907:18
   **lectern** [1] - 1803:13
   **Lee** [5] - 1920:22, 1921:22,

1922:22, 1923:18, 1951:14
**left** [4] - 1865:5, 1883:23, 1913:13, 1945:9
**legal** [2] - 1832:13, 1906:23
**legend** [1] - 1876:25
**legislators** [1] - 1865:2
**legitimate** [1] - 1875:5
**legwork** [1] - 1841:4
**Leon** [1] - 1803:5
**letter** [6] - 1828:4, 1828:5, 1828:8, 1902:1, 1905:24, 1911:12
**letters** [1] - 1901:22
**level** [3] - 1846:25, 1847:3, 1897:2
**liabilities** [1] - 1906:14
**liaised** [1] - 1823:2
**lie** [5] - 1901:16, 1902:5, 1908:13, 1909:22, 1913:6
**lied** [15] - 1899:15, 1900:25, 1901:3, 1901:4, 1901:8, 1901:13, 1909:9, 1909:17, 1910:7, 1910:10, 1911:3, 1911:10, 1911:20, 1911:23, 1912:15
**lieu** [1] - 1903:17
**light** [5] - 1868:11, 1868:23, 1868:25, 1875:23, 1932:19
**likely** [2] - 1841:9, 1953:8
**limit** [2] - 1820:4, 1887:12
**limited** [2] - 1816:13, 1831:22
**Limited** [1] - 1831:18
**line** [31] - 1854:17, 1857:23, 1858:12, 1858:18, 1858:20, 1858:23, 1859:2, 1859:11, 1859:13, 1859:15, 1859:18, 1860:23, 1861:2, 1861:16, 1862:1, 1864:4, 1865:5, 1878:3, 1889:4, 1889:9, 1889:10, 1900:21, 1916:22, 1918:11, 1931:17, 1940:2, 1940:9, 1940:15, 1941:6, 1941:11, 1941:12
**lined** [1] - 1834:4
**lines** [3] - 1877:13, 1881:22, 1941:24
**link** [3] - 1823:10, 1860:23, 1861:4
**linking** [1] - 1933:10
**list** [16] - 1858:18, 1858:21, 1859:6, 1862:15, 1897:13, 1916:25, 1920:5, 1920:9, 1921:8, 1923:16, 1935:19, 1945:2, 1945:3, 1945:10, 1951:9, 1951:13
**List** [1] - 1878:17
**listed** [6] - 1870:9, 1920:19, 1922:7, 1935:7, 1951:14
**listing** [1] - 1860:21
**lists** [1] - 1878:19

**literally** [1] - 1820:15
**live** [2] - 1812:12, 1812:13
**living** [1] - 1846:9
**LLP** [2] - 1801:22, 1802:2
**loan** [1] - 1911:14
**loans** [1] - 1911:18
**local** [1] - 1823:1
**localized** [1] - 1817:15
**located** [3] - 1815:11, 1828:16, 1831:19
**London** [1] - 1947:15
**look** [67] - 1803:4, 1816:10, 1823:24, 1824:9, 1825:4, 1826:18, 1826:19, 1827:18, 1835:18, 1847:14, 1847:16, 1848:5, 1849:22, 1850:10, 1854:14, 1856:9, 1856:11, 1856:21, 1859:25, 1863:24, 1864:22, 1867:5, 1868:13, 1869:12, 1870:4, 1872:9, 1876:8, 1876:23, 1877:7, 1877:22, 1878:3, 1880:21, 1883:15, 1884:10, 1886:20, 1886:22, 1887:16, 1888:20, 1888:22, 1909:1, 1916:14, 1919:7, 1919:13, 1919:16, 1919:22, 1924:17, 1924:22, 1926:22, 1928:1, 1930:15, 1930:16, 1930:17, 1931:7, 1935:23, 1938:22, 1943:4, 1944:25, 1945:13, 1945:17, 1950:11, 1951:5, 1954:9, 1955:6, 1955:23, 1958:5
**looked** [7] - 1832:17, 1840:6, 1840:10, 1854:20, 1929:25, 1952:12, 1954:7
**looking** [18] - 1825:20, 1834:23, 1836:20, 1848:7, 1851:22, 1854:17, 1855:8, 1856:13, 1857:16, 1860:7, 1860:14, 1864:23, 1870:5, 1877:16, 1942:18, 1948:9, 1948:11, 1949:14
**looks** [4] - 1837:16, 1920:13, 1943:8, 1955:1
**low** [1] - 1852:1
**lower** [4] - 1898:9, 1934:9, 1935:15, 1955:7
**lowered** [1] - 1851:24
**Lucy** [2] - 1866:17, 1866:20
**Lucy-Claire** [2] - 1866:17, 1866:20
**lunch** [6] - 1937:8, 1937:14, 1959:10, 1959:22, 1960:6, 1960:11
**Lyovochkin** [2] - 1930:21, 1930:22
**lyovochkin** [1] - 1930:23

# M

**ma'am** [9] - 1804:25, 1805:5, 1805:11, 1818:8, 1826:7, 1829:23, 1894:4, 1894:14, 1895:2
**main** [4] - 1816:16, 1837:21, 1838:10, 1838:13
**maintained** [1] - 1905:18
**major** [2] - 1858:22, 1957:1
**malice** [1] - 1958:17
**man** [3] - 1813:8, 1831:14, 1921:17
**Manafort** [114] - 1813:9, 1813:11, 1813:12, 1813:17, 1813:21, 1814:25, 1815:1, 1816:21, 1816:25, 1817:2, 1817:6, 1817:18, 1818:11, 1818:14, 1818:22, 1819:2, 1819:14, 1819:15, 1819:19, 1820:5, 1820:12, 1820:21, 1820:22, 1820:25, 1821:7, 1821:19, 1821:23, 1823:3, 1829:19, 1830:8, 1830:14, 1830:15, 1831:5, 1831:12, 1833:8, 1834:8, 1837:23, 1837:25, 1842:4, 1842:13, 1842:15, 1842:17, 1842:20, 1842:24, 1843:2, 1843:7, 1843:11, 1843:14, 1843:15, 1843:22, 1843:23, 1844:25, 1845:15, 1847:25, 1848:20, 1858:13, 1859:15, 1859:18, 1861:22, 1862:4, 1864:9, 1865:13, 1865:17, 1866:5, 1869:2, 1869:4, 1875:18, 1881:14, 1882:25, 1889:2, 1890:20, 1895:1, 1895:7, 1895:12, 1896:21, 1898:4, 1900:8, 1901:6, 1901:18, 1902:11, 1903:6, 1903:10, 1903:11, 1903:12, 1906:13, 1909:13, 1910:16, 1910:19, 1911:12, 1911:24, 1913:13, 1913:16, 1913:18, 1914:25, 1915:5, 1915:6, 1915:8, 1916:2, 1916:11, 1928:9, 1929:14, 1930:7, 1930:18, 1931:4, 1932:16, 1948:8, 1948:11, 1948:21, 1949:1
**Manafort's** [10] - 1819:21, 1829:24, 1895:19, 1895:22, 1895:25, 1901:19, 1907:13, 1913:9, 1913:20, 1915:25
**managed** [3] - 1811:9, 1823:3, 1909:13
**manager** [1] - 1913:18
**managing** [1] - 1814:15
**map** [1] - 1864:24
**Marcus** [2] - 1802:1, 1803:22

**mark** [1] - 1941:15
**marked** [1] - 1920:9
**married** [1] - 1812:15
**Marsteller** [3] - 1835:10, 1918:1, 1918:2
**Mary** [1] - 1812:21
**master** [9] - 1854:12, 1864:18, 1876:13, 1876:15, 1877:4, 1879:9, 1879:14, 1938:20, 1938:25
**master's** [1] - 1812:21
**material** [6] - 1825:13, 1857:9, 1865:15, 1871:16, 1878:1, 1906:19
**materials** [1] - 1905:14
**Matrix** [1] - 1864:4
**matrix** [4] - 1919:1, 1919:3, 1919:5, 1949:2
**Matrix-actions** [1] - 1864:4
**matter** [10] - 1804:5, 1819:4, 1826:6, 1842:13, 1853:7, 1890:16, 1901:15, 1901:17, 1906:5
**matters** [12] - 1817:15, 1826:7, 1832:13, 1832:16, 1837:9, 1856:8, 1904:25, 1905:9, 1907:4, 1907:5, 1907:6, 1907:19
**maximum** [1] - 1824:20
**McCullough** [2] - 1801:17, 1803:16
**MD** [1] - 1801:23
**mean** [24] - 1826:10, 1840:10, 1843:13, 1844:3, 1850:13, 1853:25, 1854:19, 1860:25, 1865:12, 1869:22, 1871:14, 1872:6, 1874:14, 1877:7, 1882:13, 1890:8, 1903:5, 1905:13, 1917:19, 1925:9, 1926:4, 1940:17, 1950:3, 1957:2
**meaning** [2] - 1833:11, 1921:17
**means** [2] - 1871:15, 1890:9
**mechanism** [1] - 1834:5
**media** [36] - 1814:22, 1823:12, 1838:17, 1838:21, 1839:11, 1847:8, 1847:11, 1847:12, 1855:6, 1855:15, 1857:5, 1857:8, 1863:11, 1865:2, 1866:12, 1869:6, 1870:15, 1870:25, 1879:9, 1881:6, 1882:21, 1886:17, 1887:9, 1890:24, 1891:7, 1916:18, 1916:25, 1919:1, 1919:3, 1919:5, 1921:8, 1921:14, 1930:2, 1930:16, 1931:5, 1953:22
**Media** [1] - 1920:17
**medical** [1] - 1810:19
**meet** [3] - 1861:17, 1861:23, 1904:18
**meeting** [64] - 1839:1, 1839:4,

1839:24, 1839:25, 1840:2, 1840:3, 1842:20, 1843:22, 1844:25, 1845:2, 1846:14, 1846:17, 1846:22, 1846:24, 1846:25, 1847:5, 1847:10, 1847:11, 1848:1, 1848:11, 1848:14, 1848:16, 1848:19, 1848:21, 1848:22, 1848:24, 1848:25, 1849:1, 1849:4, 1849:8, 1849:11, 1849:12, 1849:17, 1850:17, 1854:2, 1854:10, 1855:1, 1855:4, 1855:5, 1855:6, 1855:7, 1855:12, 1855:17, 1855:25, 1856:3, 1856:4, 1856:15, 1856:25, 1857:1, 1857:2, 1857:13, 1860:4, 1860:15, 1860:18, 1862:21, 1862:24, 1863:8, 1863:11, 1885:6, 1929:8
**meetings** [5] - 1842:17, 1842:24, 1861:14, 1861:22, 1941:7
**member** [1] - 1898:25
**members** [4] - 1868:21, 1881:21, 1889:2, 1960:3
**memo** [2] - 1934:8, 1945:19
**memorandum** [1] - 1936:10
**mention** [3] - 1839:23, 1840:2, 1862:14
**mentioned** [9] - 1817:16, 1836:8, 1840:4, 1845:19, 1896:9, 1917:8, 1918:15, 1932:7, 1932:25
**mentions** [1] - 1943:20
**Mercury** [12] - 1835:4, 1863:22, 1866:21, 1866:22, 1867:3, 1870:21, 1873:4, 1899:10, 1900:2, 1900:4, 1917:23
**message** [3] - 1850:4, 1926:7, 1951:3
**messages** [1] - 1951:4
**messaging** [2] - 1930:13, 1954:19
**met** [5] - 1825:22, 1826:10, 1837:7, 1839:5, 1885:17
**method** [1] - 1830:25
**methodical** [1] - 1836:21
**metrics** [1] - 1885:17
**middle** [1] - 1858:7
**midnight** [1] - 1878:14
**might** [18] - 1830:15, 1838:22, 1839:15, 1855:9, 1856:19, 1865:18, 1872:5, 1882:2, 1882:10, 1927:23, 1939:14, 1939:24, 1946:10, 1953:12, 1955:3, 1955:23, 1956:20
**military** [1] - 1812:23
**million** [3] - 1896:22, 1908:10, 1909:19
**mind** [3] - 1863:7, 1903:14,

1950:22
**mine** [2] - 1838:11, 1945:23
**minister** [5] - 1816:2, 1816:4, 1832:4, 1926:3, 1957:5
**Ministry** [16] - 1851:13, 1862:6, 1862:8, 1882:11, 1886:14, 1888:13, 1889:17, 1889:20, 1915:1, 1915:12, 1915:13, 1916:3, 1916:9, 1916:10, 1955:3, 1955:24
**minor** [1] - 1936:3
**minutes** [4] - 1813:7, 1883:20, 1883:23, 1892:18
**mischaracterizes** [1] - 1923:6
**mischaracterizing** [1] - 1922:14
**misspeak** [1] - 1922:2
**misspelling** [1] - 1878:9
**misstates** [2] - 1949:18, 1951:22
**mistakes** [1] - 1908:24
**Modern** [3] - 1835:14, 1867:14, 1898:13
**MOJ** [2] - 1862:2, 1890:17
**Molly** [2] - 1801:13, 1803:16
**molly.gaston@usdoj.gov** [1] - 1801:16
**momentous** [1] - 1819:12
**monetary** [1] - 1904:9
**money** [11] - 1895:18, 1895:19, 1896:11, 1896:12, 1904:6, 1910:2, 1910:13, 1910:16, 1910:23, 1911:10, 1915:8
**monitor** [1] - 1814:21
**Montenegro** [1] - 1814:4
**month** [1] - 1943:24
**months** [3] - 1825:9, 1845:24, 1876:17
**Morgan** [2] - 1911:13, 1911:14
**morning** [16] - 1803:15, 1803:19, 1803:20, 1803:25, 1804:3, 1804:20, 1804:21, 1811:5, 1811:6, 1811:14, 1812:5, 1812:6, 1877:19, 1878:14, 1892:11, 1914:19
**Morning** [1] - 1801:5
**MORNING** [1] - 1801:8
**morning's** [1] - 1810:22
**morph** [1] - 1846:8
**Moscow** [1] - 1935:16
**most** [6] - 1818:21, 1826:4, 1826:12, 1834:24, 1841:2, 1956:24
**motion** [1] - 1828:14
**motivated** [2] - 1816:7, 1956:24
**motivation** [11] - 1956:17, 1957:7, 1957:9, 1957:12, 1957:20, 1957:22, 1958:1, 1958:8, 1958:11, 1958:13, 1958:14
**move** [11] - 1815:20, 1819:17,

1821:5, 1828:15, 1829:13,
1842:6, 1844:17, 1845:23,
1851:9, 1854:12, 1868:5
  **movements** [1] - 1949:24
  **moving** [4] - 1815:17, 1816:8,
1840:21, 1943:8
  **MR** [119] - 1803:15, 1804:14,
1810:23, 1811:21, 1812:2,
1812:4, 1819:8, 1819:10,
1820:8, 1820:10, 1820:20,
1821:3, 1821:8, 1821:12,
1822:9, 1825:4, 1825:6, 1826:8,
1826:9, 1829:10, 1830:3,
1830:4, 1830:18, 1830:24,
1831:2, 1831:3, 1831:15,
1833:16, 1834:20, 1834:22,
1837:3, 1837:4, 1837:20,
1839:8, 1842:2, 1842:8,
1842:23, 1843:17, 1843:19,
1843:25, 1844:20, 1845:14,
1847:9, 1847:18, 1847:20,
1849:18, 1849:20, 1849:21,
1854:7, 1854:14, 1854:16,
1855:24, 1857:3, 1860:11,
1860:13, 1862:12, 1862:13,
1865:24, 1866:9, 1866:10,
1867:7, 1867:9, 1868:3, 1868:4,
1868:15, 1868:17, 1871:7,
1871:20, 1872:2, 1873:1,
1873:14, 1873:18, 1873:24,
1874:4, 1874:6, 1875:13,
1879:6, 1879:7, 1883:20,
1884:7, 1884:9, 1888:10,
1888:11, 1891:13, 1891:16,
1891:21, 1892:6, 1892:19,
1899:19, 1900:11, 1900:14,
1900:18, 1901:2, 1901:12,
1901:17, 1902:1, 1902:17,
1902:24, 1906:22, 1909:4,
1914:15, 1921:9, 1921:24,
1922:11, 1922:14, 1923:5,
1927:12, 1932:9, 1932:14,
1933:3, 1936:23, 1942:6,
1947:2, 1949:17, 1951:21,
1956:4, 1959:7, 1959:15,
1959:20
  **MS** [172] - 1803:20, 1803:24,
1804:15, 1818:2, 1818:17,
1818:20, 1819:9, 1819:11,
1820:9, 1821:2, 1821:9,
1821:20, 1829:5, 1829:20,
1831:8, 1833:3, 1838:24,
1841:16, 1842:6, 1842:14,
1842:19, 1843:12, 1843:18,
1844:3, 1844:12, 1844:21,
1849:6, 1852:3, 1852:9,
1852:13, 1852:22, 1853:10,
1853:13, 1853:19, 1854:4,
1855:18, 1865:19, 1866:6,
1871:2, 1871:24, 1872:16,
1873:11, 1874:1, 1874:5,

1874:8, 1874:13, 1874:18,
1875:2, 1875:6, 1875:11,
1891:9, 1891:25, 1893:8,
1893:11, 1893:13, 1893:16,
1893:18, 1893:24, 1894:1,
1896:5, 1896:8, 1897:6, 1897:8,
1897:24, 1898:1, 1898:9,
1898:11, 1899:23, 1900:1,
1900:22, 1901:3, 1901:7,
1901:10, 1901:15, 1901:24,
1902:5, 1902:15, 1902:20,
1903:1, 1903:7, 1906:25,
1907:7, 1907:10, 1907:11,
1909:5, 1912:21, 1912:23,
1913:1, 1913:4, 1913:5,
1914:17, 1916:22, 1916:24,
1919:9, 1919:11, 1920:16,
1920:18, 1921:12, 1922:2,
1922:6, 1922:8, 1922:10,
1922:13, 1922:16, 1922:18,
1922:20, 1923:9, 1923:11,
1923:14, 1924:10, 1924:12,
1924:23, 1925:1, 1926:23,
1926:24, 1927:15, 1927:16,
1927:19, 1927:21, 1927:22,
1928:2, 1928:4, 1928:18,
1928:21, 1929:22, 1929:23,
1931:8, 1931:12, 1932:24,
1933:8, 1933:15, 1933:24,
1934:1, 1934:11, 1934:13,
1937:1, 1937:7, 1937:10,
1937:13, 1937:17, 1937:20,
1937:21, 1937:23, 1937:24,
1938:24, 1939:1, 1941:17,
1941:19, 1942:11, 1944:13,
1945:22, 1945:25, 1947:5,
1949:9, 1949:19, 1949:21,
1950:8, 1951:6, 1951:12,
1952:2, 1952:5, 1952:8, 1952:9,
1955:7, 1955:9, 1956:9,
1956:14, 1956:16, 1957:17,
1959:11, 1959:22, 1959:25
  **Mueller's** [1] - 1824:17
  **multiple** [10] - 1826:7, 1846:2,
1846:4, 1846:10, 1857:11,
1868:8, 1869:23, 1923:13,
1949:24, 1955:25
  **Murphy** [2] - 1801:20, 1803:21
  **Myers** [6] - 1920:22, 1921:22,
1922:7, 1922:22, 1923:18,
1951:14

# N

  **nail** [1] - 1850:16
  **name** [21] - 1812:7, 1813:8,
1816:19, 1831:16, 1832:20,
1839:21, 1839:22, 1845:16,
1865:21, 1866:2, 1866:12,
1866:17, 1867:18, 1886:7,
1920:22, 1922:25, 1924:18,

1924:20, 1939:20, 1939:25,
1951:24
  **named** [2] - 1839:14, 1898:19
  **names** [6] - 1803:8, 1835:20,
1916:21, 1918:22, 1921:15,
1923:1
  **National** [1] - 1813:1
  **nature** [6] - 1828:17, 1833:8,
1833:10, 1833:12, 1838:23,
1854:1
  **nearly** [1] - 1855:22
  **necessarily** [6] - 1840:17,
1872:6, 1873:13, 1890:11,
1922:24, 1933:12
  **necessary** [1] - 1927:9
  **need** [12] - 1858:18, 1858:21,
1859:16, 1862:19, 1902:7,
1916:25, 1917:3, 1918:12,
1935:9, 1936:13, 1943:9,
1952:19
  **needed** [11] - 1815:5, 1816:10,
1817:25, 1822:16, 1857:10,
1860:4, 1860:5, 1881:19,
1929:2, 1943:21, 1957:1
  **needs** [3] - 1865:10, 1885:5,
1902:22
  **nefarious** [1] - 1844:15
  **negative** [1] - 1811:16
  **neutral** [3] - 1841:1, 1841:7,
1872:8
  **neutrally** [1] - 1891:3
  **never** [8] - 1846:13, 1886:7,
1903:14, 1908:21, 1912:17,
1919:5, 1920:1, 1954:11
  **nevertheless** [3] - 1918:17,
1926:19, 1948:1
  **new** [2] - 1858:12, 1919:24
  **New** [30] - 1839:5, 1839:15,
1842:1, 1842:3, 1846:15,
1846:23, 1871:9, 1872:8,
1877:25, 1878:8, 1878:13,
1879:12, 1883:3, 1884:16,
1886:18, 1887:19, 1888:1,
1888:12, 1888:16, 1889:15,
1890:4, 1890:6, 1890:7,
1890:25, 1891:8, 1891:23,
1920:20, 1921:21, 1923:17,
1951:14
  **news** [1] - 1953:11
  **next** [39] - 1811:20, 1813:24,
1829:12, 1830:2, 1845:13,
1858:18, 1858:23, 1859:2,
1859:11, 1859:13, 1859:15,
1859:18, 1860:10, 1861:2,
1861:7, 1866:8, 1871:6,
1873:19, 1875:10, 1878:3,
1891:12, 1913:2, 1913:16,
1924:23, 1935:4, 1939:7,
1940:8, 1940:14, 1941:10,
1941:14, 1941:23, 1943:8,

1944:12, 1944:22, 1950:7, 1951:8, 1952:6, 1954:25, 1955:6
**night** [1] - 1848:23
**nightclubs** [2] - 1947:18, 1947:19
**noise** [1] - 1925:15
**nondescriptive** [1] - 1874:15
**none** [3] - 1879:20, 1935:21, 1949:10
**nonprofit** [2] - 1899:6, 1899:13
**normal** [1] - 1844:9
**note** [5] - 1804:2, 1811:5, 1861:13, 1884:5, 1893:7
**notebooks** [1] - 1892:15
**notes** [10] - 1855:25, 1856:1, 1856:2, 1856:15, 1856:22, 1857:1, 1857:18, 1862:16, 1862:20, 1961:7
**nothing** [2] - 1811:15, 1874:16
**notice** [1] - 1811:13
**notified** [2] - 1868:7, 1868:8
**notify** [1] - 1868:25
**notifying** [1] - 1875:22
**November** [1] - 1868:10
**Number** [9] - 1803:11, 1849:23, 1849:25, 1850:2, 1850:7, 1864:22, 1892:22, 1934:12, 1953:22
**number** [30] - 1814:4, 1817:7, 1817:21, 1822:2, 1822:11, 1822:24, 1823:21, 1833:13, 1847:6, 1848:13, 1850:16, 1851:12, 1855:8, 1855:22, 1858:12, 1860:17, 1863:5, 1879:18, 1895:13, 1895:15, 1905:5, 1908:5, 1908:6, 1908:11, 1908:18, 1909:20, 1917:19, 1934:14, 1941:11, 1953:5
**numbered** [1] - 1945:23
**NW** [5] - 1801:14, 1801:18, 1802:2, 1802:8, 1961:14

## O

**o'clock** [1] - 1960:12
**oath** [1] - 1893:6
**Obama** [4] - 1878:19, 1878:25, 1879:3, 1879:4
**object** [4] - 1872:23, 1921:24, 1922:11, 1933:21
**objected** [6] - 1872:21, 1873:20, 1874:9, 1874:10, 1875:9
**objecting** [1] - 1933:14
**objection** [38] - 1818:2, 1818:16, 1821:20, 1829:5, 1829:20, 1831:8, 1833:3, 1838:24, 1841:16, 1842:6, 1844:18, 1849:6, 1852:3,

1855:18, 1865:19, 1866:6, 1871:2, 1871:24, 1872:16, 1874:2, 1891:9, 1891:17, 1891:25, 1899:19, 1906:22, 1909:4, 1914:15, 1921:9, 1923:5, 1927:12, 1932:9, 1936:23, 1942:6, 1947:2, 1949:17, 1951:21, 1956:4
**objectionable** [2] - 1820:23, 1841:18
**objections** [3] - 1844:15, 1932:16, 1933:11
**obligation** [1] - 1904:11
**obligations** [1] - 1895:9
**obviously** [5] - 1817:8, 1840:19, 1874:14, 1881:11, 1943:17
**occasions** [1] - 1908:7
**occur** [1] - 1879:13
**occurred** [5] - 1879:20, 1895:25, 1926:6, 1949:14, 1949:22
**odd** [1] - 1955:16
**OF** [4] - 1801:1, 1801:8, 1801:14, 1961:2
**Offense** [5] - 1897:10, 1897:23, 1901:20, 1901:21, 1902:9
**offenses** [1] - 1894:24
**offer** [1] - 1948:5
**offering** [2] - 1830:13, 1874:3
**office** [4] - 1824:18, 1828:18, 1929:10, 1948:12
**Office** [4] - 1801:13, 1824:17, 1824:24, 1894:21
**OFFICIAL** [1] - 1961:2
**official** [1] - 1915:3
**Official** [2] - 1802:7, 1961:13
**old** [2] - 1812:10, 1812:11
**omit** [2] - 1908:16, 1909:20
**omitted** [4] - 1908:9, 1909:15, 1909:19, 1909:25
**on-recorder** [1] - 1878:7
**on-the-record** [2] - 1871:22, 1888:15
**once** [1] - 1870:8
**one** [70] - 1804:24, 1811:15, 1811:18, 1813:20, 1816:2, 1817:7, 1822:1, 1822:12, 1822:18, 1823:2, 1826:5, 1826:21, 1826:23, 1828:9, 1832:12, 1834:15, 1838:10, 1840:6, 1841:11, 1841:23, 1843:4, 1843:14, 1845:25, 1848:2, 1854:9, 1854:25, 1858:15, 1858:23, 1859:4, 1860:5, 1860:7, 1861:1, 1861:22, 1866:21, 1872:15, 1877:4, 1877:11, 1878:23, 1881:8, 1881:11, 1887:13, 1889:1, 1889:23, 1889:25,

1890:3, 1893:8, 1894:18, 1901:13, 1904:5, 1904:8, 1904:25, 1912:15, 1914:7, 1918:2, 1918:3, 1918:16, 1929:24, 1932:14, 1939:7, 1942:18, 1948:10, 1950:17, 1951:4, 1954:3, 1954:9, 1955:10, 1957:24, 1958:19, 1959:11
**One** [4] - 1869:19, 1869:22, 1869:23, 1869:24
**ones** [1] - 1838:2
**ongoing** [1] - 1817:7
**online** [2] - 1861:2, 1861:6
**open** [7] - 1820:24, 1821:11, 1844:22, 1854:6, 1875:12, 1902:25, 1933:25
**Open** [1] - 1810:16
**opening** [1] - 1932:17
**opine** [1] - 1873:23
**opinion** [1] - 1872:22
**opinions** [3] - 1818:4, 1852:15, 1875:18
**opponent** [1] - 1958:18
**opportunities** [2] - 1838:17, 1948:10
**opportunity** [3] - 1861:24, 1948:10, 1948:11
**oppose** [2] - 1828:14, 1828:18
**opposed** [6] - 1819:19, 1821:6, 1844:10, 1872:12, 1873:5, 1875:15
**Opposition** [1] - 1859:13
**order** [5] - 1831:14, 1834:4, 1847:5, 1921:18, 1929:3
**organization** [3] - 1835:14, 1899:6, 1914:4
**organized** [2] - 1833:14, 1919:14
**oriented** [3] - 1817:25, 1822:17, 1857:9
**original** [2] - 1836:2, 1934:8
**originally** [1] - 1834:14
**out-of-court** [1] - 1819:1
**outlet** [1] - 1865:9
**outline** [1] - 1948:20
**outlined** [2] - 1862:23, 1863:14
**outlines** [1] - 1828:4
**outreach** [2] - 1920:5, 1943:10
**outside** [3] - 1822:5, 1880:13, 1958:25
**Overall** [1] - 1889:16
**overall** [21] - 1823:12, 1834:15, 1846:7, 1849:25, 1851:7, 1858:2, 1864:21, 1865:2, 1889:22, 1891:1, 1924:20
**overnight** [1] - 1811:11
**overruled** [4] - 1841:19, 1871:25, 1921:11
**overseas** [1] - 1813:25

overturned [1] - 1958:21
owe [1] - 1914:13
owed [3] - 1907:25, 1908:8, 1908:21
own [12] - 1819:22, 1822:13, 1831:21, 1841:4, 1874:22, 1889:9, 1895:18, 1905:17, 1906:12, 1907:18, 1907:19, 1911:23
owner [1] - 1903:13

**P**

p.m [3] - 1952:19, 1960:5
Page [1] - 1864:22
page [53] - 1824:2, 1825:5, 1826:19, 1827:18, 1828:2, 1828:11, 1828:16, 1848:5, 1854:14, 1854:15, 1856:21, 1858:7, 1860:10, 1870:4, 1877:15, 1897:24, 1897:25, 1920:9, 1920:14, 1924:22, 1924:24, 1926:22, 1926:23, 1928:1, 1928:2, 1928:18, 1930:16, 1931:7, 1934:10, 1935:4, 1935:23, 1938:24, 1939:7, 1940:14, 1941:10, 1941:14, 1941:23, 1942:12, 1944:25, 1945:17, 1945:19, 1945:20, 1945:23, 1951:6, 1951:8, 1951:9, 1951:10, 1954:25, 1955:1, 1955:6
pages [2] - 1953:2, 1953:4
paid [10] - 1833:21, 1833:23, 1834:7, 1896:17, 1896:18, 1911:24, 1914:11, 1916:11, 1916:12, 1955:16
Pakistan [1] - 1814:4
paper [1] - 1866:14
paragraph [6] - 1828:2, 1835:19, 1898:10, 1902:8, 1924:24, 1928:3
paralegal [1] - 1803:18
pardon [4] - 1896:14, 1899:2, 1912:12, 1944:19
part [41] - 1820:13, 1824:14, 1827:11, 1835:16, 1836:2, 1839:5, 1839:11, 1846:25, 1849:5, 1849:7, 1850:17, 1851:16, 1855:5, 1856:11, 1867:8, 1868:16, 1870:23, 1873:2, 1875:3, 1876:9, 1877:16, 1890:5, 1893:21, 1898:8, 1898:9, 1901:19, 1901:20, 1905:21, 1910:25, 1917:15, 1919:24, 1920:17, 1922:5, 1925:24, 1931:10, 1932:15, 1953:15, 1955:8, 1956:14
participate [1] - 1891:7

participated [3] - 1816:3, 1895:1, 1901:24
particular [6] - 1819:12, 1820:17, 1823:2, 1830:25, 1844:18
particularly [7] - 1820:23, 1822:7, 1822:16, 1822:18, 1836:14, 1896:16, 1918:25
parties [11] - 1804:1, 1833:13, 1850:9, 1850:10, 1852:1, 1852:14, 1852:18, 1877:2, 1897:19, 1898:16, 1947:18
partner [1] - 1948:14
parts [4] - 1814:17, 1814:21, 1823:4, 1949:7
Party [2] - 1915:17, 1915:18
party [4] - 1814:13, 1915:20, 1917:3, 1929:2
passed [1] - 1938:5
past [4] - 1822:19, 1832:5, 1883:18, 1908:25
Paul [3] - 1813:9, 1849:12, 1895:1
Paula [3] - 1802:1, 1803:21, 1893:14
pay [5] - 1834:5, 1904:12, 1907:24, 1907:25, 1910:23
payment [5] - 1830:20, 1831:14, 1831:17, 1834:5, 1834:9
PDF [9] - 1924:24, 1926:23, 1928:2, 1928:18, 1931:7, 1945:19, 1945:20, 1951:6, 1951:9
Penalties [1] - 1893:25
penalty [2] - 1824:20, 1824:23
pending [1] - 1823:21
Pennsylvania [1] - 1801:18
people [24] - 1816:1, 1819:23, 1822:24, 1823:1, 1830:10, 1836:22, 1838:7, 1848:17, 1850:5, 1852:6, 1853:2, 1853:8, 1853:17, 1853:22, 1863:5, 1916:20, 1917:11, 1917:16, 1918:7, 1926:5, 1942:13, 1953:8, 1953:12, 1955:24
perceived [1] - 1854:9
perception [1] - 1855:16
perhaps [1] - 1875:4
Pericles [1] - 1913:7
period [9] - 1813:18, 1814:8, 1814:15, 1871:17, 1895:25, 1913:18, 1913:23, 1914:18, 1943:23
persecution [1] - 1925:15
person [12] - 1841:14, 1842:25, 1844:9, 1845:6, 1846:18, 1860:24, 1862:5, 1867:2, 1906:20, 1917:6, 1917:8, 1928:8
person's [1] - 1820:6

personal [6] - 1805:2, 1810:18, 1818:3, 1845:8, 1848:15, 1872:24
personally [8] - 1819:19, 1822:20, 1838:16, 1882:1, 1884:4, 1903:8, 1903:9
perspective [2] - 1842:25, 1911:1
persuaded [1] - 1948:1
pertained [1] - 1864:14
Phase [3] - 1869:18, 1869:22, 1869:24
phase [1] - 1869:23
phases [1] - 1869:24
phone [1] - 1845:3
physical [1] - 1811:14
picked [2] - 1819:5, 1819:6
picks [1] - 1859:22
piece [6] - 1857:17, 1865:11, 1883:7, 1957:7, 1959:2
PJM [1] - 1930:18
pjunghans@zuckerman.com [1] - 1802:4
place [11] - 1830:23, 1838:24, 1846:22, 1846:23, 1847:10, 1848:16, 1878:15, 1878:16, 1883:7, 1929:9, 1929:10
placed [1] - 1878:13
placeholder [4] - 1927:6, 1940:1, 1950:22, 1951:3
placeholders [1] - 1923:1
Plaintiff [2] - 1801:4, 1801:12
Plan [1] - 1850:14
plan [49] - 1823:13, 1834:15, 1836:2, 1836:10, 1838:17, 1838:21, 1838:22, 1839:11, 1843:4, 1845:25, 1847:8, 1847:11, 1847:12, 1850:8, 1851:7, 1855:8, 1857:9, 1864:5, 1864:6, 1864:21, 1865:17, 1869:16, 1869:24, 1870:15, 1870:25, 1871:4, 1881:6, 1882:21, 1883:7, 1883:9, 1883:10, 1886:17, 1887:19, 1890:25, 1891:8, 1918:15, 1922:17, 1924:21, 1927:18, 1929:17, 1930:2, 1930:16, 1931:5, 1931:6, 1935:13, 1938:20, 1940:3, 1951:25
planned [2] - 1854:10, 1855:22
planning [2] - 1849:7, 1940:19
plans [8] - 1846:2, 1846:10, 1863:11, 1866:12, 1885:16, 1885:17, 1924:3, 1938:17
play [4] - 1816:21, 1870:14, 1870:24, 1871:4
played [1] - 1880:12
players [1] - 1850:25
playing [1] - 1900:23
plea [17] - 1824:6, 1824:11,

1824:14, 1826:13, 1829:8,
1893:19, 1897:9, 1897:15,
1903:16, 1903:25, 1904:15,
1905:8, 1906:6, 1908:23,
1910:25, 1914:9

**plead** [2] - 1824:11, 1824:16

**pleading** [1] - 1897:14

**pled** [8] - 1825:8, 1894:2,
1894:15, 1894:18, 1900:14,
1901:19, 1907:12, 1908:20

**Podesta** [8] - 1835:4, 1863:22,
1870:21, 1873:4, 1899:9,
1900:2, 1900:5, 1917:23

**point** [40] - 1818:24, 1820:24,
1823:12, 1838:10, 1838:13,
1849:25, 1850:3, 1852:2,
1853:2, 1857:11, 1860:15,
1862:5, 1865:13, 1867:2,
1868:10, 1869:6, 1869:9,
1869:11, 1871:10, 1881:18,
1885:10, 1889:17, 1915:8,
1916:10, 1921:14, 1929:5,
1931:9, 1931:11, 1931:20,
1933:21, 1934:3, 1936:14,
1937:4, 1938:1, 1938:6, 1939:8,
1942:2, 1952:23, 1954:16,
1956:18

**Point** [5] - 1849:23, 1850:2,
1850:7, 1850:10, 1851:9

**pointed** [2] - 1885:6, 1907:14

**points** [1] - 1850:21

**Poland** [2] - 1880:3, 1882:8

**policy** [2] - 1812:22, 1817:14

**political** [24] - 1813:22,
1813:25, 1814:14, 1815:8,
1816:5, 1859:12, 1915:20,
1925:14, 1956:17, 1956:23,
1957:4, 1957:6, 1957:9,
1957:12, 1957:20, 1957:22,
1958:1, 1958:8, 1958:11,
1958:13, 1958:14, 1958:17,
1958:20, 1959:1

**political'** [1] - 1857:24

**politically** [3] - 1816:7, 1816:11,
1956:24

**politician** [1] - 1880:19

**politicians** [10] - 1855:9,
1859:13, 1861:12, 1863:4,
1879:19, 1880:13, 1881:12,
1881:19, 1887:8

**portion** [2] - 1810:17, 1927:25

**portions** [1] - 1850:19

**position** [9] - 1885:18, 1928:15,
1935:25, 1936:6, 1936:11,
1936:14, 1936:21, 1957:19,
1958:10

**positive** [6] - 1840:17, 1841:1,
1872:7, 1890:11, 1890:15,
1891:5

**possibility** [3] - 1950:18,

1950:19, 1954:17

**possible** [5] - 1830:19, 1856:6,
1857:13, 1874:15, 1956:6

**possibly** [4] - 1861:17, 1865:10,
1912:3, 1959:11

**Post** [4] - 1885:8, 1886:1,
1886:4, 1935:5

**potential** [4] - 1838:21,
1860:21, 1886:3, 1929:4

**potentially** [8] - 1828:10,
1835:20, 1863:19, 1864:11,
1865:14, 1944:2, 1948:10,
1955:23

**PR** [30] - 1823:6, 1832:13,
1840:20, 1840:24, 1845:25,
1847:2, 1849:14, 1850:8,
1850:14, 1850:19, 1855:17,
1856:8, 1857:9, 1859:12,
1859:17, 1860:14, 1860:16,
1860:23, 1861:5, 1861:9,
1864:15, 1868:21, 1869:24,
1870:25, 1871:4, 1876:19,
1889:2, 1918:18, 1920:11,
1924:20

**practice** [1] - 1841:3

**Pratt** [1] - 1801:22

**pre** [6] - 1854:24, 1871:9,
1877:20, 1879:18, 1881:11,
1887:13

**pre-brief** [3] - 1871:9, 1879:18,
1881:11

**pre-briefing** [3] - 1854:24,
1877:20, 1887:13

**preamble** [1] - 1858:1

**precaution** [1] - 1865:17

**precise** [1] - 1828:17

**precisely** [2] - 1821:1, 1821:2

**precluded** [1] - 1874:3

**predicates** [1] - 1933:18

**predicted** [1] - 1937:15

**preface** [1] - 1933:10

**prefer** [4] - 1804:6, 1805:8,
1805:10, 1919:13

**premise** [1] - 1957:12

**prepared** [8] - 1850:1, 1850:3,
1851:16, 1851:17, 1863:12,
1867:13, 1876:25, 1952:19

**preparer** [1] - 1910:7

**present** [5] - 1803:24, 1811:4,
1811:6, 1893:3, 1936:22

**presented** [2] - 1932:19,
1958:20

**president** [6] - 1815:16,
1816:18, 1816:24, 1880:3,
1880:13, 1930:25

**President** [3] - 1878:25, 1879:3,
1913:17

**presidents** [1] - 1816:1

**pretty** [4] - 1820:18, 1834:1,
1875:5, 1905:5

**previous** [6] - 1816:11, 1827:8,
1828:11, 1919:23, 1926:3,
1945:22

**previously** [4] - 1845:17,
1863:14, 1903:17, 1945:4

**primarily** [11] - 1813:19, 1814:3,
1814:13, 1816:15, 1822:24,
1823:1, 1823:10, 1855:15,
1879:19, 1882:25, 1930:5

**primary** [4] - 1815:9, 1815:16,
1822:12, 1823:11

**prime** [5] - 1816:2, 1816:4,
1832:3, 1926:3, 1957:4

**principal** [3] - 1815:2, 1866:22,
1898:4

**principle** [1] - 1818:24

**print** [2] - 1885:24, 1954:9

**private** [2] - 1804:6, 1813:20

**privately** [1] - 1953:23

**pro** [1] - 1873:6

**pro-Tymoshenko** [1] - 1873:6

**proactive** [1] - 1933:1

**proactively** [3] - 1931:23,
1932:8, 1934:5

**probation** [1] - 1828:15

**problem** [3] - 1818:20, 1833:9,
1833:10

**procedural** [1] - 1936:3

**procedure** [1] - 1858:14

**proceed** [6] - 1812:1, 1882:3,
1883:7, 1884:6, 1892:23,
1893:10

**proceedings** [2] - 1810:22,
1961:8

**proceeds** [1] - 1916:11

**process** [12] - 1823:9, 1829:19,
1830:5, 1830:6, 1831:6,
1832:23, 1851:23, 1858:2,
1870:3, 1896:15, 1904:21,
1916:17

**processes** [1] - 1861:21

**procurement** [1] - 1851:23

**produced** [2] - 1845:25, 1846:2

**progress** [5] - 1882:21, 1883:5,
1886:17, 1889:3, 1890:21

**project** [20] - 1814:9, 1817:10,
1817:22, 1822:4, 1832:17,
1832:25, 1836:24, 1837:5,
1838:20, 1854:17, 1864:13,
1864:24, 1865:1, 1865:13,
1869:24, 1871:12, 1914:20,
1919:22, 1925:7

**Project** [3] - 1924:14, 1924:20,
1924:25

**projects** [2] - 1813:25, 1814:3

**prominent** [1] - 1929:3

**promise** [2] - 1827:16, 1906:7

**promised** [2] - 1828:25,
1891:22

**promises** [1] - 1826:15

**prompting** [1] - 1933:11
**properly** [3] - 1844:8, 1910:4, 1925:23
**proponent** [1] - 1880:5
**proponents** [1] - 1816:17
**proposed** [3] - 1919:22, 1955:2, 1958:6
**prosecute** [1] - 1827:5
**prosecuted** [2] - 1906:7, 1925:13
**prosecuting** [2] - 1926:2
**prosecution** [9] - 1831:23, 1857:24, 1890:2, 1956:23, 1957:4, 1957:20, 1958:15, 1958:21, 1959:1
**prosecutions** [1] - 1925:3
**prosecutor** [2] - 1940:18, 1940:23
**provide** [8] - 1825:12, 1825:19, 1835:20, 1888:15, 1902:3, 1905:9, 1919:3, 1941:13
**provided** [5] - 1828:13, 1919:1, 1919:5, 1945:10, 1955:16
**provides** [1] - 1828:8
**provision** [1] - 1957:1
**Pshonka** [2] - 1940:19, 1940:23
**public** [15] - 1801:5, 1805:6, 1812:22, 1817:19, 1832:10, 1834:11, 1836:1, 1836:8, 1836:12, 1836:18, 1836:22, 1839:6, 1852:19, 1873:5, 1943:11
**publication** [2] - 1928:6, 1934:16
**publications** [5] - 1836:20, 1870:7, 1921:19, 1923:1, 1923:2
**publicly** [2] - 1871:16, 1877:21
**publish** [1] - 1888:12
**published** [1] - 1889:15
**pull** [2] - 1815:13, 1893:24
**pulling** [1] - 1881:19
**purporting** [1] - 1933:13
**purports** [1] - 1939:11
**purpose** [16] - 1821:14, 1821:19, 1836:17, 1846:24, 1846:25, 1849:3, 1849:5, 1849:10, 1849:12, 1850:17, 1853:23, 1900:15, 1900:21, 1905:21, 1925:6
**purposes** [2] - 1817:18, 1859:12
**pursuant** [2] - 1825:17, 1893:20
**put** [26] - 1803:8, 1816:2, 1824:1, 1835:20, 1843:6, 1843:7, 1854:22, 1861:2, 1862:19, 1865:20, 1893:16, 1910:7, 1916:2, 1917:16, 1921:17, 1922:21, 1922:25, 1928:12, 1931:5, 1932:20, 1934:8, 1939:25, 1941:15,

1950:25, 1954:5, 1956:5
**putting** [3] - 1871:16, 1882:24, 1955:2

## Q

**Q&A** [3] - 1835:22, 1851:18, 1956:6
**Q&As** [2] - 1858:18, 1858:21
**questioning** [1] - 1900:21
**questions** [21] - 1825:24, 1841:17, 1843:8, 1844:24, 1851:18, 1851:19, 1892:7, 1893:15, 1896:9, 1901:14, 1902:3, 1907:3, 1933:12, 1933:19, 1941:4, 1955:10, 1955:23, 1955:25, 1959:12, 1959:14, 1959:19
**quibble** [1] - 1907:4
**quickly** [1] - 1833:19
**quite** [5] - 1833:20, 1859:2, 1906:10, 1939:23, 1950:23
**quotes** [2] - 1890:2, 1890:3

## R

**raise** [1] - 1884:4
**raised** [2] - 1849:14, 1954:3
**ran** [3] - 1815:15, 1816:23
**range** [4] - 1825:2, 1825:7, 1825:9, 1896:10
**ranking** [1] - 1880:18
**rather** [1] - 1913:2
**Re** [1] - 1884:19
**reach** [5] - 1839:17, 1863:3, 1863:6, 1864:9, 1870:8
**reaching** [1] - 1836:22
**reaction** [1] - 1851:10
**read** [11] - 1852:23, 1852:25, 1858:8, 1877:23, 1881:22, 1889:9, 1902:7, 1953:8, 1953:12, 1953:13
**reading** [5] - 1828:16, 1858:23, 1878:17, 1901:25, 1955:15
**reads** [5] - 1850:22, 1857:4, 1865:8, 1876:12, 1884:19
**ready** [8] - 1810:21, 1810:25, 1881:17, 1890:16, 1949:4, 1949:25, 1959:22
**really** [3] - 1883:22, 1886:7, 1900:20
**reason** [6] - 1811:17, 1855:5, 1866:2, 1873:2, 1948:15, 1953:6
**reasoning** [1] - 1836:5
**reasons** [5] - 1819:5, 1822:12, 1863:14, 1873:23, 1873:25
**recalling** [1] - 1892:21
**receive** [5] - 1813:3, 1824:21, 1847:10, 1847:11, 1949:7
**received** [9] - 1804:2, 1804:22,

1812:20, 1812:21, 1830:19, 1831:13, 1843:3, 1843:9, 1955:15
**receiving** [1] - 1831:7
**recently** [1] - 1937:19
**recess** [1] - 1892:20
**recipients** [1] - 1848:2
**recirculate** [1] - 1930:8
**recitation** [1] - 1819:13
**recite** [1] - 1934:9
**recognize** [7] - 1824:3, 1837:11, 1848:7, 1867:10, 1868:18, 1869:13, 1888:23
**recollection** [7] - 1839:10, 1839:13, 1839:14, 1875:25, 1886:5, 1944:1, 1958:12
**recommendation** [1] - 1954:6
**recommended** [1] - 1954:8
**record** [18] - 1803:9, 1803:14, 1804:8, 1805:6, 1812:8, 1837:18, 1852:20, 1871:22, 1888:15, 1905:17, 1921:20, 1922:4, 1922:6, 1922:10, 1922:16, 1923:6, 1925:19, 1959:4
**recorder** [1] - 1878:7
**recounting** [1] - 1852:15
**red** [1] - 1837:17
**reduce** [2] - 1828:10, 1855:14
**reduced** [2] - 1863:5, 1923:20
**refer** [2] - 1925:2, 1941:2
**reference** [6] - 1820:12, 1832:2, 1887:4, 1890:10, 1936:8, 1940:18
**referenced** [1] - 1824:11
**referencing** [1] - 1944:20
**referred** [1] - 1920:4
**referring** [4] - 1837:19, 1889:24, 1905:25, 1920:10
**refers** [1] - 1862:3
**refine** [5] - 1850:16, 1857:10, 1860:16, 1876:17, 1930:12
**refined** [1] - 1846:6
**refining** [1] - 1938:16
**reflect** [1] - 1837:18
**reflected** [1] - 1923:24
**reflects** [1] - 1877:19
**reform** [1] - 1816:10
**reforms** [1] - 1858:15
**refused** [1] - 1946:25
**regarding** [2] - 1822:20, 1832:10
**regards** [6] - 1823:12, 1827:9, 1827:16, 1829:16, 1832:22, 1847:25, 1869:18, 1883:3
**regime** [1] - 1874:25
**Regions** [2] - 1915:17, 1915:18
**register** [1] - 1901:11
**registering** [2] - 1898:4, 1898:5
**registration** [5] - 1827:9,

1901:13, 1902:13, 1902:19, 1931:24
**Reid** [1] - 1878:19
**reimbursed** [1] - 1913:24
**rejiggering** [1] - 1811:14
**relate** [10] - 1849:23, 1850:10, 1850:23, 1851:4, 1851:11, 1851:20, 1862:2, 1864:7, 1865:12, 1887:3
**related** [21] - 1823:13, 1827:8, 1832:19, 1847:6, 1850:8, 1856:6, 1858:13, 1862:9, 1862:10, 1879:22, 1883:12, 1886:18, 1891:23, 1895:24, 1905:15, 1906:4, 1916:18, 1917:8, 1918:18, 1924:14, 1954:8
**relates** [6] - 1832:11, 1850:12, 1851:5, 1863:10, 1879:11, 1959:15
**relation** [7] - 1823:19, 1832:1, 1839:25, 1849:13, 1851:1, 1862:4, 1905:24
**relations** [20] - 1817:19, 1823:13, 1832:10, 1834:11, 1836:1, 1836:2, 1836:8, 1836:9, 1836:12, 1836:13, 1836:19, 1836:22, 1836:23, 1838:22, 1839:7, 1847:8, 1864:16, 1873:5, 1917:1
**relationship** [3] - 1839:17, 1839:24, 1900:5
**relationships** [2] - 1836:24, 1864:15
**relative** [1] - 1844:16, 1905:9
**relatively** [2] - 1815:4, 1817:15
**Release** [1] - 1935:6
**release** [30] - 1845:24, 1846:3, 1846:5, 1863:19, 1864:8, 1865:8, 1868:5, 1868:7, 1868:11, 1868:23, 1869:16, 1872:21, 1873:9, 1873:12, 1875:9, 1875:15, 1876:18, 1877:5, 1878:15, 1878:16, 1881:17, 1889:19, 1890:17, 1924:7, 1938:1, 1938:8, 1938:9, 1939:11, 1939:14, 1952:18
**released** [13] - 1840:23, 1863:16, 1872:25, 1875:24, 1877:21, 1878:14, 1886:13, 1888:13, 1889:17, 1938:4, 1938:7, 1955:4, 1956:1
**releases** [1] - 1868:9
**releasing** [2] - 1872:12, 1873:20
**relevance** [2] - 1899:20, 1900:11
**relevant** [2] - 1822:5, 1900:18
**relieved** [1] - 1959:23
**rely** [1] - 1869:6

**Remember** [1] - 1953:24
**remember** [5] - 1829:15, 1876:1, 1912:3, 1912:5
**remind** [2] - 1893:5, 1901:22
**repeat** [1] - 1947:4
**repeated** [1] - 1866:7
**repeats** [1] - 1944:25
**Report** [152] - 1817:12, 1822:6, 1823:5, 1823:7, 1823:13, 1829:18, 1831:22, 1832:11, 1834:12, 1834:14, 1836:15, 1840:22, 1841:7, 1843:13, 1843:14, 1845:21, 1846:4, 1846:5, 1846:6, 1846:12, 1846:13, 1847:6, 1847:7, 1849:15, 1850:6, 1850:15, 1850:17, 1850:19, 1851:1, 1851:14, 1854:24, 1856:7, 1857:4, 1859:10, 1859:16, 1859:20, 1860:4, 1860:6, 1860:8, 1860:16, 1860:19, 1861:2, 1861:10, 1863:16, 1864:8, 1864:10, 1865:3, 1865:4, 1865:6, 1867:1, 1867:4, 1867:15, 1868:5, 1868:7, 1868:23, 1869:1, 1870:8, 1871:10, 1872:5, 1872:12, 1873:10, 1873:12, 1873:20, 1874:24, 1875:9, 1875:23, 1877:21, 1877:25, 1880:11, 1881:18, 1885:5, 1885:8, 1886:13, 1888:13, 1889:5, 1889:19, 1889:25, 1890:9, 1890:17, 1914:20, 1916:17, 1916:18, 1918:9, 1918:14, 1924:7, 1924:21, 1925:7, 1926:11, 1926:15, 1926:25, 1927:4, 1927:9, 1927:10, 1928:22, 1928:24, 1930:11, 1931:13, 1934:16, 1935:5, 1936:5, 1936:7, 1936:11, 1936:16, 1936:17, 1936:19, 1936:22, 1937:3, 1938:2, 1938:4, 1938:7, 1938:8, 1938:9, 1943:10, 1946:1, 1946:6, 1946:7, 1946:11, 1946:18, 1946:21, 1946:25, 1947:6, 1948:2, 1948:17, 1948:21, 1949:2, 1949:4, 1949:6, 1949:13, 1949:23, 1949:25, 1950:12, 1950:16, 1950:17, 1950:20, 1950:23, 1951:2, 1952:18, 1952:24, 1952:25, 1953:12, 1955:4, 1955:15, 1956:17, 1957:12, 1957:19, 1957:21, 1957:24, 1958:2, 1958:7, 1958:10, 1958:12
**report** [25] - 1818:7, 1822:8, 1822:10, 1822:11, 1822:13, 1836:4, 1850:1, 1861:5, 1865:8,

1872:7, 1872:8, 1873:5, 1875:16, 1880:7, 1889:7, 1889:17, 1908:1, 1908:7, 1929:2, 1932:3, 1935:25, 1951:24, 1953:7, 1955:18, 1956:1
**reporter** [29] - 1839:10, 1839:15, 1839:19, 1840:8, 1840:15, 1840:16, 1840:17, 1841:13, 1841:20, 1841:23, 1841:25, 1843:1, 1843:16, 1865:9, 1869:9, 1869:20, 1869:25, 1870:10, 1871:9, 1871:16, 1871:17, 1872:6, 1872:10, 1887:13, 1890:13, 1951:13, 1954:6, 1954:7, 1954:11
**Reporter** [3] - 1802:7, 1802:7, 1961:13
**REPORTER** [1] - 1961:2
**reporters** [17] - 1841:2, 1841:5, 1854:21, 1855:9, 1861:12, 1870:1, 1870:6, 1921:18, 1943:10, 1943:19, 1943:21, 1943:22, 1945:2, 1945:4, 1945:7, 1951:9, 1951:13
**reporting** [2] - 1840:9, 1887:7
**reports** [3] - 1886:1, 1894:11, 1895:9
**represent** [2] - 1893:14, 1917:20
**representations** [1] - 1902:4
**representative** [2] - 1879:4, 1898:15
**represented** [1] - 1899:12
**representing** [2] - 1867:14, 1901:4
**reputable** [1] - 1817:24
**request** [5] - 1805:2, 1828:15, 1946:19, 1948:16
**requested** [6] - 1864:2, 1881:13, 1882:18, 1928:11, 1931:4, 1955:19
**requesting** [1] - 1856:14
**requests** [1] - 1861:21
**required** [6] - 1804:11, 1826:13, 1827:12, 1859:24, 1904:17, 1905:8
**research** [2] - 1811:10, 1960:7
**resolve** [1] - 1833:19
**resolved** [2] - 1816:17, 1833:17
**respect** [18] - 1816:6, 1821:24, 1826:5, 1826:6, 1844:15, 1849:14, 1850:19, 1851:6, 1851:13, 1851:21, 1851:25, 1862:7, 1865:2, 1883:4, 1906:12, 1907:12, 1907:19, 1916:6
**respond** [5] - 1851:19, 1856:16, 1882:5, 1882:9, 1887:17

**responding** [1] - 1948:24
**responds** [1] - 1945:3
**response** [6] - 1842:22, 1887:16, 1896:9, 1945:16, 1948:16, 1949:3
**responses** [1] - 1918:21
**responsibilities** [1] - 1832:10
**responsibility** [1] - 1866:25
**responsible** [4] - 1828:25, 1875:22, 1877:3, 1882:20
**rest** [1] - 1888:4
**restitution** [2] - 1904:12, 1904:14
**restrictions** [1] - 1931:24
**result** [3] - 1816:5, 1820:2, 1856:8
**resulted** [1] - 1838:7
**resume** [3] - 1892:13, 1892:18, 1960:5
**retaining** [1] - 1899:9
**return** [6] - 1894:24, 1906:18, 1907:16, 1910:3
**returns** [10] - 1827:9, 1894:8, 1894:9, 1895:7, 1895:25, 1906:16, 1907:22, 1907:23, 1910:6, 1914:8
**Revenue** [1] - 1896:21
**review** [8] - 1817:12, 1828:7, 1847:5, 1850:4, 1860:6, 1860:8, 1908:21, 1956:12
**reviewed** [2] - 1939:5, 1959:4
**revise** [1] - 1930:6
**revised** [3] - 1908:24, 1930:2, 1930:15
**RG** [1] - 1860:23
**RG-AVZ** [1] - 1860:23
**RICHARD** [1] - 1811:23
**Richard** [5] - 1802:14, 1803:3, 1803:5, 1811:22, 1812:9
**Richmond** [1] - 1812:14
**Rick** [3] - 1884:20, 1885:6, 1885:25
**right-hand** [1] - 1876:25
**rights** [1] - 1941:8
**rise** [2] - 1803:1, 1959:20
**risk** [2] - 1872:9, 1890:12
**RMR** [2] - 1802:7, 1961:13
**road** [1] - 1902:14
**roadblocks** [1] - 1815:19
**Robert** [1] - 1824:17
**Rohde** [1] - 1803:18
**role** [23] - 1814:24, 1816:21, 1817:5, 1822:20, 1822:23, 1823:9, 1850:14, 1851:5, 1870:14, 1870:16, 1870:18, 1870:23, 1870:24, 1871:3, 1871:8, 1871:9, 1880:4, 1880:12, 1880:15, 1891:22, 1899:1, 1899:3, 1913:16
  **roles** [3] - 1850:8, 1850:12,

1862:23
  **rollout** [22] - 1823:6, 1823:13, 1834:11, 1838:17, 1839:11, 1847:8, 1847:11, 1850:15, 1850:20, 1851:2, 1861:10, 1867:15, 1869:6, 1870:15, 1870:16, 1881:6, 1882:21, 1886:17, 1890:25, 1891:8, 1924:21, 1927:9
  **room** [1] - 1946:20
  **Room** [2] - 1802:8, 1961:14
  **roundtable** [1] - 1935:17
  **row** [2] - 1883:24, 1883:25
  **rule** [1] - 1821:1
  **ruled** [1] - 1821:21
  **rules** [2] - 1830:10, 1844:11
  **run** [4] - 1836:1, 1881:25, 1885:5, 1885:23
  **running** [1] - 1908:5
  **Russia** [1] - 1815:12

## S

  **SA** [6] - 1860:23, 1862:2, 1917:4, 1918:12, 1920:4, 1931:21
  **Sager** [1] - 1886:24
  **sager** [2] - 1887:11, 1887:12
  **SANCHEZ** [116] - 1803:15, 1804:14, 1810:23, 1811:21, 1812:2, 1812:4, 1819:8, 1819:10, 1820:8, 1820:10, 1820:20, 1821:3, 1821:8, 1821:12, 1822:9, 1825:4, 1825:6, 1826:8, 1826:9, 1829:10, 1830:3, 1830:4, 1830:18, 1830:24, 1831:2, 1831:3, 1831:15, 1833:16, 1834:20, 1834:22, 1837:3, 1837:4, 1837:20, 1839:8, 1842:2, 1842:8, 1842:23, 1843:17, 1843:19, 1843:25, 1844:20, 1845:14, 1847:9, 1847:18, 1847:20, 1849:18, 1849:20, 1849:21, 1854:7, 1854:14, 1854:16, 1855:24, 1857:3, 1860:11, 1860:13, 1862:12, 1862:13, 1865:24, 1866:9, 1866:10, 1867:7, 1867:9, 1868:3, 1868:4, 1868:15, 1868:17, 1871:7, 1871:20, 1872:2, 1873:1, 1873:14, 1873:18, 1873:24, 1874:4, 1874:6, 1875:13, 1879:6, 1879:7, 1883:20, 1884:7, 1884:9, 1888:10, 1888:11, 1891:13, 1891:16, 1891:21, 1892:6, 1892:19, 1899:19, 1900:11, 1900:14, 1900:18, 1901:2, 1901:12,

1901:17, 1902:1, 1902:17, 1902:24, 1906:22, 1909:4, 1914:15, 1921:9, 1921:24, 1922:11, 1922:14, 1923:5, 1927:12, 1932:9, 1932:14, 1933:3, 1936:23, 1942:6, 1947:2, 1949:17, 1951:21, 1956:4
  **Sanchez** [2] - 1801:12, 1883:16
  **Sanchez..........1812** [1] - 1802:15
  **sanchez@usdoj.gov** [1] - 1801:16
  **sanger** [1] - 1883:4
  **Sanger** [62] - 1839:22, 1840:4, 1840:6, 1840:8, 1840:14, 1840:16, 1841:25, 1842:3, 1842:15, 1843:5, 1845:6, 1845:17, 1845:19, 1845:20, 1854:21, 1855:14, 1862:14, 1862:18, 1862:19, 1863:4, 1865:15, 1866:11, 1869:11, 1870:11, 1871:10, 1872:5, 1872:9, 1873:16, 1877:20, 1877:25, 1878:13, 1879:11, 1883:3, 1883:6, 1883:13, 1884:15, 1884:23, 1886:6, 1888:3, 1890:13, 1921:5, 1923:24, 1929:7, 1932:2, 1932:7, 1932:25, 1934:20, 1934:25, 1943:15, 1943:18, 1943:20, 1943:24, 1944:1, 1944:2, 1944:16, 1951:17, 1951:20, 1951:24, 1954:2, 1954:4, 1954:15, 1954:17
  **Sanger's** [2] - 1866:2, 1867:18
  **Saunders** [5] - 1866:17, 1866:20, 1866:25, 1867:2, 1867:13
  **saw** [1] - 1949:23
  **scenes** [1] - 1834:9
  **schedule** [1] - 1861:14
  **scheme** [2] - 1897:25, 1898:5
  **Schoen** [1] - 1819:5
  **Schultz** [1] - 1878:18
  **scope** [1] - 1899:20, 1900:19
  **screen** [2] - 1824:2, 1834:18
  **scroll** [4] - 1896:5, 1898:9, 1940:2, 1956:14
  **Sea** [2] - 1831:18, 1913:6
  **sealed** [1] - 1810:18
  **search** [1] - 1840:11
  **seat** [1] - 1804:18
  **seated** [3] - 1811:1, 1837:15, 1893:4
  **seating** [1] - 1811:14
  **seats** [1] - 1811:17
  **SEC** [2] - 1911:3, 1911:5
  **second** [12] - 1839:4, 1839:24, 1840:3, 1857:20, 1861:16,

1870:4, 1886:23, 1918:11,
1931:9, 1931:11, 1933:22,
1959:2

**secondary** [1] - 1957:3
**Section** [2] - 1894:13, 1896:6
**section** [5] - 1857:6, 1857:7,
1860:16, 1893:25, 1935:5
**secured** [1] - 1936:1
**see** [27] - 1837:13, 1840:11,
1850:13, 1850:14, 1856:15,
1858:6, 1861:2, 1861:14,
1864:6, 1865:6, 1884:12,
1888:6, 1891:1, 1897:1, 1906:2,
1920:6, 1921:3, 1936:16,
1943:12, 1945:15, 1946:22,
1949:1, 1949:6, 1949:24,
1949:25, 1955:1, 1960:12
**seed** [1] - 1845:21
**seeded** [2] - 1843:2, 1885:19
**seeding** [9] - 1846:11, 1846:13,
1869:7, 1869:10, 1883:3,
1883:13, 1889:25, 1890:21,
1890:25
**seeing** [1] - 1957:8
**select** [2] - 1870:1, 1889:22
**selected** [8] - 1841:14, 1841:16,
1841:20, 1841:21, 1841:23,
1841:25, 1843:10, 1923:3
**selective** [2] - 1890:2, 1958:14
**send** [6] - 1829:21, 1864:17,
1902:1, 1942:14, 1942:23,
1942:25
**sending** [4] - 1887:20, 1889:1,
1930:1, 1954:22
**sense** [2] - 1883:21, 1938:15
**sent** [21] - 1804:24, 1831:11,
1847:24, 1854:13, 1864:3,
1864:18, 1869:18, 1876:4,
1877:8, 1887:22, 1889:8,
1916:20, 1938:19, 1940:16,
1941:3, 1942:12, 1942:13,
1942:16, 1945:4, 1954:18,
1956:11
**sentence** [13] - 1825:8,
1828:10, 1829:11, 1835:24,
1927:1, 1927:18, 1927:19,
1927:20, 1928:23, 1932:21,
1935:24, 1946:2, 1950:13
**sentencing** [2] - 1823:21,
1829:1
**separate** [3] - 1826:25, 1836:9,
1906:4
**separately** [1] - 1915:15
**separating** [1] - 1958:16
**September** [5] - 1839:5,
1846:21, 1861:7, 1919:4,
1952:11
**Serhiy** [2] - 1930:21, 1930:22
**series** [6] - 1815:2, 1835:9,
1850:4, 1858:15, 1863:23,

1917:12
**serious** [1] - 1921:13
**serve** [1] - 1879:21
**served** [4] - 1813:1, 1899:1,
1899:3, 1913:16
**service** [1] - 1804:23
**Service** [1] - 1896:21
**session** [1] - 1803:2
**set** [11] - 1813:20, 1836:10,
1846:25, 1847:3, 1853:24,
1861:23, 1868:22, 1904:14,
1926:19, 1939:11, 1955:2
**sets** [4] - 1846:7, 1897:13,
1897:23, 1941:24
**setting** [2] - 1820:15, 1836:21
**several** [2] - 1847:1, 1908:7
**share** [3] - 1918:24, 1942:7,
1942:10
**shared** [4] - 1884:20, 1884:21,
1939:17, 1942:5
**short** [1] - 1874:15
**shortened** [1] - 1931:6
**shorthand** [2] - 1856:20, 1859:9
**show** [5] - 1834:17, 1927:9,
1930:7, 1930:14, 1958:16
**showed** [2] - 1855:6, 1907:24
**side** [3] - 1876:23, 1876:25,
1934:23
**sides** [2] - 1805:13, 1846:4
**sign** [2] - 1911:12, 1940:6
**significant** [5] - 1815:19,
1834:2, 1875:1, 1880:15, 1886:6
**significantly** [2] - 1855:14,
1863:5
**similar** [1] - 1940:1
**simply** [3] - 1843:24, 1877:2,
1907:23
**single** [1] - 1857:15
**sit** [4] - 1804:5, 1804:9,
1866:11, 1867:22
**sitting** [3] - 1804:8, 1837:17,
1868:6
**situation** [4] - 1815:8, 1816:2,
1925:11, 1948:19
**six** [4] - 1813:1, 1918:4,
1918:18, 1920:11
**size** [1] - 1854:1
**SKA/GC** [1] - 1850:14
**Skadden** [81] - 1817:11,
1817:16, 1817:19, 1817:23,
1817:24, 1818:6, 1819:5,
1819:6, 1821:15, 1821:19,
1822:1, 1822:20, 1822:25,
1823:2, 1823:5, 1823:7,
1829:16, 1829:18, 1831:6,
1831:12, 1831:14, 1831:17,
1831:21, 1831:22, 1831:25,
1832:11, 1832:15, 1832:18,
1833:2, 1834:12, 1834:14,
1836:3, 1838:10, 1838:12,

1850:1, 1850:12, 1851:10,
1851:22, 1851:24, 1852:20,
1854:8, 1854:23, 1861:3,
1861:4, 1862:7, 1863:19,
1864:12, 1865:3, 1865:5,
1867:1, 1867:4, 1867:15,
1875:15, 1879:21, 1880:11,
1881:20, 1914:19, 1914:20,
1914:22, 1915:1, 1915:4,
1915:8, 1915:12, 1915:25,
1918:9, 1918:13, 1918:14,
1918:17, 1918:19, 1918:24,
1924:21, 1925:7, 1928:6,
1931:21, 1934:4, 1940:13,
1948:12, 1948:13, 1958:24,
1959:4
**Skadden's** [3] - 1851:13,
1916:3
**skill** [1] - 1846:7
**SL** [1] - 1930:20
**slightly** [1] - 1840:21
**small** [3] - 1815:4, 1822:25,
1934:14
**sneaking** [1] - 1844:5
**snippets** [1] - 1949:6
**socialized** [2] - 1947:13,
1947:14
**soldier** [1] - 1819:16
**solicit** [1] - 1943:21
**soliciting** [1] - 1916:21
**someone** [2] - 1845:9, 1900:17
**sometime** [1] - 1943:14
**sometimes** [6] - 1837:8,
1844:9, 1885:16, 1895:22,
1939:4
**somewhere** [1] - 1941:16
**Sorry** [1] - 1929:12
**sorry** [21] - 1819:9, 1820:9,
1821:21, 1840:14, 1847:4,
1853:13, 1858:8, 1858:20,
1858:21, 1869:3, 1877:14,
1891:15, 1891:20, 1897:25,
1912:12, 1919:17, 1926:23,
1942:8, 1942:18, 1945:19
**sort** [11] - 1815:20, 1818:23,
1827:12, 1832:9, 1837:16,
1844:5, 1876:20, 1877:4,
1882:20, 1920:3, 1933:10
**sorts** [1] - 1925:15
**sound** [1] - 1957:23
**sounds** [1] - 1905:5
**source** [1] - 1896:24
**space** [1] - 1840:19
**SPAEDER** [2] - 1801:22, 1802:2
**span** [1] - 1813:14
**speaking** [3] - 1818:3, 1853:16,
1887:7
**spearheading** [1] - 1865:1
**Special** [3] - 1824:17, 1824:24,
1894:22

**specialist** [1] - 1803:18
**specific** [20] - 1812:13,
1834:13, 1839:16, 1840:22,
1850:8, 1855:21, 1857:7,
1866:16, 1869:17, 1887:13,
1898:25, 1912:1, 1912:18,
1930:13, 1930:14, 1936:8,
1944:18, 1944:20, 1945:12,
1950:1
**specifically** [20] - 1830:14,
1838:23, 1849:15, 1850:18,
1851:3, 1851:14, 1857:8,
1861:11, 1862:20, 1863:3,
1864:3, 1864:14, 1879:11,
1902:12, 1912:8, 1923:2,
1926:5, 1929:8, 1934:6, 1944:3
**specificity** [1] - 1935:13
**specifics** [2] - 1819:18, 1823:14
**specified** [1] - 1828:13
**speculating** [1] - 1882:2
**spell** [1] - 1812:7
**spend** [1] - 1899:21
**sphere** [2] - 1864:16
**spite** [2] - 1920:3, 1946:24
**staff** [2] - 1879:1, 1931:1
**stage** [1] - 1935:12
**stages** [1] - 1900:5
**stakeholders** [1] - 1935:7
**stand** [3] - 1804:5, 1830:10,
1879:21
**stand-in** [1] - 1879:21
**standards** [1] - 1859:19
**standpoint** [1] - 1891:5
**Stanley** [2] - 1911:13, 1911:15
**start** [2] - 1810:22, 1880:23
**started** [5] - 1832:9, 1832:14,
1834:1, 1904:20
**starting** [1] - 1877:14
**starts** [2] - 1846:3, 1957:11
**Statement** [5] - 1897:10,
1897:23, 1901:19, 1901:20,
1902:9
**statement** [23] - 1819:3, 1819:7,
1819:12, 1824:17, 1824:23,
1842:12, 1844:7, 1872:22,
1890:17, 1894:19, 1894:21,
1906:19, 1912:19, 1940:12,
1940:13, 1955:21, 1956:3,
1956:5, 1957:10, 1957:13,
1957:22
**statements** [4] - 1819:2,
1837:24, 1948:24, 1955:22
**states** [2] - 1896:20, 1958:7
**STATES** [2] - 1801:1, 1801:10
**States** [25] - 1801:3, 1802:8,
1803:1, 1803:11, 1803:17,
1813:22, 1814:16, 1816:16,
1822:17, 1824:12, 1825:13,
1834:12, 1834:13, 1841:14,
1841:24, 1863:22, 1870:9,

1892:22, 1898:3, 1917:13,
1917:22, 1917:23, 1940:20,
1945:8, 1953:25
**statue** [1] - 1894:6
**stature** [1] - 1822:6
**status** [1] - 1849:25
**statutes** [2] - 1894:16, 1897:14
**Statutory** [1] - 1893:25
**stay** [1] - 1948:13
**stayed** [1] - 1932:15
**Stefan** [1] - 1861:20
**stenograph** [1] - 1961:7
**step** [1] - 1804:11
**steps** [1] - 1944:16
**Steven** [5] - 1920:22, 1921:22,
1922:22, 1923:18, 1951:14
**steven** [1] - 1922:7
**still** [15] - 1805:6, 1817:3,
1818:16, 1869:6, 1873:9,
1893:5, 1916:17, 1936:16,
1938:15, 1946:1, 1946:9,
1950:12, 1950:20, 1951:14,
1952:25
**sting** [1] - 1875:4
**stop** [1] - 1937:8
**stopgap** [1] - 1881:20
**story** [8] - 1841:6, 1843:1,
1865:9, 1871:17, 1871:18,
1871:19, 1933:19, 1933:20
**strategic** [4] - 1834:15,
1836:10, 1846:7, 1864:21
**strategically** [1] - 1867:15
**strategies** [1] - 1924:3
**strategy** [24] - 1823:6, 1840:20,
1840:22, 1840:24, 1846:11,
1846:13, 1851:8, 1857:5,
1865:8, 1869:7, 1869:10,
1888:5, 1889:22, 1889:24,
1889:25, 1890:5, 1890:7,
1891:1, 1924:14, 1926:19,
1928:12, 1929:19, 1930:10,
1945:14
**straw** [1] - 1921:16
**Street** [3] - 1801:14, 1801:22,
1802:2
**stricken** [1] - 1891:19
**strike** [5] - 1842:6, 1939:9,
1940:22, 1952:11, 1958:4
**structure** [2] - 1853:20, 1859:9
**strung** [1] - 1948:23
**stuff** [1] - 1902:7
**stunned** [1] - 1885:21
**style** [1] - 1936:2
**subcontracted** [1] - 1833:13
**subject** [8] - 1864:4, 1876:12,
1881:16, 1889:4, 1889:5,
1901:15, 1919:20, 1947:24
**submit** [1] - 1913:23
**submitted** [1] - 1908:24
**subsequent** [1] - 1867:17

**subsequently** [1] - 1908:23
**substantial** [1] - 1828:17
**substituted** [1] - 1903:25
**success** [3] - 1822:4, 1890:24,
1891:5
**sufficient** [1] - 1897:20
**suggest** [4] - 1820:11, 1826:10,
1867:23, 1950:25
**suggested** [2] - 1845:16,
1923:24
**suggesting** [3] - 1839:10,
1884:2, 1951:20
**suggestion** [1] - 1954:15
**suit** [2] - 1837:16, 1841:12
**Suite** [2] - 1801:23, 1802:3
**summarize** [1] - 1933:13
**summary** [1] - 1882:24
**summer** [2] - 1938:4, 1938:5
**support** [1] - 1897:15
**supposed** [3] - 1878:15,
1878:16, 1878:24
**surely** [1] - 1956:18
**surface** [1] - 1942:22
**surveyed** [1] - 1958:25
**suspected** [1] - 1953:3
**sustain** [1] - 1891:17
**sustained** [1] - 1914:16
**sworn** [1] - 1811:24
**system** [2] - 1822:14, 1936:2

## T

**tabs** [2] - 1882:20, 1883:2
**target** [1] - 1865:1
**targeting** [2] - 1816:11, 1889:22
**task** [6] - 1829:15, 1829:17,
1829:21, 1830:7, 1861:3, 1915:7
**tasked** [5] - 1831:5, 1835:10,
1867:2, 1880:6, 1882:24
**tasks** [4] - 1832:12, 1834:15,
1879:8, 1879:14
**tax** [31] - 1827:9, 1894:6,
1894:7, 1894:8, 1894:9,
1894:24, 1895:7, 1895:25,
1896:16, 1896:17, 1906:12,
1906:13, 1906:15, 1906:16,
1906:18, 1907:16, 1907:19,
1907:21, 1907:22, 1907:23,
1908:9, 1908:24, 1910:3,
1910:6, 1910:10, 1910:23,
1914:8
**taxes** [10] - 1827:9, 1906:13,
1907:13, 1907:22, 1907:25,
1908:8, 1908:17, 1909:21,
1914:11
**taxpayer** [1] - 1896:17
**Taylor** [4] - 1801:21, 1803:21,
1959:14, 1960:2
**TAYLOR** [3] - 1959:7, 1959:15,
1959:20

**team** [7] - 1820:13, 1822:25, 1834:2, 1838:8, 1854:18, 1868:21, 1889:2
**Team** [1] - 1916:23
**teams** [2] - 1834:25, 1835:2
**tear** [1] - 1829:8
**technically** [1] - 1834:2
**Telegraph** [2] - 1889:15, 1890:16
**television** [2] - 1954:10, 1954:11
**ten** [6] - 1813:12, 1813:14, 1883:20, 1883:22, 1892:18, 1953:2
**tend** [1] - 1862:20
**tense** [1] - 1936:22
**tension** [1] - 1816:5
**tentatively** [2] - 1868:11, 1883:8
**term** [1] - 1913:14
**terms** [19] - 1814:20, 1815:11, 1834:4, 1838:22, 1839:23, 1847:7, 1850:25, 1855:8, 1855:17, 1860:8, 1866:13, 1867:14, 1867:16, 1870:20, 1921:6, 1921:7, 1949:24, 1954:4
**testified** [5] - 1811:25, 1819:6, 1819:23, 1825:16, 1852:21
**testify** [1] - 1821:22
**testifying** [2] - 1907:5, 1907:6
**testimony** [5] - 1852:4, 1874:2, 1874:15, 1932:6, 1958:3
**thanked** [1] - 1882:15
**THE** [206] - 1801:1, 1801:1, 1801:9, 1801:13, 1803:1, 1803:4, 1803:7, 1803:8, 1803:10, 1803:19, 1803:23, 1803:25, 1804:16, 1804:20, 1804:21, 1804:25, 1805:1, 1805:5, 1805:6, 1805:10, 1805:12, 1810:17, 1810:25, 1811:4, 1811:5, 1812:1, 1818:5, 1818:8, 1818:9, 1818:10, 1818:12, 1818:14, 1818:15, 1818:18, 1818:25, 1819:16, 1820:17, 1820:21, 1821:5, 1821:10, 1821:21, 1826:5, 1826:7, 1829:6, 1829:21, 1829:23, 1829:24, 1829:25, 1830:1, 1830:9, 1830:17, 1830:22, 1831:1, 1831:9, 1831:11, 1833:5, 1833:10, 1837:18, 1838:25, 1841:17, 1841:25, 1842:7, 1842:9, 1842:12, 1842:16, 1842:22, 1843:21, 1844:1, 1844:8, 1844:13, 1844:23, 1845:2, 1845:4, 1845:5, 1845:6, 1845:7, 1845:8, 1845:11, 1845:12, 1847:2, 1847:4, 1847:17, 1847:19, 1849:7, 1849:9,

1849:10, 1849:12, 1849:16, 1849:19, 1852:4, 1852:11, 1852:17, 1852:24, 1853:12, 1853:15, 1853:24, 1854:5, 1855:19, 1855:21, 1856:25, 1857:2, 1865:20, 1865:22, 1865:23, 1866:7, 1871:3, 1871:5, 1871:6, 1871:14, 1871:15, 1871:25, 1872:17, 1872:20, 1873:12, 1873:15, 1873:19, 1874:11, 1874:16, 1874:21, 1875:3, 1875:7, 1883:16, 1883:24, 1891:10, 1891:14, 1891:17, 1891:20, 1892:1, 1892:3, 1892:4, 1892:5, 1892:8, 1892:17, 1892:21, 1892:23, 1893:1, 1893:3, 1893:4, 1899:21, 1899:25, 1900:12, 1900:16, 1900:25, 1901:5, 1901:8, 1901:18, 1902:6, 1902:22, 1903:5, 1906:23, 1907:2, 1907:9, 1912:20, 1912:22, 1912:25, 1913:2, 1914:16, 1921:11, 1922:1, 1922:5, 1922:7, 1922:9, 1922:17, 1923:7, 1923:10, 1923:12, 1927:14, 1927:18, 1927:20, 1932:12, 1932:20, 1933:6, 1933:9, 1933:17, 1936:25, 1937:9, 1937:11, 1937:15, 1937:18, 1941:15, 1941:18, 1942:9, 1942:10, 1944:10, 1944:11, 1944:12, 1948:23, 1949:20, 1950:5, 1950:6, 1950:7, 1951:23, 1952:1, 1952:4, 1952:7, 1956:5, 1956:7, 1956:8, 1957:15, 1959:8, 1959:13, 1959:17, 1959:21, 1959:24, 1960:1, 1960:10
**therefore** [1] - 1817:2
**they've** [1] - 1852:22
**thinking** [2] - 1859:19, 1959:9
**third** [3] - 1857:23, 1917:3, 1929:2
**third-party** [2] - 1917:3, 1929:2
**thoughts** [1] - 1886:2
**three** [2] - 1816:1, 1850:8
**throughout** [1] - 1945:5
**Thursday** [2] - 1877:19, 1878:14
**tie** [1] - 1837:17
**tier** [1] - 1870:1
**time-wise** [1] - 1843:9
**timeframe** [1] - 1839:3
**timing** [2] - 1884:3, 1886:11
**tipped** [1] - 1911:7
**Title** [1] - 1907:14
**title** [1] - 1860:14
**today** [6] - 1837:13, 1866:11,

1867:22, 1868:6, 1893:21, 1905:1
**together** [9] - 1882:24, 1910:7, 1917:17, 1921:17, 1928:12, 1931:5, 1947:19, 1948:23, 1955:2
**tomorrow** [3] - 1881:25, 1882:8, 1887:20
**took** [12] - 1833:20, 1834:3, 1846:23, 1847:10, 1848:16, 1856:22, 1857:18, 1860:18, 1867:17, 1909:6, 1910:16, 1929:10
**top** [13] - 1828:16, 1847:16, 1854:15, 1856:24, 1857:4, 1864:23, 1867:8, 1886:23, 1887:16, 1919:17, 1926:22, 1930:17, 1939:8
**topic** [2] - 1833:6, 1840:21
**topics** [3] - 1840:9, 1847:6, 1848:14
**total** [5] - 1837:8, 1908:6, 1908:22, 1917:22, 1953:5
**tough** [2] - 1840:16, 1872:5
**tour** [1] - 1941:25
**toward** [1] - 1958:17
**town** [1] - 1941:3
**tracing** [1] - 1919:20
**trading** [1] - 1911:3
**transcribed** [1] - 1805:7
**Transcript** [1] - 1801:5
**transcript** [3] - 1810:17, 1961:6, 1961:7
**TRANSCRIPT** [1] - 1801:8
**transfer** [3] - 1829:17, 1829:22, 1831:13
**transfers** [1] - 1910:19
**transit** [2] - 1861:17, 1861:25
**translation** [1] - 1860:5
**transpired** [1] - 1823:15
**travel** [2] - 1814:6, 1861:14
**trial** [25] - 1816:2, 1817:12, 1825:16, 1832:4, 1832:11, 1858:2, 1859:14, 1859:23, 1859:24, 1874:21, 1875:1, 1925:21, 1926:6, 1926:25, 1927:11, 1928:22, 1928:25, 1931:13, 1941:3, 1946:2, 1950:13, 1957:2, 1958:17, 1958:25, 1959:5
**TRIAL** [2] - 1801:4, 1801:8
**trials** [1] - 1825:14
**tried** [4] - 1856:6, 1873:11, 1874:2, 1893:8
**trip** [2] - 1887:4, 1940:16
**true** [10] - 1845:11, 1873:11, 1874:4, 1874:6, 1903:14, 1906:20, 1957:13, 1961:6, 1961:7
**Trump** [3] - 1913:17, 1913:24,

1914:1
**truth** [7] - 1819:3, 1825:12, 1826:14, 1829:9, 1842:13, 1853:7, 1853:16
**truthful** [4] - 1829:4, 1902:3, 1955:21, 1956:2
**truthfully** [2] - 1903:4, 1903:9
**truthfulness** [1] - 1902:21
**try** [10] - 1820:4, 1844:17, 1844:23, 1862:6, 1884:5, 1884:8, 1892:13, 1907:7, 1922:19, 1927:21
**trying** [24] - 1820:11, 1821:3, 1821:4, 1833:14, 1835:23, 1840:7, 1844:3, 1844:8, 1844:17, 1852:14, 1853:22, 1861:13, 1885:18, 1900:17, 1906:25, 1912:19, 1912:21, 1924:18, 1927:8, 1930:9, 1937:2, 1938:5, 1948:7, 1958:16
**tug** [1] - 1815:13
**turn** [6] - 1897:4, 1920:8, 1938:24, 1940:14, 1944:22, 1954:25
**turning** [1] - 1907:18
**TV** [2] - 1954:8, 1954:9
**two** [29] - 1813:19, 1816:16, 1817:21, 1822:1, 1822:2, 1826:2, 1834:13, 1835:4, 1836:9, 1836:11, 1859:5, 1864:2, 1864:15, 1865:16, 1870:21, 1884:11, 1889:14, 1904:25, 1917:21, 1917:23, 1917:25, 1932:15, 1937:17, 1943:24, 1952:12, 1958:16, 1958:19, 1959:11, 1959:18
**Tymoshenko** [17] - 1817:12, 1817:13, 1831:23, 1832:4, 1832:11, 1847:7, 1857:4, 1859:5, 1859:17, 1873:6, 1875:1, 1924:19, 1925:4, 1931:15, 1941:2, 1956:24, 1958:20
**Tymoshenko's** [1] - 1925:8
**type** [2] - 1813:17, 1857:1
**types** [1] - 1905:20
**typically** [3] - 1823:3, 1841:4, 1939:23
**typing** [2] - 1856:25, 1857:2

# U

**U.S** [11] - 1801:13, 1801:17, 1834:25, 1835:2, 1835:4, 1864:2, 1865:1, 1865:2, 1865:8, 1869:10, 1934:23
**U.S.C** [3] - 1894:5, 1894:10, 1894:13
**Ukraine** [54] - 1814:3, 1814:6, 1814:8, 1814:12, 1814:13,

1815:8, 1815:9, 1815:10, 1815:17, 1815:20, 1815:25, 1816:8, 1816:13, 1816:18, 1817:6, 1817:8, 1822:10, 1822:11, 1822:13, 1823:1, 1835:14, 1850:22, 1850:24, 1850:25, 1859:19, 1862:5, 1864:24, 1864:25, 1867:14, 1870:19, 1871:23, 1880:5, 1880:8, 1880:16, 1889:11, 1889:19, 1896:1, 1898:13, 1898:24, 1900:3, 1905:15, 1911:23, 1911:25, 1912:16, 1912:18, 1915:13, 1915:16, 1916:4, 1918:15, 1925:11, 1928:15, 1956:25, 1957:8
**Ukraine's** [3] - 1865:2, 1888:18, 1930:25
**Ukrainian** [8] - 1822:13, 1831:13, 1833:11, 1899:5, 1901:11, 1926:7, 1926:8, 1941:8
**ultimately** [9] - 1828:25, 1833:17, 1833:21, 1834:7, 1834:10, 1841:13, 1868:10, 1888:9, 1888:12
**um-hum** [2] - 1846:16, 1884:24
**Um-hum** [4] - 1814:13, 1815:9, 1831:11, 1936:20
**under** [18] - 1824:9, 1825:10, 1826:13, 1826:15, 1826:19, 1833:13, 1833:14, 1860:14, 1878:12, 1893:6, 1903:16, 1904:11, 1904:17, 1905:8, 1906:6, 1913:16, 1913:20, 1936:2
**understood** [6] - 1819:4, 1821:22, 1896:10, 1898:2, 1947:21, 1957:19
**unemployed** [4] - 1813:5, 1823:17, 1823:18, 1823:20
**unemployment** [1] - 1823:16
**Union** [9] - 1815:10, 1815:18, 1815:22, 1816:9, 1861:21, 1880:6, 1880:9, 1880:16, 1925:25
**Unit** [4] - 1900:9, 1901:3, 1901:10, 1903:3
**UNITED** [2] - 1801:1, 1801:10
**United** [25] - 1801:3, 1802:8, 1803:1, 1803:11, 1803:17, 1813:22, 1814:16, 1816:16, 1822:17, 1824:12, 1825:13, 1834:12, 1834:13, 1841:14, 1841:24, 1863:22, 1870:9, 1892:22, 1898:3, 1917:13, 1917:22, 1917:23, 1940:20, 1945:8, 1953:25
**University** [1] - 1812:22
**unless** [1] - 1830:14
**unofficially** [1] - 1915:4

**unpaid** [1] - 1907:22
**unreleased** [1] - 1938:16
**up** [43] - 1813:20, 1820:15, 1824:22, 1824:25, 1829:8, 1830:13, 1834:4, 1836:10, 1836:21, 1840:3, 1840:6, 1840:10, 1842:10, 1843:8, 1844:4, 1849:14, 1851:12, 1851:19, 1852:24, 1852:25, 1853:24, 1857:1, 1859:22, 1860:23, 1861:4, 1861:6, 1861:23, 1868:22, 1881:11, 1893:16, 1893:24, 1897:2, 1897:6, 1902:7, 1902:8, 1919:9, 1924:10, 1931:10, 1932:20, 1933:10, 1936:14, 1938:6, 1956:21
**upcoming** [2] - 1832:6, 1832:7
**update** [5] - 1849:25, 1857:10, 1881:17, 1889:7, 1889:11
**Update** [1] - 1889:9
**updated** [7] - 1847:10, 1847:12, 1862:21, 1883:5, 1884:15, 1889:3, 1890:21
**updates** [1] - 1889:1
**upper** [1] - 1931:10
**usual** [1] - 1883:18

# V

**valid** [5] - 1927:1, 1928:22, 1931:14, 1946:2, 1950:13
**van** [24] - 1832:21, 1838:11, 1861:4, 1879:25, 1880:1, 1880:17, 1881:14, 1882:14, 1882:17, 1886:25, 1887:4, 1887:6, 1919:2, 1929:14, 1942:14, 1946:16, 1946:19, 1946:21, 1946:24, 1947:11, 1947:21, 1948:1, 1948:8, 1949:7
**various** [8] - 1814:14, 1814:17, 1814:23, 1816:3, 1817:14, 1823:4, 1898:16, 1912:4
**verify** [1] - 1912:10
**Veritas** [7] - 1924:14, 1924:17, 1924:18, 1924:20, 1924:25, 1925:3, 1938:20
**version** [3] - 1931:6, 1945:14, 1954:19
**versions** [2] - 1940:1, 1954:22
**vetted** [3] - 1832:16, 1865:10, 1874:24
**via** [3] - 1859:17, 1890:6, 1890:7
**View** [1] - 1831:18
**view** [1] - 1885:23
**viewed** [5] - 1817:24, 1822:1, 1851:15, 1877:1, 1891:3
**views** [2] - 1818:4, 1852:16
**Viktor** [1] - 1816:20

**Vin** [1] - 1866:24
**violate** [4] - 1820:6, 1894:5, 1894:15, 1907:13
**violations** [1] - 1897:4
**Virginia** [4] - 1812:14, 1813:1, 1903:21, 1904:1
**vis-à-vis** [1] - 1814:24
**Visa** [1] - 1911:20
**visibility** [1] - 1822:4
**visiting** [1] - 1935:16
**vlasenko** [1] - 1853:17
**voice** [1] - 1898:14
**vs** [1] - 1801:5

## W

**wait** [4] - 1833:5, 1885:25, 1888:5, 1919:17
**waiting** [3] - 1887:18, 1887:25, 1936:16
**waive** [1] - 1870:6
**wants** [3] - 1853:10, 1901:12, 1907:1
**Warsaw** [4] - 1881:25, 1882:18, 1887:2, 1887:4
**Washington** [12] - 1801:6, 1801:15, 1801:18, 1802:3, 1802:9, 1812:22, 1817:21, 1834:16, 1864:24, 1929:12, 1947:15, 1961:15
**wearing** [2] - 1837:15, 1837:16
**Weber** [2] - 1866:24, 1868:1
**website** [1] - 1861:3
**Wednesday** [1] - 1877:14
**week** [2] - 1861:8, 1943:9
**weeks** [2] - 1929:24, 1952:12
**weight** [1] - 1936:1
**Weissmann** [1] - 1912:6
**west** [3] - 1815:17, 1815:20, 1836:14
**Western** [9] - 1817:25, 1822:2, 1822:7, 1822:17, 1851:6, 1859:19, 1931:18, 1936:2, 1957:7
**Western-oriented** [1] - 1822:17
**Western-style** [1] - 1936:2
**whole** [2] - 1935:5, 1953:12
**William** [3] - 1801:20, 1801:21, 1812:21
**willing** [7] - 1855:13, 1855:20, 1855:21, 1862:23, 1862:24, 1888:5, 1890:12
**willingly** [1] - 1891:7
**willingness** [1] - 1855:17
**wire** [6] - 1829:17, 1829:22, 1831:5, 1831:11, 1910:18, 1915:8
**wired** [1] - 1830:22
**wise** [1] - 1843:9
**wish** [1] - 1935:19

**witness** [15] - 1802:13, 1804:5, 1810:24, 1811:20, 1811:24, 1818:3, 1820:12, 1830:10, 1844:9, 1844:10, 1857:21, 1859:6, 1892:9, 1907:1, 1960:11
**WITNESS** [31] - 1818:8, 1818:10, 1818:14, 1826:7, 1829:23, 1829:25, 1830:17, 1831:11, 1833:10, 1841:25, 1845:2, 1845:5, 1845:7, 1845:11, 1847:4, 1849:9, 1849:12, 1855:21, 1857:2, 1865:22, 1871:5, 1871:15, 1891:14, 1891:20, 1892:3, 1892:5, 1942:10, 1944:11, 1950:6, 1952:1, 1956:7
**witness's** [1] - 1899:24
**witnesses** [4] - 1819:23, 1852:21, 1859:5, 1874:22
**wmurphy@zuckerman.com** [1] - 1801:24
**woman** [2] - 1866:17, 1898:19
**wondered** [1] - 1883:18
**wondering** [1] - 1885:25
**word** [3] - 1912:8, 1912:11, 1912:14
**words** [3] - 1903:20, 1933:12
**works** [1] - 1834:3
**world** [7] - 1814:21, 1836:19, 1836:22, 1836:23, 1895:13, 1926:1, 1941:25
**worth** [1] - 1872:9
**write** [13] - 1818:7, 1828:3, 1835:19, 1843:14, 1857:14, 1871:17, 1871:18, 1872:5, 1878:13, 1910:18, 1930:5, 1949:2
**writing** [16] - 1831:22, 1839:16, 1871:19, 1880:6, 1922:21, 1923:4, 1923:5, 1923:8, 1923:9, 1923:10, 1923:11, 1923:15, 1923:16, 1923:21, 1955:10
**written** [10] - 1921:20, 1922:4, 1922:6, 1922:10, 1922:13, 1922:16, 1946:8, 1957:15, 1957:18
**wrongfully** [2] - 1925:13, 1925:14
**wrote** [3] - 1835:19, 1928:17, 1932:22
**wtaylor@zuckerman.com** [1] - 1801:25

## Y

**Yanukovych** [5] - 1816:20, 1817:3, 1874:25, 1915:20, 1925:17
**Yanukovych's** [2] - 1816:22, 1816:23

**year** [4] - 1815:16, 1908:9, 1908:16, 1909:6
**years** [10] - 1812:11, 1813:2, 1813:12, 1813:14, 1815:3, 1824:22, 1824:25, 1826:2, 1908:5, 1908:6
**yesterday** [1] - 1804:2
**York** [30] - 1839:5, 1839:15, 1842:1, 1842:3, 1846:15, 1846:23, 1871:9, 1872:8, 1878:1, 1878:8, 1878:13, 1879:12, 1883:3, 1884:16, 1886:18, 1887:19, 1888:1, 1888:12, 1888:16, 1889:15, 1890:4, 1890:6, 1890:8, 1890:25, 1891:8, 1891:23, 1920:20, 1921:21, 1923:17, 1951:14
**young** [2] - 1815:25, 1822:15
**yourself** [9] - 1803:14, 1814:6, 1876:20, 1909:12, 1910:20, 1911:10, 1919:16, 1919:19, 1943:5
**yourselves** [2] - 1898:6, 1960:4
**YT** [1] - 1931:14
**Yulia** [7] - 1832:4, 1859:5, 1859:17, 1924:19, 1925:4, 1931:15, 1941:2

## Z

**zoom** [7] - 1825:5, 1834:20, 1848:6, 1848:8, 1860:11, 1862:12, 1867:7
**ZUCKERMAN** [2] - 1801:22, 1802:2
**Zwaan** [24] - 1832:21, 1838:11, 1861:4, 1879:25, 1880:1, 1880:17, 1881:14, 1882:14, 1882:17, 1886:25, 1887:4, 1887:6, 1919:2, 1929:14, 1942:14, 1946:16, 1946:19, 1946:21, 1946:24, 1947:11, 1947:21, 1948:1, 1948:8, 1949:7

1991

1          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2

3  UNITED STATES OF AMERICA,        )
                                    )
4       v.                          )   Criminal Action No. 19-CR-125
                                    )
5  GREGORY B. CRAIG,                )   JURY TRIAL - DAY 9
                                    )   Afternoon Session
6            Defendant.             )
   _____  )   Washington, D.C.
7                                        August 22, 2019

8

9       TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
         BEFORE THE HONORABLE AMY BERMAN JACKSON
10              UNITED STATES DISTRICT JUDGE

11

                  APPEARANCES:
12

13      For the Government:     Fernando Campoamor-Sanchez, AUSA
                                Molly Gulland Gaston, AUSA
                                U.S. ATTORNEY'S OFFICE FOR THE
14                              DISTRICT OF COLUMBIA
                                555 Fourth Street, NW
15                              Washington, DC 20530
                                    -and-
16                              Jason Bradley Adam McCullough
                                U.S. DEPARTMENT OF JUSTICE
17                              950 Pennsylvania Avenue, NW
                                Washington, DC 20530

18

19      For the Defendant:      Adam B. Abelson, Esq.
                                William James Murphy, Esq.
20                              ZUCKERMAN SPAEDER, LLP
                                100 East Pratt Street
21                              Suite 2440
                                Baltimore, MD 21202
22                                  -and-
                                William W. Taylor, III, Esq.
23                              Paula M. Junghans, Esq.
                                ZUCKERMAN SPAEDER, LLP
24                              1800 M Street, NW
                                Suite 1000
25                              Washington, DC 20036

1

2

3    Court Reporter:              PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                                  U.S. Courthouse, Room 4700A
4                                 333 Constitution Avenue, NW
                                  Washington, D.C.  20001
5                                 (202) 354-3243
                     Proceedings reported by stenotype shorthand.
6            Transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1993

1

## E X A M I N A T I O N S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| RICHARD GATES | | 1994 | 2042 | |

## E X H I B I T S

| DEFENDANT EXHIBIT | PAGE |
|-------------------|------|
| 418 | 2016 |

```
 1                    AFTERNOON SESSION

 2                      (2:03 P.M.)

 3            THE COURT:  All right.  Let's bring the jury in.

 4            (Jury present)

 5            THE COURT:  The jurors are all present.

 6            Mr. Gates, I want to remind you that you're still

 7      under oath.

 8                 You can be seated.

 9            Ms. Junghans, you can resume.

10            MS. JUNGHANS:  Thank you, Your Honor.

11                      RICHARD GATES,

12      having been duly sworn, was examined and testified as follows:

13                      CROSS-EXAMINATION

14            BY MS. JUNGHANS:

15      Q.   Mr. Gates, before we broke, we were talking about Exhibit

16      126, which I just want to go back to for a moment.  And we

17      were looking at the portion where it discussed whether the

18      report stated there was no evidence of political motivation.

19                 Now, if you look at the first page of the e-mail that

20      sent this to you, the first page of the document which was

21      the e-mail that sent this to you, you'll notice that

22      Mr. Hawker says to you, "We've provided answers even where we

23      do not know the facts."

24                 Do you see that?

25      A.   Yes.
```

1    Q.   And is that because at that point, if this was all still

2    hypothetical, what the report was going to say?

3    A.   I believe at that time we still had not seen a copy of

4    the full report, so there were pieces of it that still had

5    not been filled in by Mr. Hawker because of that.

6    Q.   Okay.  But pretty much simultaneously with this, you did

7    get the report; didn't you?

8         Let's look at Exhibit 234, Government Exhibit 234.

9         This shows that on September the 12th, 2012, you were

10   forwarding the report to Mr. Hawker and he was, in turn,

11   forwarding it to Jon Aarons; correct?

12   A.   Correct.

13   Q.   Okay.  And you have the paper document in front of you;

14   correct?

15   A.   Yes.

16   Q.   This is the report --

17   A.   Yes.

18   Q.   -- right?

19        So I take it you read it when you got it?

20   A.   Not the entire report, no.

21   Q.   Have you ever read the entire report?

22   A.   Honestly, I have not read the entire report.

23   Q.   I see.  So in order to get the facts right, you would

24   have to read the report, wouldn't you, to know what the

25   report said?

1    A.   Mr. Hawker was preparing the detailed items that were

2    related to the previous attachments, so he was the one that

3    went through the report in more detail.

4    Q.   Let's look at Exhibit 233.

5         THE DEPUTY CLERK:  Government 233?

6         MS. JUNGHANS:  I'm sorry.  Government 233.  Thank

7    you.

8         BY MS. JUNGHANS:

9    Q.   There a lot of activity on September 12th, so this is

10   another e-mail from you to Mr. Hawker on September 12th, and

11   you appear to be forwarding comments from Mr. Manafort;

12   correct?

13   A.   Yes.

14   Q.   Okay.  And if we turn to the -- and sending yet another

15   messaging document.  If you look at the caption of the

16   e-mail, it says, "Project Veritas messaging and draft NR PJM

17   REV."

18        Does that mean Paul J. Manafort revisions?

19   A.   Revisions, yes.

20   Q.   Okay.  And the same thing for the other document that is

21   attached; right?

22   A.   Yes, the MOJ QNA.

23   Q.   Can you go to the next page, please, John.

24        So, again, what this is is the messaging document --

25   A.   Yes.

1    Q.   -- what we're going to say about this report.  Okay.  Is

2    that right?

3    A.   I believe so, yes.

4    Q.   Okay.  And it summarizes the findings.  Now, did you

5    check to see whether the findings actually said these things?

6    A.   I believe -- yeah, we read the executive summary, which

7    had a conclusion section in it, and we largely used that as

8    the basis for a lot of the messaging memos that we put out.

9    Q.   Okay.  And turn to the next page, please.

10          And then you put together statements that various

11   interested parties might make about the report; correct?

12   A.   Yes.

13          MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

14   question.

15          MS. JUNGHANS:  Pardon?

16          MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

17   question.

18          THE COURT:  All right.  Well, this is still -- when

19   you say "you," was that your objection?

20          MR. CAMPOAMOR-SANCHEZ:  Right.

21          THE COURT:  Okay.  So are you talking about the

22   group --

23          MS. JUNGHANS:  Yes, the group.

24          BY MS. JUNGHANS:

25   Q.   You were working on statements that interested parties

1    might make after the report was released?

2    A.   I had the occasion to edit the statements.  Mr. Hawker

3    did the initial preparation of the statements.

4    Q.   Okay.  And Mr. Manafort had occasion to edit the

5    statements?

6    A.   Correct.

7    Q.   This was a group project?

8    A.   Yes.

9    Q.   Okay.  In this draft on this page, the proposed statement

10   for the Ministry of Justice was in the headline, "Independent

11   report concludes Tymoshenko trial was not politically

12   motivated."

13   A.   Yes.

14   Q.   You see that?

15   A.   I do.

16   Q.   Is that statement in the report?

17   A.   That specific statement, no.  That was a headline that

18   Jonathan created based off the information from the report.

19        MS. JUNGHANS:  Excuse me.  Can I just consult with

20   counsel for one second, please?

21        THE COURT:  Yes.

22   (Counsel confer)

23        BY MS. JUNGHANS:

24   Q.   Let's look at page -- it is pdf page 9, John, of Exhibit

25   234 that we were just looking at; 234, page 9.

1    MR. CAMPOAMOR-SANCHEZ:  I'm confused as to

2  whether --

3    MS. JUNGHANS:  I apologize.  There are so many

4  iterations of this report.

5    BY MS. JUNGHANS:

6  Q.  Exhibit 234, which is the one we just looked at that you

7  had on September 12th, okay, and if you look at page 9, it

8  deals with selective prosecution; right?

9  A.  Yes.

10 Q.  And what it says is --

11   THE COURT:  Wait.  What are we quoting from?  The

12 last document we were asking him about was the messaging

13 plan.  This doesn't seem to be the messaging plan.

14   MS. JUNGHANS:  No, Your Honor.  This is the actual

15 report.

16   THE COURT:  Okay.  Well, we first got the step of

17 directing his attention to the e-mail transmitting the report

18 and --

19   MS. JUNGHANS:  I thought I had just done that.

20   THE COURT:  No, you missed it.  Things got a little

21 off track.  So let's go back.

22   MS. JUNGHANS:  Thank you.

23   BY MS. JUNGHANS:

24 Q.  Mr. Gates, Exhibit 234, which you have in front of you in

25 paper form -- right?

```
 1    A.   Yes.

 2             THE COURT:  Defendant's Exhibit 234; correct.

 3             MS. JUNGHANS:  No, Government's Exhibit 234.

 4             THE COURT:  Okay.

 5             MS. JUNGHANS:

 6    Q.   Shows that on December the 12th -- September the 12th,

 7    2012 you had the full report, and you sent it to Mr. Hawker;

 8    correct?

 9    A.   Yes.

10    Q.   Okay.  And then he sent it to Mr. Aarons?

11    A.   Yes.

12    Q.   Okay.  And if we turn to page 5, which is pdf page 9 of

13    this report -- and maybe before we do that, we should just

14    see how the report is -- let's back up for a second so

15    everybody can see how the report is organized.

16             So it has a cover page; right?

17             And then go to the next page, please.  It has a table

18    of contents.

19             Go on to the next page, please.  And then it

20    identifies several appendices that are attached to it.

21    Right?

22    A.   Yes.

23    Q.   Then it starts on page 1, which is pdf page 5, with the

24    executive summary; correct?

25    A.   Yes.
```

1    Q.   And the first number of bullet points are under the

2    heading of "Factual Conclusions."  And it talks about various

3    facts related to Ukraine, etc.; right?

4    A.   Yes.

5    Q.   And then there is another page of factual conclusions;

6    correct?

7    A.   Yes.

8    Q.   And then if you go to -- at the bottom of what is page 2

9    of the report, it starts identifying the conclusions of the

10   report; correct?

11   A.   Correct.

12   Q.   Okay.  Why don't we just so everybody is -- why don't we

13   all just run through them.

14        The first conclusion is the Court's opinion, and it

15   says, "The Court --

16        MR. CAMPOAMOR-SANCHEZ:  Can we approach?

17        THE COURT:  Yes.

18        MR. CAMPOAMOR-SANCHEZ:  Sorry.

19   (At the bench)

20        MR. CAMPOAMOR-SANCHEZ:  The document was still a

21   draft, it is not the final report.  So I don't just want

22   there to be any confusion that the conclusions in the

23   executive, whatever we're reading, are not from the final

24   report, they're from a draft report.

25        MS. JUNGHANS:  We can make that clear, but they don't

1    change.

2            MR. CAMPOAMOR-SANCHEZ:  Okay.  Well, maybe they

3    don't.  I just want to be --

4            THE COURT:  We are now reading to him from the draft

5    report that he had in hand as of the time of the plan --

6            MS. JUNGHANS:  Exactly.

7            THE COURT:  All right.

8        (In open court)

9            BY MS. JUNGHANS:

10   Q.   Just to be clear, Mr. Gates, this is the version that was

11   in existence as of September 12, 2012?

12   A.   Correct.

13   Q.   Okay.  And the version that you were messaging about?

14   A.   Correct.

15   Q.   Okay.  So the first conclusion is that the Court's

16   opinion -- I'm not going to read every word of this --

17   "Although many facts were in sharp dispute and conflicting

18   evidence was offered on many issues, the Court, as finder of

19   fact, based its findings on evidence before the Court and, in

20   some instances, on inferences that the Court drew from that

21   evidence."

22           Correct?

23   A.   Yes.

24   Q.   Okay.  Let's go down to the second conclusion.

25           "Legal adequacy of the charges under Ukrainian law."

1    And it says, "The parties vigorously disputed what was in

2    issue.  And then it goes on to say, "This issue of Ukrainian

3    law -- the legal requirements necessary to satisfy the

4    elements of the statutory offense -- is beyond the scope of

5    our assignment and beyond our expertise."

6            So you understood from that conclusion that Skadden

7    was not undertaking to render an opinion about whether

8    Ms. Tymoshenko was or was not guilty under Ukrainian law?

9    A.   That is correct.

10   Q.   Then, the third conclusion deals with the opportunity to

11   prepare a defense, and that was an issue Ms. Tymoshenko had

12   complained about; correct?

13   A.   Correct.

14   Q.   Okay.  And again, it says in the center of the paragraph,

15   "We believe that, looking at this case, most American trial

16   courts would have given the defendant more time to prepare

17   her defense.  It is unlikely, however, that based on this

18   record, an American appellate court would find a due process

19   violation and reverse the conviction."

20           Everybody can read it eventually.  But that was

21   conclusion two; right?

22           THE COURT:  Three.

23           MS. JUNGHANS:  Three.  Thank you.

24           BY MS. JUNGHANS:

25   Q.   Can you go to the next one, please, John.

1           And then the next issue dealt with the selection of

2      the judge and dealt with Ms. Tymoshenko's allegation, in

3      essence, that Mr. Yanukovych had hand-picked the judge;

4      right?

5      A.   Yes.

6      Q.   Okay.  And it said that "The report concluded she has not

7      established that the judge's experience, tenure, or selection

8      violated Western standards of fairness --

9      A.   Yes.

10     Q.   -- right?

11          Okay.  Let's go to the next one.

12          Jury request.  It goes on -- if I may summarize, even

13     though she would have liked to have had a jury, juries are

14     not customarily used in Ukraine, not a violation of due

15     process.  Correct?

16     A.   Yes.

17     Q.   Okay.  And let's go to the next one.

18          Her courtroom behavior.  And it describes that

19     Ms. Tymoshenko refused to acknowledge the Court's legitimacy

20     and engaged in conduct that was disrespectful.  And that the

21     tactics made management of the trial substantially more

22     difficult.  And then it points you to the pages where that is

23     discussed in more detail.  Right?

24     A.   Yes.

25     Q.   Then, can you go to the next one, please.

1      Removal from the courtroom.  This goes to her

2  complaint that she was put out of the room during certain

3  portions of the trial.  Right?

4  A.  Yes.

5  Q.  Then it says, "Neither she nor her counsel raised any

6  objection to the admission of the document, and it does not

7  appear that she suffered any prejudice."  All right.

8      THE COURT:  Well, wait.  That doesn't quite --

9      MS. JUNGHANS:  As a result of the absence.

10      And one can find more details on that at the pages

11  that are cited?  Correct?

12      THE COURT:  Well, you read the first sentence that

13  there were two removals.  And I think just to fairly

14  characterize what is sitting here, the conclusion is that the

15  July 6 removal doesn't raise fairness concerns, the 15th was

16  more troubling, but she didn't suffer any prejudice as a

17  result.

18      MS. JUNGHANS:  Yes, Your Honor.  Thank you, Your

19  Honor.

20      THE COURT:  Is that a fair summary?

21      All right.

22      BY MS. JUNGHANS:

23  Q.  Can you go to the next one, please.

24      That deals with her detention.  And this goes to the

25  fact that she was put in jail during her trial.  Correct?

1    A.   Yes.

2    Q.   Okay.  And the conclusion that is expressed here, under

3    Western standards, "We find the decision to detain Tymoshenko

4    for the entire balance of her trial and after the trial had

5    concluded -- until sentencing -- without adequate

6    justification or review raises concerns about whether she was

7    inappropriately deprived of her liberty prior to her

8    conviction."

9         Right?

10   A.   Yes.

11        MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.  The

12   conclusion or the summary is not entirely accurate.

13        THE COURT:  I'm sorry.  You want to read the whole

14   paragraph?

15        MR. CAMPOAMOR-SANCHEZ:  Yes, I think it would be

16   better to just have it read.

17        MS. JUNGHANS:  Your Honor, I'm certainly not adverse,

18   but I'm trying not to bore everybody by standing here and

19   reading the whole thing.  I'm just trying to present how the

20   report is organized.

21        THE COURT:  Well, you're now presenting the actual

22   content of the report so you can ask him if the summary of

23   the report was accurate, so --

24        MS. JUNGHANS:  Well, I'm trying to get to just the

25   last one.

1            THE COURT:  All right.  I know.  And we'll get to all

2    of them.  But I think it is fair that this one --

3            MS. JUNGHANS:  I'm happy to read it.

4            THE COURT:  You might was well just read it rather

5    than talking about it.

6            MS. JUNGHANS:  Sure.

7            THE COURT:  I would be faster.

8            BY MS. JUNGHANS:

9    Q.   So what this conclusion says, Mr. Gates, is, under the

10   subject of "detention," "Tymoshenko claims that the Court's

11   decision to incarcerate her in a detention

12   facility -- beginning on August 5 and continuing through her

13   sentencing -- was an open-ended detention unjustified by the

14   facts.  Tymoshenko's courtroom behavior would likely have

15   merited a summary contempt finding under Western standards.

16   The Court's separate suggestion that she presented a flight

17   risk is problematic, however, on the record of this case.

18   Taking steps to maintain order in the courtroom is

19   justifiable.  Using detention to achieve that objective, as

20   the Court did in this case, is an accepted but rarely used

21   practice in Western courts.  Under Western standards, we find

22   that the decision to detain Tymoshenko for the entire balance

23   of her trial and after the trial had concluded -- until

24   sentencing -- without adequate justification or review raises

25   concerns about whether she was inappropriately deprived of

1    her liberty prior to her conviction."

2    A.   Yes.

3    Q.   Okay.  And then last, the last conclusion deals with

4    -- well, actually not the last.  The next one deals with

5    representation by counsel.  And so we're not confused, I'll

6    read the whole thing.

7         "Tymoshenko argues that the Court violated her right

8    to adequate representation by examining witnesses in the

9    absence of defense counsel and by failing to adjourn the

10   proceedings to allow her to acquire new legal representation.

11   Ukrainian law, as well as European and Western legal

12   standards, requires that a defendant who wishes to be

13   represented by counsel during trial must be able to exercise

14   that right.  Under Western standards, the continued

15   examination of witnesses without representation by counsel

16   would almost certainly be viewed as a violation of the right

17   to assistance of counsel."

18        Correct?

19   A.   Yes.

20   Q.   And then the next one, presentation of defense.  "During

21   the investigation stage of the proceeding, Tymoshenko

22   identified a large number of witnesses that she asked to be

23   interviewed.  Her request was found to be untimely, and the

24   chief investigator denied her request.  During the trial, she

25   identified other witnesses and asked that they be permitted

1    to testify.  Judge Kireyev refused to permit all but two of

2    these witnesses to testify.  Tymoshenko argues that Judge

3    Kireyev's refusal undermined her ability to present her

4    defense.  Under Western standards of fairness, we believe

5    that the Court's decision not to call certain defense

6    witnesses compromised Tymoshenko's ability to present a

7    defense."

8    A.   Yes.

9    Q.   All right.  And then last, selective prosecution.

10        Before we read that, you've already told us that this

11   question of selective or political prosecution was the most

12   important issue to your client, the Ministry of Justice.

13   A.   That's correct.

14   Q.   Okay.  And what it says is, "Tymoshenko has alleged that

15   her prosecution was a politically motivated reprisal

16   undertaken in order to silence a political opponent of the

17   ruling regime.  The prosecution of a former head of

18   government, unsuccessful presidential candidate, and leader

19   of the opposition merits close scrutiny in all respects.  In

20   this report -- could you highlight this part please, John --

21   "In this report, we do not opine about whether the

22   prosecution was politically motivated or driven by an

23   improper political objective -- i.e., to remove her from

24   political life in Ukraine in the future.  Instead, based on

25   the record of the case and established precedent, we do

1     address the narrow doctrine of selective prosecution.

2     Tymoshenko has not provided specific evidence of political

3     motivation that would be sufficient to overturn her

4     conviction under American standards."

5          Right?

6     A.   Yes.

7     Q.   Okay.  Now, having this report with this executive

8     summary in hand at September 12, 2012, the messaging document

9     that was being prepared -- John, can you go back to 233,

10    please, on page 3 -- says in the headline, "Independent

11    report concludes Tymoshenko trial was not politically

12    motivated."

13         Do you see that?

14    A.   I do.

15    Q.   That was not the conclusion of the Skadden Report; was

16    it?

17    A.   That was Mr. Hawker's interpretation of the conclusion

18    from the report.

19    Q.   Well, that wasn't my question, sir.

20         MR. CAMPOAMOR-SANCHEZ:  Objection.

21         THE COURT:  You're asking him about whether something

22    someone else said is, in his judgment, the characterization

23    of something as if it is a yes-or-no fact question.  So is

24    the question -- he didn't write it.  It's in the plan.  So

25    what's your question.

1          MS. JUNGHANS:  Actually, Your Honor, he forwarded

2     this as a revised version from -- let me clarify -- from

3     yourself and Mr. Manafort?

4          THE WITNESS:  If that's at the previous e-mail you

5     showed me --

6          MS. JUNGHANS:  If you look at the first page.  John,

7     you can put that up again, please.

8          BY MS. JUNGHANS:

9     Q.   So this is a document from you to Hawker, not from Hawker

10    to you.

11    A.   But this is based off of a document that Mr. Hawker

12    provided to us first because that would reflect why there are

13    edits and revisions.

14    Q.   Okay.  So do you think this is an accurate

15    characterization of the conclusion that we just read from the

16    report?

17    A.   Based on the information at the time, yes, I do.

18    Q.   You think saying the independent report concludes it was

19    not politically motivated is the same as what I just read

20    from the --

21          MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

22    question.  Asked and answered.

23          MS. JUNGHANS:  It would be nice if I could get my

24    question out.

25          MR. CAMPOAMOR-SANCHEZ:  Objection.

2012

1          THE COURT:  Well, we have all been doing that.  Let's

2     try not to snipe at each other.  I realize everybody is

3     working very hard here and tensions are high.  This is a

4     complicated matter.  And I'm trying to avoid having everybody

5     come to the bench, but if we're going to argue at each other,

6     we're going to have to do that, and I think that would

7     frustrate everybody in the courtroom.

8          So you asked him what he thought.  You can ask

9     another question, but you can't argue with him.

10          BY MS. JUNGHANS:

11     Q.   Well, my question was:  Do you think that is an accurate

12     characterization of what we just read from the conclusions of

13     the report?

14     A.   And yes, I commented yes, I do believe that.

15     Q.   Okay.  Now, let's turn to Defendant's Exhibit 123.

16          If you could blow up the top of it, please, John.

17     No, actually, scroll down to the lower part of the page,

18     please.

19          So this is an e-mail from Mr. Hawker to you, also

20     September 12, 2006, sending you a control grid --

21          MR. TAYLOR:  2012.

22          MS. JUNGHANS:  Yes, September 12, 2012.

23          BY MS. JUNGHANS:

24     Q.   Do you see that?

25     A.   Yes.

1    Q.   And you were exchanging these documents back and forth a

2    lot during this period of time; were you not?

3    A.   Correct.

4    Q.   Okay.  And the control grid is the chart that sort of

5    sets out what everybody is going to do on launch date?

6    A.   Yes.

7    Q.   So if we turn to the first page of what is

8    attached -- first of all, you will note that it says in the

9    upper left-hand corner, "Draft document for consideration of

10   legal counsel."

11   A.   Yes.

12   Q.   Who did you understand that to be?

13   A.   I could guess, but I don't recall.

14   Q.   Okay.  Mr. Hawker did not send this to Mr. Craig here?

15   A.   Not in the e-mail you just showed me.  It was sent to me.

16   Q.   And generally speaking, at this time, you were not

17   providing these grids to Mr. Craig?

18   A.   I was not.  That was not one of my responsibilities.

19   Q.   Now, if you turn to what is identified as page DX 123-3,

20   which is again the list of who is going to do what, and you

21   look at the line that is line 14 --

22   A.   Yes.

23   Q.   -- it refers to the project team and then -- who's the

24   project team?

25   A.   The project team would have been Mr. Hawker's team on the

1        ground.

2        Q.   GC, that is Mr. Craig?

3        A.   Yes.

4        Q.   SKA, that's Skadden; right?

5        A.   Correct.

6        Q.   And it says, "Engagement with *Bloomberg*."

7        A.   Yes.

8        Q.   No David Sanger?

9        A.   Correct.

10       Q.   Okay.  And then it goes on to the next page, and we have

11       more, Mr. Craig talking to various officials; right?

12       A.   Yes.

13       Q.   And the last page, it repeats the Greg Craig travel log;

14       right?

15       A.   Yes.

16       Q.   Okay.  You had not heard from Mr. Craig that he was going

17       to take any of these trips that are identified here?

18       A.   That is correct.

19       Q.   Now, at the same time -- same day -- I guess later in the

20       day -- can we have Defendant's Exhibit 125.

21            And this is yet another version from Mr. Hawker to

22       you.  Why were you asking him for so many versions?

23       A.   So we had different audiences that these documents were

24       going to.  In reference to the document you're just citing

25       now, it was a cut-down version because it was going to

-2015-

1    different stakeholders who would not have paid attention to

2    the level of detail that we had in the master grid.

3    Q.   And when you refer to a stakeholder, who are you talking

4    about?

5    A.   It could have been somebody inside the government.  It

6    could have been somebody outside the government.  It all

7    depends on at the time who Mr. Manafort requested the

8    document go to.

9    Q.   Okay.  And do you have an idea for whom this one,

10   particular version would have been intended since it is the

11   cut-down version?

12   A.   I believe this one went to Mr. Lyovochkin, who I

13   referenced earlier was the chief of staff to the President.

14   Q.   Okay.  So the purpose of this was for your firm to tell

15   the client all the great stuff that it was doing?

16   A.   That was the general idea, yes.

17   Q.   And all the great stuff you were going to get Mr. Craig

18   to do?

19   A.   Yes.

20   Q.   But you had had no assurances from Mr. Craig that he was

21   going to do them?

22   A.   I had none, that's correct.

23   Q.   Now, let's turn to what has been marked as Defendant's

24   Exhibit 418.

25          Now, Mr. Gates this is a document dated September 12,

1    2012.  Do you recognize it?

2    A.   Yes.  I think it was a document forwarded to me by

3    Mr. Hawker, and I, in turn, sent it to Mr. van der Zwaan.

4         MS. JUNGHANS:  Your Honor, I move the admission of

5    Defendant's Exhibit 418.

6         MR. CAMPOAMOR-SANCHEZ:  No objection.

7         THE COURT:  All right.  It will be admitted.

8       (Defendant 418 admitted in evidence)

9         BY MS. JUNGHANS:

10   Q.   And what this is, Mr. Gates, is the lower portion of it

11   is something you cut and pasted from an e-mail from

12   Mr. Hawker; right?

13        Everything under "FYI"?

14   A.   Yes, I believe so.

15   Q.   Can you blow that up, please, John.

16        And what this is is a sort of form of an article

17   about the report that Mr. Hawker had written, expressing what

18   he called the worst-case scenario?

19        MR. CAMPOAMOR-SANCHEZ:  Object to the form of the

20   question.

21        THE COURT:  I think that is a fair question.

22        You can answer it if you recall.

23        THE WITNESS:  Give me one second.  Let me look at

24   this, please.

25        MS. JUNGHANS:  Well, let me rephrase it a little

1      different --

2             THE WITNESS:  Yes, I was going to say, could you

3      repeat the question --

4             MS. JUNGHANS:  Let me phrase it a little differently.

5             BY MS. JUNGHANS:

6      Q.   Actually, if you look at the caption of the article -- or

7      the caption of the e-mail, it says, "How a journalist will

8      see the report" --

9      A.   Uh-huh.

10     Q.   -- right?

11     A.   Yes.

12     Q.   So this was Mr. Hawker's take --

13     A.   Exactly.

14     Q.   -- on how he thought a journalist would see the report?

15     A.   It was one iteration of an idea that Mr. Hawker thought a

16     reporter could react to the Skadden effort, that's correct.

17     Q.   And the headline he thought that a reporter might issue,

18     start off with, was "Ukraine violated former Prime Minister's

19     rights, according to Ukraine's own lawyer"?

20     A.   Yes.

21     Q.   That's not the headline you were looking for?

22     A.   No.  But this also never appeared as the headline.

23     Q.   Well, we will get to that.

24            Let's turn to Defendant's Exhibit 134.

25            Now, at this point, you thought that the release of

1    the report was imminent; right?

2    A.   As of September 18th, yes, we thought it was going to be

3    very soon.

4    Q.   Okay.  And you had a version of the report that was

5    pretty significantly finished; wasn't it?

6    A.   Yes.

7    Q.   Okay.  And in fact, you had been told by the Skadden

8    folks that as far as they were concerned it was finished;

9    right?

10   A.   I believe that was Mr. Craig's representation, yes.

11   Q.   Okay.  But nevertheless, there were efforts by the

12   Ministry of Justice to get it to be changed yet again;

13   correct?

14   A.   That is correct.

15   Q.   If we look at Defendant's Exhibit 134, that is exactly

16   what this is, isn't it?

17          John, could you enlarge the lower part.  Thank you.

18          So this is an e-mail from you to Mr. Craig saying,

19   "Call me with questions."  And then is it fair to say that

20   what you're doing here is sending comments that Mr. Manafort

21   wrote but for whatever reason he asked you to send?

22   A.   Yes.  It is an e-mail from Mr. Manafort to me, which, in

23   turn, he asked me to forward it to Mr. Craig.

24   Q.   Okay.  And Mr. Craig's response was -- if you go to the

25   top -- "I thought we had dealt with all of the concerns that

1    had been raised."  Right?

2    A.   Correct.

3    Q.   And the concerns were those of BG; correct?

4    A.   Yes.

5    Q.   BG was?

6    A.   That referred to the President of Ukraine.

7    Q.   BG is short for Big Guy?

8    A.   Yes.

9    Q.   Nevertheless, did Mr. Craig consent to consider these

10   comments?

11   A.   Yes.

12   Q.   Okay.  And in fact, that was one of the purposes for

13   convening the meeting at the Harvard Club; wasn't it?

14   A.   It was.

15   Q.   Okay.  If we go to Government's Exhibit 254, you have

16   identified it, I think, as the agenda and a batch of other

17   documents circulated prior to the meeting at the Harvard

18   Club.

19   A.   Yes.

20   Q.   Okay.  And you have that in paper form in your binder?

21   A.   I do.  What is the exhibit number again?

22   Q.   It is Defendant's Exhibit 254.

23             THE DEPUTY CLERK:  Government's.

24             MS. JUNGHANS:  Government's exhibit.  I apologize.

25             THE WITNESS:  Okay.  I have it.

```
1              BY MS. JUNGHANS:
2    Q.   It is actually about 75 pages' worth of stuff; isn't it?
3    A.   Yes.  It is a rather large document.
4    Q.   Pardon?
5    A.   It is a rather large document.
6    Q.   Yes.  And do you recall what time -- well, strike that.
7    Do you recall receiving it?
8    A.   I do.
9    Q.   Do you recall what time you got it?
10   A.   I do not.
11   Q.   Okay.  Well, it says 4:11 a.m.  You don't know whether it
12   was actually sent at 4:11 or not; do you?
13   A.   That is actually from Mr. Hawker to me, so based on his
14   computer being on UK time, I would gather that that was
15   4 a.m. UK time at the time he sent it.
16   Q.   So it is probably more like midnight or so?
17   A.   About, yes.
18   Q.   And so you didn't have a conversation with Mr. Craig
19   about whether he had the opportunity to read this thing prior
20   to the Harvard Club meeting?
21   A.   No, I did not.
22   Q.   Okay.  And the whole master control grid was not reviewed
23   as part of the meeting; was it?
24   A.   To my recollection, it was not.
25   Q.   It was not?
```

```
 1    A.   Correct.

 2              THE COURT:  Wasn't there a stipulation about what

 3    time it was actually sent?

 4              MR. MURPHY:  11:11, Your Honor.

 5              THE COURT:  11:11 --

 6              MR. MURPHY:  p.m., Saturday night.

 7              THE COURT:  U.S. time or Hawker's time?

 8              MR. MURPHY:  11:11 Saturday night, New York time.

 9              THE COURT:  Okay.  Thank you.

10              BY MS. JUNGHANS:

11    Q.   So the master control grid that is attached to this, if

12    you could, John, go over to the -- if you could go to page 3

13    of the document, which is page 5 of the pdf.

14              It repeats -- it repeats what we have seen before

15    about Mr. Craig's engagement with U.S. media.  Right?

16              And then it repeats what we have seen before about

17    him going all over Europe to talk to people.

18    A.   Yes.

19    Q.   Okay.  And he had not consented to do these things before

20    the meeting took place?

21    A.   That is correct.

22    Q.   Okay.  Now, you have told us about the meeting at the

23    Harvard Club, and you said that Mr. Craig again mentioned the

24    name of David Sanger --

25    A.   Correct.
```

1    Q.   -- as a reporter he knew?

2    A.   To my recollection, yes.

3    Q.   Okay.  And what else is it that you say he said about

4    David Sanger?

5    A.   At the meeting, it was not a lot of discussion on any

6    specific component of Sanger but that he was a reporter that

7    we could potentially use based on Greg's relationship to get

8    the story out, the seed story out.

9    Q.   So he didn't say, "Don't worry, I'll do it, I'll go get

10   Sanger, just tell me when to launch?  He didn't say anything

11   like that?

12   A.   He did not.

13   Q.   It was just this is a good guy?

14   A.   That he had a relationship with, yes.

15   Q.   So that was not part of the media plan at the end of the

16   Harvard Club meeting that Greg Craig had taken on this

17   assignment?

18   A.   It was -- without specifically going through each

19   component of it, it was more general; that Craig had reduced

20   the amount of effort that he was willing to put into it, but

21   that he was still willing to do something.  And a lot of that

22   was still dependent on what we came up with for the final

23   plan.

24   Q.   Okay.  But you didn't go out, then, and immediately

25   change the plan to say that Greg Craig will talk to David

1    Sanger?

2    A.   That's correct.

3    Q.   And that's why, if you look at -- well, strike that.

4         If you look at Exhibit 258, which is your notes from

5    the meeting, under "PR Items" on page 2 --

6    A.   Yes.

7    Q.   -- and I think you told us earlier this was -- the next

8    page, please, John -- I think you told us earlier this was a

9    list of action items emanating from the Harvard Club meeting?

10   A.   Notes and action items, yes.

11   Q.   So there is no action item for Greg Craig?

12   A.   Correct.

13   Q.   Except possibly meeting this Mr. Fule?

14   A.   Correct.

15   Q.   To your knowledge, he never did that?

16   A.   He did not.

17   Q.   Now, do you know that the day after the Harvard Club

18   meeting Mr. Craig said that whatever discussion may have

19   occurred during that meeting about him backgrounding

20   journalists, he wouldn't be able to do it?

21   A.   I wasn't part of any discussion.  I don't recall if

22   Jonathan had mentioned it or not, but there was reluctance on

23   Mr. Craig's part to take on a number of the actions that we

24   had outlined in some of the models.

25   Q.   Well, I think you said earlier that you never heard that

2024

1    Greg Craig changed his mind.

2    A.   I personally did not, that's correct.

3    Q.   Well, did you hear about it, him changing his mind?

4    A.   Yes, at different points throughout the project, so not

5    just specifically at that time, but in other months as well.

6    Q.   Well, how about specifically at this time?

7    A.   At this time, I did not hear Mr. Craig change his mind

8    about that specific issue, no.

9    Q.   Well, wasn't his changing his mind the subject of such

10   concern that a meeting was convened at Mr. Manafort's

11   apartment at Trump Tower to talk about what was going to

12   happen in view of him changing his mind?

13        MR. CAMPOAMOR-SANCHEZ:   Objection to the form of the

14   question.

15        THE COURT:   Was there a meeting convened at the Trump

16   Tower shortly after the meeting at the Harvard Club?

17        THE WITNESS:   Yes.

18        THE COURT:   Do you know what the purpose of the

19   meeting was?

20        THE WITNESS:   The purpose of the meeting was to

21   review and go through the report's content, and then also to

22   look at some of the material that we had discussed at the

23   meeting.

24        BY MS. JUNGHANS:

25   Q.   So it had nothing to do with --

2025

1           THE COURT:  Did you call the meeting?

2           THE WITNESS:  No.

3           BY MS. JUNGHANS:

4    Q.  Well, actually, take a look at Government Exhibit 270, if

5    you would.

6           This is an e-mail from yourself to Mr. Hawker --

7    A.  Yes.

8    Q.  -- saying, "We are going to meet at 10 a.m. at Paul's

9    apartment."

10          Is it fair to say that if you didn't call it, you

11   organized it?

12   A.  Paul asked me to call for the meeting.

13   Q.  And who was there?

14   A.  Myself, Mr. Hawker, Mr. Manafort, and I believe, for part

15   of it, Mr. van der Zwaan.

16   Q.  Well, he is not on the e-mail.

17   A.  Correct.  So maybe I'm wrong about that.

18   Q.  Okay.  And you're saying that the issue of Mr. Craig

19   reversing course was not an issue that was brought up at this

20   meeting?

21   A.  It was not an issue brought up directly at the Harvard

22   Club meeting.  From my understanding from Mr. Hawker, it was

23   brought up previously to the Harvard Club meeting.

24   Q.  I'm sorry, Mr. Gates.  Maybe I'm tired, but I'm not

25   following you.  I thought you said that at the Harvard Club

1    meeting Mr. Craig said David Sanger is a good reporter?

2    A.   Correct.  In the general discussion that we had.

3    Q.   Right.  And he didn't say, I will accept the assignment

4    of briefing David Sanger?

5    A.   No, not at that meeting.

6    Q.   Okay.  But he might have talked about backgrounding the

7    journalist, in general?

8    A.   Yes.

9    Q.   Okay.  And then you heard that he changed his mind?

10   A.   Correct.  But this is not the first time he had changed

11   his mind.

12   Q.   Understood.  But I'm talking about this specific subject.

13   A.   Yes.

14   Q.   You learned that the next day?

15   A.   Yes.

16   Q.   And was that a subject of concern to the group?

17   A.   To Mr. Hawker, it was.  But Mr. Manafort indicated that

18   he would talk to Mr. Craig and take care of --

19   Q.   I didn't ask you what Mr. Manafort --

20        THE COURT:  Well, you asked if it was a subject of

21   concern to the group --

22        MS. JUNGHANS:  And that was a "yes" or "no" question.

23        THE COURT:  -- the group had different brains --

24        MS. JUNGHANS:  Right, I'm just asking --

25        THE COURT:  -- so he didn't have the same answer for

1     every person.  He's trying to answer your question.

2          MS. JUNGHANS:  Right.  Okay.

3          THE COURT:  So it was the subject -- it was -- was

4     Mr. Hawker concerned?

5          THE WITNESS:  He was.

6          THE COURT:  Was Mr. Manafort concerned?

7          THE WITNESS:  Not as concerned.

8          BY MS. JUNGHANS:

9     Q.  Okay.  So then you had this meeting at Trump Tower.

10    A.  Yes.

11    Q.  And then you continued to do media plans.

12    A.  Yes.

13    Q.  And let's look at September 26th, which is Defendant's

14    Exhibit 161.

15          Again, this is a document from you to Mr. Hawker, the

16    "SA outreach list."

17    A.  Yes.

18    Q.  Okay.  And are you the one who put this together in

19    addition to circulating it?

20    A.  No, this was actually put together by the -- primarily,

21    the two D.C. firms.  It's a template that we just updated,

22    but it had already been prepared by them.

23    Q.  Okay.  And did you have any input into it?

24    A.  I did.

25    Q.  Okay.  And particularly as to U.S. journalists who might

1    be employed in this process?

2    A.   Well, to be clear, I didn't have input in terms of who

3    that might be.  I had input into I could make changes based

4    on what I was directed to do with the document.

5    Q.   Okay.  And what the document says, if you go to page 2,

6    which is page 3 of the pdf -- so after you review journalists

7    in Europe, then you get to the United States.  And the United

8    States person was Al Hunt at *Bloomberg*; correct?

9    A.   That is correct.

10   Q.   Okay.  And did you direct that that information be

11   included?

12   A.   I don't recall, but we -- either I or Mr. Hawker updated

13   it with that information.

14   Q.   Okay.  So at this point, you are not operating on the

15   presumption that Mr. Craig is going to reach out to David

16   Sanger?

17   A.   At this stage, that is correct.

18   Q.   And if you go to Defendant's Exhibit 167, a couple of

19   days later, another version.  Do you have any idea what

20   caused you to update this version since September 26th?

21   A.   Other than just more changes as we continued to change

22   the plan.  I don't even think this is the last document,

23   either.

24   Q.   Probably not.  Let's look at pdf 167-5.

25   A.   Yes.

1    Q.   And if you look at the lower portion of the page, it has

2    got a whole bunch of assignments for Mr. Craig.  But I notice

3    in this one, it says, "Al Hunt and *Bloomberg* will be

4    contacted by FTI and MCW."

5    A.   Yes.

6    Q.   What is that?

7    A.   MCW was Mercury.  That was based on the contact that I

8    alluded to earlier that Mr. Weber had with the reporter,

9    Mr. Hunt.

10   Q.   Okay.  So Mr. Craig isn't involved in that, according to

11   this plan?

12   A.   That is correct.

13   Q.   Okay.  But Mr. Craig supposedly is going to go talk to

14   Tony Blinken, Philip Gordon, and John Boehner?

15   A.   That's who we identified, yes.

16   Q.   Pardon me?

17   A.   Yes, that's who we identified putting into the matrix.

18   Q.   You're saying that Mr. Craig told you he would talk to

19   these three individuals?

20   A.   No, I'm saying we just put it in the matrix.  We did not

21   have -- I did not have a conversation with Mr. Craig.

22   Q.   Okay.  This is your continuing wish list about what

23   Mr. Craig is going to do?

24   A.   Yes.

25   Q.   Not shared with him by you or by anybody else, as far as

1    you know?

2    A.   Correct.  This was a briefing of top level officials both

3    at Congress and at the administration that we thought that

4    Mr. Craig would be willing to do.

5    Q.   Okay.  You thought he would be willing to do, but you

6    hadn't asked him if he was willing to do it?

7    A.   I personally did not, no.

8    Q.   Now, if you go to Defendant's Exhibit 168, which is

9    September 30th, a couple of days later, again from you to

10   Mr. Hawker, yet another version, and you ask him to look

11   closely at it.

12          Now, at this point, did you think that the

13   report -- this was like getting down to crunch time?  I mean

14   you're exchanging lots of documents.

15   A.   This happened a couple of times -- actually, a few

16   times -- throughout the months that we thought we were going

17   to release it.  So it was another fire drill exercise in

18   which we were attempting and believed that the report would

19   be released, that we would be given the green light from

20   Ukraine so that we could then put these into action.

21   Q.   Right.  So, at that moment, if you look at page 168-2,

22   we're still sticking with Al Hunt and *Bloomberg*.

23   A.   That is correct.

24   Q.   Without saying who's going to do it?

25   A.   Correct.

1           MR. CAMPOAMOR-SANCHEZ:  Objection.  Are we at Exhibit

2     168?

3           MS. JUNGHANS:  168, page 2.

4           MR. CAMPOAMOR-SANCHEZ:  Can you show the jurors a

5     little bit above the box --

6           MS. JUNGHANS:  Sure.  Happy to.

7           MR. CAMPOAMOR-SANCHEZ:  Okay.

8           THE COURT:  Well, I do think -- she can ask her

9     questions, and you can ask your questions but --

10          MR. CAMPOAMOR-SANCHEZ:  May we approach, Your Honor?

11          THE COURT:  Yes.

12       (At the bench)

13          THE COURT:  I think his point was it wasn't a fair

14    question to say, without saying who's going to do it, when

15    immediately above it says this will be done by FTI and SA.

16          Now, you can establish whether he knew that, whether

17    it was a wish list, blah, blah, blah.  But it says that.  And

18    you asked a question that was misleading.  I don't think it

19    was deliberately you who put the box up --

20          MS. JUNGHANS:  I'm happy to fix it.

21          THE COURT:  Okay.

22          MS. JUNGHANS:  I'm happy to have him read this whole

23    thing.

24          THE COURT:  That's not the point.  I think what he

25    meant, information that was invisible at the moment, and so

1    it was an unfair question because it was written there.

2          MS. JUNGHANS:  I am not --

3          THE COURT:  Nobody is suggesting that you did it

4    deliberately.  All right.

5          Now, I just want to say that we're all trying to

6    remain calm.  I think you can object and ask to approach.

7    You don't need to turn back and look at him.  Let's put it

8    through me.

9          I do want to say -- and this isn't directed to you

10   personally, this is directed to everyone -- that when the

11   jurors were making the gesture that indicated let's just keep

12   going that I think that conveyed that they wanted to just

13   finish whatever we were doing before the next break.  I'm

14   concerned that it also reflects the notion that this is

15   taking a long time.  And that doesn't lie at the feet of

16   either side.  But there is, by both sides, in both directs

17   and crosses, a fair amount of replowing of territory and

18   recapitulation of testimony, and so I just want everybody to

19   think about the fact that it may be wearing on your untended

20   audience.  And as I said, I'm not directing that to you

21   personally; I'm directing that to everyone.

22         MS. JUNGHANS:  Your Honor, I appreciate that.  There

23   is evidentiary value to the fact that these people generated

24   iteration after iteration after iteration of these documents

25   that don't mention Mr. Craig.  You know, if I don't put that

1    in, I can't make the point.

2           THE COURT:  Well, I think Mr. Hawker was

3    cross-examined for an entire day during which that was put

4    in, and I think that this gentleman is being cross-examined

5    to put that in, and I understand the point, and the relevance

6    of the point will be both sides' ability to argue when the

7    time comes.  I'm just suggesting that everyone risks annoying

8    the jury with too much repetition.  I'm not directing that

9    only to the defense.  I think there has been a lot of

10   repetition by everyone.  And I think the jury's indicated

11   that.  So that's for what it is worth.

12          MS. JUNGHANS:  I hear you, and I'm doing my best.

13          THE COURT:  All right.  Thank you.

14       (In open court)

15          BY MS. JUNGHANS:

16   Q.  Mr. Gates, Mr. Campoamor pointed out that I failed to

17   highlight this whole section, and I want to make sure that it

18   is complete.

19          So, John, could you go up to -- you can just do the

20   line above the box.

21          Okay.  "The background briefings will be done by FTI

22   and SA" -- which would be Skadden, right?

23   A.  Yes.

24   Q.  -- "and include the following journalist."

25   A.  Yes.

1    Q.   And the journalist is *Bloomberg*?

2    A.   Yes.

3    Q.   Okay.  Let's look at Government Exhibit 280.  And this is

4    an e-mail from Mr. Hawker to Mr. Manafort and you.  Right?

5    A.   Yes.

6    Q.   And what he does here is to take segments out of the

7    master grid and comment on them.  Right?

8    A.   Let me read it real quick.

9         Okay.

10   Q.   Okay.  And if you go to the next page, he says that

11   "Mr. Craig is in Egypt.  In his last call, he said that he

12   would do meetings with political stakeholders."

13        You see that?

14   A.   I do.

15   Q.   Now, Mr. Craig never -- you never heard him say that to

16   you?

17   A.   No.

18   Q.   And you don't know of him ever doing that?

19   A.   Political stakeholders, I do not believe he did.

20   Q.   Okay.  And then if you go down lower on that page, he

21   talks about the part that says "the setup" -- at the

22   bottom -- "The set up and numbers is the responsibility of

23   the agencies."  Again, it says, "briefings again would be

24   done by GC" -- Greg Craig" -- slash "me."  "Me" is

25   Mr. Hawker; right?

1    A.   That's correct.

2    Q.   "Or someone appropriate from the Ukraine."  Correct?

3    A.   Yes.

4    Q.   Now, this is a few days after you have just heard that

5    Mr. Craig had --

6            THE COURT:  Wait.  Are the typed comments Hawker's

7    comments or Manafort's comments?

8            MS. JUNGHANS:  Hawker's.

9            THE WITNESS:  Mr. Hawker's.

10           BY MS. JUNGHANS:

11   Q.   Okay.  This is a few days after you had been told that

12   Mr. Craig had reversed course about whatever he indicated at

13   the Harvard Club he might be able to do?

14           MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

15           THE COURT:  I'm sorry.  Can you repeat the question?

16           BY MS. JUNGHANS:

17   Q.   You said that the Harvard Club meeting was

18   September 23rd; right?

19   A.   Correct.

20   Q.   And within a day or two after that you heard that

21   Mr. Craig said that no, I can't do that?

22   A.   With respect to media, not political stakeholders.

23   Q.   Okay.  Well, right.  But then we're talking about here,

24   the line we just looked at, we're talking about briefings

25   with political stakeholders at that point.  Right?

1    A.   Yes.

2    Q.   Okay.  So you're saying you still thought he was going to

3    do that but you understood clearly he was not going to do

4    media?

5    A.   Based on -- yes, that's correct.

6    Q.   Okay.  And let's just try to go through these.

7    Government Exhibit 281.  This is from you to Mr. Hawker,

8    "Matrix," and it says, "D.C. consultants plan."

9         Right?

10   A.   Yes.

11   Q.   And this is the Podesta and Mercury people?

12   A.   It is a revised version, yes.

13   Q.   Turn to the next page, please, John.

14        And again, we're still talking about identifying a

15   key reporter, an outlet that can leak the story, possibly

16   *Bloomberg*.  Right?

17   A.   Yes.

18   Q.   Okay.  No David Sanger?

19   A.   Not in this document.

20   Q.   Turn to Defendant's Exhibit 175.  This is from yourself

21   to Mr. Hawker, October 3rd.

22        Do you see that?  With a list?

23   A.   Yes.

24   Q.   More of the same?

25        If you scroll to the next page, please, John.

1          "Proposed outreach list."  And when you get to the

2     media on page 175-7, down at the bottom, and then go to the

3     next page, the person from *The New York Times* is Steven Lee

4     Myers.

5     A.   Yes.

6     Q.   And so was that put in by somebody from Mercury or

7     Podesta?

8     A.   No.  In fact, this was a compilation of documents from

9     Mercury and Podesta, along with the document that Mr. Hawker

10    had created, and then in a lot of these instances things had

11    not been updated accordingly.

12    Q.   I'm sorry.  I didn't hear the last part.

13    A.   Some things had not been updated accordingly.

14    Q.   Okay.  So you're saying Steven Lee Myers was just like a

15    leftover from some prior version, or was he in active

16    contemplation?

17    A.   No, that was actually from the original document that you

18    showed me earlier where Mr. Hawker had put in Mr. Myers' name

19    as a placeholder.

20    Q.   So he is still a placeholder?

21    A.   At this stage, yes.

22    Q.   So there is no plan at that point for Mr. Craig to reach

23    out to David Sanger?

24    A.   At that stage, to my knowledge, no specifics had been

25    talked about about Mr. Craig reaching out -- Mr. Craig

1    actually reaching out to him, that's correct.

2    Q.   Or Mr. Craig reaching out to any other particularly

3    identified journalist?

4    A.   That's correct.  Mr. Craig had agreed to do background

5    briefings, but the plan in the context of when he would do

6    those, how many, to who, had not been decided at this stage.

7    Q.   And then he said he couldn't do that, you heard?

8    A.   Yes.

9         MS. JUNGHANS:  Your Honor, if we could take a few

10   minutes, I can maybe consolidate this.  Is it too early?

11        THE COURT:  I think consolidation would be a useful

12   exercise.  It's a little early.  But I think it may be a

13   better use of our time than not consolidating.  So if you

14   would like to take the afternoon break now for 10 minutes, we

15   will do that.

16        MS. JUNGHANS:  Thank you.

17        THE COURT:  All right.  Members of the jury, we will

18   take our afternoon break.  It doesn't mean that if you need

19   one later that you don't get one.  But we are going to break

20   now and we will resume in 10 minutes.  That would be 3:15.

21   And our witness would get a break, too.

22        (Jury not present)

23        THE COURT:  All right.  Everyone is excused, and we

24   will resume in 10 minutes.  Thank you.

25        (Recess)

2039

1          THE DEPUTY CLERK:  Your Honor, re-calling Case Number

2     19-125, United States of America v. Gregory B. Craig.

3          THE COURT:  All right.  Can we bring the jury back

4     in.

5          (Jury present)

6   BY MS. JUNGHANS:

7     Q.   Mr. Gates, as it happened, the report was not released in

8     September of 2012; right?

9     A.   That's correct.

10    Q.   Or October?

11    A.   Correct.

12    Q.   Or November?

13    A.   Correct.

14    Q.   And it wasn't released, actually, until mid-December of

15    2012?

16    A.   That is correct.

17    Q.   And you learned in early December of 2012 that it was

18    going to be released; correct?

19    A.   Yes.

20    Q.   So there were more iterations of the plan?

21    A.   Yes.

22    Q.   Okay.  Now, let's look at December 5th, 2012.

23    A.   I'm sorry.  What exhibit?

24    Q.   I'm sorry.  Exhibit 317, Government Exhibit 317.

25          And if you look at the lower portion of the document,

1    it is an email from yourself to Mr. Kilimnik, Mr. Manafort,

2    and Mr. Hawker, saying that you are sending a complete set of

3    documents for the Skadden Report --

4    A.   Yes.

5    Q.   -- that includes edits from Paul, which is Mr. Manafort;

6    right?

7    A.   Correct.

8    Q.   And the only new one is the file entitled "Master control

9    grid, SA report."

10            You see that?

11   A.   Yes.

12   Q.   Okay.  And then Mr. Hawker, you understand, forwarded

13   that on to Mr. van der Zwaan; correct?

14   A.   Yes.

15   Q.   And the address to which it was sent,

16   AlexanderVanDerZwaan@gmail.com is Mr. van der Zwaan's private

17   e-mail address, not his Skadden e-mail address; correct?

18   A.   Correct.

19   Q.   And then Mr. Hawker -- and you did not send this to

20   Mr. Craig?

21   A.   I did not.

22   Q.   And we don't have any evidence that Mr. Hawker sent it to

23   Mr. Craig?

24   A.   I don't know.

25   Q.   Okay.  Can you look at Defendant's -- Government's

1    Exhibit 318.

2           And Mr. Hawker notified you pretty quickly there that

3    "Everything had gone to Alex's gmail.  Can't get hold of

4    Greg" --

5    A.   Yes.

6    Q.   -- you see that?

7           And if you go back to 317, that was -- the documents

8    that were forwarded -- that you sent to Mr. Hawker and

9    Mr. Hawker sent to Mr. van der Zwaan were a whole raft of

10   documents; correct?

11   A.   Yes.  It was the entirety of the packet that we had

12   prepared.

13   Q.   So if you look at Exhibit 317 in your paper form --

14   A.   Okay.

15   Q.   -- it is actually about 90-some pages of documents; is it

16   not?

17   A.   It looks pretty close.

18   Q.   Okay.  And John, if you would put up page 317-94.

19          So on the 94th page of this batch of documents is an

20   item that says, in the middle of the page -- if you can blow

21   that up -- that the report will be given -- the upper

22   portion -- the report will be given to David Sanger, etc.;

23   right?

24   A.   Yes.

25   Q.   And this is the only media plan you crafted that said

1    that, and it was not provided by you to Mr. Craig?

2    A.   I didn't craft the report.  I received a copy of it.  But

3    I did not send it to Mr. Craig, that's correct.

4             MS. JUNGHANS:  All right.  Thank you very much.

5    Nothing further.

6             THE COURT:  When you say the 94th page, was this all

7    one document or multiple documents?

8             THE WITNESS:  Multiple documents.

9             MS. JUNGHANS:  Multiple documents that are printed

10   that came as one package.

11            THE COURT:  They came as separate pdfs attached to

12   the email, and they have now been print and put in an order

13   that makes this the 94th page.

14            MS. JUNGHANS:  Correct.  And the last one that is

15   listed on the header is the master control grid.

16            THE COURT:  All right.  Any redirect?

17            MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

18                       REDIRECT EXAMINATION

19            BY MR. CAMPOAMOR-SANCHEZ:

20   Q.   Let's start with the last few sets of questions.

21            You were asked whether the documents were sent to

22   Mr. van der Zwaan's gmail account --

23   A.   Yes.

24   Q.   -- as opposed to his Skadden account.

25   A.   Yes.

1    Q.   Was there a reason for that?

2    A.   There was.  There was concern very early on from the

3    project that Mr. Manafort's e-mail had been hacked on a prior

4    occasion, and he wanted to ensure the integrity of the

5    information.  There were a number of instances where we were

6    receiving highly sensitive information from the Skadden law

7    firm, particularly about the involvement of former Prime

8    Minister Tymoshenko, so we did not want that information to

9    be hacked, basically.  So we all used personal e-mail

10   accounts for some of the documents.

11   Q.   Why would that be safer than using the Skadden account or

12   the business account?

13   A.   Well, because most people would know the Skadden account.

14   They wouldn't specifically know my gmail account because it

15   might not even have my name.  It might be personalized in

16   some other way that would not be a unique identifier to any

17   of us working on the project.

18   Q.   All right.  Let me take you back to this morning very

19   briefly.  You were asked some questions on cross-examination

20   as to who was Skadden's client in this matter.

21        Do you recall those?

22   A.   I do.

23   Q.   Now, who arranged for Skadden to become involved in this

24   project?

25   A.   To my knowledge, it was Mr. Pinchuk.

2044

1    Q.   Okay.  But who paid or who was arranging for the payment

2    to be made to Skadden?

3    A.   Mr. Manafort.

4    Q.   And who was actually delivering the payment to Skadden?

5    A.   I was.

6    Q.   At Mr. Manafort's instructions?

7    A.   Correct.

8    Q.   And who was the person that would communicate Ukraine's

9    position on the Skadden Report to Mr. Craig?

10   A.   It was Mr. Manafort.

11   Q.   Not the Ministry of Justice?

12   A.   No.

13   Q.   You were also asked a number of questions about media

14   plans, a lot of questions about media plans today.  But I

15   will be short.

16        Did you yourself ever send a media plan to Mr. Craig?

17   A.   I did not.

18   Q.   Were you copied on the one that was sent prior to the

19   Harvard Club meeting?

20   A.   I was.

21   Q.   Now, sir, do you know whether Mr. Craig -- well, strike

22   that.

23        Do you know whether Mr. Manafort had sent Mr. Craig

24   earlier versions of the media plan and you were not copied on

25   it?

1    A.   I do not.

2    Q.   Do you know whether Mr. van der Zwaan had received prior

3    versions of the media rollout plan?

4    A.   I know he did receive them from Mr. Hawker, yes.

5    Q.   And do you know if Mr. van der Zwaan had provided those

6    copies to Mr. Craig?

7    A.   I do not.

8    Q.   Do you know whether Mr. van der Zwaan had shared with

9    other members of the team at Skadden?

10   A.   I do not.

11   Q.   And did those versions of the media plan make reference

12   to all these other PR firms that were also involved?

13   A.   At different times, yes.

14   Q.   Now, talking about those other firms, you were asked some

15   questions again this morning about Podesta and Mercury and

16   whether you had lied about the ECFMU.

17        Do you recall those questions?

18   A.   I do.

19   Q.   Let me ask you, first, who was the head of the Podesta

20   Group?

21   A.   Tony Podesta.

22   Q.   And who was the person in charge of the Mercury Group?

23   A.   Vin Weber.

24   Q.   Okay.  And --

25             THE COURT:  Just for the record, he said who was in

1    charge of The Podesta Group, and you said Podesta.  What was

2    his first name?

3            THE WITNESS:  Sorry.  Tony Podesta.

4            MR. CAMPOAMOR-SANCHEZ:

5    Q.  And for Mercury, it was Vin Weber?

6    A.  Vin Weber, correct.

7    Q.  All right.  So I want to make sure now that I'm asking

8    you in their personal capacities as opposed to the business,

9    okay?

10           Sir, did you lie to Mr. Podesta himself about whether

11   the ECFMU was independent from the government of Ukraine?

12   A.  I did not.

13   Q.  Did you lie to Mr. Weber himself about whether the ECFMU

14   was independent from the government of Ukraine?

15   A.  I did not.

16   Q.  Did you, in fact, tell Podesta -- Tony Podesta --

17   that they were -- well, strike that.

18           Did you tell them who the client actually was?

19   A.  Yes.

20   Q.  And who was the client?

21   A.  The government of Ukraine.

22   Q.  So following up on that, you were also asked a lot of

23   questions about either lies or other crimes that you

24   committed earlier this morning.

25           You recall those?

1    A.   I do.

2    Q.   And sir, you also had made a reference to approximately

3    how many interviews you have done with the government?

4    A.   In excess of 40.

5    Q.   Did you tell the investigators from the government and

6    the Special Prosecutor's Office about those lies and crimes?

7    A.   Yes.

8    Q.   And that's why that long list that you went on this

9    morning is known to us and to the defense?

10   A.   Yes.

11   Q.   And sir, did you have to come clean as part of this

12   process and talk and tell about all of the things you had

13   done?

14   A.   Yes.

15   Q.   And did you do that?

16   A.   I did.

17   Q.   Sir, as you sit here today, do you have any incentive to

18   lie or hide anything else from this Court or from the ladies

19   and gentlemen of the jury?

20   A.   I certainly do not.

21          MS. JUNGHANS:  Objection.  Argumentative.

22          THE COURT:  A little.  On to your next question.

23          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  I will move

24   on.

25          BY MR. CAMPOAMOR-SANCHEZ:

1    Q.   All right.  Let's go talk about the Harvard Club meeting

2    very briefly.

3             You got a lot of questions about that, and I

4    think -- please correct me -- you said at some point -- well,

5    first of all, did you yourself remember or recall Mr. Craig

6    reversing his position about backgrounding journalists?

7    A.   No.

8    Q.   Okay.  But upon questions of cross-examination, you said

9    that you heard about a reversal.

10   A.   I did.

11   Q.   Can you explain what you mean by that?

12   A.   Yes.  The primary point of contact with Mr. Craig with

13   respect to media was Mr. Hawker.  So often Mr. Hawker would

14   communicate various updates and messages to me, and I would

15   relay them to Mr. Manafort.  In this case, Mr. Manafort and I

16   were both present for the meeting.  So Mr. Hawker

17   communicated those messages to us directly.

18   Q.   Okay.  And you, I think, also were asked about whether

19   Mr. Hawker was concerned about that.

20   A.   Yes.

21   Q.   And was he?

22   A.   He was.

23   Q.   Okay.  And whether Mr. Manafort was concerned about that?

24   A.   Mr. Manafort was not as concerned.

25   Q.   And why was Mr. Manafort not concerned?

1          MS. JUNGHANS:  Objection.

2          THE COURT:  What did he say that led you to believe

3     he was more or less concerned?

4          I think this is fair redirect after you asked him

5     what Mr. Manafort thought.

6          THE WITNESS:  Yes, Mr. Manafort indicated to me that

7     he would talk to Greg and take care of the situation.

8          BY MR. CAMPOAMOR-SANCHEZ:

9     Q.   Do you know -- without telling us what was said -- do you

10    know if Mr. Manafort did have, indeed, contact with

11    Mr. Craig?

12    A.   I do know he had contact, yes.

13    Q.   After this alleged reversal?

14    A.   Yes.

15    Q.   And in any event, was the idea of using Mr. Craig to

16    background journalists abandoned at any point?

17    A.   No.

18    Q.   Why not?

19    A.   Because we needed Skadden to represent the findings of

20    the report.  There was nobody that was more credible to do

21    it.  So if I did it or Mr. Hawker did it, it wouldn't be the

22    same.  So we had to continue down a path.  Even if Mr. Craig

23    had indicated, I'm only willing to talk to one person, we

24    would have taken it because we needed his expertise and

25    credibility to debrief people on the report.

1    Q.   Now, let me ask you:  You were shown some documents -- I

2    think it was reflected both in the notes and Government

3    Exhibit 280 that you were just shown by the defense.  But did

4    you learn of Mr. Craig traveling to Egypt around either late

5    September or early October 2012?

6    A.   I did.

7    Q.   And in fact, was that discussed at the Harvard Club

8    meeting?

9    A.   Yes.

10   Q.   Do you know who, if anybody, from the other PR firms was

11   with Mr. Craig during that trip?

12   A.   Yes.  Mr. Weber happened to be with Mr. Craig because

13   they had a separate but shared client.

14   Q.   In Egypt?

15   A.   In Egypt, yes.

16   Q.   Okay.

17   A.   Or I believe it was the Middle East.  I don't know if it

18   was Egypt specifically they were flying into and out of.

19   Q.   Okay.  Somewhere in the Middle East and they were

20   together?

21   A.   Yes.

22   Q.   Now, as you sit here today, do you recall when it was

23   that the name of David Sanger first got put in any document

24   related to the media PR plans?

25   A.   Physical document, I believe it was the first document

1      that came from Mercury that we saw earlier today.

2      Q.   And is that where Mr. Weber worked?

3      A.   It is.

4      Q.   And if we can take a look at Government's Exhibit 306.

5      Can we zoom in on the top.

6             Is this a document you're referring to?

7      A.   Yes.

8      Q.   And does this, indeed, talk about Mr. Sanger as well as

9      Mr. Hunt being part of the seeding process?

10     A.   It does.

11     Q.   And you were shown all of these media -- well, let me do

12     one more thing.  Let's go to page 3 of this report.  Let's

13     zoom in on the bottom right.

14            In looking at the created date of October 3rd, 2012,

15     in the morning, does that help refresh your recollection

16     approximately about when the name of David Sanger at least

17     was being discussed among the PR firms?

18            MS. JUNGHANS:  Objection, Your Honor.  He didn't say

19     he didn't have a recollection --

20            THE COURT:  I think he said he didn't know.  You

21     asked him do you recall when his name first showed up in a

22     document.  He said it was this document.

23            MR. CAMPOAMOR-SANCHEZ:  Right.  And I'm just trying

24     to see if this helps --

25            THE COURT:  All right.  Well, I think if you're

```
1     refreshing somebody's recollection, you do it slightly

2     differently.

3               MR. CAMPOAMOR-SANCHEZ:  Okay.  Then if --

4               THE COURT:  Ask your next question.

5               MR. CAMPOAMOR-SANCHEZ:  I will ask my next question.

6               BY MR. CAMPOAMOR-SANCHEZ:

7     Q.  As you sit here today, you don't recall?

8     A.  When David Sanger's name was first mentioned --

9     Q.  Yes.

10    A.  -- or in a document?

11    Q.  No, in a document.

12    A.  In a document, this document by Ms. Saunders was the

13    first time I had seen it in a document.

14    Q.  Now, was there a debate in the team as to whether to use

15    Mr. Sanger or Mr. Hunt?

16    A.  There was.

17    Q.  What was that debate?

18    A.  The debate, again, was that Mr. Weber was concerned that

19    Mr. Sanger would not --

20              MS. JUNGHANS:  Objection.  Objection.  Hearsay.

21              THE COURT:  All right.  Approach the bench.

22         (At the bench)

23              THE COURT:  I don't think he was bringing in the

24    truth of the matter asserted.  He's saying that there was a

25    debate, and someone said X and someone said Y.  Now, if he
```

1    wasn't present for the debate and the debate was reported to

2    him by somebody else, X said that Y said, he can't do that.

3    But if he heard the person say, I don't like Sanger for this

4    reason, and somebody else said, I like him for that reason,

5    that is not hearsay.  I don't know why he can't say that.

6         MR. TAYLOR:  May I?

7         THE COURT:  Okay.  I think she's doing great.

8         MR. TAYLOR:  She is.

9         THE COURT:  All right.

10        MR. TAYLOR:  We're going to make sure that the record

11   is clear that we object to the extensive use of hearsay,

12   which is --

13        THE COURT:  Mr. Taylor, you can't lay down a general

14   objection.  She objected every time she thought she heard

15   hearsay.

16        MR. TAYLOR:  I know that.

17        THE COURT:  And then she got up on cross-examination

18   and elicited hearsay.  So now we're on redirect.  And what is

19   your objection to my question?  And I agree that hearsay is

20   generally inadmissible.

21        He said, was there a debate within the team?  He said

22   yes.  He asked him to explain it.  And he is, I think, about

23   to testify to the fact that something was said.

24        And I don't understand where the hearsay comes in.

25   Where is the assertion of a matter for the truth of the

1    matter asserted?  That is hearsay.

2         MR. TAYLOR:  What I want to say, Your Honor, is

3    regardless of what has occurred, the testimony that Manafort

4    said he was going to do something with Craig is a violation

5    of our right in a criminal case to confront the witnesses

6    against us.  I want to be sure that -- it is not just hearsay

7    but the government's efforts to put into the case --

8         THE COURT:  Okay.  I'm going to tell you exactly why

9    I ruled the way that I ruled.

10        MR. TAYLOR:  I --

11        THE COURT:  I'm going to put it on the record.

12   Ms. Junghans asked this witness on cross-examination about

13   the meeting in Mr. Manafort's office after the e-mail had

14   been received that he wasn't going to do the backgrounding.

15   And she said, what did the group think about that?  What did

16   the group think, group including Mr. Manafort?  And he

17   started to say what each of their positions was, including a

18   statement of future intention by Mr. Manafort, which again

19   seems to me it isn't hearsay, it falls within the exception,

20   I'm going to do X.  But it was directly responsive --

21   directly responsive -- to something that had been asked on

22   cross.  And so he asked about it on redirect.  And I hear

23   you.  Your objection is on the record.  But I believe if you

24   ask a question about what did the people in the room think,

25   because people can't see inside of other people's heads,

1    they're going to tell you what they said.

2         So I think where we are right now is in the middle of

3    an answer about what the nature of the debate was within the

4    team.

5         So tell me your hearsay objection to that.

6         MS. JUNGHANS:  What I was saying there, the debate,

7    some people thought it was good and some people thought it

8    was bad.  I don't have a problem.  He was about to -- the

9    testimony that I think was about to be elicited was Mr. Weber

10   thought a specific thing, and I don't think we need to know

11   Mr. Weber's specific opinions.

12        THE COURT:  So you're saying it is irrelevant or it's

13   hearsay?

14        MS. JUNGHANS:  Both.

15        THE COURT:  All right.  Well, I think you asked him

16   why -- you asked him many times, well, why didn't it get

17   changed --

18        MS. JUNGHANS:  Now, I didn't actually --

19        THE COURT:  You kept saying, nonetheless, it's not

20   there.  So he's bringing out one of the reasons it might not

21   be there.

22        MS. JUNGHANS:  Look, I don't have a perfect

23   recollection of every word I have uttered today, I'm sure.

24   But I think I just said, it is not in this one, it is not in

25   this one, it is not in this one.  And I didn't ask a single

1   question about Vin Weber, not a single question.  So Vin

2   Weber's opinion about thus and so, I just don't think is

3   relevant.

4         THE COURT:  Nobody has addressed my question about

5   why the words that came out of Mr. Weber's mouth, if they

6   were said to Mr. Gates -- do we know if they were said to

7   Mr. Gates?

8         MR. CAMPOAMOR-SANCHEZ:  I believe there was a phone

9   call where that was said.  I can't recall if it was -- I

10   believe so, but I'm not a hundred percent sure.

11         THE COURT:  Why don't we short-circuit some of this

12   and just ask him targeted questions.  Did Mr. Weber favor the

13   use of Mr. Sanger?  No.  Who did Mr. Weber favor?

14         MR. CAMPOAMOR-SANCHEZ:  Right.

15         THE COURT:  And I think you're allowed to bring that

16   out because it is responsive to many issues that were raised.

17         MR. CAMPOAMOR-SANCHEZ:  I am trying to establish why

18   the name of Sanger was not in the document --

19         THE COURT:  I understand that.

20   Will that solve your problem?

21         MR. CAMPOAMOR-SANCHEZ:  Yes.

22         MR. TAYLOR:  If it can be done without inadmissible

23   hearsay, that's one thing.

24         THE COURT:  All right.  I just told him exactly how

25   to do it.  And so far no one has explained to me why, if he

1     heard what Mr. Weber said, it would even constitute hearsay.

2     But we're trying to skip that by having him simply say -- and

3     then don't object that it is leading -- without telling me

4     why, did Mr. Weber favor Mr. Sanger?  No.  Did he favor

5     someone else?  Yes.  Who?

6              Okay.  That's what we're going to do.

7              MR. TAYLOR:  May I tell you why it is hearsay?

8              THE COURT:  Yes.

9              MR. TAYLOR:  I know I'm trying your patience.  I'm

10    sorry.

11             THE COURT:  No, no.  It's just that you're arguing

12    broader principles than what I'm asking.

13             MR. TAYLOR:  If Mr. Gates is permitted to say

14    Mr. Weber recommended this, that conveys a message, a

15    statement, just like a doctor's diagnosis conveys.  That's

16    hearsay.  And the fact that it explains or may be relevant to

17    Mr. Weber's state of mind doesn't make it admissible against

18    a defendant in a criminal case.

19             THE COURT:  An out-of-court statement -- every

20    out-of-court statement is not hearsay.  An out-of-court

21    statement being offered for the truth of a matter asserted in

22    that statement is hearsay.  You know that.  I know that.

23    None of us need to lecture each other about what hearsay was.

24             And so I was asking him a more nuanced question about

25    why the words coming out of Mr. Weber's mouth, I want to use

1    X and not Y, is a fact, an assertion of a true fact.  So I'm

2    not sure it is, but we don't need to look it up because we're

3    going to go past that with a much more tailored redirect so

4    that we can finish this bench conference and the trial.

5             MR. TAYLOR:  We just can't cross-examine Mr. Weber

6    about what he said.

7             THE COURT:  I know that.  You can call him.

8          (In open court)

9             BY MR. CAMPOAMOR-SANCHEZ:

10   Q.   Let me ask you, to try to make this shorter:  Did

11   Mr. Weber favor having Mr. Sanger be the person to be

12   backgrounding journalists?

13   A.   No.

14   Q.   Which journalist did Mr. Weber favor?

15   A.   Mr. Al Hunt from *Bloomberg*.

16   Q.   So when you were shown all those media plans in

17   October that did not have Mr. Sanger's name, the other ones,

18   is there a reason for that?

19   A.   There is no specific reason other than that at the time

20   we looked at potentially using other reporters.  I had

21   communicated the information from Mr. Weber to Mr. Manafort.

22   And we had made a decision --

23             MS. JUNGHANS:  Objection.

24             THE COURT:  All right.  You were doing what you were

25   supposed to do at the time?

1           THE WITNESS:  Yes, ma'am.

2           THE COURT:  All right.  Go on to your next question.

3           MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

4           BY MR. CAMPOAMOR-SANCHEZ:

5     Q.   Ultimately, who made the call to use Sanger?

6     A.   Mr. Manafort.

7     Q.   And that was after Mr. Craig had suggested --

8           MS. JUNGHANS:  Your Honor, objection.  That is

9     hearsay.

10          THE COURT:  All right.

11          MS. JUNGHANS:  And I move to strike.  And it is

12    beyond the scope of the cross-examination.

13          THE COURT:  No, that one it is not.

14          At the time someone reached out to Mr. Sanger on a

15    particular date.  Do you know at whose direction -- do you

16    know from your own personal knowledge at whose direction they

17    were acting?

18          THE WITNESS:  Mr. Manafort's.

19          THE COURT:  All right.  Approach the bench.

20          MS. JUNGHANS:  I renew our objection.

21          THE COURT:  I know.

22       (At the bench)

23          MR. CAMPOAMOR-SANCHEZ:  I'm a little confused now

24    myself.

25          THE COURT:  Well, I had asked for the first two

1    questions.  I didn't know where you were going after that.

2           So he is saying -- we don't know how he knew --

3           MR. CAMPOAMOR-SANCHEZ:  I can ask him that.

4           THE COURT:  Well, it would be because Mr. Manafort

5    told him --

6           MR. CAMPOAMOR-SANCHEZ:  So I think there were

7    meetings at which they participated in phone calls.  But I

8    can ask him if that's the case.

9           MS. JUNGHANS:  Excuse me.  I'm sorry.

10          THE COURT:  If he was in a meeting where direction

11   was given to Mr. Hawker, do X --

12          MS. JUNGHANS:  But the "do X" -- Mr. Hawker never

13   talked to David Sanger.

14          THE COURT:  He sent him an e-mail.

15          MS. JUNGHANS:  No, he didn't.  I apologize.

16   Mr. Gates never communicated with Mr. Sanger.  So asking

17   Mr. Gates why Mr. Hawker did something, I don't understand

18   that at all.  He never communicated with --

19          THE COURT:  I'm going to ask him, was he ever at a

20   meeting where someone was -- where Mr. Manafort specifically

21   directed someone in his presence to contact Mr. Sanger.  I

22   think he can testify to that.  That's not hearsay.  That's

23   direction, do X, do Y.  If he was there, then he can say he

24   heard Mr. Manafort say, do X, do Y.  If he wasn't there, then

25   we have to go on.

1         MR. CAMPOAMOR-SANCHEZ:  And my understanding, Your

2   Honor, is that Mr. Manafort told him personally and then he

3   relayed that to Mr. Hawker, who puts it in the plan.  That's

4   the chain of command.

5         MS. JUNGHANS:  Well, let's be clear because I don't

6   want to keep popping up.  You're saying he is going to say

7   Manafort said --

8         MR. CAMPOAMOR-SANCHEZ:  Manafort made the decision.

9         MS. JUNGHANS:  Can I just get my words out?

10        Manafort instructed Hawker to send an e-mail to

11  Sanger and made sure of that -- is that what you're saying --

12        THE COURT:  He is saying Manafort told him, Gates,

13  tell Hawker to do it, and he did.  Told Hawker to do it.

14        MS. JUNGHANS:  Is that what you're saying?

15        MR. CAMPOAMOR-SANCHEZ:  That's what I believe, yes.

16        MS. JUNGHANS:  Well, you'd think if that had

17  happened, we would have heard it on direct.

18        MR. CAMPOAMOR-SANCHEZ:  You objected --

19        THE COURT:  Let's assume that's the testimony.  Did

20  Mr. Manafort direct you to do anything with respect to

21  Mr. Hawker and Mr. Sanger?  Yes.  What did he do?  He told me

22  to tell him to contact him.  Did you communicate that to

23  anyone?  Yes.  Mr. Hawker.

24        Is that hearsay?

25        MS. JUNGHANS:  Well, it probably isn't in that

1    precise format.  What this is all trying to hint at, which is

2    totally objectionable, is Manafort and Craig got together and

3    Craig agreed to do that and then Manafort told Hawker to do

4    it.  We really have to keep away from that.  If it is simply

5    Manafort told Hawker to e-mail Sanger and Hawker did it, I

6    don't think that is hearsay.

7            THE COURT:  And so we're going to continue to lead

8    him extremely tightly.

9            Did you get a direction?  Without telling me what it

10   is, did you get a direction from Mr. Manafort to tell

11   Mr. Hawker to do something?  Yes or no?  And then yes.  Okay.

12   What was it?  He told me to have him call Sanger.  And did

13   you pass that on to Mr. Sanger -- pass that on to Mr. Hawker?

14   And if you want to lead him through all of this, and the

15   questions are just "yes" and "no", you can do that, too.  You

16   can say, Mr. Gates, did you get a direction from Mr. Manafort

17   to pass on to Mr. Hawker?  Yes.  Was it to have Mr. Hawker

18   contact Mr. Sanger?  Yes.  And did you pass that on to

19   Mr. Hawker?  Yes.  And stop.

20           MS. JUNGHANS:  I don't know what the witness is going

21   to say as much as he does.  I'm not even sure he is going to

22   say he got a direction from Manafort to tell Hawker.

23           THE COURT:  If he says, did you get a direction to

24   pass on to Mr. Hawker, and he says no, then --

25           MR. CAMPOAMOR-SANCHEZ:  Right.  I believe -- well, I

1    will ask the question.  But I believe the direction is who's

2    the journalist to be seeded.  That's the direction.

3              THE COURT:  Did you get a specific direction from

4    Mr. Manafort to pass on to Mr. Hawker as to who to contact as

5    the first journalist?  Yes or no.  He answers yes.  Who was

6    the journalist?  Did you pass that information on to

7    Mr. Hawker?  Three questions.

8              MR. TAYLOR:  This is so important to the core of this

9    case that I want to implore you that this is a way of getting

10   before the jury the impression that Mr. Manafort had a

11   conversation with Mr. Craig, and that's the purpose of this.

12   The non-hearsay purpose is to get in front of a jury that the

13   implication that Manafort said something to Craig, he can't

14   avoid that.  And to let him testify --

15             THE COURT:  Well, I think there is already an

16   implication that it could have been a ton of people.  And we

17   have -- I mean, think of the end of the day, their closing

18   argument is going to be the documents were Craig reaches out

19   to Sanger.  But there was indication where Hawker sent an

20   e-mail to Sanger.  He seems to think he was supposed to do

21   that.  He got that direction from somebody.  And apparently

22   he got that from Gates.  And Gates didn't do it on his own.

23   He got that direction from somebody else.

24             I think the thing about Manafort said he would speak

25   to Craig, that was September.  We're now talking about

1    December, in a different time period.  We actually don't even

2    know when these conversations took place.

3         There have been at least 20 minutes of our being up

4    here in between these two things.  And he is not going to ask

5    any questions to link those two things.  I'm not even sure it

6    is fair argument.  There is no testimony in the record about

7    what transpired between the two of them.  They could have

8    talked about something else completely different.  We don't

9    know whether Mr. Craig said I will participate or I won't

10   participate, when they had that conversation.  So I don't

11   think there will be any argument in closing argument about

12   what happened in some secret side conversation between the

13   two of them.  I don't think the evidence supports it.

14        MR. TAYLOR:  His testimony was that Paul Manafort

15   gave the instruction to put Craig -- Craig and Sanger's name

16   and that that's hearsay.  And it goes --

17        THE COURT:  It is not --

18        MR. TAYLOR:  The subject was --

19        THE COURT:  He has been asked a thousand times by the

20   defense:  Is this in the report?  He told you to put it in

21   the report.  Did you run it by this person?  Did you run it

22   by that person?

23        You demanded that no conversation with Mr. Manafort

24   be introduced in direct, and the prosecution adhered to that.

25   And I sustained every objection along those lines.

1          And then, on cross-examination, you stood up and

2    said, what was Mr. Manafort thinking.  You asked, what did

3    Manafort -- how did he react.  And the witness answered.  It

4    was elicited by the defense.

5          MR. TAYLOR:  Your Honor, I don't believe that

6    anything we've done waived the right that I'm asserting, that

7    is, not to have to confront this kind of issue.  We have been

8    concerned about this from the beginning.  I note my

9    objection.  I do believe that at the most tender portion in

10   this case the government is being permitted to get the

11   implication before the jury that Manafort spoke to Craig -- I

12   think that is wrong.

13         THE COURT:  Well, as I said, I think there is a

14   separation between the two different things.  We have now Vin

15   Weber and Craig going to Egypt together and talking about who

16   knows what.  And thereafter is the first time David Sanger's

17   name appears on the document, which gave me the implication

18   that it was Weber who told his associate to write it on the

19   piece of paper, and there have been further communications.

20         We also know from evidence that this witness is not

21   going to be permitted to discuss that it is precisely during

22   that period of time that Mr. Craig reaches out to Mr. Sanger

23   and mentions Mr. Weber.  So I think at the end of the day the

24   inference that you're concerned about is not necessarily the

25   inference, I don't believe, and I think it would be

1    inappropriate in closing argument to stand up and say you all

2    can assume that Craig told Manafort he was going to do it

3    because Manafort told -- I understand their objection on that

4    point.  So I don't think you're going to argue that in

5    closing argument.  But I think asking these couple of

6    questions just to get out of this conundrum and on to your

7    next issue would be appropriate.

8              MS. JUNGHANS:  Thank you, Your Honor.

9         (In open court)

10             BY MR. CAMPOAMOR-SANCHEZ:

11   Q.   Mr. Gates, did you get direction from Mr. Manafort to

12   tell Mr. Hawker which journalist to contact for the purposes

13   of the seeding?

14             THE COURT:  That is just a "yes" or "no" question.

15             THE WITNESS:  Yes.

16             BY MR. CAMPOAMOR-SANCHEZ:

17   Q.   And which journalist was it?

18   A.   Mr. David Sanger.

19   Q.   And did you, in fact, pass on that information to

20   Mr. Hawker?

21   A.   I did.

22             MR. CAMPOAMOR-SANCHEZ:  The Court's indulgence.

23             (Pause)

24             BY MR. CAMPOAMOR-SANCHEZ:

25   Q.   Did Mr. Craig contact Mr. Sanger?

1    A.   He did.

2            MR. CAMPOAMOR-SANCHEZ:  No further questions, Your

3    Honor.

4            THE COURT:  All right.  This witness can be excused.

5    Thank you.

6        (Witness excused)

7            THE COURT:  Do we have a short witness, or a tall

8    witness who isn't going to testify for a long time?

9            MS. GASTON:  We don't have a really short witness

10   here, Your Honor.

11           THE COURT:  All right.  Then everybody has lots of

12   things to do.  So I think what we'll do is break for the

13   evening unless anybody has any objection.

14           All right.  We're going to break for the evening.

15           You are all, once again, cautioned to please do not

16   pay attention to any news accounts of this matter.  Do not

17   look back to try to find prior news accounts about this

18   matter.  Don't discuss it with anyone.  Don't discuss it with

19   each other.  The case has not yet been submitted to you.

20           Tomorrow morning, in an abundance of caution, just

21   given some other matters on my calendar, I'm going to say

22   we're going to start proceedings at 10.  You'll still get

23   your breakfast.  You can aim to be in the jury room between

24   9:30 and quarter of 10.  And then, hopefully, we will be

25   knocking on the door and beginning at 10 a.m.

1          I urge you to have a pleasant evening, and don't

2     think about the trial.

3          (Jury not present)

4          THE COURT:  All right.  Have you refined your witness

5     list such that you know how many more are left?

6          I understand that there's at least one more major

7     witness, and that would be Ms. Hunt.  But what else have we

8     got going on?

9          MR. CAMPOAMOR-SANCHEZ:  I believe we have five

10    witnesses in the mix, but likely only four.  But we just have

11    five.  Would you like me to identify them?

12         THE COURT:  Yes.

13         MS. JUNGHANS:  We can't hear you.

14         MR. CAMPOAMOR-SANCHEZ:  I'm sorry.

15         I believe we have, at most, five witnesses left,

16    although it could be as short as four.  We do expect,

17    assuming crosses are not overly long, to be done by Monday.

18         THE COURT:  All right.  That is very hopeful.  If you

19    determine which witness you're not calling, that you're

20    definitely not calling, you can let the defense know if you

21    know you're definitely not going to call them.

22         MR. CAMPOAMOR-SANCHEZ:  We will.  And we will also

23    give them the expected order for tomorrow.

24         THE COURT:  Thank you.

25         MR. TAYLOR:  Can I address the Court on a less

1    controversial matter?

2          THE COURT:  Okay.

3          MR. TAYLOR:  We expect the government will rest

4    tomorrow or Monday, and we will be addressing the Court on

5    the sufficiency issues.

6          THE COURT:  All right.

7          MR. TAYLOR:  There has been a fair amount of briefing

8    on the question of how the Court will define the duty that is

9    at issue in this case.

10          For us to meaningfully address the Rule 29 issues, it

11   would be helpful to have some understanding of how the Court

12   intends to proceed.  Obviously, that is an instruction issue.

13   But if we're going to address the question of whether or not

14   the government has proved the elements, including duty, then

15   it would be helpful to know from the Court, before we do

16   that, how the Court views the duty, as we have said in our

17   pleadings.

18          THE COURT:  I will do the best I can.  And certainly,

19   I won't make you articulate the argument if you have not yet

20   heard where I'm headed on that point.

21          I would note that the army of superb scribes on both

22   sides that are submitting information are submitting it to a

23   funnel, which is me, and I have been, as you know, here.  So

24   I have not concluded my examination of those issues, but I

25   understand that they are of the utmost importance; and that,

1    as in this case, the recurring theme, there is a deadline

2    looming and about to happen.

3             MR. TAYLOR:  I wouldn't impose on the Court for this

4    in the ordinary case, but because this is a legal issue and

5    it comes up in connection with instructions, but if we're to

6    have a meaningful discussion about sufficiency it would be

7    helpful to us.

8             THE COURT:  All right.  And I appreciate that.  And I

9    think to the extent there is any lack of clarity about which

10   way I'm headed, until I have heard the whole case, you can

11   certainly -- if you argue that they haven't even met their

12   own standard, then they clearly wouldn't have met your higher

13   standard, and you can address both.

14            MR. TAYLOR:  I'm eager to do that.

15            THE COURT:  All right.

16            MR. TAYLOR:  Thank you, Your Honor.

17            THE COURT:  I certainly want to underscore something

18   that I said at the bench, which is that I'm not chagrinned

19   with anyone in this courtroom.  I think these are very

20   difficult issues, and we're all doing our best at threading

21   the needle carefully and in accordance with the rules of

22   evidence and all the challenges that this case has posed for

23   both sides.

24            All right.  Thank you.

25            (Proceedings adjourned at 4:10 p.m.)

2071

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Patricia A. Kaneshiro-Miller, certify that the foregoing

4   is a correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Patricia A. Kaneshiro-Miller          August 22, 2019
    -----------------------------------     ---------------------
9   PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**1** [1] - 2000:23
**10** [7] - 2025:8, 2038:14, 2038:20, 2038:24, 2067:22, 2067:24, 2067:25
**100** [1] - 1991:20
**1000** [1] - 1991:24
**11:11** [3] - 2021:4, 2021:5, 2021:8
**12** [5] - 2002:11, 2010:8, 2012:20, 2012:22, 2015:25
**123** [1] - 2012:15
**123-3** [1] - 2013:19
**125** [1] - 2014:20
**126** [1] - 1994:16
**12th** [6] - 1995:9, 1996:9, 1996:10, 1999:7, 2000:6
**134** [2] - 2017:24, 2018:15
**14** [1] - 2013:21
**15th** [1] - 2005:15
**161** [1] - 2027:14
**167** [1] - 2028:18
**167-5** [1] - 2028:24
**168** [3] - 2030:8, 2031:2, 2031:3
**168-2** [1] - 2030:21
**175** [1] - 2036:20
**175-7** [1] - 2037:2
**1800** [1] - 1991:24
**18th** [1] - 2018:2
**19-125** [1] - 2039:2
**19-CR-125** [1] - 1991:4
**1994** [1] - 1993:3

## 2

**2** [4] - 2001:8, 2023:5, 2028:5, 2031:3
**20** [1] - 2064:3
**20001** [1] - 1992:4
**20036** [1] - 1991:25
**2006** [1] - 2012:20
**2012** [13] - 1995:9, 2000:7, 2002:11, 2010:8, 2012:21, 2012:22, 2016:1, 2039:8, 2039:15, 2039:17, 2039:22, 2050:5, 2051:14
**2016** [1] - 1993:6
**2019** [1] - 1991:7
**202** [1] - 1992:5
**2042** [1] - 1993:3
**20530** [2] - 1991:15, 1991:17
**21202** [1] - 1991:21
**22** [1] - 1991:7
**233** [4] - 1996:4, 1996:5, 1996:6, 2010:9
**234** [8] - 1995:8, 1998:25, 1999:6, 1999:24, 2000:2, 2000:3
**23rd** [1] - 2035:18
**2440** [1] - 1991:21
**254** [2] - 2019:15, 2019:22
**258** [1] - 2023:4
**26th** [2] - 2027:13, 2028:20

**270** [1] - 2025:4
**280** [2] - 2034:3, 2050:3
**281** [1] - 2036:7
**29** [1] - 2069:10
**2:03** [1] - 1994:2

## 3

**3** [4] - 2010:10, 2021:12, 2028:6, 2051:12
**306** [1] - 2051:4
**30th** [1] - 2030:9
**317** [4] - 2039:24, 2041:7, 2041:13
**317-94** [1] - 2041:18
**318** [1] - 2041:1
**333** [1] - 1992:4
**354-3243** [1] - 1992:5
**3:15** [1] - 2038:20
**3rd** [2] - 2036:21, 2051:14

## 4

**4** [1] - 2020:15
**40** [1] - 2047:4
**418** [4] - 1993:6, 2015:24, 2016:5, 2016:8
**4700A** [1] - 1992:3
**4:10** [1] - 2070:25
**4:11** [2] - 2020:11, 2020:12

## 5

**5** [4] - 2000:12, 2000:23, 2007:12, 2021:13
**555** [1] - 1991:14
**5th** [1] - 2039:22

## 6

**6** [1] - 2005:15

## 7

**75** [1] - 2020:2

## 9

**9** [5] - 1991:5, 1998:24, 1998:25, 1999:7, 2000:12
**90-some** [1] - 2041:15
**94th** [3] - 2041:19, 2042:6, 2042:13
**950** [1] - 1991:17
**9:30** [1] - 2067:24

## A

**a.m** [4] - 2020:11, 2020:15, 2025:8, 2067:25
**Aarons** [2] - 1995:11, 2000:10
**abandoned** [1] - 2049:16

**Abelson** [1] - 1991:19
**ability** [3] - 2009:3, 2009:6, 2033:6
**able** [3] - 2008:13, 2023:20, 2035:13
**absence** [2] - 2005:9, 2008:9
**abundance** [1] - 2067:20
**accept** [1] - 2026:3
**accepted** [1] - 2007:20
**accordance** [1] - 2070:21
**according** [2] - 2017:19, 2029:10
**accordingly** [2] - 2037:11, 2037:13
**account** [6] - 2042:22, 2042:24, 2043:11, 2043:12, 2043:13, 2043:14
**accounts** [3] - 2043:10, 2067:16, 2067:17
**accurate** [4] - 2006:12, 2006:23, 2011:14, 2012:11
**achieve** [1] - 2007:19
**acknowledge** [1] - 2004:19
**acquire** [1] - 2008:10
**acting** [1] - 2059:17
**Action** [1] - 1991:4
**action** [4] - 2023:9, 2023:10, 2023:11, 2030:20
**actions** [1] - 2023:23
**active** [1] - 2037:15
**activity** [1] - 1996:9
**actual** [2] - 1999:14, 2006:21
**Adam** [2] - 1991:16, 1991:19
**addition** [1] - 2027:19
**address** [8] - 2010:1, 2040:15, 2040:17, 2068:25, 2069:10, 2069:13, 2070:13
**addressed** [1] - 2056:4
**addressing** [1] - 2069:4
**adequacy** [1] - 2002:25
**adequate** [3] - 2006:5, 2007:24, 2008:8
**adhered** [1] - 2064:24
**adjourn** [1] - 2008:9
**adjourned** [1] - 2070:25
**administration** [1] - 2030:3
**admissible** [1] - 2057:17
**admission** [2] - 2005:6, 2016:4
**admitted** [2] - 2016:7, 2016:8
**adverse** [1] - 2006:17
**Afternoon** [1] - 1991:5
**afternoon** [2] - 2038:14, 2038:18
**AFTERNOON** [2] - 1991:9, 1994:1
**agencies** [1] - 2034:23
**agenda** [1] - 2019:16
**agree** [1] - 2053:19
**agreed** [2] - 2038:4, 2062:3
**aided** [1] - 1992:6
**aim** [1] - 2067:23
**AI** [4] - 2028:8, 2029:3, 2030:22, 2058:15
**Alex's** [1] - 2041:3
**AlexanderVanDerZwaan@gmail. com** [1] - 2040:16

**allegation** [1] - 2004:2
**alleged** [2] - 2009:14, 2049:13
**allow** [1] - 2008:10
**allowed** [1] - 2056:15
**alluded** [1] - 2029:8
**almost** [1] - 2008:16
**AMERICA** [1] - 1991:3
**America** [1] - 2039:2
**American** [3] - 2003:15, 2003:18, 2010:4
**amount** [3] - 2022:20, 2032:17, 2069:7
**AMY** [1] - 1991:9
**annoying** [1] - 2033:7
**answer** [4] - 2016:22, 2026:25, 2027:1, 2055:3
**answered** [2] - 2011:22, 2065:3
**answers** [2] - 1994:22, 2063:5
**apartment** [2] - 2024:11, 2025:9
**apologize** [3] - 1999:3, 2019:24, 2060:15
**appear** [2] - 1996:11, 2005:7
**APPEARANCES** [1] - 1991:11
**appeared** [1] - 2017:22
**appellate** [1] - 2003:18
**appendices** [1] - 2000:20
**appreciate** [2] - 2032:22, 2070:8
**approach** [5] - 2001:16, 2031:10, 2032:6, 2052:21, 2059:19
**appropriate** [2] - 2035:2, 2066:7
**argue** [5] - 2012:5, 2012:9, 2033:6, 2066:4, 2070:11
**argues** [2] - 2008:7, 2009:2
**arguing** [1] - 2057:11
**argument** [7] - 2063:18, 2064:6, 2064:11, 2066:1, 2066:5, 2069:19
**argumentative** [1] - 2047:21
**army** [1] - 2069:21
**arranged** [1] - 2043:23
**arranging** [1] - 2044:1
**article** [2] - 2016:16, 2017:6
**articulate** [1] - 2069:19
**asserted** [3] - 2052:24, 2054:1, 2057:21
**asserting** [1] - 2065:6
**assertion** [2] - 2053:25, 2058:1
**assignment** [3] - 2003:5, 2022:17, 2026:3
**assignments** [1] - 2029:2
**assistance** [1] - 2008:17
**associate** [1] - 2065:18
**assume** [2] - 2061:19, 2066:2
**assuming** [1] - 2068:17
**assurances** [1] - 2015:20
**attached** [5] - 1996:21, 2000:20, 2013:8, 2021:11, 2042:11
**attachments** [1] - 1996:2
**attempting** [1] - 2030:18
**attention** [3] - 1999:17, 2015:1, 2067:16

**ATTORNEY'S** [1] - 1991:13
**audience** [1] - 2032:20
**audiences** [1] - 2014:23
**August** [2] - 1991:7, 2007:12
**AUSA** [2] - 1991:12, 1991:13
**Avenue** [2] - 1991:17, 1992:4
**avoid** [2] - 2012:4, 2063:14

## B

**background** [3] - 2033:21, 2038:4, 2049:16
**backgrounding** [5] - 2023:19, 2026:6, 2048:6, 2054:14, 2058:12
**bad** [1] - 2055:8
**balance** [2] - 2006:4, 2007:22
**Baltimore** [1] - 1991:21
**based** [11] - 1998:18, 2002:19, 2003:17, 2009:24, 2011:11, 2011:17, 2020:13, 2022:7, 2028:3, 2029:7, 2036:5
**basis** [1] - 1997:8
**batch** [2] - 2019:16, 2041:19
**become** [1] - 2043:23
**BEFORE** [1] - 1991:9
**beginning** [3] - 2007:12, 2065:8, 2067:25
**behavior** [2] - 2004:18, 2007:14
**bench** [9] - 2001:19, 2012:5, 2031:12, 2052:21, 2052:22, 2058:4, 2059:19, 2059:22, 2070:18
**BERMAN** [1] - 1991:9
**best** [3] - 2033:12, 2069:18, 2070:20
**better** [2] - 2006:16, 2038:13
**between** [5] - 2064:4, 2064:7, 2064:12, 2065:14, 2067:23
**beyond** [3] - 2003:4, 2003:5, 2059:12
**BG** [3] - 2019:3, 2019:5, 2019:7
**Big** [1] - 2019:7
**binder** [1] - 2019:20
**bit** [1] - 2031:5
**blah** [3] - 2031:17
**Blinken** [1] - 2029:14
**Bloomberg** [7] - 2014:6, 2028:8, 2029:3, 2030:22, 2034:1, 2036:16, 2058:15
**blow** [3] - 2012:16, 2016:15, 2041:20
**Boehner** [1] - 2029:14
**bore** [1] - 2006:18
**bottom** [4] - 2001:8, 2034:22, 2037:2, 2051:13
**box** [3] - 2031:5, 2031:19, 2033:20
**Bradley** [1] - 1991:16
**brains** [1] - 2026:23
**break** [7] - 2032:13, 2038:14, 2038:18, 2038:19, 2038:21, 2067:12, 2067:14
**breakfast** [1] - 2067:23
**briefing** [3] - 2026:4, 2030:2, 2069:7
**briefings** [4] - 2033:21, 2034:23, 2035:24, 2038:5

**briefly** [2] - 2043:19, 2048:2
**bring** [3] - 1994:3, 2039:3, 2056:15
**bringing** [2] - 2052:23, 2055:20
**broader** [1] - 2057:12
**broke** [1] - 1994:15
**brought** [3] - 2025:19, 2025:21, 2025:23
**bullet** [1] - 2001:1
**bunch** [1] - 2029:2
**business** [2] - 2043:12, 2046:8
**BY** [32] - 1994:14, 1996:8, 1997:24, 1998:23, 1999:5, 1999:23, 2002:9, 2003:24, 2005:22, 2007:8, 2011:8, 2012:10, 2012:23, 2016:9, 2017:5, 2020:1, 2021:10, 2024:24, 2025:3, 2027:8, 2033:15, 2035:16, 2039:6, 2042:19, 2047:25, 2049:8, 2052:6, 2058:9, 2066:10, 2066:16, 2066:24

## C

**calendar** [1] - 2067:21
**calm** [1] - 2032:6
**CAMPOAMOR** [54] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:18, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20, 2011:21, 2011:25, 2016:6, 2016:19, 2024:13, 2031:1, 2031:4, 2031:7, 2031:10, 2035:14, 2042:17, 2042:19, 2046:4, 2047:23, 2047:25, 2049:8, 2051:23, 2052:3, 2052:5, 2052:6, 2056:8, 2056:14, 2056:17, 2056:21, 2058:9, 2059:3, 2059:4, 2059:23, 2060:3, 2060:6, 2061:1, 2061:8, 2061:15, 2061:18, 2062:25, 2066:10, 2066:16, 2066:22, 2066:24, 2067:2, 2068:9, 2068:14, 2068:22
**Campoamor** [2] - 1991:12, 2033:16
**CAMPOAMOR-SANCHEZ** [54] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:18, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20, 2011:21, 2011:25, 2016:6, 2016:19, 2024:13, 2031:1, 2031:4, 2031:7, 2031:10, 2035:14, 2042:17, 2042:19, 2046:4, 2047:23, 2047:25, 2049:8, 2051:23, 2052:3, 2052:5, 2052:6, 2056:8, 2056:14, 2056:17, 2056:21, 2058:9, 2059:3, 2059:4, 2059:23, 2060:3, 2060:6, 2061:1, 2061:8, 2061:15, 2061:18, 2062:25, 2066:10, 2066:16, 2066:22, 2066:24, 2067:2, 2068:9, 2068:14, 2068:22
**Campoamor-Sanchez** [1] - 1991:12
**candidate** [1] - 2009:18
**capacities** [1] - 2046:8
**caption** [3] - 1996:15, 2017:6, 2017:7
**care** [2] - 2026:18, 2049:7

**carefully** [1] - 2070:21
**case** [18] - 2003:15, 2007:17, 2007:20, 2009:25, 2016:18, 2048:15, 2054:5, 2054:7, 2057:18, 2060:8, 2063:9, 2065:10, 2067:19, 2069:9, 2070:1, 2070:4, 2070:10, 2070:22
**Case** [1] - 2039:1
**caused** [1] - 2028:20
**caution** [1] - 2067:20
**cautioned** [1] - 2067:15
**center** [1] - 2003:14
**certain** [2] - 2005:2, 2009:5
**certainly** [6] - 2006:17, 2008:16, 2047:20, 2069:18, 2070:11, 2070:17
**chagrinned** [1] - 2070:18
**chain** [1] - 2061:4
**challenges** [1] - 2070:22
**change** [4] - 2002:1, 2022:25, 2024:7, 2028:21
**changed** [5] - 2018:12, 2024:1, 2026:9, 2026:10, 2055:17
**changes** [2] - 2028:3, 2028:21
**changing** [3] - 2024:3, 2024:9, 2024:12
**characterization** [3] - 2010:22, 2011:15, 2012:12
**characterize** [1] - 2005:14
**charge** [2] - 2045:22, 2046:1
**charges** [1] - 2002:25
**chart** [1] - 2013:4
**check** [1] - 1997:5
**chief** [2] - 2008:24, 2015:13
**circuit** [1] - 2056:11
**circulated** [1] - 2019:17
**circulating** [1] - 2027:19
**cited** [1] - 2005:11
**citing** [1] - 2014:24
**claims** [1] - 2007:10
**clarify** [1] - 2011:2
**clarity** [1] - 2070:9
**clean** [1] - 2047:11
**clear** [5] - 2001:25, 2002:10, 2028:2, 2053:11, 2061:5
**clearly** [2] - 2036:3, 2070:12
**CLERK** [3] - 1996:5, 2019:23, 2039:1
**client** [6] - 2009:12, 2015:15, 2043:20, 2046:18, 2046:20, 2050:13
**close** [2] - 2009:19, 2041:17
**closely** [1] - 2030:11
**closing** [4] - 2063:17, 2064:11, 2066:1, 2066:5
**Club** [16] - 2019:13, 2019:18, 2020:20, 2021:23, 2022:16, 2023:9, 2023:17, 2024:16, 2025:22, 2025:23, 2025:25, 2035:13, 2035:17, 2044:19, 2048:1, 2050:7
**COLUMBIA** [2] - 1991:1, 1991:14
**coming** [1] - 2057:25
**command** [1] - 2061:4

**comment** [1] - 2034:7
**commented** [1] - 2012:14
**comments** [6] - 1996:11, 2018:20, 2019:10, 2035:6, 2035:7
**committed** [1] - 2046:24
**communicate** [3] - 2044:8, 2048:14, 2061:22
**communicated** [4] - 2048:17, 2058:21, 2060:16, 2060:18
**communications** [1] - 2065:19
**compilation** [1] - 2037:8
**complained** [1] - 2003:12
**complaint** [1] - 2005:2
**complete** [2] - 2033:18, 2040:2
**completely** [1] - 2064:8
**complicated** [1] - 2012:4
**component** [2] - 2022:6, 2022:19
**compromised** [1] - 2009:6
**computer** [2] - 1992:6, 2020:14
**computer-aided** [1] - 1992:6
**concern** [4] - 2024:10, 2026:16, 2026:21, 2043:2
**concerned** [13] - 2018:8, 2027:4, 2027:6, 2027:7, 2032:14, 2048:19, 2048:23, 2048:24, 2048:25, 2049:3, 2052:18, 2065:8, 2065:24
**concerns** [5] - 2005:15, 2006:6, 2007:25, 2018:25, 2019:3
**concluded** [4] - 2004:6, 2006:5, 2007:23, 2069:24
**concludes** [3] - 1998:11, 2010:11, 2011:18
**conclusion** [15] - 1997:7, 2001:14, 2002:15, 2002:24, 2003:6, 2003:10, 2003:21, 2005:14, 2006:2, 2006:12, 2007:9, 2008:3, 2010:15, 2010:17, 2011:15
**Conclusions** [1] - 2001:2
**conclusions** [4] - 2001:5, 2001:9, 2001:22, 2012:12
**conduct** [1] - 2004:20
**confer** [1] - 1998:22
**conference** [1] - 2058:4
**conflicting** [1] - 2002:17
**confront** [2] - 2054:5, 2065:7
**confused** [3] - 1999:1, 2008:5, 2059:23
**confusion** [1] - 2001:22
**Congress** [1] - 2030:3
**connection** [1] - 2070:5
**consent** [1] - 2019:9
**consented** [1] - 2021:19
**consider** [1] - 2019:9
**consideration** [1] - 2013:9
**consolidate** [1] - 2038:10
**consolidating** [1] - 2038:13
**consolidation** [1] - 2038:11
**constitute** [1] - 2057:1
**Constitution** [1] - 1992:4

**consult** [1] - 1998:19
**consultants** [2] - 2036:8
**contact** [10] - 2029:7, 2048:12, 2049:10, 2049:12, 2060:21, 2061:22, 2062:18, 2063:4, 2066:12, 2066:25
**contacted** [1] - 2029:4
**contemplation** [1] - 2037:16
**contempt** [1] - 2007:15
**content** [2] - 2006:22, 2024:21
**contents** [1] - 2000:18
**context** [1] - 2038:5
**continue** [2] - 2049:22, 2062:7
**continued** [3] - 2008:14, 2027:11, 2028:21
**continuing** [2] - 2007:12, 2029:22
**control** [6] - 2012:20, 2013:4, 2020:2, 2021:11, 2040:8, 2042:15
**controversial** [1] - 2069:1
**conundrum** [1] - 2066:6
**convened** [2] - 2024:10, 2024:15
**convening** [1] - 2019:13
**conversation** [6] - 2020:18, 2029:21, 2063:11, 2064:10, 2064:12, 2064:23
**conversations** [1] - 2064:2
**conveyed** [1] - 2032:12
**conveys** [2] - 2057:14, 2057:15
**conviction** [4] - 2003:19, 2006:8, 2008:1, 2010:4
**copied** [2] - 2044:18, 2044:24
**copies** [1] - 2045:6
**copy** [2] - 1995:3, 2042:2
**core** [1] - 2063:8
**corner** [1] - 2013:9
**correct** [71] - 1995:11, 1995:12, 1995:14, 1996:12, 1997:11, 1998:6, 2000:2, 2000:8, 2000:24, 2001:6, 2001:10, 2001:11, 2002:12, 2002:14, 2002:22, 2003:9, 2003:12, 2003:13, 2004:15, 2005:11, 2005:25, 2008:18, 2009:13, 2013:3, 2014:5, 2014:9, 2014:18, 2015:22, 2017:16, 2018:13, 2018:14, 2019:2, 2019:3, 2021:1, 2021:21, 2021:25, 2023:2, 2023:12, 2023:14, 2024:2, 2025:17, 2026:2, 2026:10, 2028:8, 2028:9, 2028:17, 2029:12, 2030:2, 2030:23, 2030:25, 2035:1, 2035:2, 2035:19, 2036:5, 2038:1, 2038:4, 2039:11, 2039:13, 2039:16, 2039:18, 2040:7, 2040:13, 2040:17, 2040:18, 2041:10, 2042:3, 2042:14, 2044:7, 2046:6, 2048:4
**counsel** [8] - 1998:20, 2005:5, 2008:5, 2008:9, 2008:13, 2008:15, 2008:17, 2013:10
**Counsel** [1] - 1998:22
**couple** [4] - 2028:18, 2030:9, 2030:15, 2066:5
**course** [2] - 2025:19, 2035:12
**COURT** [116] - 1991:1, 1994:3, 1994:5,

1997:18, 1997:21, 1998:21, 1999:11,
1999:16, 1999:20, 2000:2, 2000:4,
2001:17, 2002:4, 2002:7, 2003:22,
2005:8, 2005:12, 2005:20, 2006:13,
2006:21, 2007:1, 2007:4, 2007:7,
2010:21, 2012:1, 2016:7, 2016:21,
2021:2, 2021:5, 2021:7, 2021:9,
2024:15, 2024:18, 2025:1, 2026:20,
2026:23, 2026:25, 2027:3, 2027:6,
2031:8, 2031:11, 2031:13, 2031:21,
2031:24, 2032:3, 2033:2, 2033:13,
2035:6, 2035:15, 2038:11, 2038:17,
2038:23, 2039:3, 2042:6, 2042:11,
2042:16, 2045:25, 2047:22, 2049:2,
2051:20, 2051:25, 2052:4, 2052:21,
2052:23, 2053:7, 2053:9, 2053:13,
2053:17, 2054:8, 2054:11, 2055:12,
2055:15, 2055:19, 2056:4, 2056:11,
2056:15, 2056:19, 2056:24, 2057:8,
2057:11, 2057:19, 2058:7, 2058:24,
2059:2, 2059:10, 2059:13, 2059:19,
2059:21, 2059:25, 2060:4, 2060:10,
2060:14, 2060:19, 2061:12, 2061:19,
2062:7, 2062:23, 2063:3, 2063:15,
2064:17, 2064:19, 2065:13, 2066:14,
2067:4, 2067:7, 2067:11, 2068:4,
2068:12, 2068:18, 2068:24, 2069:2,
2069:6, 2069:18, 2070:8, 2070:15,
2070:17
   **court** [8] - 2002:8, 2003:18, 2033:14,
2057:19, 2057:20, 2058:8, 2066:9
   **Court** [15] - 1992:3, 2001:15, 2002:18,
2002:19, 2002:20, 2007:20, 2008:7,
2047:18, 2068:25, 2069:4, 2069:8,
2069:11, 2069:15, 2069:16, 2070:3
   **Court's** [7] - 2001:14, 2002:15,
2004:19, 2007:10, 2007:16, 2009:5,
2066:22
   **Courthouse** [1] - 1992:3
   **courtroom** [6] - 2004:18, 2005:1,
2007:14, 2007:18, 2012:7, 2070:19
   **courts** [2] - 2003:16, 2007:21
   **cover** [1] - 2000:16
   **craft** [1] - 2042:2
   **crafted** [1] - 2041:25
   **CRAIG** [1] - 1991:5
   **Craig** [77] - 2013:14, 2013:17, 2014:2,
2014:11, 2014:13, 2014:16, 2015:17,
2015:20, 2018:18, 2018:23, 2019:9,
2020:18, 2021:23, 2022:16, 2022:19,
2022:25, 2023:11, 2023:18, 2024:1,
2024:7, 2025:18, 2026:1, 2026:18,
2028:15, 2029:2, 2029:10, 2029:13,
2029:18, 2029:21, 2029:23, 2030:4,
2032:25, 2034:11, 2034:15, 2034:24,
2035:5, 2035:12, 2035:21, 2037:22,
2037:25, 2038:2, 2038:4, 2039:2,
2040:20, 2040:23, 2042:1, 2042:3,
2044:9, 2044:16, 2044:21, 2044:23,
2045:6, 2048:5, 2048:12, 2049:11,

2049:15, 2049:22, 2050:4, 2050:11,
2050:12, 2054:4, 2059:7, 2062:2,
2062:3, 2063:11, 2063:13, 2063:18,
2063:25, 2064:9, 2064:15, 2065:11,
2065:15, 2065:22, 2066:2, 2066:25
   **Craig's** [4] - 2018:10, 2018:24,
2021:15, 2023:23
   **created** [3] - 1998:18, 2037:10,
2051:14
   **credibility** [1] - 2049:25
   **credible** [1] - 2049:20
   **crimes** [2] - 2046:23, 2047:6
   **Criminal** [1] - 1991:4
   **criminal** [2] - 2054:5, 2057:18
   **CROSS** [2] - 1993:2, 1994:13
   **cross** [10] - 2033:7, 2033:4, 2043:19,
2048:8, 2053:17, 2054:12, 2054:22,
2058:5, 2059:12, 2065:1
   **cross-examination** [6] - 2043:19,
2048:8, 2053:17, 2054:12, 2059:12,
2065:1
   **CROSS-EXAMINATION** [1] - 1994:13
   **cross-examine** [1] - 2058:5
   **cross-examined** [2] - 2033:3, 2033:4
   **crosses** [2] - 2032:17, 2068:17
   **CRR** [1] - 1992:3
   **crunch** [1] - 2030:13
   **customarily** [1] - 2004:14
   **cut** [3] - 2014:25, 2015:11, 2016:11
   **cut-down** [2] - 2014:25, 2015:11

# D

   **D.C** [4] - 1991:6, 1992:4, 2027:21,
2036:8
   **date** [3] - 2013:5, 2051:14, 2059:15
   **dated** [1] - 2015:25
   **David** [16] - 2014:8, 2021:24, 2022:4,
2022:25, 2026:1, 2026:4, 2028:15,
2036:18, 2037:23, 2041:22, 2050:23,
2051:16, 2052:8, 2060:13, 2065:16,
2066:18
   **DAY** [1] - 1991:5
   **days** [4] - 2028:19, 2030:9, 2035:4,
2035:11
   **DC** [3] - 1991:15, 1991:17, 1991:25
   **deadline** [1] - 2070:1
   **deals** [5] - 1999:8, 2003:10, 2005:24,
2008:3, 2008:4
   **dealt** [3] - 2004:1, 2004:2, 2018:25
   **debate** [9] - 2052:14, 2052:17,
2052:18, 2052:25, 2053:1, 2053:21,
2055:3, 2055:6
   **debrief** [1] - 2049:25
   **December** [5] - 2000:6, 2039:14,
2039:17, 2039:22, 2064:1
   **decided** [1] - 2038:6
   **decision** [6] - 2006:3, 2007:11,
2007:22, 2009:5, 2058:22, 2061:8
   **defendant** [3] - 2003:16, 2008:12,

2057:18
   **Defendant** [3] - 1991:6, 1991:19,
2016:8
   **DEFENDANT** [1] - 1993:5
   **Defendant's** [13] - 2000:2, 2012:15,
2014:20, 2015:23, 2016:5, 2017:24,
2018:15, 2019:22, 2027:13, 2028:18,
2030:8, 2036:20, 2040:25
   **defense** [13] - 2003:11, 2003:17,
2008:9, 2008:20, 2009:4, 2009:5,
2009:7, 2033:9, 2047:9, 2050:3,
2064:20, 2065:4, 2068:20
   **define** [1] - 2069:8
   **definitely** [2] - 2068:20, 2068:21
   **deliberately** [2] - 2031:19, 2032:4
   **delivering** [1] - 2044:4
   **demanded** [1] - 2064:23
   **denied** [1] - 2008:24
   **DEPARTMENT** [1] - 1991:16
   **dependent** [1] - 2022:22
   **deprived** [2] - 2006:7, 2007:25
   **DEPUTY** [3] - 1996:5, 2019:23, 2039:1
   **der** [9] - 2016:3, 2025:15, 2040:13,
2040:16, 2041:9, 2042:22, 2045:2,
2045:5, 2045:8
   **describes** [1] - 2004:18
   **detail** [3] - 1996:3, 2004:23, 2015:2
   **detailed** [1] - 1996:1
   **details** [1] - 2005:10
   **detain** [2] - 2006:3, 2007:22
   **detention** [5] - 2005:24, 2007:10,
2007:11, 2007:13, 2007:19
   **determine** [1] - 2068:19
   **diagnosis** [1] - 2057:15
   **different** [9] - 2014:23, 2015:1, 2017:1,
2024:4, 2026:23, 2045:13, 2064:1,
2064:8, 2065:14
   **differently** [2] - 2017:4, 2052:2
   **difficult** [2] - 2004:22, 2070:20
   **direct** [4] - 2028:10, 2061:17, 2061:20,
2064:24
   **DIRECT** [1] - 1993:2
   **directed** [4] - 2028:4, 2032:9, 2032:10,
2060:21
   **directing** [4] - 1999:17, 2032:20,
2032:21, 2033:8
   **direction** [15] - 2059:15, 2059:16,
2060:10, 2060:23, 2062:9, 2062:10,
2062:16, 2062:22, 2062:23, 2063:1,
2063:2, 2063:3, 2063:21, 2063:23,
2066:11
   **directly** [4] - 2025:21, 2048:17,
2054:20, 2054:21
   **directs** [1] - 2032:16
   **discuss** [3] - 2065:21, 2067:18
   **discussed** [4] - 1994:17, 2004:23,
2024:22, 2050:7, 2051:17
   **discussion** [5] - 2022:5, 2023:18,
2023:21, 2026:2, 2070:6
   **dispute** [1] - 2002:17

**disputed** [1] - 2003:1
**disrespectful** [1] - 2004:20
**DISTRICT** [4] - 1991:1, 1991:1, 1991:10, 1991:14
**doctor's** [1] - 2057:15
**doctrine** [1] - 2010:1
**document** [41] - 1994:20, 1995:13, 1996:15, 1996:20, 1996:24, 1999:12, 2001:20, 2005:6, 2010:8, 2011:9, 2011:11, 2013:9, 2014:24, 2015:8, 2015:25, 2016:2, 2020:3, 2020:5, 2021:13, 2027:15, 2028:4, 2028:5, 2028:22, 2036:19, 2037:9, 2037:17, 2039:25, 2042:7, 2050:23, 2050:25, 2051:6, 2051:22, 2052:10, 2052:11, 2052:12, 2052:13, 2056:18, 2065:17
**documents** [18] - 2013:1, 2014:23, 2019:17, 2030:14, 2032:24, 2037:8, 2040:3, 2041:7, 2041:10, 2041:15, 2041:19, 2042:7, 2042:8, 2042:9, 2042:21, 2043:10, 2050:1, 2063:19
**done** [9] - 1999:19, 2031:15, 2033:21, 2034:24, 2047:3, 2047:13, 2056:22, 2065:6, 2068:17
**door** [1] - 2067:25
**down** [9] - 2002:24, 2012:17, 2014:25, 2015:11, 2030:13, 2034:20, 2037:2, 2049:22, 2053:13
**draft** [5] - 1996:16, 1998:9, 2001:21, 2001:24, 2002:4
**Draft** [1] - 2013:9
**drew** [1] - 2002:20
**drill** [1] - 2030:17
**driven** [1] - 2009:22
**due** [2] - 2003:18, 2004:14
**duly** [1] - 1994:12
**during** [10] - 2005:2, 2005:25, 2008:13, 2008:20, 2008:24, 2013:2, 2023:19, 2033:3, 2050:11, 2065:21
**duty** [3] - 2069:8, 2069:14, 2069:16
**DX** [1] - 2013:19

## E

**e-mail** [24] - 1994:19, 1994:21, 1996:10, 1996:16, 1999:17, 2011:4, 2012:19, 2013:15, 2016:11, 2017:7, 2018:18, 2018:22, 2025:6, 2025:16, 2034:4, 2040:17, 2043:3, 2043:9, 2054:13, 2060:14, 2061:10, 2062:5, 2063:20
**eager** [1] - 2070:14
**early** [5] - 2038:10, 2038:12, 2039:17, 2043:2, 2050:5
**East** [3] - 1991:20, 2050:17, 2050:19
**ECFMU** [3] - 2045:16, 2046:11, 2046:13
**edit** [2] - 1998:2, 1998:4
**edits** [2] - 2011:13, 2040:5
**effort** [2] - 2017:16, 2022:20

**efforts** [2] - 2018:11, 2054:7
**Egypt** [6] - 2034:11, 2050:4, 2050:14, 2050:15, 2050:18, 2065:15
**either** [5] - 2028:12, 2028:23, 2032:16, 2046:23, 2050:4
**elements** [2] - 2003:4, 2069:14
**elicited** [3] - 2053:18, 2055:9, 2065:4
**email** [2] - 2040:1, 2042:12
**emanating** [1] - 2023:9
**employed** [1] - 2028:1
**end** [3] - 2022:15, 2063:17, 2065:23
**ended** [1] - 2007:13
**engaged** [1] - 2004:20
**Engagement** [1] - 2014:6
**engagement** [1] - 2021:15
**enlarge** [1] - 2018:17
**ensure** [1] - 2043:4
**entire** [6] - 1995:20, 1995:21, 1995:22, 2006:4, 2007:22, 2033:3
**entirely** [1] - 2006:12
**entirety** [1] - 2041:11
**entitled** [1] - 2040:8
**Esq** [4] - 1991:19, 1991:19, 1991:22, 1991:23
**essence** [1] - 2004:3
**establish** [2] - 2031:16, 2056:17
**established** [2] - 2004:7, 2009:25
**etc** [2] - 2001:3, 2041:22
**Europe** [2] - 2021:17, 2028:7
**European** [1] - 2008:11
**evening** [3] - 2067:13, 2067:14, 2068:1
**event** [1] - 2049:15
**eventually** [1] - 2003:20
**evidence** [10] - 1994:18, 2002:18, 2002:19, 2002:21, 2010:2, 2016:3, 2040:22, 2064:13, 2065:20, 2070:22
**evidentiary** [1] - 2032:23
**exactly** [5] - 2002:6, 2017:13, 2018:15, 2054:8, 2056:24
**examination** [8] - 2008:15, 2043:19, 2048:8, 2053:17, 2054:12, 2059:12, 2065:1, 2069:24
**EXAMINATION** [2] - 1994:13, 2042:18
**examine** [1] - 2058:5
**examined** [3] - 1994:12, 2033:3, 2033:4
**examining** [1] - 2008:8
**except** [1] - 2023:13
**exception** [1] - 2054:19
**excess** [1] - 2047:4
**exchanging** [2] - 2013:1, 2030:14
**excuse** [2] - 1998:19, 2060:9
**excused** [3] - 2038:23, 2067:4, 2067:6
**executive** [4] - 1997:6, 2000:24, 2001:23, 2010:7
**exercise** [3] - 2008:13, 2030:17, 2038:12
**EXHIBIT** [1] - 1993:5

**exhibit** [3] - 2019:21, 2019:24, 2039:23
**Exhibit** [32] - 1994:15, 1995:8, 1996:4, 1998:24, 1999:6, 1999:24, 2000:2, 2000:3, 2012:15, 2014:20, 2015:24, 2016:5, 2017:24, 2018:15, 2019:15, 2019:22, 2023:4, 2025:4, 2027:14, 2028:18, 2030:8, 2031:1, 2034:3, 2036:7, 2036:20, 2039:24, 2041:1, 2041:13, 2050:3, 2051:4
**existence** [1] - 2002:11
**expect** [2] - 2068:16, 2069:3
**expected** [1] - 2068:23
**experience** [1] - 2004:7
**expertise** [2] - 2003:5, 2049:24
**explain** [2] - 2048:11, 2053:22
**explained** [1] - 2056:25
**explains** [1] - 2057:16
**expressed** [1] - 2006:2
**expressing** [1] - 2016:17
**extensive** [1] - 2053:11
**extent** [1] - 2070:9
**extremely** [1] - 2062:8

## F

**facility** [1] - 2007:12
**fact** [15] - 2002:19, 2005:25, 2010:23, 2018:7, 2019:12, 2032:19, 2032:23, 2037:8, 2046:16, 2050:7, 2053:23, 2057:16, 2058:1, 2066:19
**facts** [5] - 1994:23, 1995:23, 2001:3, 2002:17, 2007:14
**Factual** [1] - 2001:2
**factual** [1] - 2001:5
**failed** [1] - 2033:16
**failing** [1] - 2008:9
**fair** [10] - 2005:20, 2007:2, 2016:21, 2018:19, 2025:10, 2031:13, 2032:17, 2049:4, 2064:6, 2069:7
**fairly** [1] - 2005:13
**fairness** [3] - 2004:8, 2005:15, 2009:4
**falls** [1] - 2054:19
**far** [3] - 2018:8, 2029:25, 2056:25
**faster** [1] - 2007:7
**favor** [6] - 2056:12, 2056:13, 2057:4, 2058:11, 2058:14
**feet** [1] - 2032:15
**Fernando** [1] - 1991:12
**few** [5] - 2030:15, 2035:4, 2035:11, 2038:9, 2042:20
**file** [1] - 2040:8
**filled** [1] - 1995:5
**final** [3] - 2001:21, 2001:23, 2022:22
**finder** [1] - 2002:18
**findings** [4] - 1997:4, 1997:5, 2002:19, 2049:19
**finish** [2] - 2032:13, 2058:4
**finished** [2] - 2018:5, 2018:8
**fire** [1] - 2030:17

**firm** [2] - 2015:14, 2043:7
**firms** [5] - 2027:21, 2045:12, 2045:14, 2050:10, 2051:17
**first** [23] - 1994:19, 1994:20, 1999:16, 2001:1, 2001:14, 2002:15, 2005:12, 2011:6, 2011:12, 2013:17, 2013:8, 2026:10, 2045:19, 2046:2, 2048:5, 2050:23, 2050:25, 2051:21, 2052:8, 2052:13, 2059:25, 2063:5, 2065:16
**five** [3] - 2068:9, 2068:11, 2068:15
**fix** [1] - 2031:20
**flight** [1] - 2007:16
**flying** [1] - 2050:18
**folks** [1] - 2018:8
**following** [3] - 2025:25, 2033:24, 2046:22
**follows** [1] - 1994:12
**FOR** [2] - 1991:1, 1991:13
**form** [10] - 1997:13, 1997:16, 1999:25, 2011:21, 2016:16, 2016:19, 2019:20, 2024:13, 2035:14, 2041:13
**format** [1] - 2062:1
**former** [3] - 2009:17, 2017:18, 2043:7
**forth** [1] - 2013:1
**forward** [1] - 2018:23
**forwarded** [4] - 2011:1, 2016:2, 2040:12, 2041:8
**forwarding** [3] - 1995:10, 1995:11, 1996:11
**four** [2] - 2068:10, 2068:16
**Fourth** [1] - 1991:14
**front** [3] - 1995:13, 1999:24, 2063:12
**frustrate** [1] - 2012:7
**FTI** [3] - 2029:4, 2031:15, 2033:21
**Fule** [1] - 2023:13
**full** [2] - 1995:4, 2000:7
**funnel** [1] - 2069:23
**future** [2] - 2009:24, 2054:18
**FYI** [1] - 2016:13

# G

**GASTON** [1] - 2067:9
**Gaston** [1] - 1991:13
**gates** [13] - 1994:6, 1999:24, 2007:9, 2015:25, 2025:24, 2033:16, 2039:7, 2056:6, 2056:7, 2057:13, 2060:16, 2060:17, 2062:16
**GATES** [2] - 1993:3, 1994:11
**Gates** [7] - 1994:15, 2002:10, 2016:10, 2061:12, 2063:22, 2066:11
**gather** [1] - 2020:14
**GC** [2] - 2014:2, 2034:24
**general** [5] - 2015:16, 2022:19, 2026:2, 2026:7, 2053:13
**generally** [2] - 2013:16, 2053:20
**generated** [1] - 2032:23
**gentleman** [1] - 2033:4
**gentlemen** [1] - 2047:19
**gesture** [1] - 2032:11

**given** [6] - 2003:16, 2030:19, 2041:21, 2041:22, 2060:11, 2067:21
**gmail** [3] - 2041:3, 2042:22, 2043:14
**Gordon** [1] - 2029:14
**Government** [6] - 1991:12, 1995:8, 2025:4, 2034:3, 2039:24, 2050:2
**government** [14] - 1996:5, 1996:6, 2009:18, 2015:5, 2015:6, 2036:7, 2046:11, 2046:14, 2046:21, 2047:3, 2047:5, 2065:10, 2069:3, 2069:14
**government's** [3] - 2019:23, 2019:24, 2054:7
**Government's** [4] - 2000:3, 2019:15, 2040:25, 2051:4
**great** [3] - 2015:15, 2015:17, 2053:7
**green** [1] - 2030:19
**Greg** [8] - 2014:13, 2022:16, 2022:25, 2023:11, 2024:1, 2034:24, 2041:4, 2049:7
**Greg's** [1] - 2022:7
**Gregory** [1] - 2039:2
**GREGORY** [1] - 1991:5
**grid** [8] - 2012:20, 2013:4, 2015:2, 2020:22, 2021:11, 2034:7, 2040:9, 2042:15
**grids** [1] - 2013:17
**ground** [1] - 2014:1
**group** [9] - 1997:22, 1997:23, 1998:7, 2026:16, 2026:21, 2026:23, 2054:15, 2054:16
**Group** [3] - 2045:20, 2045:22, 2046:1
**guess** [2] - 2013:13, 2014:19
**guilty** [1] - 2003:8
**Gulland** [1] - 1991:13
**Guy** [1] - 2019:7
**guy** [1] - 2022:13

# H

**hacked** [1] - 2043:3, 2043:9
**hand** [4] - 2002:5, 2004:3, 2010:8, 2013:9
**hand-picked** [1] - 2004:3
**happy** [4] - 2007:3, 2031:6, 2031:20, 2031:22
**hard** [1] - 2012:3
**Harvard** [16] - 2019:13, 2019:17, 2020:20, 2021:23, 2022:16, 2023:9, 2023:17, 2024:16, 2025:21, 2025:23, 2025:25, 2035:13, 2035:17, 2044:19, 2048:1, 2050:7
**Hawker** [70] - 1994:22, 1995:5, 1995:10, 1996:1, 1996:10, 1998:2, 2000:7, 2011:9, 2011:11, 2012:19, 2013:14, 2014:21, 2016:3, 2016:12, 2016:17, 2017:15, 2020:13, 2025:6, 2025:14, 2025:22, 2026:17, 2027:4, 2027:15, 2028:12, 2030:10, 2033:2, 2034:4, 2034:25, 2036:7, 2036:21, 2037:9, 2037:18, 2040:2, 2040:12,

2040:19, 2040:22, 2041:2, 2041:8, 2041:9, 2045:4, 2048:13, 2048:16, 2048:19, 2049:21, 2060:1, 2060:12, 2060:17, 2061:3, 2061:10, 2061:13, 2061:21, 2061:23, 2062:3, 2062:5, 2062:11, 2062:13, 2062:17, 2062:19, 2062:22, 2062:24, 2063:4, 2063:7, 2063:19, 2066:12, 2066:20
**Hawker's** [7] - 2010:17, 2013:25, 2017:12, 2021:7, 2035:6, 2035:8, 2035:9
**head** [2] - 2009:17, 2045:19
**headed** [2] - 2069:20, 2070:10
**header** [1] - 2042:15
**heading** [1] - 2001:2
**headline** [6] - 1998:10, 1998:17, 2010:10, 2017:17, 2017:21, 2017:22
**heads** [1] - 2054:25
**hear** [6] - 2024:3, 2024:7, 2033:12, 2037:12, 2054:22, 2068:13
**heard** [15] - 2014:16, 2023:25, 2026:9, 2034:15, 2035:4, 2035:20, 2038:7, 2048:9, 2053:3, 2053:14, 2057:1, 2060:24, 2061:17, 2069:20, 2070:10
**hearsay** [25] - 2052:20, 2053:5, 2053:11, 2053:15, 2053:18, 2053:19, 2053:24, 2054:1, 2054:6, 2054:19, 2055:5, 2055:13, 2056:23, 2057:1, 2057:7, 2057:16, 2057:20, 2057:22, 2057:23, 2059:9, 2060:22, 2061:24, 2062:6, 2063:12, 2064:16
**help** [1] - 2051:15
**helpful** [3] - 2069:11, 2069:15, 2070:7
**helps** [1] - 2051:24
**hide** [1] - 2047:18
**high** [1] - 2012:3
**higher** [1] - 2070:12
**highlight** [2] - 2009:20, 2033:17
**highly** [1] - 2043:6
**himself** [2] - 2046:10, 2046:13
**hint** [1] - 2062:1
**hold** [1] - 2041:3
**honestly** [1] - 1995:22
**Honor** [25] - 1994:10, 1999:14, 2005:18, 2005:19, 2006:11, 2006:17, 2011:1, 2016:4, 2021:4, 2031:10, 2032:22, 2038:9, 2039:1, 2042:17, 2047:23, 2051:18, 2054:2, 2059:3, 2059:8, 2061:2, 2065:5, 2066:8, 2067:3, 2067:10, 2070:16
**HONORABLE** [1] - 1991:9
**hopeful** [1] - 2068:18
**hopefully** [1] - 2067:24
**hundred** [1] - 2056:10
**Hunt** [4] - 2028:8, 2029:3, 2030:22, 2058:15
**hunt** [4] - 2029:9, 2051:9, 2052:15, 2068:7
**hypothetical** [1] - 1995:2

## I

**i.e** [1] - 2009:23
**idea** [5] - 2015:9, 2015:16, 2017:15, 2028:19, 2049:15
**identified** [8] - 2008:22, 2008:25, 2013:19, 2014:17, 2019:16, 2029:15, 2029:17, 2038:3
**identifier** [1] - 2043:16
**identifies** [1] - 2000:20
**identify** [1] - 2068:11
**identifying** [2] - 2001:9, 2036:14
**III** [1] - 1991:22
**immediately** [2] - 2022:24, 2031:15
**imminent** [1] - 2018:1
**implication** [3] - 2063:13, 2063:16, 2065:11, 2065:17
**implore** [1] - 2063:9
**importance** [1] - 2069:25
**important** [2] - 2009:12, 2063:8
**impose** [1] - 2070:3
**impression** [1] - 2063:10
**improper** [1] - 2009:23
**inadmissible** [2] - 2053:20, 2056:22
**inappropriate** [1] - 2066:1
**inappropriately** [2] - 2006:7, 2007:25
**incarcerate** [1] - 2007:11
**incentive** [1] - 2047:17
**include** [1] - 2033:24
**included** [1] - 2028:11
**includes** [1] - 2040:5
**including** [3] - 2054:16, 2054:17, 2069:14
**indeed** [2] - 2049:10, 2051:8
**Independent** [2] - 1998:10, 2010:10
**independent** [3] - 2011:18, 2046:11, 2046:14
**indicated** [6] - 2026:17, 2032:11, 2033:10, 2035:12, 2049:6, 2049:23
**indication** [1] - 2063:19
**individuals** [1] - 2029:19
**indulgence** [1] - 2066:22
**inference** [2] - 2065:24, 2065:25
**inferences** [1] - 2002:20
**information** [12] - 1998:18, 2011:17, 2028:10, 2028:13, 2031:25, 2043:5, 2043:6, 2043:8, 2058:21, 2063:6, 2066:19, 2069:22
**initial** [1] - 1998:3
**input** [3] - 2027:23, 2028:2, 2028:3
**inside** [2] - 2015:5, 2054:25
**instances** [3] - 2002:20, 2037:10, 2043:5
**instead** [1] - 2009:24
**instructed** [1] - 2061:10
**instruction** [2] - 2064:15, 2069:12
**instructions** [2] - 2044:6, 2070:5
**integrity** [1] - 2043:4
**intended** [1] - 2015:10
**intends** [1] - 2069:12
**intention** [1] - 2054:18
**interested** [2] - 1997:11, 1997:25
**interpretation** [1] - 2010:17
**interviewed** [1] - 2008:23
**interviews** [1] - 2047:3
**introduced** [1] - 2064:24
**investigation** [1] - 2008:21
**investigator** [1] - 2008:24
**investigators** [1] - 2047:5
**invisible** [1] - 2031:25
**involved** [3] - 2029:10, 2043:23, 2045:12
**involvement** [1] - 2043:7
**irrelevant** [1] - 2055:12
**issue** [12] - 2003:2, 2003:11, 2004:1, 2009:12, 2017:17, 2024:8, 2025:18, 2025:19, 2025:21, 2065:7, 2066:7, 2069:9, 2069:12, 2070:4
**issues** [6] - 2002:18, 2056:16, 2069:5, 2069:10, 2069:24, 2070:20
**item** [2] - 2023:11, 2041:20
**items** [3] - 1996:1, 2023:9, 2023:10
**Items** [1] - 2023:5
**iteration** [4] - 2017:15, 2032:24
**iterations** [2] - 1999:4, 2039:20

## J

**JACKSON** [1] - 1991:9
**jail** [1] - 2005:25
**James** [1] - 1991:19
**Jason** [1] - 1991:16
**John** [16] - 1996:23, 1998:24, 2003:25, 2009:20, 2010:9, 2011:6, 2012:16, 2016:15, 2018:17, 2021:12, 2023:8, 2029:14, 2033:19, 2036:13, 2036:25, 2041:18
**Jon** [1] - 1995:11
**Jonathan** [2] - 1998:18, 2023:22
**journalist** [12] - 2017:7, 2017:14, 2026:7, 2033:24, 2034:1, 2038:3, 2058:14, 2063:2, 2063:5, 2063:6, 2066:12, 2066:17
**journalists** [6] - 2023:20, 2027:25, 2028:6, 2048:6, 2049:16, 2058:12
**Judge** [2] - 2009:1, 2009:2
**JUDGE** [1] - 1991:10
**judge** [2] - 2004:2, 2004:3
**judge's** [1] - 2004:7
**judgment** [1] - 2010:22
**July** [1] - 2005:15
**JUNGHANS** [91] - 1994:10, 1994:14, 1996:6, 1996:8, 1997:15, 1997:23, 1999:5, 1999:14, 1999:19, 1999:22, 1999:23, 2000:3, 2000:5, 2001:25, 2002:6, 2002:9, 2003:23, 2003:24, 2005:9, 2005:18, 2005:22, 2006:17, 2006:24, 2007:3, 2007:6, 2007:8,

2011:1, 2011:6, 2011:8, 2011:23, 2012:10, 2012:22, 2012:23, 2016:4, 2016:9, 2016:25, 2017:4, 2017:5, 2019:24, 2020:1, 2021:10, 2024:24, 2025:3, 2026:22, 2026:24, 2027:2, 2027:8, 2031:3, 2031:6, 2031:20, 2031:22, 2032:2, 2032:22, 2033:12, 2033:15, 2035:8, 2035:10, 2035:16, 2038:9, 2038:16, 2039:6, 2042:4, 2042:9, 2042:14, 2047:21, 2049:1, 2051:18, 2052:20, 2055:6, 2055:14, 2055:18, 2055:22, 2058:23, 2059:8, 2059:11, 2059:20, 2060:9, 2060:12, 2060:15, 2061:5, 2061:9, 2061:14, 2061:16, 2061:25, 2062:20, 2066:8, 2068:13
**Junghans** [3] - 1991:23, 1994:9, 2054:12
**juries** [1] - 2004:13
**jurors** [3] - 1994:5, 2031:4, 2032:11
**JURY** [2] - 1991:5, 1991:9
**jury** [11] - 1994:3, 2004:12, 2004:13, 2033:8, 2038:17, 2039:3, 2047:19, 2063:10, 2063:12, 2065:11, 2067:23
**Jury** [4] - 1994:4, 2038:22, 2039:5, 2068:3
**jury's** [1] - 2033:10
**Justice** [4] - 1998:10, 2009:12, 2018:12, 2044:11
**JUSTICE** [1] - 1991:16
**justifiable** [1] - 2007:19
**justification** [2] - 2006:6, 2007:24

## K

**KANESHIRO** [1] - 1992:3
**KANESHIRO-MILLER** [1] - 1992:3
**keep** [3] - 2032:11, 2061:6, 2062:4
**kept** [1] - 2055:19
**key** [1] - 2036:15
**Kilimnik** [1] - 2040:1
**kind** [1] - 2065:7
**Kireyev** [1] - 2009:1
**Kireyev's** [1] - 2009:3
**knocking** [1] - 2067:25
**knowledge** [4] - 2023:15, 2037:24, 2043:25, 2059:16
**known** [1] - 2047:9
**knows** [1] - 2065:16

## L

**lack** [1] - 2070:9
**ladies** [1] - 2047:18
**large** [3] - 2008:22, 2020:3, 2020:5
**largely** [1] - 1997:7
**last** [12] - 1999:12, 2006:25, 2008:3, 2008:4, 2009:9, 2014:13, 2028:22, 2034:11, 2037:12, 2042:14, 2042:20
**late** [1] - 2050:4

**launch** [2] - 2013:5, 2022:10
**law** [5] - 2002:25, 2003:3, 2003:8, 2008:11, 2043:6
**lawyer** [1] - 2017:19
**lay** [1] - 2053:13
**lead** [2] - 2062:7, 2062:14
**leader** [1] - 2009:18
**leading** [1] - 2057:3
**leak** [1] - 2036:15
**learn** [1] - 2050:4
**learned** [2] - 2026:14, 2039:17
**least** [3] - 2051:16, 2064:3, 2068:6
**lecture** [1] - 2057:23
**led** [1] - 2049:2
**Lee** [2] - 2037:3, 2037:14
**left** [3] - 2013:9, 2068:5, 2068:15
**left-hand** [1] - 2013:9
**leftover** [1] - 2037:15
**legal** [6] - 2002:25, 2003:3, 2008:10, 2008:11, 2013:10, 2070:4
**legitimacy** [1] - 2034:19
**less** [2] - 2049:3, 2068:25
**level** [2] - 2015:2, 2030:2
**liberty** [2] - 2006:7, 2008:1
**lie** [4] - 2032:15, 2046:10, 2046:13, 2047:18
**lied** [1] - 2045:16
**lies** [2] - 2046:23, 2047:6
**life** [1] - 2009:24
**light** [1] - 2030:19
**likely** [2] - 2007:14, 2068:10
**line** [4] - 2013:21, 2033:20, 2035:24
**lines** [1] - 2064:25
**link** [1] - 2064:5
**list** [9] - 2013:20, 2023:9, 2027:16, 2029:22, 2031:17, 2036:22, 2037:1, 2047:8, 2068:5
**listed** [1] - 2042:15
**LLP** [2] - 1991:20, 1991:23
**log** [1] - 2014:13
**look** [30] - 1994:19, 1995:8, 1996:4, 1996:15, 1998:24, 1999:7, 2011:6, 2013:21, 2016:23, 2017:6, 2018:15, 2023:3, 2023:4, 2024:22, 2025:4, 2027:13, 2028:24, 2029:1, 2030:10, 2030:21, 2032:7, 2034:3, 2039:22, 2039:25, 2040:25, 2041:13, 2051:4, 2055:22, 2058:2, 2067:17
**looked** [3] - 1999:6, 2035:24, 2058:20
**looking** [5] - 1994:17, 1998:25, 2003:15, 2017:21, 2051:14
**looks** [1] - 2041:17
**looming** [1] - 2070:2
**lower** [6] - 2012:17, 2016:10, 2018:17, 2029:1, 2034:20, 2039:25
**Lyovochkin** [1] - 2015:12

# M

**ma'am** [1] - 2059:1

**mail** [24] - 1994:19, 1994:21, 1996:10, 1996:16, 1999:17, 2011:4, 2012:19, 2013:15, 2016:11, 2017:7, 2018:18, 2018:22, 2025:6, 2025:16, 2034:4, 2040:17, 2043:3, 2043:9, 2054:13, 2060:14, 2061:10, 2062:5, 2063:20
**maintain** [1] - 2007:18
**major** [1] - 2068:6
**Manafort** [57] - 1996:11, 1996:18, 1998:4, 2011:3, 2015:7, 2018:20, 2018:22, 2025:14, 2026:17, 2026:19, 2027:6, 2034:4, 2040:1, 2040:5, 2044:3, 2044:10, 2044:23, 2048:15, 2048:23, 2048:24, 2048:25, 2049:5, 2049:6, 2049:10, 2054:3, 2054:16, 2054:18, 2058:21, 2059:6, 2060:4, 2060:20, 2060:24, 2061:2, 2061:7, 2061:8, 2061:10, 2061:12, 2061:20, 2062:2, 2062:3, 2062:5, 2062:10, 2062:16, 2062:22, 2063:4, 2063:10, 2063:13, 2063:24, 2064:14, 2064:23, 2065:2, 2065:3, 2065:11, 2066:2, 2066:3, 2066:11
**Manafort's** [6] - 2024:10, 2035:7, 2043:3, 2044:6, 2054:13, 2059:18
**management** [1] - 2004:21
**marked** [1] - 2015:23
**Master** [1] - 2040:8
**master** [5] - 2015:2, 2020:22, 2021:11, 2034:7, 2042:15
**material** [1] - 2024:22
**matrix** [2] - 2029:17, 2029:20
**Matrix** [1] - 2036:8
**matter** [9] - 2012:4, 2043:20, 2052:24, 2053:25, 2054:1, 2057:21, 2067:16, 2067:18, 2069:1
**matters** [1] - 2067:21
**McCullough** [1] - 1991:16
**MCW** [2] - 2029:4, 2029:7
**MD** [1] - 1991:21
**mean** [5] - 1996:18, 2030:13, 2038:18, 2048:11, 2063:17
**meaningful** [1] - 2070:6
**meaningfully** [1] - 2069:10
**meant** [1] - 2031:25
**media** [17] - 2021:15, 2022:15, 2027:11, 2035:22, 2036:4, 2037:2, 2041:25, 2044:13, 2044:14, 2044:16, 2044:24, 2045:3, 2045:11, 2048:13, 2050:24, 2051:11, 2058:16
**meet** [1] - 2025:8
**meeting** [35] - 2019:13, 2019:17, 2020:20, 2020:23, 2021:20, 2021:22, 2022:5, 2022:16, 2023:5, 2023:9, 2023:13, 2023:18, 2023:19, 2024:10, 2024:15, 2024:16, 2024:19, 2024:20, 2024:23, 2025:1, 2025:12, 2025:20, 2025:22, 2025:23, 2026:1, 2026:5, 2027:9, 2035:17, 2044:19, 2048:1, 2048:16, 2050:8, 2054:13, 2060:10,
2060:20
**meetings** [2] - 2034:12, 2060:7
**members** [2] - 2038:17, 2045:9
**memos** [1] - 1997:8
**mention** [1] - 2032:25
**mentioned** [3] - 2021:23, 2023:22, 2052:8
**mentions** [1] - 2065:23
**Mercury** [8] - 2029:7, 2036:11, 2037:6, 2037:9, 2045:15, 2045:22, 2046:5, 2051:1
**merited** [1] - 2007:15
**merits** [1] - 2009:19
**message** [1] - 2057:14
**messages** [2] - 2048:14, 2048:17
**messaging** [8] - 1996:15, 1996:16, 1996:24, 1997:8, 1999:12, 1999:13, 2002:13, 2010:8
**met** [2] - 2070:11, 2070:12
**mid** [1] - 2039:14
**mid-December** [1] - 2039:14
**Middle** [2] - 2050:17, 2050:19
**middle** [2] - 2041:20, 2055:2
**midnight** [1] - 2020:16
**might** [11] - 1997:11, 1998:1, 2007:4, 2017:17, 2026:6, 2027:25, 2028:3, 2035:13, 2043:15, 2055:20
**MILLER** [1] - 1992:3
**mind** [8] - 2024:1, 2024:3, 2024:7, 2024:9, 2024:12, 2026:9, 2026:11, 2057:17
**Minister** [1] - 2043:8
**Minister's** [1] - 2017:18
**Ministry** [4] - 1998:10, 2009:12, 2018:12, 2044:11
**minutes** [5] - 2038:10, 2038:14, 2038:20, 2038:24, 2064:3
**misleading** [1] - 2031:18
**missed** [1] - 1999:20
**mix** [1] - 2068:10
**models** [1] - 2023:24
**MOJ** [1] - 1996:22
**Molly** [1] - 1991:13
**moment** [3] - 1994:16, 2030:21, 2031:25
**Monday** [2] - 2068:17, 2069:4
**months** [2] - 2024:5, 2030:16
**morning** [6] - 2043:18, 2045:15, 2046:24, 2047:9, 2051:15, 2067:20
**most** [5] - 2003:15, 2009:11, 2043:13, 2065:9, 2068:15
**motivated** [5] - 1998:12, 2009:15, 2009:22, 2010:12, 2011:19
**motivation** [2] - 1994:18, 2010:3
**mouth** [2] - 2056:5, 2057:25
**move** [3] - 2016:4, 2047:23, 2059:11
**MR** [79] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:18, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20,

2011:21, 2011:25, 2012:21, 2016:6,
2016:19, 2021:4, 2021:6, 2021:8,
2024:13, 2031:1, 2031:4, 2031:7,
2031:10, 2035:14, 2042:17, 2042:19,
2046:4, 2047:23, 2047:25, 2049:8,
2051:23, 2052:3, 2052:5, 2052:6,
2053:6, 2053:8, 2053:10, 2053:16,
2054:2, 2054:10, 2056:8, 2056:14,
2056:17, 2056:21, 2056:22, 2057:7,
2057:9, 2057:13, 2058:5, 2058:9,
2059:3, 2059:4, 2059:23, 2060:3,
2060:6, 2061:1, 2061:8, 2061:15,
2061:18, 2062:25, 2063:8, 2064:14,
2064:18, 2065:5, 2066:10, 2066:16,
2066:22, 2066:24, 2067:2, 2068:9,
2068:14, 2068:22, 2068:25, 2069:3,
2069:7, 2070:3, 2070:14, 2070:16
   **MS** [92] - 1994:10, 1994:14, 1996:6,
1996:8, 1997:15, 1997:23, 1997:24,
1998:19, 1998:23, 1999:3, 1999:5,
1999:14, 1999:19, 1999:22, 1999:23,
2000:3, 2000:5, 2001:25, 2002:6,
2002:9, 2003:23, 2003:24, 2005:9,
2005:18, 2005:22, 2006:17, 2006:24,
2007:3, 2007:6, 2007:8, 2011:1,
2011:6, 2011:8, 2011:23, 2012:10,
2012:22, 2012:23, 2016:4, 2016:9,
2016:25, 2017:4, 2017:5, 2019:24,
2020:1, 2021:10, 2024:24, 2025:3,
2026:22, 2026:24, 2027:2, 2027:8,
2031:3, 2031:6, 2031:20, 2031:22,
2032:2, 2032:22, 2033:12, 2033:15,
2035:8, 2035:10, 2035:16, 2038:9,
2038:16, 2039:6, 2042:4, 2042:9,
2042:14, 2047:21, 2049:1, 2051:18,
2052:20, 2055:6, 2055:14, 2055:18,
2055:22, 2058:23, 2059:8, 2059:11,
2059:20, 2060:9, 2060:12, 2060:15,
2061:5, 2061:9, 2061:14, 2061:16,
2061:25, 2062:20, 2066:8, 2067:9,
2068:13
   **multiple** [3] - 2042:7, 2042:8, 2042:9
   **Murphy** [1] - 1991:19
   **MURPHY** [3] - 2021:4, 2021:6, 2021:8
   **must** [1] - 2008:13
   **Myers** [2] - 2037:4, 2037:14
   **Myers'** [1] - 2037:18

## N

   **name** [12] - 2021:24, 2037:18,
2043:15, 2046:2, 2050:23, 2051:16,
2051:21, 2052:8, 2056:18, 2058:17,
2064:15, 2065:17
   **narrow** [1] - 2010:1
   **nature** [1] - 2055:3
   **necessarily** [1] - 2065:24
   **necessary** [1] - 2003:3
   **need** [5] - 2032:7, 2038:18, 2055:10,
2057:23, 2058:2

   **needed** [2] - 2049:19, 2049:24
   **needle** [1] - 2070:21
   **never** [8] - 2017:22, 2023:15, 2023:25,
2034:15, 2060:12, 2060:16, 2060:18
   **nevertheless** [2] - 2018:11, 2019:9
   **new** [2] - 2008:10, 2040:8
   **New** [2] - 2021:8, 2037:3
   **news** [2] - 2067:16, 2067:17
   **next** [25] - 1996:23, 1997:9, 2000:17,
2000:19, 2003:25, 2004:1, 2004:11,
2004:17, 2004:25, 2005:23, 2008:4,
2008:20, 2014:10, 2023:7, 2026:14,
2032:13, 2034:10, 2036:13, 2036:25,
2037:3, 2047:22, 2052:4, 2052:5,
2059:2, 2066:7
   **nice** [1] - 2011:23
   **night** [2] - 2021:6, 2021:8
   **nobody** [3] - 2032:3, 2049:20, 2056:4
   **non** [1] - 2063:12
   **non-hearsay** [1] - 2063:12
   **none** [2] - 2015:22, 2057:23
   **nonetheless** [1] - 2055:19
   **note** [3] - 2013:8, 2065:8, 2069:21
   **notes** [3] - 2023:4, 2023:10, 2050:2
   **nothing** [2] - 2024:25, 2042:5
   **notice** [2] - 1994:21, 2029:2
   **notified** [1] - 2041:2
   **notion** [1] - 2032:14
   **November** [1] - 2039:12
   **NR** [1] - 1996:16
   **nuanced** [1] - 2057:24
   **number** [6] - 2001:1, 2008:22,
2019:21, 2023:23, 2043:5, 2044:13
   **Number** [1] - 2039:1
   **numbers** [1] - 2034:22
   **NW** [4] - 1991:14, 1991:17, 1991:24,
1992:4

## O

   **oath** [1] - 1994:7
   **object** [4] - 2016:19, 2032:6, 2053:11,
2057:3
   **objected** [2] - 2053:14, 2061:18
   **objection** [27] - 1997:13, 1997:19,
2005:6, 2006:11, 2010:20, 2011:21,
2011:25, 2016:6, 2024:13, 2031:1,
2035:14, 2047:21, 2049:1, 2051:18,
2052:20, 2053:14, 2053:19, 2054:23,
2055:5, 2058:23, 2059:8, 2059:20,
2064:25, 2065:9, 2066:3, 2067:13
   **Objection** [1] - 1997:16
   **objectionable** [1] - 2062:2
   **objective** [2] - 2007:19, 2009:23
   **obviously** [1] - 2069:12
   **occasion** [3] - 1998:2, 1998:4, 2043:4
   **occurred** [2] - 2023:19, 2054:3
   **October** [5] - 2036:21, 2039:10,
2050:5, 2051:14, 2058:17
   **OF** [5] - 1991:1, 1991:3, 1991:9,

1991:14, 1991:16
   **offense** [1] - 2003:4
   **offered** [2] - 2002:18, 2057:21
   **Office** [1] - 2047:6
   **office** [1] - 2054:13
   **OFFICE** [1] - 1991:13
   **officials** [2] - 2014:11, 2030:2
   **often** [1] - 2048:13
   **once** [1] - 2067:15
   **one** [38] - 1996:2, 1998:20, 1999:6,
2003:25, 2004:11, 2004:17, 2004:25,
2005:10, 2005:23, 2006:25, 2007:2,
2008:4, 2008:20, 2013:18, 2015:9,
2015:12, 2016:23, 2017:15, 2019:12,
2027:18, 2029:3, 2038:19, 2040:8,
2042:7, 2042:10, 2042:14, 2044:18,
2049:23, 2051:12, 2055:20, 2055:24,
2055:25, 2056:23, 2056:25, 2059:13,
2068:6
   **ones** [1] - 2058:17
   **open** [5] - 2002:8, 2007:13, 2033:14,
2058:8, 2066:9
   **open-ended** [1] - 2007:13
   **operating** [1] - 2028:14
   **opine** [1] - 2009:21
   **opinion** [4] - 2001:14, 2002:16,
2003:7, 2056:2
   **opinions** [1] - 2055:11
   **opponent** [1] - 2009:16
   **opportunity** [2] - 2003:10, 2020:19
   **opposed** [2] - 2042:24, 2046:8
   **opposition** [1] - 2009:19
   **order** [5] - 1995:23, 2007:18, 2009:16,
2042:12, 2068:23
   **ordinary** [1] - 2070:4
   **organized** [3] - 2000:15, 2006:20,
2025:11
   **original** [1] - 2037:17
   **out-of-court** [3] - 2057:19, 2057:20
   **outlet** [1] - 2036:15
   **outlined** [1] - 2023:24
   **outreach** [2] - 2027:16, 2037:1
   **outside** [1] - 2015:6
   **overly** [1] - 2068:17
   **overturn** [1] - 2010:3
   **own** [4] - 2017:19, 2059:16, 2063:22,
2070:12

## P

   **p.m** [2] - 2021:6, 2070:25
   **P.M** [1] - 1994:2
   **package** [1] - 2042:10
   **packet** [1] - 2041:11
   **PAGE** [1] - 1993:5
   **page** [46] - 1994:19, 1994:20, 1996:23,
1997:9, 1998:9, 1998:24, 1998:25,
1999:7, 2000:12, 2000:16, 2000:17,
2000:19, 2000:23, 2001:5, 2001:8,
2010:10, 2011:6, 2012:17, 2013:7,

2013:19, 2014:10, 2014:13, 2021:12, 2021:13, 2023:5, 2023:8, 2028:5, 2028:6, 2029:1, 2030:21, 2031:3, 2034:10, 2034:20, 2036:13, 2036:25, 2037:2, 2037:3, 2041:18, 2041:19, 2041:20, 2042:6, 2042:13, 2051:12
**pages** [3] - 2004:22, 2005:10, 2041:15
**pages'** [1] - 2020:2
**paid** [2] - 2015:1, 2044:1
**paper** [5] - 1995:13, 1999:25, 2019:20, 2041:13, 2065:19
**paragraph** [2] - 2003:14, 2006:14
**pardon** [3] - 1997:15, 2020:4, 2029:16
**part** [12] - 2009:20, 2012:17, 2018:17, 2020:23, 2022:15, 2023:21, 2023:23, 2025:14, 2034:21, 2037:12, 2047:11, 2051:9
**participate** [2] - 2064:9, 2064:10
**participated** [1] - 2060:7
**particular** [2] - 2015:10, 2059:15
**particularly** [3] - 2027:25, 2038:2, 2043:7
**parties** [3] - 1997:11, 1997:25, 2003:1
**pass** [8] - 2062:13, 2062:17, 2062:18, 2062:24, 2063:4, 2063:6, 2066:19
**past** [1] - 2058:3
**pasted** [1] - 2016:11
**path** [1] - 2049:22
**patience** [1] - 2057:9
**PATRICIA** [1] - 1992:3
**Paul** [4] - 1996:18, 2025:12, 2040:5, 2064:14
**Paul's** [1] - 2025:8
**Paula** [1] - 1991:23
**Pause** [1] - 2066:23
**pay** [1] - 2067:16
**payment** [2] - 2044:1, 2044:4
**pdf** [6] - 1998:24, 2000:12, 2000:23, 2021:13, 2028:6, 2028:24
**pdfs** [1] - 2042:11
**Pennsylvania** [1] - 1991:17
**people** [10] - 2021:17, 2032:23, 2036:11, 2043:13, 2049:25, 2054:24, 2054:25, 2055:7, 2063:16
**people's** [1] - 2054:25
**percent** [1] - 2056:10
**perfect** [1] - 2055:22
**period** [3] - 2013:2, 2064:1, 2065:22
**permit** [1] - 2009:1
**permitted** [4] - 2008:25, 2057:13, 2065:10, 2065:21
**person** [10] - 2027:1, 2028:8, 2037:3, 2044:8, 2045:22, 2049:23, 2053:3, 2058:11, 2064:21, 2064:22
**personal** [3] - 2043:9, 2046:8, 2059:16
**personalized** [1] - 2043:15
**personally** [5] - 2024:2, 2030:7, 2032:10, 2032:21, 2061:2
**Philip** [1] - 2029:14
**phone** [2] - 2056:8, 2060:7

**phrase** [1] - 2017:4
**physical** [1] - 2050:25
**picked** [1] - 2004:3
**piece** [1] - 2065:19
**pieces** [1] - 1995:4
**Pinchuk** [1] - 2043:25
**PJM** [1] - 1996:16
**place** [2] - 2021:20, 2064:2
**placeholder** [2] - 2037:19, 2037:20
**plan** [19] - 1999:13, 2002:5, 2010:24, 2022:15, 2022:23, 2022:25, 2028:22, 2029:11, 2036:8, 2037:22, 2038:5, 2039:20, 2041:25, 2044:16, 2044:24, 2045:3, 2045:11, 2061:3
**plans** [5] - 2027:11, 2044:14, 2050:24, 2058:16
**pleadings** [1] - 2069:17
**pleasant** [1] - 2068:1
**Podesta** [12] - 2036:11, 2037:7, 2037:9, 2045:15, 2045:19, 2045:21, 2046:1, 2046:3, 2046:10, 2046:16
**point** [16] - 1995:1, 2017:25, 2028:14, 2030:12, 2031:13, 2031:24, 2033:1, 2033:5, 2033:6, 2035:25, 2037:22, 2048:4, 2048:12, 2049:16, 2066:4, 2069:20
**pointed** [1] - 2033:16
**points** [3] - 2001:1, 2004:22, 2024:4
**political** [10] - 1994:18, 2009:11, 2009:16, 2009:23, 2009:24, 2010:2, 2034:12, 2034:19, 2035:22, 2035:25
**politically** [5] - 1998:11, 2009:15, 2009:22, 2010:11, 2011:19
**popping** [1] - 2061:6
**portion** [6] - 1994:17, 2016:10, 2029:1, 2039:25, 2041:22, 2065:9
**portions** [1] - 2005:3
**posed** [1] - 2070:22
**position** [2] - 2044:9, 2048:6
**positions** [1] - 2054:17
**possibly** [2] - 2023:13, 2036:15
**potentially** [2] - 2022:7, 2058:20
**PR** [5] - 2023:5, 2045:12, 2050:10, 2050:24, 2051:17
**practice** [1] - 2007:21
**Pratt** [1] - 1991:20
**precedent** [1] - 2009:25
**precise** [1] - 2062:1
**precisely** [1] - 2065:21
**prejudice** [2] - 2005:7, 2005:16
**preparation** [1] - 1998:3
**prepare** [2] - 2003:11, 2003:16
**prepared** [3] - 2010:9, 2027:22, 2041:12
**preparing** [1] - 1996:1
**presence** [1] - 2060:21
**present** [10] - 1994:4, 1994:5, 2006:19, 2009:3, 2009:6, 2038:22, 2039:5, 2048:16, 2053:1, 2068:3

**presentation** [1] - 2008:20
**presented** [1] - 2007:16
**presenting** [1] - 2006:21
**President** [2] - 2015:13, 2019:6
**presidential** [1] - 2009:18
**presumption** [1] - 2028:15
**pretty** [4] - 1995:6, 2018:5, 2041:2, 2041:17
**previous** [2] - 1996:2, 2011:4
**previously** [1] - 2025:23
**primarily** [1] - 2027:20
**primary** [1] - 2048:12
**Prime** [2] - 2017:18, 2043:7
**principles** [1] - 2057:12
**print** [1] - 2042:12
**printed** [1] - 2042:9
**private** [1] - 2040:16
**problem** [2] - 2055:8, 2056:20
**problematic** [1] - 2007:17
**proceed** [1] - 2069:12
**proceeding** [1] - 2008:21
**Proceedings** [2] - 1992:5, 2070:25
**proceedings** [2] - 2008:10, 2067:22
**process** [5] - 2003:18, 2004:15, 2028:1, 2047:12, 2051:9
**produced** [1] - 1992:6
**project** [8] - 1998:7, 2013:23, 2013:24, 2013:25, 2024:4, 2043:3, 2043:17, 2043:24
**Project** [1] - 1996:16
**proposed** [2] - 1998:9, 2037:1
**prosecution** [8] - 1999:8, 2009:9, 2009:11, 2009:15, 2009:17, 2009:22, 2010:1, 2064:24
**Prosecutor's** [1] - 2047:6
**proved** [1] - 2069:14
**provided** [5] - 1994:22, 2010:2, 2011:12, 2042:1, 2045:5
**providing** [1] - 2013:17
**purpose** [5] - 2015:14, 2024:18, 2024:20, 2063:11, 2063:12
**purposes** [2] - 2019:12, 2066:12
**put** [24] - 1997:8, 1997:10, 2005:2, 2005:25, 2011:7, 2022:20, 2027:18, 2027:20, 2029:20, 2030:20, 2031:19, 2032:7, 2032:25, 2033:3, 2033:5, 2037:6, 2037:18, 2041:18, 2042:12, 2050:23, 2054:7, 2054:11, 2064:15, 2064:20
**puts** [1] - 2061:3
**putting** [1] - 2029:17

## Q

**QNA** [1] - 1996:22
**quarter** [1] - 2067:24
**questions** [19] - 2018:19, 2031:9, 2042:20, 2043:19, 2044:13, 2044:14, 2045:15, 2045:17, 2046:23, 2048:3, 2048:8, 2056:12, 2060:1, 2062:15,

2063:7, 2064:5, 2066:6, 2067:2
**quick** [1] - 2034:8
**quickly** [1] - 2041:2
**quite** [1] - 2005:8
**quoting** [1] - 1999:11

## R

**raft** [1] - 2041:9
**raise** [1] - 2005:15
**raised** [3] - 2005:5, 2019:1, 2056:16
**raises** [2] - 2006:6, 2007:24
**rarely** [1] - 2007:20
**rather** [3] - 2007:4, 2020:3, 2020:5
**re** [1] - 2039:1
**re-calling** [1] - 2039:1
**reach** [2] - 2028:15, 2037:22
**reached** [1] - 2059:14
**reaches** [2] - 2063:18, 2065:22
**reaching** [3] - 2037:25, 2038:1, 2038:2
**react** [2] - 2017:16, 2065:3
**read** [20] - 1995:19, 1995:21, 1995:22,
1995:24, 1997:6, 2002:16, 2003:20,
2005:12, 2006:13, 2006:16, 2007:3,
2007:4, 2008:6, 2009:10, 2011:15,
2011:19, 2012:12, 2020:19, 2031:22,
2034:8
**reading** [3] - 2001:23, 2002:4, 2006:19
**real** [1] - 2034:8
**realize** [1] - 2012:2
**really** [2] - 2062:4, 2067:9
**reason** [6] - 2018:21, 2043:1, 2053:4,
2058:18, 2058:19
**reasons** [1] - 2055:20
**recapitulation** [1] - 2032:18
**receive** [1] - 2045:4
**received** [3] - 2042:2, 2045:2, 2054:14
**receiving** [2] - 2020:7, 2043:6
**Recess** [1] - 2038:25
**recognize** [1] - 2016:1
**recollection** [6] - 2020:24, 2022:2,
2051:15, 2051:19, 2052:1, 2055:23
**recommended** [1] - 2057:14
**record** [8] - 2003:18, 2007:17,
2009:25, 2045:25, 2053:10, 2054:11,
2054:23, 2064:6
**RECROSS** [1] - 1993:2
**recurring** [1] - 2070:1
**redirect** [5] - 2042:16, 2049:4,
2053:18, 2054:22, 2058:3
**REDIRECT** [2] - 1993:2, 2042:18
**reduced** [1] - 2022:19
**refer** [1] - 2015:3
**reference** [3] - 2014:24, 2045:11,
2047:2
**referenced** [1] - 2015:13
**referred** [1] - 2019:6
**referring** [1] - 2051:6
**refers** [1] - 2013:23

**refined** [1] - 2068:4
**reflect** [1] - 2011:12
**reflected** [1] - 2050:2
**reflects** [1] - 2032:14
**refresh** [1] - 2051:15
**refreshing** [1] - 2052:1
**refusal** [1] - 2009:3
**refused** [2] - 2004:19, 2009:1
**regardless** [1] - 2054:3
**regime** [1] - 2009:17
**related** [3] - 1996:2, 2001:3, 2050:24
**relationship** [2] - 2022:7, 2022:14
**relay** [1] - 2048:15
**relayed** [1] - 2061:3
**release** [2] - 2017:25, 2030:17
**released** [5] - 1998:1, 2030:19,
2039:7, 2039:14, 2039:18
**relevance** [1] - 2033:5
**relevant** [2] - 2056:3, 2057:16
**reluctance** [1] - 2023:22
**remain** [1] - 2032:6
**remember** [1] - 2048:5
**remind** [1] - 1994:6
**removal** [2] - 2005:1, 2005:15
**removals** [1] - 2005:13
**remove** [1] - 2009:23
**render** [1] - 2003:7
**renew** [1] - 2059:20
**repeat** [2] - 2017:3, 2035:15
**repeats** [4] - 2014:13, 2021:14,
2021:16
**repetition** [2] - 2033:8, 2033:10
**rephrase** [1] - 2016:25
**replowing** [1] - 2032:17
**report** [60] - 1994:18, 1995:2, 1995:4,
1995:7, 1995:10, 1995:16, 1995:20,
1995:21, 1995:22, 1995:24, 1995:25,
1996:3, 1997:1, 1997:11, 1998:1,
1998:11, 1998:16, 1998:18, 1999:4,
1999:15, 1999:17, 2000:7, 2000:13,
2000:14, 2000:15, 2001:9, 2001:10,
2001:21, 2001:24, 2002:5, 2004:6,
2006:20, 2006:22, 2006:23, 2009:20,
2009:21, 2010:7, 2010:11, 2010:18,
2011:16, 2011:18, 2012:13, 2016:17,
2017:8, 2017:14, 2018:1, 2018:4,
2030:13, 2030:18, 2039:7, 2040:9,
2041:21, 2041:22, 2042:2, 2049:20,
2049:25, 2051:12, 2064:20, 2064:21
**Report** [3] - 2010:15, 2040:3, 2044:9
**report's** [1] - 2024:21
**reported** [2] - 1992:5, 2053:1
**reporter** [7] - 2017:16, 2017:17,
2022:1, 2022:6, 2026:1, 2029:8,
2036:15
**Reporter** [1] - 1992:3
**reporters** [1] - 2058:20
**represent** [1] - 2049:19
**representation** [5] - 2008:5, 2008:8,

2008:10, 2008:15, 2018:10
**represented** [1] - 2008:13
**reprisal** [1] - 2009:15
**request** [3] - 2004:12, 2008:23,
2008:24
**requested** [1] - 2015:7
**requirements** [1] - 2003:3
**requires** [1] - 2008:12
**respect** [3] - 2035:22, 2048:13,
2061:20
**respects** [1] - 2009:19
**response** [1] - 2018:24
**responsibilities** [1] - 2013:18
**responsibility** [1] - 2034:22
**responsive** [3] - 2054:20, 2054:21,
2056:16
**rest** [1] - 2069:3
**result** [2] - 2005:9, 2005:17
**resume** [3] - 1994:9, 2038:20, 2038:24
**REV** [1] - 1996:17
**reversal** [2] - 2004:9, 2049:13
**reverse** [1] - 2003:19
**reversed** [1] - 2035:12
**reversing** [2] - 2025:19, 2048:6
**review** [4] - 2006:6, 2007:24, 2024:21,
2028:6
**reviewed** [1] - 2020:22
**revised** [2] - 2011:2, 2036:12
**revisions** [3] - 1996:18, 1996:19,
2011:13
**RICHARD** [2] - 1993:3, 1994:11
**rights** [1] - 2017:19
**risk** [1] - 2007:17
**risks** [1] - 2033:7
**RMR** [1] - 1992:3
**rollout** [1] - 2045:3
**room** [3] - 2005:2, 2054:24, 2067:23
**Room** [1] - 1992:3
**Rule** [1] - 2069:10
**ruled** [1] - 2054:9
**rules** [1] - 2070:21
**ruling** [1] - 2009:17
**run** [3] - 2001:13, 2064:21

## S

**SA** [4] - 2027:16, 2031:15, 2033:22,
2040:9
**safer** [1] - 2043:11
**SANCHEZ** [54] - 1997:13, 1997:16,
1997:20, 1999:1, 2001:16, 2001:18,
2001:20, 2002:2, 2006:11, 2006:15,
2010:20, 2011:21, 2011:25, 2016:6,
2016:19, 2024:13, 2031:1, 2031:4,
2031:7, 2031:10, 2035:14, 2042:17,
2042:19, 2046:4, 2047:23, 2047:25,
2049:8, 2051:23, 2052:3, 2052:5,
2052:6, 2056:8, 2056:14, 2056:17,
2056:21, 2058:9, 2059:3, 2059:4,
2059:23, 2060:3, 2060:6, 2061:1,

2061:8, 2061:15, 2061:18, 2062:25, 2066:10, 2066:16, 2066:22, 2066:24, 2067:2, 2068:9, 2068:14, 2068:22
**Sanchez** [1] - 1991:12
**Sanger** [26] - 2014:8, 2021:24, 2022:4, 2022:6, 2022:10, 2023:1, 2026:1, 2026:4, 2028:16, 2036:18, 2037:23, 2041:22, 2050:23, 2051:16, 2052:15, 2053:3, 2056:18, 2057:4, 2059:5, 2060:13, 2061:11, 2062:5, 2062:12, 2063:19, 2063:20, 2066:18
**sanger** [12] - 2051:8, 2052:19, 2056:13, 2058:11, 2059:14, 2060:16, 2060:21, 2061:21, 2062:13, 2062:16, 2065:22, 2066:25
**Sanger's** [4] - 2052:8, 2058:17, 2064:15, 2065:16
**satisfy** [1] - 2003:3
**Saturday** [2] - 2021:6, 2021:8
**Saunders** [1] - 2052:12
**saw** [4] - 2051:1
**scenario** [1] - 2016:18
**scope** [2] - 2003:4, 2059:12
**scribes** [1] - 2069:21
**scroll** [2] - 2012:17, 2036:25
**scrutiny** [1] - 2009:19
**seated** [1] - 1994:8
**second** [4] - 1998:20, 2000:14, 2002:24, 2016:23
**secret** [1] - 2064:12
**section** [2] - 1997:7, 2033:17
**see** [16] - 1994:24, 1995:23, 1997:5, 1998:14, 2000:14, 2000:15, 2010:13, 2012:24, 2017:8, 2017:14, 2034:13, 2036:22, 2040:10, 2041:6, 2051:24, 2054:25
**seed** [1] - 2022:8
**seeded** [1] - 2063:2
**seeding** [2] - 2051:9, 2066:13
**seem** [1] - 1999:13
**segments** [1] - 2034:6
**selection** [2] - 2004:1, 2004:7
**selective** [4] - 1999:8, 2009:9, 2009:11, 2010:1
**send** [6] - 2013:14, 2018:21, 2040:19, 2042:3, 2044:16, 2061:10
**sending** [4] - 1996:14, 2012:20, 2018:20, 2040:2
**sensitive** [1] - 2043:6
**sent** [18] - 1994:20, 1994:21, 2000:7, 2000:10, 2013:15, 2016:3, 2020:12, 2020:15, 2021:3, 2040:15, 2040:22, 2041:8, 2041:9, 2042:21, 2044:18, 2044:23, 2060:14, 2063:19
**sentence** [1] - 2005:12
**sentencing** [3] - 2006:5, 2007:13, 2007:24
**separate** [3] - 2007:16, 2042:11, 2050:13
**separation** [1] - 2065:14

**September** [18] - 1995:9, 1996:9, 1996:10, 1999:7, 2000:6, 2002:11, 2010:8, 2012:20, 2012:22, 2015:25, 2018:2, 2027:13, 2028:20, 2030:9, 2035:18, 2039:8, 2050:5, 2063:25
**Session** [2] - 1991:5
**SESSION** [2] - 1991:9, 1994:1
**set** [2] - 2034:22, 2040:2
**sets** [2] - 2013:5, 2042:20
**setup** [1] - 2034:21
**several** [1] - 2000:20
**shared** [3] - 2029:25, 2045:8, 2050:13
**sharp** [1] - 2002:17
**short** [6] - 2019:7, 2044:15, 2056:11, 2067:7, 2067:9, 2068:16
**short-circuit** [1] - 2056:11
**shorter** [1] - 2058:10
**shorthand** [1] - 1992:5
**shortly** [1] - 2024:16
**show** [1] - 2031:4
**showed** [4] - 2011:5, 2013:15, 2037:18, 2051:21
**shown** [4] - 2050:1, 2050:3, 2051:11, 2058:16
**shows** [2] - 1995:9, 2000:6
**side** [2] - 2032:16, 2064:12
**sides** [3] - 2032:16, 2069:22, 2070:23
**sides'** [1] - 2033:6
**significantly** [1] - 2018:5
**silence** [1] - 2009:16
**simply** [2] - 2057:2, 2062:4
**simultaneously** [1] - 1995:6
**single** [2] - 2055:25, 2056:1
**sit** [3] - 2047:17, 2050:22, 2052:7
**sitting** [1] - 2005:14
**situation** [1] - 2049:7
**SKA** [1] - 2014:4
**Skadden** [18] - 2003:6, 2010:15, 2014:4, 2017:16, 2018:7, 2033:22, 2040:3, 2040:17, 2042:24, 2043:6, 2043:11, 2043:13, 2043:23, 2044:2, 2044:4, 2044:9, 2045:9, 2049:19
**Skadden's** [1] - 2043:20
**skip** [1] - 2057:2
**slash** [1] - 2034:24
**slightly** [1] - 2052:1
**snipe** [1] - 2012:2
**solve** [1] - 2056:20
**someone** [8] - 2010:22, 2035:2, 2052:25, 2057:5, 2059:14, 2060:20, 2060:21
**somewhere** [1] - 2050:19
**soon** [1] - 2018:3
**sorry** [12] - 1996:6, 2001:18, 2006:13, 2025:24, 2035:15, 2037:12, 2039:23, 2039:24, 2046:3, 2057:10, 2060:9, 2068:14
**sort** [2] - 2013:4, 2016:16
**SPAEDER** [2] - 1991:20, 1991:23

**speaking** [1] - 2013:16
**Special** [1] - 2047:6
**specific** [9] - 1998:17, 2010:2, 2022:6, 2024:8, 2026:12, 2055:10, 2055:11, 2058:19, 2063:3
**specifically** [6] - 2022:18, 2024:5, 2024:6, 2043:14, 2050:18, 2060:20
**specifics** [1] - 2037:24
**staff** [1] - 2015:13
**stage** [5] - 2008:21, 2028:17, 2037:21, 2037:24, 2038:6
**stakeholder** [1] - 2015:3
**stakeholders** [5] - 2015:1, 2034:12, 2034:19, 2035:22, 2035:25
**stand** [1] - 2066:1
**standard** [2] - 2070:12, 2070:13
**standards** [8] - 2004:8, 2006:3, 2007:15, 2007:21, 2008:12, 2008:14, 2009:4, 2010:4
**standing** [1] - 2006:18
**start** [3] - 2017:18, 2042:20, 2067:22
**started** [1] - 2054:17
**starts** [2] - 2000:23, 2001:9
**state** [1] - 2057:17
**statement** [9] - 1998:9, 1998:16, 1998:17, 2054:18, 2057:15, 2057:19, 2057:20, 2057:21, 2057:22
**statements** [5] - 1997:10, 1997:25, 1998:2, 1998:3, 1998:5
**States** [3] - 2028:7, 2028:8, 2039:2
**STATES** [3] - 1991:1, 1991:3, 1991:10
**statutory** [1] - 2003:4
**stenotype** [1] - 1992:5
**step** [1] - 1999:16
**steps** [1] - 2007:18
**Steven** [2] - 2037:3, 2037:14
**sticking** [1] - 2030:22
**still** [13] - 1994:6, 1995:1, 1995:3, 1995:4, 1997:18, 2001:20, 2022:21, 2022:22, 2030:22, 2036:2, 2036:14, 2037:20, 2067:22
**stipulation** [1] - 2021:2
**stood** [1] - 2065:1
**stop** [1] - 2062:19
**story** [3] - 2022:8, 2036:15
**Street** [3] - 1991:14, 1991:20, 1991:24
**strike** [5] - 2020:6, 2023:3, 2044:21, 2046:17, 2059:11
**stuff** [3] - 2015:15, 2015:17, 2020:2
**subject** [7] - 2007:10, 2024:9, 2026:12, 2026:16, 2026:20, 2027:3, 2064:18
**submitted** [1] - 2067:19
**submitting** [1] - 2069:22
**substantially** [1] - 2004:21
**suffer** [1] - 2005:16
**suffered** [1] - 2005:7
**sufficiency** [2] - 2069:5, 2070:6
**sufficient** [1] - 2010:3

**suggested** [1] - 2059:7
**suggesting** [2] - 2032:3, 2033:7
**suggestion** [1] - 2007:16
**Suite** [2] - 1991:21, 1991:24
**summarize** [1] - 2004:12
**summarizes** [1] - 1997:4
**summary** [7] - 1997:6, 2000:24, 2005:20, 2006:12, 2006:22, 2007:15, 2010:8
**superb** [1] - 2069:21
**supports** [1] - 2064:13
**supposed** [2] - 2058:25, 2063:20
**supposedly** [1] - 2029:13
**sustained** [1] - 2064:25
**sworn** [1] - 1994:12

## T

**table** [1] - 2000:17
**tactics** [1] - 2004:21
**tailored** [1] - 2058:3
**talks** [1] - 2001:2, 2034:21
**tall** [1] - 2067:7
**targeted** [1] - 2056:12
**TAYLOR** [22] - 2012:21, 2053:6, 2053:8, 2053:10, 2053:16, 2054:2, 2054:10, 2056:22, 2057:7, 2057:9, 2057:13, 2058:5, 2063:8, 2064:14, 2064:18, 2065:5, 2068:25, 2069:3, 2069:7, 2070:3, 2070:14, 2070:16
**Taylor** [2] - 1991:22, 2053:13
**team** [8] - 2013:23, 2013:24, 2013:25, 2045:9, 2052:14, 2053:21, 2055:4
**template** [1] - 2027:21
**tender** [1] - 2065:9
**tensions** [1] - 2012:3
**tenure** [1] - 2004:7
**terms** [1] - 2028:2
**territory** [1] - 2032:17
**testified** [1] - 1994:12
**testify** [6] - 2009:1, 2009:2, 2053:23, 2060:22, 2063:14, 2067:8
**testimony** [6] - 2032:18, 2054:3, 2055:9, 2061:19, 2064:6, 2064:14
**THE** [137] - 1991:1, 1991:9, 1991:13, 1994:3, 1994:5, 1996:5, 1997:18, 1997:21, 1998:21, 1999:11, 1999:16, 1999:20, 2000:2, 2000:4, 2001:17, 2002:4, 2002:7, 2003:22, 2005:8, 2005:12, 2005:20, 2006:13, 2006:21, 2007:1, 2007:4, 2007:7, 2010:21, 2011:4, 2012:1, 2016:7, 2016:21, 2016:23, 2017:2, 2019:23, 2019:25, 2021:2, 2021:5, 2021:7, 2021:9, 2025:1, 2025:2, 2026:20, 2026:23, 2026:25, 2027:3, 2027:5, 2027:6, 2027:7, 2031:8, 2031:11, 2031:13, 2031:21, 2031:24, 2032:3, 2033:2, 2033:13, 2035:6, 2035:9, 2035:15,

2038:11, 2038:17, 2038:23, 2039:1, 2039:3, 2042:6, 2042:8, 2042:11, 2042:16, 2045:25, 2046:3, 2047:22, 2049:2, 2049:6, 2051:20, 2051:25, 2052:4, 2052:21, 2052:23, 2053:7, 2053:9, 2053:13, 2053:17, 2054:8, 2054:11, 2055:12, 2055:15, 2055:19, 2056:4, 2056:11, 2056:15, 2056:19, 2056:24, 2057:8, 2057:11, 2057:19, 2058:7, 2058:24, 2059:1, 2059:2, 2059:10, 2059:13, 2059:18, 2059:19, 2059:21, 2059:25, 2060:4, 2060:10, 2060:14, 2060:19, 2061:12, 2061:19, 2062:7, 2062:23, 2063:3, 2063:15, 2064:17, 2064:19, 2065:13, 2066:14, 2066:15, 2067:4, 2067:7, 2067:11, 2068:4, 2068:12, 2068:18, 2068:24, 2069:2, 2069:6, 2069:18, 2070:8, 2070:15, 2070:17
**theme** [1] - 2070:1
**thereafter** [1] - 2065:16
**thinking** [1] - 2065:2
**third** [1] - 2003:10
**thousand** [1] - 2064:19
**threading** [1] - 2070:20
**three** [4] - 2003:22, 2003:23, 2029:19, 2063:7
**throughout** [2] - 2024:4, 2030:16
**tightly** [1] - 2062:8
**tired** [1] - 2025:24
**today** [6] - 2044:14, 2047:17, 2050:22, 2051:1, 2052:7, 2055:23
**together** [5] - 1997:10, 2027:18, 2027:20, 2050:20, 2062:2, 2065:15
**tomorrow** [3] - 2067:20, 2068:23, 2069:4
**ton** [1] - 2063:16
**Tony** [4] - 2029:14, 2045:21, 2046:3, 2046:16
**took** [2] - 2021:20, 2064:2
**top** [4] - 2012:16, 2018:25, 2030:2, 2051:5
**totally** [1] - 2062:2
**Tower** [3] - 2024:11, 2024:16, 2027:9
**track** [1] - 1999:21
**Transcript** [1] - 1992:6
**TRANSCRIPT** [1] - 1991:9
**transcription** [1] - 1992:6
**transmitting** [1] - 1999:17
**transpired** [1] - 2064:7
**travel** [1] - 2014:13
**traveling** [1] - 2050:4
**trial** [14] - 1998:11, 2003:15, 2004:21, 2005:3, 2005:25, 2006:4, 2007:23, 2008:13, 2008:24, 2010:11, 2058:4, 2068:2
**TRIAL** [2] - 1991:5, 1991:9
**trip** [1] - 2050:11
**trips** [1] - 2014:17
**troubling** [1] - 2005:16

**true** [1] - 2058:1
**Trump** [3] - 2024:11, 2024:15, 2027:9
**truth** [3] - 2052:24, 2053:25, 2057:21
**try** [4] - 2012:2, 2036:6, 2058:10, 2067:17
**trying** [11] - 2006:18, 2006:19, 2006:24, 2012:4, 2027:1, 2032:5, 2051:23, 2056:17, 2057:2, 2057:9, 2062:1
**turn** [14] - 1995:10, 1996:14, 1997:9, 2000:12, 2012:15, 2013:7, 2013:19, 2015:23, 2016:3, 2017:24, 2018:23, 2032:7, 2036:13, 2036:20
**two** [11] - 2003:21, 2005:13, 2009:1, 2027:21, 2035:20, 2059:25, 2064:4, 2064:5, 2064:7, 2064:13, 2065:14
**Tymoshenko** [14] - 1998:11, 2003:8, 2003:11, 2004:19, 2006:3, 2007:10, 2007:22, 2008:7, 2008:21, 2009:2, 2009:14, 2010:2, 2010:11, 2043:8
**Tymoshenko's** [3] - 2004:2, 2007:14, 2009:6
**typed** [1] - 2035:6

## U

**U.S** [6] - 1991:13, 1991:16, 1992:3, 2021:7, 2021:15, 2027:25
**UK** [2] - 2020:14, 2020:15
**Ukraine** [10] - 2001:3, 2004:14, 2009:24, 2017:18, 2019:6, 2030:20, 2035:2, 2046:11, 2046:14, 2046:21
**Ukraine's** [2] - 2017:19, 2044:8
**Ukrainian** [4] - 2002:25, 2003:2, 2003:8, 2008:11
**ultimately** [1] - 2059:5
**under** [13] - 1994:7, 2001:1, 2002:25, 2003:8, 2006:2, 2007:9, 2007:15, 2007:21, 2008:14, 2009:4, 2010:4, 2016:13, 2023:5
**undermined** [1] - 2009:3
**underscore** [1] - 2070:17
**understood** [3] - 2003:6, 2026:12, 2036:3
**undertaken** [1] - 2009:16
**undertaking** [1] - 2003:7
**unfair** [1] - 2032:1
**unique** [1] - 2043:16
**UNITED** [3] - 1991:1, 1991:3, 1991:10
**United** [3] - 2028:7, 2039:2
**unjustified** [1] - 2007:13
**unless** [1] - 2067:13
**unlikely** [1] - 2003:17
**unsuccessful** [1] - 2009:18
**untended** [1] - 2032:19
**untimely** [1] - 2008:23
**up** [22] - 2000:14, 2011:7, 2012:16, 2016:15, 2022:22, 2025:19, 2025:21, 2025:23, 2031:19, 2033:19, 2034:22, 2041:18, 2041:21, 2046:22, 2051:21,

2053:17, 2058:2, 2061:6, 2064:3, 2065:1, 2066:1, 2070:5
**update** [1] - 2028:20
**updated** [4] - 2027:21, 2028:12, 2037:11, 2037:13
**updates** [1] - 2048:14
**upper** [2] - 2013:9, 2041:21
**urge** [1] - 2068:1
**useful** [1] - 2038:11
**utmost** [1] - 2069:25
**uttered** [1] - 2055:23

## V

**value** [1] - 2032:23
**van** [9] - 2016:3, 2025:15, 2040:13, 2040:16, 2041:9, 2042:22, 2045:2, 2045:5, 2045:8
**various** [4] - 1997:10, 2001:2, 2014:11, 2048:14
**Veritas** [1] - 1996:16
**version** [13] - 2002:10, 2002:13, 2011:2, 2014:21, 2014:25, 2015:10, 2015:11, 2018:4, 2028:19, 2028:20, 2030:10, 2036:12, 2037:15
**versions** [4] - 2014:22, 2044:24, 2045:3, 2045:11
**view** [1] - 2024:12
**viewed** [1] - 2008:16
**views** [1] - 2069:16
**vigorously** [1] - 2003:1
**Vin** [6] - 2045:23, 2046:5, 2046:6, 2056:1, 2065:14
**violated** [3] - 2004:8, 2008:7, 2017:18
**violation** [4] - 2003:19, 2004:14, 2008:16, 2054:4

## W

**wait** [3] - 1999:11, 2005:8, 2035:6
**waived** [1] - 2065:6
**Washington** [5] - 1991:6, 1991:15, 1991:17, 1991:25, 1992:4
**wearing** [1] - 2032:19
**weber** [15] - 2029:8, 2050:12, 2051:2, 2052:18, 2055:9, 2056:12, 2056:13, 2057:1, 2057:4, 2057:14, 2058:5, 2058:11, 2058:14, 2058:21, 2065:23
**Weber** [7] - 2045:23, 2046:5, 2046:6, 2046:13, 2056:1, 2065:15, 2065:18
**Weber's** [5] - 2055:11, 2056:2, 2056:5, 2057:17, 2057:25
**Western** [8] - 2004:8, 2006:3, 2007:15, 2007:21, 2008:11, 2008:14, 2009:4
**whole** [9] - 2006:13, 2006:19, 2008:6, 2020:22, 2029:2, 2031:22, 2033:17, 2041:9, 2070:10
**William** [2] - 1991:19, 1991:22
**willing** [6] - 2022:20, 2022:21, 2030:4, 2030:5, 2030:6, 2049:23

**wish** [2] - 2029:22, 2031:17
**wishes** [1] - 2008:12
**witness** [12] - 2038:21, 2054:12, 2062:20, 2065:3, 2065:20, 2067:4, 2067:7, 2067:8, 2067:9, 2068:4, 2068:7, 2068:19
**Witness** [1] - 2067:6
**WITNESS** [17] - 1993:2, 2011:4, 2016:23, 2017:2, 2019:25, 2024:17, 2024:20, 2025:2, 2027:5, 2027:7, 2035:9, 2042:8, 2046:3, 2049:6, 2059:1, 2059:18, 2066:15
**witnesses** [9] - 2008:8, 2008:15, 2008:22, 2008:25, 2009:2, 2009:6, 2054:5, 2068:10, 2068:15
**word** [2] - 2002:16, 2055:23
**words** [3] - 2056:5, 2057:25, 2061:9
**worry** [1] - 2022:9
**worst** [1] - 2016:18
**worst-case** [1] - 2016:18
**worth** [2] - 2020:2, 2033:11
**write** [2] - 2010:24, 2065:18
**written** [2] - 2016:17, 2032:1
**wrote** [1] - 2018:21

## Y

**Yanukovych** [1] - 2004:3
**yes-or-no** [1] - 2010:23
**York** [2] - 2021:8, 2037:3
**yourself** [6] - 2011:3, 2025:6, 2036:20, 2040:1, 2044:16, 2048:5

## Z

**zoom** [2] - 2051:5, 2051:13
**ZUCKERMAN** [2] - 1991:20, 1991:23
**Zwaan** [7] - 2016:3, 2025:15, 2040:13, 2041:9, 2045:2, 2045:5, 2045:8
**Zwaan's** [2] - 2040:16, 2042:22